

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ANIBAL CANALES JR., | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -vs- | § | |
| | § | |
| NATHANIEL QUARTERMAN, | § | CIVIL ACTION NO. 2:03CV69 |
| Director, Texas Department of | § | ** CAPITAL CASE ** |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## POST-STAY BRIEFING REGARDING PROCEDURAL STATUS OF MR. CANALES' CLAIMS IN THIS COURT

### INTRODUCTION

Mr. Canales was convicted of capital murder in the 5th Judicial District Court of

Bowie County, Texas. As more fully described in his Petition for Writ of *Habeas Corpus*

(Dkt. No. 7), Mr. Canales was convicted of murdering another prisoner to further the

interests of a prison gang to which he allegedly belonged. The Texas Court of Criminal

Appeals affirmed his conviction and sentence on January 15, 2003. *Canales v. State*, 98

S.W.3d 690 (Tex. Crim. App. 2003). The Texas Court of Criminal Appeals denied Mr.

Canales' application for writ of habeas corpus on March 12, 2003. *Ex parte Canales*, No.

54,789-01 (Tex. Crim. App. 2003). On December 1, 2003, the United States Supreme

Court denied *certiorari* review of Mr. Canales' direct appeal.

On November 29, 2004, Mr. Canales filed his Petition for Writ of *Habeas Corpus*

(Dkt. No. 7) ("Petition") in this Court, and Respondent filed his Original Answer with

Brief in Support (Dkt. No. 12) ("Answer") on June 1, 2005. Respondent argued certain

claims had not been exhausted, and on October 25, 2005, Mr. Canales moved this Court to stay further proceedings and hold his case in abeyance in order to permit him to present his claims to the state court. (Dkt. No. 22). On March 23, 2007, the Court granted this motion over the Respondent's objection. (Dkt. Nos. 24, 31).

On May 22, 2007, Mr. Canales filed a successive petition in Bowie County. Pursuant to Texas procedure, the petition was forwarded to the Court of Criminal Appeals which would determine whether Mr. Canales would be permitted to have the merits of this successive petition considered. On October 17, 2007, the Court of Criminal Appeals ordered Mr. Canales and the State to file simultaneous briefs on the following questions:

> (1) Is *Wiggins v. Smith,* 539 U.S. 510, 527 (2003), new law or such an extension of old law that this Court should hold that it meets the dictates of Article 11.071 § 5?
>
> (2) If *Wiggins* is new law or such an extension of old law that it should meet the dictates of Article 11.071 § 5, under what standard should a court judge the effectiveness of counsel's actions undertaken before the decision in *Wiggins* was announced?

The briefs were timely filed, and on February 13, 2008, the Court of Criminal Appeals denied Mr. Canales authorization to proceed with his successive petition. That court stated:

> We have reviewed the application and the briefs of both parties and find that all of the allegations fail to satisfy the requirements of Article 11.071, Section 5(a). Accordingly, this application is dismissed as an abuse of the writ.
>
> *Ex parte Canales*, slip op., No. WR-54-789-02 (Tex. Crim. App. 2008).

Mr. Canales then timely notified this Court of the state court's decision, and asked for permission to brief the procedural issues now presented in Mr. Canales's case. Based

on the Respondent's Answer, Mr. Canales anticipates Respondent will argue that certain claims Mr. Canales raised in his Petition are procedurally defaulted, and therefore the interests of comity and federalism prevent this Court from granting relief of Mr. Canales's conviction and/or sentence. This brief addresses the current procedural posture of these particular claims.[1]

Petitioners accused of procedurally defaulting their claims can obtain federal review in three primary ways. A petitioner can focus on questions surrounding the application of the state procedural rule by, *e.g.*, illuminating inconsistencies in the application of the asserted state court procedural rule. A petitioner can rebut the presumption that the state court in fact relied upon the procedural rule in reaching its decision. If the state court decision disposing of the claim was intertwined with federal law or was ambiguous, the claim is amenable to federal court review. Or a petitioner can demonstrate his good faith in litigating the case and establish the salience of his legal claims.

This brief sets out why, to the extent a claim may be defaulted, the state procedural rule is ineffective to bar federal court review and relief in this case; the state court opinion should be understood as a ruling not independent of federal law; and, even if the Court finds the state procedural rule sufficient to bar review and relief as to Mr. Canales's other claims, Mr. Canales can establish cause and prejudice sufficient to excuse the default.

I.    **Mr. Canales's Claim of Unconstitutional Shackling Is Not Procedurally Defaulted.**

---

[1] If Respondent asserts a procedural bar as to other claims not discussed in this brief, Mr. Canales will respond to those assertions in his reply brief.

Respondent has argued that Canales did not alert the state court to the constitutional violation underlying the trial court's shacking of Canales during the penalty phase of his trial. (Answer at 49-51). Respondent is incorrect. This federal constitutional issue was presented to the state court before federal habeas proceedings began.

In *Wilder v. Cockrell*, the case relied upon by Respondent, petitioner's only invocation of the federal constitutional violation was "[a] fleeting reference...tacked onto the end of a lengthy, purely state-law evidentiary argument," and even then, it was raised before only the intermediate appellate court. *Id.*, 274 F.3d 255, 260 (5th Cir. 2001). In contrast, Canales' claim demonstrated how intertwined the state and federal constitutional issues were. His state habeas claim, presented to the Texas Court of Criminal Appeals, included an extensive, substantive quotation from *Illinois v. Allen*, 397 U.S. 337 (1970), the leading United States Supreme Court case involving courtroom restraints, regarding how shackles convey to the jury that the defendant is dangerous. SH Pet. at 94. This is sufficient to exhaust this claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (prisoner who presented claim of "effective assistance of appellate counsel" in state court pleadings without indicating whether claim was based on federal or state law could have exhausted claim "by citing in conjunction with the claim ... a case deciding such a claim on federal grounds."). Mr. Canales's claim, whose merits are argued in his Petition and Reply in Support of his Petition (Dkt. No. 21), is therefore ripe for adjudication.

Respondent also argues that a presumption of correctness attaches to the state court's finding that the record indicated that the jurors were unaware of the shackles. *Id.*

.

4

Canales has moved for discovery to develop additional facts surrounding this claim. DE 15 at 15-16. As reflected in the investigators' declarations,[2] Canales believes he can rebut this presumption, as provided for in 28 U.S.C. § 2254(e)(1).[3]

Finally, Respondent was also incorrect in arguing that the application of *Deck v. Missouri*, __ U.S. __, 125 S. Ct. 2007 (2005), is barred by *Teague v. Lane*. 489 U.S. 288 (1989). *Teague* prohibits the application of "new rules," but while Canales' direct appeal was final before *Deck* was decided, *Deck*'s is plainly not a new rule. Indeed, none of the propositions Respondent asserts in support of his contention that *Deck* established a "new rule" is contrary to *Deck*. Respondent asserts that the law established at the time Canales' conviction was final required the reviewing court to focus on whether the shackles created an unacceptable risk of prejudice; scrutinize the use of restraints; balance due process concerns with the State's interest in safety and decorum; and accord the trial judge discretion to determine whether restraints are required. *Answer* at 53.

*Deck* embraced this precedent. *See, e.g., id.*, 125 S. Ct. at 2010-15. The only question at issue in *Deck* was whether the difference between shackling during the guilt

---

[2] Respondent here too raises a complaint suggesting this Court may not consider this evidence. As set forth above, Canales was unable to develop this information in state court because of extremely limited investigation resources. Further, as also set forth above, the investigators' declarations are appropriately submitted in connection with habeas proceedings, and jurors are permitted to testify as to matters such as whether they could see shackles on a defendant. Respondent's complaint that the jurors cannot testify to their own deliberations is irrelevant to this claim.

[3] In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

5

and penalty phases of a capital trial is a "change of circumstance [that] makes a constitutional difference." *Id.*, 125 S. Ct. at 2012.  The Court recounted the established rationale for disfavoring restraints:  they "undermine[ ] the presumption of innocence and the related fairness of the factfinding process;" they "interfere with the accused's ability to communicate with his lawyer;" and they detract from the dignity of the court." *Id.*, 125 S. Ct. 2013.

The Court concluded, "The considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with alike force to penalty proceedings in capital cases.  This is obviously so in respect to the latter two considerations mentioned, securing a meaningful defense and maintaining dignified proceedings." *Id.*, 125 S. Ct. at 2014.  While not implicating the right to innocence directly, "shackles at the penalty phase threaten related concerns... [T]he jury is deciding between life and death.  That decision, given the severity and finality of the sanction, is no less important than the decision about guilt." *Id.* (citation and internal punctuation omitted).  The Supreme Court, drawing on well-established caselaw, did not announce a new rule in *Deck*.

In this case, the trial court did not have what *Illinois v. Allen*, and its progeny, including *Deck*, require, namely a case specific determination that Canales presented a special security need or escape risk.  The trial court simply found that because he had been convicted, Canales lost all right to be in a courtroom unrestrained.   SH FOF 14.  The state court adjudication of Canales' claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" and Canales is entitled to relief on this claim. 28 U.S.C. §2254(d)(1).

## II.      The State Procedural Rule Is Neither Adequate Nor Independent

A federal court reviewing a state court judgment may not reach the merits of the claim where a prior state reviewing court applied an independent and adequate state law ground to deny relief. *Coleman v. Thompson*, 501 U.S. 722 (1991).  To make the determination of whether a state court's resolution of a claim is based on an independent and adequate state ground, a federal court naturally looks to the state court's decision. "When ... a state court decision *fairly appears* to rest primarily on federal law, *or to be interwoven with the federal law*, and when the adequacy and independence of any possible state law ground is *not clear* from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983) (emphasis supplied).  *See also Coleman v. Thompson*, 501 U.S. 722, 733 (1991) (reaffirming the *Long* principle).

When resolution of a state procedural law question depends upon a predicate federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and a federal court may address the merits of the claim. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *Smith v. Texas*, ___ U.S. ___, 127 S.Ct. 1686, 1698 (2007) (a state court's predicate "error of federal law" in resolving a state procedural question does not preclude federal review); *Delaware v. Prouse*, 440 U.S. 648, 652-653 (1979) (state court decision is not based on an independent state ground where the resolution of a state law question involves an interpretation of what federal law requires to state a claim for

7

relief). Under these circumstances, the federal court may review the claim because "[i]f the state court misapprehended federal law, '[i]t should be freed to decide . . . these suits according to its own local law,'" and not under a mistaken interpretation of federal law. *Prouse*, 440 U.S. at 653 (quoting *Missouri ex rel. Southern R. Co. v. Mayfield*, 340 U.S. 1, 5 (1950)).

In short, when a state procedural law question depends, in part, on resolution of a federal constitutional question, a presumption exists that a state court decision is *not* based upon an independent and adequate state ground if the state court does not ***clearly and expressly*** state that its decision is "based on bona fide separate, adequate, and independent grounds." *Long*, 463 U.S. at 1041. *See also Coleman*, 501 U.S. at 733; *Harris v. Reed*, 489 U.S. 255, 266 (1989); *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). As the Supreme Court explained in *Coleman*:

> [F]ederal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state court judgments, ***will presume*** that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman*, 501 U.S. at 734-35 (citations omitted and emphasis supplied). Federal law thus places the burden on the state court to clearly and expressly show the state-law ground of decision if federal review of a claim is to be precluded.

To bar federal review, the state procedural rule must also be "adequate." To be adequate, the rule must be "firmly established and regularly followed." *Ford v. Georgia*,

498 U.S. 411, 424 (1991). "Only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 424 (1991) (*citing James v. Kentucky*, 466 U.S. 341 (1984) (internal quotation marks omitted)). *See also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) (state procedural rules "not strictly or regularly followed" may not bar federal review); *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) ("If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may go to the merits of the claim.").

The adequacy of a procedural ground invoked by a state court is a question of federal law, which can and must be resolved by the federal court itself *de novo*. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("[W]e have consistently held the question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question"); *see also Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) ("The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question...").

Federal courts may not defer to state courts which exploit flux and inconsistencies in their own law in order to deny inmates meaningful review of federal claims unpredictably. *See, e.g., Gosier v. Welborn*, 175 F.3d 504, 507 (7th Cir. 1999) (state court rule inadequate because state courts applied it inconsistently in "incompatible lines of authority," resulting in a "wavering course of state law" that gave defendants no meaningful notice of procedural requirements); *Martin v. Maxey*, 98 F.3d 844, 848 (5th Cir. 1996) (state rule inadequate when state court failed to enforce it in cases similar to petitioner's). The Supreme Court has emphasized that procedural rules bar federal

9

review only when there is no doubt about the existence of the rule and its applicability to the defendant's conduct in the particular case.  *See Lee v. Kemna*, 534 U.S. 362, 377 (2002) (failure to lodge objection when error of judge's ruling was "not in doubt" constituted valid procedural bar).

### A. **The CCA's dismissal of Mr. Canales' claims is not independent and does not preclude this Court from examining his claims.**

In an unsigned *per curiam* order, the CCA disposed of all of Mr. Canales' claims by simply stating:

> We have reviewed the application and the briefs of both parties and find that all of the allegations fail to satisfy the requirements of Article 11.071, Section 5(a).  Accordingly, this application is dismissed as an abuse of the writ.

*Ex parte Canales*, slip op., No. WR-54-789-02 (Tex. Crim. App. 2008).

Prior to 2007, there was virtually unanimous agreement in the courts that an order such as the one in Mr. Canales' case was facially adequate and independent.  In 2007, however, the Texas Court of Criminal Appeals explained its interpretation of the state procedural bar found in Article 11.071, Section 5 and explicitly held that review of successive applications for habeas relief encompass a review of whether there is an "antecedent showing of 'sufficient specific facts'" of a federal constitutional claim to merit further review.

In *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007), the CCA explicated how it conducts a Section 5(a) assessment of a subsequent application where it is alleged that the facts were not available at the time the prior application was filed:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this

article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) *the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence*.

*Id.* at 421.

In other words, despite absence of such language in the state's successor statute, the CCA's subsequent writ jurisprudence entails a ruling on whether a meritorious federal claim has been alleged. As the CCA held in *Campbell*, "Applicant also must jump over the rest of the section 5(a)(1) bar. That is, his application must allege sufficient specific facts that, if proven, **establish a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence**." *Id.* at 422 (emphasis added and internal footnote omitted).

Mr. Canales argued to the CCA that he should be allowed to proceed in state court on his various claims because they were either previously factually or legally unavailable to him and he alleged facts which, if proven, would establish violations of the United States Constitution. Mr. Canales' application was, in fact, dismissed pursuant to Section 5. However, because Section 5 includes a federal component and because characterizing the dismissal as an abuse of the writ does not of its own force constitute an independent and adequate state law ground, this order does not end the inquiry. As discussed above, federal law places the burden on the state court to clearly and expressly show the state-law ground of decision if federal review of a claim is to be precluded. By issuing a brief order that simply stated Mr. Canales' claims were barred by Section 5, the CCA failed to "clearly and expressly" demonstrate that the basis of its decision was a state procedural

11

rule rather than the federal component of Section 5 acknowledged in *Ex parte Campbell*, *supra*.

As the Fifth Circuit explained in *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007):

> This settled principle [of adequate and independent state procedural bars] gives to state courts control over the federal review of their opinions. It has become a rote rule at the fingertips of every writing member of state courts of last resort-where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvertent. Calibrated uncertainty can play a mediating role in garnering support for an outcome. To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's *Wiggins* claim to federal review. At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application. As the CCA is keenly aware, its choice of language was made against a background legal standard-which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ-that is interwoven with federal law.
>
> The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence. The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.

*Id* at 527 (internal citations omitted).

As the Fifth Circuit noted in *Ruiz*, the CCA in Mr. Canales' case could have clearly stated, if it choose to do so, that it was rejecting Mr. Canales' claims on an independent state law basis. It did not, however, and merely issued a boilerplate order that failed to clearly and expressly state the basis of the dismissal. Because a Section 5 dismissal is, by the Court's own explanation in *Ex parte Campbell*, necessarily

interwoven with federal law, this Court must presume the dismissal is not independent and must therefore review the merits of all the claims outlined in Mr. Canales' Petition for a Writ of Habeas Corpus.

**B.  Additional considerations specific to certain claims.**

Even though the non-independence of the CCA's boilerplate dismissal allows this Court to review the merits of each and every one of Mr. Canales' claims, the unique circumstances of several of the claims require further comment.

**1)  The CCA's dismissal of Mr. Canales *Wiggins* Claim was not independent of federal law.**

Even if this Court did believe that the CCA's dismissal in general is independent of federal law, it is clear that the CCA's analysis of Mr. Canales *Wiggins* claim is not. Mr. Canales pleaded his claim and argued that his claim was previously legally unavailable. In response, the CCA ordered both parties to brief the following issues:

> (1) Is *Wiggins v. Smith,* 539 U.S. 510, 527 (2003), new law or such an extension of old law that this Court should hold that it meets the dictates of Article 11.071 § 5?

> (2) If *Wiggins* is new law or such an extension of old law that it should meet the dictates of Article 11.071 § 5, under what standard should a court judge the effectiveness of counsel's actions undertaken before the decision in *Wiggins* was announced?

*Ex parte Canales*, 2008 WL 383804 (Tex. Crim. App. 2008). After the briefing was complete, the CCA, without further comment, issued a boilerplate order dismissing Mr. Canales' claim pursuant to Section 5.

As discussed above, because Section 5 contains a determination of whether a meritorious federal constitutional claim for relief has been alleged, a boilerplate dismissal cannot be presumed independent of federal law. The basis of the CCA's dismissal of Mr.

13

Canales' *Wiggins* claim is even more ambiguous and intertwined with federal law.   In addition to the determination of whether a potentially meritorious federal constitutional claim was presented, the CCA requested additional briefing and considered what standard should be applied for judging "the effectiveness of counsel's actions undertaken before the decision in *Wiggins*."   It cannot be disputed that this question is inextricably intertwined with federal law; namely, the well-known standard of *Strickland v. Washington*, 466 U.S. 668 (1984).   The CCA held no oral argument, issued no opinion or other comment on the issues after the additional briefing was submitted and ultimately issued its boilerplate order citing Section 5.  Without further explanation or a dismissal citing a state procedural rule, the CCA's order strongly suggests that it debated and potentially resolved Mr. Canales' *Wiggins* claim on federal law grounds.  At best, the CCA's dismissal, "leaves the decisional path far short of the clarity insisted upon by *Michigan v. Long*,...of which the CCA is acutely aware." *Ruiz, supra*.   Under these circumstances, this Court must presume that the CCA's decision is not independent of federal law and must reach the merits of Mr. Canales' *Wiggins* claim.

### 2) The CCA's dismissal of Mr. Canales' state misconduct claims were neither adequate nor independent.

The Fifth Circuit has specifically determined, in the context of a state misconduct claim, that the CCA's unclear Section 5 dismissal is not independent of federal law. *In re Johnson*, No. 07-20546 (5th Cir. July 27, 2007)(attached as Appendix 1).  In that case the Fifth Circuit rejected application of a procedural default asserted by the CCA to a *Brady* claim, stating:

> This Court "will not apply a procedural default unless the last state court to consider a particular claim 'clearly and expressly' relied on an independent and adequate state ground."   *Emery v. Johnson,* 139 F.3d

14

> 191, 195 (5th Cir. 1997)(quoting *Coleman v. Thompson,* 501 U.S. 722,
> 735 (1991)).  Because  we do not find that the Court of Criminal Appeals
> order contains such a clear and express statement, we decline to find the
> claims procedurally barred.

*Id.*

Furthermore, the CCA's application of Section 5 to Mr. Canales' state misconduct claims is not adequate.  "State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar cases." *Hawthorn v. Lovorn*, 457 U.S. 255, 262-63 (1982)(quoting *Barr v. City of Columbia*, 378 US. 146, 149 (1964), Accord *Dugger v. Adams*, 489 U.S. 401, 410-11 n.6 (1989).  Procedural rules that are applied inconsistently will not divest a federal court of jurisdiction. *See James* v. *Kentucky*, 466 U.S. 341, 348-349 (1984) (only "firmly established and regularly followed state practice . . . can prevent implementation  of federal constitutional rights"); *Barr* v. *City of Columbia*, 378 U.S. 146, 149 (1964) (state procedural rules "not strictly or regularly followed" may not bar review); *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 457-458 (1958) ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.").

The CCA's invocation of an abuse of the writ to avoid reviewing Mr. Canales' state misconduct claims is not a regularly followed rule. *See Ex parte Toney,* No. 51,047-03 (Tex Crim. App. 2007) (authorizing successive proceedings on, inter alia, *Brady* and *Napue* allegations) ; *Ex Parte Reed*, No. 50,961-03 (Tex. Crim. App. 2005) (authorizing successive proceedings on *Brady* allegations); *Ex parte Rousseau*, No. 43, 534-02 (Tex. Crim. App. 2002) (authorizing successive proceedings on a claim that the State withheld impeachment evidence of eyewitness and evidence of innocence); *Ex parte Washington*,

No. 35, 410-02 (Tex Crim. App. 2002) (authorizing successive proceedings on claim that the State withheld information regarding criminal records of punishment phase witnesses and presented false and misleading testimony); *Ex parte Murphy*, No. 30.035-02 (Tex. Crim. App. Sept. 13, 2000) (authorizing successive proceedings on a claim that prosecutors relied on perjured testimony); *Ex parte Faulder*, No. 10,395-03 (Tex. Crim. App.  June 9, 1997) (authorizing successive proceedings on a claim that prosecutors allowed witnesses to testify falsely and withheld exculpatory evidence); *Ex parte Nichols*, No. 21,253-02 (Tex. Crim. App. Apr. 16, 1997) (authorizing successive proceedings on a claim that prosecutors withheld the correct name address of a witness with exculpatory information).

The CCA made no effort, as required, to clearly and expressly announce the basis of its dismissal in Mr. Canales' case and thus this Court cannot but assume that the Section 5 dismissal in Mr. Canales' case is not regularly applied.  Indeed, examination of the underlying claims reveals that the rule is not regularly applied.  In fact, several of the cases, including *Toney*, *Washington*, and *Rousseau* were allowed to proceed in subsequent proceedings to litigate *Brady* claims based on evidence discovered through public records requests and a thorough review of documents previously available to prior counsel.  There is no meaningful distinction between these cases and Mr. Canales' which could explain the boilerplate dismissal in his case.  If anything, Mr. Canales can better demonstrate the prior unavailability of the misconduct claims than several of the prior cases authorized by the CCA.  Because the procedural bar in Mr. Canales' case has not been firmly established or regularly followed, this Court has jurisdiction to reach the merits of his claim.

3)   **The CCA's dismissal of Mr. Canales' juror misconduct claims was not based on an adequate state procedural rule**

The CCA has not regularly and consistently applied its state procedural bar to subsequent claims raising juror misconduct claims.  Although such claims are less frequently raised in state successor applications, the CCA has allowed such claims to proceed in successor litigation.  In *Ex parte Gibbs*, No. 23-624-03 (Tex. Crim. App. April 5, 1999) (attached as Appendix 2), for example, the CCA authorized a claim regarding a juror's deceptive voir dire answers and sent it back to the district court for further factual development.  The CCA provided no explicit reasoning for dismissing Mr. Canales' juror misconduct claims and in light of the CCA's inconsistent application of the procedural bar to juror misconduct claims, this Court has jurisdiction to reach the merits of his allegations.

**III.   Regardless of the independence and adequacy of the state procedural rule, Mr. Canales can demonstrate the cause and prejudice excusing any default of his remaining claims.**

Even if the Court rejects Mr. Canales's argument that the state procedural rule is inadequate to bar review of his claims in federal court, it should find that Mr. Canales has established cause to excuse any default, and that the underlying federal constitutional violation was actually prejudicial.  By establishing cause and prejudice, Mr. Canales is entitled to have any procedural default excused.  "Cause" has been defined as any "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. at 488.  A petitioner can demonstrate cause if "the factual or legal basis for a claim was not reasonably available to counsel." *Coleman v. Tompson*, 501 U.S. 722, 752 (1992).  To establish prejudice, the

petitioner must establish the complained-of constitutional error caused actual prejudice to his case.

STATE MISCONDUCT

### A)      Mr. Canales's <u>Brady</u> claims

In deciding whether a *Brady* claim satisfies the cause and prejudice exceptions to procedural default, the Court need simply consider whether it meets the criteria for a meritorious *Brady* claim.

> We set out in *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999), the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S., at 281-282. "[C]ause and prejudice" in this case "parallel two of the three components of the alleged *Brady* violation itself." *Id.*, at 282. Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes. 527 U.S., at 282.

*Banks v. Dretke,* 540 U.S. 668, 691 (2004).

As set out in Mr. Canales' Petition for Writ of *Habeas Corpus* ("Petition") and reply in support (Dkt. # 7 and # 21), Mr. Canales has demonstrated the State suppressed the evidence at issue, and that it is material, and in so doing, has established cause and prejudice to excuse procedural default.

1.  <u>The State's Suppression of Exculpatory Evidence and False Representations to Mr. Canales's Counsel Constitute Cause.</u>

As detailed below, the prosecution in this case failed to disclose extensive benefits to witnesses and voluminous documentation impeaching their credibility.

18

Further, in words strikingly similar to the Texarkana prosecutor's statement in *Banks* (who promised to "provide [ ] with all discovery to which you are entitled" *id.*, at 674-75), the prosecutor in this case indeed provided *further* reassurance:

> **There's absolutely nothing that we have not disclosed in discovery. We've gone way above what they're entitled to, and I'm just trying to forego any problem later, someone saying we held something back.**

SR 3:21.

Given the prosecutor's strong and unequivocal statement, "it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld," *Strickler*, 527 U.S. at 285.   In fact, as trial counsel attest, extensive information was suppressed. *See* Docket Entry # 19, Exhs. 1 & 2 (affidavits of trial counsel Harrelson and Hoover).   Only in the course of federal post-conviction proceedings did the State disclose to Mr. Canales's counsel the voluminous evidence it suppressed at trial.  This suppression constitutes cause to excuse Mr. Canales's default, as it was plainly an external, objective factor that accounts for his failure to raise this claim sooner. As the Supreme Court noted in *Banks*, fundamental values of our criminal justice system compel the conclusion that this kind of suppression constitutes cause to excuse a default:

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. ...  The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence," *Tr. of Oral Arg.* 35, so long as the "potential existence" of a prosecutorial misconduct claim might have been detected, *id.,* at 36.  A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. "Ordinarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). We have several times underscored the "special role played by the American prosecutor in the search for truth

19

in criminal trials." *Strickler*, 527 U.S., at 281. Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." *Berger*, 295 U.S. 78, 88 (1935). Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. *See Kyles*, 514 U.S. 419, 440 (1995), ("The prudence of the careful prosecutor should not ... be discouraged.").

*Banks* at 696 (some citations omitted).

2.  This Suppression was Prejudicial

Suppression is prejudicial for the purposes of the cause and prejudice analysis if it is material for *Brady* purposes. *Banks*, 527 U.S., at 282. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 514 U.S. 419, 115 S.Ct. at 1565; *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564; *Adams*, 768 S.W.2d at 290. The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Petitioner is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 115 S.Ct. at 1566-1567. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 1566. Second, materiality analysis *"is not a sufficiency of the evidence test."* *Id.* (emphasis added). The Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict [or return a sentence of death]." *Id.* One demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (footnote omitted); *see also Lindsey*

20

*v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness's testimony). Third, harmless error analysis is not applicable to *Brady* violations. *Kyles*, 115 S.Ct. at 1566. The *Kyles* Court stated, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.* Finally, materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Kyles*, 115 S.Ct. at 1567. As is discussed herein, when the suppressed evidence in Mr. Canales' case is considered collectively, as it must be under *Kyles*, there is a reasonable probability that the result of his sentencing proceedings would have been different.

3. The Suppressed Evidence:  Witnesses About Whom The State Failed To Disclose Benefits And Deals

 *a. Bruce Innes*

Bruce Innes was a crucial witness for the State at both the guilt/innocence and the punishment phase. Through Innes the State presented letters allegedly written by Mr. Canales explaining his participation in the murder of Dickerson and trying to put out a hit on a State witness. However, because Mr. Canales' defense was denied important impeachment evidence regarding Mr. Innes, the jury was unable to place Mr. Innes in the proper context. The evidence regarding Mr. Innes that was suppressed by the State included:

> ·   Evidence demonstrating Innes' renunciation of his gang affiliation was not true and that he was simply seeking the benefits conferred by not being labelled as a gang member;

> ·   Evidence that Innes received favorable treatment in prison contraband cases such as possessing a weapon;

> ·   Evidence that the relationship between SPU and Innes was ongoing and multifaceted whereby Innes was receiving Unit transfers and other

benefits in exchange for his cooperation, including the solicitation of incriminating evidence;

· Evidence that SPU not only agreed to the deal revealed to the defense but that SPU agreed to continue to advocate for him including sending favorable recommendations to the parole board;

· Evidence that Innes was allowed to speak to other State witnesses and corroborate their stories; and

· Evidence that Innes' testimony about how he received Mr. Canales' incriminating letter was false and that the State knew his testimony was false.

Although these violations standing alone would undermine confidence in the jury's verdict in Mr. Canales' case, taken together they illustrate the inherent unreliability of all the State's inmate witnesses.

### i.   Continued Gang Ties

Innes presented himself to the jury as an ex-gang member who, because of pangs of conscience, came forward and assisted in the prosecution of the murder of Dickerson. Although Innes did admit that he was pending sentencing for two offenses, a major theme on cross-examination, his complete and sundry history was never revealed. When asked why he decided to go to the authorities he responded:

> Well, that's kind of a complicated question, but I felt like that it was possible that they got the wrong person, and not only that, my romanticized ideas of being in the Texas Mafia were destroyed. I mean, you know, it woke me up – you know, murder – it's all well and good to want to be Al Capone and all of that, but to actually know that you're involved in something that's taking people's lives, is – it's pretty heavy, so –

SR 10:40.

Contrary to the impression he gave the jury, Innes seemed to have little problem with the violence of prison gang life. On December 23, 1996, for example, Innes and two

others attacked another inmate with their fists and "an oblong stone approximately 6" in length, 2 ½" in circumference, with one end blunt, and the other end pointed." Exh.  15[4] (Incident Report and memo).  As a result of their attack, the inmate "received 5 puncture wounds to the lower back, a 4" laceration to the back of his head which required 13 stitches, and multiple bruises and contusions to the face and forehead." *Id.*  The jury was never informed of Innes' attack on this inmate.

Even though the State presented Innes as an ex-gang member who had apparently had become disillusioned with prison gang life after Dickerson's murder, the State never revealed the detail surrounding Innes' gang renunciation or the substantial benefits an inmate gains from disassociation with a prison gang.  Documents in the DA' s file obtained by undersigned counsel demonstrate that Innes sought not only reduced sentences on his pending charges, but also gang declassification as a condition for his cooperation with the murder investigation.  TDCJ officials had apparently agreed to Innes' declassification early in 1998.  On June 1, 1998 A.P. Merillat of the SPU Unit contacted Records/Classification and informed them he was leaving it up to Innes "as to whether or not he wants the de-confimation process started, or if he wants to lay low and provide us information on the gang."  Exh. 47 (SPU letter 6/15/98).  Innes was still seeking benefits of deconfirmation in 1999 and 2000.  On September 3, 1999, a Telford Unit printout shows that "offender Innes has requested to be reclassified as an ex member, but claims that special proscecutor's [sic] office has instructed him to keep in

---

[4] To streamline the already-extensive documentary record in this case, Mr. Canales has not attached the cited exhibits with this pleading.  All the citations to exhibits correspond to the exhibits filed with this Court in connection with his Petition.  Mr. Canales would be happy to file another set of exhibits if so directed by the Court.

contact with TM members (for purposes concerning the homicide)." Exh. 42 (Telford

Unit printout).

> An I-60 also demonstrates Innes' belief that he should no longer be treated as a
> gang member: Capt. Scott, I have requested to be reclassified as an X-member of
> the TM. Due to my cooperation in a capital murder investigation involving
> several member, so that my file reads as me being de-confirmed & that my seg.
> status be changed to protective custody, instead of security detention as threat to
> staff & inmates.

Exh. 48 (I-60 from Innes).

Moreover, SPU was allowing Innes to seek the benefits of deconfirmation despite

evidence and even TDCJ employee's strong concern that he had not renounced

membership. Lonnie Eason, another TM member providing information to SPU, wrote

to A.P. Merillat in July of 2000 noting that Innes had not given up his gang activity.

According to Eason, Innes "has been constantly representing T.M. matters and has been

pure 'Gun Ho.'" Exh. 49 (Letter of Eason). He also asks Merillat to "Just tell Innes to

leave T.M. Alone & lay low, He's outta there with em when he Testify's anyway!" *Id.*

TDCJ's concerns about Innes' renunciation are reflected in a letter dated June 2000, well

after Innes had supposedly "renounced affiliation." The Estelle Unit copied a letter from

Innes to a "District Major"of TM named James Nicholas. Attached to the letter, a TDCJ

employee queries:

> Please note: According to I/M Innes O [illegible] screen he is supposed to
> be on the TM "Hit list" if he was why would he be writing the District
> major a letter like this?

Exh. 50. This information, which directly undermined Innes' assertions that he was no

longer involved with the gang, was never supplied to the defense. Moreover, because

this information was known to the State, the prosecution violated *Napue* by failing to

correct the false impressions Innes presented to the jury regarding Innes' revelations of conscience.

### ii.  Special Treatment Regarding Crimes Committed In Prison

Innes' cooperation with SPU gained him other advantages which were also suppressed by the State.  Innes, for example, was not subjected to prosecution for taking a metal shaft from his fan and hiding it in a pipe chase, an action which normally be considered concealing a shank.  After "catching a case," Mr. Innes wrote to Merillat:

> I was without a radio & I had a pair of headphones.  My neighbor offered
> to connect me if I could come up with some wire & help him get his radio
> open.  So I broke my fan down for the coil of copper wire inside & I used
> the metal shaft that [illegible] is on to make a screwdriver out of to try &
> break the triangle shaped screws.  Well it didn't work & I threw away, or
> tried to, in the back vent...

Exh. 51 (Innes 10/7/99 Letter).

> Merillat responded:

> Regarding the recent case you spoke of where a fan was disassembled and
> part of it was put in the pipe chase – just because a disciplinary case was
> written, it does not mean that our office will file criminal charges.  We
> have no control over the disciplinary process within TDCJ.  However,
> when IAD comes to us to file charges in criminal matters, we screen each
> case individually, giving consideration to each element of the case.
> Simply calling an item a weapon does not guarantee that the SPU will go
> to the grand jury seeking indictment.  Yes, I know that fingernail clipper
> can be called a weapon, and we have prosecuted inmates for less than that
> _but_ –  we have _only_ done that when the facts showed that the defendant
> intended the item to be a weapon.  So, the facts that you provided make a
> big difference in how we would look at the case.

Exh. 52 (SPU 10/14/99 Letter).

Thus, even though SPU admittedly has prosecuted inmates for having less than a fingernail clipper, in Innes' case SPU simply chose to believe his version of events and nothing was pursued.  This information was never revealed to the defense.

### iii. Ongoing relationship between SPU and Innes

The relationship between Innes and the SPU was much more complicated than the State portrayed at trial.  Although the State admitted that they had cut a deal with Innes in exchange for his testimony, the communications between both parties reveal that there were continual intricate and subtle negotiations.  Innes, for example, wrote to SPU from Midway, Texas (likely the Ferguson Unit) in July of 1999 stating:

> Mr. Merillat I'm not just dead weight to you, as you can see by the info –
> I'm asking you to help me get transferred <u>A.S.A.P.</u>  I will continue to
> prove useful & help full, [sic] But if I have problems I expect your help
> too.

Exh. 53 (Innes 7/7/99 Letter).

He wrote again in October of 1999 when he suddenly believed that the State had retracted its deal.  Since the last letter Innes had been moved to the Wynne Unit.  He wrote:

> Also I get a letter from State Counsel for Inmates and it's a plea offer on
> the New Boston cases!  But I'm being offered 10 on one case & five on
> the other to run CC.  But I was told by Mr. David P. O"Neil (also runs
> State Counsel for offenders) that the agreement for my copperation [sic] &
> testimony & the letters I had, would be 3 yrs. & the weapons charge
> dropped.

Exh. 51 (Innes 10/7/99 Letter).

Merillat, acknowledging the unit change, reassured Innes:

> I got your letter, and previously heard that you were on the Wynne Unit.  I
> recall our phone call when you were housed at Telford, and you advised
> me that Wynne would be agreeable for housing.  Now, we are not going
> back on anything...let me know who promised you what as far as
> agreements on your pending cases.  I have not been involved in any
> negotiations, deals or anything of that nature.  If someone made promises,
> let me know *who* it was so I can pursue that.

Exh. 52 (SPU 10/14/99 Letter).

A letter to Innes, this time signed "A.P.", dated June 12, 2000 makes clear that Innes is still in an active working relationship with SPU.  He states:

> I got your letter and the Stiner information today.  Thanks for sending those documents.  I have not heard anything about the Canales letters or any ramifications about the letters you sent him.  I was hoping he might make some admissions, etc., but evidently not.

Exh. 46 (SPU 6/12/00 Letter).

By July 2000, Innes was already having difficulty at the Wynne Unit and requesting another change.  Merillat wrote back offering to help:

> I got your letter today.  I have made moves toward getting you somewhere else.  They aren't real supportive of my asking for particular units, but I'm willing to give it a go.

Exh. 54 (SPU 7/12/00 Letter).

On November 6, 2000, almost immediately after Mr. Canales' trial, a SPU investigator wrote TDCJ's Bureau of Classification, asking it to "honor [the prisoners'] request" to be moved to specific units.  Innes, along with the other State's witnesses, was on this list. Exh. 76.

These documents, which were never revealed to the defense, demonstrate that Innes' relationship with the State far exceeded simply getting a deal on his pending felonies.  Innes was continually receiving benefits from the prison system in exchange for actively seeking out evidence to use at Mr. Canales' trial.  This partnership even included illegally soliciting incriminating information from Mr. Canales himself. *See infra.*  Had the jury been aware of this information, Innes' testimony would have been placed in proper perspective: that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to make his time in prison easier.

### iv.  Collaboration between State witnesses

Unbeknownst to the defense and the jury, the State had placed Innes together with another witness thus providing an opportunity to compare information. This classic type of impeachment evidence was not disclosed to the defense.

An April 4, 2000, letter from Larry Whited indicates that he and Innes are in solidarity and working for SPU. In the letter Whited recounts how he and Innes have compared and corroborating each other's stories. Whited mentions that he and Bruce Innes went to the John Sealy Hospital in Galveston together:

> But anyway, we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile) and I found out a whole lot about some of the things that've been going on with the infamous Texas Mafia since I've been gone. Which is good for me because "To Know Is To Be Prepared." If you know what I mean.

Exh. 55 (Whited 4/4/00 Letter). Whited also reveals more of Innes' incentive to cooperate:

> Which reminds me, A.P., the dude ask me to talk to you about helping him go on and get out of Seg so he can get somewhere to do his time, so even though I already know that there isn't a whole lot you can do, I'm still going to go on and try to do this because I gave him my word that I would. Not to mention the fact that if you'de [sic] have seen his face when he ask me, well, you'de [sic] have probalby [sic] done the same thing. (smile) He wants to come to population and be on the same farm as I am , A.P. Which to be honest, isn't really a bad idea since we're in this particular boat we are in.

*Id.*

### v.  State's Continued Support Of Inmate Witnesses

Despite acknowledging only that the State agreed to a deal with Innes about his pending felonies, documents now revealed strongly suggest that other promises were made. After the trials were completed, for example, SPU provided letters to the Texas Board of Pardons and Parole on behalf of inmates Baker, Canida, Innes, Hill, Henson,

Driver and Rice and provided a letter to Sammy Buentello for Innes regarding gang renunciation. Exh. 56. No documents have been disclosed to the defense regarding any promises or deals involving the parole board. It is possible that such documents do not exist despite such promises being made. Several letters from A.P. Merillat regarding inmate Eason illustrate how SPU so effectively suppresses this information. In December 1999, Merillat wrote to Eason:

> Now, what I must make clear is that no moves or benefits will be done in exchange for helping us. That would amount to payment to some people, and we do not do that. If anyone ever asks what you "got" for helping the State, you can honestly answer that we have only promised you protection, nothing else. If that ever changed, you would have to answer with whatever benefit you received.

Exh. 57 (Merillat letter to Eason).

> The same day Merillat wrote to Sammy Buentello stating:

> Eason has cooperated with the Special Prosecution Unit in case preparations for the Dickerson murder case out of the Telford Unit. He has requested that we send you this copy of his renunciation. This is provided for any consideration you deem appropriate. Please call if you have any questions.

Exh. 58 (Merillat letter to Buentello).

These transactions, conducted with a wink and a nod, seem fairly well understood by inmates. In Whited's chatty letter of April 4, 2000, he lets Merillat know that he would really like a radio:

> I've got somebody who'll send me a radio just like the one that got took from me. It has all the T.V. stations and is a clock radio. It'll be brand new, still in the box, coming directly from the store is gets bought at... I know you can't just bring it up here to me without asking somebody first but I'm hoping you might be able to pull some strings and get someone in Huntsville to approve you giving it to me. **Your office reputation will still remain untarnished as far as your never having to pay witnesses for testimony and all that...** All you have to say is that you're replacing a

radio that was destroyed by people who don't want to see me take me stand, and it's a clock radio, medium size, and leave it at that.

Exh. 55 (Whited letter).

### vi.  False Testimony About Receiving The Letter From Mr. Canales

Innes also provided perhaps the most damaging evidence against Mr. Canales when he testified to witnessing Mr. Canales pass him a "kite" containing a confession to the murder.[5]

Q:          Alright, so on this particular day you told Canales you wanted a blow by blow description in a kite of what happened?

[Innes]:     Yes

Q:          Now, did you get it that day?

[Innes]:     I got it the next day.

* * *

[Innes]:     Yes, I asked him if he had that for me, and he said, yes, I've got it, and I said, well, hang on just a second and I'll shoot the line out there to you and you can tie it on the line.

Q:          Alright, explain to the jury what you mean by "shooting the line."

[Innes]:     A line is thread taken from a waistband from the elastic of underwear, braided or twisted into a handmade rope, in sections of eight or ten foot, and then there's any type of weighty object attached to the end of it.  The doors in Ad Seg only have about an inch or an inch and a half of space underneath, so it has to be something flat, and you just slide it out there to the day room, and that way you can pick stuff up, and send stuff.

Q:          Alright, you said the sections of string might eight to ten foot.  Can a string – is that the longest it can be?

[Innes]:     Oh, no.  There's lines long enough to go all the way around six stations.

---

[5] The length of the excerpt reproduced below demonstrates the amount of time and attention the State devoted to Innes allegedly receiving a kite from Mr. Canales.

Q:           Alright, they just keep tying strings?

[Innes]:     Uh, huh (yes).  They just keep adding them on – tying them on.

Q:           And – okay.   Is that a way for inmates to pass things among
             themselves?

[Innes]:     Sure.

Q:           Now, did you shoot a line over to the day room where Mr. Canales
             was?

[Innes]:     Yes, I did.

Q:           Did you live on the first row or the second row?

[Innes]:     I lived on the second row.

Q:           Alright, did the line make it over to near the day room?

[Innes]:     Yes, right by the bars.

Q:           Was Mr. Canales able to reach the line?

[Innes]:     Yes, he was.

Q:           Explain how Mr. Canales was able reach the line if you were on
             the second row?

[Innes]:     Well, if you'll notice where the door is – the day room door –
             where the bars come into a "V" – an inmate would – Mr. Canales
             would climb up the bars and stand about even with the 2-Row tier
             floor, and specifically that area right there is blind to the picket, so
             you know, just climb up there – climb up the bars, and I'd slide the
             line to him, and he'd reach out and grab it, and tie whatever he
             had.

Q:           Okay.  Did Mr. Canales climb up those bars?

[Innes]:     Yes, he did.

Q:           Did he get hold of your line?

[Innes]:     Yes, he did.

31

Q:          Did he put anything on your line?

[Innes]:    He tied a written kite to me on the line.

Q:          Did he pull the line back in your cell?

[Innes]:    Yes, I did.

Q:          Did you read the kite?

[Innes]:    Yes, I did.

* * *

Q:          Mr. Ennis, do you recognize State's Exhibit 27?

[Innes]:    Yes, this is the –

Q:          –no, no.  We're going to take this step by step.  Be very careful.
            Do you recognize it?

[Innes]:    Yes, I do.

Q:          When is the first time you ever saw State's Exhibit 27?

[Innes]:    The day that Mr. Canales tied this onto my line.

Q:          Is that the kite you received from Mr. Canales?

[Innes]:    Yes, it is.

Q:          Did you see Anibal Canales tie that kite onto your string?

[Innes]:    Yes, I did.

Q:          Did you pull it into your cell?

[Innes]:    Yes, I did.

Q:          And did you read it?

[Innes]:    Yes, I did.

SR 10: 28-33.

32

The importance of the letter was emphasized by the prosecution, which relied on it almost exclusively in its closing argument:

> The problem for Mr. Canales, is that they didn't back any of theirs up with anything.  They got a couple of inmates to come and say, naw, I know where he was – I know what he was doing, but they didn't back it up.  I did.  I backed up our testimony with the most damning piece of evidence I could have imagined, and there it is, and you will have this with you in the jury room, and if you don't, you may ask for it.  This is the letter.  This should convince you that Anibal Canales killed Gary Dickerson.

SR 11: 136.  The State spent the remainder of closing presenting an exegesis of the letter.

Despite the almost agonizing detail presented to the jury about how Innes came into possession of the letter, the State never revealed that Innes had given a previous account which directly contradicted his trial testimony.  Furthermore, the State never corrected Innes' false testimony.

In early 1998, as Innes was facing several criminal charges, his lawyer Dave O'Neil approached SPU about providing evidence in exchange for a deal.  SPU, initially, would not guarantee anything.  Exh. 59.  A few weeks later, O'Neil again contacted SPU and informed them that Innes had "**access** to a letter written by suspects." *Id*. (emphasis added).  The details surrounding the letter became clearer the following day when Innes was interviewed directly by SPU.  During that interview, Innes informed SPU that he **neither possessed the letter nor received it.**  SPU's notes of this interview state:

> Letter
>     written by Canales
>     **Another inmate has the letter - he's not involved @**
>     **all – will have to get the letter from him**
>     **Another inmate rec the letter from Canales**
>     This inmate sent me the letter to see it
>     The letter is step for step how the letter [sic]
>     went down.
>     The letter is in Canales' handwriting

Exh. 60 (SPU notes) (emphasis added).

Thus Innes' claim before the jury that he had Mr. Canales write a letter and that he watched as Mr. Canales tied the kite on a string was completely fabricated.  Had this evidence been properly disclosed and/or had the State discharged its duty to inform the jury that one of their main witnesses was testifying falsely, the jury would have had a very different view of the State's case and the investigation of Dickerson's murder.  *See e.g. Kyles v. Whitley*, 514 U.S. 419, 445 (1995) ("Damage to the prosecution's case would not have been confined to evidence of eyewitnesses, for [the suppressed evidence] would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well.").

  b.     *Steven "Beaver" Canida*

The State went to great lengths to assure the jury that its key eyewitness, Steven Canida, had obtained no benefits in exchange for his testimony:

Q:              Have you ever talked to me or any other prosecutor about any cases?

[Canida]:      No, sir, never.

Q:              Have I ever offered you any kind of a deal?

[Canida]:      No, sir.

Q:              Have you ever asked me for anything

[Canida]:      No, sir.

Q:              Well, as a prosecutor – you understand I work for TDCJ, right?

[Canida]:      Yes, sir.

Q:          Is there something I can do to help you?

[Canida]:   No, sir, ain't nothing – not that I know of.

SR 10:114.

In fact, Canida did receive substantial benefits from the State for his testimony. On November 6, 2000, just weeks after Canida testified, SPU wrote to the Board of Pardons and Parole on Canida's behalf.  Exh. 56 (Inmate witness correspondence note). Canida was paroled the following July, having served only 11 years on a 50 year sentence. Exh. 61 (Canida criminal history).

Further, upon information and belief, Canida's cooperation with the State enabled him to diminish significantly his sentence and incarceration on a subsequent offense. Although an apparent candidate to be prosecuted under as a habitual offender[6]– indeed it was because it was his third felony offense that when he testified against Mr. Canales, Canida was serving a 50 year sentence for Delivery of Marijuana in the Second Degree[7] – when Canida was convicted of another felony in 2002, he was sentenced to only 10 years, and served only one year before being paroled.   Exh. 61 (Canida criminal history).

The extent of Canida's involvement and cooperation with authorities has not yet been fully revealed.  Mr. Canales has not been given access to internal TDCJ documents regarding Canida, correspondence from Canida to TDCJ or other documents that would explain Canida's favorable treatment.  Under separate cover, Mr. Canales is moving for discovery of the information necessary to fully prove this claim.

    *c.*     *Larry Whited*

---

[6]  TEX. PENAL CODE §12.42.

[7] SR 10:79.

35

Larry Whited did not testify at Mr. Canales' trial nor at Mr. Speer's subsequent trial for the murder of Dickerson. Whited, however, appears to have been instrumental in developing and investigating the case against Mr. Canales. Whited was one of the first inmates to contact authorities and offer help in exchange for various benefits. On July 27, 1997 Whited wrote:

> If you want to talk to me about this, then you take me away from here first. I do not care about your threats about refusing to cooperate. I will. But under my conditions (and parole is not one of them).

Exh. 62 (Whited 7/27/97 Letter).

By April of 1998, SPU was already helping Whited become declassified as a gang member. According to a letter from the SPU chief prosecutor:

> Larry Whited #575256 has cooperated with the State of Texas in the investigation of the murder of inmate Dickerson which occurred at the Telford Unit in July 1997. Inmate Whited, previously confirmed as a Texas Mafia member, has provided valuable information against that gang, including details of how and why the killing was carried out, background information of gang activity at the Telford Unit and other information crucial to the prosecution of this murder case, which was a Texas Mafia hit on Dickerson... Please consider the possibility of classifying inmate Whited as "Ex-Texas Mafia," if this would be appropriate in light of his cooperation.

Exh. 63 (SPU 4/22/98 Letter). After Mr. Canales was convicted, SPU wrote the Texas Board of Pardons and Parole on behalf of Whited, noting that although he "[d]id not testify, but cooperated." Exh. 56 (Inmate witness correspondence).

Whited's role in the investigation and prosecution of Mr. Canales is not entirely clear. However, it appears that much of the original prosecution theory may be attributable to Whited's contact. Such a role would not be inconsistent with the manner in which TDCJ is known to develop prison cases. As State witness Doyle Wayne Hill stated:

> They interviewed those of us who were in administrative segregation first because TDCJ assumed the killers would have had to clear it with us first, since the leaders of the gang were in administrative segregation. You knew that in this situation, a lot of people are going to say whatever, whether they've seen something or not. There are just that many prisoners looking to make a deal... If the prosecutors have no evidence, they just get one or two prisoners to write a statement. They just tell them what to say and give them good time.

Exh. 64 (Declaration of Hill).

Whited's extensive contact was not revealed to the defense prior to trial and has only been partially disclosed to undersigned counsel. Under separate cover, Mr. Canales moves for further discovery to fully prove this claim.

        *d.*     *Richard Driver, Jr.*

Richard Driver was another witness that provided a purported link between Mr. Canales and the death of Dickerson. Driver claimed that he saw Canales speaking to Constadine, Speer and Barnes prior to the murder, an important fact to pursue a combination theory of prosecution. Driver, however, gave multiple versions of the events he supposedly witnessed, each changing significantly from the last. *See* discussion *infra*. The extent of Driver's participation with authorities has never been fully disclosed although it is clear from SPU's noted that prosecutors wrote the Texas Board of Pardons and Parole on his behalf. Exh. 56 (Inmate witness correspondence).

As the foregoing discussion demonstrates, Mr. Canales can show the necessary cause and prejudice to overcome any potential procedural default of his *Brady* claims. This Court should, therefore, examine the merits of Mr. Canales' claims.

**B.**     **Mr. Canales's Other Claims of Prosecutorial Misconduct**

Just as the State's suppression of crucial exculpatory and impeaching evidence constitute cause for Mr. Canales's inability to present his *Brady* claims to the state court,

so too does it constitute cause for his inability to present his *Massiah* and *Napue/Giglio* claims to the state court. The information giving rise to these claims was contained in the same prosecution file that contained the *Brady* information. Further, Mr. Canales can establish prejudice as these claims are plainly meritorious.

### *Massiah*

Bruce Innes was the star of the State's case, presenting two powerfully inculpatory notes alleged written by Mr. Canales. He provided the only testimony alleging any statement or admission from Mr. Canales regarding the Dickerson murder. Unbeknownst to defense counsel, and in violation of *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980), at the time he gathered these statements, Innes was acting as an undercover agent of the State. This fact was never disclosed to the defense and was discovered only upon review of documents from the State's file recently disclosed to undersigned counsel.

### 1.      Governing Legal Standard

The test for a violation under *Massiah v. United States*, 377 U.S. 201 (1964) is whether the Government "deliberately elicited" information from a defendant in custody and under indictment. The "deliberate" requirement is met even when the Government agent/informant is instructed not to initiate conversations with the defendant, but to act passively and merely "pay attention to information" given in the course of ordinary conversation that will implicate the defendant. *United States v. Johnson*, 954 F.2d 1015 (5th Cir. 1992). Any time the government intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel, it has violated the Sixth Amendment. *See United States v. Henry*, 447 U.S. 264 (1980).

Any statements of a defendant so obtained, must be excluded from trial. *Massiah*, 377 U.S. at 207.

### 2.    Factual Background

In early 1998, in Ad Seg and the target of a SPU prosecution himself, Innes supplied SPU with two incriminating "kites," one allegedly from Mr. Canales and one from Speer, which became crucial pieces of evidence in the prosecution's case against Mr. Canales.[8]  Realizing that Innes provided a ready conduit into TM activity and the circumstances surrounding Dickerson's murder, the State began cultivating Innes as a source of valuable evidence.  Over the three years between the murder and Mr. Canales' trial, Innes became an important agent for SPU.  Because SPU actively used Innes' position as a trusted member of the Texas Mafia to solicit incriminating correspondence from Mr. Canales in violation of *Massiah* and its progeny, Mr. Canales is entitled to habeas relief.

Although it is currently unclear when Innes was first approached about collecting information for the State, he was certainly acting as an agent for the State starting sometime around July 11, 1997, the date of the murder and January 28, 1998.  Sometime in January 1998, Innes requested a meeting with a TDCJ Security Threat Group officer, which occurred on January 28, 1998. Exh. 34.  At that meeting, Innes stated:

> Lt. Dodson, Telford IAD, had requested any information or kites that inmate Innes had pertaining to the homicide of inmate Dickerson, Gary #587361, shortly after the incident occurred, but that inmate Innes denied knowing anything regarding the incident..  However, inmate Innes now admits that all though [sic] he did not have any prior knowledge of the situation, he sent a kite to both inmate Canales, Anibal #696334, now

---

[8]  Mr. Canales alleges in this claim that this first letter was also obtained illegally. Mr. Canales has previously moved for the discovery necessary to fully prove his claim.

> C/TM, AKA: Bigfoot/Jewboy/Dobie; and inmate Spper, William
> #668485, S/TM, AKA: Say Puff; asking what happened.

*Id.* Innes then said that he had given the original kites to his attorney to assist in a plea

bargain. *Id.*

Innes continued to work actively for SPU and TDCJ investigators, fueled on by

Innes' "desperate need," *supra*, to escape Ad Seg – where he had been living since at

least July 1997 – and the State's eagerness to obtain the information Innes was acquiring.

Two undated I-60 requests clearly demonstrate Innes was acting as an agent for

SPU.  In one, after asking to be moved, Innes wrote:

> As you know I'm a witness for special prosecution unit & was gathering
> information as a member of TM.

Exhibit 35 (I-60).  He reaffirmed his role in another I-60:

> As you know I'm a cooperating witness in a murder case for the State  the
> special prosecution division & A.P. Merillat.   I've been gathering
> information a member of TM..."

Exhibit 36 (I-60).

In exchange for his cooperation, SPU agreed to "de-confirm" Innes but expressed

internal concern about losing his ability to surreptitiously collect information about the

gang.  By mid-1998, Innes also recognized the tension between becoming de-confirmed

and his ability to retain bargaining power.   Worried about losing his informer-agent

status, Innes wrote to SPU June 18, 1998:

> Dear Mr Merillat,
>
> I just received your letter of June 18[th] 98. Thank you for responding.
>
> Okay- first order of business. Good [I] want to be (de-confirmed) the
> question I have is, **will they do this even if they want me to milk my
> situation with TM. Until the last? Which I'm still corresponding for**

**info** in other words or must I cut all ties immediately to be de-confirmed. I am willing to help in what ever capacity officials want me to.

Exh. 37 (Innes 6/18/98 letter to Merillat) (emphasis added).

The SPU, however, was not so willing to let Innes become declassified since he was so eagerly and effectively gathered information for the State.   Although Innes desperately wanted to be deconfirmed and begin accruing those benefits, Merillat recognized how Innes was of unique use to the State and worked with TDCJ investigators to identify further opportunities for Innes to inform:

> I received a letter from inmate Innes yesterday, June 23, 1998.  In his letter, Innes states that he does want the process to have him 'de-confirmed' from the Texas Mafia started.  Innes relates that he is willing to 'work' either or both of our offices in any way we can use him. **He will correspond with gang members as usual, *if you want him to*, in order to help expose/uncover their activities, or do whatever is best**.  Innes is presenting a valuable, unique opportunity to possibly do some major damage to the TM's business.

Exh. 38 (Merillat 6/24/98 letter to Cheatham) (emphasis added).

Later that year, Innes wrote to Merillat to let him know that he had "cut all contact with any and all Texas Mafia Members," and had "tried to get the Unit Mail Room (return to sender) all inmate mail because the only inmates writing me are gang members." Exh.  39 (Innes 7/25/98 letter to Merillat).  In response to the mail room's failure to follow his request, Innes wrote an I-60 to "get help in this matter!" and also requested a letter from Merillat to show or give to Classification to let them know he was co-operating with SPU. Exh. 36.  For whatever reason, Innes was clearly still receiving correspondence from other prisoners by June 1999.  That month, Merillat wrote Innes a reminder:

> Please remember to keep any correspondence you get from inmates threatening you. It would be beneficial to try not to handle letters too

much, as there might be a possibility of lifting prints from them. Let me know if you have anything like that, and I'll make arrangements to pick them up and have them processed.

Exh. 40.

In August, Innes again reminded TDCJ his work for SPU in his continued attempt to have TDCJ deconfirm him:

So I contacted the special prosecutors office & Huntsville & offered to give my cooperation in solving & testifying in the case.  I have been providing information to Special Agent A.P. Merillat . . . He will verify my cooperation.

Exh. 41 (Handwritten Statement by Bruce David Innes regarding his application to the Gang Renunciation Unit, 8/16/99).

A Wynne Unit sergeant also reminded the Wynne Security Threat Group office of Innes' undercover work for the State:

Offender Innes has requested reclassification as an ex member, but claims that **special prosecutor's office has instructed him to keep in contact with TM members (for purposes concerning the homicide)**. You may want to contact Mr. C. Dodson, Telford IAD, regarding any questions you have concerning this situation.

Exh. 42 (Telford Unit Memo: Sgt. D. Johnson to Wynne STG: 9/3/99) (emphasis added).

In 2000, Innes' fishing for incriminating correspondence apparently bore fruit as he purportedly received a letter from Mr. Canales which he claims puts a hit on a prosecution trial witness.  SPU investigation notes reveal that:

D wrote Innes, advising that he (D) thought Whited had snitched.  Canales writes Whited needs to be hit – either by TM or another gang.  (APM) **Sent Innes letter asking him to correspond w/ Canales** (see copy).

Exh. 43 (SPU notes).

On March 13, 2000, Merillat notified Gang Intelligence at the Wynne Unit about Innes' assistance:

> Innes provided that letter to me, and he, at my request agreed to correspond with Canales to confirm authorship of the letter, attempt to obtain details of actions against our witnesses, information on the Dickerson killing, etc.

Exh. 44 (Merillat 3/13/00 Letter).    Merillat also makes clear that this relationship has

been ongoing:

> For several months, inmate Innes has been corresponding with me, providing information on TM activities, background information on the gang, and he has assisted our office with intelligence surrounding the killing of Dickerson and the persons responsible for the murder.

*Id.*

When Innes began having difficulty because his mail was being confiscated

because of its gang material, SPU became even more directly involved by essentially

becoming a mail carrier for Innes.  Innes wrote to Merillat:

> I'm glad to be of service to you in the getting of information! But I've had several letters denied by the unit gang intelligence officer – Mr. Sgt Burson - Man it must be really confusing to these people because, I claim to be an X- but they see these gang related letters coming and going to me!
> …
> The fact that I am only in contact at the request of S.P.U. and that they should not hold any writing against my de-confirmation process, because it is at this time damaging that process and it makes me look like a liar.

Exh. 33 (Innes 3/6/00 letter to Merillat).    Merillat quickly began to make special

arrangements for Innes' mail.   He faxed a letter to Burson and personally spoke to

another sergeant:

> Letter from Innes re: SPU asking him to correspond w/ Canales to prove authorship, get info on this case etc. Innes needs SPU to let Sid @ (WY) know, so they won't think he's trying to keep patch, etc. APM faxed letter to SFT. Burson.
>
> 3/13/00 (APM) Spoke to Sgt. Kirb - S. L. @ (B.1) re: Canales writing to/from Innes. **He will allow Innes letter through, & advise APM regarding any corresp. from Co.Ds.**

Exh. 43. Merillat also began sending the actual letters to Mr. Canales that were allegedly

from Innes. Having established a more reliable mail system, Innes now became worried

that his value was drying up. Concerned that he was not getting any response to his letter

to Canales, Innes wrote to Merillat:

> I wrote to Canales about the issue of taking 'Iron' out and **sent it to you to
> you to mail out**, I never heard from him or you! I wrote him directly to
> see if he got the letter and again reiterating that Iron issue - never got word
> back!? I'd like to ask if there is any witness list as evidence been made
> available to the defense because if so and I'm on it, it could be the reason
> he's not responding.

Exh. 45 (Innes 6/4/00 letter to Merillat).

On June 12, 2000, Merillat wrote Innes expressing his disappointment about the

most recent attempt at collecting incriminating evidence:

> Dear Bruce,
>
> I got your letter and the Stiner information today. Thanks for sending
> those documents. I have not heard anything about the Canales letters or
> any ramifications about the letters you sent him. I was hoping he might
> make some admissions etc., but evidently not. As far as a witness list, we
> haven't sent one out yet, Mr. Mullin and I are holding off as long as we
> can.

Exh. 46 (Merillat 6/12/00 letter to Innes).

Mr. Innes did receive a letter purporting to be from Mr. Canales in June. The

State relied heavily on this letter, ostensibly calling for a "hit" on another gang member,

during the punishment phase of the case.

### 3.    Argument

The extensive correspondence among Innes, TDCJ investigators, and SPU

investigators make clear both Innes' continuous efforts to produce information to the

State so that he could be taken out of Ad Seg, as well as the State's intent to have him

seek out this information.  Using Innes in this way clearly violated *Massiah* and its progeny.

In *United States v. Henry*, the Supreme Court distinguished between the jailhouse informant as "listening post," *i.e.*, one who was instructed only to "overhear conversations," and the inmate who as a government agent "deliberately and surreptious[ly] interrogates" the defendant.  447 U.S. at 276 (Powell, J., concurring) (internal punctuation omitted).  Innes' role far exceeded that of overhearing conversations, and instead constituted an on-going campaign to obtain information the State sought.  Indeed, the State's role in facilitating this effort – as demonstrated, for example, by the fact that it was mailing Innes' interrogating letters for him – reveals how enmeshed Innes' inquiries were with the State's.

Further, as the Supreme Court noted in *Illinois v. Perkins*, Innes was perfectly situated to elicit especially incriminating statements from Mr. Canales.  "[W]here the suspect is incarcerated, the constant threat of physical danger peculiar to the prison environment may make him demonstrate his toughness to other inmates by recounting or inventing past violent acts." 496 U.S. 292, 307 (1990).  Assuming *arguendo* that Mr. Canales in fact wrote one or both of the letters to Innes, he would have been aware of Innes' status in the TM, and would have had reason to "demonstrate his toughness" to him.

Innes, therefore, clearly acted as a government agent in asking Mr. Canales questions about matters of interest to the State, and his conduct falls in the heartland of conduct prohibited by *Massiah*.  These statements were also clearly damaging.  They were the only statements the jury heard ostensibly from Mr. Canales.  In both the

guilt/innocence and the punishment phases of the trial, the State used these letters as the centerpiece of its argument.   These illegally obtained letters incontestably had a substantial and injurious effect on the verdict and actually prejudiced Mr. Canales. Because Mr. Canales can demonstrate cause and prejudice to overcome any procedural default of this claim, this Court must examine the merits of Mr. Canales' claim.

**C.**   ***Giglio v. United States* and *Napue v. Illinois***

Under *Giglio* and its progeny, a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.  *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.1996), (citing *Giglio v. United States*, 405 U.S. 150 (1972)); *Napue v. Illinois*, 360 U.S. 264 (1959); *Cordova v. Collins*, 953 F.2d 167 (5th Cir. 1992).  Due process also is violated when the prosecution allows the jury to be presented with a materially false impression.  *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States v. O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997). "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications."  *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979).

In order to obtain relief under *Giglio*, Mr. Canales must show that (1) the testimony in question was actually false, (2) the State knew it was false and (3) the testimony was material.  *See Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998); *O'Keefe*, 128 F.3d at 893; *Faulder*, 81 F.3d at 519.  "False evidence is 'material' only "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83

46

F.3d 714, 726 (5th Cir.1996), *cert. denied*, 117 S.Ct. 773 (1997).  It is immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness.  *O'Keefe*, 128 F.3d at 893; *Barham*, 595 F.2d at 241-42.  Even if there is sufficient evidence in the case to support a guilty verdict, it is the jury, and not judges, that is the body given the constitutional responsibility to decide guilt or innocence.  *Barham*, 595 F.2d at 242.  Habeas relief is warranted if there is a reasonable likelihood that the false testimony could have affected the jury's determination. *Bagley*, 473 U.S. at 678-79 & n.9; *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir.), *cert. denied*, 119 S.Ct. 359 (1998).[9]

Moreover, *Giglio* relief is warranted for false evidence that affects the jury at the punishment phase, as well as evidence that affects the guilt/innocence phase.  *See, e.g.*, *Moody*, 139 F.3d at 484 (discussing *Napue/Giglio* claim regarding allegedly false expert testimony at punishment phase on subject of future dangerousness); *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1998) (discussing claim regarding allegedly false testimony by punishment phase witness).  Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of **one juror** could have been changed with respect to the imposition of the sentence of death."  *Kirkpatrick*, 992 F.2d at 497 (discussing Louisiana law) (emphasis added).  Clearly the State's suppression of this evidence actually

---

[9] This standard is "considerably less onerous" than the standard for relief under *Brady v. Maryland*, 373 U.S. 83 (1963).  The *Brady* standard requires a showing of a reasonable probability that the result of the proceeding would have been different if the evidence in question had been disclosed to the defense.  A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome of the proceeding.  *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (citing *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

prejudiced Mr. Canales and thus he can establish cause and prejudice to overcome any procedural default.

**D.      The Procedural Default of the Claim of Cumulative Error Stemming from State Misconduct and Ineffective Assistance of Counsel Should Be Excused**

As set forth above, both Mr. Canales's claims of state misconduct and of ineffective assistance of counsel are entitled to this Court's review.  For the reasons those claims warrant review, this claim of cumulative error also warrants review.

**E.      The Procedural Default of the Claims of Juror Misconduct Should Be Excused**

**1.      The State's Suppression of Information Regarding Criminal Investigations of and Proceedings Against Two Jurors, Along with the Jurors' Own Concealment of Relevant Facts, Constitutes Cause To Excuse Default.**

In the material disclosed by the State to Mr. Canales's federal habeas counsel, undersigned counsel discovered handwritten notations in the prosecution's file that strongly suggest that two (and perhaps three) jurors lied under oath regarding their prior criminal history.  Because of the apparently early stages of the investigation of the jurors, Mr. Canales's trial counsel would not have been able to find this information on their own.  This constitutes cause to excuse the default.

Two of the jurors – Mr. Rawson and Mr. Miller – answered the following question under oath on the juror questionnaire:

> Have you or any member of your family ever been arrested or charged with any crime other than a traffic offense?

Exh. 67 (Questionnaires of Rawson and Miller).  Each answered in the negative. *Id.*

However, in the prosecution file, a list of veniremembers reflects notations by different names.  Next to Mr. Rawson's name, the prosecutor noted, "been arrested for

hot checks" and "inv. pending."  Exh. 70 (State's juror list).  Next to Mr. Miller's name, was written "hot checks" and "inv. pnd."  *Id.*[10]  Thus despite each of these men's disavowals, at least one, and perhaps both, had been arrested for something other than a traffic offense.  Moreover, each of these men was currently **under investigation**.  At no point did the State, despite their actual knowledge of these arrests and pending investigations on their juror list, never brought to the Court and counsels' attention that these jurors were concealing relevant facts.

Further, a juror's withholding of material information can also constitute cause. In *(Michael) Williams v. Taylor*, 529 U.S. 420 (2000),[11] the Supreme Court considered whether a petitioner could be blamed for failing to raise in his state post-conviction proceedings a claim that a juror was biased, based on the fact that she withheld the fact that she had been married to the lead detective (and witness) in the case.  The Court of Appeals for the Fourth Circuit stated that the claim could have been discovered if the state postconviction lawyers had searched the county marriage records.  The Supreme Court rejected this argument:  "Because of [the juror's and knowledgeable prosecutor's] silence, there was no basis for an investigation into [the juror's] marriage history."  529 U.S. at 443.

It is true that in *Williams*, state habeas counsel had sought and been denied funds in state court to investigate another juror, but the Supreme Court clearly did not find that

---

[10] Steve Matlock also has a notation which states: "he's been arrested several times – reckless driving, etc." and "no conv." *Id.*  To the extent that any of the other of the "several times" he was arrested was for something other than a traffic offense, Mr. Canales incorporated Mr. Matlock into this claim.

[11] In this case, the Supreme Court analyzed whether a petitioner had "failed to develop" a claim of juror bias for the purposes of Section 2254(e)(2), but made clear that that analysis "should suffice to establish cause for any procedural default."  529 U.S. at 444.

motion dispositive of the question. The petitioner had made only "vague allegations" of "as yet undeveloped claims," and the State could certainly deny funding for this investigation. *Id.*, 529 U.S. at 443-44. The problem was that the individuals in the courtroom who knew the truth remained silent and the claim was necessarily undeveloped. *Id.* at 443. In Mr. Canales's case, there is no reason to believe state postconviction investigation into the jurors would have enabled him to develop his claim. None of the information presented in this claim emerged from the interviews Mr. Canales's investigators were able to obtain. All of it came from the prosecution file. There was no reason for state postconviction counsel to divert scarce investigation resources onto a claim he had no basis to believe existed.

### 2. Juror Dozier's Concealment of Relevant Facts Constitutes Cause.

Mr. John Dozier served on the jury which convicted Mr. Canales of capital murder and sentenced him to death. Prior to his selection, he completed a juror questionnaire under oath that asked him the following:

> 30.   Have you or any member of your family ever been convicted of a crime other than a traffic offense?

> 32.   Have you, a family member, or someone close to you ever spent time in jail or a penitentiary?

*See* Exh. 65 (Dozier Juror Questionnaire).

Mr. Dozier answered all these questions "no," except in answer to Question 31, whether he had ever been arrested or charge with any crime other than a traffic offense. He admitted he had, but claimed that the record had been expunged. *Id.*

Upon information and belief, Mr. Dozier was arrested and convicted of battery in the second degree in Miller County, Arkansas.  Mary de la Rosa reviewed court records pertaining to Mr. Dozier in Miller County.  She states:

> In the Criminal Fee Book "U" at the Miller County Courthouse in Texarkana, Arkansas, there is an entry under the name of John Dozier on page 325.  The Criminal Fee Book indicates a case name and number – *State v. Dozier*, No. CR 81-310 – and a charge, Battery in the 2nd Degree.

Exh. 66 at ¶ 5 (de la Rosa Decl.).

Ms. de la Rosa asked to see the court file corresponding to this entry, but the clerk of the court was unable to locate the file corresponding to the Criminal Fee Book entry. Exh. 66 at ¶ 6.  According to Arkansas law, had this conviction been expunged, all mention of it would have been removed from any publically available file.  In addition, all records regarding that conviction would be preserved by the court, albeit not in a publically accessible place.

> (e)    (1) The clerk of the court shall remove all petitions, orders, docket sheets, and documents relating to the case, place them in a file, and sequester them in a separate and confidential holding area within the clerk's office.
>
> (2)    (A)  A docket sheet shall be prepared to replace the sealed docket sheet.
>
> (B) The replacement docket sheet shall contain the docket number, a statement that the case has been sealed, and the date that the order to seal the record was issued.
>
> (3) All indices to the file of the individual with a sealed record shall be maintained in a manner to prevent general access to the identification of the individual.
>
> (f) Upon notification of an order to seal records, all clerks, arresting agencies, and other criminal justice agencies maintaining such conviction records in a computer-generated database shall either segregate the entire record into a separate file or by other electronic means ensure that the sealed record shall not be available for general access unless otherwise authorized by law.

A.C.A. § 16-90-904 (e) & (f).

As with Rawson, Miller and perhaps Matlock, Juror Dozier's apparent concealment of important details regarding his criminal history constitutes cause. While information regarding this claim did not come from the prosecutor's file, the emergence of the other juror claims provided the basis for investigating the Dozier claim.

### 3. Mr. Canales Can Establish Prejudice For Relief on These Claims

If Mr. Dozier, Rawson, and Miller in fact have criminal convictions and/or arrests, their failure to answer relevant questions truthfully raises the inference that they sought to conceal these facts because they had an actual bias in the case.

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court set out the federal standard for evaluating claims that a party had been denied his constitutional right to an impartial jury. The defendant must demonstrate (1) that a juror failed to answer honestly a material question on *voir dire*, and (2) that a correct response would have provided a valid basis for a challenge for cause. *Id.* at 556. The Supreme Court has made clear that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi*, 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted). Accordingly, the presence of a biased juror can never be harmless, and "the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d 970, 972 n. 2 (9th Cir.)(en banc), *cert. denied*, 119 S.Ct. 575 (1998) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-310 (1991)).

The fact that the juror lied is itself indicative of bias.  "[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *McDonough Power Equipment, Inc.*, 464 U.S. at 556 (Blackmun, J., concurring). *See also United States v. Boney*, 977 F.2d 624, 633-34 (D.C. Cir. 1992) (hearing into possible bias required where juror failed to acknowledge prior felony conviction on juror qualification form; juror's lack of candor "presents serious concerns," because it "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality"); *Dyer*, 151 F.3d at 979 (juror's "lies give rise to an inference of implied bias on her part."); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) ("Mrs. G. was dishonest is her response to questions on voir dire – this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonestly, of itself, is evidence of bias."); *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989) ("Willingness to lie about [potentially disqualifying fact] exhibited an interest strongly suggesting partiality"); *United States v. Scott*, 854 F.2d 697, 699-700 (5th Cir. 1988) ("certainly when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's right to a fair trial."); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984) (juror's "dishonesty, in and of itself, is a strong indication that he was not impartial."); *Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir. 1982) ("a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief"); *McCoy v. Goldston*, 652 F.2d 654, 659 (6th Cir. 1981) ("A district judge shall presume bias where juror deliberately concealed information").

As one court explained:

> If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror – to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions – with equal scorn. Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process. How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity? Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer* at 983.

### 4.    The Eighth Amendment's Mandate Of Heightened Reliability Prohibits Upholding A Death Sentence Rendered By These Jurors.

While a juror's misconduct has always concerned the courts, it takes on added significance in the context of a death penalty case.  Because the penalty of death is qualitatively different from any other punishment, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (O'Connor, J., concurring).  One of the most important and consistent themes of the Supreme Court's death penalty jurisprudence is the "emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner." *Barclay v. Florida*, 463 U.S. 939, 960, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983) (Stevens, J., concurring); *see Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980) (noting that, because death is different, "we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination").  Accordingly, the severity of the sentence that Mr. Canales faces demands that this Court apply "careful scrutiny in the

review of any colorable claim of error." *Stephens v. Zant*, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1982).  This admonition is especially true when the claim of error involves the right to a fair trial, one of the primary means of ensuring that a jury render its verdict "based only on the evidence subjected to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir.), *cert. denied*, 502 U.S. 953 (1991).

### 5.    The Jurors' Misconduct Requires Reversal Of Mr. Canales' Conviction And Sentence.

"[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.  The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi*, 481 U.S. 658, 668, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987) (citations and internal quotation marks omitted).   Accordingly, "the presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.  Like a judge who is biased, the presence of a biased juror introduces a structural defect not subject to harmless error analysis." *Dyer v. Calderon*, 151 F.3d at 972 (*en banc*) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)).

#### PRAYER FOR RELIEF

WHEREFORE, petitioner ANIBAL CANALES, JR. prays that this Court:

1.  Consider the merits of each of the claims set forth in Mr. Canales' Petition for a Writ of Habeas Corpus;

2.  Grant such other relief as the ends of justice may require.

Respectfully submitted this 23rd day of June, 2008.

_/s/ Morris H. Moon_____
Morris H. Moon
Texas Bar No. 24032750
Texas Defender Service
412 Main St, Ste. 1150
Houston, Texas 77002
Tel: (713) 222-7788
Fax: (713) 222-0260
mmoon@compassnet.com

_____
Meredith Martin Rountree
Texas Bar No. 24033544
Law Offices of
Owen & Rountree, L.L.P.
Post Office Box 40428
Austin, Texas 78704
Tel: (512) 804-2661
Fax: (512) 804-2685
meredithmr@earthlink.net

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing *Post-Stay Briefing Regarding Procedural Status of Mr. Canales' Claims in This Court* upon counsel for Respondent by sending same via CM/ECF:

> Asst. Attorney General Thomas M. Jones
> Office of the Attorney General
> Postconviction Litigation Division
> Office of the Attorney General
> P.O. Box 12548
> Capitol Station
> Austin, TX  78711

this 23rd day of June, 2008.

_/s/ Morris H Moon_____