IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ANIBAL CANALES, JR.,

      Petitioner,

          v.                                                     CIVIL ACTION NO. 2:03CV69

NATHANIEL QUARTERMAN, Director,          **\*CAPITAL CASE\***
Texas Department of Criminal Justice,
Correctional Institutions Division,

      Respondent.

---

## PETITIONER CANALES'S MOTION
## FOR ADDITIONAL DISCOVERY
## AND MEMORANDUM OF LAW IN SUPPORT

Comes now Petitioner, ANIBAL CANALES, Jr. by and through his attorneys of record, Meredith Martin Rountree and Morris H. Moon, and pursuant to Rule 6(a) of the Rules Governing Section 2254 Cases, *inter alia*, presents this Motion for Additional Discovery, and in support thereof would respectfully show this Court the following:

### I.  Introduction

This Court granted in part Petitioner Canales's *Motion for Discovery*, ordering the depositions of the jurors and four prisoner witnesses in *State of Texas v. Anibal Canales, Jr.* (Docket Entry ("DE") 42).  In that order, the Court permitted Petitioner to move the Court for the remaining requested discovery at the conclusion of the ordered depositions.

Mr. Canales hereby renews his original request for discovery.  While slightly modified to reflect information gained in the course of the recently-completed depositions, Mr. Canales reurges the bulk of his original discovery requests as necessary to enable Mr. Canales to complete the record of prosecutorial misconduct with respect to

the prisoner witnesses, particularly Bruce Innes, the State's crucial witness against Mr. Canales.

In addition, based on the juror depositions, Mr. Canales moves for limited additional discovery to explore very narrow issues relating to three jurors in this case, as well as the conduct of the court and bailiff during jury deliberations.

## II.    Legal Standard for Discovery

Rule 6(a) of the Rules Governing Section 2254 Cases permits a district court to grant discovery once a petitioner makes a "good cause" showing that information he intends to seek under the federal rule **could** support his claims for relief.  Although Mr. Canales believes he has made the requisite prima facie showing, a petitioner does **not** have to demonstrate a prima facie case for relief in order to establish good cause. As the Supreme Court has indicated, discovery is precisely what is needed in many instances to make the prima facie case petitioners are entitled to develop once they present well-pleaded claims based on specific allegations.  *See Bracy v. Gramley*, 520 U.S. 899, 905 (1997).

In *Bracy*, the United States Supreme Court unanimously reversed the lower courts' denial of discovery, even though the Court found Bracy's argument that discovery would support his theory for relief was admittedly "speculative" and "only a theory at this point."  *Id*. at 905, 908.

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is… entitled to relief, it is the duty of the courts to provide the necessary facilities and procedure for an adequate inquiry.

*Murphy v. Johnson*, 205 F.3d 809, 813-14 (5th Cir. 2000) (internal citation and punctuation omitted).  *See also Calderon v. United States Dist. Ct.* 144 F.3d 618, 622 (9th

Cir. 1998) (Rule 6(a)'s 'good cause' standard satisfied by showing that requested discovery would bolster constitutional claim and that claim is not "purely speculative or without any basis in the record");  *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1095 (N.D. Ill. 1999) (discovery warranted where petitioner did "not rely on bare unfocused allegations).  Mr. Canales has met the requirements of Habeas Rule 6(a) and is entitled to discovery as set forth below.

### III.     Juror and Jury Deliberation Issues

### 1.   Undisclosed Experiences with the Criminal Justice System

Mr. Canales alleged in his petition for writ of habeas corpus that several jurors were biased and falsely answered questions about their criminal background.  DE 7 at 116-22.   As the Fifth Circuit's decision in *Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005), makes clear, even if a juror is **not** lying, the bias stemming from a juror who faces criminal charges himself at the time of the trial on which he sits as a juror can be so great that it is objectively unreasonable to sustain a conviction and death sentence in light of it.

The juror depositions revealed that three jurors failed to disclose in their sworn juror questionnaires their contacts with the criminal justice system.  The questionnaires specifically asked whether the veniremember had ever been arrested or charged with any non-traffic offenses, or had spent time in jail.   In the course of the depositions, these three jurors provided relatively vague accounts of their run-ins with the law, consequently requiring limited additional discovery of law enforcement records.

For example, Juror Steve Matlock acknowledged being arrested pursuant to a warrant in 1986 for theft over $50, reportedly because of a bank error.  For this he spent

the night in jail.  He was released from jail the following morning after paying a fine. Appendix 1 at 20-22 (*Deposition of Steve Matlock*).  Mr. Matlock also acknowledged a warrant had issued for his arrest in a separate matter.  Appendix 1 at 19 (*Deposition of Steve Matlock*).  On his juror questionnaire, Mr. Matlock had responded that he had never been arrested or jailed.  Appendix 2 (Juror Questionnaire of Matlock).  During his deposition, he sought to explain this inconsistency:  "An arrest, in my mind, is when I am arrested, charged and convicted of a crime."  Appendix 1 at 25 (*Deposition of Steve Matlock*).

Juror John Dozier recalled being handcuffed by police, taken to the Bowie County jail, where he was fingerprinted and required to post some kind of bond.  This occurred soon after James Prince defeated Mary Choate for Bowie County Sheriff in 2000, but before Prince had been sworn in.  Appendix 3 at 22-25 (*Deposition of John Dozier*). Upon information and belief, this means Mr. Dozier's arrest and jailing occurred shortly after the March 2000 Bowie County Democratic primary.  In his deposition, Mr. Dozier asserted that this incident was what he was referring to in voir dire when he disclosed he had an offense expunged.  Because Mr. Dozier also has a conviction arising Miller County, Arkansas, that appears to have handled as a sort of deferred adjudication, Mr. Canales seeks documents associated with the Bowie County incident to clarify Mr. Dozier's situation at the time of Canales's trial.

Juror Marty Rawson also reported run-ins with the law.  He believed one instance involved a charge of making terroristic threats in approximately 1993 or 1994.  He learned a warrant had issued for his arrest, so he turned himself in to the police.  He recalled being handcuffed during that encounter.  He believed the District Attorney had

offered essentially a deferred adjudication, wherein if Mr. Rawson stayed away from the putative victim, the charge would drop off his record.  Mr. Rawson had no documents regarding this incident.  Appendix 4 at 18 (*Deposition of Marty Rawson*).

In addition, Mr. Rawson recalled learning that he had written "hot" checks, and contacted his bank – TEXAR Credit Union – who, according to Mr. Rawson, apologized for a bank error.  Mr. Rawson learned of the problem with the checks when one of the check recipients returned the check to him "with a note saying, it was going to be sent to the prosecuting attorney."  Appendix 4 at 27 (*Deposition of Marty Rawson*).  Mr. Rawson could not recall when this occurred.  *Id.*

These depositions therefore strongly suggest that these three jurors had experiences with the criminal justice system that were not revealed to trial court and counsel.  Because the jurors' recollections were so imperfect, however, important factual questions remain.  Mr. Canales therefore moves the Court for leave to subpoena the law enforcement records relevant to these experiences, and, in Mr. Rawson's case, for bank records related to possible hot checks charges.

Specifically, Mr. Canales moves this Court to permit him to subpoena the following documents:

- Bank records from TEXAR Credit Union for Marty Rawson through November 1, 2000.

- All Texarkana, Texas and Texarkana, Arkansas prosecution, police, sheriff, and jail records on Marty Rawson through November 1, 2000.

- All Texarkana, Texas prosecution, police, sheriff, and jail records on Steve Matlock through November 1, 2000.

- All Texarkana, Texas and Texarkana, Arkansas prosecution, police, sheriff, and jail records on John Dozier through November 1, 2000.

Mr. Canales also seeks leave to question the trial prosecutors regarding their source(s) of information for their notes regarding veniremembers' legal problems.

## 2.  Juror Note(s) during Juror Deliberation

Mr. Canales has alleged that the judge and other court officials communicated with the jury *ex parte*.  DE 7 at 122-27.  The proper practice for a jury inquiry and response requires: "(1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel for the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it."  *See, e.g., United States v. Mejia*, 356 F.3d 470, 475 (2nd Cir. 2004).  "The right to be present has been extended to require that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds."  *Id.* at 474.  This procedure is essentially identical to the established procedure in Bowie County, where, as the attached declarations attest, jury questions are to be submitted in writing to the bailiff, presented to the judge, who then reads them to counsel.  Counsel make argument to the judge regarding appropriate responses, and the judge delivers a response to the jury.  The trial record is supposed to reflect this process, and the jury's note is to be made part of the record.  Appendices 5 and 6 (Declarations of Paul Hoover and Jeff Harrelson).

While the jurors' recollections are imperfect, it appears this practice was not followed in this case.  Further discovery is necessary to ascertain what in fact happened. Multiple jurors recalled posing at least one question to the bailiff during deliberations.

Some recalled requesting and receiving evidence; one believed they had requested a read-back of testimony.   The record does not reflect any jury notes or inquiries during deliberation.

Juror James Butler recalled:

A   I believe we asked the bailiff when we were in – When we were in the process of determining the decision, I think we asked the bailiff to ask the judge for some of the letters or something.  It seems to me there was a piece of evidence that we wanted to see that we didn't have at that moment in time.
…
We were all talking and the foreman – there was a buzzer and we buzzed.  The bailiff came and we said can we get this and he went out and brought it back.
…
It was just a piece of information that was in a plastic cover to protect it.

Q   Was there a – do you know if the foreman wrote something down?

A   No, it seems to me we just – there was a buzzer in the room I think.  I'm sorry, I don't recall that specific process.

Q   Do you recall how long it was between the time you asked the bailiff for that piece of evidence and it came back?

A   It wasn't all that long.  Five, ten minutes at the most.

Appendix 7 at 10-12 (*Deposition of James Butler*).

Juror Brian Steed recalled written notes asking to review evidence:

A   … And, I believe there were some things passed during deliberations through the bailiff to the judge, I believe there were questions to him.  Not on, necessarily, clarification of our purpose, but we were asking for some of the evidence to come through.
….
Q   When you asked that to the judge, were there written notes?

A   Yes.

Q   Were there any times that you asked anything of the bailiff that were not written down during deliberations?

A   I don't believe so.  I believe our foreman wrote down what evidence we needed to see, and that is how it was done.

Q    And, if you recall, how many notes total were passed during deliberation?

A    Only two or three, I believe.
…
Q    What evidence, if you recall, did you want to see again?

A    It seems like we asked for, I am trying to think what wasn't already provided. Most of the things were already in there. It may have been something like a transcript from the trial, or a section of it. I am trying to remember what it was. Something like that.

Q    A transcript of testimony that you had heard in the trial?

A    Right.

Q    Did you get a response to those notes?

A    Whatever it was, we got it back pretty quickly.

Q    How did that happen?  Did the bailiff bring it back?

A    The bailiff brought it, yeah.

Q    What did the bailiff bring back?

A    I am trying to remember what it was.  If it was a transcript, it was just the paper.
…
Q    At any time did you go into the courtroom as a result of these notes?

A    No.  We stayed where we were at.

Q    You remained in the jury room?

A    Yes.
…
A    The foreman wrote the note for whoever needed the question answered, and then, asked for whatever it was, the piece of evidence, or the transcript, whatever it was, asked that and handed it to, I think we had, like, a buzzer, or something, that brought the bailiff in and handed it over.

Q    Handed the note to the bailiff.

A    Correct.

Q    The bailiff took the note, is that correct?

PETITIONER CANALES'S MOTION FOR
ADDITIONAL DISCOVERY AND
MEMORANDUM OF LAW IN SUPPORT - 8

A   Yes.

MS. JORDAN:  Objection, form.

Q   And, relatively soon returned with material responding to the question in the note?

A   Right.

Q   Are we talking ten minutes, an hour?

A   I would say ten minutes.

Q   And, you believe that there two or three occasions?

A   If I remember correctly, yes.

Q   And, was it the same process for each of those occasions?

A   Yes.

…

Q [cross-examination]  When you spoke about the notes that you passed to the bailiff, are you absolutely positive that they were just requests for evidence and not clarification of what the law was?

A   Like I said before, I am just going off memory about seven or eight years old.  So, I cannot say absolutely that there wasn't one pertaining to instruction.  I don't remember that.

Q   But, right now, as you sit here today, can you remember ever asking in a note about clarification about the law and what you were supposed to do, or your purpose, do you recall?

A   I don't recall that.

Q   As you sit here today, your best recollection about those notes is that it was about requests for evidence?

A   I believe so.

Appendix 8 at 19-24 (*Deposition of Brian Steed*).

Juror McGary also recalled jury notes:

PETITIONER CANALES'S MOTION FOR
ADDITIONAL DISCOVERY AND
MEMORANDUM OF LAW IN SUPPORT - 9

Q   Now, let me ask you, when you were deliberating, do you remember any of the jury, or the jury foreperson sending out any notes to the judge?

A   Yes.
…

Q   Okay.  And, how many notes were sent out?

A   I don't know.
….

Q   What were the notes about?

A   I think at that point in time, we were getting close to whatever decision we were doing, or it was almost time for dinner, or something.  I am not quite clear on that point, though, about what the notes were about, because I probably didn't see the notes.  But, I do recall some notes.
…

Q   And, how were the notes passed out of the jury room?

A   By a court official.

Q   And, they were asked to take it to the judge?  Is that what the notes were for, the judge?

A   Yes.

Q   Do you remember what happened as a result of the notes?

A   Well, I believe that it might have dealt with, were we almost finished, or did we need more time, should we reconvene the next day.  It was something to that effect, I believe.

Q   So, you got answers to your notes from the court official as well.

A   Now, I didn't specifically, but our chief juror, I will call him, it had to do with, were we going to finish.  I really can't say just absolutely what it was about, but that is what I would assume.
…

Q   So, all the communication with this court official, everything was written down first?

A   No.  I wouldn't say that, no.

Q   So, sometimes the chief juror asked questions verbally to the Court official?

A    Possibly.  It was a long time ago.

Appendix 9 at 22-23 (*Deposition of Harriet McGary*).

Another juror, Jon Miller, recalls written questions, but believes those happened

prior to deliberations.

A    It seems to me I remember a question or two.  It wasn't out loud.  I am wanting to
say it was written down on a piece of paper, given to the bailiff, and the bailiff
gave it to the judge.
…
Q    Were they questions – Do you remember what part of the trial that was during?

A    I don't have a clue.

Q    Were you in the jury room deliberating?

A    No, sir.  This wasn't at the end of it.  I think this was the very start when a few
people had questions.  I don't think it was no big deal.

Q    Had the trial started at that point?

A    I couldn't tell you.  I really don't remember.  It has been awhile.

Appendix 10 at 9-10 (*Deposition of Jon Miller*).

Another juror recalled verbal questions only:

Q    Do you remember asking any questions to the bailiff?

A    We may have had some pictures that we – and some documents or letters there
that we may have asked what a word was or something like that, but it's been so
long ago –
…

Q    All right.  And did you ever ask the bailiff to get certain evidence brought to the
jury room?

A    I think there was a case that we had that we did.  Maybe some of the letters.

Appendix 11 at 10-11 (*Deposition of Barbara Sue Totty*).

Based on this testimony, Mr. Canales asks this Court to grant him leave to depose the bailiff in this case to determine what the jury asked for, and how he handled that request.

### IV.     Prosecutorial Misconduct Relating to Prisoner Witnesses

While the depositions of the prisoners have been illuminating, key questions remain which require additional discovery.  Depositions of the inmate witnesses verified the bases of Mr. Canales' allegations but, in many areas, failed to provide a full understanding of the surrounding circumstances.   Witness Canida, for example, demonstrated such limited understanding of his parole status that his complete parole file must be reviewed to determine whether he received preferential treatment in obtaining parole after testifying against Mr. Canales.  Witness Driver reported memory problems, agreeing he would not have testified if he had not obtained assurances from the State that they would not prosecute him in connection with Gary Dickerson's murder, but could not recall the substance of those assurances.   Witness Innes, by contrast, was alternately deceptive and forgetful, and although he did not discredit Mr. Canales' claims, his lack of candor left crucial dimensions of his participation unexplained.  Mr. Canales, therefore, seeks additional depositions and document discovery to develop fully the facts underlying his claims relating to the State's misconduct in presenting the prisoners' testimony.

### 1.  Mr. Canales is Entitled to Discovery of Documents Relevant to Benefits to Inmate Witnesses

Larry Whited confirmed what Mr. Canales has alleged:  Telford prisoners viewed Canales's case as an opportunity to win the prison lottery.  Mr. Whited recollected that inmates saw Mr. Canales's case as offering rich opportunities to improve their situations

("And there was a lot of people that weren't involved in it that… were saying that they were because they wanted to get write-ups off of them …"), and observed that prisoners would lie to get a case dismissed or to get transferred to another facility.  Appendix 12 at 66-67, 135 (*Deposition of Larry Whited*).  The deposed inmate witnesses repeatedly offered examples of their own powerlessness in effecting these kinds of changes on their own, without an influential sponsor such as Investigator Merillat or prosecutor Mark Mullin.  *See e.g.* Appendix 13 at 26 (*Deposition of Richard Driver*)("[Y]ou were pretty much placed where you're at.  And if they needed—if they felt that you needed to move, that was not a decision that you made, it was a decision that they made.").

The inmates' continued allegiance to these sponsors was evident in the depositions.  Over eight years after Mr. Canales's trial, Mr. Innes immediately contacted Mr. Merillat and Mr. Mullin when he received his deposition subpoena to find out if they wanted to have "some say about it" and to ask if they wanted to be present.  Appendix 14 at 84 (*Deposition of Bruce Innes*).  Mr. Whited would not even participate until he spoke to Mr. Merillat on the phone and was assured that Merillat told him it was all right to proceed with the deposition.  Appendix 12 at 13 (*Recorded Proceedings of Larry Whited*).

Mr. Whited's deposition testimony also vividly captured what SPU had to offer potential inmate witnesses, particularly the similarly situated Bruce Innes.  Mr. Whited's description of his experiences with SPU provides evidence of SPU's tactics with witness Innes, and, in addition to the voluminous documentary evidence presented in his petition for writ of habeas corpus, furnishes a basis for this Court to order the depositions of SPU trial prosecutors and investigators, as well as TDCJ personnel.  Further, Mr. Canales

renews his request seeking all TDCJ, SPU, and Board of Pardons and Parole documents relating to the investigation and prosecution of Mr. Canales.

### A.   Bruce Innes

As detailed in Mr. Canales's petition for writ of habeas corpus, Bruce Innes was desperate to escape from administrative segregation ("ad seg") and otherwise escape the consequences of his membership in the Texas Mafia.  Larry Whited, a Texas Mafia lieutenant, was placed in ad seg after Mr. Dickerson's murder, and his path away from ad seg and gang identification provides a useful template to understand Mr. Innes's own release from ad seg and the burdens of gang affiliation.  Importantly for this case, SPU featured prominently in Mr. Whited's efforts to improve his living conditions, making it reasonable to believe that it similarly assisted Mr. Innes as he observed Mr. Whited's success with SPU and otherwise interacted with SPU Investigator A.P. Merillat.

Mr. Whited recalled quite clearly that A.P. Merillat told him that if Whited told the truth, Merillat would help get him out of ad seg and would help him renounce his gang membership in the eyes of TDCJ.  Investigator Merillat helped him by contacting Sammy Buentello, the then-head of TDCJ's Security Threat Group Management Office, to get Mr. Whited moved off of the notoriously hellish Estelle High Security unit and onto the "mellow" Wynne unit which was desirable as it offered more privileges, freedoms, and greater opportunities to participate in trades.  Appendix 12 at 49-50, 71 (*Deposition of Larry Whited*; Appendix 14 at 160 (*Deposition of Bruce Innes*);  Appendix 13 at 16, 97 (*Deposition of Richard Driver*).   While Mr. Whited was initially in administrative segregation on Wynne, he was, thanks to Investigator Merillat, eventually moved into general population on Wynne.  Investigator Merillat also worked to persuade

TDCJ to reverse Mr. Whited's disciplinary case relating to the murder of Mr. Dickerson, and sent at least one supportive letter to the parole board on Mr. Whited's behalf. Appendix 12 at 64 (*Deposition of Larry Whited*).

Mr. Innes, like Whited, was sent to Estelle High Security from the Telford unit. As did Mr. Whited, Mr. Innes reported that Estelle High Security was "very, very stressful". Appendix 14 at 25-26 (*Deposition of Bruce Innes*) (describing it as "hell"); Appendix 12 at 47 (*Deposition of Larry Whited*) ("And that place is bad, I mean, then that place is bad. They can do anything they want to you there. I mean, it was bad, bad, bad place [sic]"). Innes was released from there to two other units before landing on the Wynne unit, where he was held in ad seg before being moved into general population. While Mr. Innes now attributes this move primarily to his advocacy skills, before Mr. Canales's trial, he worked additional angles, asking Mr. Whited to write Mr. Merillat for support in his efforts, *see* DE 7 at Exhibit 55, and acknowledged that being a witness for the State was "the only way that I can get out of Ad. Seg." Appendix 14 at 75 (*Deposition of Bruce Innes*). He was ultimately transferred to safekeeping in the Hughes unit, a housing assignment Mr. Innes plainly values highly. His gratitude to Investigator Merillat and Mullin is similarly obvious. Appendix 16 is a lengthy "thank you" letter from Innes to Mullin that Mark Mullin only recently disclosed on April 6, 2009. Mr. Innes also stated that he had sent both Mr. Mullin and Investigator Merillat belts and wallets as gifts. Appendix 14 at 79 (*Deposition of Bruce Innes*).

While Innes admitted to the substantial benefits SPU secured for him in terms of his housing assignments, he minimized his contacts with SPU, including SPU's assistance with his disciplinary problems, and SPU's requests for Mr. Innes's assistance

in their case against Mr. Canales.  Appendix 14 at 86 (*Deposition of Bruce Innes*).  For example, Innes claimed he wrote to Merillat only about three times prior to Mr. Canales's trial, *Id.* at 85, and that Merillat wrote him only to let him know when he was to be bench warranted.  *Id.* at 86.  Innes further claimed that Merillat never asked him to do anything because "there was nothing I could do for that man in here."  *Id.* at 88.  These assertion are patently false as indisputable documentary evidence proves that Merillat and Innes were in frequent contact prior to Mr. Canales' trial and that Innes clearly was actively seeking incriminating evidence at the behest of Merillat.  DE 7 at 85-87.

Rather than clarify his role in Mr. Canales' prosecution, Mr. Innes' deposition uncovered further inconsistencies in his trial testimony.  For example, at trial the State allowed Innes to portray himself as a disillusioned romantic naïf who separated himself from the Texas Mafia prison gang because he was so appalled by the murder of the victim in this case.  SR 10:40; DE 7 at 95.  In his deposition, Innes acknowledged he understood from the beginning that the Texas Mafia to be a violent organization that killed people, and recounted instances of his own participation in potentially lethal gang-related violence.  Appendix 14 at 50, 110 (*Deposition of Bruce Innes*).  Contrary to his trial testimony, Innes admitted in his deposition that anyone who didn't know that murders were part of prison gang life was a liar.  *Id.*  at 50.

Because Innes was not forthcoming about his involvement in the investigation and prosecution of Mr. Canales's case, additional depositions, discussed *infra*, and further document discovery is warranted.  The extent of the State's knowledge about Innes's activities, his gang affiliation, and the benefits he received for his cooperation can only be understood through discovery of all of the State's files related to Innes and his

cooperation with the prosecution.    Mr. Canales' Petition demonstrated through documents in the prosecution file that Innes sought not only reduced sentences on his pending charges, but also the highly prized and rare gang declassification as a condition for his cooperation with the murder investigation.  DE 7 at 83-84, 94-106.  It also appears that Mr. Innes was able to use his cooperation to effectively immunize himself against charges for participating in gang activity and other prison crimes.  DE 7 at 96-98.  Mr. Canales needs to reconstruct that relationship fully, and discovery of the TDCJ's files relating to Innes is central to that task.

Moreover, Mr. Canales has alleged that investigators from SPU and TDCJ used Innes's position as a trusted member of the Texas Mafia to solicit incriminating correspondence from Mr. Canales which were then used as the centerpiece of the State's case against him.  While certain correspondence between SPU and Innes were discovered and formed the basis of Mr. Canales' *Massiah* claim in his Petition, the complete SPU and TDCJ files, including internal and personal notes and files,[1] are necessary to develop a full picture of the relationship between Innes and SPU.  Mr. Canales anticipates that, complemented by relevant depositions, these files will reveal when the relationship began and under what circumstances.  Mr. Canales also anticipates that these files will show the benefits or compensation Innes received as a result of his work on behalf of the State.

Because Mr. Innes's deposition was inadequate to resolve the material facts in this case, further discovery is required.

---

[1] This request is necessary in light of the prosecutor Mullin's April 2009 letter disclosing for the first time a letter from Innes that prosecutor Mullin had framed and hung on his office wall.  *See* Appendix 16.  In

B.  *Steven Canida*

Mr. Canida was able to provide only a sketchy history of his path toward parole after Mr. Canales's trial but it is undisputed that Canida was paroled the following July, having served only 11 years on a 50 year sentence.  *See* Petition at Exhibit 61 (Canida criminal history. Further, Mr. Canida could not account for why, remarkably, on a ten year sentence on a new criminal charge he acquired *while on parole*, he obtained a favorable vote from the parole board only six months into this sentence and on his first time before the board on this new charge, and then was paroled after only one year.

> Q   When were you -- I'm assuming since you're sitting here with us today you didn't serve the full ten years; that you got paroled out?
>
> A   Yes, ma'am.
>
> …
>
> Q   Okay.  When did you first become eligible for parole on that offense?
>
> A    I could not recall because I was under my old number.  I really didn't understand it.  It added -- like, I had -- like, my long way discharge was 2040.  Now it's -- then it was 2041.  I didn't know how they -- I didn't understand how they put a year on a fifty-year sentence and made it fifty-one years.
> …
>
> Q   Okay.  To your knowledge, were you paroled the first time you came up for parole?
>
> A   To my knowledge, I think so.

Appendix 17 at 20-22 (*Deposition of Steven Canida*).

The publicly-available Board of Pardons and Paroles Division Minutes confirm Mr. Canida's understanding.  On January 29, 2003, Mr. Canida's parole was revoked. On January 17, 2004, his parole plan was approved and parole certificate issued.  The

---

addition, Whited mentioned sending Merillat cards and notes that were not in the files disclosed to Mr.

documents publicly available from TDCJ's Parole Division, however, do not explain why Mr. Canida became eligible for parole this early, especially as he may well have lost his previously earned good time when his parole was revoked.

Mr. Canida also had significant gaps in his memory regarding his post-release parole status.  The records Mr. Canales obtained from TDCJ's Parole Division indicate that Mr. Canida had multiple "blue warrants," or warrants for his arrest for parole violation, that were issued and then withdrawn.  Mr. Canida had no explanation for these.

> Q   …And it looks like there was another -- I think probably a blue warrant, but some sort of arrest warrant in August of '05.
>
> MR. JONES:  Objection; form.

Q   Does that ring a bell with you?

A   I don't recall that.

> Q    Okay.  And there's another indication of some sort of arrest warrant in October of  '06.  Does that ring a bell?

A   No, ma'am.

*Canida Deposition* at 28-29.

Further, the documents Mr. Canales's counsel has obtained through the Open Records Act are inadequate to complete this history, if only because some of the most salient documents, such as supportive letters from the prosecution are not considered public and therefore are not released.  Therefore, Mr. Canales renews his motion to discover Mr. Canida's complete parole file.

---

Canales.  Appendix 12 at 128 (*Deposition of Larry Whited*).

### C.  Richard Driver

While Mr. Driver reports that Mark Mullin made "no guarantees," he did pledge to "see what they could do" with respect to Mr. Driver's classification and housing. Appendix 13 at 70 (*Deposition of Richard Driver*).  More dramatically, Mr. Driver was accused of conspiring with another prisoner and TM member, Michael Constadine, to kill Dickerson, yet nonetheless testified for the State.  In his deposition, Mr. Driver acknowledged he would have sought reassurances from the State that he would not be targeted for prosecution, but he could not recall the specifics of those assurances. Depositions of the prosecution team are therefore required to ascertain the scope and details of the benefits that Mr. Driver acknowledged he received.

### D. TDCJ Files, Including Internal Affairs Division, Regarding the Death of Mr. Dickerson.

Mr. Canales renews his request for the TDCJ files relating to the investigation of Dickerson's death, including all Internal Affairs Division files and records of disciplinary hearings of inmates who were suspected in Dickerson's death.  Mr. Canales can show good cause for this discovery based on his previous pleadings as well as information learned in the recent deposition of Larry Whited.  In that deposition, Whited testified that Steven Canida (and Tim Rice, Dickerson's cellmate) apologized to him after the Canales trial.  He stated they told him they had lied about Mr. Whited's involvement in the murder, apparently by providing testimony against him at the TDCJ disciplinary hearing on Mr. Whited's involvement in Mr. Dickerson's death.  Mr. Canales does not believe these statements have been provided to him, and the fact that, as Mr. Whited describes them, these statements were inconsistent with trial testimony, raises the possibility of another *Brady* violation.  This further supports Mr. Canales's allegations of misconduct

in the prosecution of Mr. Canales, and provides additional support for his request for discovery of the complete TDCJ file on the investigation of Gary Dickerson's death.

### E.  Discovery of TDCJ files on the Texas Mafia

Discovery of TDCJ files, particularly those maintained by the Security Threat Group division, compiled in the wake of Mr. Dickerson's murder is necessary to, *e.g.*, track correspondence between Texas Mafia members that were acting as state's witnesses to see the extent to which they were shaping and corroborating each other's stories, and to identify when the state knew about it.  We know from the depositions that the witnesses communicated with each other regarding their testimony while housed together during the Canales trial.  *See, e.g.*, Appendix 12 at 56-58, 145-46 (*Deposition of Larry Whited*).

TDCJ closely monitors gang communication, including letters sent through the mail and "kites" confiscated from inmates' cells.  Discovery of these documents would further demonstrate which witnesses possessed potentially exculpatory information and/or provided false information in the investigation and prosecution of Mr. Canales, and also the State's knowledge of this information.

### 2.      Mr. Canales requests authority to depose additional witnesses necessary to conclusively prove his claims for relief.

#### A.  A. P. Merillat

Mr. Canales alleged that SPU investigator A.P. Merillat knowingly withheld witness impeachment evidence, cultivated inmate witnesses as informants and had information demonstrating that certain state witnesses testified falsely.  Merillat's deposition is necessary to uncover the information he had, and the totality of the benefits he provided to inmates that cooperated with the investigation.  Prosecution files revealed

that Merillat actively used Texas Mafia members to elicit damaging information in exchange for certain benefits. *See, e.g.,* DE 7 at Exhibit 44 (Merillat 3/13/00 Letter) ("Innes provided that letter to me, and he, at my request agreed to correspond with Canales to confirm authorship of the letter, attempt to obtain details of actions against our witnesses, information on the Dickerson killing, etc."); DE 7 at Exhibit 47 (SPU letter 6/15/98) (Merillat contacted TDCJ Records/Classification to inform them he was leaving it up to Innes "as to whether or not he wants the de-confirmation process started, or if he wants to lay low and provide us information on the gang.")

As discussed, *supra*, Innes provided little insight into this relationship. Innes failed to acknowledge the frequency of his communications with Merillat prior to Mr. Canales' trial and denied SPU solicited his aid, contrary to the documentary evidence. A deposition of Merillat is necessary to flesh out exactly the State's relationship with the inmate witnesses. Further, with respect to Innes in particular, crucial questions related to Mr. Canales's *Massiah* claim need to be answered regarding **when** Innes started acting as a government agent. Deposing Investigator Merillat will clarify the Innes-SPU relationship.

### B.    Innes Attorney David O'Neil

Mr. Canales has alleged that the State used Innes to elicit damaging information about him, and then suppressed impeachment evidence and allowed Innes to lie on the stand. The crux of this claim involves Innes' testimony that he requested a "kite" from Mr. Canales describing the Dickerson incident and watched Mr. Canales send him the kite by "throwing him a line." DE 7 at 102-105. Notes in a SPU file, however, reveal that in fact Innes previously told the prosecution, unbeknownst to trial defense counsel,

that Innes had to request the kite from someone else and that he never saw the letter in Mr. Canales' possession.  DE 7 at 105-06.

During his deposition, Innes stated that he met with O'Neil and tried to turn the letter over to him.  O'Neil refused to take the letter and negotiated with SPU on Innes's behalf.  Appendix 14 at 79, 124-25 (*Deposition of Bruce Innes*).  This assertion directly contradicts the prosecution's notes of a contemporaneous interview with Innes wherein he stated he neither received nor possessed the notes.  DE 7 at 106 and Exhibit 60. Because this discrepancy is at the core of Mr. Canales's *Brady* and *Napue* claims involving Innes, further discovery is necessary.  Mr. Canales requests leave to subpoena Mr. O'Neil's files concerning his representation of Bruce Innes.  Moreover, Mr. Canales believes that a deposition is necessary because, according to Innes, O'Neil was the only one present during his interview with Innes and he took no notes.  Appendix 14 at 105 (*Deposition of Bruce Innes*).

      *C.*     *SPU Investigator Royce Smithey*

SPU investigator Royce Smithey has information pertinent to Mr. Canales' claims involving Innes.  Innes stated in his deposition that Smithey was the official from SPU who actually met with Innes and picked up the notes later introduced as evidence against Mr. Canales. Appendix 14 at 119-20 (*Deposition of Bruce Innes*).  Because of his contact with Innes during this crucial time, Mr. Smithey's deposition is necessary to fully understand what Innes said regarding how he got the notes and who was holding the notes for him while he negotiated his deal.

In addition, as Exhibit 72 to Mr. Canales's petition for habeas corpus indicates, Smithey was integrally involved in negotiating benefits such as housing assignments with TDCJ on behalf of the State's inmate witnesses.

D.    *TDCJ Investigator Cheatham*

Investigator Cheatham worked for TDCJ and investigated the Telford murder. Although the details are currently unclear, he also appears to have had some input into the use of other inmate witnesses.  In June of 1998, Merillat wrote to Cheatham and explained that Innes wanted to be deconfirmed from prison gang status and was willing to "correspond with gang members as usual, if you want him to, in order to help expose/uncover their activities, or do what is best.  Innes is presenting a valuable, unique opportunity to possibly do some major damage to the TM's business."  DE 7 at Exhibit 38.  According to Merillat, "Innes relates he is willing to 'work' for either or both of our offices in any way we can use him." *Id.*  Because this information directly relates to Mr. Canales' *Messiah* and *Brady* claims and cannot be discovered without this Court's assistance, Mr. Canales requests a deposition of Cheatham.

E.    *Salvador "Sammy" Buentello*

Mr. Buentello, formerly head of TDCJ's Security Threat Group Management Office, was also approached by the prosecution about witnesses in Mr. Canales' trial. The letters attached as Exhibits 57 and 58 to Mr. Canales's petition for writ of habeas corpus, for example, appear to confirm a "wink and a nod" agreement between A.P. Merillat and Mr. Buentello regarding the housing assignments sought by cooperating inmates.   Moreover, Exhibit 72 demonstrates that Buentello had daily phone conversations with Smithey as they negotiated the housing assignments for the inmate

witnesses.    Because Mr. Buentello was a (and perhaps **the**) major point of contact as SPU negotiated benefits for its inmate witnesses, Mr. Buentello clearly has information relevant to Mr. Canales' allegations and should be deposed.

### f.    Mark Mullin and Candace Norris

Mark Mullin and Candace Norris were the trial prosecutors in Mr. Canales' case. Mr. Mullin and Ms. Norris are in a unique position to provide crucial information relating to several of Mr. Canales' claims.  First, they interacted directly with the State's witnesses and were likely aware of the promises made in exchange for testimony and the expectations of each of the inmate witnesses.  Moreover, because Mr. Canales alleges that the State presented testimony that it knew to be false, it is crucial for him to determine what the trial prosecutors knew and when they first learned that portions of inmate witnesses trial testimony was false.

### Conclusion

For the reasons stated above, Mr. Canales asks this Court to order the additional discovery requested in this motion.

Respectfully submitted this 27th day of May, 2009.

/s/ Morris H. Moon
Morris H. Moon
Texas Bar No. 24032750
2307 Union Street
Houston, Texas 77007
Tel: (713) 880-3556
moonlawfirm@aol.com

/s/ Meredith Martin Rountree
Meredith Martin Rountree
Texas Bar No. 24033544
Law Offices of
Owen & Rountree, L.L.P.
Post Office Box 40428
Austin, Texas 78704
Tel: (512) 804-2661
Fax: (512) 804-2685
meredithmr@earthlink.net

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing upon counsel for Respondent by sending same via CM/ECF:

> Asst. Attorney General Thomas M. Jones
> Asst. Attorney General Carole Callaghan
> Office of the Attorney General
> Postconviction Litigation Division
> Office of the Attorney General
> P.O. Box 12548
> Capitol Station
> Austin, TX  78711

this 27th day of May, 2009.

      /s/ Meredith Martin Rountree

PETITIONER CANALES'S MOTION FOR
ADDITIONAL DISCOVERY AND
MEMORANDUM OF LAW IN SUPPORT - 26