IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ANIBAL CANALES, JR.,

     Petitioner,

          v.                                    CIVIL ACTION NO. 2:03CV69

RICK THALER, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

     Respondent.

---

PETITIONER CANALES' RESPONSE TO
RESPONDENT THALER'S MOTION FOR SUMMARY JUDGMENT AND TO
VACATE DISCOVERY ORDER WITH BRIEF IN SUPPORT

---

TABLE OF CONTENTS

Introduction……………………………………………………………………….. 1

I.   Respondent Misreads *Cullen v. Pinholster* and the
     Applicable §2254(d) Analysis…………………………………………… 2

II.  *Pinholster's* Reach Is Further Limited in its Application
     to Mr. Canales' Case………………………………………………………6

     A.  Mr. Canales' claim that his Sixth Amendment right to
         counsel was violated by trial counsel's failure to
         investigate and present mitigating evidence………………………… 6

         1.  This claim is not procedurally defaulted……………………………..7

             a.  The CCA's ruling was ambiguous about the
                 basis of its dismissal of Mr. Canales' claim.
                 Therefore, this Court must presume the state
                 court's decision was not based on an
                 independent state law ground…………………………………….7

             b.  The state court record contains strong indicia
                 that the state court considered and passed
                 upon the underlying federal claim………………………………… 8

         2.  The state court decision is nonetheless not subject
             to 28 U.S.C. §2254(d)……………………………………………..14

         3.  Assuming, arguendo, the CCA's order is an
             adjudication on the merits, Section 2254(d)
             does not preclude granting of relief on Mr.
             Canales' Sixth Amendment right to counsel claim……………………..17

     B.  Mr. Canales' claim that the State misconduct violated
         his federal constitutional rights is not procedurally defaulted…………….. 19

     C.  The CCA's decision dismissing Mr. Canales' juror
         misconduct claims is not based on an adequate state ground……………… 22

     D.  The CCA's decision dismissing all other claims
         alleged by Mr. Canales is not based on an independent
         state ground……………………………………………………………23

III.   Even Assuming the Independence and Adequacy of the
State Court Decision, Mr. Canales Can Demonstrate Cause
and Prejudice Excusing Any Alleged Default of His Claims....................  23

A.  Mr. Canales' *Brady* claims.......................................................  24

   1.  The State's suppression of exculpatory evidence
and false representations to Mr. Canales' counsel
constitute cause................................................................. 25

   2.  This suppression was prejudicial............................................ 27

   3.  The suppressed evidence: witnesses about whom
the State failed to disclose benefits and deals............................. 28

      a.  Bruce Innes.............................................................. 28

         i.  Continued gang ties................................................. 29

         ii.  Special treatment regarding crimes
committed in prison.................................................... 32

         iii.  Ongoing relationship between SPU and Innes.................... 33

         iv.  Collaboration between State witnesses........................... 35

         v.  State's continued support of inmate witnesses.................... 36

         vi.  False testimony about receiving the letter
from Mr. Canales.................................................... 37

      b.  Steven Canida............................................................ 41

      c.  Larry Whited............................................................43

      d.  Richard Driver, Jr...................................................... 44

B.  Mr. Canales' other claims of prosecutorial misconduct..................... 45

   1.  *Massiah* .................................................................. 45

   2.  *Giglio/Napue*.............................................................46

C. Any alleged procedural default of the claims of juror
misconduct is excused due to cause and prejudice………………………… 48

1. The State's suppression of information regarding
criminal investigations of and proceedings
against jurors, along with the jurors' own
concealment of relevant facts, constitutes
cause to excuse default…………………………………………………… 48

2. Mr. Canales can establish prejudice for relief
on these claims……………………………………………………………50

D. Any procedural default of the claims of *ex parte*
communication between the jury and court
personnel is excused due to cause and prejudice…………………….… 52

1. The suppression of information regarding
the *ex parte* communication between the
jury and court personnel constitutes cause
to excuse default………………………………………………… 52

2. This communication violated Mr. Canales'
constitutional rights and was highly prejudicial………………………...53

IV. Mr. Canales' Claim of Unconstitutional Shackling Is
Not Procedurally Defaulted…………………………………………...… 54

Conclusion and Relief Requested……………………………………………… 55

INTRODUCTION

For the reasons set forth below, this Court should deny Respondent's *Motion For Summary Judgment And To Vacate Discovery Order With Brief In Support* (hereafter "*Motion*"), and permit the remaining legally appropriate and reasonably necessary discovery – the depositions of Mark Mullin and A.P. Merillat, **currently scheduled for June 22 and 23 –** to proceed.

In his *Motion,* Respondent both misreads the applicable law and misapplies that law to this case. This Response explains why *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388 (2011), the recent Supreme Court decision that prompted the Director's *Motion,* changes nothing about the procedural posture of this case or the legal principles that govern the Court's review of Mr. Canales' claims for relief. In addition, we correct Respondent's mistaken view of the Fifth Circuit's precedent interpreting the Texas Court of Criminal Appeals' ("CCA") bar on successive applications for habeas corpus relief. As that discussion will make clear, Fifth Circuit decisional law fully supports this Court's considered determination that the CCA's dismissal of Mr. Canales' second application for habeas corpus relief does not create a procedural default barring review of his claims in this proceeding. (*Order Granting in Part Petitioner Canales' Motion for Discovery* (Dkt. No. 42) at 2).

By moving for summary judgment, the Director has put in issue all of the legal claims presented in Mr. Canales' *Petition for Writ of Habeas Corpus*. (Dkt. No. 7). The law requires Mr. Canales to respond by addressing, at least in brief, each claim. That obligation not only lengthens this *Response* considerably, but also forces Mr. Canales to

argue his claims before completing the discovery already ordered by this Court, and fully analyzing the legal significance of the evidence thereby developed. Per this Court's Sealed Memorandum of April 28, 2011, Mr. Canales will supplement his arguments within 21 days after deposing witnesses Mark Mullin and A.P. Merillat, so that the Court may have the benefit of a fully developed presentation of the issues. These depositions touch on a range of claims Mr. Canales has raised, including all the state misconduct claims, his claims that certain jurors concealed information about their criminal history, and his claim regarding *ex parte* contact between court personnel and the jury. He accordingly asks this Court to defer any ruling on his claims until he has had that opportunity.

## I.    Respondent Misreads *Cullen v. Pinholster* and the Applicable §2254(d) Analysis.

In his discussion of *Pinholster*, which addressed how federal courts should apply 28 U.S.C. §2254(d), Respondent misunderstands a critical aspect of the operation of §2254, namely that it is a limitation on the power of courts to grant habeas relief, and is not itself a basis for relief.

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Before 1996, once a prisoner made the showing that he was illegally confined – usually by proving that the judgment pursuant to which he was confined was obtained in violation of the United States Constitution – he was entitled to relief. In 1996, however, the Anti-terrorism and Effective Death Penalty Act (AEDPA)

was enacted. The AEDPA left intact the core habeas requirement that a petitioner prove

he is being confined in violation of the laws of the United States, but proving illegal

confinement was no longer sufficient to be granted relief.  The AEDPA "place[d] a new

constraint on the power of a federal habeas court to grant a state prisoner's application for

a writ of habeas corpus with respect to claims adjudicated on the merits in state court."

*Williams v. Taylor,* 529 U.S. 362, 412 (2000).

> Title 28, Section 2254(d) provides,

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable
>     application of, clearly established Federal law, as determined by the Supreme
>     Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the
>     facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).

Where Section 2254(d) applies – *i.e.*, where there has been an "adjudication on

the merits" in state court – it operates as a limitation on the power of a federal court to

grant relief in those cases in which the court has found constitutional error. James S.

Liebman & Randy Hertz, 2 Federal Habeas Corpus Practice and Procedure § 30.1, at

1357 (5th ed. 2005); *Jimenez v. Walker*, 458 F.3d 130, 135 n.2 (2d Cir. 2006) ("§ 2254(d)

may more accurately be called a 'limitation on relief' than a deferential 'standard of

review'"). Thus, a habeas petitioner must show (1) illegal confinement to be *entitled* to

habeas relief and (2) satisfaction of 2254(d), when applicable, to *be granted* habeas relief.

If a petitioner can show that he is confined illegally, thereby entitling him to relief, but the court does not believe the applicable requirements of Section 2254(d) have been satisfied, then the court simply lacks the power to grant the remedy of habeas relief, despite the petitioner's entitlement to it.  *See also Appendix A* at 10 (*Goforth v. Parker*, 5:09-cv-00352-KKC (E.D. Ky.) (Motion by Intervenor United States of America) ("Section 2254(d)(1) does not intrude on the authority to interpret governing law and to decide cases. Rather, it represents a proper exercise of Congress's well-entrenched authority to define the scope of the habeas remedy for state prisoners. Indeed, regulating relief is a far cry from limiting the interpretive power of the courts") (citation and internal punctuation omitted).

As to the order in which a federal court addresses the merits and the section 2254(d) determination, "AEDPA does not require a federal habeas court to adopt any one methodology." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). *Lockyer* reviewed a Ninth Circuit decision that required a federal court to determine entitlement to relief before determining whether the federal court was precluded by Section 2254(d) from granting relief. The Supreme Court reversed, disagreeing that the AEDPA required any particular ordering of determinations on the relevant legal questions. *Id*.

*Pinholster* confined itself to interpreting §2254(d), and did not address any question regarding the federal court's ability to determine whether there has been a constitutional violation.  It held that the federal court's judgment of the reasonableness of the state court's adjudication must be limited to the state court record.  It in no way

precluded a federal court from considering evidence that was not raised in state court in determining whether a federal constitutional violation has been proved.

Further, and contrary to the Director's contention, *Pinholster* does not hold that a federal court is precluded from considering additional evidence any time there has been an adjudication on the merits in state court.  In Part II(B) of *Pinholster*, the Court rejected the prisoner's argument that its interpretation of §2254(d) rendered superfluous §2254(e)(2), the provision of the habeas statute that addresses a federal court's ability to hear new evidence:

> Section 2254(e)(2) continues to have force where §2254(d)(1) does not bar federal habeas relief. For example, not all federal habeas claims by state prisoners fall within the scope of §2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.' At a minimum, therefore, §2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court. *See, e.g.*, *Michael Williams*, 529 U. S., at 427–429.

*Pinholster*, 131 S. Ct. at 1401 (emphasis added).  As the text makes clear, the Court is giving an example of where §2254(e)(2) applies. It is not, contrary to Respondent's contention, holding that in order to be entitled to consideration of new facts, the claims must not have been adjudicated in state court.  While this Court may not consider the evidence developed in discovery when conducting its 2254(d) analysis (where 2254(d) applies), it is not true that the Court must ignore the evidence developed in discovery when determining whether Mr. Canales has proven a federal constitutional violation, or, indeed, that discovery itself serves no purpose.

**II.**   ***Pinholster's*** **Reach Is Further Limited in its Application to Mr. Canales' Case.**

Because several of Mr. Canales' claims were not adjudicated on the merits by the CCA, *Pinholster* simply does not apply.  Further, because they are not procedurally defaulted, this Court may not only consider them, but may also take new evidence to determine whether a constitutional violation occurred.

**A. Mr. Canales' claim that his Sixth Amendment right to counsel was violated by trial counsel's failure to investigate and present mitigating evidence.**

As the docket in this case reflects, the Court granted Mr. Canales' motion to stay further federal court proceedings and held his case in abeyance while Mr. Canales returned to state court to file a successive petition (Dkt. No. 22, 31).  After Mr. Canales filed his successive petition in Bowie County, the Bowie County clerk, pursuant to Texas Code of Criminal Procedure Article 11.071 §5, forwarded Mr. Canales' petition to the CCA so it could determine whether he would be permitted to have the merits of this successive petition considered.  On October 17, 2007, the CCA ordered Mr. Canales and the State to file simultaneous briefs on the following questions:

> (1) Is *Wiggins v. Smith*, 539 U.S. 510, 527 (2003), new law or such an extension of old law that this Court should hold that it meets the dictates of Article 11.071 §5?

> (2) If *Wiggins* is new law or such an extension of old law that it should meet the dictates of Article 11.071 §5, under what standard should a court judge the effectiveness of counsel's actions undertaken before the decision in *Wiggins* was announced?

The briefs were timely filed, and the CCA subsequently denied Mr. Canales authorization to proceed with his successive petition, and dismissed the application.  The CCA stated:

We have reviewed the application and the briefs of both parties and find that all of the allegations fail to satisfy the requirements of Article 11.071, Section 5(a). Accordingly, this application is dismissed as an abuse of the writ.

*Ex parte Canales*, slip op., No. WR-54-789-02 (Tex. Crim. App. 2008).

> **1. *This claim is not procedurally defaulted.***
>
> > **a. The CCA's ruling was ambiguous about the basis of its dismissal of Mr. Canales' claim. Therefore, this Court must presume the state court's decision was not based on an independent state law ground.**

A federal court may not reach the merits of a claim where a prior state reviewing court applied an independent and adequate state law ground to deny relief. *Coleman v. Thompson*, 501 U.S. 722 (1991). If the state court's decision is ambiguous as to whether it relied on an independent state ground, this Court must presume that it did not.

> [W]hen . . . a state court decision fairly appears to rest primarily on federal law, *or to be interwoven with the federal law*, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Michigan v. Long*, 463 U.S. 1032, 1041 (1983) (emphasis added).

In *Harris v. Reed*, the Supreme Court extended to habeas review *Long*'s rule for determining whether a state court has relied on an independent state ground. *Harris v. Reed*, 489 U.S. 244, 265 (1989). As *Harris* makes clear, the "plain statement" rule applies "regardless of whether the disputed state-law ground is substantive (as it was in *Long*) or procedural, as in *Caldwell v. Mississippi*, 472 U.S. 320, 327 . . . (1985)." *Id.* at 263.

> Thus, the mere fact that a federal claimant failed to abide by a state procedural rule does not, in and of itself, prevent [a federal court] from

reaching the federal claim: "[T]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case[.]" Furthermore, ambiguities in that regard must be resolved by the application of the *Long* standard.

*Id*. at 261-262 (quoting *Caldwell*, 472 U.S. at 327). *See also Coleman*, 501 U.S. at 739 (a state court decision is ambiguous when a federal reviewing court has "good reason to question whether there is an independent and adequate state ground for the decision").

> **b.  The state court record contains strong indicia that the state court considered and passed upon the underlying federal claim.**

A state court habeas application is dismissed if the CCA concludes the applicant failed to satisfy any of the § 5(a) requirements.  Each of the three Section 5(a) subdivisions has a federal constitutional law component.  Section 5(a)(1), as interpreted by the CCA and the one implicated in Mr. Canales' case, requires both (1) a *prima facie* showing of "a federal constitutional claim that requires relief from the conviction or sentence" (the "merits" prong); and, (2) a showing that the factual or legal basis of the federal claim was unavailable at the time the initial application was filed (the "unavailability" prong). Tex. Code Crim. Proc. Art. 11.071 § 5(a)(1) (West 2011); *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007); *Ex parte Staley*, 160 S.W.3d 56, 66 (Tex. Crim. App. 2005) (*per curiam*). An application does not satisfy §5(a)(1) if it fails to satisfy either the merits prong or the unavailability prong. *Campbell*, 226 S.W.3d at 421; *Ex parte Morris*, No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009) (Price, J., dissenting) (referring to the merits prong as "a judicial gloss we have de facto placed upon the statutory authorization of subsequent writs in capital cases, namely, that they must also 'make a *prima facie* showing of possible merit' as to the federal claim").

In asking this Court to reverse its previous Order on discovery (Dkt. No. 42), Respondent relies heavily on the Fifth Circuit's subsequent decision in *Rocha v. Thaler*, 626 F3d. 815 (5th Cir. 2010), yet *Rocha* is readily distinguishable from Mr. Canales' case. First, the CCA in *Rocha* never ordered briefing on the § 5 question, whereas it specifically directed counsel in Mr. Canales' case to brief the significance of federal law specifically to aid its § 5(a)(1) determination.

Second, and a point the Director never acknowledges, the Fifth Circuit in *Rocha* analyzed a different legal provision than the one at issue in Mr. Canales' case. Mr. Canales, unlike Rocha, argued in state court that the legal basis for his claim was previously unavailable and therefore reviewable under §5(a)(1). Rocha, by contrast, argued his claims should be heard pursuant to §5(a)(3), the "actual innocence of the death penalty" exception. The CCA's order dismissing Rocha's application expressly cited Section 5(a)(3). As the Fifth Circuit made clear in *Rocha*, the subparts of §5 operate separately from one another, and the legal analysis for each is different. *Id*. at 819 ("our precedent interpreting §5(a)(1) does not compel us to conclude that the CCA did not employ an independent state-law ground of decision when it determined that Rocha could not satisfy §5(a)(3)"). Respondent's general references to *Rocha* reflect the fundamentally different legal questions posed in that case, and that in this case, *Rocha* is, at best, *dicta*.

In addition to relying on *dicta*, Respondent's *Motion* does not attempt to address the core legal question about the independence of the state procedural bar. The *Motion* cites the sequential analysis the *Rocha* Court imputed to the CCA's §5(a)(1) analysis

(where the first step involves an independent state law analysis, and only the second step implicates federal law), and "reads the tea leaves" of what was ordered briefed in concluding that the CCA must have engaged in only the first step in Mr. Canales' case. For example, the Director essentially concedes he is speculating when he argues that "it is not likely" that the CCA concluded *Deck* constituted new law because it did not order briefing. (*Motion* at 17.) This is exactly the kind of speculation federal courts do not engage in in deciding the independence of a procedural default. The Director also eviscerates his own argument that the CCA, despite its call for briefing, plainly rejected Mr. Canales' *Wiggins* claim based on the first step of the §5(a)(1) analysis, when, on the very next page, he cites the absence of a briefing order on the *Deck* question as evidence the CCA rejected the "new law" argument for that claim. (*Motion* at 16-17.)

The Director, while arguing that "the Court of Criminal Appeals does not view *Wiggins* as offering a new legal basis for a claim," (*Motion* at 16), cites only the Fifth Circuit for this proposition of state law and does not cite any state law. But, of course, if it were so clear that the CCA does not consider *Wiggins* to be a new legal basis for state law purposes, why would the CCA ask for briefing on that exact question in this case? But the fundamental point is this: even if the analysis were in fact sequential,[1] the CCA's

---

[1] Contrary to the Fifth Circuit's *dicta* in *Rocha*, the two-element legal standard established in *Campbell* does not require sequential application, nor has any decision subsequent to *Campbell* so held. Post-*Campbell*, the CCA has dismissed subsequent applications by resolving only the federal constitutional element without ever addressing the unavailability question. See *Ex parte Morris*, No. WR-43,550-03 (Tex. Crim. App. Mar. 4, 2009) (unpublished) (court dismissed subsequent application raising claim of race discrimination in capital prosecution pursuant to Section 5 because it "failed to make a prima facie case of discrimination"); *Ex parte Reed*, No. WR-50,961-06 (Tex. Crim. App. July 1, 2009) (unpublished) (court dismissed application raising *Brady* claim pursuant to Section 5 because the applicant "failed to show that this information constitutes exculpatory evidence"). In *Ex parte Ruiz*, 2007 Tex. Crim. App. Unpub. LEXIS 928

order is still silent as to the basis for its decision in Mr. Canales' case.  Specifically, this Court cannot discern from the face of the state court order whether the CCA (1) determined that *Wiggins* is not a new legal basis within the meaning of state law and stopped its analysis; or (2) determined that *Wiggins* is a new legal basis within the meaning of state law but dismissed based on its view that Mr. Canales had not made a prima facie showing of a constitutional violation "sufficiently serious as to likely require relief from his conviction or sentence." *Ex parte Campbell,* 226 S.W.3d at 422.  Because it is ambiguous, this Court cannot presume an independent state bar.

Deciding the §5(a)(1) argument permitted the CCA to decide whether Mr. Canales has made a *prima facie* showing of a federal constitutional rights violation warranting relief.  Because §5(a)(1) contains a determination of whether a meritorious federal constitutional claim for relief has been alleged, and given the state court record *in this case*, the state court's unexplained dismissal cannot be determined independent of federal law.  "Whether a §5(a)(1) dismissal is independent of federal law turns on case-specific factors." *Rocha*, 626 F.3d at 835.

In *Ruiz v. Quarterman*, 504 F. 3d 523 (5th Cir. 2007), the petitioner filed a *Wiggins* claim in state court in a successive application and argued that the factual basis for his claim was not previously available within the meaning of §5(a)(1) due to the severance of the agency relationship between the petitioner and his counsel.  In response

---

(Tex. Crim. App. 2007), also a post-*Campbell* decision, Judge Womack expressly wrote that he was resolving the merits prong without resolving the procedural element. In short, *Campbell* imposes no such requirement. *See also Balentine v. Thaler*, 629 F.3d 470, 483-84 (5th Cir. 2010). (Dennis, J., dissenting) ("In short, the CCA does not always first decide the unavailability prong of § 5(a)(1) before considering the prima facie showing component.")

to Ruiz's application, the CCA issued an unexplained *per curiam* order dismissing the application similar to the one issued in Mr. Canales' case.  Judge Womack, who joined the *per curiam* order, wrote a separate concurrence to express his view that, while the procedural question that the petitioner raised was a "serious and unresolved question," he did not believe it necessary to answer because he believed the claim lacked merit and could therefore be disposed under the merits prong of §5(a)(1). *Ruiz*, 2007 Tex. Crim. App. Unpub. LEXIS 928 at *5 (Womack, J., concurring).  A dissent was also written in which the minority accused the majority of misinterpreting the nature of Ruiz's Sixth Amendment claim, which wrongly led them to believe it lacked merit. *Id*. at *3-*4.  The Fifth Circuit subsequently determined that the *per curiam* dismissal order was not independent of federal law and therefore, federal court review was permitted and warranted. *Ruiz*, 504 F.3d. at 527.

In *Balentine v. Thaler*, 626 F. 3d 842 (5th Cir. 2010), the petitioner had also filed a *Wiggins* claim in state court in a successive application.  Unlike *Ruiz*, "Balentine did not expressly identify in his subsequent application to the state court which subsections were relevant."  626 F.3d. at 855.  Also unlike *Ruiz*, "Balentine's subsequent application made no effort to show that the facts or law underlying his *Wiggins* claim were unavailable to him at the time of his first state application."  *Id*.  The CCA dismissed Balentine's successive state application in an unexplained order similar to the *per curiam* order in *Ruiz*. *Id*. at 850-51.  The Fifth Circuit held that the state court's dismissal order was based on an independent state ground. The Fifth Circuit found it dispositive that there was nothing in the record – not in Balentine's habeas application and nothing in the

CCA's orders – that gave any indication that the CCA was considering or determined the merits element of §5(a)(1). *Id*. at 854.

Here, the state court record is anything but silent. Unlike *Balentine*, but like *Ruiz*, Mr. Canales' successive application identified §5(a)(1) as the provision he satisfied and made a prior-unavailability argument under §5(a)(1). Also unlike *Balentine*, but like *Ruiz*, the CCA itself indicated its consideration of the merits element of §5(a)(1) when it issued an order requesting additional briefing on what standard should be applied for judging "the effectiveness of counsel's actions undertaken before the decision in *Wiggins*." It cannot be disputed that this question goes to the underlying Sixth Amendment claim that Mr. Canales raised. Although the parties wrote and submitted briefs addressing the federal question, the CCA held no oral argument, issued no opinion or other comment on the issues after the additional briefing was submitted and ultimately issued its unexplained dismissal order citing §5. Without further explanation or a clear and express statement that the dismissal was based on an independent state ground, the state court record strongly suggests that it debated and resolved Mr. Canales' *Wiggins* claim on federal law grounds.

As the Supreme Court recognized in *Harris v. Reed*, "state courts have become familiar with the 'plain statement' requirement under *Long* and *Caldwell*." 489 U.S. at 264. Therefore, the Fifth Circuit has recognized that "an absence of clarity in an opinion is seldom inadvertent. Calibrated uncertainty can play a mediating role in garnering support for an outcome." *Ruiz*, 504 F.3d at 527. Given the state court record in this case, and the explicit request for additional briefing on the merits, this "absence of clarity"

becomes affirmative evidence of a disposition based on the underlying federal constitutional question.

As in *Ruiz*, the Fifth Circuit case that Mr. Canales' resembles more closely than *Balentine* or *Rocha*, the CCA's dismissal, "leaves the decisional path far short of the clarity insisted upon by *Michigan v. Long*, … of which the CCA is acutely aware." *Ruiz*, 504 F.3d at 528. Under these circumstances, and unlike in *Balentine* or *Rocha*, there is "good reason to question whether there is an independent and adequate state ground for the decision." *Coleman*, 501 U.S. at 739. This Court must presume that the CCA's decision is not independent of federal law and address the merits of Mr. Canales' *Wiggins* claim.

### 2. The state court decision is nonetheless not subject to 28 U.S.C. §2254(d).

Any inquiry into whether this Court must apply the strictures of 28 U.S.C. §2254(d) must first ask whether the claims were "adjudicated on the merits in State court proceedings." When a claim has been presented to a state court, but the state court has not adjudicated the claim on the merits, then Section 2254(d)'s limitation on a federal court's power to grant relief does not apply and review is *de novo*. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland [v. Washington*, 466 U.S. 668 (1984)] analysis"); *Rompilla v, Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts…never reached the issue of prejudice, … we examine this element of the *Strickland* claim *de novo*").

This inquiry is distinct from whether the state court ruling is independent of federal law, a question focused on whether the federal court must respect a state court's application of a procedural bar. In very narrow circumstances, such as in Mr. Canales' case, a state court dismissal can be treated as non-independent of federal law and still fail to be an adjudication on the merits with respect to 28 U.S.C. §2254. The overlap and interplay of these two distinct doctrines requires further explanation.

When a state court dismisses a claim by applying a state procedural bar and a federal petitioner challenges the dismissal's independence, several scenarios exist regarding potential federal review. First, the procedural bar could unambiguously be based upon a state procedural default. For example, the state court could expressly dismiss the claim because a timely objection was not raised at trial. This unambiguous procedural bar is solely grounded in a state rule and incorporates no federal constitutional consideration. The federal habeas court must, therefore, respect the state procedural bar and cannot review the merits of the claim. In this situation, 28 U.S.C. §2254 is irrelevant because merits consideration is forbidden unless cause and prejudice are shown, in which case, §2254 is inapplicable. *Graves v. Dretke*, 442, F.3d, 334, 339 (5th Cir. 2006).

A second possibility is that the state court issues a dismissal but, during its analysis of the case, clearly rests that dismissal on federal law. In *Ex parte Campbell*, for example, the CCA dismissed the petitioner's successive petition only after discussing Campbell's failure to make a *prima facia* case for his *Brady* claim (and, indeed, rejecting Campbell's effort to distinguish his *Brady* claim from one denied in another federal case). 226 S.W.3d 418, 422, 424 (Tex. Crim. App. 2007). The CCA's dismissal was expressly

based on the resolution of federal legal questions and clearly an adjudication on the merits.

Mr. Canales' case presents a third, less common, scenario. As *Harris v. Reed*, *supra*, instructs, a federal court is not required to speculate as to the basis of a state court dismissal. When a state court dismisses on procedural grounds but fails to clearly and expressly show the dismissal was based independently on state law grounds, the federal court cannot respect that procedural bar. In such a situation, the federal court is required to treat the dismissal *as if* it were a merits determination for purposes of procedural default analysis. This presumption, however, does not indicate that it is, in fact, a merits determination or that it should be considered an "adjudication on the merits" pursuant to §2254(d). It simply instructs the federal court to disregard the alleged procedural default. However, because the Court cannot discern the actual basis of the dismissal, 28 U.S.C. §2254(d) does not apply. *Prevatte v. French*, 459 F.Supp.2d 1305 (N.D.Ga. 2006) explained this situation clearly:

> In short, the state habeas court's order gives no indication whether it considered and rejected these claims, or whether it never passed on the merits of those claims based upon a state procedural rule. From this, the Court draws two conclusions. First, because the state habeas court did not "clearly and expressly" state that it relied on state grounds in reaching its decision, the doctrine of procedural default does not apply to bar these claims in this federal habeas action. *See Harris v. Reed,* 489 U.S. 255, 263 (1989). Second, because of the various reasons given for the denial of those claims, the Court cannot discern whether the state court actually considered and rejected Petitioner's *Brady* claims on the merits, so as to constitute an adjudication within the meaning of § 2254, or whether it simply refused to reach the federal issue. *Cf. Romine v. Head,* 253 F.3d 1349, 1365 (11th Cir. 2001) ("when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply"). That being the case, this Court will review Petitioner's [] claims de novo.

*Id.* at 1382.

When Mr. Canales presented his ineffective assistance of counsel claim to the state court, the CCA, in a *per curiam* order, held that the claims "fail to satisfy the requirements of Article 11.071, Section 5(a)" and dismissed the application "as an abuse of the writ." *See* Order, *Ex parte Canales,* slip op., No. WR-54-789-02 (Tex. Crim. App. Feb. 13, 2008) (unpublished).  As discussed, *supra*, where a state court disposition does not clearly and expressly rest on a state law ground that is both independent of federal law and adequate, a federal court is not precluded from addressing and resolving the merits of the federal claim.[2]  But, finding that the state court's disposition is ambiguous and therefore not independent for purposes of procedural default is not a finding that the state court has adjudicated the merits of the federal constitutional claim within the meaning of 28 U.S.C. § 2254(d).  The CCA's order in Mr. Canales' case was undeniably ambiguous and, just as in *Prevatte*, this Court should review Mr. Canales' claim *de novo*.

### 3. Assuming, arguendo, the CCA's order is an adjudication on the merits, Section 2254(d) does not preclude granting of relief on Mr. Canales' Sixth Amendment right to counsel claim.

Even if the state court is considered to have adjudicated Mr. Canales' ineffective assistance of counsel claim on the merits, §2254(d) would not bar relief because any adjudication of Mr. Canales' claim on the merits by the state court was objectively

---

[2] Because petitions for habeas corpus raise federal questions, the state's application of an independent and adequate state law ground to dispose of a claim does not create any kind of jurisdictional impediment to review of the federal claim in the federal habeas action.  Procedural default doctrine is instead grounded in concerns of comity and federalism. *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).  The doctrine advances the principle that "the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights" and

unreasonable.  At the stage of proceedings at which it was dismissed, the CCA had to decide whether Mr. Canales *alleged* a prima facie violation rather than whether he proved a constitutional violation by a preponderance of evidence.  *Campbell*, 226 S.W.3d at 421 ("We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a) ... the ***specific facts alleged***, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." (emphasis added)).  The CCA's presumed decision that Mr. Canales' state application did not allege a prima facie Sixth Amendment violation is simply an unreasonable application of the Supreme Court law.

A defendant is denied effective assistance when trial counsel performs deficiently, *i.e.*, his performance falls below professional norms, and when that deficient performance is prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*, 466 U.S. at 694.  If "there is a reasonable probability that at least one juror would have struck a different balance," the petitioner has established prejudice.  *Wiggins v. Smith*, 539 U.S. at 537; *see also* CR 110 (jury must "unanimously find and determine" the answer to the "mitigation" special issue).

As outlined in his Petition (Dkt. No. 7) and the identical pleading filed in state court, Mr. Canales clearly provided sufficient evidence to make a *prima facie* case on both prongs of *Strickland*.  A wealth of mitigating evidence was available to counsel;

---

"ensures that the States' interest in correcting their own mistakes is respected in all federal habeas

counsel failed to investigate and present evidence; there was no strategic reason for this failure; and this failure prejudiced Mr. Canales. (Dkt. No. 7, 5-15, 36-74).

Once the Court finds the state court's decision unreasonable, federal review is no longer constrained. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Thus, regardless of the path taken, the destination is the same: Section 2254's limitation on relief either does not apply or is satisfied and federal review is *de novo*.

**B. *Mr. Canales' claim that the State misconduct violated his federal constitutional rights is not procedurally defaulted.***

For the same reasons outlined above, Mr. Canales' claims of state misconduct are not procedurally defaulted. *Rocha* is again easily distinguishable because Rocha did not make a §5(a)(1) unavailability argument to the state court whereas Mr. Canales did. Further, unlike in *Rocha*, here there is "good reason to question" whether there is an independent state ground for the decision" dismissing the misconduct claims, namely his *Massiah*, *Brady*, and *Napue* state misconduct claims. *Coleman*, 501 U.S. at 739.

The state court disposition is not independent of federal law, and indeed, the Fifth Circuit specifically determined, in the context of a state misconduct claim, that the CCA's unclear §5 dismissal is not independent of federal law. *In re Johnson*, No. 07-20546 (5th Cir. July 27, 2007) (attached as Appendix B). In that case, the Fifth Circuit rejected application of a procedural default asserted by the CCA to a *Brady* claim, stating:

> This Court "will not apply a procedural default unless the last state court to consider a particular claim 'clearly and expressly' relied on an independent and adequate state ground." *Emery v. Johnson*, 139 F.3d 191,

cases." *Id.*, at 731, 732.

195 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)).  Because we do not find that the Court of Criminal Appeals order contains such a clear and express statement, we decline to find the claims procedurally barred.

*Id.   See also* Memorandum Opinion and Order, at 20, *Jones v. Thaler*, No. 09-cv-01825 (S.D. Tex. Mar. 3, 2011) (applying Harris presumption to *Brady* claim dismissed under §5).

The CCA's application of §5 to Mr. Canales' state misconduct claims is also not adequate.  To be "adequate" to bar habeas review, the procedural default must occur pursuant to a state procedural rule that is 'firmly established and regularly followed' in the state courts.  *Ford v. Georgia*, 498 U.S. 411, 423 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).  In other words, "State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar cases."  *Hathorn v. Lovern*, 457 U.S. 255, 262-63 (1982) (quoting *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964)); *accord Dugger v. Adams*, 489 U.S. 401, 410-11 n.6 (1989).  Procedural rules that are applied inconsistently will not divest a federal court of jurisdiction.  *See James v. Kentucky*, 466 U.S. 341, 348-349 (1984) (only "firmly established and regularly followed state practice … can prevent implementation of federal constitutional rights"); *Barr v. City of Columbia,* 378 U.S. at 149 (state procedural rules "not strictly or regularly followed" may not bar review); *National Ass'n for the Advancement of Colored People ex rel. Patterson*, 357 U.S. 449, 457-458 (1958) ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights").

The CCA's invocation of an abuse of the writ to avoid reviewing Mr. Canales' state misconduct claims is not "adequate" because it is not a regularly followed or consistently applied rule. *See Ex parte Toney*, No. 51,047-03 (Tex. Crim. App. 2006) (authorizing successive proceedings on, inter alia, *Brady* and *Napue* allegations); *Ex parte Reed*, No. 50,961-03 (Tex. Crim. App. 2005) (authorizing successive proceedings on *Brady* allegations); *Ex parte Rousseau*, No. 43,534-01 (Tex. Crim. App. 2002) (authorizing successive proceedings on a claim that the State withheld impeachment evidence of eyewitness and evidence of innocence); *Ex parte Washington*, No. 35,410-02 (Tex. Crim. App. 2002) (authorizing successive proceedings on claim that the State withheld information regarding criminal records of punishment phase witnesses and presented false and misleading testimony); *Ex parte Murphy*, No. 30,0035-02 (Tex. Crim. App. Sept. 13, 2000) (authorizing successive proceedings on a claim that prosecutors relied on perjured testimony); *Ex parte Faulder*, No. 10,395-03 (Tex. Crim. App. June 9, 1997) (authorizing successive proceedings on a claim that prosecutors allowed witnesses to testify falsely and withheld exculpatory evidence); *Ex parte Nichols,* No. 21,253-02 (Tex. Crim. App. Apr. 16, 1997) (authorizing successive proceedings on a claim that prosecutors withheld the correct name and address of a witness with exculpatory information).

Examination of the underlying claims reveals that the rule is not regularly applied. The petitioners in *Toney*, *Washington*, and *Rousseau* were allowed to proceed in subsequent proceedings to litigate *Brady* claims based on evidence discovered through public records requests and a thorough review of documents previously available to prior

counsel.  There is no meaningful distinction between these cases and Mr. Canales' case which could explain the boilerplate dismissal of this case.  If anything, Mr. Canales can better demonstrate the prior unavailability of the misconduct claims than the petitioners in several of the prior cases authorized by the CCA.  Because the procedural bar in Mr. Canales' case has not been firmly established or regularly followed, this Court has jurisdiction to reach the merits of his claim.   As set forth above, §2254(d) does not apply if the state court decision is not independent.  Further, where the state court's procedural bar is irregularly applied, the AEDPA imposes no constraint. *Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009).

## C. The CCA's decision dismissing Mr. Canales' juror misconduct claims is not based on an adequate state ground.

The analysis above applies with equal force here.  The CCA has not regularly and consistently applied its state procedural bar to subsequent claims raising juror misconduct.   Although such claims are less frequently raised in state successor applications, the CCA has allowed such claims to proceed in successor litigation. In *Ex parte Gibbs,* No. 23-624-03 (Tex. Crim. App. April 5, 1999), for example, the CCA authorized a claim regarding a juror's deceptive voir dire answers and sent it back to the district court for further factual development. The CCA provided no explicit reasoning for dismissing Mr. Canales' juror misconduct claims and in light of the CCA's inconsistent application of the procedural bar to juror misconduct claims, this Court has jurisdiction to reach the merits of his allegations.  As set forth above, §2254(d) does not apply if the state court decision is not independent.  Further, where the state court's

procedural bar is irregularly applied, the AEDPA imposes no constraint. *Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009).

### D. The CCA's decision dismissing all other claims alleged by Mr. Canales is not based on an independent state ground.

As set forth, *supra*, the state court decision in this case is not clearly independent of federal law. Therefore, this Court has jurisdiction to reach the merits and conduct *do novo* review of all of Mr. Canales' claims. As set forth above, §2254(d) does not apply if the state court decision is not independent.

### III. Even Assuming the Independence and Adequacy of the State Court Decision, Mr. Canales Can Demonstrate Cause and Prejudice Excusing Any Alleged Default of His Claims.

Even if the Court rejects Mr. Canales' argument that the state procedural rule is either not independent or inadequate to bar review of his claims in federal court, it should find that Mr. Canales has established cause to excuse any default, and that the underlying federal constitutional violation was actually prejudicial.

By establishing cause and prejudice, Mr. Canales is entitled to have any procedural default excused. "Cause" has been defined as any "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). A petitioner can demonstrate cause if "the factual or legal basis for a claim was not reasonably available to counsel." *Coleman v. Tompson,* 501 U.S. 722, 752 (1992). To establish prejudice, the petitioner must establish the complained-of constitutional error caused actual prejudice to his case. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) ("Once the petitioner has established cause, he must show 'actual prejudice' resulting from the errors of which he complains").

If the Court finds cause and prejudice, §2254(d) does not apply as there was no adjudication on the merits in state court. Further, the Court's review of the federal constitutional claim is *de novo*. *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1995) (citing Larry W. Yackle, *A Primer on the New Habeas Corpus Statute*, 44 Buff. L. Rev. 381, 420-21 & n.129 (1996) (stating that state court decision that claim was procedurally barred cannot be adjudication on the merits for purpose of AEDPA)). Thus, if cause and prejudice are satisfied, *Pinholster* has no relevance to the case and the Court may consider any new evidence in determining whether a constitutional violation occurred so long as it does not fundamentally alter the claim. *Morris v. Dretke*, 413 F.3d 484, 495 (5th Cir. 2005) (considering "new IQ evidence presented for the first time in federal court" because the "new evidence merely supplemented the petitioner's claims").

### A. *Mr. Canales' Brady claims*

In deciding whether a *Brady* claim satisfies the cause and prejudice exceptions to procedural default, the Court need simply consider whether it meets the criteria for a meritorious *Brady* claim. *Strickler* v. *Greene,* 527 U.S. 263 (1999), outlined the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281-82.

"[C]ause and prejudice" in this case "parallel two of the three components of the alleged *Brady* violation itself." *Id.* at 282. Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his

failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice in the context of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes. *Id.  See also Banks* v. *Dretke,* 540 U.S. 668, 691 (2004).

As set out in Mr. Canales' Petition for Writ of *Habeas Corpus* ("Petition") and reply in support (Dkt. Nos. 7, 21), and briefing related to discovery (Dkt. Nos. 15, 19, 73, 81), Mr. Canales has demonstrated the State suppressed the evidence at issue, and that it is material, and in so doing, has established cause and prejudice to excuse procedural default.

### 1. The State's suppression of exculpatory evidence and false representations to Mr. Canales' counsel constitute cause.

As detailed below and in Mr. Canales' Petition for Writ of *Habeas Corpus* and reply in support (Dkt. Nos. 7, 21), and briefing related to discovery (Dkt. Nos. 15, 19, 73, 81), the prosecution in this case failed to disclose extensive benefits to witnesses and voluminous documentation impeaching their credibility.  Further, in words strikingly similar to the Texarkana prosecutor's statement in *Banks* (who promised to "provide … all discovery to which you are entitled" (*id.* at 674-75)), the prosecutor in this case indeed provided *further* reassurance:

> There's absolutely nothing that we have not disclosed in discovery.  We've gone way above what they're entitled to, and I'm just trying to forego any problem later, someone saying we held something back.

SR 3:21.

Given the prosecutor's strong and unequivocal statement, "it is especially unlikely that counsel would have suspected that additional impeaching evidence was being

withheld." *Strickler*, 527 U.S. at 285.  Further, state post-conviction counsel was entitled

to rely on this representation.

> If it was reasonable for trial counsel to rely on, not just the presumption
> that the prosecutor would fully perform his duty to disclose all exculpatory
> materials, but also the implicit representation that such materials would be
> included in the open files tendered to defense counsel for their
> examination, we think such reliance by counsel appointed to represent
> petitioner in state habeas proceedings was equally reasonable.

*Id.* at 284.

In fact, as trial counsel attest, extensive information was suppressed. *See* Dkt. No.

19, Exhs. 1 & 2 (affidavits of trial counsel Harrelson and Hoover).  Only in the course of

the initial federal *habeas* proceedings did the State disclose to Mr. Canales' counsel the

voluminous evidence it suppressed at trial.[3]  This suppression constitutes cause to excuse

Mr. Canales' default, as it was plainly an external, objective factor that accounts for his

failure to raise this claim sooner.  As the Supreme Court noted in *Banks,* fundamental

values of our criminal justice system compel the conclusion that this kind of suppression

constitutes cause to excuse a default:

> Our decisions lend no support to the notion that defendants must scavenge
> for hints of undisclosed *Brady* material when the prosecution represents
> that all such material has been disclosed. ... The State here nevertheless
> urges, in effect, that "the prosecution can lie and conceal and the prisoner
> still has the burden to ... discover the evidence," *Tr. of Oral Arg.* 35, so
> long as the "potential existence" of a prosecutorial misconduct claim
> might have been detected, *id.,* at 36. A rule thus declaring "prosecutor may
> hide, defendant must seek," is not tenable in a system constitutionally
> bound to accord defendants due process. "Ordinarily, we presume that
> public officials have properly discharged their official duties." *Bracy v.
> Gramley,* 520 U.S. 899, 909 (1997). We have several times underscored
> the "special role played by the American prosecutor in the search for truth

---

[3] After federal habeas counsel made a formal demand in writing for the prosecutor's files, and
over the objection of the Attorney General, the prosecutor provided the files to counsel.

in criminal trials." *Strickler,* 527 U.S., at 281. Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." *Berger,* 295 U.S. 78, 88 (1935). Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. *See Kyles,* 514 U.S. 419, 440 (1995), ("The prudence of the careful prosecutor should not ... be discouraged. ").

540 U.S. at 696 (some citations omitted).

### 2.   This suppression was prejudicial.

Suppression is prejudicial for the purposes of the cause and prejudice analysis if it is material for *Brady* purposes. *Banks,* 527 U.S. at 282. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 433 (1995); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Blackmon v. Scott,* 22 F.3d 560, 564 (5th Cir. 1994); *Ex parte Adams,* 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).   The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*.   First, to demonstrate materiality, Petitioner is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 433-34.   The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 434.   Second, materiality analysis "*is not a sufficiency of the evidence test.*" *Id.* (emphasis added).   "[A] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict [or return a sentence of death]." *Id.* at 434-35.   One demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435 (footnote omitted); *see also Lindsey* v. *King,* 769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness's testimony).   Third, harmless error analysis is not applicable to *Brady* violations. *Kyles,* 514 U.S. at 435.

"[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.*   Finally, materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Id.*, 514 U.S. at 437.   As is discussed herein, when the suppressed evidence in Mr. Canales' case is considered collectively, as it must be under *Kyles,* there is a reasonable probability that the result of his sentencing proceedings would have been different.

### 3.   The suppressed evidence: witnesses about whom the State failed to disclose benefits and deals

#### a.   Bruce Innes

Bruce Innes was a crucial witness for the State at both the guilt/innocence and the punishment phases of trial. Through Innes the State presented letters allegedly written by Mr. Canales explaining his participation in the murder of Dickerson and trying to put out a hit on a State witness. However, because Mr. Canales' defense was denied important impeachment evidence regarding Mr. Innes, the jury was unable to place Mr. Innes in the proper context. The evidence regarding Mr. Innes that was suppressed by the State included:

- Evidence demonstrating Innes' renunciation of his gang affiliation was not true and that he was simply seeking the benefits conferred by TDCJ of not being labelled as a gang member;

- Evidence that Innes was not criminally prosecuted for possessing a weapon in prison;

- Evidence that the relationship between the Special Prosecution Unit ("SPU") and Innes was ongoing and multifaceted whereby Innes was receiving Unit transfers and other benefits in exchange for his cooperation, including the solicitation of incriminating evidence;

- Evidence that SPU not only agreed to the deal revealed to the defense but that SPU agreed to continue to advocate for him including sending favorable recommendations to the parole board;

- Evidence that Innes was allowed to speak to other State witnesses and corroborate their stories; and

- Evidence that Innes' testimony about how he received Mr. Canales' incriminating letter was false and that the State knew his testimony was false.

Although these violations standing alone would undermine confidence in the jury's verdict in Mr. Canales' case, taken together they illustrate the inherent unreliability of all the State's inmate witnesses.

### i. Continued gang ties

Innes presented himself to the jury as an ex-gang member who, because of pangs of conscience, came forward and assisted in the prosecution of the murder of Dickerson. Although Innes did admit that he was pending sentencing for two offenses, a major theme on cross-examination, his complete and sundry history was never revealed. When asked why he decided to go to the authorities he responded:

> Well, that's kind of a complicated question, but I felt like that it was possible that they got the wrong person, and not only that, my romanticized ideas of being in the Texas Mafia were destroyed. I mean, you know, it woke me up – you know, murder – it's all well and good to want to be Al Capone and all of that, but to actually know that you're involved in something that's taking people's lives, is – it's pretty heavy, so –

SR 10:40.

Contrary to the impression he gave the jury, Innes seemed to have little problem with the violence of prison gang life.  On December 23, 1996, for example, Innes and two others attacked another inmate with their fists and "an oblong stone approximately 6" in length, 2 ½" in circumference, with one end blunt, and the other end pointed." Exh. 154[4] (Incident Report and memo).  As a result of their attack, the inmate "received 5 puncture wounds to the lower back, a 4" laceration to the back of his head which required 13 stitches, and multiple bruises and contusions to the face and forehead." *Id.*  The jury was never informed of Innes' attack on this inmate.

Even though the State presented Innes as an ex-gang member who had become disillusioned with prison gang life after Dickerson's murder, the State never revealed the detail surrounding Innes' gang renunciation or the substantial benefits an inmate gains from disassociation with a prison gang.  Documents in the prosecutor's file obtained by undersigned counsel demonstrate that Innes sought not only reduced sentences on his pending charges, but also gang declassification as a condition for his cooperation with the murder investigation.  TDCJ officials had apparently agreed to Innes' declassification early in 1998.  On June 1, 1998 A.P. Merillat of the SPU Unit contacted Records/Classification and informed them he was leaving it up to Innes "as to whether or not he wants the de-confimation process started, or if he wants to lay low and provide us

---

[4] To streamline the already-extensive documentary record in this case, Mr. Canales has not attached the cited exhibits with this pleading. All the citations to exhibits correspond to the exhibits filed with this Court in connection with his Petition (Dkt. No. 7). Mr. Canales would be happy to file another set of exhibits if so directed by the Court.

information on the gang." Exh. 47 (SPU letter 6/15/98).  Innes was still seeking benefits

of deconfirmation in 1999 and 2000.  On September 3, 1999, a Telford Unit printout

shows that "offender Innes has requested to be reclassified as an ex member, but claims

that special proscecutor's [sic] office has instructed him to keep in contact with TM

members (for purposes concerning the homicide)." Exh. 42 (Telford Unit printout).  A

TDCJ "I-60" prisoner request form also demonstrates Innes' belief that he should no

longer be treated as a gang member:

> Capt. Scott, I have requested to be reclassified as an X-member of the TM.
> Due to my cooperation in a capital murder investigation involving several
> members, so that my file reads as me being de-confirmed & that my seg.
> status be changed to protective custody, instead of security detention as
> threat to staff & inmates.

Exh. 48 (I-60 from Innes).

Moreover, SPU was allowing Innes to seek the benefits of deconfirmation despite

evidence and even strong concern by a TDCJ employee that he had not renounced

membership.  Lonnie Eason, another TM member providing information to SPU, wrote

to A.P. Merillat in July of 2000 noting that Innes had not given up his gang activity.

According to Eason, Innes "has been constantly representing T.M. matters and has been

pure 'Gun Ho.'" Exh. 49 (Letter of Eason).  He also asks Merillat to "Just tell Innes to

leave T.M. alone & lay low.  He's outta there with em when he testify's anyway!" *Id.*

 TDCJ's concerns about Innes' renunciation are reflected in a letter dated June

2000, well after Innes had supposedly "renounced affiliation." The Estelle Unit copied a

letter from Innes to a "District Major"of TM named James Nicholas. Attached to the

letter, a TDCJ employee queries: "Please note: According to I/M Innes '07' screen he is

supposed to be on the TM "Hit list" if he was why would he be writing the District major a letter like this?"   Exh. 50. This information, which directly undermined Innes' assertions that he was no longer involved with the gang, was never supplied to the defense. Moreover, because this information was known to the State, the prosecution violated *Napue* by failing to correct the false impressions Innes presented to the jury regarding Innes' revelations of conscience.

### ii. Special treatment regarding crimes committed in prison

Innes' cooperation with SPU gained him other advantages which were also suppressed by the State. Innes, for example, was not subjected to prosecution for taking a metal shaft from his fan and hiding it in a pipe chase, an action which normally be considered concealing a shank. After "catching a case," Mr. Innes wrote to Merillat:

> I was without a radio & I had a pair of headphones. My neighbor offered to connect me if I could come up with some wire & help him get his radio open. So I broke my fan down for the coil of copper wire inside & I used the metal shaft that [illegible] is on to make a screwdriver out of to try & break the triangle shaped screws. Well it didn't work & I threw away, or tried to, in the back vent...

Exh. 51 (Innes 10/7/99 Letter).

Merillat responded:

> Regarding the recent case you spoke of where a fan was disassembled and part of it was put in the pipe chase – just because a disciplinary case was written, it does not mean that our office will file criminal charges. We have no control over the disciplinary process within TDCJ. However, when IAD comes to us to file charges in criminal matters, we screen each case individually, giving consideration to each element of the case. Simply calling an item a weapon does not guarantee that the SPU will go to the grand jury seeking indictment. Yes, I know that fingernail clipper can be called a weapon, and we have prosecuted inmates for less than that *but* – we have – done that when the facts showed that the defendant

intended the item to be a weapon. So, the facts that you provided make a big difference in how we would look at the case.

Exh. 52 (SPU 10/14/99 Letter).

Thus, even though SPU admittedly has prosecuted inmates for having less than a fingernail clipper, in Innes' case SPU simply chose to believe his version of events and nothing was pursued. This information was never revealed to the defense.

### iii. Ongoing relationship between SPU and Innes

The relationship between Innes and the SPU was much more complicated than the State portrayed at trial. Although the State admitted that they had cut a deal with Innes in exchange for his testimony, the communications between both parties reveal that there were continual intricate and subtle negotiations. Innes, for example, wrote to SPU from Midway, Texas (likely the Ferguson Unit) in July of 1999 stating: "Mr. Merillat I'm not just dead weight to you, as you can see by the info – I'm asking you to help me get transferred A.S.A.P. I will continue to prove useful & help full, [sic] But if I have problems I expect your help too." Exh. 53 (Innes 7/7/99 Letter).

Innes wrote again in October of 1999 when he suddenly believed that the State had retracted its deal. Since the last letter Innes had been moved to the Wynne Unit. He wrote:

> Also I get a letter from State Counsel for Inmates and it's a plea offer on the New Boston cases! But I'm being offered 10 on one case & five on the other to run cc. But I was told by Mr. David P. O''Neil (also runs State Counsel for Offenders) that the agreement for my copperation [sic] & testimony & the letters I had, would be 3 yrs. & the weapons charge dropped.

Exh. 51 (Innes 10/7/99 Letter).

Merillat, acknowledging the unit change, reassured Innes:

> I got your letter, and previously heard that you were on the Wynne Unit. I recall our phone call when you were housed at Telford, and you advised me that Wynne would be agreeable for housing. Now, we are not going back on anything .. .let me know who promised you what as far as agreements on your pending cases. I have not been involved in any negotiations, deals or anything of that nature. If someone made promises, let me know *who* it was so I can pursue that.

Exh. 52 (SPU 10/14/99 Letter).

A letter to Innes, this time signed "A.P.", dated June 12, 2000 makes clear that Innes is still in an active working relationship with SPU. He states: "I got your letter and the Stiner information today. Thanks for sending those documents. I have not heard anything about the Canales letters or any ramifications about the letters you sent him. I was hoping he might make some admissions, etc., but evidently not."   Exh. 46 (SPU 6/12/00 Letter).

By July 2000, Innes was already having difficulty at the Wynne Unit and requesting another change. Merillat wrote back offering to help:  "I got your letter today. I have made moves toward getting you somewhere else. They aren't real supportive of my asking for particular units, but I'm willing to give it a go." Exh. 54 (SPU 7/12/00 Letter).

On November 6, 2000, almost immediately after Mr. Canales' trial, a SPU investigator wrote TDCJ's Bureau of Classification, asking it to "honor [the prisoners'] request" to be moved to specific units. Innes, along with the other State's witnesses, was on this list. Exh. 76.

These documents, which were never revealed to the defense, demonstrate that Innes' relationship with the State far exceeded simply getting a deal on his pending

felonies. Innes was continually receiving benefits from the prison system in exchange for actively seeking out evidence to use at Mr. Canales' trial. This partnership even included illegally soliciting incriminating information from Mr. Canales himself. *See infra.* Had the jury been aware of this information, Innes' testimony would have been placed in proper perspective: that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to make his time in prison easier.

### iv. Collaboration between State witnesses

Unbeknownst to the defense and the jury, the State had placed Innes together with another witness thus providing an opportunity to compare information. This classic type of impeachment evidence was not disclosed to the defense.

An April 4, 2000, letter from Larry Whited indicates that he and Innes are in solidarity and working for SPU. In the letter Whited recounts how he and Innes have compared and corroborated each other's stories. Whited mentions that he and Bruce Innes went to the John Sealy Hospital in Galveston together:

> But anyway, we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile) and I found out a whole lot about some of the things that've been going on with the infamous Texas Mafia since I've been gone. Which is good for me because "To Know Is To Be Prepared." If you know what I mean.

Exh. 55 (Whited 4/4/00 Letter). Whited also reveals more of Innes' incentive to cooperate:

> Which reminds me, A.P., the dude ask me to talk to you about helping him go on and get out of Seg so he can get somewhere to do his time, so even though I already know that there isn't a whole lot you can do, I'm still going to go on and try to do this because I gave him my word that I would. Not to mention the fact that if you 'de [sic] have seen his face when he ask me, well, you' de [sic] have probalby [sic] done the same thing. (smile) He

wants to come to population and be on the same farm as I am, A.P. Which
to be honest, isn't really a bad idea since we're in this particular boat we
are in.

*Id.*

### v.  State's Continued Support of Inmate Witnesses

Despite acknowledging only that the State agreed to a deal with Innes about his

pending felonies, documents disclosed only in post-conviction strongly suggest that other

promises were made.  After the trials were completed, for example, SPU provided letters

to the Texas Board of Pardons and Parole on behalf of inmates Baker, Canida, Innes,

Hill, Henson, Driver and Rice and provided a letter to Sammy Buentello for Innes

regarding gang renunciation. Exh. 56.  No documents have been disclosed to the defense

regarding any promises or deals involving the parole board.  It is possible that such

documents do not exist despite such promises being made.  Several letters from A.P.

Merillat regarding inmate Eason illustrate how SPU so effectively suppresses this

information. In December 1999, Merillat wrote to Eason:

> Now, what I must make clear is that no moves or benefits will be done in
> exchange for helping us. That would amount to payment to some people,
> and we do not do that. If anyone ever asks what you "got" for helping the
> State, you can honestly answer that we have only promised you protection,
> nothing else. If that ever changed, you would have to answer with
> whatever benefit you received.

Exh. 57 (Merillat letter to Eason).

The same day Merillat wrote to Sammy Buentello stating:

> Eason has cooperated with the Special Prosecution Unit in case
> preparations for the Dickerson murder case out of the Telford Unit. He has
> requested that we send you this copy of his renunciation. This is provided
> for any consideration you deem appropriate. Please call if you have any
> questions.

Exh. 58 (Merillat letter to Buentello).

These transactions, conducted with a wink and a nod, seem fairly well understood by inmates. In Whited's chatty letter of April 4, 2000, he lets Merillat know that he would really like a radio:

> I've got somebody who'll send me a radio just like the one that got took from me. It has all the T.V. stations and is a clock radio. It'll be brand new, still in the box, coming directly from the store is gets bought at... I know you can't just bring it up here to me without asking somebody first but I'm hoping you might be able to pull some strings and get someone in Huntsville to approve you giving it to me. Your office reputation will still remain untarnished as far as your never having to pay witnesses for testimony and all that ... All you have to say is that you're replacing a radio that was destroyed by people who don't want to see me take me stand, and it's a clock radio, medium size, and leave it at that.

Exh. 55 (Whited letter).

### vi.  False testimony about receiving the letter from Mr. Canales

Innes also provided perhaps the most damaging evidence against Mr. Canales when he testified to witnessing Mr. Canales pass him a "kite" containing a confession to the murder.[5]

| | |
|---|---|
| Prosecutor: | Alright, so on this particular day you told Canales you wanted a blow by blow description in a kite of what happened? |
| Innes: | Yes |
| Prosecutor: | Now, did you get it that day? |
| Innes: | I got it the next day. |

* * *

---

[5] The length of the excerpt reproduced below demonstrates the amount of time and attention the State devoted to Innes allegedly receiving a kite directly from Mr. Canales.

Innes:          Yes, I asked him if he had that for me, and he said, yes, I've got it, and I said, well, hang on just a second and I'll shoot the line out there to you and you can tie it on the line.

Prosecutor:     Alright, explain to the jury what you mean by "shooting the line."

Innes:          A line is thread taken from a waistband from the elastic of underwear, braided or twisted into a handmade rope, in sections of eight or ten foot, and then there's any type of weighty object attached to the end of it. The doors in Ad Seg only have about an inch or an inch and a half of space underneath, so it has to be something flat, and you just slide it out there to the day room, and that way you can pick stuff up, and send stuff.

Prosecutor:     Alright, you said the sections of string might eight to ten foot. Can a string – is that the longest it can be?

Innes:          Oh, no. There's lines long enough to go all the way around six stations.

Prosecutor:     Alright, they just keep tying strings?

Innes:          Uh, huh (yes). They just keep adding them on – tying them on.

Prosecutor:     And – okay. Is that a way for inmates to pass things among themselves?

Innes:          Sure.

Prosecutor:     Now, did you shoot a line over to the day room where Mr. Canales was?

Innes:          Yes, I did.

Prosecutor:     Did you live on the first row or the second row?

Innes:          I lived on the second row.

Prosecutor:     Alright, did the line make it over to near the day room?

Innes:          Yes, right by the bars.

Prosecutor:     Was Mr. Canales able to reach the line?

Innes:          Yes, he was.

Prosecutor:     Explain how Mr. Canales was able reach the line if you were on the second row?

Innes:          Well, if you'll notice where the door is – the day room door – where the bars come into a "V" – an inmate would – Mr. Canales would climb up the bars and stand about even with the 2-Row tier floor, and specifically that area right there is blind to the picket, so you know, just climb up there – climb up the bars, and I'd slide the line to him, and he'd reach out and grab it, and tie whatever he had.

Prosecutor:     Okay. Did Mr. Canales climb up those bars?

Innes:          Yes, he did.

Prosecutor:     Did he get hold of your line?

Innes:          Yes, he did.

Prosecutor:     Did he put anything on your line?

Innes:          He tied a written kite to me on the line.

Prosecutor:     Did you pull the line back in your cell?

Innes:          Yes, I did.

Prosecutor:     Did you read the kite?

Innes:          Yes, I did.

* * *

Prosecutor:     Mr. Ennis, do you recognize State's Exhibit 27?

Innes:          Yes, this is the

Prosecutor:     – no, no. We're going to take this step by step.  Be very careful. Do you recognize it?

Innes:          Yes, I do.

Prosecutor:     When is the first time you ever saw State's Exhibit 27?

Innes:          The day that Mr. Canales tied this onto my line.

Prosecutor:     Is that the kite you received from Mr. Canales?

Innes:          Yes, it is.

Prosecutor:     Did you see Anibal Canales tie that kite onto your string?

Innes:          Yes, I did.

Prosecutor:     Did you pull it into your cell?

Innes:          Yes, I did.

Prosecutor:     And did you read it?

Innes:          Yes, I did.

SR 10: 28-33.

The importance of the letter was emphasized by the prosecution, which relied on it almost exclusively in its closing argument:

> The problem for Mr. Canales, is that they didn't back any of theirs up with anything. They got a couple of inmates to come and say, naw, I know where he was – I know what he was doing, but they didn't back it up. I did. I backed up our testimony with the most damning piece of evidence I could have imagined, and there it is, and you will have this with you in the jury room, and if you don't, you may ask for it. This is the letter. This should convince you that Anibal Canales killed Gary Dickerson.

SR 11: 136.

The State spent the remainder of closing presenting an exegesis of the letter. Despite the abundant detail presented to the jury about how Innes came into possession of the letter, the State never revealed that Innes had given a previous account which directly contradicted his trial testimony. Furthermore, the State never corrected Innes' false testimony.

Specifically, in early 1998, as Innes was facing several criminal charges, his lawyer David O'Neil approached SPU about providing evidence in exchange for a deal. SPU, initially, would not guarantee anything. Exh. 59.  A few weeks later, O'Neil again contacted SPU and informed them that Innes had "access to a letter written by suspects." *Id.* (emphasis added).  The details surrounding the letter became clearer the following day when Innes was interviewed directly by SPU.  During that interview, Innes informed SPU that he neither possessed the letter nor received it.  SPU's notes of this interview state:

> Letter
>
> written by Canales
> **Another inmate has the letter – he's not involved @ all – will have to get the letter from him**
> **Another inmate rec the letter from Canales**
> This inmate sent me the letter to see it
> The letter is step for step how the letter [sic] went down.
> The letter is in Canales' handwriting

Exh. 60 (SPU notes) (emphasis added).

Thus Innes' claim before the jury that he had Mr. Canales write a letter and that he watched as Mr. Canales tied the kite on a string was completely fabricated.  Had this evidence been properly disclosed and/or had the State discharged its duty to inform the jury that one of their main witnesses was testifying falsely, the jury would have had a very different view of the State's case and the investigation of Dickerson's murder. *See e.g. Kyles v. Whitley,* 514 U.S. 419, 445 (1995) ("Damage to the prosecution's case would not have been confined to evidence of eyewitnesses, for [the suppressed evidence] would have raised opportunities to attack not only the probative value of crucial physical

evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well.").

      *b.   Steven Canida*

The State went to great lengths to assure the jury that its key eyewitness, Steven Canida, had obtained no benefits in exchange for his testimony:

Q:      Have you ever talked to me or any other prosecutor about any cases?

Canida: No, sir, never.

Q:      Have I ever offered you any kind of a deal?

Canida: No, sir.

Q:      Have you ever asked me for anything?

Canida: No, sir.

Q:      Well, as a prosecutor – you understand I [don't] work for TDCJ, right?

Canida: Yes, sir.

Q:      Is there something I can do to help you?

Canida: No, sir, ain't nothing – not that I know of.

SR 10:114.

In fact, Canida did receive substantial benefits from the State for his testimony. On November 6, 2000, just weeks after Canida testified, SPU wrote to the Board of Pardons and Parole on Canida's behalf. Exh. 56 (Inmate witness correspondence note). Canida was paroled the following July, having served only 11 years on a 50 year sentence. Exh. 61 (Canida criminal history).

Further, upon information and belief, Canida's cooperation with the State enabled him to diminish significantly his sentence and incarceration on a subsequent offense. Although an apparent candidate to be prosecuted as a habitual offender (pursuant to Texas Penal Code §12.42),[6] when Canida was convicted of another felony in 2002, he was sentenced to only 10 years, and served only one year before being paroled. Exh. 61 (Canida criminal history).[7]

### c.   *Larry Whited*

Larry Whited did not testify at Mr. Canales' trial nor at Mr. Speer's subsequent trial for the murder of Dickerson. Whited, however, appears to have been instrumental in developing and investigating the case against Mr. Canales. Whited was one of the first inmates to contact authorities and offer help in exchange for various benefits. On July 27, 1997 Whited wrote: "If you want to talk to me about this, then you take me away from here first. I do not care about your threats about refusing to cooperate. I will.  But under my conditions (and parole is not one of them)." Exh. 62 (Whited 7/27/97 Letter).

By April of 1998, SPU was already helping Whited become declassified as a gang member. According to a letter from the SPU chief prosecutor:

> Larry Whited #575256 has cooperated with the State of Texas in the investigation of the murder of inmate Dickerson which occurred at the Telford Unit in July 1997. Inmate Whited, previously confirmed as a Texas Mafia member, has provided valuable information against that

---

[6]   Indeed, it was because it was his third felony offense that when he testified against Mr. Canales, Canida was serving a 50 year sentence for Delivery of Marijuana in the Second Degree (SR 10:79).

[7]   Through discovery, Mr. Canales was recently permitted access to documents pertinent to this claim and is currently analyzing this information for inclusion in the Supplemental Petition to be filed after the depositions of Mr. Mullin and Mr. Merillat.

> gang, including details of how and why the killing was carried out, background information of gang activity at the Telford Unit and other information crucial to the prosecution of this murder case, which was a Texas Mafia hit on Dickerson... Please consider the possibility of classifying inmate Whited as "Ex-Texas Mafia," if this would be appropriate in light of his cooperation.

Exh. 63 (SPU 4/22/98 Letter). After Mr. Canales was convicted, SPU wrote the Texas Board of Pardons and Parole on behalf of Whited, noting that he "[d]id not testify, but cooperated." Exh. 56 (Inmate witness correspondence).

Whited's role in the investigation and prosecution of Mr. Canales is not entirely clear, but Mr. Canales' counsel are currently analyzing recently obtained relevant information for inclusion in the Supplemental Petition to be filed after the depositions of Mr. Mullin and Mr. Merillat.

### d.  Richard Driver, Jr.

Richard Driver was another witness that provided a purported link between Mr. Canales and the death of Dickerson. Driver claimed that he saw Canales speaking to Constadine, Speer and Barnes prior to the murder, an important fact to pursue a combination theory of prosecution. Driver, however, gave multiple versions of the events he supposedly witnessed, each changing significantly from the last. *See* Dkt. No. 7 at 18-22. Mr. Canales' counsel are currently reviewing recently obtained information related to this claim for inclusion in the Supplemental Petition to be filed after the depositions of Mr. Mullin and Mr. Merillat.

As the foregoing discussion demonstrates, Mr. Canales can show the necessary cause and prejudice to overcome any potential procedural default of his *Brady* claims. This Court should, therefore, examine the merits of Mr. Canales' claims.

### B. Mr. Canales' Other Claims of Prosecutorial Misconduct

Just as the State's suppression of crucial exculpatory and impeaching evidence constitute cause for Mr. Canales' inability to present his *Brady* claims to the state court, so too does it constitute cause for his inability to present his *Massiah* and *Napue/Giglio* claims to the state court. The information giving rise to these claims was contained in the same prosecution file that contained the *Brady* information. Further, Mr. Canales can establish prejudice as these claims are plainly meritorious.

#### 1. *Massiah*

Bruce Innes was the star of the State's case, presenting two powerfully inculpatory notes alleged written by Mr. Canales. He provided the only testimony alleging any statement or admission from Mr. Canales regarding the Dickerson murder.

Unbeknownst to defense counsel, and in violation of *Massiah* v. *United States,* 377 U.S. 201 (1964) and *United States* v. *Henry,* 447 U.S. 264 (1980), at the time he gathered these statements, Innes was acting as an undercover agent of the State. This fact was never disclosed to the defense and was discovered only upon review of documents from the State's file disclosed to undersigned counsel in these *habeas* proceedings. This constitutes cause for any default.

As detailed in his Petition (Dkt. No. 7 at 81-89), SPU recruited Bruce Innes as an undercover agent to collect information about the Dickerson murder. Innes supplied SPU with two incriminating "kites" allegedly from Mr. Canales, and these became crucial pieces of evidence in the prosecution's case against Mr. Canales. They were the only statements the jury heard ostensibly from Mr. Canales. In both the guilt/innocence and

the punishment phases of the trial, the State used these letters as the centerpiece of its argument. These illegally obtained letters incontestably prejudiced Mr. Canales.

Because Mr. Canales can demonstrate cause and prejudice to overcome any procedural default of this claim, this Court must examine the merits of Mr. Canales' claim.

### 2.  *Giglio/Napue*

Under *Giglio* and its progeny, a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Faulder v. Johnson,* 81 F.3d 515, 519 (5th Cir. 1996) (citing *Giglio v. United States,* 405 U.S. 150 (1972)); *Napue v. Illinois,* 360 U.S. 264 (1959); *Cordova v. Collins,* 953 F.2d 167 (5th Cir. 1992).  Due process also is violated when the prosecution allows the jury to be presented with a materially false impression. *See Alcorta v. Texas,* 355 U.S. 28, 31 (1957); *United States v. O'Keefe,* 128 F.3d 885, 897 (5th Cir. 1997). "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham, 595* F.2d 231, 242 (5th Cir. 1979).

In order to obtain relief under *Giglio,* Mr. Canales must show that (1) the testimony in question was actually false, (2) the State knew it was false and (3) the testimony was material. *See Pyles v. Johnson,* 136 F.3d 986, 996 (5th Cir. 1998); *O'Keefe,* 128 F.3d at 893; *Faulder,* 81 F.3d at 519.  "False evidence is 'material' only 'if there is any reasonable likelihood that [it] could have affected the jury's verdict.'"

*Goodwin v. Johnson,* 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996)). It is immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness. *OKeefe,* 128 F.3d at 893; *Barham,* 595 F.2d at 241-42. Even if there is sufficient evidence in the case to support a guilty verdict, it is the jury, and not judges, that is the body given the constitutional responsibility to decide guilt or innocence. *Barham,* 595 F.2d at 242. Habeas relief is warranted if there is a reasonable likelihood that the false testimony could have affected the jury's determination. *Bagley,* 473 U.S. at 678-79 & n.9; *Moody* v. *Johnson,* 139 F.3d 477,484 (5th Cir.).[8]

Moreover, *Giglio* relief is warranted for false evidence that affects the jury at the punishment phase, as well as evidence that affects the guilt/innocence phase. *See, e.g., Moody,* 139 F.3d at 484 (discussing *Napue/Giglio* claim regarding allegedly false expert testimony at punishment phase on subject of future dangerousness); *Goodwin* v. *Johnson,* 132 F.3d 162 (5th Cir. 1998) (discussing claim regarding allegedly false testimony by punishment phase witness). Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death." *Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993) (emphasis added).

---

[8] This standard is "considerably less onerous" than the standard for relief under *Brady* v. *Maryland,* 373 U.S. 83 (1963). The *Brady* standard requires a showing of a reasonable probability that the result of the proceeding would have been different if the evidence in question had been disclosed to the defense. A "reasonable probability" is defined as a probability sufficient to

As indicated by the evidence outlined above, in this case, the prosecution violated *Napue* in multiple ways, including by permitting Innes to testify falsely about his sole custody and personal witnessing of the supposed Canales confession; failing to correct the false impressions, as revealed in the evidence outlined above, Innes presented to the jury regarding Innes' revelations of conscience; and by eliciting the false testimony regarding SPU's inability to provide the inmate witnesses with any benefits.

Clearly the State's suppression of this evidence actually prejudiced Mr. Canales and thus he can establish cause and prejudice to overcome any procedural default. Because Mr. Canales can demonstrate cause and prejudice to overcome any procedural default of this claim, this Court must examine the merits of Mr. Canales' claim.

**C.** ***Any alleged procedural default of the claims of juror misconduct is excused due to cause and prejudice***

    **1.** **The State's suppression of information regarding criminal investigations of and proceedings against jurors, along with the jurors' own concealment of relevant facts, constitutes cause to excuse default.**

Two jurors answered the following question under oath on the juror questionnaire: "Have you or any member of your family ever been arrested or charged with any crime other than a traffic offense?" Exh. 67 (Questionnaires of Rawson and Miller). Each answered in the negative. *Id.* However, in the prosecution file, a list of veniremembers reflects notations by different names. Next to Mr. Rawson's name, the prosecutor noted, "been arrested for hot checks" and "inv. pending." Exh. 70 (State's juror list). Next to Mr. Miller's name, was written "hot checks" and "inv. pnd." *Id.* Thus despite

---

undermine confidence in the outcome of the proceeding. *See Kirkpatrick* v. *Whitley,* 992 F.2d 491, 497 (5th Cir. 1993) (citing *United States* v. *Bagley,* 473 U.S. 667, 679 n.9 (1985)).

each of these men's disavowals, at least one, and perhaps both, had been arrested for something other than a traffic offense. Moreover, each of these men was at that time **under investigation.** At no point did the State, despite their actual knowledge of these arrests and pending investigations, reveal to the Court and counsel that these jurors were concealing relevant facts.

Further, in deposition testimony, three jurors (Matlock, Dozier, and Rawson) confirmed they had had experiences with the criminal justice system that were not revealed to trial court and counsel. (Dkt. No. 73 at 3-5). A juror's withholding of material information can constitute cause. In *(Michael) Williams v. Taylor,* 529 U.S. 420 (2000), the Supreme Court considered whether a petitioner could be blamed for failing to raise in his state post-conviction proceedings a claim that a juror was biased, based on the fact that she withheld the fact that she had been married to the lead detective (and witness) in the case. The Court of Appeals for the Fourth Circuit stated that the claim could have been discovered if the state post-conviction lawyers had searched the county marriage records. The Supreme Court rejected this argument: "Because of [the juror's and knowledgeable prosecutor's] silence, there was no basis for an investigation into [the juror's] marriage history." 529 U.S. at 443.

In *Williams,* state habeas counsel had sought and been denied funds in state court to investigate another juror, but the Supreme Court did not find that motion dispositive of the question. The petitioner had made only "vague allegations" of "as yet undeveloped claims," and the State could certainly deny funding for this investigation. *Id.,* 529 U.S. at 443-44. The problem was that the individuals in the courtroom who knew the truth

remained silent and the claim was necessarily undeveloped. *Id.* at 443. In Mr. Canales' case, there is no reason to believe state post-conviction investigation into the jurors would have enabled him to develop his claim.   None of the information presented in this claim emerged from the interviews Mr. Canales' investigators were able to obtain.   All of it came from the prosecution file.   There was no reason for state post-conviction counsel to divert scarce investigation resources onto a claim he had no basis to believe existed.

### 2.   Mr. Canales can establish prejudice for relief on these claims.

If Mr. Dozier, Rawson, and Miller in fact have criminal convictions and/or arrests, their failure to answer relevant questions truthfully raises the inference that they sought to conceal these facts because they had an actual bias in the case.[9]   In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548 (1984), the Supreme Court set out the standard for evaluating claims that a party had been denied his constitutional right to an impartial jury. The defendant must demonstrate (1) that a juror failed to answer honestly a material question on *voir dire,* and (2) that a correct response would have provided a valid basis for a challenge for cause. *Id.* at 556.   "[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi,* 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted). Accordingly, the presence of a biased juror can never be harmless, and "the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon,* 151 F.3d 970, 972 n.2 (9th Cir. 1998) (en banc) (citing *Arizona v. Fulminante,* 499 U.S. 279, 307-10 (1991)).

The fact that the juror lied is itself indicative of bias. "[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *McDonough Power Equipment, Inc.,* 464 U.S. at 556 (Blackmun, J., concurring). *See also United States* v. *Boney,* 977 F.2d 624, 633-34 (D.C. Cir. 1992) (hearing into possible bias required where juror failed to acknowledge prior felony conviction on juror qualification form; juror's lack of candor "presents serious concerns," because it "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality"); *Dyer,* 151 F.3d at 979 (juror's "lies give rise to an inference of implied bias on her part"); *Burton* v. *Johnson,* 948 F.2d 1150, 1159 (10th Cir. 1991) ("Mrs. G. was dishonest is her response to questions on voir dire – this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonestly, of itself, is evidence of bias."); *United States* v. *Colombo,* 869 F.2d 149, 152 (2d Cir. 1989) ("Willingness to lie about [potentially disqualifying fact] exhibited an interest strongly suggesting partiality"); *United States* v. *Scott,* 854 F.2d 697, 699-700 (5th Cir. 1988) ("certainly when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's right to a fair trial"); *United States* v. *Perkins,* 748 F.2d 1519, 1532 (11th  Cir. 1984) (juror's "dishonesty, in and of itself, is a strong indication that he was not impartial."); *Rogers* v. *McMullen,* 673 F.2d 1185, 1189 (l1th Cir. 1982) ("a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief"); *McCoy* v.

---

[9] After the depositions of Mr. Mullin and Mr. Merillat, Mr. Canales will supplement this claim in

*Goldston,* 652 F.2d 654, 659 (6th Cir. 1981) ("A district judge shall presume bias where juror deliberately concealed information").

> As one court explained:

> If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror – to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions – with equal scorn. Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process. How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity? Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer*, 151 F.3d at 983.

Because Mr. Canales can demonstrate cause and prejudice to overcome any procedural default of this claim, this Court must examine the merits of Mr. Canales' claim.

**D. Any procedural default of the claims of ex parte communication between the jury and court personnel is excused due to cause and prejudice.**

*1. The suppression of information regarding the ex parte communication between the jury and court personnel constitutes cause to excuse default.*

In the course of the depositions of the jurors and the bailiff, undersigned counsel learned that the jury in Mr. Canales' case submitted questions to, and obtained evidence from, the bailiff.  Multiple jurors recalled posing at least one question to the bailiff during deliberations.  Some recalled requesting and receiving evidence; one believed they had requested a readback of testimony.  *See Petitioner Canales's Motion For Additional Discovery And Memorandum Of Law In Support* (Dkt. No. 73 at 7-11) (quoting jurors'

---

his supplemental post-deposition briefing.

deposition testimony).   These contacts were never presented in open court with the knowledge and presence of counsel and Mr. Canales.[10]   Nor was any record made of these questions.   Unless state officials – the bailiff and possibly the trial court judge – informed Mr. Canales and his attorneys, there was no way for Mr. Canales to know these contacts had occurred.   This state action constituted an "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. at 488.

### 2. *This communication violated Mr. Canales' constitutional rights and was highly prejudicial.*

These contacts constituted impermissible *ex parte* communication between the jury and the court, and violated Mr. Canales' Sixth Amendment right to confrontation and effective assistance of counsel, his Fourteenth Amendment rights to a fair trial and to appeal.   The proper practice for a jury inquiry and response requires: "(1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel for the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it."  *See, e.g., United States v. Mejia*, 356 F.3d 470, 475 (2nd Cir. 2004).

Based on some of the jurors' testimony, it appears that they requested materials not sent back to the jury room, and that that evidence may have been testimony, or even

---

[10] Mr. Canales will supplement this claim in his supplemental post-deposition briefing after the depositions of Mr. Mullin and Mr. Merillat.

the letters introduced by the State against Mr. Canales.  Granting the jury unfettered access to this evidence, without defense counsel having the opportunity to argue for any regulation or cautionary instruction regarding examining certain evidence, was plainly prejudicial.

Because Mr. Canales can demonstrate cause and prejudice to overcome any procedural default of this claim, this Court must examine the merits of Mr. Canales' claim.

## IV. Mr. Canales' Claim of Unconstitutional Shackling Is Not Procedurally Defaulted.

As Mr. Canales has previously briefed in this Court (Dkt. No. 41 at 1-5), this claim was exhausted in state court in Mr. Canales' initial petition.  *Cone v. Bell*, __ U.S. __, 129 S. Ct. 1769, 1781 (2009) ("A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once.").

CONCLUSION AND RELIEF REQUESTED

For the reasons set out above, Mr. Canales asks this Court to deny Respondent's motion in its entirety so that he may complete the depositions of two individuals who have information relevant to several of Mr. Canales' claims.

Respectfully submitted this 20th day of May, 2011,


___/s/_____          _/s/_____
Teresa L. Norris                       Meredith Martin Rountree
South Carolina Bar No. 15081           Texas Bar No. 24033544
Blume Weyble & Norris, LLC             Law Offices of
P.O. Box 11744                         Owen & Rountree, L.L.P.
Columbia, SC 29211                     Post Office Box 40428
Tel:  (803) 765-1044                   Austin, Texas 78704
Fax: (803) 765-1143                    Tel: (512) 804-2661
teresa@blumelaw.com                    Fax: (512) 804-2685
                                       meredithmr@earthlink.net

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true and correct copy of the foregoing *Motion For Extension Of Time For Petitioner To File Brief After State Court Exhaustion* upon counsel for Respondent by sending same via CM/ECF:

     Asst. Attorney General Thomas M. Jones
     Asst. Attorney General Leslie Kuykendall
     Office of the Attorney General
     Postconviction Litigation Division
     Office of the Attorney General
     P.O. Box 12548
     Capitol Station
     Austin, TX  78711

this 20th day of May, 2008.

                         _/s/ Meredith Martin Rountree_____