IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ANIBAL CANALES, JR.,

    *Petitioner,*

        v.

RICK THALER, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

    *Respondent.*

CIVIL ACTION NO.  2:03CV69

**FILED UNDER SEAL**

---

**THIS IS A DEATH PENALTY CASE**

---

**SUPPLEMENT TO PETITION FOR WRIT OF HABEAS CORPUS**

ANIBAL  CANALES,  JR.  petitions  this  Court  for  relief  from  an  unconstitutional

conviction and sentence of death.  The judgment and sentence under attack were entered by the

5th Judicial District Court for Bowie County, Texas.  This Court has jurisdiction pursuant to 28

U.S.C. § 2241(d) and 2254.

### PROCEDURAL HISTORY

Mr. Canales was indicted on November 4, 1999.  CR 2-9.[1]  The guilt/innocence phase of

his trial began on October 16, 2000.  SR 9.  He was convicted of capital murder on October 27,

2000.  SR 11:95, 149.  The punishment phase of the trial was conducted on October 31, 2000,

and he was sentenced to death the morning of November 1, 2000.  SR 12; CR 12.  The Texas

---

[1] References to record are abbreviated SR (State record) Volume: page number.  The clerk's
record is abbreviated CR.  Exhibits to this Supplemental Petition are abbreviated "SP Exh."  Exhibits to
Mr. Canales' original Petition (Dkt. No. 7) are designated "P Exh."

Court of Criminal Appeals affirmed his conviction and sentence on January 15, 2003. *Canales v. State*, 98 S.W.3d 690 (Tex. Crim. App. 2003). The Texas Court of Criminal Appeals denied Mr. Canales' application for writ of habeas corpus on March 12, 2003. *Ex parte Canales*, No. 54,789-01 (Tex. Crim. App. 2003). On December 1, 2003, the United States Supreme Court denied *certiorari* review of Mr. Canales' direct appeal. *Canales v. Texas*, 540 U.S. 1051 (2003).

Mr. Canales timely filed his Petition for Writ of Habeas Corpus (Dkt. No. 7) in this Court, but subsequently asked the Court to stay and hold the case in abeyance while he exhausted certain claims in state court. (Dkt. No. 22) The Court granted the Motion. (Dkt. No. 31) Mr. Canales returned to this Court after the state court denied his successive application for writ of habeas corpus, and, after some litigation, the Court granted in part Mr. Canales' motions to proceed with discovery relating to his claims involving state misconduct and irregularities regarding the jury. (Dkt. Nos. 15, 17, 19, 36, 40, 41, 42, 73, 78, 79, 81, and 86).[2] Mr. Canales was permitted to, and did, depose the jurors and the bailiff, fact witnesses Steven Canida, Richard Driver, Jr., Bruce Innes, and Larry Whited, as well as Mark Mullin, the prosecutor in this case, and A.P. Merillat, the lead investigator. (Dkt. Nos. 42 and 86) In addition, the Court ordered the Special Prosecution Unit and the Texas Department of Criminal Justice to disclose for *in camera* review documents relevant to Mr. Canales' case. (Dkt. No. 86) On April 7, 2011, the Court made available to the parties for inspection and copying the documents it concluded were relevant to Mr. Canales' claims. (Dkt. No. 109) On April 28, 2011, the Court ordered that Petitioner's supplemental briefing be filed not later than 21 days after the depositions of Messrs.

---

[2] Because of the demands of developing the facts in these claims, Mr. Canales has not been able to proceed in developing further the facts underlying his claims of ineffective assistance of counsel. Dkt. No. 7 at 5-79. They are therefore not included in this Supplement to the Petition for Writ of Habeas Corpus, and Mr. Canales submits are not ripe for decision. Mr. Canales will, under separate cover, seek authorization for expert services to provide the Court with additional evidence regarding this claim.

Mullin and Merillat.  (Sealed Order of April 28, 2011)  Those depositions were conducted on June 22 and June 23, 2011.  This supplemental briefing is timely filed.

## OVERVIEW OF FACTS

On the evening of July 11, 1997, Gary "Dirty" Dickerson was found dead on his Telford Unit bunk.  Officers working the unit that night were alerted to Dickerson's death by his cellmate, Tim Rice.  SR 9:69.  After a brief examination by the unit nurse, the Texas Department of Criminal Justice (TDCJ) concluded that Dickerson had died of natural causes.  SR 9:135.  Without further inquiry, they allowed several inmates – who would all subsequently become prized witnesses for the State – to scrub Dickerson's cell down.  SR 9:299-300.

Only after the autopsy revealed that Dickerson had been strangled did TDCJ begin to make further inquiries into his death.  The Telford Unit Internal Affairs Division (IAD) began to interview inmates, and the Special Prosecution Unit (SPU), which prosecutes crimes committed in prison, became involved as well.

The State's theory was essentially that, after a bundle of contraband tobacco was discovered by prison authorities, many prisoners, for various reasons, believed that Dickerson had provided the information about the tobacco drop to the prison.  SR 9:155.  Some of the prisoners who had a financial stake in the contraband tobacco were prison gang members, and one of the gangs, the Texas Mafia (TM), decided to exact its revenge on Dickerson by killing him.  SR 9:160-61.

The State called Tim Rice, Dickerson's cellmate, to testify that his cell door had been locked when he arrived that night.  SR 9:63.  The State also called Steven "Beaver" Canida to testify he had seen Mr. Canales and William Keith "StayPuff" Speer walking into Dickerson's cell, and locking the door after they left.  SR 10:90.  A critical part of the State's theory,

however, was that Mr. Canales had committed the murder in furtherance of the prison gang's interests.  As a result, the State called other witnesses to make a connection between Mr. Canales and other gang members.  Richard Driver, Jr., Doyle Wayne Hill, and Bruce Innes[3] all testified about Mr. Canales' supposed gang connection and the gang's connection to the murder.  SR 9:289-91; SR 10:159; SR 10:25 et seq.

Crucially, the State had two letters it alleged were written by Mr. Canales.  These letters, obtained from Bruce Innes, contained extremely inculpatory statements.  One consisted of a detailed description of the murder and that it was committed to further the TM's interest.  SR Exhibit 27.  The other, introduced at punishment, suggested that Mr. Canales was trying to organize a "hit" on Larry "Bam" Whited, another TM member.  SR Exhibit 25. The State used this letter to argue that Mr. Canales would be a danger in the future.

At the guilt/innocence phase of trial, the defense established that Mr. Canales did not live in the same part of the prison as the victim did and that it would have been a violation of prison rules for him to go there.  Sergeant Theilen, who was stationed at a desk Mr. Canales would have had to pass if he had gone to the victim's housing area that evening, SR 11:28,  testified that he did not see Mr. Canales out of place that night.  *Id.*  Inmate Earwood remembered Mr. Canales being in his cell shortly before the murder occurred.  SR 11:38-39.  The defense also put on a prison investigator and inmate Hughes to suggest that Whited had claimed responsibility for the killing.[4]  Finally, the defense read a statement of Inmate Melvin Walker who had been with Mr. Canales for about an hour when they learned of the murder.  SR 11:97.

---

[3]  Innes' name was misspelled "Ennis" in the court transcript.

[4]  In the course of state habeas proceedings, Hughes and Earwood provided affidavits supporting Mr. Canales' innocence of the crime for which he was convicted.  Mr. Hughes recounted a conversation

The jury received the case on October 27, 2000 and returned a guilty verdict the same day.  CR 12.

## SUPPLEMENT TO CLAIMS FOR RELIEF
## AND ARGUMENT AND AUTHORITIES

As set forth below, the State in this case failed not only to disclose its use of a jailhouse informant to solicit information from Mr. Canales after his Sixth Amendment right to counsel had attached; the State also failed to disclose material impeaching and/or exculpatory evidence of which it had actual or constructive knowledge, in violation of the Fourteenth Amendment; and the State both affirmatively misled and also permitted the jury to form false impressions of the facts, also in violation of the Fourteenth Amendment.

Investigation documents and internal communications paint a vivid picture of how intertwined TDCJ's and SPU's investigators are with each other and with the inmates who served as informants, witnesses – and sometimes agents.  Further, they demonstrate how SPU became enmeshed as an intermediary between the inmates and the sometimes hostile, often indifferent prison bureaucracy that regulates inmate lives in minute detail.

---

he had with Baker and Driver while waiting to testify in Mr. Canales' case.  P. Exh. 78 (Affidavit of Homer Hughes).  Baker informed Hughes that Mr. Canales' trial was "ironic" because Whited and Driver were actually responsible for Dickerson's death.  *Id.*  Driver told Hughes that Canida saw Whited and Driver leaving the cell but was testifying that it was Mr. Canales and Speer.  On the way back to the prison after trial, Whited told Baker to keep his mouth shut because "[t]hat Jew bastard finally got his..." *Id.*  Earwood also overheard Driver talking about the case on the prison bus.  Driver stated, "I don't care if they fry that mother fucking Jew boy; better than a white man.  I know who was involved and as along [sic] as they blame a Jew, I ain't got no problems with lying on somebody."  P. Exh. 11 (Affidavit of Earwood).  Earwood also heard Canida talking about the deal he got and all he "had to do was lie on that Jew."  *Id.*  Although these affidavits provide core evidence of Mr. Canales' innocence, due to the strictures of *Herrera v. Collins*, 506 U.S. 390 (1993), Mr. Canales has not pled his innocence as a separate claim.

To understand and evaluate the State's misconduct in Mr. Canales' case, both in SPU recruiting Innes to elicit statements from Mr. Canales and in SPU providing extensive and undisclosed benefits and deals to its witnesses, it is essential to recognize that deals and benefits provided in exchange for cooperation and testimony in a prison environment are different from so-called "freeworld" deals and benefits in several important respects. Where *Brady* evidence involving informant witnesses generally includes promises not to prosecute and favorable plea agreements in exchange for testimony, in prison the incentives to cooperate are more varied and subtle precisely because the prison exerts total control over the inmate's environment, from whether he is permitted to hang pictures of his family on his cell wall to whether he is locked in his cell 23 hours a day. The atmosphere in prison is so controlled that prisoners can be punished for possession of lip balm or other small items. *See* P Exh. 31. If an inmate has a long sentence, benefits that seem trivial to a free person represent to a prisoner a way to make prison survivable.

When an inmate is classified as a confirmed gang member, his already contracted freedoms can be even further reduced. Confirmed TM gang members are automatically placed in administrative segregation ("Ad Seg"). SP Exh. 1 at 46:20-24; *see also* P Exh. 32 at Para. F ("Offenders assigned Level 1 [of Ad Seg] are generally maintaining good behavior but have a requirement for segregation or separation from general population offenders. Additionally, the offender is considered a security risk due to being: … (c) a physical threat to the physical safety of offenders or staff for reasons other than behavior, such as membership in a Security Threat Group (STG)"). According to TDCJ policies, an inmate is on "Administrative Segregation anytime he is separated from the general population by confinement in a cell for twenty (20) hours or more a day without a disciplinary hearing." P Exh. 32.

In reality, the best behaved prisoner in Ad Seg will be allowed out of his cell for either one hour a day, seven days a week; two hours, five days a week; or three hours, four days a week. *Id.* at 16.   Ad Seg inmates are housed in single man cells and allowed only one non-contact visit each week and no contact visits.   They are not allowed work assignments and their movement is severely restricted.   "Any time an offender is transported to or from his assigned cell, the offender is to be strip-searched and placed in hand restraints prior to the opening of the cell door."   *Id.*   Ad Seg inmates must be accompanied by two officers whenever they are taken outside of the segregation area and each officer must "be outfitted with a riot baton, thrust vest, and Carry on Person (COP) chemical agent."   *Id.*   "Before the offender is returned to his cell, he shall again be strip-searched."   *Id.*

The hardships of Ad Seg were reflected (albeit obliquely) in trial testimony and letters written by inmates.   State witness Richard Driver acknowledged that an inmate might "cover a patch" even if still a gang member in order to get out of Ad Seg.  SR 9:316.   In a letter to prison authorities, Innes noted that "This is a terrible place to do prison time and I myself desperately need out..."  SP Exh. 2.

Faced with the hard time that gang classification entails and the powerful influence SPU had on TDCJ, it is little wonder that inmates would readily concoct stories, exaggerate their knowledge and act as illicit agents for the State.   Further, given how SPU continued to assist its witnesses for years after they testified at trial, the true scope of the suppressed evidence remains difficult to assess.[5]   What Mr. Canales has found despite these impediments, however, reveals

---

[5] Tellingly, Innes sent Messrs. Mullin and Merillat an agitated letter before he was deposed, asking for their assistance and whether they could obtain the questions in advance.  SP Exh. 3.

state misconduct requiring reversal of his conviction and sentence.  The brief below presents the evidence Mr. Canales has developed supporting his claims of constitutional violations.

I.   **WHEN THE STATE USED INNES AS THEIR AGENT TO SOLICIT INCRIMINATING EVIDENCE FROM MR. CANALES FOR USE AT BOTH THE CULPABILITY AND PUNISHMENT PHASES OF TRIAL, IT VIOLATED MR. CANALES' SIXTH AND FOURTEENTH AMENDMENT RIGHTS.**

Bruce Innes was the star of the State's case.  Presenting two powerfully inculpatory notes allegedly written by Mr. Canales, he provided the only testimony alleging any statement or admission from Mr. Canales regarding the Dickerson murder.  Unbeknownst to defense counsel, and in violation of *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980), Innes was acting as an undercover agent of the State.

A *Massiah* violation has three elements: (1) "the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present;" (2) "that agent 'deliberately elicit[s]' incriminating statements from the defendant," and (3) the Sixth Amendment right to counsel has attached.  *Henderson v. Quarterman,* 460 F.3d 654, 664 (5th Cir. 2006) (alteration in original) (quoting *Massiah,* 377 U.S. at 206).  Any time the government intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel, it has violated the Sixth Amendment.  *See United States v.*

---

I'm disturbed by it & I need your counsel on this, could you please get back to me on this or at least try to put this off until we are prepared to answer their questions, do they not have to let you know what they will ask or something like that?

Mr. Merillat testified in his deposition that he did not believe they responded to Mr. Innes' letter. (SP Exh. 1 at 114:10-14)  This may account for why Mr. Innes repeatedly lied in his deposition about critical issues regarding the extent of his contact with the prosecution.  (SP Exh. 43 at 85:7-16 (wrote Merillat only about three times; disclosed documents included over 25 letters from Innes to Merillat); at 88:14-19 (Merillat could do little for Innes and Innes could do little for Merillat); at 95:18-20, 96:6-15, 97: 4-12, 21-25, 98:1-4 (denied knowing Whited and saw him only on the chain bus to Bowie County).  He clearly understood the impeachment value of the information he sought to conceal.

Supplement to Petition for
Writ of *Habeas Corpus* - 8

*Henry*, 447 U.S. 264 (1980).  Any statements of a defendant so obtained, must be excluded from trial.  *Massiah*, 377 U.S. at 207.

### 1. Bruce Innes Acted As An Agent for the State

Documents establish that Bruce Innes started working as a State agent as early as January 1998.  Likely not coincidentally, TDCJ completed its confirmation of his gang membership, with the first vote for confirmation taking place in December 1997 and the third and final vote in January 1998.  SP Exh. 4.

On January 7, 1998, Innes' lawyer approached SPU to tell them his client had valuable information. SP Exh. 5.  On January 14, 1998, a SPU investigator interviewed Innes about some letters he claimed to have.  *Id.*  Innes subsequently met with a TDCJ Security Threat Group officer on January 28, 1998.  SP Exh. 6.  Notes from that meeting reflect:

> Lt. Dodson, Telford IAD, had requested any information or kites that inmate Innes had pertaining to the homicide of inmate Dickerson, Gary #587361, shortly after the incident occurred, but that inmate Innes denied knowing anything regarding the incident.  However, inmate Innes now admits that all though [sic] he did not have any prior knowledge of the situation, he sent a kite to both inmate Canales, Anibal #696334, now C/TM, AKA: Bigfoot/Jewboy/Dobie; and inmate Speer, William #668485, S/TM, AKA: Stay Puff; asking what happened.

*Id.*  Innes told the TDCJ employee that he had given the original kites to his attorney to assist in a plea bargain.  *Id.*

In a June 24, 1998 letter to a TDCJ official, SPU investigator A.P. Merillat discussed Mr. Innes' willingness to work as an agent.

> Innes relates that he is willing to "work" for either or both of our offices in any way we can use him. He will correspond with gang members as usual, if you want him to, in order to help expose/uncover their activities, or do whatever is best.

SP Exh. 7.

In two undated notes from Innes to TDCJ personnel, Innes identified himself as acting as an agent for SPU.  In one, after asking to be moved, Innes wrote: "As you know I'm a witness for special prosecution unit & was gathering information as a member of TM."  SP Exh. 8.  In another I-60, Innes wrote:

> As you know I'm a cooperating witness in a murder case for the State the special prosecution division & A.P. Merillat.  I've been gathering information as a member of TM.

SP Exh. 9.

> Innes' role as information-gatherer for SPU was known in TDCJ.

> Offender Innes has requested to be reclassified as an ex member, but claims that **special prosecutor's office has instructed him to keep in contact with TM members (for purposes concerning the homicide)**. You may want to contact Mr. C. Dodson, Telford IAD, regarding any questions you have concerning this situation.

SP Exh. 10 (emphasis added).

In his deposition, Mr. Merillat made clear that he encouraged Mr. Innes to seek out information.  With respect to the June 8, 1998 letter from Mr. Innes to Mr. Merillat, Mr. Merillat testified as follows:

> Q    In that letter, towards the middle, where it says:  What I want to know is do you wish for me to follow-up on it?
> A    Okay.
> Q    Do you recall in the follow-up he wanted to know, obviously, whether to continue communications with Mr. Canales.
> A    That's what it looks like he's asking me should he do. Yes.
> Q    Do you recall whether or not you responded to this request?
> A    I assume I have because sitting here today I would want him to do that.
> Q    All right.
> …
> Q    In general, would you want him to continue gathering information?
> A    I would hope he could.
> Q    The next one that we're going to mark as Deposition Exhibit 11 a letter dated June 15th, 1998 from you to Mr. Innes.
> A    I have it.

Q       Just want to verify that that is your signature, your letter?
A       Yes, ma'am.
Q       All right. And that appears to be what you actually did tell Mr. Innes in that situation?
A       Yes, ma'am.

SP Exh. at 71:24-25; 72:1-11; *see also* at 44:11-19 ("was that the general discussion between you and Mr. Innes about how to approach things in terms of keep trying to get all the information you can?  A:  Sure  As far as Whited, and also any information he could get on the Canales case I would take as well").

According to Innes' trial testimony, he subsequently received a letter dated February 12, 2000, that he believed to be an incriminating letter from Mr. Canales.  SR12:21.  He sent this letter -- subsequently introduced at trial as State's Exhibit 25 -- to A.P. Merillat.  In response, Mr. Merillat provided Mr. Innes further instruction:

> Another extremely important item:  can you write Canales back, acknowledging receipt of his letter.  Also if you get him to admit writing that letter and re-iterating the need to take "iron" out, it will prove authorship of the original letter. We must *prove* that Canales is the author…simply coming from his mailroom with his name and number will not prove authorship.  You will know better than we how to talk to Canales, what you can ask, how to ask without arousing suspicions, etc. Think about it, and do what you can, alright?

SP Exh. 11.

Innes responded on March 6, 2000, telling Merillat that "I'm glad to be of service to you in the getting of information!"  SP Exh. 12.  Innes complied with Merillat's request and sent Merillat a letter he drafted to elicit incriminating statements from Canales:  "This is my letter to Canales about the issue you wished me to try & confirm through him."  SP Exh. 13.  Using coded language in which gang members are referred to as writwriters and using Larry Whited's nickname of "Iron," Innes wrote:

> As you know my people have taken pretty good care of me & at this time I've got 3 C-notes on the books; so I could start talks with a reputable law firm to sue the 'Iron' company and totally destroy it & finish it forever. ... [need to clear with higher ups] **But I also need to be sure that is what <u>you</u> were telling me in your last letter, you know I'm a little slow bro &  I'd hate to be making a mistake!  Get back to me <u>A.S.A.P.</u>!  Set me straight & let me know how you want to proceed if I'm reading you right!**

*Id.* at 2-3.

Putting to rest any question whether Innes sought this information at the behest of the prosecution, **A.P. Merillat apparently mailed this letter for him.**  Innes was concerned that TDCJ gang intelligence would intercept the letter and frustrate his efforts.  Therefore, he sent his March 6 letter to Merillat, and while Merillat denied it in his *Speer* deposition (SP Exh. 14 at 64:12-14), it appears he sent Innes' letter to Canales.  One copy of the March 6 letter in the files has what appears to be a copy of a "post-it" note on it that says "Orig: mailed from Hville 3/13/00 APM." SP Exh. 15.

> **2.  An Incriminating Letter Purportedly Written By Mr. Canales To Mr. Innes While Mr. Innes Was Acting As A Government Agent Was Introduced At Trial Against Mr. Canales.**

Innes' work paid off, and at the punishment phase, the State introduced through Innes a letter allegedly written by Mr. Canales on February 12, 2000, which according to Mr. Innes' interpretation, threatened Larry Whited. SR 12:21.

> **3.  Mr. Canales' Sixth Amendment Right To Counsel Had Attached.**

The Sixth Amendment right to counsel *Massiah* is intended to protect attaches upon indictment.  *Henderson*, 460 F.3d at 664.  Mr. Canales was indicted on November, 4, 1999. CR 2-9.

**Discussion**

Supplement to Petition for
Writ of *Habeas Corpus* - 12

The *Massiah* violation in obtaining this letter is clear.  Mr. Canales' Sixth Amendment right to counsel attached on November 4, 1999.  Innes had been working as a government agent since early 1998.  The State used Innes to elicit incriminating information from Mr. Canales in a letter which was received sometime in 2000 (and therefore after indictment).  At trial, this letter was the basis of the trial prosecutor's arguments to the jury that Canales was scheming to kill one of the State's witnesses.

In *United States v. Henry*, the Supreme Court distinguished between the jailhouse informant as "listening post," *i.e.*, one who was instructed only to "overhear conversations," and the inmate who as a government agent "deliberately and surreptious[ly] interrogates" the defendant.  447 U.S. at 276 (Powell, J., concurring) (internal punctuation omitted).  Innes was far more than an eavesdropper; he engaged in an on-going campaign to obtain information the State sought.  Indeed, the State's role in facilitating this effort – as demonstrated, for example, by the fact that it mailed at least one of Innes' interrogating letters for him – reveals how enmeshed Innes' inquiries were with the State's.

Further, as the Supreme Court noted in *Illinois v. Perkins*, Innes was perfectly situated to elicit especially incriminating statements from Mr. Canales.  "[W]here the suspect is incarcerated, the constant threat of physical danger peculiar to the prison environment may make him demonstrate his toughness to other inmates by recounting or inventing past violent acts."  496 U.S. 292, 307 (1990).  Assuming *arguendo* that Mr. Canales in fact wrote one or both of the letters to Innes, he would have been aware of Innes' status in the TM, and would have had reason to "demonstrate his toughness" to him.

Innes, therefore, clearly acted as a government agent in asking Mr. Canales questions about matters of interest to the State, and his conduct falls well within conduct prohibited by

*Massiah*.  These statements were also clearly damaging.  They were the only statements the jury heard ostensibly from Mr. Canales.  In both the guilt/innocence and the punishment phases of the trial, the State used these letters as the centerpiece of its argument.  Canales has demonstrated that at the time Innes received this second letter he clearly was working as an agent for the state.  Dkt. No. 7 at 82-88.  This second letter formed the basis for the state's expert's handwriting comparison and thus the foundation for admission of the guilt/innocence phase "kite."  *See* SR 10:62.  Because of these violations, Canales is entitled to, at a minimum, punishment phase relief.  While these illegally obtained letters incontestably had a substantial and injurious effect on the verdict, Mr. Canales is entitled to have the State prove the error harmless beyond a reasonable doubt, pursuant to *Chapman v. California*, 386 U.S. 18 (1967).  Mr. Canales should not be denied a more lenient harm standard because of the State's misconduct in withholding this information from him.

## II.     THE STATE DEPRIVED MR. CANALES OF DUE PROCESS OF LAW WHEN IT WITHHELD MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*.

Post-conviction discovery in this case uncovered voluminous evidence calling into question the fundamental fairness of Anibal Canales' trial.  These previously-undisclosed documents reveal troubling investigative practices, impeach the credibility of the State's witnesses, and indeed, fundamentally undermine the State's evidence against Mr. Canales.  The recent depositions of Mark Mullin and A.P. Merillat do nothing to diminish the power of these documents, and indeed, their testimony betrays a profound – and even reckless – understanding of the constitutional principles governing their work.  While the depositions provide ample support for the Court to find that they in fact saw the documents that should have been disclosed under *Brady*, this goes far beyond what Mr. Canales is required to prove.  The Supreme Court

has made clear that the prosecution has a duty to inquire into the existence of impeaching or exculpatory evidence and disclose what favorable evidence it finds. *Kyles v. Whitley*, 514 U.S. 419, 437, 438 (1995). The recent depositions demonstrate not only that the prosecution in this case failed to do either, but that the prosecutor to this day embraces the practices that lead to these failures: "I … don't intend to do much different because I think the State of Texas is fortunate to have me as a prosecutor." (Mullin Deposition at 63, line 15-17.)

Due process requires the State to disclose "evidence favorable to the accused… where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is favorable if is exculpatory or impeaching. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The Supreme Court's case law has focused on the real value at stake, namely a fair trial, rather than assessing the blameworthiness of the prosecutor when favorable evidence is not disclosed. Therefore, the good faith or bad faith of the prosecutor is irrelevant. *Brady*, 373 U.S. at 87. Whether the defense requests the information is similarly irrelevant. *Bagley*, 473 U.S. at 682; *United States v. Agurs*, 427 U.S. 97, 107 (1976).

Recognizing that litigators may be tempted to turn a blind eye to information that undermines their case, the Supreme Court imposes on the State not only a duty to disclose information, but also a duty to inquire into whether such information exists. Because *Brady* evidence includes information "known only to police investigators and not to the prosecutor," "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles v. Whitley*, 514 U.S. at 437, 438.

Prosecutor Mullin does not dispute that his file was separate from the investigation file, and that he disclosed to the defense only what he had in his own file.

> Q     And does the investigator maintain separate files from you?
> A     The investigator usually has their own investigative notes and things because they have to, you know, prepare to contact witnesses and make whatever notes they have.
> Q     And is that -- is a copy of that placed in your file or is that maintained separately?
> A     Historically what I'm used to seeing is when the case is over, an investigator…typically will take his file, and it's usually in a manila folder or whatever, and put it in my box or my file once the case is over. But I don't recall seeing [A.P.] copy me on stuff during the pending of the case.

SP Exh. 16 at 6:21-25; 7: 1-10.

While Mr. Mullin clearly prides himself on his disclosure practices – "I can't think of a case I've ever had and certainly never a murder, capital murder, where they couldn't look at every piece of paper that was in my possession regarding that case" (SP Exh. 16 at 16:25; 17: 1-3) – his understanding of the documents he needs to disclose falls short of the Supreme Court's standard:

> Q     And typically when you make disclosures, is that just the file that you maintain in your cabinets, your boxes, or would you also go get the investigator's file?
>
> **A     I have never -- since I've started prosecuting, I can't remember ever thinking to go get an investigator's file and hand it over to the defense.**

SP Exh. 16 at 15:24-25;-16: 1-4.

Therefore, the only question for this Court to resolve (other than materiality, discussed below), is whether SPU Investigators, TDCJ's Office of the Inspector General (OIG) (formerly the Internal Affairs Division (SP Exh. 1 at 84: 9-10)), and TDCJ's Security Threat Group Management Office (STGMO) constitute "others acting on the government's behalf in this case," thereby requiring the prosecutor to inquire into and disclose favorable evidence in their files or known to them.

### The Favorable Evidence the State Failed To Disclose

The depositions conducted and documents disclosed to the Court pursuant to its orders on discovery (Dkt. No. 86; Sealed Order March 14, 2011) not only provide additional support for Mr. Canales' claims, but they also reveal new types of evidence the State had a duty to disclose. The State suppressed evidence that:

- Innes' testimony about how he received Mr. Canales' incriminating letter was false;

- Innes was himself a suspect in the Dickerson homicide;

- SPU in fact made promises to help the inmate witnesses and to provide information to the parole board;

- SPU encouraged Innes to speak to at least one other State witness prior to trial;

- Innes' renunciation of his gang affiliation was suspect;

- After accepting it for prosecution, SPU dismissed a felony case of Possession of a Deadly Weapon in a Penal Institution against Mr. Innes prior to Mr. Canales' trial;

- Innes repeatedly – and successfully – sought SPU's intervention on prison matters regarding gang deconfirmation, better TDCJ classification, better housing, and property in exchange for his cooperation, including soliciting incriminating evidence; and

- SPU assisted inmate witnesses in obtaining favorable housing, with parole, in subsequent criminal matters, and in post-release planning.

**1. The State Failed To Disclose Information Contradicting Innes' Testimony About How He Received Mr. Canales' Incriminating Letter.**

Innes provided perhaps the most damaging evidence against Mr. Canales when he testified to witnessing Mr. Canales pass him a "kite" containing a confession to the murder.[6]

> Q:         Alright, so on this particular day you told Canales you wanted a blow by blow description in a kite of what happened?
>
> [Innes]:   Yes

---

[6] The length of the excerpt reproduced below demonstrates the amount of time and attention the State devoted to persuading the jury that Innes received the kite directly from Mr. Canales.

Q:          Now, did you get it that day?

[Innes]:    I got it the next day.

…

[Innes]:    Yes, I asked him if he had that for me, and he said, yes, I've got it, and I said, well, hang on just a second and I'll shoot the line out there to you and you can tie it on the line.

Q:          Alright, explain to the jury what you mean by "shooting the line."

[Innes]:    A line is thread taken from a waistband from the elastic of underwear, braided or twisted into a handmade rope, in sections of eight or ten foot, and then there's any type of weighty object attached to the end of it. The doors in Ad Seg only have about an inch or an inch and a half of space underneath, so it has to be something flat, and you just slide it out there to the day room, and that way you can pick stuff up, and send stuff.

Q:          Alright, you said the sections of string might be eight or ten foot. Can a string – is that the longest it can be?

[Innes]:    Oh, no. There's lines long enough to go all the way around six stations.

Q:          Alright, they just keep tying strings?

[Innes]:    Uh, huh (yes). They just keep adding them on – tying them on.

Q:          And – okay. Is that a way for inmates to pass things among themselves?

[Innes]:    Sure.

Q:          Now, did you shoot a line over to the day room where Mr. Canales was?

[Innes]:    Yes, I did.

Q:          Did you live on the first row or the second row?

[Innes]:    I lived on the second row.

Q:          Alright, did the line make it over to near the day room?

[Innes]:    Yes, right by the bars.

Q:          Was Mr. Canales able to reach the line?

[Innes]:    Yes, he was.

Q:          Explain how Mr. Canales was able reach the line if you were on the second row?

[Innes]:    Well, if you'll notice where the door is – the day room door – where the bars come into a "V" – an inmate would – Mr. Canales would climb up the bars and stand about even with the 2-Row tier floor, and specifically that area right there is blind to the picket, so you know, just climb up there – climb up the bars, and I'd slide the line to him, and he'd reach out and grab it, and tie on whatever he had.

Q:          Okay. Did Mr. Canales climb up those bars?

[Innes]:    Yes, he did.

Q:          Did he get a hold of your line?

[Innes]:    Yes, he did.

Q:          Did he put anything on your line?

[Innes]:    He tied a written kite to me on the line.

Q:          Did you pull the line back in your cell?

[Innes]:    Yes, I did.

Q:          Did you read the kite?

| [Innes]: | Yes, I did. |
| ... | |
| Q: | Mr. Ennis, do you recognize State's Exhibit 27? |
| [Innes]: | Yes, this is the – |
| Q: | –no, no.  We're going to take this step by step.  Be very careful.  Do you recognize it? |
| [Innes]: | Yes, I do. |
| Q: | When is the first time you ever saw State's Exhibit 27? |
| [Innes]: | The day that Mr. Canales tied this onto my line. |
| Q: | Is that the kite you received from Mr. Canales? |
| [Innes]: | Yes, it is. |
| Q: | Did you see Anibal Canales tie that kite onto your string? |
| [Innes]: | Yes, I did. |
| Q: | Did you pull it into your cell? |
| [Innes]: | Yes, I did. |
| Q: | And did you read it? |
| [Innes]: | Yes, I did. |

SR 10: 28-33.

The importance of the letter was emphasized by the prosecution, which relied on it almost exclusively in its closing argument:

> The problem for Mr. Canales, is that they didn't back any of theirs up with anything.  They got a couple of inmates to come and say, naw, I know where he was – I know what he was doing, but they didn't back it up.  I did.  I backed up our testimony with the most damning piece of evidence I could have imagined, and there it is, and you will have this with you in the jury room, and if you don't, you may ask for it.  This is the letter.  This should convince you that Anibal Canales killed Gary Dickerson.

SR 11: 136.  The State spent the remainder of closing argument presenting an exegesis of the letter.

While delving deeply into how Innes came into possession of the letter, the State never revealed that Innes had given a previous account which directly contradicted his trial testimony.  As stated above, in early 1998, as Innes was facing several criminal charges, his lawyer Dave O'Neil approached SPU about providing evidence in exchange for a deal.  SPU, initially, would

not guarantee anything.   P Exh. 59.   A few weeks later, O'Neil again contacted SPU and informed them that Innes had "**access** to a letter written by suspects." *Id.* (emphasis added).   The details surrounding the letter became clearer when Innes was interviewed directly by SPU on January 14, 1998.   During that interview, Innes informed SPU that he **neither possessed the letter nor had directly received it.**   SPU's notes of this interview state:

> Letter
> written by Canales
> **Another inmate has the letter - he's not involved @**
> **all – will have to get the letter from him**
> **Another inmate rec the letter from Canales**
> This inmate sent me the letter to see it
> The letter is step for step how the letter [sic]
> went down.
> The letter is in Canales' handwriting

SP Exh. 17 (emphasis added).[7]

Thus Innes' claim before the jury that he had Mr. Canales write a letter and that he watched as Mr. Canales tied the kite on a string was completely fabricated.   Had this evidence been properly disclosed and/or had the State discharged its duty to inform the jury that one of their main witnesses was testifying falsely, the jury would have had a very different view of the State's case and the investigation of Dickerson's murder.   *See e.g. Kyles v. Whitley*, 514 U.S. at 445 ("Damage to the prosecution's case would not have been confined to evidence of eyewitnesses, for [the suppressed evidence] would have raised opportunities to attack not only

---

[7]   In their depositions, Mr. Mullin and Mr. Merillat suggested that Mr. Smithey is the appropriate person to talk to regarding these notes.   Mr. Canales has previously moved to depose Mr. Smithey (Dkt. No. 73).   He continues to believe he has demonstrated good cause for this deposition and that this deposition would provide useful information.   That said, Mr. Smithey's recollection of this interview and his notes is not essential to Mr. Canales' claim.   The notes speak for themselves.

the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well").

**2.   The State Did Not Disclose That Innes Was Himself A Suspect In The Dickerson Homicide.**

TDCJ records found within the STGMO and OIG files disclosed subsequent to this Court's *in camera* review contain multiple references to Innes being a suspect in the Dickerson homicide.  SP Exh. 18 at 21, 22, 28, 30 (Innes "suspect in I/M homicide on Telford 7/97").  An identical copy of these documents is contained in the disclosed STGMO file.

Another notation on May 26, 2000 in the OIG files indicates "Confir[sic] member of Texas Mafia, allegedly on TM hit list, State witness in Bowie Co Murder trial 7/99, Suspect in I/M homicide on Telford, part in extortion on Telford 11/96, sexual hist, ext. drug abuse hist." SP Exh. 18 at 28.[8]  The OIG documents prepared in connection with the felony case against Innes for Possession of a Deadly Weapon in a Penal Institution also refer to Mr. Innes as a suspect in the Telford homicide.  SP Exh. 19 at 38.

This is *Brady* evidence and had to be disclosed to the defense.  *Moynihan v. Manson*, 419 F. Supp. 1139 (D. Conn. 1976), *aff'd*, 559 F.2d 1204 (2nd Cir. 1977) (*Brady* violated when state failed to disclose that a key witness had been the primary suspect and had been threatened with prosecution prior to his statements accusing the defendant).

**3.   SPU facilitated Innes' communication with at least one other State witness prior to trial.**

---

[8]   During the recent depositions, the Assistant Attorney General made the point that SPU cannot guarantee the accuracy of TDCJ's files. SP Exh. 1 at 127:4-6; SP Exh. 16 at 76:18-20.  This is not the legal standard.  The only question is whether this information is "favorable to the defense," which it unquestionably is.

Unbeknownst to the defense and the jury, the State encouraged witnesses to speak to each other prior to trial, thus providing an opportunity to compare information.  This classic type of impeachment evidence was not disclosed to the defense.

On October 14, 1999, Mr. Merillat wrote Mr. Innes, saying "I spoke to Whited recently, and he advised me that he would like to correspond with you.  He's at the Wynne unit also."  SP Exh. 20. Again on March 1, 2000, he wrote Mr. Innes and asked, "Do you and Larry Whited correspond?" SP Exh. 21.

On March 6, 2000, Mr. Innes finally responded, explaining to Mr. Merillat:

> I would write Larry Whited, but I do not have his # & unless you explained to the warden & Sgt. Burson why we are writing each other & that I am not TM any longer, all they would do is re-seg Larry for being a member of TM & engaging in activities!

SP Exh. 12 at 2.

Mr. Innes asked for Mr. Whited's contact information, indicated he would like Mr. Merillat to facilitate their communication, lest it be misunderstood as gang activity.  "If you will call or come to the unit & explain all this to a warden & G.I. & send me Larrys [TDCJ] # then yes, I'll write, but I do not wish to unintentionally put the man back in seg." *Id.*

On June 4, 2000, Mr. Innes reported to Mr. Merillat that he and Mr. Whited had in fact been in touch, though not through the mail:  "I do not correspond w/Mr. Whited because it's not safe for me.  But we have visited face to face & went over what we know."  SP Exh. 22.

Perhaps referring to the same meeting, Larry Whited wrote Mr. Merillat on March 3, 2000, to tell him he and Mr. Innes had spoken.  In the letter Whited recounts how he and Innes have compared and corroborated each other's stories.  Whited mentions that he and Innes went to the John Sealy Hospital in Galveston together:

But anyway, we got to talk the whole way down there (and no, we didn't coach one another on our stories. Smile) and I found out a whole lot about some of the things that've been going on with the infamous Texas Mafia since I've been gone. Which is good for me because "To Know Is To Be Prepared." If you know what I mean.

SP Exh. 23 at 21.

**4. The State Failed To Disclose Evidence Casting Doubt On Whether Innes Had Genuinely Renounced His Gang Affiliation**

Innes presented himself to the jury as an ex-gang member who, because of pangs of conscience, came forward and assisted in the prosecution of the murder of Dickerson. When asked why he decided to go to the authorities he responded:

Well, that's kind of a complicated question, but I felt like that it was possible that they got the wrong person, and not only that, my romanticized ideas of being in the Texas Mafia were destroyed. I mean, you know, it woke me up – you know, murder – it's all well and good to want to be Al Capone and all of that, but to actually know that you're involved in something that's taking people's lives, is – it's pretty heavy, so –

SR 10:40.

Even though the State presented Mr. Innes as an ex-gang member disillusioned with prison gang life after Mr. Dickerson's murder, the true picture of Mr. Innes' gang activity was less clear. Lonnie Eason, another TM member providing information to SPU, wrote to A.P. Merillat in July 2000, alerting him that Mr. Innes had not given up his gang activity. According to Mr. Eason, Mr. Innes "has been constantly representing TM matters and has been pure 'Gun Ho.'" SP Exh. 24. He also asked Mr. Merillat to "Just tell Innes to leave TM Alone & lay low, He's outta there with em when he Testify's anyway!" *Id*. A jury might wonder whether Innes had found a way to play both sides of the fence. Even Mr. Mullin agreed:

> Q:      So we have a situation where Mr. Innes is both trying to deconfirm to gain
>         benefits in the way that he lives, yet he wants to create a situation where he can
>         receive correspondence from other gang members that might be beneficial to him
>         as well?
>  A:     [T]hat is the way it appears, and I think that's what was happening.

SP Exh. 25 at 24:22-25; 25:1-6.

TDCJ was also suspicious of Mr. Innes.  In a June 2000 letter, well after Innes had

supposedly "renounced affiliation," the Estelle Unit copied a letter from Innes to a "District

Major"of TM named James Nicholas.  Attached to the letter, a TDCJ employee queries:

> Please note: According to I/M Innes '07' screen he is supposed to be on the TM
> "Hit list" if he was why would he be writing the District major a letter like this?

SP Exh. 26.[9]

### 5.   The State Never Revealed The Fact That It Dismissed A Felony Case -- Incurred While He Was Working as the State's Agent -- Against Innes.

On October 3, 1999, an officer noticed a "shank … made from the armature and shaft

from the motor of an electric fan" in the "cell vent to pipe chase" behind Innes' cell.  The fan

from which the armature and shaft had been removed was found in Innes's cell.  SP Exh. 19 at 5,

11-12.  One end of the armature shaft had been sharpened to a point.  SP Exh. 19 at 15.  Innes

was charged with possession of a deadly weapon in a penal facility.  SP Exh. 19 at 8.  This

offense is not only a violation of prison policy, but also a felony.

TDCJ turned to SPU to prosecute this crime.  As Mr. Merillat acknowledged, this is the

kind of case that SPU handles.  SP Exh. 14 at 91:3-6.  He explained, "pieces of a fan like he's

talking about, … metal from inside the cell, … just about anything that's stiff enough to put

---

[9]  While the year the document was written is not clear from the document, the note was written while Innes was at the Wynne unit.  This suggests the note was written in 2000.  *See*  SP Exh. 27 (10/7/99 letter from Innes to Merillat from Wynne unit), and SP Exh. 18 at 27 (reflecting 7/00 Innes move to Stiles unit).

inside a human being, you know, a stabbing device could be made to it."  SP Exh. 14 at 91:9-14.

SPU and TDCJ take these cases so seriously that Mr. Merillat recalled testifying in cases

involving fingernail clippers.  SP Exh. 14 at 91:24-25; at 92:1-3.

On November 4, 1999, TDCJ OIG presented the case against Mr. Innes to Kelly Weeks,

a prosecutor in the Special Prosecution Unit.  SP Exh. 19 at 5.  On November 4th or 5th, Ms.

Weeks accepted the case for prosecution.  SP Exh. 19 at 5; SP Exh. 28.  Sometime later, SPU

asked the Walker County District Court to dismiss the felony charge of Possession of a Weapon

in A Penal Institution, which that court did on February 16, 2000.  SP Exh. 29.  For a prisoner

with an extensive criminal and prison disciplinary history, this was an amazingly fortunate

outcome.  Mr. Merillat in the Speer deposition detailed the significant criminal consequences

Innes would have faced if convicted.  Mr. Merillat estimated:

> [I]t could be a second degree felony probably for Bruce or first degree.  I can't
> remember how many enhancements he has; it could be.  It could go all the way up
> to life stacked.  So, yeah, it could be a terrible problem.

SP Exh. 14 at 88: 12-16.

There would also have been severe prison disciplinary consequences:

> He would lose immediately the housing that he's in, and he would stay in that transit
> status until he has a hearing, a disciplinary hearing… and if he is convicted, especially of
> a weapons case – and the disciplinary process is long before indictment – he could be put
> in ad-seg, he could be put in closed custody, lose whatever privileges he has as far as
> visitation and commissary, recreation.  So a lot of bad things could happen to him just
> from the disciplinary.

SP Exh. 14 at 89: 2-13.

In addition, he could lose "good time" credits that can accelerate parole.  SP Exh. 14 at

89: 14-22.

Not surprisingly, while TDCJ prepared its case against Mr. Innes, Mr. Innes wrote to Mr.

Merillat:

> I was with out [sic] a radio & I had a pair of headphones.  My neighbor offered to connect me if I could come up with some wire & help him get his radio open.  So I broke my fan down for the coil of copper wire inside & I used the metal shaft that the armature is on to make a screw driver out of to try & break the triangle shaped screws.  Well it didn't work & I threw away, or tried to, in the back vent...

SP Exh. 30.

> Mr. Merillat responded:

> Regarding the recent case you spoke of where a fan was disassembled and part of it was put in the pipe chase – just because a disciplinary case was written, it does not mean that our office will file criminal charges.  We have no control over the disciplinary process within TDCJ.  However, when IAD comes to us to file charges in criminal matters, we screen each case individually, giving consideration to each element of the case.  Simply calling an item a weapon does not guarantee that the SPU will go to the grand jury seeking indictment.  Yes, I know that a fingernail clipper can be called a weapon, and we have prosecuted inmates for less than that *but* –  we have only done that when the facts showed that the defendant intended the item to be a weapon.  So, the facts that you provided make a big difference in how we would look at the case.

SP Exh. 31.

Mr. Merillat has testified that Mr. Innes was not prosecuted for this offense "probably because he was helping us with these cases[.]," namely the cases against Canales and Speer SP Exh. 14 at 93:5-8.  Perhaps to suggest an arm's length relationship with Mr. Innes, Mr. Merillat testified in the Speer deposition that Innes' 1999 weapons case was intentionally kept open to hang over Innes's head prior to his testimony to prevent "manipulat[ion]" by Innes.  SP Exh. 14 at 101:3.  The contemporaneous correspondence and dismissal of the prosecution well before either Canales or Speer was tried suggests a different version of events.

As noted above, the Walker County District Court signed SPU's motion to dismiss the case against Mr. Innes on February 16, 2000.

On February 23, 2000, Mr. Innes wrote Mr. Merillat to tell him he had received a letter (likely the February 12, 2000, letter subsequently introduced at trial as State's Exhibit 25) allegedly from Mr. Canales asking for a "hit" on Larry Whited.  The same day – perhaps after mail was delivered – he wrote another letter to Mr. Merillat to inform him he had received the "Motion to Dismiss" and to express his relief.  "Be rest assured from here on out I will (<u>never</u>) have questionable material in my surrounding or on my person <u>ever</u> <u>again</u>!" SP Exh. 32. Presumably, the document Mr. Innes received related to the pending fan prosecution.

**6.  SPU in fact made promises to "help" the inmate witnesses**

From the very beginning of this case, it was clear to all that the situation was ripe for inmates to be attempting to better their own situation by cooperation with the State.  Inmate Whited, who cooperated with the State but did not ultimately testify, recollected that inmates saw Mr. Canales' case as offering rich opportunities to improve their situations.  He observed that prisoners would lie to get a case dismissed or to get transferred to another facility.  SP Exh. 33 at 135:2-4, 8-9; *see also* 66:13-24 ("And there was a lot of people that weren't involved in it that… were saying that they were because they wanted to get write-ups off of them …").  Likewise, State witness Doyle Wayne Hill stated:

> You knew that in this situation, a lot of people are going to say whatever, whether they've seen something or not.  There are just that many prisoners looking to make a deal[.]

SP Exh. 34.

They were not wrong.  Inmates that did cooperate with the State were told that they would receive assistance with virtually any reasonable request.  "[Y]ou said you'd help me in

anything reasonable as long as I wasn't screwing up," Bruce Innes wrote to SPU on April 13, 1998. SP Exh. 35 at 2.  Larry Whited wrote Mr. Merillat, "You told me from the very beginning that if I ever needed anything that all I had to do was ask."  SP Exh. 36 at 4.

Mr. Merillat confirmed he commonly said this to prisoners and was not surprised to hear someone else from his office had said the same thing to a witness in this case.  SP Exh. 1 at 36:11-16; 90:7-13.  He clarified that he would do anything for cooperating inmate witnesses "that's within the law or propriety."  SP Exh. at 38:1.  He would pass on even unreasonable requests by inmates:  "[E]ven if it's not a reasonable request, if they want me to pass it along to the person, I'll pass it along, but I won't offer any substance to it." SP Exh. 1 at 40:19-21. Mullin also affirmed that he had heard Merillat inform witnesses:  "[W]hat I typically do – A.P. speaking – what I typically do is when an inmate testifies for us, I'll – I'll inform the parole board so that they know."  SP Exh. 16 at 54:16-19.  As outlined in this Supplemental Petition, SPU had ample opportunities to, and did, follow through on these commitments, and yet none of this was disclosed to the defense.

In their depositions, Mr. Mullin and Mr. Merillat define very narrowly what benefits have to be disclosed under *Brady*.  Whereas the law requires the disclosure simply of "evidence favorable to the defense," they did not see SPU's many favors as relevant.  They downplayed the importance of the benefit they conveyed.  They simply spoke to people, they insisted.  They could not themselves make things happen.  SP Exh. 1 at 23:4-10;  SP Exh. 16 at 37:22-24. Yet as Mr. Mullin himself recognized, "TDCJ is such a big bureaucracy. It's very difficult to get them to understand -- for the right people to know what's going on sometimes."  SP Exh. 16 at 72:8-10. Mr. Merillat, however, knows the "right people." He testified "I will at least inform the right people that here's -- here's what's going on with this inmate." And "I will do whatever I can to

pass along a request to the right people." SP Exh. 1 at 23:4-6; 70:23-24. TDCJ records reflect SPU's success in contacting the "right people" as classification records contain notations of changes done "per SPU," and, of course, TDCJ agreed to the unit transfers requested by SPU on behalf of its inmate witnesses. *See, e.g.*, SP Exh. 18 at 25, 29; SP Exh. 37.

In his earlier deposition in the *Speer* case, Mr. Merillat was perhaps more candid about how his letters are understood. Mr. Merillat described one of his letters to TDCJ's Cheatham as more than simply passing along information: "I am vouching for Innes in the fact that he does want to get out, he is helping us and here is an excellent opportunity to do some damage to the Texas Mafia[.]" Only Cheatham can decide what he wants to do, "but if I can vouch for the guy and I will and I did." SP Exh. 14:40:11-14, 41:3-4.

Mr. Merillat also argued these benefits were not a "deal," as evidenced by the fact that one prisoner Mr. Merillat helped ultimately did not testify for the State. "[I]f you call it a deal that I offer to help an inmate get his property back who the prison lost his property, yes, I did do that, but that was not a deal for him to testify because he refused to testify for us." SP Exh. 1 at 40:10-13. While Mr. Merillat may well have offered assistance to every prisoner who wrote to him, clearly he made judgments about who got more help. With respect to relating to Royce Smithey where SPU witnesses wanted to transfer to following Canales' trial, Mr. Merillat allowed: "But after a trial would be a good time to do it because then I could tell him: Yes, he did testify. No, he didn't. He got up and lied, or something like that." SP Exh. 1at 66:1-6; *see also* SP Exh. 14 at 47:22-24 (regarding inmates asking him for help with transfers, "if I thought it was a good idea I would ask or request that that inmate be given consideration for a transfer"). These requests were not motivated solely by safety concerns, but also inmates' desires to be

closer to family or prison educational or vocational opportunities.SP Exh. 14 at 47:19-25; SP Exh. 1 at 35:22-25, 36:1-2.

And whether Mr. Merillat wanted to acknowledge it, he was aware that prisoners wanted to please him because of the help he offered:  "If they don't think they're getting help fast enough or as much help as somebody else might get, they would perhaps feel like they needed to compete to get more help or help faster." SP Exh. 14 at 69:8-11.  He also believed making requests on SPU letterhead helped.  He used SPU stationery because "I do it as a representative of our office because I'm nobody even with our office and without our office, I'm really nobody, so why would they listen to me?" SP Exh. 14 at 72:9-12.   The prisoners certainly believed in the value of SPU's letterhead.  As Larry Whited explained to Mr. Merillat: "I ask you to do things because you're in a position to do them.  That's all." SP Exh. 38.  The prisoner correspondence disclosed in these proceedings is replete with complaints about the unresponsiveness of unit-level TDCJ officers without SPU intervention.  *See e.g.*, SP Exh. 39 ("I have sent a request to the unit classification board, but have no word on it [a transfer] yet.  Could you please put a call into Huntsville & help me?"); SP Exh. 23 at 2 ("You know how these people work.  It doesn't matter if a guy's innocent or guilty, if an officer writes him a case then he's guilty no matter what"); SP Exh. 40 at 1 ("I have tried a number of times to contact [Gang Intelligence officer] within the past three weeks but have not been able to speak with her").

The deposed inmate witnesses also repeatedly offered examples of their own powerlessness in effecting these kinds of changes on their own, without an influential sponsor such as Investigator Merillat or Prosecutor Mark Mullin. *See e.g.* SP Exh. 41 26:21-24 ("[Y]ou were pretty much placed where you're at. And if they needed -- if they felt that you needed to move, that was not a decision that you made, it was a decision that they made").  A letter from

Mr. Whited illustrates how the inmates perceived a few well-placed letters from SPU. In his bid for parole, Mr. Whited wrote Mr. Merillat asking for a letter from SPU. He explained that he had already told the parole staff about his efforts on his own behalf.

> But this is not going to be enough, Mr. Merillat. Not with all the stuff they've got written in my files. That's what this letter to you is all about. … I could really use a support letter from you and the Prosecutor on my behalf. Something to help me convince these people that this place is not where I need to be.

> …If I've got the support of your office, then there is a very good chance that these people will let me to go a pre-release center and then maybe even home in a year or two. That's more of one then [sic] I'll have if I don't have someone fighting for me.

> …You told me from the very beginning that if I ever needed anything that all I had to do was ask. I took those words to heart. Although I'm very aware that so far you've been good to your word. But I haven't taken advantage of you either….

> Because without it [the parole letter], I really don't think I stand a chance.

SP Exh. 42.

Mr. Whited believes it was thanks to A.P. Merillat that he was able to get out of Ad Seg and renounce his gang membership in the eyes of TDCJ. He believes Merillat was instrumental in getting him moved off of the notoriously hellish Estelle High Security unit and onto the "mellow" Wynne unit which was desirable as it offered more privileges, freedoms, and greater opportunities to participate in trades. SP Exh. 33 at 50:2-7, 11-13, 64:16-25, 65:1-25, 66:1-3; SP Exh. 43 at 160:3-13; SP Exh. 41 at 16:2-4, 97:19-25, 98:1-3.

> While I was [at Estelle High Security after the murder], he [Merillat] told me, if you're telling me the truth, I'll get you out of here, I'll help you get out of seg. If you're going to renounce your membership, you know, and you're really going to try to do right, I'll get you out of here. If you're lying to me, that's it. ...And he investigated, he looked into some of the stuff that we talked about, that we've

talked about right here, and he helped me out; he got me out of – got me out of super seg, and he helped me out.

SP Exh. 33 at 50:2-13.

In addition, Whited believes TDCJ's decision to reverse his disciplinary case relating to the murder of Mr. Dickerson (something Mr. Whited believes was a substantial impediment to parole) and restore the good time he lost was attributable to Mr. Merillat's letters to TDCJ.  SP Exh. 33 at 65:5-9; SP Exh. 44.

Certainly Mr. Innes believed Mullin and Merillat were responsible for his prized housing in safekeeping (not Ad Seg) at a unit close to his family.  "Man I've been in a state of shock every [sic] since leaving Telford & finding out my status!...Im' [sic] just blown away by all you've done for me…. I just had to write & send my most heartfelt gratitude!" SP Exh. 45.  Mr. Innes also stated that he had sent both Mr. Mullin and Investigator Merillat belts and wallets as gifts.  SP Exh. 43 at 79:7-9.

One revealing exchange with Lonnie Eason also reflects the wink and a nod with which SPU's interactions with inmates took place.   In December 1999, Mr. Merillat wrote to Mr. Eason:

> Now, what I must make clear is that no moves or benefits will be done in exchange for helping us.  That would amount to payment to some people, and we do not do that.  If anyone ever asks what you "got" for helping the State, you can honestly answer that we have only promised you protection, nothing else.  If that ever changed, you would have to answer with whatever benefit you received.

SP Exh. 46.

The same day, however, Mr. Merillat wrote to Sammy Buentello stating:

> Eason has cooperated with the Special Prosecution Unit in case preparations for the Dickerson murder case out of the Telford Unit.  He has requested that we send

you this copy of his renunciation.  This is provided for any consideration you deem appropriate.  Please call if you have any questions.

SP Exh. 47.

Mr. Eason's renunciation found its way to the "right people," but the terms were clear: this would not be called a "benefit."  The need to play along with SPU's characterization of their relationship seems well understood by inmates.  In Whited's lengthy letter of April 4, 2000, he let Mr. Merillat know that he would really like a radio:

> I've got somebody who'll send me a radio just like the one that got took from me. It has all the T.V. stations and is a clock radio.  It'll be brand new, still in the box, coming directly from the store is gets bought at... I know you can't just bring it up here to me without asking somebody first but I'm hoping you might be able to pull some strings and get someone in Huntsville to approve you giving it to me. **Your office reputation will still remain untarnished as far as your never having to pay witnesses for testimony and all that..** All you have to say is that you're replacing a radio that was destroyed by people who don't want to see me take me stand, and it's a clock radio, medium size, and leave it at that.

SP Exh. 48.

The Constitution's ultimate concern, however, is not what Mr. Merillat or Mr. Mullin call the benefits that flow to their inmate witnesses, but whether this information regarding what the inmates asked for and received from SPU was "favorable to the defense."  There is no question a jury could find the information about SPU's interactions with its witnesses and the TDCJ bureaucracy impeaching.

The inmate witnesses saw SPU as providing a crucial asset as they tried to negotiate TDCJ's housing and classification bureaucracy and parole.  A jury was entitled to consider those benefits in assessing the inmate witnesses' credibility.  Due process requires the disclosure of not "only bona fide enforceable [promises]. . . .  Its reach extends to 'any understanding or

agreements'" between the government and a prosecution witness. *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985) (quoting *Giglio*, 405 U.S. at 155); *DuBose v. Lefevre*, 619 F.2d 973 (2nd Cir. 1980) (*Brady* violated where state failed to disclose that witness had been encouraged to testify under promise of leniency, even though the promise had not been specific, especially where witness denied any deals).

**7. Innes repeatedly – and successfully – sought SPU's intervention on prison matters regarding gang deconfirmation, better TDCJ classification, better housing, and property in exchange for his cooperation, including the solicitation of incriminating evidence.**

The relationship between Innes and the SPU was much more complicated than the State portrayed at trial. Although the State admitted that they had cut a deal with Innes on two pre-homicide criminal offenses in exchange for his testimony, the communications between both parties reveal that there was more to the "deal" on these prior charges than was disclosed and there were continual *quid pro quo* benefits on a range of issues beyond that plea agreement.

By the time of the Dickerson murder, Bruce Innes had a long history of serious violence in Texas prisons. An active member of the TM, he was implicated in February, 1996, in a TM assault on another prisoner. On April 1, 1996, while housed on the highly restrictive "close custody" area of Telford, he assaulted an officer – "struck [officer] victim multiple times with fists after victim had removed another inmate from fight with [Innes]." SP Exh. 49, SP Exh. 18 at 18. In May 1996, he was found with a weapon. SP Exh. 18 at 18. In December, 1996, he and two other prisoners attacked a fourth prisoner as part of a "TM disciplinary matter." They attacked the other inmate with their fists and "an oblong stone approximately 6" in length, 2 ½" in circumference, with one end blunt, and the other end pointed." SP Exh. 50 (Incident Report and memo). As a result of their attack, the inmate "received 5 puncture wounds to the lower

back, a 4" laceration to the back of his head which required 13 stitches, and multiple bruises and contusions to the face and forehead." *Id*.

In May, 1997 – two months prior to the homicide of the victim in this case – Innes was part of a racial attack of five white prisoners assaulting three black prisoners "with homemade weapons… 2 metal rods about 6 to 7 inches in length and 2 peices [sic] of metal approximately 6 ½ inches long, all sharpened to a point." SP Exh. 51.   Unsurprisingly, TDCJ classification documents regularly refer to Innes as a "threat to the physical safety of other inmates" and "assaultive with weapon, staff assaultive." SP Exh. 52.  With this history of prison misconduct and gang affiliation, Mr. Innes faced the possibility of serving his whole 40 year sentence in Ad Seg. SP Exh. 1 at 46:20-23, 47:22-25, 139:6-11; SP Exh. 43 at 50:19-21. By December 1997, TDCJ's investigation into Innes' gang affiliation culminated with its formal designation of Innes as a confirmed member of the TM.   The first vote was cast by Bruce Thaler of the Unit Classification Committee on December 22, 1997; the final and third vote by Bill Cheatham of the State Classification Committee on January 30, 1998.  SP Exh. 4.

This background casts in new light Innes' efforts, beginning in January 1998, to try to save himself from serving his 40 year sentence in Ad Seg.  Very early on in his negotiations with SPU, Innes sought to be transferred to the Hughes Unit (where he was transferred to immediately after the Canales trial).  He explained to two SPU employees that it was near where his family lived.  If he were there, they would be able to visit him.  "I've never been where they could come & see me with regularity."[10]  SP Exh. 35 at 1.

---

[10] While Mr. Merillat characterized his efforts to effect transfers as being related to safety, he acknowledged proximity to family was another basis.  SP Exh. 1 at 35:22-25, 36:1-2.

When asked how a prisoner might otherwise transfer off the very violent Telford unit, Whited stated: "If you had a clean disciplinary record and you're all right with the staff and what have you and you wanted to take a trade, or something like that, then they would – maybe you might be able to get transferred to wherever – a facility that offers that particular trade. But other than that, if it's not medical, you know, or administrative as in because of disciplinary, then, no, it's not happening. It ain't going to happen." SP Exh. 33 at 38:22-25, 39:1-6. Certainly someone with a record of disciplinary infractions like Innes' – who said he was shipped to Telford when it opened because that is what wardens did with their "trash" – would have trouble negotiating a transfer on his own. SP Exh. 43 at 21:24-25, 22:1 (Q: "Any idea why you got moved to the Telford Unit?" A: "When a new unit opens up, man, everybody sends their trash").

Without minimizing the risk that Innes ran by testifying for the State, his requests to be transferred to other units based on his expressed safety concerns were apparently not based on any investigation into his allegations. Merillat apparently accepted them at face value. Generally Innes' letters to Merillat simply expressed a conviction that he could not get along with the other prisoners around him and needed to be moved, all while reminding Merillat of his value as an informant/agent. *See, e.g.*, SP Exh. 53 ("I'm again asking you to make a <u>call</u> to try & facilitate the transfer. I have some information for you").

Other documents indicate that Innes received far more than a transfer to the Hughes unit, most importantly, a release from Ad Seg. On March 6, 2000, Mr. Innes wrote to Mr. Merillat to ask for help in getting out of Ad Seg and to motivate Mr. Merillat by providing him more information:

> This a terrible place to do prison time & I myself desperately want out, so I can get in school programs to help myself get better. I can do nothing but rot in Ad. Seg. **As a matter of fact I'm wondering if there isn't something you could do**

**to get me released to population on this unit?** I have a (year) w/out any major disciplinarys & since I've been in Ad. Seg. I have <u>never</u> had any inmate or staff assaults. The only reason they are keeping me in seg is because of my positive gang tag. I've been in Ad Seg since May 27, '97 w/no kinds of assaults. If Larry Whited is out why not me? It would mean a lot to me & (my family) to be able to be a productive positive inmate & to be able some day to get contact visits! In here (Ad Seg) it's not possible – unless my designation is changed from a threat to inmates & staff, to protective custody Ad Seg. A.P. I've been locked up 10 years now & I've still got some to go, so my family is important to me. My ol' Mama won't be around forever! **I'd appreciate anything you could do! I'll get back to you with any more info I get, please let me hear back from you on the issues I raised!**"

SP Exh. 2 at 2-4.

On November 6, 2000, TDCJ documents reflect that Sammy Buentello – one of Mr. Merillat's frequent interlocutor's regarding Innes – ordered Innes removed from administrative segregation and put into "safekeeping," a far less restrictive place to do time. SP Exh. 54. Innes finally prevailed in his long campaign to be released from Ad Seg. Small wonder Innes wrote an effusive letter to Mullin and Merillat thanking them for his new placement. SP Exh. 45.

These documents, which were never revealed to the defense, demonstrate that Innes' relationship with the State far exceeded simply getting a deal on his pending felonies. Innes was continually receiving benefits from the prison system in exchange for actively seeking out evidence to use at Mr. Canales' trial. This partnership even included illegally soliciting incriminating information from Mr. Canales himself. *See supra*. Had the jury been aware of this information, Innes' testimony would have been placed in proper perspective: that of a canny, sophisticated, and manipulative prisoner who would do whatever he could to avoid additional punishment for his previous crimes and to make his time in prison easier.

**8. SPU assisted other inmate witnesses in obtaining favorable housing, before the parole board, in subsequent criminal matters, and in post-release planning.**

As stated above, prisoners knew that working with or for SPU could and would benefit them.  Prior to trial, Mr. Merillat sent letters to property officers of the different units where the State's inmate witnesses were located, asking that the State's witnesses be allowed to take their property with them while on bench warrant for the Canales trial. SP Exh. 55.  The documents disclosed include no similar letters for the defense witnesses.

After the trials were completed, SPU provided letters to the Texas Board of Pardons and Parole on behalf of inmates Baker, Canida, Innes, Hill, Henson, Driver and Rice and provided a letter to Sammy Buentello for Innes regarding gang renunciation.  SP Exh. 56.  Mr. Mullin testified that he was aware that Mr. Merillat told inmates as a matter of course that they will inform the parole board of their cooperation.  SP Exh. 16 at 54:16-19.

TDCJ also agreed to transfer the SPU prisoners to the units or geographic locations of their choice.  On November 6, 2000, almost immediately after Mr. Canales' trial, a SPU investigator wrote TDCJ's Bureau of Classification confirming that "Per our phone conversation of November 2, 2000, each request [for the inmates' unit transfers] will be honored."  Innes, along with the other State's witnesses, was on this list.  SP Exh. 57

The SPU list identifies the area or in some cases the specific units the inmate witnesses said they wanted to go to, and handwritten notes by each inmate reflects that the inmates' requests were largely granted in all but one case.  Since geographic location can improve the chances of visits from loved ones, it often drives housing preferences that prisoners are usually unable to effect on their own. Innes requested Hughes, and the handwritten note indicates "AH," TDCJ code for the Hughes unit. *See* SP Exh. 58.  Rice requested safekeeping at Telford, but was put in the Huntsville unit, a unit with a reputation for housing ex-gang members and "snitches." *See also* SP Exh. 41 at 97:19-25, 98:1-3 (Huntsville area unit generally preferable).  Canida

asked for Ramsey I or the Huntsville area, and was approved for "GR," or the Goree unit in Huntsville.  Baker wanted to be transferred to Ramsey I ("R1").  While he was transferred to Terrell ("R3") rather than Ramsey I, Terrell and Ramsey I are both in Brazoria county.  Henson asked for and was approved for transfer to Powledge ("B2")  Driver asked to go to the same unit as Canida.  While this request was not granted, he was transferred to Wynne, another Huntsville area unit.  Whited sought Ramsey I, and was approved for transfer to Ramsey I.   SP Exh. 57.

By contrast, for the defense witnesses SPU wrote a letter more consistent with the arms-length image it advanced at trial.  In a November 6, 2000 letter from SPU Investigator Smithey to TDCJ, SPU gave the names of the Canales witnesses and wrote:   "They should be considered enemies of the previously provided list of witnesses that testified for the STATE.  Please make a NFSUA [Not For Same Unit As] notation and other precautions to protect the state's witnesses." SP Exh. 59.  This is the kind of letter one would expect SPU to write regarding all the witnesses. It simply alerted TDCJ to possible security issues involving certain individual prisoners.  With the State's witnesses, however, SPU solicited their witnesses housing preferences.  SP Exh. 60. Further, they presented them to TDCJ not simply by letter, but also negotiated them ahead of time in a personal meeting and followed up by telephone.  SP Exh. 57.  This was a significant benefit to the State's inmate witnesses.

Helping SPU also paid future dividends.  Mr. Canales is not alleging that SPU explicitly promised to help the inmate witnesses if they got in trouble in the future.  The point is that the inmates did not need to hear an explicit promise to know that SPU was a powerful ally in a world where they had none and that SPU would continue to provide assistance to them.

For example, when Canida found himself once again in county jail, facing a possible life sentence, he wrote A.P. Merillat to ask him to write the Lamar County District Attorney.  SP

Exh. 61.  On August 5, 2002, Merillat wrote the Lamar County District Attorney to tell him about Canida's value to the case against Mr. Canales.  SP Exh. 62.  He was sentenced to ten years, and garnered a favorable vote from the parole board on this new criminal charge he acquired *while on parole*, after serving only six months on his new ten year sentence.  He was paroled the first time he came up for parole, and served only one year, despite a parole protest letter in his file from the local County Attorney.  SP Exh. 63; SP Exh. 64.  Likewise, when he came up for parole in 2004, Mr. Innes wrote Mr. Mullin and Mr. Merillat to ask for help.

> Hello guys!  Hey I've made the biggest decision of my life to date.  I'm totally giving my life over to the Lord!! I want to get into Calvary Commission, a school for Discipleship & Missionary work. …  It also just happens to be a perfect prison after care program for me & one (hopefully & prayerfully) that parole would see fit to release me to.  The both of you have been personal witnesses to me about God & my need for God & my obedience to him, you have been both friend & mentors & I need you to (each) write a letter of reference, for me to I.C.O.M.  It is a requirement to get in.  Id [sic] also like to ask for a letter of suport [sic] in your professional & personal capacity to the parole board with your mentioning your support and agreement that I.C.O.M. would be a good positive after care program to release me to.
>
> Mark, A.P. Im [sic] sending you my application for you to look over & some info about the program – Please- I need your letters of support to ICOM & the parole board so I can get all of the stuff put together.  I know yall are busy – but this is very important to me.  I feel that with the right support & plan/program Gods will that this is my way to get out & live for God!
>
> So please take the time to read the material, go over my application and ✓ it for legal errors concerning my criminal past & diciplinary [sic] & write me a letter for ICOM & one for the Board & send my application & the letters back to me so I can mail it off & get the ball rolling! ☺

SP Exh. 65.

On March 11, 2004, as requested, Mr. Mullin and Mr. Merillat sent a letter to the Board of Pardons and Paroles.  SP Exh. 66.  Mr. Merillat also sent a separate letter to I.C.O.M. SP Exh. 67; SP Exh. 1 at 112:25, 113:1-5.  While the first page is missing in the materials disclosed to the

undersigned counsel, Mr. Merillat believes he sent the letter on SPU letterhead since he signed it in his capacity as a SPU investigator.  SP Exh. 1 at 113:8-12.

On June 4, 2004, Mr. Innes again wrote Mr. Mullin and Mr. Merillat to ask them to talk to the major on his unit about Mr. Innes' cellmate issues.  He stated his belief that if they spoke to the major, it would make a significant difference.

> [H]e would take it more seriously into consideration & put me & Richard Gilbert back in a cell together.  This means a great deal to me you guys, so please use all your (considerable) charm on him because I want my cellie back.  He's clean, got his own $ & knows my past & I'm comfortable with him.  Right now Im' [sic] in a cell with some nut case who just came back from Skyview psych unit.  Please call & talk to him about this for me please!  I need you on this one fellas.

SP Exh. 68.  In his deposition, Mr. Merillat acknowledged that he could have made this call. SP Exh. 1 at 111:14-16.

While some of these benefits may not appear dramatic, the inmates' correspondence reveal SPU's assistance to be invaluable.  Their letters are replete with stories of their failed efforts to resolve problems with prison officials.  Housing conditions, discipline, cell assignments, and being able to keep one's meager personal property are core concerns to prisoners.  Time and again, the SPU witnesses sought help from SPU, especially A.P. Merillat, when TDCJ officials turned a deaf ear, and time and again they received the promised benefit of any "reasonable" request granted if only the inmate asked.

**THE UNDISCLOSED EVIDENCE WAS IN THE POSSESSION OF THE PROSECUTION**

**1. Documents In The Special Prosecution Unit Investigation Files Should Have Been Disclosed To Defense Counsel Prior To Trial.**

The overwhelming majority of the favorable evidence discovered by Mr. Canales' current counsel was found in SPU's own file.  In the course of discovery, it has become apparent that these files were never disclosed because they were in the possession of the investigator, not

the prosecutor.  SP Exh. 16 at 97:19-25, 98:1-3 (investigation file physically separate from

prosecution file).   Prosecutor Mullin made clear that he does not inquire into the information

developed by investigators.  With respect to the correspondence between Mr. Merillat and Bruce

Innes, for example – letters that are replete with impeaching information regarding benefits Innes

enjoyed by virtue of his cooperation, as well as Mr. Merillat's ongoing violation of the Sixth

Amendment, Mr. Mullin was unconcerned.

> Most of that [correspondence] was just, you know, A.P. doing his job.  He's
> handling it. If he had an issue or something he wanted to bring to my attention, he
> would come to me. But most of that was just between them.

SP Exh. 16 at 56: 11-14.

The investigator agreed with the prosecutor's assessment.  His involvement in complying

with *Brady* was simply to respond to the prosecutor's request:

> Q    And in terms of requests for discovery from the defense --
> A    Yes, ma'am.
> Q    -- are you involved at all in --
> A    Only in -- when a prosecutor is making his discovery to the defense, if they want
>      to make sure there's something in the file or if there's something missing, I'll
>      provide it. But as far as doing the discovery, that's not my job. …But in Canales,
>      that was -- that was not my responsibility. And if I did any discovery, it's because
>      I traveled up there to bring them something.
> Q    So in general you're only involved to the point of your prosecutor saying I need
>      your stuff?
> A    Yes, ma'am.

SP Exh. 1 at 38:3-19.

Yet what the prosecutor – specifically Mullin -- would ask for was very limited.  A

request to see Merillat's investigative notes was "very rare," and indeed, Merillat testified that he

"can't think of a reason why they would say: Let me see your notes, A.P.  Usually if they have a

question they'll ask me a question, then I'll refer to my notes and answer it.  But I don't recall

one specifically saying:  Hey, let me see all of your notes."  SP Exh. 1 at 9:13-17.

Supplement to Petition for
Writ of *Habeas Corpus* - 42

Without direction from the prosecutor, the investigator made unilateral decisions regarding what needed to be disclosed to the prosecutor.  He would relate orally to the prosecutor what was "worthy to report," and testified that, if he planned to be out of the office for a while, "I'll let them have what they need to know from me." SP Exh. 1 at 9:3-5, 10:17.  The same investigator's testimony in his deposition in the Speer case reflects not only his independence in deciding what constitutes *Brady* evidence, but also his ignorance of the applicable law.  He plainly saw the State's disclosure requirements as extending only to information "crucial to the actual guilt or innocence of a defendant," rather than, *e.g.*, impeaching information.  He explained:

> Now, if Mr. Mullin asks me about a situation or about an inmate being transferred, I'll tell him that I've written classification and asked that he be moved or that he's having trouble with his property.  Now, here again I won't tell them every time because I don't think that's crucial to the actual guilt or innocence of a defendant, and I don't believe myself that it's exculpatory information, so if the prison is holding back his property while he's in transit, I just don't see how that affects the guilt or innocence of a case, so I don't always tell Mr. Mullin about that.  There are occasions that I have but usually not; and where that ends up, it'll be in a folder somewhere.  I don't really know.

SP Exh. 14 at 22:14-25, 23:12.

Also in the *Speer* deposition, Mr. Merillat admitted he did not think about impeachment.  With respect to the dismissal of the Innes prosecution for a deadly weapon, Merillat was asked whether the fact that "probably the reason that that case was not prosecuted as a weapons case was because of Mr. Innes's cooperation, do you understand that to be potentially impeachment evidence that could be used against Mr. Innes?"  He responded:  "So as far as the impeachment, I don't know.  I don't understand all about that." SP Exh. 14 at 99:18-19.  Merillat testified that Innes "could have read [ ] into" Merillat's letter about the weapons case that "it probably won't be pursued if he continues to cooperate." SP Exh. 14 at 100:22-25.  When asked whether this

might be impeaching, Merillat reflected, "at the time I'd never considered that, no, sir." SP Exh. at 102:4.

Mr. Mullin had a constitutional responsibility to inquire into information developed and maintained by the investigators, but failed to disclose this *Brady* material to the defense.

**2. TDCJ Documents Should Have Been Disclosed To Defense Counsel Prior To Trial Because TDCJ Was Intimately Involved In The Dickerson Homicide Investigation, Its Files Were Available To And Were Reviewed By) The Prosecution, And Because The State Had A Duty To Disclose These Documents Due to the *Brady* Material Contained Within Them.**

Five years before Mr. Canales' trial, the Supreme Court made clear that the Due Process Clause of the Constitution imposes on the prosecutor the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437-38 (emphasis added).  In addition, the Fifth Circuit, among other federal courts, has also refused to limit the State's responsibilities along organizational lines. Instead, federal courts have examined the substance of different entities' participation in order to determine whether they are "others acting on the government's behalf in the case."   *Id.*

As far back as 1973, the Fifth Circuit rejected the prosecution's complaint that it could not be held accountable for evidence in the hands of another agency.   In *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973) (overruled on other grounds, *United States  v. Henry*, 749 F.2d 203 (5th Cir. 1984)), the Fifth Circuit held.

> The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny having access to the Post Office files. In fact it did not even deny access, but only present possession without even an attempt to remedy the deficiency. We do not suggest ... that the government was obliged to obtain evidence from third parties, but there is no suggestion in *Brady* that

different "arms" of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities.

*Deutsch,* 475 F.2d at 57 (citations and footnote omitted).

Similarly, in *United States v. Antone,* the Fifth Circuit required federal prosecutors to disclose information from state law enforcement where they "pooled their investigative energies to a considerable extent." 603 F.2d 566, 569 (5th Cir. 1979). The Court found:

> [I]mposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process. Rather than endorse a Per se rule, we prefer a case-by-case analysis of the extent of interaction and cooperation between the two governments.

*Id.*

In this case, because certain offices within TDCJ were intimately involved in developing the case against Mr. Canales, *Brady* and its progeny prohibits artificially sealing them off from the State's constitutional responsibility to disclose exculpatory or impeaching evidence.

## "They are our police department."[11]

In their depositions, Mr. Mullin and Mr. Merillat explained how closely SPU works with TDCJ's Office of the Inspector General (OIG). Mr. Merillat, a police officer for 13 years before joining SPU (Merillat Deposition at 7, line 22-24), analogized OIG to the police:

> So whereas -- as a prosecuting agency, similar to a DA's office, we get our offense reports from TDCJ's Office of the Inspector General. They are our police department. They will write up a case -- an allegation of a crime and bring it before our prosecutors who will screen the cases and determine whether or not they are okay for grand jury or need further investigation or don't meet the elements. And so in that respect, we work closely with the Office of Inspector General because they are our police department.

SP Exh. 1 at 16:23-25, 17:1-7). Merillat even assisted them in drafting search warrants, court orders, and subpoenas. SP Exh. 14 at 7:4-5.

---

[11] SP Exh. 1 at 17:1.

Mr. Mullin described a similar relationship: "OIG does the investigation and some how or other after they've written a case up, they present it to me." SP Exh. 16 at 11:16-17.

OIG investigators not only develop the case to present to the prosecutors, but they remain involved in the case:

> [Merillat] OIG would be involved in the investigation from the outset. Once they bring it to our prosecutors, if there is additional information they need or want or would help prove out the guilt of the proper people would we get involved. … In some cases they don't have to do anything extra. The case is very well put together by OIG and all we do is from grand jury to the courthouse.
> …
> Q     And once SPU -- you specifically as the SPU investigators involved, are OIG investigators still involved or does it not overlap at all?
> A     We -- we involve them as much as possible.  Especially when it's a very difficult case and there are a lot of problems with the case, we will try to get the case agent of all people to help us or to develop the information that we don't have. That is a very frequent more times than not situation.

SP Exh. 1 at 38: 23-25, 39:1, 4-6, 11-19.

Consistent with this prosecutor/police relationship, SPU staff have largely unfettered access to TDCJ documents.  In addition to having computer access to substantial parts of TDCJ's files on a computer in SPU's office (SP Exh. 1 at 20:5-22), both Mr. Merillat and Mr. Mullin agreed that OIG and STGMO documents are available to them, usually with simply a phone call. SP Exh. at 32: 9-24; at 33:11-17.  They may not necessarily obtain copies of sensitive documents such as gang files, but they are permitted to review the documents.

Mr. Merillat testified as follows:

> Q     Are you provided access, upon your request, of OIG files?
> A     Yes, ma'am.
> Q     Are you provided access, upon request, to the STG files?
> A     Yes.
> Q     Is there any part of the TDCJ files that if you asked for it they will say no, you can't have it?
> A     Not that I know of.

SP Exh. 1 at 21:6-14.

He elaborated:

[T]he STG office, are a little more careful with how they release information. If it's a simple question about do you have anything on inmate so-and-so? Is he a gang member? I can pick up the phone and ask them.  If I'm wanting -- like, if he is a gang member and I want his whole gang file, they'll -- they'll ask that we either subpoena it or put a request on our letterhead or do something official.  As far as OIG records, I can usually just call over there and say: I need an offense report. I need pictures out of your file, or whatever the prosecutor needs to get ready for trial. I'll usually just -- first I'll call. And, generally speaking, OIG let's me have it on a phone call.

SP Exh. 1 at 32:9-22.

Mr. Mullin agreed:

Q      But in terms of getting the OIG files – computer aside, if you asked for it, you're going to get it; is that fair?
A      Oh, you know, nothing is absolute. I get frustrated because it's a big bureaucracy.  Okay?
Q      Sure.
A      But overall I expect to eventually get it, yes.
Q      And how about Security Threat Group access, computer or otherwise?
A      That's different. We have to go hat in hand and ask them and hope that they'll cooperate.
Q      And generally do you get the cooperation?
A      Over the years we've had -- we've had pretty good cooperation. … But -- but overall, yes, we've had pretty good access -- pretty good luck with it. ... If I recall -- I think especially during this Canales/Speer stuff, I do think that the access was pretty forthcoming, but I think, if I recall, I had to go over to BOT[12] where they keep all that and look at things there. They didn't -- I don't think that they just let me copy stuff and take it. …  But -- but I'd say overall I had -- I had pretty decent access to gang stuff.

SP Exh. 16 at 8:15-25, 9:1-20.

Plainly, TDCJ and SPU are intimately intertwined in the State's prosecution.  Not only

does TDCJ make available documents to SPU personnel upon request, but TDCJ personnel in

---

[12] BOT, or the Brown Oil Tool building, is an administrative hub for TDCJ, and, among other things, is a TDCJ records repository and the location of the Security Threat Group Management Office.

the OIG are involved in building the case against the defendant.  The personnel and documents the prosecutor used or could have used to prosecute his case fall within the prosecutor's responsibilities under *Brady*.

Courts have repeatedly found that prosecutors must "search accessible files to find requested exculpatory material." *Hollman v. Wilson*, 158 F.3d 177 (3rd Cir. 1998), *citing United States v. Brooks*, 966 F.2d 1500, 1502-03 (D.C. Cir. 1992); *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984); and *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980).  The "government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure." *Brooks*, 966 F.2d at 1503. If such a duty were not imposed, the prosecution could intentionally remain ignorant of information useful to the defense and frustrate the purposes of the Due Process Clause. *See Carey*, 738 F.2d at 878.  *See also United States v. Perdomo,* 929 F.2d 967, 970–71 (3rd Cir.1991) (U.S. Attorney's failure to disclose federal government's witness' state criminal record was held to be a *Brady* violation even though the information was not possessed by the U.S. Attorney because the information was "readily available" to the U.S. Attorney's Office from local authorities); *United States v. Burnside*, 824 F. Supp. 1215, 1254 (N.D.Ill.,1993) ("even if none of the U.S. Attorney's personnel nor the federal agents nor the police officers had been as aware of the undisclosed *Brady* material as they were, knowledge of the information would still be attributed to the government for *Brady* purposes since much of the undisclosed *Brady* material was possessed by the Warden and other personnel in the [Metropolitan Correctional Center] in Chicago and was 'readily available' to the U.S. Attorney's Office for the asking").

In *Carriger v. Stewart*, a Ninth Circuit case directly on point, the court rejected the State's contention that correctional files on an inmate witness fell outside its disclosure

responsibilities.   132 F.3d 463 (9th Cir. 1997).   The court first outlined the substance and

rationale of the constitutional disclosure requirement:

> The prosecutor's actual awareness (or lack thereof) of exculpatory evidence in the government's hands, however, is not determinative of the prosecution's disclosure obligations. *See Kyles,* at 435-40.  Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. *See id.,* 436-38.  Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned. *See id.,* at 438-40.  The disclosure obligation exists, after all, not to police the good faith of prosecutors, but to ensure the accuracy and fairness of trials by requiring the adversarial testing of all available evidence bearing on guilt or innocence. *See id.,* at 438-42; *Brady,* 373 U.S. at 87.

132 F.3d at 480.   It then considered the prosecution's specific responsibilities in using

prisoners as witnesses:

> In this case, Dunbar was the prosecution's star witness, and was known by police and prosecutors to be a career burglar and six-time felon, with a criminal record going back to adolescence.  When the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility. *See Giglio*, 405 U.S. at 154; [*United States v.*] *Bernal-Obeso*, 989 F.2d [331,] 333-34 [(9th Cir. 1993)].  This must include the witness's criminal record, **including prison records**, and any information therein which bears on credibility.  **The state had an obligation, before putting Dunbar on the stand, to obtain and review Dunbar's corrections file, and to treat its contents in accordance with the requirements of *Brady* and *Giglio*.**

132 F.3d at 480 (emphasis added).

## MATERIALITY

As set forth above, in *Brady v. Maryland*, the United States Supreme Court held that "the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or punishment, irrespective of the good

faith or bad faith of the prosecution."  373 U.S. at 87.  Subsequent decisions have abandoned the

prerequisite of a defense request for exculpatory evidence before an accused may benefit from the Court's decision in *Brady*. *Bagley*, 473 U.S. at 682. Moreover, the Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis. *Id.* at 677; *Giglio*, 405 at 154. Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: 1) the prosecution suppressed favorable evidence; and, 2) the evidence was material to either the guilt or punishment. *Brady,* 373 U.S. at 87. *See also Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433; *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564; *Adams*, 768 S.W.2d at 290.

The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Petitioner is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 434-35. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 434. Second, materiality analysis "*is not a sufficiency of the evidence test.*" *Id.* (emphasis added). The Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict [or return a sentence of death]." *Id.* One demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (footnote omitted); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness's testimony).

Third, harmless error analysis is not applicable to *Brady* violations.  *Kyles*, 514 U.S. at 436.  The

*Kyles* Court stated, "once a reviewing court applying *Bagley* has found constitutional error there

is no need for further harmless error review."  *Id*.  Finally, materiality must be assessed "in terms

of the suppressed evidence considered collectively, not item by item."  *Id*. at 436-37.  As is

discussed herein, when the suppressed evidence in Mr. Canales' case is considered collectively,

as it must be under *Kyles*, there is a reasonable probability that the result of his sentencing

proceedings would have been different.

In a case that relied so heavily on inmate witnesses, the suppression of evidence of the

witnesses' bias was plainly material.  Without knowledge of the subtle but important ways in

which SPU assisted its witnesses, the defense could only make vague inquiries into these

benefits, and was powerless to respond with specific, contradicting evidence when they testified,

like Canida and Innes, that they stepped forward because it was the right thing to do. SR 10:115,

SR 10:40.

The suppressed evidence pertaining to Innes in particular prevented a fair trial.  Had the

withheld information been disclosed, the jury would have been aware, among other things, that

the State's primary witness was motivated to cooperate in order to escape being classified a gang

member and having to serve his entire 40 year sentence in Ad Seg.  They could have considered

the impact of the prospect of decades in Ad Seg, and appreciated that that alone is a powerful

motivation to cooperate with the only people who seemed able to do anything to change his

classification.  They would have also realized that Innes had another powerful incentive, namely

that he too was a suspect in the murder.

Further, by suppressing the contradictions surrounding Innes' account of the confessional

letter, the jury was denied the opportunity to consider reasonable doubts about how this letter

was produced and how it was transmitted.  Innes provided the best evidence that Mr. Canales wrote that letter.  Yet the suppressed evidence calls that into doubt since it undercuts the clear narrative that Canales wrote this letter in response to a direct question from Innes, and that Innes then saw Canales give this letter to him.  Canales may not have written the letter at all.  Or, Innes, as a TM member, instructed Canales to write the letter, either as a loyalty test (Canales was believed by some to be a TM prospect (SP Exh. 33 at 42:3-5), or as a way to take the pressure off the guilty parties, if he believed Canales would be able to prove he could not have committed the crime.

If the jury had known that Innes was himself a suspect in his crime, they would likely have been even less willing to take his testimony at face value.  Instead, they may have seen him as an experienced, canny inmate trying to shift blame from himself by eliciting incriminating information from Canales and Speer.  In doing so, he managed to obtain the State's most significant evidence – the confession kite – from another inmate and sent it to his lawyer to attempt to work a deal with the State to cooperate and testify in exchange for a lighter sentence on pending charges.

A jury may well have believed that, while Innes initially informed the State that he had not been involved in obtaining the letter and could only provide hearsay testimony about it, he soon realized that this hearsay testimony would not do.  Thus, his story evolved to put him at center stage, and he could now personally attest that he asked Canales to write it, that he saw Canales tie the kite to his string, and that he personally pulled that kite into his cell.  The jury was deprived of all of this information, except that Innes received a deal concerning pending charges.

Likewise, had the State complied with *Brady*, the jury would have been aware that Innes received assistance in being de-confirmed as a gang member, even though the State was warned by another prospective inmate witness that Innes was still heavily involved with and communicating with gang members.  The jury would also have known that SPU helped get him out of Ad Seg.  Even though he incurred a new felony charge for possession of a weapon, an offense that Innes was smart enough to know would devastate his plans to improve his prison classification and any prospects for release, this charge was dismissed while he was cooperating with the State.  Surely the jury would have factored these benefits into its assessment of Innes' credibility.

Finally, had this evidence been disclosed, the jury would have been aware that every single inmate that testified for the State had been told and fully expected that the prosecution would inform the parole board of their cooperation and would request that they be assigned to whatever institution they requested following the trial.  The legal issue is not whether SPU's efforts were inappropriate.  The question before the Court is whether these efforts had to be disclosed to the defense.  Without a doubt, the defense was entitled to know of these powerful incentives that clearly affected the witnesses' credibility.

While each separate piece of information withheld was material and requires reversal, clearly, the cumulative, collective analysis reveals that there is a reasonable probability that the result of his sentencing proceedings would have been different.

**III.    THE STATE DEPRIVED MR. CANALES OF DUE PROCESS OF LAW WHEN IT KNOWINGLY ALLOWED FALSE TESTIMONY TO BE PRESENTED TO THE JURY IN VIOLATION OF *GIGLIO V. UNITED STATES* AND *NAPUE V. ILLINOIS*.**

In violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), the State knowingly presented false testimony to the jury and did not correct the

testimony.  Under *Giglio* and its progeny, a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.1996), (citing *Giglio v. United States*, 405 U.S. 150 (1972)); *Napue v. Illinois*, 360 U.S. 264 (1959); *Cordova v. Collins*, 953 F.2d 167 (5th Cir. 1992).  Due process also is violated when the prosecution allows the jury to be presented with a materially false impression.  *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States v. O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997).  "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979).

In *Tassin v. Cain*, the Fifth Circuit made clear that *Giglio* and *Napue* extend beyond, *e.g.*, an undisclosed plea agreement.

> *Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair. Although *Giglio* and *Napue* use the term "promise" in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary. … The fact that the stake *was not guaranteed through a promise or binding contract*, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction.

517 F.3d 770, 778 (5th Cir. 2008) (*citing United States v. Bagley*, 473 U.S. 667, 683(1985) (opinion of Blackmun, J., joined by O'Connor, J.)).  Indeed, the informality of an arrangement may make it more potent.[13]

---

[13]  This insight was notably lacking in both Mr. Mullin and Mr. Merillat, who preferred **not** reaching formal agreements with witnesses prior to trial. SP Exh. 1 at 55:16-25, 56:2-4; SP Exh. 16 at 25:4-7.

> [R]ather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor.

*Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976).

In order to obtain relief under *Giglio*, Mr. Canales must show that (1) the testimony in question was actually false, (2) the State knew or should have known it was false and (3) the testimony was material. *See Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998); *O'Keefe*, 128 F.3d at 893; *Faulder*, 81 F.3d at 519. "False evidence is 'material' only "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir.1996). It is immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness. *O'Keefe*, 128 F.3d at 893; *Barham*, 595 F.2d at 241-42. Even if there is sufficient evidence in the case to support a guilty verdict, it is the jury, and not judges, that is the body given the constitutional responsibility to decide guilt or innocence. *Barham*, 595 F.2d at 242.

The standards are different under the *Brady/Bagley* line of cases involving failure to disclose favorable evidence to the defense and the *Napue/Mooney* line of cases involving the presentation of false testimony by a government witness. Under *Brady* and *Bagley*:

> [E]vidence is material only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682. The "materiality" standard under *Mooney*, *Napue*, and *Giglio*, however, is that the conviction "must be set aside if there is any reasonable likelihood that the false

testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Bagley*, 473 U.S. at 678-79 & n.9; *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998). This is a stricter standard of materiality because of the "corruption of the truth-seeking function of the trial process" involved when false evidence is presented. *Id.* at 104.

In short, reversal is required when the State knowingly used false testimony unless the false testimony was "harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 680. In other words, this standard is "equivalent to" the harmless-error standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Bagley*, 473 U.S. at 679 n.9 (quoting *Chapman*, 386 U.S. at 24)). Moreover, relief is warranted for false evidence that affects the jury at the punishment phase, as well as evidence that affects the guilt/innocence phase. *See, e.g.*, *Moody*, 139 F.3d at 484 (discussing *Napue/Giglio* claim regarding allegedly false expert testimony at punishment phase on subject of future dangerousness); *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1998) (discussing claim regarding allegedly false testimony by punishment phase witness). Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of **one juror** could have been changed with respect to the imposition of the sentence of death." *Kirkpatrick*, 992 F.2d at 497 (discussing Louisiana law) (emphasis added).

Here, there clearly is a "reasonable likelihood that the false testimony" from Innes, the State's star witness, "could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, and the State has failed to prove that the error was harmless beyond a reasonable doubt. Reversal is required.

**1.   The jury was given a false impression of the circumstances of Innes obtaining the confession kite.**

As addressed above, the jury was provided with false testimony that Innes obtained the confession "kite" directly from Canales.  While Mullin and Merillat may not have personally known at the time that Innes had previously disclosed that he did not personally receive the letter, it makes no difference.  The notes from Royce Smithey, another SPU agent, were in the SPU file.  *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153 ("A *Napue* violation may occur not only when the prosecuting attorney knows that a witness's testimony is false, but also when another government attorney knows of the false testimony and does nothing the correct it").

**2.      The State left the jury with the false impression that the inmate witnesses received no benefits in exchange for their testimony, when in fact the State provided the inmate witnesses with crucial assistance with regard to their property, housing, classification, parole chances, and continued to advocate for them even after the trial.**

Again, the relevant facts are set forth above.  And, again, while Mullin may not have known about some of the benefits Merillat provided to witnesses, it makes no difference as Merillat was a member of the prosecution team and was also present in the courtroom during the trial.  SR 3:20.

Contrary to the actual facts, the State created the false impression that the inmate witnesses received nothing in exchange for their cooperation and testimony.  With Canida, the State communicated to the jury that it was powerless to benefit the inmates.  The State also went to great lengths to assure the jury that its key eyewitness, Steven Canida, had obtained no benefits in exchange for his testimony:

Q:              Have you ever talked to me or any other prosecutor about any cases?
[Canida]:      No, sir, never.

| Q: | Have I ever offered you any kind of a deal? |
|---|---|
| [Canida]: | No, sir. |
| Q: | Have you ever asked me for anything |
| [Canida]: | No, sir. |
| Q: | Well, as a prosecutor – you understand I [don't] work for TDCJ, right?[14] |
| [Canida]: | Yes, sir. |
| Q: | Is there something I can do to help you? |
| [Canida]: | No, sir, ain't nothing – not that I know of. |

SR 10:114.  In reality, as addressed above, SPU was providing substantial benefits to the inmate witnesses.

Thus, the State left the jury with the false impression that the inmate witnesses received no benefits in exchange for their testimony, when in fact the State provided the inmate witnesses with crucial assistance with regard to their property, housing, classification, parole chances, and continued to advocate for them even after the trial.  SPU promised to "help them with anything reasonable;" the inmates understood these benefits; but the jury that was charged with assessing these witnesses' credibility was led to believe that these inmates were motivated solely by a stricken conscience.

### IV.  MR. CANALES' RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE JURY'S *EX PARTE* COMMUNICATIONS WITH BAILIFFS DURING TRIAL DELIBERATIONS.

In these proceedings Mr. Canales has found that the jury communicated with the bailiff about the case – likely in writing – during deliberations, and these inquiries were never brought to the attention of the court or counsel, nor made part of the record.  Indeed, the alacrity of the bailiff's response to their inquiries – one juror estimated he took ten minutes – corroborates the

---

[14] While the record reflects that Mullin said "I work for TDCJ," Mullin clarified in his deposition that either the court reporter erred or he made a misstatement as he does not work for TDCJ.  SP Exh. 16 at 57:12-14.

absence of any proceedings on the jurors' inquiries.  This *ex parte* communication between the jurors and the bailiff violated Mr. Canales' constitutional rights, and requires reversal.

### A.        Factual Background

Recognizing the sensitivity of communications between the court and the jury, the Texas Code of Criminal Procedure allows jurors to communicate with the trial court, but under very specific conditions:

> When the jury wishes to communicate with the court, it shall so notify the sheriff, who shall inform the court thereof.  Any communication relative to the cause must be written, prepared by the foreman and shall be submitted to the court through the bailiff.  The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel, and shall first submit the question and also submit his answer to the same to the defendant or his counsel or objections and exceptions, in the same manner as any other written instructions are submitted to such counsel, before the court gives such answer to the jury, but if he is unable to secure the presence of the defendant and his counsel, then he shall proceed to answer the same as he deems proper.  The written instruction or answer to the communication shall be read in open court unless expressly waived by the defendant.
>
> All such proceedings in felony cases shall be a part of the record and recorded by the court reporter.

Tex. Code Crim. Proc. Ann. Art 36.27.

This procedure is essentially identical to the established procedure in Bowie County, where jury questions are to be submitted in writing to the bailiff, presented to the judge, who then reads them to counsel.  Counsel make argument to the judge regarding appropriate responses to the questions, and the judge delivers a response to the jury. The trial record is supposed to reflect this process, and the jury's note is to be made part of the record. Dkt. No. 73 Appendices 5 & 6 (Declarations of Paul Hoover and Jeff Harrelson).

While the jurors' recollections are imperfect, the jurors' depositions indicate this practice was not followed in this case.  Multiple jurors recalled posing at least one question to the bailiff during deliberations.  Some recalled requesting and receiving evidence; one believed they had requested a readback of testimony.  However, the docket, the Clerk's Record, and the Exhibits reflect no notes or inquiry during deliberations. SP Exh. 69.

Juror James Butler recalled:

A      I believe we asked the bailiff when we were in – When we were in the process of determining the decision, I think we asked the bailiff to ask the judge for some of the letters or something. It seems to me there was a piece of evidence that we wanted to see that we didn't have at that moment in time.
…
We were all talking and the foreman – there was a buzzer and we buzzed. The bailiff came and we said can we get this and he went out and brought it back.
…
It was just a piece of information that was in a plastic cover to protect it.

Q      Was there a – do you know if the foreman wrote something down?

A      No, it seems to me we just – there was a buzzer in the room I think. I'm sorry, I don't recall that specific process.

Q      Do you recall how long it was between the time you asked the bailiff for that piece of evidence and it came back?

A      It wasn't all that long. Five, ten minutes at the most.

SP Exh. 70 at 10:16-25, 11:2-25, 12:1.

Juror Brian Steed recalled written notes asking to review evidence:

A      And, I believe there were some things passed during deliberations through the bailiff to the judge, I believe there were questions to him. Not on, necessarily, clarification of our purpose, but we were asking for some of the evidence to come through.
….
Q      When you asked that to the judge, were there written notes?

A      Yes.

Q      Were there any times that you asked anything of the bailiff that were not written down during deliberations?

A      I don't believe so. I believe our foreman wrote down what evidence we needed to see, and that is how it was done.

Q     And, if you recall, how many notes total were passed during deliberation?

A     Only two or three, I believe.

…

Q     What evidence, if you recall, did you want to see again?

A     It seems like we asked for, I am trying to think what wasn't already provided. Most of the things were already in there. It may have been something like a transcript from the trial, or a section of it. I am trying to remember what it was. Something like that.

Q     A transcript of testimony that you had heard in the trial?

A     Right.

Q     Did you get a response to those notes?

A     Whatever it was, we got it back pretty quickly.

Q     How did that happen? Did the bailiff bring it back?

A     The bailiff brought it, yeah.

Q     What did the bailiff bring back?

A     I am trying to remember what it was. If it was a transcript, it was just the paper.

…

Q     At any time did you go into the courtroom as a result of these notes?

A     No. We stayed where we were at.

Q     You remained in the jury room?

A     Yes.

…

A     The foreman wrote the note for whoever needed the question answered, and then, asked for whatever it was, the piece of evidence, or the transcript, whatever it was, asked that and handed it to, I think we had, like, a buzzer, or something, that brought the bailiff in and handed it over.

Q     Handed the note to the bailiff.

A     Correct.

Q     The bailiff took the note, is that correct?

A     Yes.

MS. JORDAN: Objection, form.

Q     And, relatively soon returned with material responding to the question in the note?

A     Right.

Q     Are we talking ten minutes, an hour?

A     I would say ten minutes.

Q     And, you believe that there two or three occasions?

A     If I remember correctly, yes.

Q     And, was it the same process for each of those occasions?

A       Yes.

…

Q       [cross-examination] When you spoke about the notes that you passed to the bailiff, are you absolutely positive that they were just requests for evidence and not clarification of what the law was?

A       Like I said before, I am just going off memory about seven or eight years old. So, I cannot say absolutely that there wasn't one pertaining to instruction. I don't remember that.

Q       But, right now, as you sit here today, can you remember ever asking in a note about clarification about the law and what you were supposed to do, or your purpose, do you recall?

A       I don't recall that.

Q       As you sit here today, your best recollection about those notes is that it was about requests for evidence?

A       I believe so.


SP Exh. 71 at 19-22.


Juror McGary also recalled jury notes:

Q       Now, let me ask you, when you were deliberating, do you remember any of the jury, or the jury foreperson sending out any notes to the judge?

A       Yes.

…

Q       Okay. And, how many notes were sent out?

A       I don't know.

….

Q       What were the notes about?

A       I think at that point in time, we were getting close to whatever decision we were doing, or it was almost time for dinner, or something. I am not quite clear on that point, though, about what the notes were about, because I probably didn't see the notes. But, I do recall some notes.

…

Q       And, how were the notes passed out of the jury room?

A       By a court official.

Q       And, they were asked to take it to the judge? Is that what the notes were for, the judge?

A       Yes.

Q       Do you remember what happened as a result of the notes?

A      Well, I believe that it might have dealt with, were we almost finished, or did we need more time, should we reconvene the next day. It was something to that effect, I believe.

Q      So, you got answers to your notes from the court official as well.

A      Now, I didn't specifically, but our chief juror, I will call him, it had to do with, were we going to finish. I really can't say just absolutely what it was about, but that is what I would assume.

…

Q      So, all the communication with this court official, everything was written down first?

A      No. I wouldn't say that, no.

Q      So, sometimes the chief juror asked questions verbally to the Court official?

A      Possibly. It was a long time ago.

SP Exh. 72 at 21-23.

Another juror, Jon Miller, recalls written questions, but believes those happened prior to

deliberations.

A      It seems to me I remember a question or two. It wasn't out loud. I am wanting to say it was written down on a piece of paper, given to the bailiff, and the bailiff gave it to the judge.

…

Q      Were they questions – Do you remember what part of the trial that was during?

A      I don't have a clue.

Q      Were you in the jury room deliberating?

A      No, sir. This wasn't at the end of it. I think this was the very start when a few people had questions. I don't think it was no big deal.

Q      Had the trial started at that point?

A      I couldn't tell you. I really don't remember. It has been awhile.

SP Exh. 73 at 9-10.

Another juror recalled verbal questions only:

Q      Do you remember asking any questions to the bailiff?

A      We may have had some pictures that we – and some documents or letters there that we may have asked what a word was or something like that, but it's been so long ago –

…

Q      All right. And did you ever ask the bailiff to get certain evidence brought to the jury room?

A      I think there was a case that we had that we did. Maybe some of the letters.

SP Exh. 74 at 10:2-7, 11:4-7.

## B.      Governing Legal Standard

The *ex parte* communications between the jury and the bailiff violated Mr. Canales' Sixth Amendment right to confrontation and effective assistance of counsel and his Fourteenth Amendment rights to a fair trial and to appeal.

In *Remmer v. United States*, the Supreme Court held:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reason, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.,* 347 U.S. 227, 229 (1954).

To be sure, bailiffs routinely have contact with jurors. That is part of their job. However, there is an important difference between contacts regarding jurors' need for food, smoking, or bathroom breaks, and those involving the bases for their deliberations. *See United States v. Kupau*, 781 F.2d 740, 743 (9th Cir. 1986) (distinguishing managing juror accommodations from actions that "involve[ ] the crucial jury function of reviewing the evidence")

The Supreme Court recognized in *Mattox v. United States*, 146 U.S. 140 (1892), and in *Remmer v. United States*, 347 U.S. 227 (1954), that private communication with members of the jury during a trial about the matter pending before the jury, is presumptively prejudicial if not

made pursuant to known rules of the court and the instructions of the court made with full knowledge of the parties.

While in *Kupau*, the Ninth Circuit found the error harmless because of the "absence of any suggestion that extraneous matters came before the jury," *id.* at 743, the Court cannot find the same here.  The bailiff in his deposition testified that all the exhibits would be in the jury deliberation room by the time the jurors entered the room, and did not know why the jurors would ask for evidence since they would have it in there with them already.  SP Exh. 77 at 21, 36:21-25.  One of the jurors also recalled that "[m]ost of the things were already in there" SP Exh. 71:15-16.

This testimony gives rise to two possibilities, both of which mandate reversal.  First, the fact that the jurors had all the exhibits with them during deliberations, and then asked for and received additional materials makes it impossible to find "the absence of any suggestion that extraneous matters came before the jury."  *Kupau*, 781 F.2d at 743.

Second, the jurors may have been given only some of the exhibits, and therefore had to ask for the omitted exhibits to be brought to the jury room.  Like providing only some parts of a trial transcript of a witness examination, selective production of the exhibits presents risk of skewing the jury's deliberation.  Therefore, the presence of counsel to ensure the jury receives "all appropriate and relevant aspects of the requested [material]" is required.  *United States v. Toliver*, 330 F.3d 607, 616 (3rd Cir. 2003) (*quoting United States v. Bertoli*, 40 F.3d 1384, 1401 (3d Cr. 1994)); *United States v. Schmitt*, 748 F.2d 249, 256 (5th Cir. 1984) ("furnishing only a part of the transcript would create a danger that the jurors might give that portion undue weight.")  Under either scenario, Mr. Canales was prejudiced.

Further, due process entitles the accused to a record of sufficient completeness to demonstrate that prejudicial error occurred during the trial. *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971). Because all the communication occurred outside the presence of a court reporter, Mr. Canales' counsel did not know the communication had occurred and has been denied the best mechanism to appeal that this *ex parte* communication occurred.

**V.      AT LEAST ONE JUROR, IF NOT THREE, WHO SAT IN JUDGMENT OF MR. CANALES LIED ABOUT HIS CRIMINAL PAST, VIOLATING MR. CANALES' RIGHT TO A FAIR TRIAL UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.**

Mr. Canales alleged in his petition for writ of habeas corpus that several jurors were biased and falsely answered questions about their criminal background. This Court granted Mr. Canales' request for depositions of the jurors (Dkt. No. 42), and these depositions revealed that three jurors failed to disclose in their sworn juror questionnaires contacts with the criminal justice system. Mr. Canales subsequently moved for additional discovery, which the Court granted in part. (Dkt. Nos. 73, 86) Significantly, however, bank records for one juror – Mr. Rawson – were not ordered disclosed by the Court. This omission is significant because on the prosecutor's list of prospective jurors is a handwritten note indicating "been arrested for hot checks" and "inv. pending." P Exh. 70 (State's juror list). In his deposition, Mr. Rawson recalled learning that he had written "hot" checks, and contacted his bank – TEXAR Credit Union – who, according to Mr. Rawson, apologized for a bank error. Mr. Rawson learned of the problem with the checks when one of the check recipients returned the check to him "with a note saying, it was going to be sent to the prosecuting attorney." SP Exh. 75. Mr. Rawson could not recall when this occurred. *Id.* While the law enforcement records obtained by Mr. Canales' counsel pursuant to subpoena do not indicate any investigation into hot checks, this information

may be reflected in the bank records. Without discovery of the bank records, Mr. Canales is unable to determine whether Mr. Rawson was in fact being investigated for hot checks at the time of Mr. Canales' trial and impliedly biased. *See Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005).

By contrast, Juror Steve Matlock's implied bias was apparent from his deposition testimony where he repeatedly imposed his own idiosyncratic definitions of terms like "arrest" and "jail," as detailed below.

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court set out the federal standard for evaluating claims that a party had been denied his constitutional right to an impartial jury. The defendant must demonstrate (1) that a juror failed to answer honestly a material question on *voir dire*, and (2) that a correct response would have provided a valid basis for a challenge for cause. *Id.* at 556. The Supreme Court has made clear that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi*, 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted). Accordingly, the presence of a biased juror can never be harmless, and "the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon,* 151 F.3d 970, 972 n. 2 (9th Cir. 1998) (citing *Arizona v. Fulminante,* 499 U.S. 279, 307-310 (1991)).

The fact that the juror lied is itself indicative of bias. "[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *McDonough Power Equipment, Inc.*, 464 U.S. at 556 (Blackmun, J., concurring).

> If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror – to listen to the evidence, not to consider extrinsic facts, to follow the judge's

> instructions – with equal scorn.  Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process.  How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity?  Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer*, 151 F.3d at 983.  *See also United States v. Boney*, 977 F.2d 624, 633-34 (D.C. Cir. 1992) (hearing into possible bias required where juror failed to acknowledge prior felony conviction on juror qualification form; juror's lack of candor "presents serious concerns," because it "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality"); *Dyer*, 151 F.3d at 979 (juror's "lies give rise to an inference of implied bias on her part"); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) ("Mrs. G. was dishonest is her response to questions on voir dire – this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonestly, of itself, is evidence of bias"); *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989) ("Willingness to lie about [potentially disqualifying fact] exhibited an interest strongly suggesting partiality"); *United States v. Scott*, 854 F.2d 697, 699-700 (5th Cir. 1988) ("certainly when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's right to a fair trial"); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984) (juror's "dishonesty, in and of itself, is a strong indication that he was not impartial"); *Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir. 1982) ("a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief"); *McCoy v. Goldston*, 652 F.2d 654, 659 (6th Cir. 1981) ("A district judge shall presume bias where juror deliberately concealed information").  Assurances of impartiality, however sincere, do not

resolve the matter: "Determining whether a juror is biased … is difficult, partly because the juror may be unaware of it."   *Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring).

Mr. Matlock acknowledged being arrested pursuant to a warrant in 1986 for theft over $50, reportedly because of a bank error.  For this he spent the night in jail. He was released from jail the following morning after paying a fine.  SP Exh. 76 at 20-22.   Mr. Matlock also acknowledged a warrant had issued for his arrest in a separate matter.   SP Exh. 76 at 19 (*Deposition of Steve Matlock*).   On his juror questionnaire, Mr. Matlock had responded that he had never been arrested or jailed. Dkt. No. 73 Appendix 2 (Juror Questionnaire of Matlock).  In his deposition, Mr. Matlock testified:

> Q:   And then, there was the theft over fifty and under five hundred dollars that resulted in your arrest.
> A:   It was just a check.
> Q:   That never resulted in any kind of conviction?
> A:   It was like a check, like you had a hot check.  That was all it was.
> Q:   But, were you arrested?
> A:   I was arrested.
> Q:   Spent the night in jail?
> A:   Right, spend the night.  But, again, I didn't think, I didn't think I was convicted of anything because we got that clear the next day as well.
> Q:   The question just asks if you had ever been arrested or charged?
> A:   Again, I didn't feel like I was charged with anything.  I felt like it was an error on their part, which it was.  And, I took care of it the next morning. So, I didn't think anything else about it.  An arrest, in my mind, is when I am arrested, charged and convicted of a crime.

SP Exh. 76 at 24:10-25, 25:1-4.

The problem with this explanation is two-fold.  First, it reveals his jury questionnaire answers were untrue, and second, it indicates Mr. Matlock is making the mistake made by the juror in *United States v. Scott*, namely that he "consciously censored the information. He believed that it was *his* place, and not the place of the court or defense counsel, to determine

whether his relations were a bar to jury service in this case." 854 F.2d at 699.  This gives rise to an inference of implied bias.  *Id.*

### 2. The Eighth Amendment's Mandate Of Heightened Reliability Prohibits Upholding A Death Sentence Rendered By These Jurors.

While a juror's misconduct has always concerned the courts, it takes on added significance in the context of a death penalty case.  Because the penalty of death is qualitatively different from any other punishment, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring).  One of the most important and consistent themes of the Supreme Court's death penalty jurisprudence is the "emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner."  *Barclay v. Florida*, 463 U.S. 939, 960 (1983) (Stevens, J., concurring); *see Beck v. Alabama*, 447 U.S. 625, 638 (1980) (noting that, because death is different, "we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination").  Accordingly, the severity of the sentence that Mr. Canales faces demands that this Court apply "careful scrutiny in the review of any colorable claim of error." *Stephens v. Zant*, 462 U.S. 862, 885 (1982).  This admonition is especially true when the claim of error involves the right to a fair trial, one of the primary means of ensuring that a jury render its verdict "based only on the evidence subjected to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir. 1991).

### 3. This Misconduct Requires Reversal Of Mr. Canales' Conviction And Sentence.

"[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.  The right to an impartial adjudicator, be it judge or jury, is such a right."  *Gray v. Mississippi*, 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted).  Accordingly, "the presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.  Like a judge who is biased, the presence of a biased juror introduces a structural defect not subject to harmless error analysis."  *Dyer v. Calderon,* 151 F.3d at 972 (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-310 (1991)).

## PRAYER FOR RELIEF

WHEREFORE, petitioner ANIBAL CANALES, JR. prays that this Court::

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

2. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct in which to brief the issue of law and of fact raised by this petition or such hearing;

3. Defer ruling on the above-developed claims until he has had the opportunity to develop and present his remaining claims for relief as set forth in his original Petition for Habeas Corpus;

4. Grant such other relief as the ends of justice may require.

Respectfully submitted this 14th day of July, 2011.

___/s/_____          ___/s/_____
Teresa L. Norris                          Meredith Martin Rountree
                                          Texas Bar No. 24033544
Blume Weyble & Norris, LLC                Law Offices of
P.O. Box 11744                            Owen & Rountree, L.L.P.
Columbia, SC 29211                        Post Office Box 40428
Tel: (803) 765-1044                       Austin, Texas 78704
Fax: (803) 765-1143                       Tel: (512) 804-2661
teresa@blumelaw.com                       Fax: (512) 804-2685
                                          meredithmr@earthlink.net

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing upon counsel for Respondent by sending same via CM/ECF:

> Asst. Attorney General Thomas M. Jones
> Asst. Attorney General Leslie Kuykendall
> Office of the Attorney General
> Postconviction Litigation Division
> Office of the Attorney General
> P.O. Box 12548
> Capitol Station
> Austin, TX  78711

this 14th day of July, 2011.

 /s/ Meredith Martin Rountree_____