MERILLAT A.P. CONFIDENTIAL 06-22-2011

1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3   ANIBAL CANALES, JR.              *
                                     *
4   VS.                             *        Civil Action No.
                                     *        2:03-cv-00069-TJW
5   RICK THALER, DIRECTOR, TDCJ-CID *

6

7

8

9                    ORAL DEPOSITION OF
                       A.P. MERILLAT
10                     Volume 1 of 1

11

12

13

14

15

16

17          ORAL DEPOSITION OF A.P. MERILLAT, produced as a

18   witness at the instance of the Petitioner, and duly sworn, was

19   taken in the above styled and numbered cause on the 22nd day of

20   June, 2011, from approximately 9:40 a.m. to 3:39 p.m., before

21   Liesa Kliman, Certified Shorthand Reporter in and for the State

22   of Texas, reported by machine shorthand at the Holiday Inn

23   Express, located in Huntsville, Texas pursuant to the Texas

24   Rules of Civil Procedure and the provisions stated on the

25   record or attached hereto.

2

```
1                    A P P E A R A N C E S

2   FOR THE PETITIONER:
              BY: MS. TERESA NORRIS
3             Blume Weyble & Norris, LLC
              1247 Sumter Street, 2nd Floor
4             Columbia, South Carolina  29201
              Telephone:(803)765-1044
5

6   AND

7             BY: MS. MEREDITH MARTIN ROUNTREE
              Owen & Rountree, L.L.P.
8             P.O. Box 40428
              Austin, Texas  78704
9             Telephone:(512)804-2661

10

11  FOR THE RESPONDENT:
              BY: MS. LESLIE K. KUYKENDALL
12            MR. THOMAS JONES
              Assistant Attorney General
13            P.O. Box 12548
              Austin, Texas  78711-2548
14            Telephone:(512)936-1400

15

16

17  FOR THE WITNESS:
              MS. MELINDA FLETCHER
              Special Prosecution Unit
18            P.O. Box 1744
              Amarillo, Texas 79105
19            Telephone: (806)367-9407

20

21

22

23

24

25
```

3

1                      I N D E X

2                                       PAGE

3 Appearances . . . . . . . . . . . . . . . . . . .   2

4 WITNESS
   A.P. MERILLAT

5

6 EXAMINATION
   BY MS. NORRIS . . . . . . . . . . . . . . . . .   7
7 EXAMINATION
   BY MS. ROUNTREE . . . . . . . . . . . . . . . .   103
8 EXAMINATION
   BY MS. KUYKENDALL . . . . . . . . . . . . . . .   123
9 EXAMINATION
   BY MR. JONES . . . . . . . . . . . . . . . . .   130
10 FURTHER EXAMINATION
   BY MS. NORRIS . . . . . . . . . . . . . . . . .   138
11
   Conference Call With Judge . . . . . . . . . .   26
12

13 SIGNATURE AND CHANGES . . . . . . . . . . . . .   140

14 REPORTER'S CERTIFICATE . . . . . . . . . . . . .   141

15

16

17

18

19

20

21

22

23

24

25

4

|  | | EXHIBITS | |
|---|---|---|---|
| 1 | | | |
| 2 | Number | Description | Page |
| 3 | 1 | Undated Notes | 19 |
| 4 | 2 | Affidavit of A.P. Merillat | 14 |
| 5 | 3 | Affidavit of A.P. Merillat | 14 |
| 6 | 4 | Supplemental Affidavit of A.P. Merillat | 19 |
| 7 | 5 | Handwritten Notes | 15 |
| 8 | 6 | Handwritten Notes | 51 |
| 9 | 7 | Letter, 2/4/98 | 68 |
| 10 | 8 | Handwritten Letter, 4/13/96 | 69 |
| 11 | 9 | Handwritten Letter, 6/8/96 | 69 |
| 12 | 10 | Letter, 6/15/98 | 71 |
| 13 | 11 | Letter, 6/15/98 | 72 |
| 14 | 12 | Handwritten Letter, 7/25/98 | 72 |
| 15 | 13 | Letter, 7/28/98 | 72 |
| 16 | 14 | Letter, 7/28/98 | 73 |
| 17 | 15 | Judgment and Sentence on Plea | 73 |
| 18 | 16 | Statement of Fact Form | 74 |
| 19 | 17 | Statement of Fact Form | 74 |
| 20 | 18 | Computer Printout | 75 |
| 21 | 19 | Handwritten Notes | 76 |
| 22 | 20 | Computer Printout | 76 |
| 23 | 21 | Travel Card | 77 |
| 24 | 22 | Travel Card | 78 |
| 25 | 23 | Computer Printout | 81 |

MERILLAT A.P. CONFIDENTIAL 06-22-2011 PAGE 5

5

|   | EXHIBITS (cont'd) | |
|---|---|---|
| Number | Description | Page |
| 24 | Handwritten Notes | 81 |
| 25 | Letter, 7/17/00 | 81 |
| 26 | Criminal Case Information Worksheet | 82 |
| 27 | Supplement Offense Report | 85 |
| 28 | Handwritten Notes | 87 |
| 29 | Handwritten Letter Undated | 88 |
| 30 | Memo Undated | 88 |
| 31 | Letter, 8/15/99 | 89 |
| 32 | Letter, 3/21/01 | 91 |
| 33 | Letter, 3/22/01 | 91 |
| 34 | Letter, 11/6/00 | 92 |
| 35 | Handwritten Letter, 8/26/01 | 92 |
| 36 | Letter, 10/2/01 | 94 |
| 37 | Letter, 11/6/00 | 94 |
| 38 | Letter, 12/11/00 | 95 |
| 39 | Handwritten Letter, 2/27/01 | 95 |
| 40 | Letter, 11/6/00 | 103 |
| 41 | Letter, 11/6/00 | 104 |
| 42 | Handwritten Letter, 7/24/02 | 104 |
| 43 | Letter, 8/5/02 | 107 |
| 44 | Letter, 10/14/99 | 108 |
| 45 | Handwritten Letter, 3/6/00 | 109 |
| 46 | Handwritten Letter, 6/4/04 | 110 |

6

```
 1                        EXHIBITS (cont'd)

 2    Number           Description              Page

 3    47        Handwritten Letter, 3/8/04        111

 4    48        Letter, 3/11/04                   112

 5    49        Letter P.2, Undated               112

 6    50        Handwritten Letter, 2/5/09        113

 7    51        Investigation Notes               114

 8    52        Handwritten Notes                 116

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

7

1                        A.P. MERILLAT,

2    having been first duly sworn, testified as follows:

3                        EXAMINATION

4    BY MS. NORRIS:

5        Q    Good morning, sir.

6        A    Good morning.

7        Q    Basically, just for process, at any point if you need

8    clarification of a question, feel free to ask.  If you need a

9    break, water, anything, please let us know.

10       A    All right.

11       Q    Could you just state your full name for the record.

12       A    A.P. Merillat.

13       Q    And, Mr. Merillat, where do you work?

14       A    Work for the Special Prosecutions Unit here in

15   Huntsville.

16       Q    And generally, if you would, describe your

17   educational and professional history.

18       A    Well, I've continued my college studies.  I'm

19   currently going back for my degree.  So I have 34 plus years of

20   experience as a police officer.  I'm a certified licensed peace

21   officer in Texas.

22               For the first ten years of my career, I worked

23   for the Houston Police Department, and after that for three

24   years I worked here at the Huntsville Police Department, and

25   then 22 years ago -- a little over 22 years ago I came to work

8

1   for the Special Prosecution.

2       Q      And within the Special Prosecution Unit, would you

3   basically describe the file keeping process?

4       A      In the Huntsville office -- I can't speak to the

5   other ones.  I rarely go to the other offices.  But in the

6   Huntsville office where I've been for all these years, the

7   individual prosecutors primarily keep their active files in or

8   near their offices.  Some of them inside, some of them have

9   smaller offices and they won't fit, but the active files for

10  which each prosecutor is working are somewhere close to them.

11             When a case is disposed of, for a period -- a

12  limited period of time, we will keep those files -- immediately

13  disposed files somewhere in the office.  We have places to keep

14  those.  Because our office is not real big, there's a

15  suspension period and after a certain amount of time -- we have

16  storage buildings, we have two or three here in town, and our

17  clerks will take those files, the older files, and put them

18  there.  So as far as the Huntsville office goes, each

19  prosecutor is responsible for their own active files, pending

20  files, and then the disposed files stay in the office for a

21  little while, then the clerks, by whatever method, take them to

22  a storage area.

23      Q      And do the individual prosecutors' files while the

24  case is active, does that also include your work product, your

25  material?

9

1    A    No.  Now, I have put notes inside active files.  It

2  just depends on what the notes are about, whether or not I'm

3  going to be available for any amount of time -- if I'm going to

4  be gone for an extended time, I'll let them have what they need

5  to know from me.

6            As a general rule, I keep my own notes, work

7  product, what I'm doing as far as an investigation goes, in my

8  office.

9    Q    And at what point, if ever, does the individual

10  prosecutor see all of your file, your notes?

11    A    Primarily if they ask for it, which is very rare.

12  Nobody -- they don't seem to care what I have.  But if they ask

13  for it, they can see it.  Or -- I can't think of a reason why

14  they would say:  Let me see your notes, A.P.  Usually if they

15  have a question they'll ask me a question, then I'll refer to

16  my notes and answer it.  But I don't recall one specifically

17  saying:  Hey, let me see all of your notes.

18    Q    And is there a process -- in terms of after you go

19  interview a witness, do you do a formalized memo at some point

20  or do you just tell the prosecutor need to know sort of things?

21    A    Usually I'll just make a verbal report.  Now, I might

22  make notes.  I'm not saying I don't make notes, but I'll tell

23  the prosecutor what I've learned, discovered or found out or

24  what I've gleaned from what they've told me to go find out.  Or

25  there have been occasions where I actually typed up not so much

10

1  a memo, but I call it a supplementary report or something like

2  that.  We don't have our own standard report forms like a

3  police department does.  So I make up my own form.  It will say

4  supplement to such-and-such case.  And if it's -- if it's --

5  several times I've been called out on my own investigations,

6  sexual assaults and such, that internal affairs did not work.

7  So I had to come back and make a report, so I just made up my

8  own form and turned that into the chief.

9      Q    When you're doing your investigation, for instance

10 interviewing a witness, do you make notes --

11     A    Yes, ma'am.

12     Q    -- during the conversation?

13     A    Yes, ma'am.

14     Q    And does that go in your file or the prosecutors'

15 file?

16     A    The notes -- the notes would go in my file.  And,

17 once again, if I was to -- if it was worthy to report to the

18 prosecutor, I would sit in my office with my notes and just say

19 here's what I --

20     Q    And do those witness interview notes stay in your

21 file as long as you keep the file?

22     A    Yes, ma'am.  If I wasn't clear, I apologize, but I

23 have a file that would be investigation notes for this

24 particular case, not a -- not a master file of all my notes.

25 In other words, on the Canales case, I had a Canales file and I

11

1   would keep notes in that file.

2       Q    So every witness interview note that you had would go

3   in that file?

4       A    Yes, ma'am.

5       Q    Let me back up a little bit.

6            MS. ROUNTREE:   10:15 is the time for us to call

7   in to the Judge for clarification.

8       Q    (By Ms. Norris) And in preparation for this

9   deposition, what materials have you been provided?

10      A    I have this -- I don't know what this is.

11      Q    Does it have a case caption?

12      A    Exhibit volume.

13      Q    All right.

14      A    Three.

15      Q    All right.  So, for the record, it appears to be the

16  sealed exhibits to the petitioner's habeas petition in this

17  case.

18      A    Okay.

19      Q    Have you been provided any other documents?

20      A    I have -- I think it's called a checklist for -- that

21  you-all submitted to the court, a checklist for him to look for

22  specific things.

23      Q    Okay.

24      A    That's the two primary things I have.  Then from the

25  Speer's deposition I had notes or comments that I made or such

12

1   as that.  I have the Speer's transcript, but I didn't print it.

2      Q     I understand.  Let me show you -- and we can slide

3   this down -- a document that is labeled Defendant's Exhibit 25

4   and see if that is what you are referring to from Mr. Speer's

5   case.

6               MS. KUYKENDALL:  Do you have like a second copy

7   that we can --

8               MS. ROUNTREE:  We don't have a second copy, but

9   we can make one at some point, but I don't have a copy with me.

10              MS. KUYKENDALL:  This is rather lengthy.  Okay.

11     Q     (By Ms. Norris) I show you that and ask, is that what

12   you're referring to in terms of your notes and comments?

13     A     These are notes and comments, but I don't know that

14   they are what I'm referring to in the William Speer's case.

15     Q     All right.  Fair enough.

16     A     These are notes and comments.

17              MR. JONES:  This is Tom Jones.  Can I jump in?

18   He -- I supplied him a transcript of the Reporter's Record of

19   his deposition in the state habeas corpus petition in the Speer

20   matter.  That may be what he's referring to.

21              THE WITNESS:  Yeah, but I didn't print.

22              MR. JONES:  Okay.

23     Q     (By Ms. Norris) Fair enough.  And you referred to

24   notes?

25     A     These are notes that I made prior to the Speer's

13

1  deposition -- Speer deposition.  Based -- I wrote those based

2  upon what the allegations were against me.  So, in other words,

3  to prepare for what I was going to be asked, I went and

4  addressed certain allegations.  I didn't want to miss certain

5  points, so I made those notes.  And the attorney at that time

6  made a copy of those also, Mr. -- I can't remember his name.

7                  MS. NORRIS:  Let's go ahead and mark those.

8                  THE WITNESS:  Can I have them back, though?

9                  MS. NORRIS:  Yes, sir, we're going to hand them

10 back to you.  For the record, there are some sticky notes

11 attached to that.  We are also offering it complete with the

12 sticky notes.

13     Q     (By Ms. Norris) Did you -- is there anything else you

14 looked at in preparation for today?

15     A     Let's see.  Excuse me.  This is an affidavit to Judge

16 Ward from the federal court.

17     Q     Uh-huh.

18     A     And I -- it's -- I don't know how we knew to do this.

19 If we were ordered, I don't -- I don't recall how this came

20 about.  But we photocopied every item in every box in this

21 case, Speer and Canales.  Every item that we had in our office

22 that had anything to do with Speer and Canales was photocopied

23 and was actually scanned and made into disks, CDs.

24     Q     Uh-huh.

25     A     And along with that, Mark Mullin and I, along with

14

1   that, did affidavits to the Judge saying here's what we're

2   sending you in response.  I don't even know what the response

3   was to, but we were told to do it and I can't remember.

4       Q    And is that an affidavit from October 28th, November

5   5th --

6       A    Oh, yes.  Yes, ma'am.  28th.

7       Q    -- and November 18th?

8       A    I have one from the 28th and November 18th.

9       Q    And do you also have November 5th?

10      A    No, ma'am.

11      Q    If you would, if you can hand me the two that you

12  have.  I'm going to mark those.  And while I'm doing that, let

13  me show you the one from November 5th and ask you whether or

14  not that is your affidavit?

15      A    Yes.  Yes, ma'am.

16      Q    I'll hand those two back to you.  I'm going to wait.

17  Ms. Rountree has left us.  I'm going to wait to mark the one

18  from November 5th so I can give you a clean copy, but I am

19  going to hand these back to you.

20           And you have some other documents before you.

21  What are those?

22      A    That's handwritten notes.  I don't recall if I did

23  those before Speer or after, but that's definitely my writing.

24  And they are notes about letters from and to Lonnie Eason and

25  myself.  Just highlights of subjects of the letters in case

15

1   they were -- if they become a matter of this particular hearing

2   I wanted to remember certain things from the letters.  They are

3   letters that everybody has had in these cases, so they're not

4   anything new, but I just wanted to make notes about them in

5   case I needed to refresh my memory.

6            And then I have copies of letters that I refer

7   to in this, as a matter of fact from Lonnie Eason to myself and

8   back and forth.  And I think they're all Lonnie Eason letters.

9   I'm sure they are all Lonnie Eason letters.  But I believe

10  they're copies that are in the -- in all of these things that

11  we've been talking about in the hearings.

12       Q    Was there a particular reason why you focused in in

13  your notes there in pulling copies with respect to Eason only?

14       A    I think there is, but I don't know what it is right

15  now.  I imagine as we get into this something is going to come

16  up about Lonnie Eason.  It's stuck in my brain that I better

17  remember these things, so I made these notes.  And I don't know

18  why I centered in on Lonnie Eason.  But I do now remember that

19  lawyer's name, Craig Henry, from the Speer case.  I think that

20  was his name.

21       Q    I'm going to hand those back to you and I'm going to

22  ask you to hand me your notes again.  I'm going to mark those.

23  And this will be Deposition Exhibit 5.  I left 4 to put on the

24  other affidavit.  And at the end of our deposition, I'm going

25  to ask you to leave these marked documents with us but I'm

16

1  going to hand them to you so you can certainly have your notes.

2      A    Okay.

3      Q    Do you have anything else before you?

4      A    No, ma'am, I don't think so.  I have my subpoena or

5  the order to be here.

6      Q    And who did you talk to in preparation for the

7  deposition?

8      A    Well, first of all, Ms. Rountree e-mailed me and told

9  me about it, and then Mr. Jones told me that we were being

10 ordered by the federal court to be here and then -- let's see.

11 I think there was a phone call between myself and Mr. Jones

12 about scheduling and about e-mailing me the transcript and the

13 checklist -- not the checklist.  The -- yeah, the checklist.

14 Very little discussion between us.  Very little.  And almost

15 absolutely no discussion between myself and Ms. Fletcher, so --

16 no real preparation per se.

17     Q    In terms of the SPU unit, what is the relationship

18 with the Department of Criminal Justice?

19     A    We're an independent agency.  We're not a part of

20 them.  We're not employees of them.  We don't have benefits

21 that arise out of employment with them.

22          As a matter of fact, we prosecute employees of

23 that department and people associated with it.  So whereas --

24 as a prosecuting agency, similar to a DA's office, we get our

25 offense reports from TDCJ's Office of the Inspector General.

17

1  They are our police department.  They will write up a case --

2  an allegation of a crime and bring it before our prosecutors

3  who will screen the cases and determine whether or not they are

4  okay for grand jury or need further investigation or don't meet

5  the elements.  And so in that respect, we work closely with the

6  Office of Inspector General because they are our police

7  department.

8      Q    Uh-huh.  You mentioned earlier that sometimes there

9  are cases that come to you directly where your police

10 department, using your phrasing, doesn't do it.  You're sort of

11 the first line?

12     A    Yes, ma'am.

13     Q    What --

14     A    That has happened.

15     Q    What would prompt that situation?

16     A    It's -- every situation has been different, so

17 there's not like a set rule.  But one occasion I remember

18 specifically were allegations of sexual assault by employees at

19 the -- at the Hobby Unit in Marlin, Texas.  It was -- I don't

20 believe he was a guard.  I think he was an official with TDCJ.

21 And I can't remember his position now.  Our office received

22 several complaints -- it's a female unit -- from female inmates

23 that he had been sexually assaulting them.

24          We got the complaint directly.  It didn't go

25 through OIG or TDCJ at all.  It came straight to our office.

18

1   And so the chief prosecutor at the time -- and I don't recall

2   if it was Mr. Bodice or Mr. Boone.  I don't remember who our

3   chief was at the time.  He asked me to go work the case up.  So

4   OIG was never involved in this case.  I started it on my own

5   from the beginning all the way through.

6        Q    And is that the only case that you recall where --

7        A    No, ma'am.

8        Q    -- OIG wasn't involved before?

9        A    No, ma'am.  There was another one where an inmate was

10  forging parole documents and selling paroles to other inmates

11  to forge documents for them to get them paroled.  And when the

12  TDC -- when the prison systems classification director found

13  out about it, he called us.  He didn't call OIG or Internal

14  Affairs, he called us directly.  For one thing, he didn't know

15  how many inmates had been paroled on these forged documents,

16  but he did know of one because the guy who was forging the

17  documents snitched on that person.  So I got involved to

18  work-up the forgeries and the actual escapes because people

19  were released on false pretenses.  So I did get involved in

20  that.

21            There was another case where an inmate was

22  paroled by mistake and they asked us to go chase him down, find

23  him, arrest him, and bring him back, which I did.

24       Q    Let me stop you there and just ask this more

25  generally.  Is it a common occurrence that you're the first

19

1   line?

2       A    No.

3       Q    Or is that really an exceptional case?

4       A    It's exception.

5       Q    Okay.  I'm going to hand you back your notes,

6   Exhibit 1, so you can have those and we're going to mark the

7   November 5th, 2009 affidavit as Deposition Exhibit 4.  And

8   we'll hand that back to you as well.  And if you would,

9   Mr. Merillat, your notes there, to the yellow pages, if you

10  would go ahead and staple those together for us.

11      A    May I have copies of these since you're going to take

12  them?

13      Q    Absolutely.  Before you leave --

14      A    Later or what?

15      Q    We'll make copies before we leave today.

16      A    Oh, okay.

17      Q    In terms of the relationship with TDCJ, can inmates

18  get mail to you uncensored by --

19      A    Yes, ma'am.

20      Q    -- those officials?  And is that official policy?

21      A    I believe it's official policy of the prison system

22  for all legal mail to go through without being opened.  It's

23  not my office policy.

24      Q    So just prison policy legal mail, period?

25      A    Yes, ma'am.

20

1      Q      And do you have access within your office, computer

2  access, to the TDCJ central system?

3      A      Parts of it.

4      Q      What parts?

5      A      The assignments, trust funds -- no, not trust funds.

6  Let's see.  Assignment, history, visitors lists, detainer

7  screens, disciplinary, classification screens.  There are

8  several.  I can't remember all of them, but I don't have

9  particular -- like, who's contributing to the trust funds of an

10  inmate, but I can find out how much is on his books.  I

11  can't -- let's see.  Oh, personnel, I can't get into the

12  personnel screens.  There are many different things I can look

13  at in the prison terminal.

14      Q      And can you access the OIG files from there?

15      A      No, ma'am.  I think our -- our clerk can access

16  whether or not a case involves a particular inmate, but I don't

17  think we can read the details of it.  If we can -- I'm not

18  saying we can't, but I can't.  I don't have access to that.

19      Q      And how about the Security Threat Group files?

20      A      I cannot access theirs.  I believe there's an

21  investigator in our office who can get into gang files, but I

22  certainly cannot.

23      Q      And who is the investigator that can?

24      A      Mike Holm, H-O-L-M.

25      Q      And the access, lack of access that you just

21

1   described in terms of what you could reach on the computer, was

2   that the same in the 1997 to 2000 timeframe?

3       A    I don't recall because we've not always had the

4   access, but I don't recall exactly when we got it.

5       Q    In terms of the -- leaving computer aside and going

6   back to paper.  Are you provided access, upon your request, of

7   OIG files?

8       A    Yes, ma'am.

9       Q    Are you provided access, upon request, to the STG

10  files?

11      A    Yes.

12      Q    Is there any part of the TDCJ files that if you asked

13  for it they will say no, you can't have it?

14      A    Not that I know of.

15      Q    In terms of inmate transfers -- understanding that

16  inmate witnesses are a particular danger category.  When you

17  request that an inmate be transferred for safety, are you ever

18  denied that request?

19      A    I have been.  And I haven't been denied to my face

20  but I've -- it's been denied.  In other words, I have made the

21  request and it hasn't happened or it's happened through other

22  channels.  But it's not very -- historically, it's not a

23  blanket agreed upon thing when I ask they do.  That does not

24  happen.

25      Q    Would you say 95 percent of the time they do?

22

1      A      No, ma'am.

2      Q      What percentage would you put on it?

3      A      And I'm going over history.  I would say 60 percent

4   maybe.  It's hard to know because I've asked for hundreds, if

5   not thousands of inmates for various reasons, not only criminal

6   cases.  But I've asked for many, many, many, many, many inmates

7   who have asked me to ask on their behalf for them to be moved

8   and I don't know that all of them have been moved or I don't

9   know that half of them have been moved, but I do know the

10  requests were made.

11     Q      Do you recall in this particular case having any

12  problem getting requested transfers made?

13     A      I do recall making numerous requests and transfers

14  not happening quickly or even if at all.  And I don't -- and I

15  can't pinpoint a particular inmate who was denied a transfer

16  for safety reasons.  But at the same time, when I made

17  requests, nobody actually told me:  Okay.  We're going to do

18  it.  It's always:  Well, we'll look into it.  And I would give

19  the request, usually in writing, and I think always in writing,

20  and then they would look into it and if they think it's right

21  they do it.  So --

22     Q      And in terms of gang designations, historically when

23  you support an inmate, ask that they be de-confirmed as a gang

24  member, does that generally happen?

25     A      As far as I know it never happens only on my word or

23

1   my request.  I think it's never happened on my request, but I

2   always -- if I'm convinced that the inmate is sincere or even

3   if I'm not convinced, but the inmate has done something that

4   indicates he's moving in that direction, I will at least inform

5   the right people that here's -- here's what's going on with

6   this inmate.  He's claiming to de-confirm.  He wants to

7   de-confirm.  And then let them -- that's not my purview, so I

8   let them handle it from there.  But to my knowledge, I've never

9   said:  This guy is not a gang member any more.  Please

10  de-confirm him.  I've always offered evidence for what I think

11  his heart was.

12      Q    And in terms of the OIG investigations, is OIG the

13  investigator for disciplinary incidents?  Say, for instance, an

14  inmate is caught with a shank.  Who would investigate that

15  initially?

16      A    Well, initially it's the officer who found it, which

17  could be any employee, actually.  They will write up a

18  disciplinary case.  And if it's a criminal type of case, it

19  could even be an administrative case, if I'm not mistaken.

20  Once they write it up, it goes through certain channels, which

21  I'm not familiar with, and will end up in OIG.

22      Q    And if it is a case that OIG feels needs to come to

23  your office, how does that process work?

24      A    The investigators -- every county is different, but

25  in the counties I work, the investigators will write up the

24

1  criminal case, just like a police department would, and submit

2  it to their supervisors.  And in some situations the supervisor

3  brings it to the prosecutor.  He waits until he has sufficient

4  cases to make the trip worthwhile, and he'll bring them to our

5  prosecutor, the one who works that county.  Or sometimes the

6  investigators themselves who wrote the case will come to our

7  office and present it to the various prosecutors who work that

8  county.  In other words, if it happened in Walker County,

9  there's a certain prosecutor they will talk to, not the guy

10 from Jefferson County, even though we're all in the same

11 office.

12      Q    And once a case is accepted by the prosecutor or

13 someone within the SPU unit for prosecution, how is the

14 decision made after that whether to pursue it or not and who

15 makes that determination?

16      A    When a case is brought -- and I'll speak to an

17 investigator bringing it -- his own case to the prosecution.

18 If an investigator is working up any criminal case and brings

19 it to our prosecutor -- sometimes I'm not even involved in the

20 conversation.  More times than not I'm not.  The prosecutor and

21 the investigator will discuss the case; if there's enough

22 elements to go forward with it.  If there are, it now becomes

23 the prosecutor accepts it for prosecution, then he will prepare

24 it for grand jury, make up an indictment, take it to the grand

25 jury.

25

1          If it needs more work, if they're missing some

2    element or some piece of evidence or something, some

3    prosecutors, particularly the ones I work with, will tell that

4    investigator:  Here's what's missing.  Go get it and then come

5    back to me and let's see what you've got.  Some prosecutors

6    will say to their investigator in our office, my counterparts:

7    You go find out what they're missing.

8          The guy I work with primarily has the

9    investigator go do that and bring him back the case in a more

10   complete form.

11         And then the prosecutor will decide -- or not

12   decide, he'll just wait for the next grand jury in that county

13   and go.  Or they can actually reject a case when it's brought

14   them, if it doesn't meet their -- their ideas of what they want

15   to pursue.

16         And our office has gone through a change now

17   where we -- we don't take everything that happens in two man

18   cells and common areas out on the rec yards and such.  There

19   are too many and we can't prove particular ownership, say, of a

20   weapon.  So sometimes they'll reject a case out of hand and

21   that's the end of it.

22   Q     And you referred to the guy you primarily work with.

23   Who is that?

24   A     Mark Mullin.

25   Q     And how long has that been the case?

26

1     A     I believe I've been his investigator ever since he's

2   been there.   I'm sure over ten years, maybe 12 or 13.   I

3   don't -- it's been a pretty good while.

4                 MS. ROUNTREE:  We probably --

5                 MS. NORRIS:  We're going to take a break.   We

6   have a conference call with the Judge.

7                 THE WITNESS:  You want me to step out?

8                 MS. NORRIS:  I don't think so.

9                     (Recess from 10:14 to 10:17.)

10                    (Conference call with Judge Ward.)

11                MS. ROUNTREE:  Your Honor, as you are aware in

12  this case, you have entered some orders protecting the

13  disclosure of certain documents, and we are mindful of those

14  orders.

15                Mr. Merillat has brought with him today an

16  attorney from his office, who is actually present at this

17  telephonic hearing.   And we did -- we wanted clarification from

18  the Court of whether this attorney may be present in the

19  deposition when the sealed exhibits -- not sealed exhibits.

20  I'm sorry, Your Honor.   The documents that the Court released

21  after in-camera review, and which are subject to a separate

22  order sealing them, whether she may be present when those

23  documents are shown to the deponent and whether she may hear

24  testimony connected to those in-camera disclosed documents.

25                THE COURT:  Well, number one, what's the name of

27

1   the lawyer?

2           MS. KUYKENDALL:  Your Honor, the lawyer is

3   Melinda Fletcher.  She's present on the line with us.

4           THE COURT:  And, Ms. Fletcher, who are you

5   employed by?

6           MS. FLETCHER:  The Special Prosecution Unit.

7   The same group that Mr. Merillat is employed by.

8           THE COURT:  What is the position of their -- of

9   the party, the actual parties to the case on this issue about

10  whether she -- are you rejecting to her or are you wanting her

11  placed under the same order that you-all are, or what

12  exactly -- exactly what is your --

13          MS. ROUNTREE:  Your Honor --

14          THE COURT:  -- what is your position?

15          MS. ROUNTREE:  -- we do not object to counsel

16  for Mr. Merillat seeing these documents or hearing about these

17  documents in the course of the deposition.  Otherwise, we -- we

18  just would like her to be brought within the scope of the

19  Court's order.  We just wanted to make sure we did not violate

20  your order by having her see these documents and be privy to

21  evidence regarding them.  But we would just ask that she be

22  brought in within the scope of the existing documents binding

23  all counsel in this case.

24          MS. KUYKENDALL:  And, Your Honor, this is Leslie

25  Kuykendall.  I -- yeah, I have no objection to her being

28

1  brought within the scope of the order, so it's fine by -- fine

2  by us.

3          THE COURT:  When you say the scope of the order,

4  there's two orders, I guess, that are involved.  Number one was

5  the one that I originally entered for the attorney eyes only.

6          MS. ROUNTREE:  Correct.

7          THE COURT:  And then you filed a motion or

8  you-all filed a joint motion, and I entered the order that you

9  provided to me.

10          MS. ROUNTREE:  Correct.

11          MS. KUYKENDALL:  Right.

12          MS. ROUNTREE:  And that motion -- I'm sorry,

13  Your Honor.

14          THE COURT:  Well, I just -- so Ms. Fletcher is

15  employed by the Special Prosecution Unit.  It's my direction

16  that she can participate in this deposition and she can read

17  these documents.  You've got attorney eyes only up to this

18  point and nobody else can -- the witness has seen the

19  documents, as I understand it; is that correct?

20          MS. KUYKENDALL:  That is what I understand, sir.

21  This is Leslie Kuykendall.

22          THE COURT:  And then the two lawyers of record

23  have seen the documents, but there's -- you're not to discuss

24  them with anyone else, right?

25          MS. ROUNTREE:  That's correct, Your Honor.

29

1          MS. KUYKENDALL:  That's correct.

2          THE COURT:  Okay.  And, Ms. Fletcher, you can

3   stay there.  You can read them, you can hear the testimony

4   about the documents, but you cannot discuss the contents of the

5   documents or this witness' testimony with anyone else within

6   the Special Prosecution Unit without further order of this

7   Court or with any person, including anyone in the Special

8   Prosecution Unit.  Do you understand that?

9          MS. FLETCHER:  Yes, sir.  I'll be glad to abide

10  by that rule.

11         THE COURT:  Okay.

12         MS. KUYKENDALL:  And, Your Honor, this is Leslie

13  Kuykendall.  I just wanted to clarify.  We'll be taking a

14  deposition tomorrow of Mark Mullin who -- or not we'll be.  I

15  believe the petitioner will be taking a deposition of Mark

16  Mullin tomorrow who is -- who was the prosecutor on the Canales

17  case.  And my understanding is that Ms. Fletcher will be

18  attending that deposition tomorrow as well.  So I just want to

19  make sure that what you're saying right now covers that

20  deposition as well.

21         THE COURT:  This order will cover both the

22  depositions of Mr. Mark Mullin and Mr. A.P. Merillat and

23  Ms. Fletcher's participation.  And we'll enter a written order

24  so that she can make no discussion with any person about the

25  documents or the testimony without further order of this court.

30

1  Okay.

2           MS. ROUNTREE:  Your Honor, two other issues that

3  have arisen is if the order -- if we could get a commitment

4  from the court reporter, and if this could also be in the

5  Court's order as well that the court reporter is similarly

6  bound not to discuss the contents of this deposition or the

7  deposition of Mr. Mullin tomorrow.

8           THE COURT:  You're talking about the court

9  reporter that's there?

10          MS. ROUNTREE:  Yes, sir.

11          THE COURT:  And that -- the name of the court

12 reporter is?

13          MS. ROUNTREE:  The name of the court reporter is

14 Liesa Kliman, L-I-E-S-A  K-L-I-M-A-N.

15          THE COURT:  Ms. Kliman, you can hear me speak I

16 take it.

17          THE REPORTER:  Yes.

18          THE COURT:  Okay.  You understand that you're

19 under this same order that other than transcribing the

20 deposition, that you cannot discuss the contents of this

21 deposition of Mr. Merillat today or Mr. Mullin tomorrow unless

22 this Court -- or discuss the contents of the documents that are

23 revealed without leave of the Court.

24          THE REPORTER:  I understand.

25          THE COURT:  Okay.  We'll put all of that in an

31

1   order.

2               MS. ROUNTREE:  And finally, Your Honor, it has

3   been indicated to us that the counsel from the Special

4   Prosecution Unit may seek to question Mr. Merillat in the

5   course of the deposition.  We object to that since she's not

6   representing a party to this case.  And we wanted to note the

7   objection and ask that the Court could rule on that.

8               THE COURT:  That objection is sustained.  You

9   cannot participate -- you're not there -- the State of Texas is

10  well represented by the Attorney General and the director of

11  Department of Criminal Justice.  I'm not going to allow that.

12  You can stay there and participate as a -- read the documents

13  and sit there, but you're not going to participate.  You're

14  there as an employee of the State of Texas is what I

15  understand.

16              MS. FLETCHER:  That's fine, Your Honor.

17              THE COURT:  Okay.  Now then, would you spell the

18  court reporter's name again so we make sure we get it right?

19              MS. ROUNTREE:  L-I-E-S-A  K-L-I-M-A-N.

20              THE COURT:  Got it.  Okay.  All right.  That

21  will be the order of the Court.  Thank you for -- appreciate

22  your cooperation.

23              MS. KUYKENDALL:  All right.  Thank you, Your

24  Honor.

25              MS. ROUNTREE:  Thank you, Your Honor.

32

1              MS. FLETCHER:  Thank you, Judge.

2                   (Recess from 10:24 to 10:37.)

3              MS. NORRIS:  We're going back on the record now.

4              MS. KUYKENDALL:  It's 10:37 by my clock.

5      Q     (By Ms. Norris) When we were talking about your

6  access to the TDCJ files, in terms of getting what you want, is

7  it you show up, they hand you a file, or do you make some

8  specific request?  How does that work?

9      A     Depends on the office.  Some offices, such as the

10 gang office, the STG office, are a little more careful with how

11 they release information.  If it's a simple question about do

12 you have anything on inmate so-and-so?  Is he a gang member?  I

13 can pick up the phone and ask them.

14              If I'm wanting -- like, if he is a gang member

15 and I want his whole gang file, they'll -- they'll ask that we

16 either subpoena it or put a request on our letterhead or do

17 something official.

18              As far as OIG records, I can usually just call

19 over there and say:  I need an offense report.  I need pictures

20 out of your file, or whatever the prosecutor needs to get ready

21 for trial.  I'll usually just -- first I'll call.  And,

22 generally speaking, OIG let's me have it on a phone call.

23              Other offices -- trust fund, for example, they

24 want a subpoena.  Visitors list I can get with a phone call.

25     Q     And in this particular case, given all the Texas

33

1   Mofia members, do you recall specifically how you obtained

2   access to their STG files?

3       A    I don't recall ever getting a complete file on any of

4   the witnesses, defendants, or anybody as far as complete gang

5   files.  I did know who gang members were.

6               Let's see.  First of all, by talking to our

7   witnesses or other people, like, he's a TM member.  And then I

8   would have to call somebody at STG and say:  Is he a TM member?

9   And they would say yes or no.  So as far as like we would take

10  a whole witness list, or a defendant list, and me going getting

11  all the records, that didn't happen.  And I'm sure I made

12  several calls to different gang offices, probably more than any

13  to unit gang offices, because they're the ones that are working

14  with those people every day as opposed to headquarters here in

15  Huntsville who doesn't know what's happening in New Boston for

16  a while.  So I would -- I would call the unit if I needed gang

17  information and talk to that STG officer.

18      Q    And in terms of -- shifting gears on you back to the

19  workings within SPU.  Is there a -- I think you referenced this

20  before, but is there an overall policy of how a case is

21  developed or does it -- in terms of who's doing what, or does

22  that come down to which prosecutor and which investigator?

23      A    How a case is developed?  Like --

24      Q    In terms of, for instance, initially does the

25  attorney go with you for witness interviews or do you do it all

34

1 then they come in?  How does it work specifically for you and

2 Mr. Mullin, put it that way.

3     A   It sounds like after a case is indicted and we're

4 getting ready for trial --

5     Q   Yes.

6     A   -- is what you're talking about?

7     Q   Yes.

8     A   He -- it depends on how far away trial is.  We have a

9 real hard time getting court time.  We work a lot of different

10 counties and they always put us at the bottom of the docket

11 because the free world docket is more important, of course.  So

12 as a case gets close to trial or to pretrial settings, if

13 Mr. Mullin has a particular case we're working in Polk County,

14 and he's going through it and he sees there's something that's

15 missing or he would like to know that might help him, he'll

16 say:  A.P., I need this piece of information.  And I can either

17 call somebody, if it's available that way, or I'll go to the

18 unit by myself and get it.  If he wants me to interview

19 somebody -- just depends on his schedule.  He likes to go to

20 interviews more than our other prosecutors do.  So more than

21 any other prosecutors, Mark and I have gone and interviewed

22 inmates together, and defendants, with their counsel.

23         So if I'm answering your question properly, I

24 don't know.  I go by myself and I go with him, I go with

25 another investigator.  Just depends on the circumstances.

35

1    Q    And when Mr. Mullin goes with you, does he take his

2  own notes of interviews?

3    A    I've never -- I've never seen him take a note.  And

4  when he goes with me, he does a lot of the talking.

5    Q    And when you have inmate cooperating witnesses, what

6  do you tell them generally about what you can/cannot do for

7  them?

8    A    I'm always very clear at the outset with an inmate

9  that -- first I tell them I'm a cop, so they'll know that they

10  are talking to a peace officer.  I make it very clear to them

11  that I can offer them absolutely nothing.  Whether or not they

12  help us, or if they have the most crucial information to break

13  the biggest case we've ever had, I still can't promise them

14  anything.

15         I will promise to do what I can to keep them

16  safe, which means calling or writing letters or whatever I can

17  to advise somebody in authority that this guy is cooperating.

18         As far as a big issue -- of course, in this

19  case, Speer and every other case that I've worked, is can I get

20  inmates transferred more or less as payment for their help.

21  No, I cannot.  I can ask for transfers.  Just like we spoke a

22  little bit ago.  I can ask for transfers based upon their

23  safety needs or if there are some extenuating circumstance.

24  They have a crippled family member who cannot travel, but they

25  would like to move closer to their home and there's a proper

36

1   unit near their home.  That's his request, not mine.  I will

2   pass it along.

3              When I interview or Mr. Mullin or anybody else

4   I've ever worked with in 22 years, the first thing we make

5   clear is we can't do anything for you.  If we made promises and

6   didn't follow-up with them, we would be out of jobs quickly

7   just because of the nature of the crimes we work.

8       Q    Is it fair to say -- and later I'm going to show you

9   some of these letters.

10      A    Okay.

11      Q    But in general several of the inmate letters in the

12  files we have referenced you told us you would do anything

13  reasonable for us.  Is that a fair statement --

14      A    Yes, ma'am.

15      Q    -- of what you would say to them?

16      A    I believe it is.  Yes, ma'am.

17      Q    And there are also references to Royce Smithey in

18  this case.

19      A    Yes, ma'am.

20      Q    Who is Mr. Smithey?

21      A    He's our chief investigator.

22      Q    And what -- do you know personally what his

23  involvement was in this case?

24      A    Separating Canales from Speer, right --

25      Q    Yes.

37

1    A    -- whenever we talk today?

2    Q    Let's talk specifically about Mr. Canales.

3    A    Okay.  Okay.  I believe -- I'm confident that Royce

4 was the original investigator on this case because I didn't

5 even know about this case until, I believe, after indictment

6 when Mr. Mullin got it and then we started getting it ready for

7 pretrial.  So I believe Royce was the original investigator

8 from our office, not OIG, in this case.

9    Q    And after you got on the case, did he continue having

10 involvement in it?

11    A    He had some because our request for help for inmate

12 transfers and whatnot have to go through him.  And then if -- I

13 don't know if we used him for this purpose, but if --

14 customarily, if he's closer to a unit where I need some

15 information from an inmate or a guard or anybody, instead of me

16 driving five hours to it, Royce can go get it.  So I'm sure

17 that happened in this.

18    Q    And as the chief investigator, is he a supervisor

19 over you or is that --

20    A    Yes.  Yes, ma'am.

21    Q    -- something else?

22    A    Uh-huh.

23    Q    All right.  And in terms of using, again, the phrase

24 we'll do anything reasonable for you, to you what does that

25 entail of what you will do for the inmate upon request?

38

1      A     I'll do anything that's within the law or propriety.

2  And that's exactly what I mean by that.

3      Q     And in terms of requests for discovery from the

4  defense --

5      A     Yes, ma'am.

6      Q     -- are you involved at all in --

7      A     Only in -- when a prosecutor is making his discovery

8  to the defense, if they want to make sure there's something in

9  the file or if there's something missing, I'll provide it.  But

10 as far as doing the discovery, that's not my job.

11           I probably have done it before, just because of

12 logistics.  If somebody wasn't available, A.P. go give the guy

13 a copy of our file or something.  So I'm sure I have.  But in

14 Canales, that was -- that was not my responsibility.  And if I

15 did any discovery, it's because I traveled up there to bring

16 them something.

17     Q     So in general you're only involved to the point of

18 your prosecutor saying I need your stuff?

19     A     Yes, ma'am.

20     Q     In general in a case like this, a hypothetical case

21 of an inmate killing where it's all inmate witnesses, at what

22 point would SPU become involved in the investigation?

23     A     Only -- OIG would be involved in the investigation

24 from the outset.  Once they bring it to our prosecutors, if

25 there is additional information they need or want or would help

39

1   prove out the guilt of the proper people would we get involved.

2   So doesn't sound like I'm making sense but --

3       Q    You're making sense to me.

4       A    Okay.  In some cases they don't have to do anything

5   extra.  The case is very well put together by OIG and all we do

6   is from grand jury to the courthouse.  That's not -- that's not

7   the majority of the cases; murders down to weapons cases.  But

8   hopefully we get a case that doesn't need a lot of work on our

9   end and OIG does everything and we just take the prosecution

10  end of it.

11      Q    And once SPU -- you specifically as the SPU

12  investigators involved, are OIG investigators still involved or

13  does it not overlap at all?

14      A    We -- we involve them as much as possible.

15  Especially when it's a very difficult case and there are a lot

16  of problems with the case, we will try to get the case agent of

17  all people to help us or to develop the information that we

18  don't have.  That is a very frequent more times than not

19  situation.

20      Q    In this particular case, you had referenced earlier

21  that when you interview witnesses, you actually take notes and

22  that goes in your file.

23      A    Yes, ma'am.

24      Q    Do you know where those notes are in this case?

25      A    No, ma'am.  I thought I had seen them before in the

40

1   other deposition, but I don't know where they are.

2      Q    Do you recall there being -- aside from we'll do

3   anything reasonable for you, do you recall there being any

4   promises, any deals with any witness and/or inmate who

5   ultimately was not a witness in the Canales case specifically?

6             MS. KUYKENDALL:  I'm going to object to the form

7   of the question just because it assumes -- sort of assumes that

8   there were deals -- that those qualify as deals.  That's just

9   for purposes of the record.

10     A    To be clear on my answer, if you call it a deal that

11  I offer to help an inmate get his property back who the prison

12  lost his property, yes, I did do that, but that was not a deal

13  for him to testify because he refused to testify for us.  But

14  it's something that I did.  When he said:  Would you help me

15  get my property?  I said yes.  And so you can call that a

16  promise because I did.

17             But if I understand you properly, what I promise

18  inmates is the safety issue and whatever is reasonable and I'll

19  pass along requests.  Now, even if it's not a reasonable

20  request, if they want me to pass it along to the person, I'll

21  pass it along, but I won't offer any substance to it.

22     Q    (By Ms. Norris) Sure.  Let's talk specifically now

23  about Bruce Innes.  Do you recall when your first contact

24  involvement with him was?

25     A    It was -- we were getting ready for the trial.  I

41

1  knew Bruce Innes pretty much had broken the case open before I

2  got involved.  He had some letters from Canales and kites where

3  Canales admitted to killing.  And so Bruce Innes obviously

4  became a very important witness in the case.

5          He gave those letters to his lawyer at the time

6  who gave them to our office.  And I don't know how that

7  transaction transpired.  I don't know when it exactly was, but

8  I know we ended up with letters from Canales to Innes

9  indicating his involvement.  So as we're getting ready for

10 trial, I had to interview Bruce Innes about the letters getting

11 ready for trial.  So I don't remember the first time I saw him

12 or where it was, but I do -- I've seen him many times.

13     Q    And in Mr. Innes' communications within TDCJ, do you

14 know what an I-60 form is?

15     A    Yes, ma'am.

16     Q    Tell me what that is.

17     A    It's a -- like a memo from an inmate to officials for

18 making a request for something or saying they have a particular

19 need.  It's a memo from an inmate.

20     Q    And there are several, if not more, of those requests

21 that are already in our exhibits where he requested moves.  Do

22 you recall him being denied any move?

23     A    No.  Matter of fact, I've never read through his

24 requests.  His I-60s did not involve me, so he could have told

25 me I made an I-60, which that's okay with me.  But I wasn't

42

1    involved in his I-60s.

2         Q    All right.  So those you would not have looked at?

3         A    I don't believe they are written to me at all.  I

4    don't recall any.

5         Q    Mr. Merillat, I'm going to ask you were you provided

6    some documents from the sealed stuff?

7         A    Yes, ma'am.

8         Q    If you have there sealed Exhibit 37, it's a letter

9    that's dated June 18th addressed to you from Mr. Innes.

10        A    Okay.  I have it.

11        Q    In that letter, towards the beginning there where

12   he's talking about whether he should be de-confirmed, whether

13   he should, quote, milk my situation.  In general, what were the

14   discussions between you and Mr. Innes about that situation?

15        A    Revolving around this letter?

16        Q    Not particularly the letter.

17        A    Oh.

18        Q    Just -- just the topic of whether he should be

19   de-confirmed, whether he should not and continue to, quote,

20   milk my situation.

21        A    First, I point out that those are his words not mine

22   and I didn't suggest --

23        Q    I understand.  I understand.

24        A    -- milk anything.  That's an inmate writing to me.

25        Q    That's why I'm asking you.

43

1      A      Let me see.  If this -- if his letter to me about

2  milking a situation -- situation and de-confirming from the

3  gang and such is in response to my asking him to try to get

4  information on the hit on Larry Whited, this is exactly what

5  he's talking about.

6           Innes received communications from, I believe,

7  Canales or somebody in the gang, that they were going to hit or

8  kill Larry Whited because he was a witness for us.  I asked

9  Bruce Innes -- since Innes got that communication, I asked him:

10  Okay.  Try -- try to get some more information.  Whatever it

11  takes.  Write whoever wrote you.  I think Canales.  I'm not

12  sure.  Whoever can give you information on the hit on Larry

13  Whited -- Whited, try to get it.

14           And if I may say, that was not a Canales

15  prosecution now.  It's a Larry Whited victimization.  This is a

16  retaliation or it's a possible capital murder if it works.

17  This is a new crime.

18           So the information I'm asking Innes, since he

19  was in a good position to get it, was not to necessarily

20  convict Anibal Canales, it was trying to find out what's going

21  to happen to Larry Whited.  So if that's what this letter is in

22  response -- it sounds like it is.  And I just don't recall the

23  timeframe of this, but it sounds like he's -- he's asking me or

24  he's talking about the fact that how can I keep the gang giving

25  me communications, but then the prison system thinks I'm still

44

1   in the gang because I'm writing letters for the gang, which

2   that's a very big clue for the STG people not to de-confirm

3   somebody when they are still getting gang mail.

4           So if I -- if I recall this letter properly,

5   that's what he's talking about. Do I milk my situation? Do I

6   still continue as if I'm a gang member to try to find out

7   what's going to happen to Whited or do I stop it or what? I

8   think that's what he's talking about.

9       Q    And that letter aside, just in general --

10      A    Yes, ma'am.

11      Q    -- was that the general discussion between you and

12  Mr. Innes about how to approach things in terms of keep trying

13  to get all the information you can?

14      A    Sure. As far as Whited, and also any information he

15  could get on the Canales case I would take as well.

16  Absolutely. Yes, ma'am. Or any other thing he could get. So

17  I'm not saying that he was only trying to get information on

18  that hit on Whited. Anything he could get that would help us

19  destroy that gang, I'll take it. I sure will. I still will.

20      Q    And you are asking him to continue to get that

21  information?

22      A    Whatever he can get. But I thought this was about

23  the Whited case.

24      Q    I understand. I just used that as a specific

25  example --

45

1    A    Oh.

2    Q    -- of the type of discussion.

3    A    All right.

4    Q    And if you will look at sealed Exhibit 38, a letter

5  from you to Bill Cheatham.

6    A    Yes, ma'am.

7    Q    This is sort of on the same topic of whether

8  Mr. Innes should be de-confirmed or not.

9         Did you -- how did the discussion come up

10 between you and Mr. Innes?  And this is not specific to this

11 letter.  But how did the discussion come up between you and

12 Mr. Innes about whether he would be de-confirmed?

13   A    I don't recall.  When he -- when he expressed his

14 willingness to testify for us or help us against the gang, that

15 in itself starts his de-confirmation process.  So I don't know

16 how we would -- I don't recall ever sitting down with him

17 face-to-face saying:  Are you de-confirming right now?

18   Q    Is it --

19   A    I don't know that that ever happened.

20   Q    Is that an automatic process that if they're

21 cooperating against a gang you're going to get them

22 de-confirmed with TDCJ?

23   A    No.  And please be clear I don't get anybody

24 de-confirmed.

25   Q    I understand.

46

1    A    Okay.  That never happens.  But, no, it's not

2  automatic when a person -- we've prosecuted numerous gangs.

3  This is not the only one.

4           When a person expresses willingness to testify

5  against a gang and he is part of that gang or another one, he

6  is starting his de-confirmation process if he wants to

7  continue, which he would be a fool not to.  So when Innes

8  became cooperative with us, he initiated his own

9  de-confirmation process.

10    Q    And when you say he would be a fool not to,

11  specifically what do you mean?  What -- what's the benefit of

12  being de-confirmed as a gang member?

13    A    I mean, if he tried to stay in the gang as a snitch

14  against his gang, he would be a fool because they would kill

15  him.

16    Q    And in terms of when you are a confirmed gang within

17  TDCJ, what are the -- generally the housing restrictions?  What

18  comes with the day-to-day treatment of an inmate designated

19  gang?

20    A    Okay.  First of all, if he's in one of eight

21  designated security threat groups, which Texas Mofia is one of

22  those eight, and he's confirmed as a member of that gang, he is

23  automatically put in ad. seg. or solitary.  I don't recall

24  Innes' situation.  I don't remember where he was housed the

25  first time we spoke or anything like that.  But if he was a

47

1   confirmed Texas Mafia member, he should have been ad. seg.  Is

2   that what you asked me?

3       Q    I asked in general, not --

4       A    Okay.

5       Q    -- not Mr. Innes particularly.

6       A    Oh.

7       Q    In general, if you're designated STG?

8       A    If he was one of those eight security threat groups

9   that they have designated, and confirmed, he would be

10  automatically ad. seg.

11      Q    And what are the day-to-day conditions in ad. seg.?

12      A    Solitary cell, 23 hours a day locked inside the cell.

13  He comes out only in handcuffs and escort by correctional

14  officer to take a shower or go to an hour of recreation.

15  That's pretty much it.  He's pretty well confined to his cell.

16      Q    And as long as you're a designated gang, you just

17  stay there permanently?  How does that work?

18      A    Well, if you de-confirm or go through their grad

19  program, which is a gang renunciation program, and you are no

20  longer believed to be a part of that gang, you can work your

21  way out of ad. seg.

22           For the worst gang, such as TM or TS or Aryan

23  Brotherhood or such, it's not -- the prison will not always let

24  you out of ad. seg. after even they are convinced that you're

25  no longer a part of it because of the safety issue.  It puts

48

1   you in protective status, but usually that protective status is

2   back in ad. seg.  You're just in a different wing or a

3   different part of ad. seg. blocks.  So it's not -- it's not a

4   pleasant thing for a person who was a Texas Mafia member to

5   de-confirm and stay in protective custody because you might end

6   up back in ad. seg. with the same stipulations against you; 23

7   hours a day, come out in handcuffs, and all that stuff.

8            Or after so many years or so much time passes,

9   you could end up in general population or you could end up in

10  another state in the prison system there.

11      Q    There are references -- let me just ask this

12  generally.  Not specific to Mr. Canales, but when you have a

13  case, such as -- where there are multiple inmate witnesses, do

14  you give them any instruction, any guidance about whether they

15  should talk to each other, not talk to each other?

16      A    Yes, ma'am.  I tell them not to.  We make it very

17  clear that they're not to discuss anything that would change or

18  influence their testimony.  And I separate that from being

19  under the rule, of course.  I don't say the Judge says you're

20  not allowed to talk to each other because it's not true.  But I

21  do tell them that they are not supposed to talk to each other

22  about what they're going to testify about.

23      Q    And when you are requesting transfers to keep people

24  safe, do you take into consideration whether or not you've got

25  another cooperating witness in the same unit?

49

1    A    No, ma'am, I don't, because sometimes, depending on

2  the inmate's classification, it limits the units he can go to.

3  So -- especially when you're talking about gang problems,

4  there's only so many units they can go to.

5    Q    How many units are there for confirmed members of the

6  eight?  Let's be specific.  TM?

7    A    Well, whatever number of units there are in the state

8  that have ad. seg., which there are many.  I could try to go

9  down a list, but I believe it would not be very productive.  I

10  mean, there are many.  Just need an ad. seg. block.

11    Q    In this particular case, there are sealed exhibits

12  before you, sealed Exhibit 43.

13    A    I have a question.

14    Q    Yes, sir.

15    A    We went to the Cheatham letter but we never talked

16  about it.  This last one.

17    Q    What was the number on that one again?

18    A    38.  38.  That's 37 right there.

19    Q    We did to the extent that I was interested in just

20  the general process --

21    A    Okay.

22    Q    -- of de-confirming, whether that was automatic.

23    A    Okay.

24    Q    Sealed Exhibit 43 now.  Do you recognize the

25  handwriting on those notes?

50

1      A     Yeah.   That's mine.

2      Q     All of those notes are yours, both pages?  There are

3   two pages to that.

4      A     Yes, ma'am.

5      Q     And is this a typed log you keep in each case?

6      A     This is an example of my investigative notes that we

7   spoke of earlier.  Whenever I'm taking notes in a case, this is

8   the kind of paper I would write on.  And when I do something,

9   interview, or do anything for a case, I'll put the date that

10  I'm doing it, what the results are.  This is typical

11  investigation notes when I'm preparing for trial.

12     Q     All right.  And the next few exhibits, Exhibit 44, is

13  that your signature on that letter?  And, in other words --

14  well, let me just ask first:  Is that your signature?

15     A     Yes, ma'am.

16     Q     And any time your signature block is there, is

17  anybody within SPU authorized to sign for you?

18     A     No, ma'am.

19     Q     In sealed Exhibit 46 there is a reference in there in

20  the fourth line, quote:  Mr. Mullin and I are holding off as

21  long as we can.

22     A     Yes, ma'am.

23     Q     Referencing discovery?

24     A     Yes.

25     Q     Or disclosure --

51

1     A     Of witnesses.

2     Q     -- of witnesses?  Tell me specifically why you were

3  holding off as long as you could?

4     A     Because they -- each of our witnesses were testifying

5  potentially against the Texas Mafia, and we knew it was in

6  their best interest, safety wise, not to let the gang know who

7  they were until it was absolutely necessary.  And then as a

8  result, I put that in Mr. Mullin's field.  Like, whenever it's

9  time, it's time, but let's hold off as long as we can.

10    Q     Looking at Exhibit 59 now before you.  Wait a minute.

11 That one is not a sealed exhibit.  It's Exhibit 59 but it's not

12 sealed, so let me see if I can find that for you.

13          I'm going to hand you my copy and we will make

14 copies afterward.  I'm going to hand it to them first --

15    A     Oh.

16    Q     -- so they can look at it.  Let me go ahead and mark

17 this.

18          MS. ROUNTREE:  We're at 6.

19          MS. NORRIS:  Yes.

20    Q     (By Ms. Norris) We're marking as Deposition Exhibit 6

21 handwritten notes that start with the name Dave O'Neil.  Do you

22 recognize the handwriting on that document?

23    A     It looks like Royce Smithey's.

24    Q     Is that a document that you saw when you got involved

25 as the investigator in the case?

52

1    A    I don't remember seeing this one.  I'm not saying I

2  didn't, but I don't recall it at all.

3    Q    There's a reference in there to Mr. Innes wanting

4  OST.  What -- what is OST?

5    A    Oh, out of state transfer.  I would imagine that's

6  what that means.

7    Q    And it references about, quote, another inmate has

8  the letter, unquote.  Did you ever -- ever have a discussion

9  with Mr. Innes about the particular nature of how he came into

10  possession of the letters?  The letters, meaning the ones put

11  into evidence.

12    A    That Canales sent him through the rec or something?

13    Q    Yes.

14    A    Yes, ma'am.

15    Q    Those two in particular is what I'm interested in.

16    A    We talked about how he -- I don't know if we talked

17  about how he got the letters because I believe Mr. Mullin

18  already knew, once Royce was in the case, how -- I believe his

19  lawyer gave us the letters, so we knew how we got the letters.

20         But I remember talking about the letters because

21  as we got ready for trial, Mr. Mullin and myself, when we would

22  interview Bruce prior to trial time, asked about the letters

23  and what Mr. Mullin was going to expect about the evidence --

24  how the evidence was to go about getting the letters in and

25  such as that.  But as far as myself and Bruce Innes having a

53

1   private conversation about the letters, I don't think we ever

2   did.

3        Q    And was there any concern in that -- in that

4   discussion that the original disclosure was that he had no

5   involvement in getting the letters, other than from another

6   inmate, as opposed to his trial testimony that he actually saw

7   these being written?  Do you recall a discussion about that?

8        A    No, but I don't think I understand the whole

9   question.

10       Q    All right.  Let me see if I can explain it better.

11  That document, is it your understanding looking at that, that

12  he is representing that he did not get those letters directly

13  from Mr. Canales, he got them from another inmate?

14       A    I'm going to need to read it then.

15       Q    All right.

16       A    I see what you're talking about now, and it

17  references the fact that another inmate has the letter.  That's

18  the first time I remember seeing this.

19       Q    Let me look back at this.

20       A    I would like to point out, I don't know what Royce

21  meant when he wrote the letter.

22       Q    All right.  The line I'm referring to is -- I'm going

23  to ask Ms. Rountree to point it out for you, but it says

24  another inmate, starts out.

25       A    You want me to read it out loud?

54

1      Q    Yeah.

2      A    "Another inmate has the letter."  It looks like,

3  "He's not involved at all.  Will have to get the letter from

4  him."  Another inmate probably received the letter from

5  Canales, so -- and, here again, I'm trying to interpret another

6  person's writing.  I don't know what his intention was or

7  anything behind the words.

8      Q    I understand.  And ultimately -- sort of breaking

9  down trying to explain my long, complicated question before.

10 Ultimately, Mr. Innes' testimony was that he saw Mr. Canales

11 attach that kite and he pulled it in.  Do you --

12     A    I think I remember that from the trial itself.

13     Q    All right.

14     A    I think I do.

15     Q    And so my question is:  In between these notes and

16 the trial testimony, do you recall any discussion about the

17 inconsistencies in whether another inmate got this or whether

18 Mr. Innes saw it, got it?

19     A    I don't recall talking about that.

20     Q    In this case, it was disclosed that Mr. Innes had a

21 deal --

22     A    Yes, ma'am.

23     Q    -- on his other charges.

24     A    Yes, ma'am.

25     Q    Do you recall specifically what that deal was?

55

1  A  No, ma'am.

2  Q  Do you recall whether it was -- well, let me put it

3 this way.  What is in the record is that he would be given

4 three year concurrent sentences -- running concurrent with time

5 he was already served.

6  A  I don't dispute it, but I would also point out that

7 he did not know what his deal was when he testified, as

8 I recall.  We kept that -- in other words, he didn't -- I think

9 I'm correct in this.  Mr. Mullin can clarify it.  But as

10 I recall, Bruce Innes didn't know -- he knew he was going to

11 get a deal for the weapons case, but I don't think he knew up

12 until his testimony what it was going to be.  Of course, the

13 record will show you, but I thought that was the deal.  But I

14 didn't have anything to do with the deal and I didn't know -- I

15 don't recall what it was independently.

16  Q  Is there a general practice, not just this case but

17 when there is a deal with an inmate like that, where we'll

18 accept a plea, this is your sentence, an inmate witness, is it

19 a general practice that they don't know what the actual deal is

20 when they testify?

21  A  I don't know that it's a general practice.  I know

22 that Mr. Mullin does that sometimes because of the appearance.

23 Like, we'll give you this if you'll testify, it looks like --

24 it looks like -- to me it would look like we're doing

25 something -- almost paying him to say a certain thing for us.

56

1  So Mr. Mullin is very good about that.

2              We're going to do something, but we don't want

3  you to know what it is.  We're not going to tell you what it

4  is.  You'll have to trust us.  And usually that's through his

5  lawyer that he does that.  And that way the inmate doesn't come

6  back later and say:  Hey, they promised me something and they

7  screwed me over and didn't do it.  If he goes through his

8  attorney, then everything is supposedly on the level between

9  lawyers.  So I don't know that it's a general practice in our

10 office.  I can't speak to the other prosecutors.

11      Q    Looking now at sealed Exhibit 51.  Actually, before

12 we go there, let's look at sealed Exhibit 49.  Is this one of

13 the letters from Mr. Eason that you had pulled out and brought

14 with you today?

15      A    49.  I don't know that it is, but I remember the

16 letter.

17      Q    It doesn't really matter.

18      A    Yeah.

19      Q    Looking at the sealed Exhibit 49, the beginning of

20 the second paragraph there where it starts:  Innes has recently

21 been active and housed with the other TM.

22      A    Yes, ma'am.

23      Q    And then down the beginning of the last paragraph he

24 references:  He has constantly been representing TM matters and

25 has been pure gun ho.

57

1      A      Uh-huh.  Yes.

2      Q      Did you make any investigation about whether or not

3   these allegations were true?

4      A      I don't -- I don't know that I have.  I don't recall

5   yes or no, but I think I responded to this -- to Eason saying

6   that if he's not -- if he's not sincere, when he gets on the

7   stand it will be very obvious.  So -- and at the same time, I

8   don't know if Eason is trying to play against me or play me

9   against Innes, and then Innes is trying to play me against

10  Eason.  Any of that can happen and frequently does.

11             So by him telling me that Innes is still a

12  gangster, I take that into consideration, but then I look at

13  the fact, well, if he gets on that stand and points out Canales

14  and Speer committing capital murder, you can't be a gangster

15  with the TM.  So I don't know if or what kind of investigation

16  I did behind his -- this letter.

17     Q      Did you ever personally have any concern about

18  whether Mr. Innes was sincere and --

19     A      Every witness I do.  Every witness.  Even guards.  I

20  always hope that they are sincere and I always -- I'm always

21  concerned that they're sincere.  Yes, ma'am.

22     Q      My --

23     A      I missed you.

24     Q      Maybe I didn't phrase it well.  Did it ever cross

25  your mind in this case that Mr. Innes may not have been

58

1    sincere?

2        A    I thought that from when I got involved in this case

3    and I've thought it -- I've wondered about it since the case,

4    in these many years since.  Like I said, I hope he was sincere

5    but I've thought about it.

6        Q    Looking at the sealed Exhibit Number 50 up there at

7    the top, there are handwritten notes to the side that start:

8    Please note.  And it seems to indicate that Mr. Innes is

9    writing to a district major.  Were you ever aware that he was

10   still in contact, apparently, with a TM district major?

11       A    No, and I don't know that I've ever seen this

12   document.

13       Q    Looking now at sealed -- or, yes, sealed Exhibit 51.

14   Do you recall this particular letter where Mr. Innes is

15   explaining to you that he had gotten a disciplinary?

16       A    Yes, ma'am.

17       Q    And with respect to that particular disciplinary, did

18   you do anything to investigate whether or not what Mr. Innes

19   was relating to you was true?

20       A    I don't recall if I talked to the person who wrote

21   the case or found the articles.  I don't recall that, but I

22   need to -- I need to expound on something, if I may.

23       Q    Go ahead.  Feel free.

24       A    I'll try to articulate it properly.  In your

25   accusation against me, in this -- in the -- that document that

59

1  went to the court, the checklist, you asked the Judge to look

2  for specific things, and one of them was Bruce Innes having fan

3  blades in his cell.

4          I know of no mention in any of the letters,

5  documents, or anything of fan blades.  He broke open a fan and

6  took out the armature, according to this letter, to try to make

7  a screwdriver.  Now, he could have been trying to make a bomb

8  for all we know.  But to my sincere knowledge, there is no

9  mention in any of the documentation about fan blades.

10         When you put that to a federal judge for him to

11 look for Merillat ignoring Bruce Innes having fan blades in the

12 cell, it's tantamount to me to saying look for a special note

13 by Merillat saying he ignored a gun in his cell.

14         Fan blades and an armature are not the same

15 thing.  Fan blades automatically draw a picture in a person's

16 mind of cutting things; of metal, pieces of knives or something

17 like that.

18         I think when you put that in -- with all

19 respect, when you put that into your checklist to the Judge,

20 you automatically plant a seed in that Judge's mind that, man,

21 this guy had broken pieces of fan blades in his cell and A.P.

22 Merillat ignored that.  And that is totally untrue.  And if --

23 which he did not.  If he had fan blades in his cell, they're

24 plastic.  Prison fans are not metal.  They're made of plastic.

25 You can stick your finger in it when it's going and stop it.

60

1          So I -- when I saw that, I immediately wanted

2  the opportunity to tell somebody --

3     Q    Sure.

4     A    -- and even put it on this record that I did not

5  ignore or avoid my responsibility to the citizens of the state

6  by not trying to pursue a case against Bruce Innes for having

7  something in his cell more than what he told me it was.  And he

8  never to me -- and if you show me something that he did say is

9  a fan blade, I will take it all back, but I don't recall

10  anything about fan blades.  And I think you didn't do me fairly

11  when you put that in your pleading to a federal judge.

12     Q    To the extent that we offended you, I sincerely

13  apologize for that.  If we have misstated it as a fan blade --

14     A    Well, now he'll know.

15     Q    Your explanation is there, so I will apologize.

16  Didn't mean to deliberately mislead anyone.

17          Talking specifically again about this letter,

18  the disciplinary.

19     A    Uh-huh.

20     Q    Do you recall whether or not you talked to the

21  officer involved?

22     A    No, ma'am, I do not.  I do not.

23     Q    And do you recall whether or not that particular

24  disciplinary was forwarded onto SPU for investigation,

25  prosecution?

61

1    A    I don't think so.  And here is an explanation for

2  that.  I don't know that we've ever gotten a disciplinary

3  report into our office to pursue as a criminal case.  The

4  disciplinary report is supposed to go through OIG or IAD.  They

5  will determine if a criminal case is potentially there, and

6  then they'll write up a criminal case.

7             We don't do anything based upon disciplinary

8  records.  We do our -- our cases based upon offense reports.

9  So I don't know if a disciplinary case report was sent to our

10  office.  And I would point out that if Bruce Innes breaks the

11  law and we become aware of it, we will prosecute him.  I've

12  told him that.  So, no, ma'am, we did not do anything based

13  upon a disciplinary report coming to our office.  I don't know

14  that one did.

15    Q    Looking at sealed Exhibit -- and I believe this is 51

16  still.  I'm not very good at reading Mr. Innes' handwriting.

17  Let me scratch that topic.  Maybe that's not the one I want.

18  Actually, it is.

19             On the second page of that -- let's see -- six

20  lines down where he starts:  But I'm being offered ten in one

21  case and five on another.  Where there is what appears to be a

22  complaint from him about a promise on his other charges not

23  being pursued.  Do you recall that?

24    A    This is refreshing my memory.  It looks like he did

25  know about the -- or he did assume that he was going to get

62

1  three years on the weapons case or on his pending case.  So

2  according to this, he knew what the deal was and I was -- I

3  misstated before because I didn't remember or didn't know,

4  so --

5      Q    All right.  Do you recall whether you looked into

6  this, his specific complaint about being told by one person

7  this is your deal when he had already been told three years?

8  Do you recall looking into that?

9      A    If I did, it would have only been to Mr. Mullin.

10     Q    So the next exhibit, sealed Exhibit 2 (sic), your

11 letter back to him --

12                MS. ROUNTREE:  52.

13                MS. NORRIS:  Yes.

14     Q    (By Ms. Norris) 52 where you're referring in the

15 third line down:  Let me know who promised you what as far as

16 agreements on your pending cases.

17     A    Uh-huh.

18     Q    You don't recall whether you went further with that

19 or not?

20     A    I don't know if I got a response to that particular

21 statement or not.

22     Q    Looking at sealed Exhibit 54, in the second paragraph

23 there it begins:  I don't like hearing that there are problems

24 between you and Eason.  Do you recall what problems there were?

25     A    I'm probably responding to letters both of them have

63

1  written me about each other.  I don't know why I said that at

2  this time.

3      Q    Do you recall what specific concerns Mr. Innes was

4  having that you were looking towards moving him at that time

5  surrounding this July 12th, 2000 letter?

6      A    No.  I'm noticing that he was at the Wynne Unit when

7  I wrote him, so he wanted to be transferred.  If this -- if

8  memory serves me correctly, he wanted to go to -- closer to the

9  Austin area because I think he has family there.  So I imagine,

10  and I'm only speculating, that he wanted to go from the Wynne

11  Unit to somewhere closer to Austin because he ended up in the

12  Hughes Unit, which is Gatesville, closer to Austin than

13  Huntsville.  I think that's what I talked to him about.

14      Q    I'm going to flip down to sealed Exhibit 76.  Should

15  be a letter from Mr. Smithey dated November 6, 2000 to Sammy --

16  pronounce that for me.

17      A    Buentello.

18      Q    Buentello.

19      A    What number are we looking at?

20      Q    76.

21          MS. ROUNTREE:  Should be the last document, I

22  think.

23          THE WITNESS:  The last one.

24      Q    (By Ms. Norris) It's the last sealed document, yes.

25      A    Got it.

64

1    Q    Do you recall why Mr. Smithey would have been

2  involved making that request as opposed to you?

3    A    Yes, ma'am.  As I said earlier, requests like this

4  have to go through him.

5    Q    Like this, meaning to -- well, first of all, tell me

6  who Mr. Buentello is?

7    A    He at one time was the director or assistant director

8  over classification.

9    Q    And does any request on classification -- any request

10 you make on the classification of an inmate have to go through

11 Mr. Smithey before it goes to Mr. Buentello?

12   A    It's supposed to.  Yes, ma'am.

13   Q    And if you -- and is classifications the unit that

14 you would make requests to have someone de-confirmed?

15   A    A division of that unit, the gang unit.

16   Q    And at this time, November 6th, which is shortly

17 after Mr. Canales' trial, do you recall whether Mr. Smithey was

18 involved at all or whether this letter would have been prompted

19 because you were making this request that he was passing on as

20 your supervisor?

21   A    I automatically think that that's why that letter was

22 written because Smithey has to -- is supposed to make the

23 request for our office.  And although he was very familiar with

24 this case and he was in on it early and then he kept up with it

25 over the years, I imagine that I would have been in the best

65

1  position to know what each inmate was asking for.  So without

2  any independent recollection, I believe that I told Royce,

3  here's what the inmates want, and he wrote the letter from

4  there.

5      Q    And particularly with the request -- and I think this

6  is attached to that.  The attachment listing where the various

7  inmates, their desires of where they will be housed, is this a

8  letter that any time there are inmate witnesses, which I assume

9  would be a large number of your cases -- any time a witness

10 testifies for you, you're going to send a similar letter?

11     A    This is the first one like it that I've seen.  And

12 only because Royce doesn't send me the letters he sends to

13 classification.  So it looks like it could be a standard

14 format.  If the case I just came off of, if I called Royce and

15 said this inmate wants to be moved to so-and-so, he would

16 probably do something similar to this.

17     Q    Well, on a day-to-day basis when you conclude a

18 trial, do you relate to Mr. Smithey this is what witness one

19 wants, this is what witness two wants?  Is that a typical

20 conversation?

21     A    No, ma'am.  Actually, it could even be before the

22 trial commences.  If I'm interviewing an inmate and he says,

23 yes, I'll help you but I want to be closer to my grandmother, I

24 could tell Royce at that time:  This guy wants to help us but

25 here's what he's looking for.  So that could have been very

66

1   early on.

2           But after a trial would be a good time to do it

3   because then I could tell him:  Yes, he did testify.  No, he

4   didn't.  He got up and lied, or something like that.  But this

5   to me looks like a typical way that Royce would do it.  And,

6   no, I haven't seen many of these, if any, more than this.

7       Q    But you don't know whether it's typical?

8       A    No, ma'am.

9       Q    All right.  Going to sealed Exhibit 55, which is a

10  lengthy typed letter from Mr. Whited.

11      A    Yes, ma'am.

12      Q    Do you recall the information in there -- let me just

13  point you to it.  About halfway down the page, the paragraph

14  that starts:  But, anyway, we got to talk the whole way down

15  there.  And he's referencing that he apparently was on a prison

16  transport at the same time Mr. Innes was.

17      A    Yes.

18      Q    Do you recall getting this letter?

19      A    Yes, ma'am.

20      Q    Do you recall responding one way or another about

21  whether he should or should not be comparing stories, my

22  wording, in this case?

23      A    I'm sure I responded to his letter because I usually

24  respond to people that write me when I think I should.

25  However, I would not have responded -- just knowing myself, I

67

1   would not have responded after the fact and said:  Don't do

2   that any more or -- I don't think.  Or, that was wrong to do,

3   or something like that.

4              I don't even remember particularly responding to

5   this letter, but when I saw that, I did appreciate what he said

6   but -- and I absolutely see with anybody reading this letter

7   could look at because he wrote the word smile after it.  It's

8   like, don't worry, we didn't talk to each other about the case,

9   smile.  So it absolutely looks like, to somebody reading this

10  letter, that they probably did.  However, when he wrote that,

11  don't worry, we didn't coach each other on our stories,

12  somebody must have told them that that's wrong, and that

13  somebody would have been me in our conversation, or why would

14  he have thrown that into his letter.

15             So -- and I would also reiterate they were going

16  to the hospital in Galveston for some reason, some medical

17  reason, which I did not know was occurring, I did not know was

18  in the plan or anything.  I did not know it had happened.

19     Q    All right.

20     A    And I have no control over how they get there or

21  whether or not they ride in the same medical van to the

22  hospital.

23     Q    I understand.  I'm going to move to the super sealed

24  exhibits now.  There's a letter dated February 4, 1998 from

25  David O'Neil to Latham Boone that we're going to mark as the

68

1  next deposition exhibit.

2          MS. NORRIS:  What number are we on?

3          MS. ROUNTREE:  I think we should be on Number 7.

4    Q    (By Ms. Norris) Deposition Exhibit 7.

5    A    Okay.

6    Q    Is that a letter that you have seen before?

7    A    No, ma'am.

8    Q    Can you tell me who Latham Boone is?

9    A    He was our chief prosecutor at one time.

10    Q    And were you aware -- looking at the middle of the

11  page where it specifies what the actual agreement is between

12  Mr. Innes and the SPU chief prosecutor, were you -- were you

13  aware that the recommendation -- that the deal included the

14  second one there, recommend the sentence of three years with

15  credit for time served from the date of the offense?  Were you

16  aware that the "with credit" was involved?

17    A    No, ma'am.  I don't doubt that it was, but I wasn't

18  aware of that.  Wasn't aware of this letter.

19    Q    Were you aware that there was a deal to immediately

20  have Innes transferred out of the Telford Unit?

21    A    No.

22    Q    Were you aware that part of the deal was to do your

23  best to have an interstate transfer made?

24    A    No.  But do your best doesn't mean me personally.

25    Q    I understand.

69

1    A    Okay.

2    Q    I understand.  I'm asking in general were you aware

3  that the State of Texas had made this deal --

4    A    No.

5    Q    -- with Mr. Innes?

6    A    No, ma'am.

7    Q    We're going to mark as Deposition Exhibit 8 a letter

8  dated April 13th, 1998 from Mr. Innes to Mr. Smithey and

9  Mr. Boone.

10    A    Okay.

11    Q    Do you recall ever seeing that letter?  And let me

12  point you specifically to the last paragraph is what I'm

13  particularly interested in.

14    A    Okay.

15    Q    Where it starts:  Mr. Smithey, you said you'd help me

16  in anything reasonable as long as I wasn't screwing up.

17    A    Okay.

18    Q    In general, were you aware that Mr. Smithey had made

19  that indication to Mr. Innes?

20    A    No, ma'am.

21    Q    Do you know working with Mr. Smithey, whether his

22  practice is similar to yours in that anything reasonable is a

23  fair statement of what he might say to an inmate?

24    A    Yes, ma'am.  I would probably say the same thing.

25    Q    All right.  We're going to mark as Deposition Exhibit

70

1  9 a letter from Innes to you, Mr. Merillat, on June 8th.  Looks

2  like 1998.

3      A    I have it.

4      Q    Do you recall getting this letter from Mr. Innes?

5      A    No, ma'am.

6      Q    In that letter, towards the middle, where it says:

7  What I want to know is do you wish for me to follow-up on it?

8      A    Okay.

9      Q    Do you recall in the follow-up he wanted to know,

10  obviously, whether to continue communications with Mr. Canales.

11     A    That's what it looks like he's asking me should he

12  do.  Yes.

13     Q    Do you recall whether or not you responded to this

14  request?

15     A    I assume I have because sitting here today I would

16  want him to do that.

17     Q    All right.

18     A    I would point out also when we say we'll do whatever

19  is reasonable for an inmate, it's not only a witness.  It could

20  be any inmate.  So I don't know if I was clear early on.  I get

21  communications from inmates who have nothing to do with our

22  office but they hear about me from other inmates and they'll

23  write me letters and ask for things.  And I will do whatever I

24  can to pass along a request to the right people.  So when I say

25  we will do whatever is reasonable, I'm not talking simply about

71

1  criminal witnesses in a case.

2      Q    So, in general, are you saying that if any inmate

3  were to -- any inmate who is not involved in a prosecution as a

4  witness were to send you a letter asking for something

5  reasonable, that you would pursue that?

6      A    I would -- I would pass his request along if I

7  thought it was legitimate.  There are also inmates who are

8  obviously mental cases or trying to manipulate us or something.

9  And I just have to use good judgment -- the best judgment I can

10  when I get a letter like that.  But in answer to your question,

11  there are hundreds and hundreds of letters I have from inmates

12  over the years and I've tried to be fair to every one of them.

13      Q    Next Deposition Exhibit 10 we're going to mark as a

14  letter dated June 15th, 1999 from you to Mr. Cheatham.

15      A    I have it.

16      Q    In there you indicate sort of midway, the sentence

17  starts:  I have left it up to Innes as to whether or not he

18  wants the de-confirmation process started or if he wants to lay

19  low and provide us with information on the gang.

20      A    Yes, ma'am.

21      Q    Understanding that you left it up to him, did you

22  make a recommendation to Mr. Innes which way he should go?

23      A    I don't recall.  I don't recall.

24      Q    In general, would you want him to continue gathering

25  information?

72

1      A     I would hope he could.

2      Q     The next one that we're going to mark as Deposition

3  Exhibit 11 a letter dated June 15th, 1998 from you to

4  Mr. Innes.

5      A     I have it.

6      Q     Just want to verify that that is your signature, your

7  letter?

8      A     Yes, ma'am.

9      Q     All right.  And that appears to be what you actually

10 did tell Mr. Innes in that situation?

11     A     Yes, ma'am.

12     Q     The next one we're going to mark as Deposition

13 Exhibit 12 a letter from Mr. Innes to you, July 25th, 1998.

14     A     Okay.

15     Q     Do you recall getting this letter from Mr. Innes?

16     A     No.  I know I got it, but I don't recall getting it.

17     Q     Midway there he says, quote, I need from you a letter

18 that I can show or give to state classification in September.

19     A     Yes.

20     Q     Do you recall whether or not you provided him such a

21 letter?

22     A     No, but I don't doubt that I did.

23     Q     Next one marked as Deposition Exhibit 13 a letter

24 from you to Mr. Innes, July 28th, 1998.

25     A     Okay.

73

1      Q     Does that appear to be the letter that you requested?

2      A     It's telling him that I sent the letter.  It's not

3    the letter he requested.

4      Q     You got me on that one.  We've marked the wrong one.

5            MS. ROUNTREE:  Okay.

6            MS. NORRIS:   What I'm looking at is not what

7    we've marked.

8            THE WITNESS:  But I do need to take a break.

9            MS. NORRIS:  All right.  Let's take a break.

10           (Recess from 11:54 to 12:05.)

11     Q     (By Ms. Norris) All right.  We're going back on the

12   record.  And let me clarify that Deposition Exhibit 13 is a

13   letter from Mr. Merillat to Bruce Innes, July 28th, 1998.  And

14   Mr. Merillat has pointed out to me Deposition Exhibit 14 is

15   Mr. Merillat's letter to Mr. Cheatham.

16     A     Okay.

17     Q     And what I was referencing in that letter,

18   specifically asking, the letter that Mr. Innes had requested to

19   classifications, does that appear to be the letter that you

20   sent?

21     A     Yes.

22     Q     Next, Deposition Exhibit Number 15 is a judgment and

23   sentence on plea of guilty before the court dated August 23rd,

24   2001.  And there are six pages to that.

25     A     Okay.

74

1    Q    First of all, were you involved specifically with

2  Mr. Innes and this plea happening?  And this is the plea on the

3  other charges that we had talked about.

4    A    I don't recall.

5    Q    Do you recall -- I'll mark the next Deposition

6  Exhibit, and this is --

7                  MS. ROUNTREE:  16.

8    Q    (By Ms. Norris) -- 16, which is a two page document

9  captioned statement of fact form.

10   A    Yes, ma'am.

11   Q    Do you recall sending this recommendation for

12 parole -- for Mr. Innes specifically on this charge of deadly

13 weapon in a penal institution?

14   A    I don't recall it, but I did do it.  This is my

15 signature.  And this also indicates that I was there when the

16 plea was taken because this would have been filled out at the

17 same time as the plea papers.

18   Q    And do you recall whether or not you had indicated to

19 Mr. Innes prior to his testimony in the Canales case,

20 recognizing that this came after Canales -- do you recall

21 whether or not Mr. Innes knew prior to his testimony that you

22 would also be recommending parole for him on the separate

23 charges?

24   A    I don't recall that.  No.

25   Q    The next one is Deposition Exhibit 17, which is

75

1   captioned statement of fact form and relates to the other

2   offense that Mr. Innes pled to.

3        A    Okay.

4        Q    Is it fair -- fair to assume that your answers would

5   be the same --

6        A    Yes, ma'am.

7        Q    -- on that?

8        A    Yes, ma'am.

9        Q    All right.  Do you know who Mr. Failer is?

10       A    He's a high ranking official or was in the prison

11  system.  I don't remember his title.  At one time he was a

12  warden.

13       Q    The next Deposition Exhibit --

14            MS. ROUNTREE:  Eighteen.

15       Q    (By Ms. Norris) -- 18 is dated July 21st, 1999.

16  Looks like a computer printout.

17       A    Okay.

18       Q    In general, is this the type of computer

19  classification information that you can access from within SPU?

20       A    No, ma'am.

21       Q    There's an indication there that Bruce Innes is,

22  quote, suspect in inmate homicide on Telford, 7/97.

23       A    Okay.

24       Q    Do you recall whether or not Mr. Innes was in fact

25  one of the initial suspects in this case?

76

1      A     No, ma'am.  I don't recall that.

2      Q     It also -- this exhibit also indicates state witness

3    in Bowie County or is it Bowie County?

4      A     Bowie.

5      Q     Bowie County murder trial, 7/99.  Do you recall that

6    murder trial?  Do you recall whether Mr. Innes was in fact a

7    cooperating witness in a case other than the killing of

8    Mr. Dickerson?

9      A     Not that I recall.  There was a murder at the Telford

10   that the DA -- the local DA prosecuted, but I don't know any of

11   the details of it.

12     Q     Next one is Deposition Exhibit 19, which is in

13   handwriting that appears to go along with that computer entry.

14     A     Okay.

15     Q     Do you recognize that handwriting?

16     A     No, ma'am.

17     Q     All right.  Next one we're going to mark Deposition

18   Exhibit 20 is a computer printout from May 26, 2000.

19     A     Okay.

20     Q     And, again, what I'm interested in there's still the

21   indication that he's a state witness in this other murder trial

22   and that he's a suspect --

23     A     Yes, ma'am.

24     Q     -- in the Telford homicide.

25     A     Right.

77

1    Q    But you don't -- you don't recall one way or another?

2    A    No, ma'am.

3    Q    All right.  Next Deposition Exhibit 21 are

4  handwritten notes from April 28th, 1998.  And for the record --

5  for the record, those computer printouts we've just referenced

6  and these handwritten documents came to us in a file marked

7  Security Threat Group.  And I believe OIG also had these

8  documents.

9            Specifically to that exhibit, do you recognize

10  that handwriting?

11    A    No, ma'am.  But I know what this document is.  It's a

12  travel card.

13    Q    All right.

14    A    Came out of his file.

15    Q    And --

16    A    But I don't know who wrote on it.

17    Q    Tell me what a travel card is.

18    A    That's -- some of them are very thick.  It's a

19  document that follows an inmate wherever he goes.  It talks

20  about his conviction, his rationale for his conviction, his

21  alleged crime.  It talks about his disciplinary problems, the

22  history of the units he's been on, whether or not he's a gang

23  member.  Pretty much it's a -- it's a document that can tell

24  you everything you want to know about an inmate in a short

25  version without going to his whole file.

78

1          And when we have inmates come to court

2    throughout the state, that travel card stapled together, many

3    pages will follow him.  Wherever he goes, that travel card has

4    to go with him.  They are very protective of those things and

5    we have difficulty getting them ourselves.  But I recognized

6    immediately that that's what this is.

7      Q    And, again, that indicates that Mr. Innes is a

8    suspect in an inmate homicide on Telford 7/97?

9      A    Yes, ma'am.

10     Q    The next Deposition Exhibit 22 is handwritten notes,

11   looks like from October 30th, 2000 is the first entry.  And

12   this, again, is from files that came to us both from the STG

13   and the OIG.

14     A    Okay.  It's another travel card.

15     Q    And the entry -- and, again, this relates to

16   Mr. Innes.  The entry on November 6th, 2000 where it

17   indicates -- tell me what that means to you.  Start with the

18   word Hughes.

19     A    Hughes, which is the unit he's at, the Alfred Hughes

20   Unit.  I don't know -- those letters in parentheses, I don't

21   know what that is.  Reassigned per state classification

22   committee, that's SCC, and special prosecution office.  Line

23   two is part of his classification.  Tells you what level of

24   custody he's serving time.

25     Q    And explain to me right there what would a line two

79

1   classification be?

2       A    It's -- the levels of custody from good to bad are

3   SAT1, SAT2, SAT3.  And then the worst behaved an inmate is it

4   goes from the S down to line or an L.  Sometimes it's just an L

5   but it means line.  So from -- from the S classifications you

6   go down to line one, line two, line three.  Line two is the

7   middle of the bad custody classification.

8       Q    And do you recall whether that was a step up, if you

9   will, to a better level for Mr. Innes or a step down?

10      A    Well, I don't know where he was before two, so I

11  don't know if he stepped up or down.

12      Q    Well, let -- let me ask that a different way.

13  November 6th, 2000 is right after Mr. Canales' trial.

14      A    Okay.

15      Q    Do you recall whether Mr. Innes was given a better

16  classification following Mr. Canales' trial?

17      A    Oh, I don't recall, but this refers to him being

18  transferred to the Hughes more than it does us -- we don't ask

19  for people to be line anything or S anything.

20      Q    All right.

21      A    So this is referring -- when it speaks of our office,

22  it's talking about his transfer to the Hughes Unit.

23      Q    Okay.

24      A    Again, I don't know what he was before he was two.

25      Q    And it also -- okay.  Go ahead.  Following that, the

80

1   line two with your explanation of what all that code means.

2       A    Okay.  What now?  I thought I was finished with my

3   explanation.

4       Q    Oh, I thought I cut you off in the middle.

5       A    No.

6       Q    I cut you off at line two.

7       A    Oh, okay.

8       Q    This goes on.

9       A    Line two, medical P3DP.  I do not know what that

10  means.  The M-E-D I assume means medical.  He had some kind of

11  liver problem.  He has enemies at the Diagnostic Unit in

12  Huntsville, Stiles Unit in Beaumont, Huntsville Unit in

13  Huntsville, Estelle Unit in Walker County, Bill Clements in

14  Amarillo, Telford in New Boston, and T -- I don't know what

15  this other unit is.  T -- I can't tell if that's an X or an N

16  or -- I don't know what that second is, but it's another unit.

17  And N5 is a state jail somewhere.  Confirmed ex Texas Mafia

18  member.  Then the T-TM verified, I don't know what that means.

19  Inmate assaultive.  History, refusal -- history of refusing to

20  work.  History of drug use.  History of refusing to obey, I

21  assume, orders.  Previous assignment was Michael, Ferguson and

22  Wynne.  And these are the initials of the person who wrote

23  that.

24      Q    Do you recall whether Mr. Innes had been confirmed as

25  ex-TM prior to Mr. Canales' trial?

81

1      A     No, ma'am.

2      Q     Deposition Exhibit 23 is dated November 6, 2000 and

3  is another computer printout.

4      A     Okay.

5      Q     There's an indication in there, delete admin. seg.

6  status per SCC --

7      A     Yes, ma'am.

8      Q     -- upon arrival at Hughes.  Were you -- were you

9  involved in making a request that he be de-confirmed and taken

10 off admin. seg. status?

11     A     I don't know.  I don't doubt that I would have been.

12 The SCC means state classification committee.

13     Q     Uh-huh.

14     A     But I'm not disputing that I would have asked that.

15     Q     The next one is Deposition Exhibit 24, which is

16 handwriting.  That appears to go along with that computer

17 entry.  Do you recognize that handwriting?

18     A     No, ma'am.

19     Q     Deposition Exhibit 25 is a letter dated July 17th,

20 2000 from Mr. Smithey to Mr. Cheatham.

21     A     Yes, ma'am.

22     Q     Do you recall what problem Mr. Innes was having at

23 that time concerning gang activity?

24     A     No, ma'am.

25     Q     There within the body of the letter the number two:

82

1  As soon as inmate Innes testifies Telford homicide BOC will

2  place him in protective custody.   What is BOC?

3       A    Bureau of classification.

4       Q    All right.   Deposition Exhibit 26 is captioned by the

5  Internal Affair Division, criminal case information worksheet,

6  dated October 3rd, 1999.   And there are two pages to that.

7       A    Okay.

8       Q    Just in general, these forms -- assuming they are

9  blank forms for purposes of this question, are these forms

10 you're familiar with?

11      A    It's been a long time since I've seen this particular

12 type of report form, but I've seen them before.   They don't use

13 this any more.

14      Q    And I have stapled these two pages together.   In what

15 you're familiar with, do those two pages go together?

16      A    I assume so.   I don't know.   I'm not -- I don't know.

17      Q    Well, that's my assumption too, but just so the

18 record --

19      A    I don't have any reason not to think so.

20      Q    So the record is clear, I'm assuming they go

21 together.

22      A    Okay.

23      Q    Now, talking about the substance in there.   The

24 information down there starting in paragraph number seven, does

25 that appear to be the actual report on the disciplinary we were

83

1   talking about earlier, whether there were fan blades or not?

2       A    Yes, ma'am.

3       Q    All right.  Do you recall ever seeing this document

4   or this information?

5       A    No, I don't recall it.  I'm not saying I never did,

6   but I don't recall it.

7       Q    All right.  And -- and the second page of that --

8       A    Yes, ma'am.

9       Q    -- down following the word disposition, where it

10  lists prosecution accepted by Kelly Weeks.  Do you know who

11  Kelly Weeks is?

12      A    She was -- actually, she's the wife of our district

13  attorney and she was one of our prosecutors and she worked

14  Walker County.  This case involving the fan motor thing

15  happened in Walker County, so Kelly would have been the

16  prosecutor that screened that case.  She doesn't work for us

17  any more.

18      Q    But at that time she was within the SPU unit?

19      A    Yes, ma'am.

20      Q    All right.  And what does it mean within the SPU unit

21  when there's an indication that it's been accepted for

22  prosecution or what does the word accepted mean?

23      A    Accepted means accepted for prosecution.

24      Q    And were you aware at that time, specifically on

25  November 5th, '99, that the SPU unit had accepted for

84

1  prosecution the disciplinary that Mr. Innes had been

2  corresponding with you about?

3      A    I don't think I was aware of it at the time.  No,

4  ma'am.  I'm not aware of it now until I see this.

5      Q    All right.  Fair enough.  When a case such as this

6  comes in, comes in from Internal Affairs -- let me ask this

7  question.  We referred to OIG before.  Is Internal Affairs a

8  separate office?

9      A    It's the new name of Internal -- OIG is the new name

10  of Internal Affairs.

11     Q    All right.

12     A    It's the same place.

13     Q    And OIG stands for?

14     A    Office of the Inspector General.

15     Q    All right.  In general, when a case like this comes

16  in from the Office of Inspector General, or at that time

17  Internal Affairs, into SPU and it's accepted for prosecution,

18  is there a check to determine whether the person involved in

19  the charges is also involved in another case within the office?

20     A    I don't know of a formal check.  If the prosecutor --

21  say if Kelly Weeks got this and she recognized the name, well

22  then, she would have asked further questions.  But I don't know

23  of any situation where prosecutors have said is anybody

24  familiar with inmate so-and-so in any way.

25     Q    And there wouldn't be a file or computer system where

85

1  Ms. Weeks, for example, could look up to see whether Mr. Innes

2  was a witness in another case?

3      A    Not in our office at that time we didn't have a

4  database like that.

5      Q    All right.

6      A    I don't know that we have one now like that.

7      Q    The next Deposition Exhibit, which I believe is 27,

8  is a supplemental offense report dated November 2nd, 1999 and

9  is a three page document.

10     A    Okay.

11     Q    And, again, I marked this primarily for our record as

12 it also relates to Mr. Innes actually receiving a disciplinary

13 within TDCJ for that fan blade/not fan blade incident, the

14 incident involving the fan.

15          MS. NORRIS:  And at that point I think we'll go

16 off the record for our lunch break.

17          THE WITNESS:  You want me to keep this right

18 here?

19          MS. NORRIS:  You can leave it all right there.

20              (Recess from 12:34 to 1:40.)

21     Q    (By Ms. Norris) Mr. Merillat, you had mentioned

22 earlier that you were working on a degree.  What degree

23 specifically are you working on?

24     A    Criminal justice.

25     Q    Is that a Bachelor level?

86

1    A    Yes.  Yes, ma'am.

2    Q    All right.  And when we were talking about Mr. Innes'

3  disciplinary case being accepted for prosecution in the SPU

4  unit, in general how would you categorize this particular case

5  of Mr. Canales and Mr. Speer and was it sort of high profile

6  within your office, within the system?

7    A    First of all, I want to be clear that the documents

8  we talked about that I said were old and I hadn't seen in a

9  long time, those were not disciplinary cases, those were actual

10  criminal cases, offense reports sent to us by then called

11  Internal Affairs.  They were criminal cases, those weren't --

12  it was based upon a disciplinary case in a prison but they were

13  not disciplinary.  So I want to -- I kind of want to make that

14  distinction clear.  If we misuse the word disciplinary and

15  interchange it with criminal, it is two different things.

16    Q    I apologize.  That's me mislabeling.

17    A    Then I also want to clear up -- it might make no

18  difference at all now or in the future, but I would point out

19  that the letter I got from Bruce Innes where he said he had

20  broken the fan down and hid it in the cell, they found the

21  pieces, he wrote that letter on October the 7th.  In the

22  documents that I was shown just previously came to Kelly Weeks

23  on October the 4th.  So three days after Kelly got the criminal

24  case is when I -- Bruce wrote me the letter and I think I got

25  it on the 7th.  So not that it matters to anybody in the world,

87

1    I just want to point that out.

2         Q    Sure.

3         A    I thought it was interesting.  I just discovered that

4    myself, so -- so --

5         Q    My question was:  Was Mr. Canales, Mr. Speer case a

6    high profile case within your office?

7         A    Interestingly enough, people in our office rarely

8    know what each other are doing.  We're a small unit, but I mean

9    they knew Mark and I were having to drive back and forth to

10   Texarkana.  They knew there was a capital case.  But like the

11   office in Amarillo, I don't know if they even knew what we were

12   doing or if Dickerson had been killed.  Just -- if it doesn't

13   involve people, usually we just don't -- we don't know.  And

14   it's not that we don't care, it's just we don't pass around

15   information very well.

16        Q    I understand.  The next deposition we have marked as

17   Deposition Exhibit 28, which is handwriting that starts at the

18   top from Canales to Innes.

19        A    Okay.

20        Q    Do you recognize the handwriting there at the top?

21   Basically --

22        A    Where it says Dodson's Exhibit Number 1, I think

23   that's Mark Mullin's writing.  I'm not sure.  It's not mine.

24        Q    All right.

25        A    From Canales to Innes.

88

1    Q    And specifically the line that says:  Was given to

2  Royce by Dave O'Neil.

3    A    Oh.  I don't know.  I think it's Mark's writing.  And

4  then down here at the bottom where it says original label

5  SPU-3, that's my writing.

6    Q    All right.  And do you have any personal knowledge of

7  who within your office took possession of letters Bruce Innes

8  provided that Andy Canales had allegedly written to him?

9    A    No, I don't know.

10    Q    Deposition Exhibit 29 starts:  Sir, I am in

11  protective custody.  Do you recognize the handwriting on that

12  document?

13    A    No.  It could be Innes'.  I'm not sure.

14    Q    Do you recall getting a letter within the SPU unit

15  like this of someone being in protective custody as a possible

16  witness where that person had no knowledge or was complaining

17  I'm not a possible witness?

18    A    Well, this says he was -- he was at the Powledge

19  Unit, which is in Henderson County, so that narrows it down,

20  but I don't know who this is writing.  I don't remember which

21  inmate was in the Powledge Unit.

22    Q    And for the -- for the record, this is cut off.

23  There's no signature on it, but that's how we received it,

24  so -- Deposition Exhibit 30 it starts at the top SCO personnel.

25    A    Okay.

89

1      Q      It's SPU personnel listed there.

2      A      Yes, ma'am.

3      Q      Mr. Boone, do you have any personal knowledge of what

4  level of involvement he had in the prosecution of Mr. Canales,

5  investigation and/or prosecution?

6      A      I think none.  I don't think he had much of anything

7  to do with it.

8      Q      And Mr. Smithey?

9      A      Like I said, he was originally on the case and then

10  throughout the case if we needed something from or to

11  classification we're supposed to go through him.

12      Q      And Kenneth Thompson?

13      A      I don't know if he had any involvement at all.  I

14  don't know that he did anything.

15      Q      Cathy Holm?

16      A      Same -- same situation.  And whoever wrote my name

17  spelled it wrong, so I didn't write this.

18      Q      Deposition Exhibit 31 is a five page letter dated

19  August 15th, 1999 from Mr. Whited to you.  Specifically, what

20  I'm interested in is about a third of the way down on that

21  first page where it starts:  First of all, I suppose that I

22  should thank you for helping me get back out in population.

23              Do you recall whether or not you did help him

24  get back into general population?

25      A      No, but I don't dispute that I did.

90

1      Q      And then on the next page, the second full paragraph:

2  I'm writing you this letter to ask you for a support letter to

3  the parole board.  Do you recall whether you did or did not

4  write a support letter to the parole board?

5      A      I'm sure I did, but I don't recall that independent.

6      Q      On the fourth page, the third paragraph down it says:

7  You told me from the very beginning that if I ever needed

8  anything that all I had to do was ask.  Did you in fact make

9  that statement to Mr. Whited?

10     A      I'm sure I did.  I don't know if that's the exact

11 words I used, but that sounds like something I would say.

12     Q      All right.

13     A      In so many words.

14     Q      At the end of that in handwriting in the P.S.,

15 Mr. Whited asked:  Can I call you?  Did you arrange so that

16 Mr. Whited could call you?

17     A      I could have.  I've done that many times before.  I

18 don't remember a phone call with him, but I sure could have.

19     Q      Do you recall having phone calls with Mr. Innes in

20 this case?

21     A      I could have, I just -- I don't recall specific ones.

22     Q      Okay.

23     A      I've done it many time.  Sometimes it's easier than

24 driving to wherever they are at.

25     Q      Sure.  Do you recall specifically whether you had

91

1  phone calls with any of the inmate witnesses in Mr. Canales'

2  case?

3       A    No.  If I had it would have been either Whited or

4  Innes, but I just don't remember.

5       Q    Deposition Exhibit 32 is a letter dated March 21st,

6  2001 from Mr. Smithey to Mr. Buentello.

7       A    I did call Whited.  It says right here at the top

8  A.P. called L.W., Larry Whited, so I did call him.

9       Q    All right.  Do you recall Mr. Whited actually getting

10 a disciplinary within the Department of Criminal Justice

11 related specifically to the murder of Gary Dickerson?

12      A    I don't recall.  No, ma'am.

13      Q    Do you recall him ever asking you for assistance in

14 getting that disciplinary removed?

15      A    I don't dispute it, but I just don't remember it.

16      Q    All right.  And Deposition Exhibit 33 is a March 22nd

17 letter from Mr. Smithey to Mr. Whited.  Do you recall in

18 particular why Mr. Smithey would have been dealing with

19 Mr. Whited where it appears, at least from looking at the

20 files, that you were dealing with the other inmates?

21      A    No, but I -- I think I dealt a lot with Larry Whited

22 and if Royce had as well, there's no problem with me with that,

23 but I thought I had dealt with him --

24      Q    Okay.

25      A    -- much.

92

1      Q      So for all we know, you may have been on vacation

2  that week?

3      A      Well, I just don't know.

4      Q      Okay.  Fair enough.

5      A      Oh, Royce works in Bonham.  I don't know if it is

6  clear to you-all, but he doesn't work in our Huntsville office

7  he works in North Texas, about four hours from here.  He's not

8  close.

9      Q      Okay.  And Deposition Exhibit 34 is a letter from

10 Mr. Smithey to Gary Johnson dated November 6, 2000.  In

11 general, not specifically this case, this particular subject,

12 is it policy or practice within SPU that if you investigate a

13 case where an inmate has received a prior disciplinary and you

14 find it unfounded that you will request the disciplinary be

15 removed?

16     A      Customary?  I don't know.  But I think the right

17 thing to do if we discovered somebody had gotten a disciplinary

18 case and they were not involved in that particular offense, we

19 should speak up for them.  So I -- still, I don't remember

20 Larry Whited getting a case but obviously he did.

21     Q      Sure.  Deposition Exhibit 35 is a letter dated

22 August 26, 2001 addressed to A.P.  For the record, we have

23 blacked out information in this letter.  We being Mr. Canales'

24 attorneys with the consent of respondent's counsel to protect

25 location.  And that is a three page letter with the envelope

93

1  attached where there is also blacking out on the envelope.

2      A    Okay.

3      Q    Do you recall visiting Mr. Whited outside of the

4  State of Texas?

5      A    No, ma'am.  I heard he was -- I mean, I found out he

6  was outside of Texas.  He wrote me this letter from there, I

7  believe.

8      Q    And at the top of the second page he references:  I

9  know you and Mark came and told me that basically your office

10  has done about as much as they can do.  Do you remember such a

11  meeting with Mr. Whited?

12      A    No, but it would have not been outside of Texas.

13      Q    Okay.  And the next paragraph he asked you in

14  quotations for this personal support with the board.  Do you

15  recall specifically what he was asking you to do?

16      A    Well, he's saying:  I'm really trying to get out of

17  here, A.P., and this would help me a great deal.  So I think he

18  means prison.  Personal support letter -- and the board, by the

19  board I'm assuming he's meaning the Board of Criminal Justice.

20      Q    And in that letter, he refers to you, Mullin and

21  Mr. Smithey by first names.

22      A    Yes, ma'am.

23      Q    How close are -- let me phrase it this way.  How

24  would you categorize your relationship with Mr. Whited?

25      A    It was a friendly relationship but I'd also say that

94

1   I tell every inmate to call me A.P.  That's no special thing.

2        Q    All right.  Deposition Exhibit 36 is a letter dated

3   October 2nd, 2001 from you to Gerald Garrett.  And for the

4   record, we have also blacked out identifying information of

5   location for Mr. Whited on that.  Does that appear to be your

6   follow-up response to his request for a letter?

7        A    I don't know.  Let's see.  August 21st -- yes, ma'am.

8        Q    And in essence looking back at his letter when he

9   asked you for a personal favor, is it your practice -- well, do

10  you make a distinction in your own mind of whether you are

11  personally providing someone a parole support letter or whether

12  you are doing that as a representative of SPU?

13       A    Well, when I do it on our office letterhead, I'm

14  representing my office.  Yes, ma'am.

15       Q    Deposition Exhibit 37 is a letter dated November 6,

16  2000 from Mr. Merillat to the Board of Pardons and Parole.  Do

17  you recall specifically writing this support letter for

18  Mr. Whited to parole on his behalf?

19       A    Not specifically, but I did write it.  Yes, ma'am.

20       Q    Do you recall whether Mr. Whited in fact testified in

21  this case?

22       A    He did not.

23       Q    Do you recall why he didn't?

24       A    No.  I think it was the prosecutor's decision.  I

25  don't know.

95

1      Q     Deposition Exhibit 38 a letter dated December 11th,

2   2000 signed by both you and Mr. Mullin to Renee Zeller.

3      A     Yes, ma'am.

4      Q     Do you recall supporting Mr. Whited's out of state

5   transfer?

6      A     Yes, ma'am.

7      Q     Is there a particular reason that this particular

8   letter both you and Mr. Mullin signed whereas others I've seen

9   it's just from one person?

10      A     I was just -- I guess we just wanted to let

11   Ms. Zeller know that he's -- the prosecutor supported me, the

12   investigator, making this request.

13      Q     All right.  Deposition Exhibit 39 is a ten page

14   letter plus the envelope attached that starts out, A.P.  And it

15   has a stamp received in the SPU Unit February 27th, 2001.  And

16   for the record, the first page of that is cut off, but I

17   believe that is how we received it.  What I'm interested in,

18   Mr. Merillat, is on the second page towards the bottom before

19   the smiley face.

20      A     Okay.

21      Q     Where it says:  Remember what he done to that clown

22   on the Wynne Unit during Foot's trial?  And the broader context

23   is he is referring to Mr. Mullin.  Do you recall an incident

24   concerning witnesses -- do you know what he was referring to?

25   Let me ask it that way.

96

1      A      Absolutely not.  I don't know what he's talking

2  about.

3      Q      And Foot's trial, would you agree that that refers to

4  Mr. Canales?

5      A      Right.  Big Foot.  Yes, ma'am.

6      Q      Yeah.  Do you recall what provisions were made for

7  the housing of the witnesses during Mr. Canales' trial?

8      A      No, but I think we were asked by his lawyers to make

9  sure that his witnesses were accessible to them.  In other

10  words, don't put them in Amarillo if the lawyers are in

11  Texarkana.  So during the trial, I think everyone was fairly

12  close to New Boston, if not actually at the Telford Unit.

13      Q      Do you recall whether provisions were made to

14  separate the defense witnesses or the inmates testifying for

15  the defense?

16      A      When I order -- we have to order the inmate witnesses

17  to our trials.  And usually I'm the one to do that.  When I

18  order inmates to come to the courthouse, I always advise

19  classification, these are defense witnesses, these are state's

20  witnesses.  And then sometimes we have state's witnesses who

21  are opposed to each other.  They're enemies.  And then I

22  separate those, also.  In my words, not physically.  I tell

23  them:  These two witnesses should not be together.  So -- and I

24  think I had to order the defense witnesses, I'm not sure, since

25  they were not prison lawyers.  That happens frequently.  And if

97

1    I had to order Canales' witnesses, I would have said the same

2    thing:  These are defense witnesses.  Keep them separate from

3    state's witnesses.

4        Q    And would keeping them separate also include

5    transportation to and from the trial --

6        A    Yes, ma'am.

7        Q    -- location?

8        A    Yes, ma'am.

9        Q    Do you recall a witness in this case named Mantoma?

10       A    Manyoma.

11       Q    Manyoma?

12       A    Yes, ma'am.

13       Q    Who was that?

14       A    Franklin Anthony Manyoma, I believe is his name.

15   He -- I believe he's a murderer from Houston.  No, he's Speer's

16   codefendant.  That's right, Speer's codefendant.  Yes, ma'am.

17       Q    From a different case?

18       A    Yes.  Not from the prison case.  They came to prison

19   because of that case.

20       Q    Okay.  And did he have any involvement as a witness

21   in this particular prosecution of --

22       A    Canales?

23       Q    -- the death of --

24       A    No.  I think we used him in punishment in Speer's

25   case.

98

1    Q    Okay.  Do you recall a witness Steven Canida?

2    A    Yes, ma'am.

3    Q    How would you describe your level of involvement with

4  him in terms of interviews, preparation for trial?

5    A    Much the same as with the others.  Matter of fact, I

6  think he was out of prison when we found him and we interviewed

7  him at -- Mark Mullin and I at his parole officer's office.  I

8  can't remember -- up near Paris, Texas.

9          And he -- he was given the same considerations.

10 He -- he actually and his family were threatened more than

11 anyone else, other than Larry Whited, I believe, in this case.

12 His mother continued to contact me for years after this trial

13 with threats and the gang showing up at her house and such.

14 And he since came back to prison.

15   Q    And do you recall whether or not you supported his

16 parole?

17   A    I would have, yes, ma'am.

18   Q    And just for your clarification, some of these

19 documents are in the sealed exhibits.  I'm just not --

20   A    These here?

21   Q    Yeah.

22   A    Oh, okay.

23   Q    I've just not pulled them out because they are

24 already in our record.

25   A    Okay.

99

1      Q     Do you recall a witness Richard Driver?

2      A     Yes, but not as well as I do the others.  I remember

3 his name, but not much about him.

4      Q     Do you know whether someone else would have been

5 dealing with him?

6      A     I don't know about that.  It probably would have been

7 me.

8      Q     Do you remember a witness Doyle Wayne Hill?

9      A     Yes, ma'am.

10      Q     How would you characterize your level of involvement

11 in interviewing, preparing him for trial?

12      A     It was a little more distant relationship wise

13 because I think he came in later as the case was progressing.

14 And the fact that he -- I can't remember what his information

15 was.  I think it was future dangerousness that he testified

16 about.  And I want to say he was a former or a current member

17 of the TM.  I can't remember for sure.  But I do remember Doyle

18 Wayne, yes.

19      Q     Mr. Merillat, you've referred several times to the

20 deposition you did in Mr. Speer's case.

21      A     Yes, ma'am.

22      Q     And I'm going to refer you to Page 69 of that

23 deposition.  And I apologize.  This is really, really small

24 print.  I'm going to pass it to opposing counsel first.

25            On Page 69, there at the beginning, could you

100

1    read the question and answer, please?

2        A    "And when you're receiving information with regards

3    to inmates that are working for your office, for lack of a

4    better term, is there sometime some competition among those

5    inmates?"

6                    "It's happened, yes, sir."

7                    "And why is that?"

8                    "If they don't -- well, I can only assume, but

9    if they don't think they're getting help fast enough or as much

10   help as somebody else might give, they would perhaps feel like

11   they needed to compete to get more help or help faster."

12                   Read the whole page?

13       Q    I think we can stop with that.  What my question,

14   following up on that, is in essence, is it your experience in a

15   case like this where there are multiple inmate witnesses that

16   there may in fact be some competition --

17       A    Yes, ma'am.

18       Q    -- for attention?

19       A    Yes.

20       Q    Do you recall that particularly being the situation

21   in this case?

22       A    The reason it stuck out in my mind was because of

23   Eason and Innes trying to, like we talked about earlier, play

24   us against each other.

25       Q    I'm going to completely shift gears on you now to