**Page 61**

1  A.  I recall a visit where we took documents, we
2  took our case file to them, and I think they copied
3  them at their offices. It's just too voluminous for us
4  to do and mail, and I don't remember if it was Speer or
5  Canales. I don't recall, but I don't even remember
6  which lawyer it was, but I remember going to Texarkana
7  with our case file and having copies made. So I don't
8  know. I don't know if there was a mailing of documents
9  or not.
10  Q.  And again, if you don't know, that's fine.
11  I'm just trying to be clear on it.
12  A.  Well, I want to remember.
13  Q.  Regardless of how you handled discovery in
14  Canales' case, I want to focus in on Speer.
15  A.  Yes, sir.
16  Q.  Would there have been an initial discovery
17  response by your office?
18  A.  Well, to the best of my knowledge, but as I
19  recall there's -- I believe we used what's called an
20  omnibus order for discovery, and that's about the open
21  file policy, and Mr. Mullin can address that better
22  than I can. Sometimes I'm there when discovery is
23  made, sometimes I'm not; but I do recall bringing our
24  case law to some lawyers in Texarkana. That's the best
25  I can remember.

**Page 62**

1  Q.  Now, Mr. Whited in connection with the
2  Canales/Speer case, who was he and why was he
3  important?
4  A.  Larry Whited was a Texas Mafia member, and I
5  don't recall his rank or his function in the gang, but
6  he had knowledge about the Dickerson killing. I don't
7  remember. I can't remember how important he was, but I
8  do remember he didn't testify for us.
9  Q.  And that was my next question. Do you recall
10  why Mr. Whited didn't testify at trial?
11  A.  No, I don't, I sure don't.
12  Q.  I'm going to hand you Deposition Exhibit
13  Number 11 and ask if you can identify that document.
14  A.  Yes, sir.
15  Q.  And what is that?
16  A.  This is a letter from me to Sergeant Burson,
17  who is the gang intelligence officer at the Wynne Unit,
18  dated March 13th of 2000. There is my letter to
19  Sergeant Burson referring to Bruce Innes's letter to me
20  about Canales' threat against Larry Whited, who was
21  called Bam. That's his gang name -- I mean, Iron. I
22  think he was called Bam also.
23      And I'm telling Sergeant Burson once again if
24  he gets letters back and forth that doesn't mean he's
25  still trying to be in the gang.

**Page 63**

1  Q.  I'm going to hand you what I'm going to mark
2  as Deposition Exhibit No. 12, and does that appear to
3  be a letter from Mr. Innes dated March 6th, 2000, which
4  caused you to generate Deposition Exhibit Number 11?
5  A.  This looks like he's wanting me to write
6  Sergeant Burson to talk about why he's getting mail to
7  and from the gang.
8  Q.  And that the mail that he's receiving from
9  the gang is preventing him from going further in his
10  deconfirmation process?
11  A.  On the face of it, it sounds like they're
12  doubting their sincerity because he's getting mail back
13  and forth, so he's asking me to write Sergeant Burson
14  about the situation.
15  Q.  I'm going to hand you what's been marked as
16  Deposition Exhibit No. 13 and ask if you can identify
17  that document.
18  A.  This is another letter from Innes to me, June
19  4, 2000.
20  A.  Okay.
21  Q.  And that letter refers to an issue involving
22  a person nicknamed Iron?
23  A.  Yeah, which would be Larry Whited, yes, sir.
24  Q.  And he indicates that -- Mr. Innes indicates
25  that he had written you concerning that issue and never

**Page 64**

1  heard back from you?
2  A.  Right. He's insinuating that I ignored his
3  letter, and actually he says, "If you could take the
4  time to come across the street and come see me, you
5  know, we could talk," which that was his version of the
6  facts. There's reasons I can't go see him all the
7  time, of course, and he didn't understand that; but,
8  yeah, he's talking about some updates on gang business,
9  some of the leadership and he's talking about, he says
10  he wrote Canales about the issue of taking Iron out,
11  which would be Larry Whited, and sent it to you to mail
12  out; and I don't recall ever mailing a letter from
13  Bruce Innes to Canales. I'm emphatic about never doing
14  that. I don't recall that at all.
15  Q.  And he's also expressing concern in
16  Deposition Exhibit No. 15 that perhaps Canales and the
17  others may know that he has a defense -- I'm sorry, a
18  prosecution witness?
19  A.  Who? Bruce Innes?
20  Q.  Yes.
21  A.  That Canales might know he is one?
22  Q.  Yes, because the witness list had been
23  released.
24  A.  I guess you're talking about in the Speer
25  case.

Page 65

1  Q.  Either, either Canales or I suppose it would
2  have been Canales.
3  A.  We haven't had Canales yet. Can you show me
4  where the witness list part is?
5  Q.  You can read these better than I can.
6  A.  It must have stuck in your brain somewhere.
7  I don't see it in that letter. "I'd like to ask if
8  there is any witness list or evidence been made
9  available," so he's asking if there's a witness list.
10  Q.  And whether that's been disclosed to
11  Mr. Canales?
12  A.  Yeah. He's asking me if it's been done,
13  which I don't know if it has by that time or not;
14  perhaps.
15  Q.  Who was Lonnie Eason, and what was his
16  connection to this prosecution?
17  A.  He, I don't recall if he was a confirmed gang
18  member or not, but he did have -- he was a potential
19  witness for us. He had information about the killing
20  that we thought was important, and I can't recall what
21  it was at this time, but I know he later turned on us
22  and turned against us and he didn't help us. That's
23  why his name sticks out, and I've had a lot of
24  correspondence with him.
25  Q.  I'm going to hand you what's been marked as

Page 66

1  Deposition Exhibit 14 and ask if you can identify that.
2  A.  Yes, sir. This looks like it's in response
3  to that one we just talked about, about me coming
4  across the street to see you. The Stiner information,
5  Gaylord Stiner is some official in the Texas Mafia. I
6  can't recall his exact rank, and he's obviously told me
7  something in his letter about Stiner, and I told him I
8  don't think there's a witness list yet, we're waiting
9  as long as we can before we absolutely have to give it
10  up for safety reasons. I don't apologize for that at
11  all.
12  Q.  So for safety reasons and the fact that you
13  didn't want to plug the flow of information from other
14  Texas members.
15  A.  I would not want to stop the flow. I don't
16  know if that's why Mark didn't give up the witness
17  list. I'm not in charge of giving up the witness list.
18  I'll prepare it, but I think it's good business to wait
19  until we absolutely have to, I really do, and I'm
20  already suspecting Lonnie Eason's motives, according to
21  this letter to Innes. I just don't recall --
22  Q.  Do you recall why you were suspecting his
23  motives?
24  A.  No, sir, I don't, and I don't even know what
25  he knew. That's why I don't recall why he was

Page 67

1  important to us. Then I'm just telling him where I've
2  been and why I haven't written back to him in a long
3  time.
4  Q.  Now, you indicated that Larry had his own
5  problems?
6  A.  Yes, sir.
7  Q.  Do you recall what that was about?
8  A.  No. I know that he was getting threats. I
9  know he has physical problems, I think his liver or
10  something like that. I don't recall, but I know he has
11  physical problems, and there were some family problems
12  that I don't recall. He was a miserable man. I don't
13  remember everything about it.
14  Q.  I'm going to hand you what I've marked as
15  Deposition Exhibit No. 15 and ask if you can identify
16  that document.
17  A.  It looks like a letter purporting to be from
18  Lonnie Eason to me about Bruce Innes.
19  Q.  And I'll give you a little time to refer to
20  that, but would it be fair to say that the gist of that
21  letter is Mr. Eason telling you that Mr. Innes is not
22  being true to his word in really seeking
23  deconfirmation?
24  A.  Yeah. Now, this is July the 9th, 2000, and
25  Eason is trying to warn or inform us that Innes is

Page 68

1  probably not sincere in his help with us or his
2  deconfirmation process.
3  Q.  Why would -- in your opinion, why would
4  Mr. Eason be telling you that information?
5  A.  In my opinion it's because he wanted to
6  remain with the TM if he was one of them, and he's
7  trying to, it sounds like he's trying to make, make
8  that known verbally where people can hear him say
9  things that would make other inmates think that he was
10  not a part of us; and by exposing Bruce Innes as a part
11  of us, for lack of a better word, he's gaining the
12  trust of other inmates is what I glean from this.
13  Q.  Or that Mr. Eason is trying to up his status
14  with your office and become, I guess, for lack of a
15  better word the Number 1 informer.
16  A.  Yeah. He wanted to, I think he wanted to
17  manipulate us to better his situation, and I think, I
18  think there was something about he lost his glasses, or
19  he lost some property, and I helped him get it back, as
20  a matter of fact. Even after he turned his back on us
21  and we found out that he was not square with us, I
22  continued to do what I told him I would do. I believe
23  I wrote a parole letter for him, and I did help him get
24  his property back because that's what I promised him,
25  and that's what I did.

Page 69

1  Q.  And when you're receiving information with
2  regards to inmates that are working for your office,
3  for lack of a better term, is there sometime some
4  competition among those inmates?
5  A.  It's happened, yes, sir.
6  Q.  And why is that?
7  A.  If they don't -- well, I can only assume, but
8  if they don't think they're getting help fast enough or
9  as much help as somebody else might get, they would
10 perhaps feel like they needed to compete to get more
11 help or help faster.
12 Q.  And that's why these inmates give the
13 information in some form is to receive some benefit?
14 A.  No, sir, I totally disagree with that, I do.
15 Q.  What's your opinion on that subject?
16 A.  It's a heart issue to me. I've worked all or
17 part of 156 prison murders since I've been here, and
18 that's including the Randy Payne case where 20 inmates
19 stomped another inmate to death. We indicted 20 prison
20 inmates for one murder case in Polk County. The only
21 witnesses to that case were prison inmates, no guards,
22 no anybody, just prison inmates.
23     Using that as an example, there's no way in
24 the world our office could have successfully prosecuted
25 over 150 prison murders if we were known to make up

Page 70

1  stories, to manipulate inmates, to make promises we
2  couldn't keep or to offer things that there was no way
3  in the world that could be given to them. And me
4  personally I can't get promoted. I can't get more
5  money. I can't do anything by winning cases. Winning
6  cases, it's not me; it's the prosecutors, of course, so
7  there's no motivation for me to try to goad an inmate
8  into helping us. If we lose a case, if a case doesn't
9  get indicted or if we dismiss a case out-and-out, it
10 doesn't affect my job. And for 20 years I've been
11 here, there's no punishment to me for losing a case.
12 We've lost cases, we really have.
13     So when I go into preparing a case for trial
14 and I'm talking to go an inmate, potential witness, say
15 Bruce Innes or anybody else in any number of murder
16 cases, I'm always up front about who I am, who I work
17 for. And one of the first words out of my mouth is I
18 can do nothing for you, I cannot do anything for you.
19 If I did anything else, we would never have won a case.
20 We would never have had a witness because that word
21 would get out very quickly.
22     So when I talk to inmates and I want you to
23 know that if I talk to 20 inmates there might be 18 of
24 them who will not help, absolutely refuse, and so if I
25 was to promise, make all of these promises that I was

Page 71

1  accused of in these briefs that I read -- really,
2  really touched me deeply. If I made the promises that
3  I've been accused of, the two inmates who testified for
4  us would supposedly have gotten all of these benefits
5  and the 18 would have got nothing. Well, that's
6  totally not true because there are inmates who don't
7  testify for us and they're fine. And there's inmates
8  -- and I'm glad we have them on the Eason issue --
9  because there's inmates who turned their backs on us
10 and totally went against our office, but I promised him
11 a parole letter, I wrote it and I helped him get his
12 property back, and I've had communications with him for
13 years since then, and I've always been up and up with
14 him.
15     So the fact that we write parole letters does
16 not, does not make inmates testify for us. I'll write
17 parole letters on an inmate I meet that has nothing to
18 do with the prison crime but I think he's in dire
19 circumstances and deserves a fair shot, I'll write that
20 saying here's a guy and here's his situation, here's
21 why I think you should be aware of what I'm telling you
22 about him. And contrary to what you guys accuse me of,
23 there's no link in the knot, and the parole board
24 doesn't even know me. I can't even tell you who the
25 members are. There's no link in the knot when I write

Page 72

1  a parole letter. I write a letter saying this inmate
2  gave us important information, we think you need to
3  know about it, if you have any questions call me. And
4  I don't apologize for doing that. If I'm ordered by my
5  boss to stop, I will, but I've never been. She's
6  written parole letters also.
7  Q.  The letters that you write you write on SPU
8  stationery?
9  A.  Oh, yes, sir, I sure do. I do it as a
10 representative of our office because I'm nobody even
11 with our office and without our office, I'm really
12 nobody, so why would they listen to me? But I think
13 it's important that if I tell an inmate, not if you
14 help us I'll write a letter, but because you've helped
15 us and cooperated I'm going to write a letter.
16     So there's no prefacing an inmate coming to
17 testify with, hey, if you helped us I'll write you a
18 letter. No, sir, that does not happen. It's I would
19 rather know the guy is telling me the truth. I don't
20 want people getting up there and lying. I could
21 probably make them lie by making these promises. I
22 don't do that.
23     I'm probably being disjointed. I apologize
24 for that, but this is a passionate issue for me. I
25 would point out to you and the others who have accused

73

1 me of terrible things, nobody in 20 years has ever been
2 paroled because I wrote a letter for them, and if
3 somebody has I don't know that. Nobody has come up and
4 said hey, A.P, guess what, I got paroled because you
5 wrote, I don't know of that ever happening.
6 So, no, sir, inmates don't help us because
7 they've been promised something. Inmates help us
8 because I think something clicks within them, you know,
9 it's time to do the right thing; and thank the Lord
10 they do that, some of them. Some of them don't. Some
11 of them tell me to get screwed and take a walk.
12 Q. Now, you testified at Mr. Speer's trial,
13 correct?
14 A. I don't recall. I probably did, I probably
15 did his fingerprints. I'm not sure.
16 Q. Do you understand that regardless of what
17 your thoughts are concerning these parole letters that
18 a jury or a fact-finder might imply different thoughts
19 upon reading those parole letters?
20 A. No, sir. I believe that the letters are so
21 basic they speak for themselves: Here's the
22 information, here's the truth. I mean, it could be
23 disproven if I've written a lie in the letters. Here's
24 the truth, you folks on the parole board use this if
25 you can, if you want to. If you don't want to, fine.

74

1 I'm not telling them one way or the other, and if you
2 have any questions call me, which they never do. So,
3 yes, a defense lawyer can take that and could skew it;
4 and a prosecutor could take that and skew it as well.
5 So a juror sitting there figuring out which skew to
6 listen to, and I can't speak to what jurors believe
7 because I don't know. I know they're all different.
8 But if I testified about parole letters in the Speer
9 trial, I don't recall that. I'm not saying I didn't.
10 I just don't recall that.
11 Q. But there would have been parole letters in
12 Mr. Speer's case because you had already had Mr.
13 Canales case?
14 A. I believe that to be correct.
15 Q. And assuming that those parole letters were
16 not turned over to the defense, do you see that that
17 could have been important? The jury would have been
18 deprived the information that you had sent those parole
19 letters on those inmates' behalf?
20 A. No, sir, I don't believe that and here's why,
21 because if I testified that I wrote parole letters the
22 jury now knows. I believe if it's that important the
23 defense should have said, well, where are they, let me
24 see your copies. Which they could have had because;
25 like we've talked about earlier, they're available. I

75

1 don't know which box they were in or something, but
2 they were available.
3 Q. If they asked -- well, I want to clarify that
4 point. If the parole letters were in your maroon
5 folder, you've already testified that you considered
6 that work product and would not have been delivered to
7 the defense?
8 A. I'm sorry that I clouded that up. I don't
9 think a parole letter is work product. I think like
10 these notes here are that we've talked about where I'm
11 talking about witnesses in a new case on Larry Whited,
12 I think that's work product. I don't think a parole
13 letter is. So barring knowing where to keep parole
14 letters when I write them, I put them either in my
15 binder, in a folder, in a case box, in a drawer. I
16 don't have a particular policy where I keep them, but
17 if I'm testifying about, yes, I wrote parole letters on
18 these inmates and the defense said give them to me,
19 I'll give it. If they'd have said at pretrial, I would
20 give it to them. I have no reason -- if I'm going to
21 testify to it, why would I hide it? I mean, I'm
22 telling the folks it's there.
23 So, no, sir, that's not work product, and
24 maybe I'm wrong, but I don't think it is work product.
25 Q. Doesn't that presuppose that someone has made

76

1 the decision for you to testify during the Speer trial?
2 A. Somebody has what now, presuppose?
3 Q. What I understood your testimony to be is
4 that if you testified I wrote parole letters then
5 what's the big deal because I testified there were
6 parole letters.
7 A. No, not what's the big deal. What's the big
8 deal that you're making of it that, well, if you are
9 testifying to it why didn't you hand it to the defense
10 lawyer to testify to it. That's the lawyer's call.
11 That's not my call. If I'm testifying to it and the
12 defense attorney says show it to me, I will. I won't
13 try to hide it or say, well, it doesn't exist. Well,
14 here it is because I believe that bolsters what I'm
15 saying because the letter is so generic, I think --
16 well, I don't know why defense lawyers do what they do,
17 but I think a jury reading a letter I had written and I
18 just testified about bolsters what I say.
19 Q. And what I'm asking you is that if a
20 determination is made that you not testify in that case
21 do you not tell the defense we have these parole
22 letters?
23 A. That's incorrect in the substance of it. If
24 I don't testify -- and I still don't recall testifying
25 in the Speer's case about it, but if you tell me I did

Page 77

1  I'm going to believe you.
2  Q.  Well, again it gets foggy to me too because
3  I've looked at them both.
4  A.  I don't know.
5  Q.  So I'm not for sure, but what I'm trying to
6  get at is --
7  A.  I hope I did.
8  Q.  -- if you didn't testify, would you have
9  necessarily have delivered the parole letters to
10 Mr. Speer's trial counsel?
11 A.  With those parameters, if I did not testify
12 the defense knew I wrote parole letters because
13 somebody asked our witnesses, be it Mr. Mullin or the
14 other guys. Our witnesses, I remember Bruce Innes
15 getting on the stand in "What has the State done for
16 you?" And I remember in their close that they hammered
17 the fact that they were accusing us of paying for their
18 testimony, not just in parole letters, but they made us
19 sound like we were actually paying and they were
20 getting good things. Bruce Innes hadn't gotten a good
21 thing yet that I recall, that I know of. I hadn't seen
22 him in a pretty good while.
23     So if I did not testify, the defense
24 regardless of that fact knew that there were parole
25 letters written, and they also knew that after Speer's

Page 78

1  trial there would be parole letters written, so I don't
2  want it thought that that was hidden from anybody.
3  It's not hidden.
4  Q.  But it may not have necessarily been turned
5  over to them.
6  A.  I don't know. I don't know if it was a part
7  -- well, it couldn't have been discovery prior to it
8  because they weren't written yet.
9  Q.  Now let's back up though because I want to
10 make sure, and again I may just be misunderstanding
11 this.
12 A.  And I'm simple.
13 Q.  But you have Canales' trial.
14 A.  Yes, sir.
15 Q.  And from what I understood your testimony to
16 be is that after that trial was complete you wrote
17 parole letters on the witness's behalf during the
18 Canales trial?
19 A.  Well, you know what, when you put it like
20 that I need to see the dates on my parole letters, I
21 guess. Maybe I waited until after Speer's.
22     This says November the 6th, 2000. I wrote
23 letters to the parole board for each witness and also
24 Sammy Buentello, so November of 2000 I would have
25 written them.

Page 79

1  Q.  So that would have been after Canales' trial
2  but before Speer's trial.
3  A.  There you go, that's right.
4  Q.  And the question is, did you provide those
5  letters of November 6th, 2000, to Mr. Speer's trial
6  counsel?
7  A.  Well, I didn't personally give them to the
8  lawyers, but they went into our active case file, the
9  parole letters.
10 Q.  Maybe, maybe not.
11 A.  No, sir, I wouldn't have said it if I didn't
12 do it, especially in that note that I wrote so many
13 years ago never knowing this was going to happen.
14 Q.  Okay, I see what you're saying, and we'll get
15 to it, and I don't want to rehash it, but we'll get to
16 it in a minute. It says, "copies made of above, one
17 for each inmate, one for SPU file."
18 A.  Yes, sir. So, in other words, not only do I
19 write it to parole, they have copies, the inmates get a
20 copy, and then our file gets a copy.
21 Q.  And when you reference the SPU file --
22 A.  I'm talking about the case file, no longer my
23 file.
24 Q.  Okay, no longer your maroon folder or Manila
25 folder that you keep for yourself?

Page 80

1  A.  Absolutely, or the maroon folder after that
2  second trial would have gone in these boxes; but
3  according to this they went into the boxes. I'm so
4  glad you showed me. Thank you.
5  Q.  Now, once the parole letters make it into
6  what we're going to call the SPU file, which would be
7  the file that Mr. Mullin kept in his office or near his
8  office, whether that file was made available to the
9  defense team by actually taking the file to New Boston,
10 can you answer that question?
11 A.  No, I can't, I can't.
12 Q.  And so it's your position that and correct me
13 if I'm wrong is that with the exception of your maroon
14 folder and this Manila folder that you kept with you
15 because of things you considered work product, if the
16 defense had traveled to Huntsville they could have
17 looked at any of the other documents?
18 A.  Yes, sir, because I called one of the lawyers
19 I can't remember which one, I made a note of it too
20 that I called them, said I'll be in Huntsville all day
21 because they were coming here for something; if you
22 need to see anything, I'm here, all the stuff is here.
23 Q.  And I guess what I'm real unclear about and
24 maybe this is better for Mr. Mullin is, how did they
25 get the initial information?

Page 81

1  A. Who?
2  Q. The defense team, how did they get the
3  witness statements, the interviews?
4  A. I don't know, sir.
5  Q. But you would agree with me that being
6  released from ad-seg can be a benefit?
7  A. Yes, sir, I do.
8  Q. And I guess with regards to closed custody
9  there are two ways to look at that: One, a person
10 might want to get out of closed custody so that he can
11 get back and mingle with the general population?
12 A. Get out of closed custody?
13 Q. Yes, sir.
14 A. Yeah, you'd want to be out of close. I'd
15 rather be in ad-seg than in closed custody.
16 Q. Why is that?
17 A. Because the bad inmates who have not quite
18 been found out to be bad enough to be in ag-seg are all
19 in closed custody, and that's why we have so many
20 problems. A lot of our assault cases and murders,
21 weapons cases come out of closed custody because
22 they're bad, uncooperative, incorrigible inmates. They
23 just haven't gotten bad enough yet to be in ag-seg, so
24 I'd rather be in ag-seg where I'm by myself 23 hours a
25 day than closed custody. I'd rather be in general

Page 82

1  population or medium custody or minimum.
2  Q. Right, and I guess it cuts the other way to
3  some extent is that you may be an inmate, for lack of
4  better words, may be a 98-pound weakling in general
5  population and that individual might prefer to be in
6  closed custody or ad-seg.
7  A. Absolutely not, no, sir. I could just quote
8  you many problems where weak inmates have been in close
9  custody and become victims. They would be tossed
10 around like rag dolls, and that just happened. We just
11 come off a trial where that was the situation. A weak
12 inmate does not want to be in close custody because the
13 people who have gotten there have earned their way
14 there through usually violence, and they're tough, bad
15 inmates, bad, bad-acting inmates.
16 Q. Would you characterize Mr. Innes as being a
17 weak inmate?
18 A. No, sir. He has health problems too. I
19 forget what they are, but I know they're serious, but
20 when I met him he was pretty stout, and he was some
21 kind of, not enforcer, but some kind of -- a guy who
22 used force to keep the gang running smoothly; in other
23 words, he was a tough guy.
24 Q. Muscle?
25 A. Yes, sir, and able to fight. I think he was

Page 83

1  a fighter in the free world of some kind. So, no.
2  They called him Kung Fu. That was one of his names, so
3  he was pretty tough.
4  Q. Were you aware that Mr. Innes had in his past
5  refused housing so that he could be placed in closed
6  custody?
7  A. Well, no, I didn't, but I don't doubt it.
8  Q. And why do you don't doubt it?
9  A. Because he's a tough inmate and he was a
10 gangster, so that's the kind of inmate that occupies
11 closed custody, bad, bad-acting inmates.
12 Q. But what I'm telling you is, did he ever tell
13 you that he actively tried to get put into closed
14 custody?
15 A. I'm not saying he didn't tell me, but I don't
16 recall the conversation or the words he used or
17 anything, but I'm not saying he didn't say it.
18 Q. And it could be that from his perspective or
19 from any inmate's perspective closed custody might be
20 better than being in the general population because
21 you're not exposed to general population.
22 A. I don't know why an inmate would prefer
23 closed custody unless his unconfirmed gang member mates
24 are in closed custody, he might want to be there then
25 because you could get drugs, sex, anything you want in

Page 84

1  closed custody just like you can in general population
2  or ag-seg. So from my limited perspective as a guy who
3  wouldn't want to be in prison in the first place, I
4  don't know why somebody would want to be in closed
5  custody, but I'm not doubting that there are idiots who
6  want to be in closed custody.
7  Q. If Mr. Innes testified that he wanted to be
8  in closed custody because it made it easier on him for
9  whatever reason, you'd have no reason to doubt that?
10 A. I don't doubt he would say that. I don't
11 know why, but I don't doubt it.
12 Q. I'll show you Deposition Exhibit No. 16 and
13 ask if you can identify that document.
14 A. No, sir, I don't know what this is. I really
15 don't understand what they're saying. It's not a
16 document of mine.
17         MR. HENRY: Let her take a break.
18         (Break taken)
19 Q. (By Mr. Henry) All right. With regards to
20 Deposition Exhibit 16, you understand this was a
21 document that was pulled from the SPU file?
22 A. No, I didn't, I didn't know it was, but I
23 believe it was, I believe you.
24 Q. And it appears to be some kind of security
25 threat group correspondence?

Page 85

1  A.  Yes, sir. It looks like there was a sticky
2  on top of it at one time. I don't know this person.
3  Q.  But the sticky appears to be someone, perhaps
4  a guard with TDC that is expressing concern as to why
5  Mr. Innes would be in the process of being deconfirmed
6  but yet writing a major in the Texas Mafia?
7  A.  Let's see, "According to Inmate Innes 07
8  screen," which is a screen classification he uses on
9  terminal about his situation with the gang, he is
10 supposed to be on the TM hit list. If he was, why
11 would he be writing the district major a letter like
12 this, and this says C03, so that's a guard named Heath.
13 So what's your question?
14     They denied a letter from him to this person.
15 Q.  So what happened -- just tell me what
16 happened based on your understanding of reading
17 Deposition Exhibit No. 16.
18 A.  This one is hard to read. "Shockley's
19 cousin, Shockley's cousin was here"?
20 Q.  Let me try it this way.
21 A.  You want to recap it for me.
22 Q.  I'm going to try to because again, I'm not
23 clear what happened either because I don't understand
24 what goes on in the prison, but this is my take on it,
25 and tell me if I'm wrong, that Mr. Innes was writing a

Page 86

1  letter to a major, a ranked major in the Texas Mafia,
2  and the security threat group prevented that letter
3  from going out.
4  A.  Yes, sir. I believe that's what happened,
5  and I can't see the date. It says June 12th something,
6  so I don't know when it was.
7  Q.  But the point of the guard was we need to be
8  suspect of Mr. Innes because he's telling us he's
9  trying to deconfirm, but yet he's still trying to write
10 letters.
11 A.  Right. That officer is saying if he's on the
12 hit list of the Texas Mafia why would he be writing
13 this major. Oh, it's from the Wynne Unit.
14 Q.  I'm going to show us what's been marked as
15 Deposition Exhibit No. 17 and ask if you can identify
16 that document.
17 A.  It looks like Bruce's handwriting, a letter
18 to me, spelled my name wrong. I don't know what the
19 date, it's a Thursday, still at the Wynne Unit 10/7 of
20 '99.
21 Q.  I'll let you read over that, but I just want
22 you to summarize for me what you understand the purpose
23 of that letter is for.
24     What's your understanding of what Mr. Innes
25 is writing you about in Deposition Exhibit No. 17?

Page 87

1  A.  He's telling me that he caught or what we
2  call caught a new case, or he's been given a new
3  disciplinary case, possible criminal charges, it looks
4  like for what they're saying is a weapon, and he's
5  telling me that he was trying to help a guy fix his
6  radio or make a tool to fix his radio, a screwdriver,
7  out of this shaft from his fan; and he's saying that
8  when he tried to get rid of that tool that it was found
9  out, which happens a lot. They know that's Bruce
10 Innes's tool and could have been a weapon, probably
11 looked like a weapon, I'm sure.
12     He's saying he has no reason to make a
13 weapon. He's probably asking for me for help with this
14 disciplinary case, but I didn't see it come to that in
15 the letter because he moves over to the fact that he's
16 been -- his lawyer has said that the deal on his
17 weapons cases that are pending in New Boston is for 10
18 on one case and five on the other, and he's telling me
19 that wasn't the deal; the deal was for three years and
20 the weapons charge dropped. So all of that stuff is
21 out of my purview. I don't have anything to do with
22 that. I don't know what his plea offers were. As a
23 matter of fact, I didn't know Bruce existed until later
24 on in this case. So he's complaining to me that he
25 thinks they're going back on what was promised to him

Page 88

1  on the plea deal, plea agreement.
2  Q.  Let's focus on the first issue, the issue
3  about this part from the fan. It's my understanding --
4  correct me if I'm wrong -- is that that would have been
5  a new potential weapons charge that he picked up at the
6  Wynne Unit.
7  A.  Could have been, yes, sir, could have been.
8  Q.  Sometime prior to October of '99?
9  A.  Well, yes, sir, I believe so, yes, sir.
10 Q.  And let's talk about weapons cases in TDC.
11 Number 1, it's a big problem?
12 A.  Could be. Well, it could be a second-degree
13 felony probably for Bruce or first degree. I can't
14 remember how many enhancements he has; it could be. It
15 could go all the way up to life stacked. So, yeah, it
16 could be a terrible problem.
17 Q.  And from what I understand your testimony, it
18 can be a problem twofold: One, it could be a criminal
19 case, or it might be a disciplinary.
20 A.  Or both.
21 Q.  Or both.
22 A.  Yes, sir.
23 Q.  With regards to the disciplinary aspect,
24 catching a weapons charge, what does that do to an
25 inmate as far as the discipline?

Page 89

1  A.  The first thing that happens is they would
2  put him in a special cell prehearing detention. He
3  would lose immediately the housing that he's in, and he
4  would stay in that transit status until he has a
5  hearing, a disciplinary hearing, which could be soon,
6  or it could be days.
7       And if an inmate is convicted, especially of
8  a weapons case -- and the disciplinary process is long
9  before indictment -- he could be put in ad-seg, he
10 could be put in closed custody, lose whatever
11 privileges he has as far as visitation and commissary,
12 recreation. So a lot of bad things could happen to him
13 just from the disciplinary.
14 Q.  What about lose good time credits?
15 A.  Yes, yes, sir.
16 Q.  When we talk about good time credits, what
17 are we talking about?
18 A.  The accumulation of credit to your sentence,
19 which is called good time, which can be added together
20 to take down the number of years you serve in prison.
21 Q.  Make you parole earlier?
22 A.  Sure, could.
23 Q.  And with regards to you mentioned commissary,
24 are there different amounts that an inmate can spend on
25 commissary depending on where he's classified?

Page 90

1  A.  Yes, sir.
2  Q.  And how does that work?
3  A.  I don't know the numbers anymore, but I used
4  to. You get more spend per two-week period according
5  to your classification. I don't remember how much it
6  is.
7  Q.  Fair to say that the higher your
8  classification, the lesser amount you're able to spend
9  in commissary?
10 A.  The more strict your classification the more
11 you can spend at the commissary, yes, sir, in a given
12 time.
13 Q.  So the weapons charge potentially could have
14 caused Mr. Innes great problems both in how he was
15 housed and classified; is that correct?
16 A.  Yes, sir.
17 Q.  And other things, such as denying him
18 recreation and commissiary and those sorts of things?
19 A.  Yes, sir.
20 Q.  It also could have resulted in additional
21 criminal charges, which in his case he would have
22 gotten potentially the big bitch.
23 A.  Could have if he had enough enhancements. I
24 don't recall.
25 Q.  Which could have left him anywhere between 25

Page 91

1  to life.
2  A.  Yes, sir.
3  Q.  And with regards to your experience in the
4  Special Prosecution Unit, are those the type of cases
5  that your office handles, weapons in TDC?
6  A.  Yes, sir.
7  Q.  And your experience with those types of
8  cases, what do generally inmates make weapons out of?
9  A.  Well, like this, pieces of a fan like he's
10 talking about, pencils, bones, metal from inside the
11 cell, Plexiglas from inside the cell or outside, pieces
12 of fence, just about anything that's stiff enough to
13 put inside a human being, you know, a stabbing device
14 could be made to it.
15 Q.  Fair to say they can be ingenious in creating
16 weapons?
17 A.  Uh-huh.
18 Q.  Can make a weapon out of anything?
19 A.  Uh.
20 Q.  Is that a "yes"?
21 A.  Yes, sir, it is. I'm sorry, I apologize.
22 Q.  Including fingernail clippers?
23 A.  Yes, sir.
24 Q.  In fact, your office has prosecuted cases
25 where an inmate has made weapons out of fingernail

Page 92

1  clippers?
2  A.  Yes, sir. I've testified in those very
3  cases, yes, sir.
4  Q.  I'm going to hand you what's been marked as
5  Deposition Exhibit No. 18 and ask if you can identify
6  that document.
7  A.  That's a letter from me to Bruce Innes at the
8  Wynne Unit.
9  Q.  Does that letter appear to be in response to
10 Deposition Exhibit No. 17?
11 A.  I would imagine because of the dates, yes,
12 sir.
13 Q.  Generally can you tell us what's contained in
14 Deposition Exhibit 18?
15 A.  Yes, sir. Well, I'm telling him I have
16 nothing to do with the plea bargain agreement, first of
17 all, which is the last subject in this letter. And
18 then where he's talking about the disciplinary case for
19 the fan part being found and called a weapon, I'm
20 telling him, I'm informing him that -- and I'm
21 informing you as I did earlier, just because somebody
22 brings a weapon case to us doesn't mean we're going to
23 accept it for prosecution for a variety of reasons.
24 And back in 1999 that was the case as well. We don't
25 prosecute everything brought to us. Now it's a

Page 93

1  prosecutor's call.
2     Q.   And a prosecutor makes that call perhaps
3  sometimes with your input?
4     A.   I do input, yes, sir, I sure do; and
5  sometimes it doesn't make any difference.
6     Q.   I understand.
7     A.   But anyway, he was, by the tone in his letter
8  he's like being -- I don't know the proper word -- like
9  aggressive, like you guys promised something and you
10 didn't do it. His tone is -- I can't think of the word
11 I'm trying to say -- it's not gentle as I read it, but
12 at the same time when I decided to write him back -- I
13 could have decided not write him back, but I did; so
14 when I decided to write him back, first of all, to tell
15 him I have nothing to do with the plea process, don't
16 bring that to me, I have nothing to do with it, the
17 weapons thing, if our prosecutors decide to file on
18 him, he's going to get filed, and I've told him that
19 since all of these cases, as a matter of fact: If you
20 do something we're going to come after you and never
21 made any bones about that, but I'm also reminding him
22 we don't have to pursue everything that comes to us,
23 and that's the case in the free world and all of my
24 police career, and I don't see anything wrong with it.
25    Q.   Do you recall whether or not your office ever

Page 94

1  prosecuted criminally Mr. Innes for possession of the
2  fan part that is described in Deposition Exhibit
3  No. 18?
4     A.   I don't think we did.
5     Q.   Do you know the reasons why you did not seek
6  prosecution in that case?
7     A.   In my opinion, it's probably because he was
8  helping us with these cases, and I think that would be
9  legitimate.
10    Q.   Can you tell us as you sit here today whether
11 Deposition Exhibits No. 17 and 18 were ever disclosed
12 to Mr. Speer's trial counsel, Mr. Carter or Mr. Dodson?
13    A.   I don't know.
14    Q.   Can you tell us sitting today whether
15 Deposition Exhibits 17 or 18 ever made it from your
16 Manila file or your maroon file into what we've been
17 calling the SPU prosecution file prior to completion of
18 Mr. Speer's trial?
19    A.   Yes, sir.
20    Q.   How do you make that determination?
21    A.   This file is called "miscellaneous Innes
22 letters," and this is how I recall it looking when
23 Mark Mullin made up the prosecution boxes, so because
24 of the fact it's in this file, it's in the
25 miscellaneous Innes letters file, which happens to be

Page 95

1  in our case file, I'm telling you that it was in our
2  file.
3     Q.   And again, I'm just not following you how
4  you're so sure of that. Take me step by step through
5  the process.
6     A.   We have a case file. We have an active file
7  -- we have a file in the active case file.
8     Q.   It's confusing because you've got two cases
9  in one file, and just as aside, I'd hope you not do
10 that in the future, but I can understand why y'all did
11 it because it was met with the same facts; but
12 nevertheless, that's just my two cents' worth.
13    A.   And this is probably not the most confusing
14 case we've ever worked, like the 20-defendant case I
15 was telling you about. Because we have a file in the
16 hand of Mark Mullin called "miscellaneous letters."
17    Q.   And when you say that, the file that you're
18 referring to is a Manila file that has a handwritten
19 notation, "miscellaneous Innes letters."
20    A.   Yes, sir; and it's a legal-size file. Sir?
21    Q.   Go ahead.
22    A.   That's Mark Mullin's writing.
23    Q.   That's what I was going to ask. And you said
24 it's a legal-size file, so I guess you'd find some
25 significance in that.

Page 96

1     A.   No. I'm just being more descriptive for the
2  record.
3     Q.   I only use letter-size files.
4     A.   Well, that's what I use.
5     Q.   And that's why you I asked you if it made any
6  difference.
7     A.   And I don't carry around a legal-size file.
8  When I told you I keep a Manila file sometimes in
9  conjunction with that, I don't keep a legal-size file.
10    Q.   You keep a letter-size file.
11    A.   I keep letter size. It's just easier to
12 handle for me, and they fit in there much better. I
13 don't like legal-size files, but that's an aside.
14    Q.   But apparently Mr. Mullin likes legal-size
15 files.
16    A.   Yes, sir.
17    Q.   And he uses that.
18    A.   Yes, sir. Now, I'm not saying exclusively,
19 but he does use a lot of them, and he's very organized
20 when he does file things. He has his own system, but
21 he knows what his system is, and because of the fact
22 that this letter is in a file not my own I am
23 testifying to you this morning that this letter was
24 inside this file, and the defense had full access to
25 this file.

Page 97

Q. And how do you know at what time that letter made it into the legal-size file marked "miscellaneous Innes letters"?
A. I can't tell you a time frame. I don't know when.
Q. It could have been before Mr. Canales' file?
A. Well, I believe it was. I believe it was in 1999.
Q. It could have been after Mr. Canales's file.
A. It could have been before, but it could have been after.
Q. That's what I'm asking.
A. If it was before, it was not after. I believe it was before the Canales trial.
Q. But you don't know that for a fact?
A. I don't know. I don't know the date that the letter was put in there. That's my answer.
Q. So my question is since you don't know when it was put in there you don't know whether it was put in there before Mr. Canales's trial?
A. I believe, I sincerely believe that it was out in there before Canales' trial. One thing, it's in chronological order, as I just glanced. Another thing, I see the note that I wrote to Mark Mullin on the previous letter, put there before this letter, so that

Page 98

tells me things were going chronologically. The things that I put in the file were chronological, not like I told you before. There were things that I didn't put in here, say, parole letters because I didn't think they were exculpatory, but if I'd been asked about them I would have given them up.
So my best knowledge is, my best testimony is that these were in the file prior to the Canales trial, certainly before the Speer's trial.
Q. Now, in connection with the file that you're referring to that is contained in the SPU prosecution file with the title "miscellaneous Innes letters," do you know whether or not that file would have ever been taken to a pretrial in the Speer's case?
A. I don't know. Maybe Mr. Mullin will remember. I don't know.
Q. And if it wasn't taken on one of your trips to New Boston for pretrial, the only way the defense would have been able to employ the contents of that file would have been to come to the office here in Huntsville?
A. If it was not taken to them and if I or Mark hadn't mailed them information, yes, they would have had to come and look at it.
Q. And do you understand and agree with me, sir,

Page 99

that taking light the fact that you have testified that probably the reason that that case was not prosecuted as a weapons case was because of Mr. Innes's cooperation, do you understand that to be potentially impeachment evidence that could be used against Mr. Innes?
A. No, sir, I don't understand that to be the case, but I'm understanding what you're saying to me, but I believe that's a prosecutor call. I'm talking about whether or not we prosecute that weapons case. That's not my call. If I had input, my input would have been: Would you please take this into consideration because he's helping us in a much more important case, perhaps maybe even to bring down the Texas Mafia. So that would have been my input. I'm saying I didn't input that. I would have been glad to input that.
So as far as the impeachment, I don't know. I don't understand all about that.
Q. Well, you understand that inmates will do any number of things to benefit themselves, and you've encountered that in your career.
A. I just had an epiphany. When Innes testified, I know that he testified that he was given a deal for the older weapons cases. I don't know if he

Page 100

said the years or not. I don't recall that, but I do know that that was known to the defense lawyers. So, yes, I understand that he could have been asked if he was given a deal on this brand-new weapons case from the Wynne Unit, and the jury had a right to know about that; but I don't know if he knew that that case was not pursued because of this.
Now, he might have had it in his heart and in his mind, well, they didn't go after me because I'm helping them. But if we told him that, yeah, the jury could have known that.
Q. And your letter marked Deposition Exhibit No. 18 tends to indicate that you're probably not going to prosecute him for that case.
A. That's from me to Bruce, and I left it open like that because he could have, he could have been prosecuted. Had the Dickerson case gone away somehow, we could have still gone after Bruce Innes. So I'm not telling him we're not going. I want to make that clear. I'm leaving it open.
Q. You're leaving it open, but you're giving him an indication that it probably won't be pursued if he continues to cooperate.
A. Well, no, sir. I mean, he could have read that into it, and you are certainly reading that into

Page 101

it, but I consider it leaving it open because in the back of my mind I'm always knowing an inmate can manipulate me, and I'm going to leave it open. Even on death row cases that we don't normally go after, I leave those open, like, hey guess what, we are going to go after you, I never said we're not.

So I understand what you're telling me that I did, but I left it open; we could have still gone after him.

Q.  And Deposition Exhibit 18 could have been important for the jury in Mr. Speer's case as to Mr. Innes's cooperation?

A.  Sir, that would be a defense call. I don't know. That's their call.

Q.  But from your perspective at the time that you wrote the letter marked Deposition Exhibit 18, you didn't think it could be used for anything?

A.  I didn't think that what, the weapon?

Q.  No, the letter, you didn't think there was anything useful?

A.  Oh, when I wrote the letter I wasn't anticipating future trials or defense strategies. I wasn't anticipating anything. I was responding to him being so aggressive in his letters.

Q.  And you didn't see that it would be anything

Page 102

impeachment value in Deposition No. 18?

A.  Well, sitting here today as you describe it, I say, well, he could have been impeached with that, but at the time I'd never considered that, no, sir, and it was in the file, so the defense could have used it all they wanted.

Q.  Clearly, if he wasn't prosecuted for the weapon case at the Wynne Unit, which is separate and apart from the weapons cases he obtained in Telford Unit, to which he did receive sentences --

A.  Something.

Q.  -- that would be a benefit conferred on the inmate?

A.  What would?

Q.  If he didn't get prosecuted for a weapons charge because of his cooperation in the Dickerson murder.

A.  It is a benefit per se because he didn't get time for that; however, he could have gotten the same benefit by us prosecuting him and running the sentence cc with the other two, so there's many things we could have done that would have benefited him and still indict him for that weapons case, so that's not the only benefit he got out of the deal.

Q.  But the fact is he was never indicted for the

Page 103

weapons case out of the Wynne Unit?

A.  To my knowledge, no, sir. My input would have been not to indict him.

Q.  And because your input would have been not to indict him because he provided you valuable information in the Dickerson case as well as understanding the structure of the Texas Mafia?

A.  And at the time continuing to help us. I would do anything I can to break down that gang, yes, sir, I would within the law.

Q.  I'm going to show you Exhibt Deposition Exhibit No. 19 and ask if you can identify that document.

A.  It's a letter from Bruce to me, Bruce Innes to me in 1999.

Q.  And Deposition Exhibit No. 17 is a letter from Mr. Innes to you?

A.  19?

Q.  I'm sorry, 19.

A.  Yes, sir.

Q.  And can you tell what date that letter is?

A.  He wrote July 7th, it looks like '99.

Q.  What is the substance of that letter?

A.  Let's see, he said that he got my July the 1st, '99 letter delivered properly and not opened.

Page 104

See, the prison won't open mail that comes from any legal source, you or anybody else. That's called legal mail.

My grievance was answered, which I don't know what grievance he's talking about, where he says in this paragraph "but I'm not going to do anything detrimental to my sentence." In a letter prior to this, I told him what I said a few minutes ago: If you do something bad we're going to come after you, you know, telling you to behave.

So he's saying like what makes you say that or why would you think I would be bad or do something wrong, what is that about. So he said that he hasn't been contacted by classification about a request for a transfer. He's asking me to make a call to facilitate the transfer.

Q.  We talked about that, that may have been helpful; it might not have been helpful.

A.  Sure, yeah, sure. Because if I told him, I did it.

Q.  But just an inmate requesting transfer --

A.  Sometimes that works out sometimes, but back in this time frame I can't say. Sometimes an inmate with a legitimate request does get transferred. It would have looked nicer or better, more professional

Page 105

1 for us to request with a reason, yes, sir.
2  Q. So he was seeking a transfer to another unit?
3  A. Yes, sir.
4  Q. And can you tell what unit he was on at the
5 time?
6  A. According to the envelope, it was written
7 from the Ferguson Unit.
8  Q. He also expressed concern that the deal that
9 he received on the weapons charges or that they were
10 talking about giving him was not what he understood it
11 to be.
12  A. Is that this letter? I think that was a
13 previous letter.
14  Q. And your testimony is you would have had no
15 input as to what would happen in those cases, the
16 Telford weapons cases?
17  A. Yes, sir, but I want to clear something up,
18 that one you just referred to about not getting the
19 deal he thought he was going to get was written after
20 he was transferred to the Wynne Unit, and it looks like
21 several months after the letter we're talking about
22 right now, Exhibit No. 19.
23  Q. Did he ever express to you that he wanted to
24 go to the Wynne Unit?
25  A. I don't recall.

Page 106

1  Q. If he had done that, you would have sought
2 that recommendation?
3  A. If there was a unit that he preferred, I
4 would have put that in my letter, he preferred this
5 unit.
6  Q. Again, back to the letter where he's
7 referring or expressing some concern that the deal on
8 his Telford cases was not what he understood it to be,
9 as I understand your testimony, you had no input into
10 that?
11  A. You mean the deal he got in New Boston?
12  Q. Yes.
13  A. Right. I believe all of that was done before
14 I came into this case. If it was not, then my input
15 would have been to do something, you know, agreeable to
16 him or for him in this situation, but I don't know if I
17 had any input into that.
18  Q. I'm going to hand you Deposition Exhibit
19 No. 20 and ask if you can identify that document.
20  A. Okay.
21  Q. And what is Deposition Exhibit No. 20?
22  A. 20, it's a letter from me to Bruce Innes,
23 July 12th, 2000. He's at the Wynne Unit, and I'm
24 telling him I have made effort toward getting him
25 moved, and I'm telling him they're supportive of my

Page 107

1 asking for particular units, but I do ask. If he has
2 one that he wants to go to, I will ask. I heard about
3 problems between he and Eason, and I assume it's from
4 that other letter that you showed me a while ago, and
5 actually I'm telling him that no matter what Eason is
6 bragging about to other convicts, for lack of a better
7 term, the nut cutting is when you get on that witness
8 stand and you face the Texas Mafia and you start
9 testifying. Now your heart is really showing. So
10 that's what I'm explaining to Bruce. I'm telling him
11 that if you're trying to manipulate us once you get on
12 that witness stand it'll become evident.
13         And I tell him what I tell all inmates. I'm
14 going to try to do what is right. I don't care the
15 race, I don't care the person's station in life, if
16 he's killed we'll try to prosecute the killers if it's
17 right.
18  Q. Deposition Exhibit No. 18 indicates that
19 Mr. Innes had told you that he preferred housing at the
20 Wynne Unit; is that correct?
21  A. Yes, sir.
22  Q. And he was ultimately moved, in fact, to the
23 Wynne Unit?
24  A. Yes, sir.
25  Q. I want to show you Deposition Exhibit No. 21

Page 108

1 and ask if you can identify that document.
2  A. I know it's a letter from Roy Smithey to
3 Sammy Buentello.
4  Q. Why would you have a copy of that in your
5 file?
6  A. We sometime in the last several years,
7 obviously before November 6th, 2000, our office policy,
8 unwritten policy became that any requests for inmate
9 transfers especially for safety purposes or to get
10 inmates -- see, sometimes we move inmates closer to us
11 as we get ready for trial to go to talk to them. I
12 can't go to Amarillo all the time or Fort Stockton. So
13 any request, Royce Smithey -- with an E-Y -- he's our
14 chief investigator, we're supposed to go through Royce.
15 Royce will call the classification people, and it's
16 just to give it where there's one person doing all of
17 it. In other words, I make my request through Royce to
18 them. The people in Amarillo make a request through
19 Royce. It was to streamline it, so he sent me a copy
20 showing that, yeah, I did the letter.
21  Q. So classification does honor SPU's request
22 regarding transfers to different locations on a routine
23 basis?
24  A. Well, no, it's not routine. It's better now
25 that Buentello is gone, but it's not routine. It never

Page 109

1 has been routine, but it was our policy to go through
2 Royce to make the request, and sometimes they have been
3 granted.
4 Q. And in the Deposition Exhibit 21, you're
5 enclosing or Mr. Smithey is enclosing at your request a
6 list of inmates that testified in either Canales or
7 Speer's trial or I guess actually Canales' trial.
8 A. Yes; and Sammy told Royce that he would
9 review each inmate individually to see if it could be
10 done.
11 Q. But Mr. --
12 A. That doesn't say it's my request or his
13 request. It says here's the list of inmates.
14 Q. Well, he carbon copied you.
15 A. Sure. I would have asked Royce to write the
16 letter, but the letter doesn't say A.P. asked me to
17 write the letter.
18 Q. But you know for a fact that you would have
19 asked him to write the letter?
20 A. Oh, yes, yes, sir.
21 Q. So it would have been Mr. Smithey working on
22 your request?
23 A. I had to go through Mr. Royce to make the
24 request, or I would have done it myself.
25 Q. For someone in classification to house the

Page 110

1 inmate witnesses according to what their desires were.
2 A. Yeah. Royce actually wrote down the request
3 that the inmate made for Buentello to look at to see if
4 it could be done.
5 Q. And Mr. Innes requested that he be placed in
6 P.C. segregation or protective custody segregation if
7 he could not be placed in general population?
8 A. Yes.
9 Q. An Inmate Driver requested to be transferred
10 with Inmate Canida and stay at the same unit as
11 Mr. Canida?
12 A. That's what his request was.
13 Q. And the last sentence of Deposition Exhibit
14 21, does that indicate that all the requests were
15 approved by Mr. Buentello with classification?
16 A. Yes, sir, it does.
17 Q. And with regards to these particular inmates'
18 requests as to which units they want to go to, do you
19 know whether that was for safety or for personal
20 reasons or a combination of both?
21 A. I think it says on there, like one person
22 said for safety, and I think they've said what their
23 reason was.
24 Q. Okay. Well, show me that.
25 A. Right here, protection, protection,

Page 111

1 safekeeping, to be protected.
2 Q. So if they didn't indicate either protection
3 or safekeeping, perhaps the inmate had some other
4 reason they wanted to be at that particular unit?
5 A. I believe Doyle Hill was from the Houston
6 area, and he was going to parole in 57 days, so his
7 request was to be housed near the Houston area. Of
8 course, he would have paroled out of Huntsville, but
9 for some reason he wanted to go to Houston.
10 Q. Now, there was a time where -- again I don't
11 know anything about prison stuff, but do they always
12 parole out of Huntsville?
13 A. They could here lately be paroling out of
14 different places. I don't know that to be a fact. I
15 think the females might be. I'm not sure. But
16 generally speaking, they all leave out of the Walls
17 Unit downtown.
18 Q. And there was at some point in time parole
19 absentia where they parole out of county jails, that
20 sort of thing?
21 A. Yes.
22 Q. Now, with regards to Mr. Innes, he didn't ask
23 for protective custody, he asked to either be in
24 general population somewhere close to Austin. I guess
25 that's where he's from.

Page 112

1 A. Well, he asked for protective custody if he
2 could not be in general population. I think he's from
3 Austin.
4 Q. In fact, have you visited with Mr. Innes
5 after Mr. Speer's trial?
6 A. I believe Mr. Mullin and I both saw him. We
7 were working a murder case at the Hughes Unit several
8 years ago, and I believe we both -- I know I have seen
9 him, and I think Mr. Mullin and I both saw him.
10 Q. How many times would you say you've seen him
11 after Mr. Speer's trial?
12 A. All I recall is that one time. If there's
13 more, I'm not denying it, but all I recall is that one
14 particular time.
15 Q. Is that an occasion where you visited with
16 himself, or was Mr. Mullin there?
17 A. Like I said, I think Mr. Mullin was with me,
18 I'm pretty sure.
19 Q. Did you ever receive any gifts from
20 Mr. Innes?
21 A. I believe he made me a wallet or something.
22 I didn't use it. I gave it to some person. I didn't
23 take possession of it.
24 Q. Perhaps a wallet and a belt?
25 A. No, I never got a belt.

Page 113

Q. Do you know if that was after Mr. Speer's trial?

A. I'm sure it was, yes, sir.

Q. Now, with regards to SPU's policy when they have inmate witnesses or a number of inmate witnesses that are going to testify in a particular trial, do y'all try to keep them separated? In other words, you don't want to pile all of your prosecution witnesses in one room, do you?

A. No, sir. I mean, sometimes in the courthouse they put them in the same room. That's not policy per se. We don't have a written policy about how to handle inmate witnesses that I know of. When we have several inmate witnesses, like I said, we'll try to get them where it's easier for us to get to them day by day or as we need to talk to them, but we don't ask for them to be housed in the same cell or even to be able to communicate with each other. Sometimes a prison in their own wisdom will transport them all on the same van or bus, and that is not according to our request. Our request is to keep them separate from defense witnesses for obvious safety reasons. So if I answered your question, I don't know, but we don't ask for them to be put together.

Q. Well, I guess my question is, in a perfect

Page 114

world you would prefer that even the State witnesses not be together --

A. Sure.

Q. -- and communicate?

A. Sure. Mr. Mullin, I've seen him hundreds of times, many times tell them: Don't talk about this case, you know, amongst yourselves and especially when they end up at the courthouse together, don't talk about this case. So like I said before, we don't gain anything by them cheating or by us cheating. So I know it's his course of business to instruct the witnesses not to talk.

Q. And the reason you don't want the witnesses to talk to each other is you don't want them comparing notes and fabricating.

A. It's not fair, it's not fair.

Q. I'm going to show you what's been marked as Deposition Exhibit Number 22 and ask if you can identify that document.

A. I believe I recall this is so long, unusually long. It's from Larry Whited to me. And, yeah, when I saw one of y'all's briefs it talked about me -- about Larry Whited telling me that he rode a van to the hospital with Bruce Innes, and he's saying, don't worry, we didn't talk to each other on the van about

Page 115

the case, and he writes "smile" after that. And y'all's accusation was that they did talk about the case and it was all at my behest. That's how I took it.

Q. Well, no, I don't think anybody was indicating it was at your behest.

A. It sounded really bad the way it was written down.

Q. But you can understand that if he says, "we didn't talk about the case on the way down there, smile," that --

A. Yeah. It's like to me it says, don't worry, A.P, we didn't talk about the case like you're always telling me to do, see. So the reason he wrote smile, I had no control over that. It would have sounded much better without the word, but he's a convict. But anyway, be that as it may, when I read y'all's charge against me in that brief, I immediately thought, hey, here's proof that I tell these guys let's do it the right way or why would he have said that to me, see, if he had never heard that from me.

So I would point to you, point out to you that I have no control over who goes to the hospital. I had no idea they were going to the hospital, and I certainly can't tell them: Put these guys on a van and

Page 116

take them to the hospital. I found out when I got the letter from Larry, and I would point out once again he did not testify. If Bruce Innes has told him anything about the trials, it didn't flavor the trial at all because the jury never heard from Larry Whited. And I can't explain to you why he wrote that to me with a smile in there, but I like the fact that he knew not to talk about the case, and he knew that from me or from Mark or both of us.

Q. Now, with regards to Deposition Exhibit No. 22, can you tell us whether it made it into the SPU prosecution file prior to the time of Mr. Speer's trial?

A. I'll try to tell you in just a second.

Q. And while you look for that, you understand from a defense perspective any opportunity that an inmate has had to get together and compare notes would be something important for cross-examination?

A. Yes, sir. Yes, sir. Now, this is in the SPU case file, and I cannot tell you when this file got into the box. That's my handwriting, and I'll point out it's a letter-size Manila folder. I just happened to notice that this is a letter-size folder.

Q. It is a letter-size folder, which to you indicates it's probably not Mr. Mullin's because he

117

1 typically as a general rule uses legal-size folders.
2    A.   Legal size; and I do acknowledge that. I'm
3 not trying to hide that from you at all, and that is my
4 writing on the tab.
5    Q.   And the tab says?
6    A.   "Letters from inmate witnesses to SPU,
7 Telford murder case."
8       Now, to the best of my knowledge or my
9 recollection, the way I labeled this file indicates to
10 me personally that it would have been in our case file
11 because if this would have been my personal file I
12 wouldn't have had to write a label, certainly not
13 something that clear because I would know what it is.
14 I could look through there and say, Oh, these are the
15 letters about the case. So I can't tell you that. I
16 can't tell you one way or another, but I believe they
17 were in the case file just by virtue of the way the
18 label is written.
19    Q.   Now, with regards to whether that file ever
20 went to New Boston during any of the pretrial
21 proceedings, can you tell us whether it would have or
22 not?
23    A.   I can't tell you if it ever went to
24 pretrials. I can tell you that it probably did make
25 its way to New Boston because when I had to go to the

118

1 Telford Unit up there to talk to witnesses I would have
2 wanted my notes and my letters to say, hey, I'm A.P.
3 Merillat, you wrote me a letter. So they wouldn't just
4 say, no, I'm not talking to you. I would say, you
5 wrote me a letter, let's talk about that letter. So I
6 don't know if it made it to pretrial, but I'm sure it
7 made it up to New Boston.
8    Q.   Just so I'm clear that I understand your
9 testimony, anytime that you would have gone into the
10 prison to visit with the inmates, you probably would
11 have taken the file with you to compare in contrast?
12    A.   I would have taken certainly parts of it. If
13 there was an inmate in the Ferguson and I'm going to
14 the Telford, I wouldn't believed I had to take it
15 but --
16    Q.   But when you went to pretrial, which would
17 have been at the courthouse in New Boston, you don't
18 know whether you took that file with you during any
19 pretrial proceedings?
20    A.   I don't recall independently, no, sir.
21    Q.   We've talked about Deposition Exhibit 23
22 before, but I just want to go through it again just to
23 make sure the record is clear. That is, I guess, what?
24 What is Deposition Exhibit 23?
25    A.   It's typewritten and I don't know if I typed

119

1 or Royce or somebody else. I don't recall who typed
2 this, but it's inmates that testified for us in the
3 Canales case, and then also there's, I made or whoever
4 made this made a note that he didn't testify but he
5 cooperated, and that being Larry Whited. Then it talks
6 about a November 6th of 2000 letters to the parole
7 board were written for each of them and then letters to
8 Sammy Buentello for Innes's gang renunciation. I think
9 I typed that. I'm just not sure.
10    Q.   What was the reason for typing Deposition
11 Exhibit 23? Was it an attachment to a letter, or what
12 do you think?
13    A.   I don't know. I see that it was attached to
14 something else because of the dog-ear right here. I
15 don't know why it was typed and not handwritten. I
16 have no idea.
17    Q.   It also indicates that you wrote a letter to
18 Sammy Buentello on November 6th, 2000 for Innes
19 regarding his gang renunciation?
20    A.   Yes, sir.
21    Q.   And then the last sentence says that copies
22 made of the above, one for each inmate, one for the SPU
23 file.
24    A.   Yes.
25    Q.   And your understanding is that you would have

120

1 made a copy of all of the letters, parole letters and
2 put them in the SPU file?
3    A.   Yes, sir.
4    Q.   With regards to the letter from Sammy
5 Buentello, would you have also made a copy and put it
6 in the file?
7    A.   Yes, according to this note, I would have,
8 yes, sir.
9    Q.   I'm going to hand you what's been marked as
10 Deposition Exhibit No. 24. Before I do that, I notice
11 that you're referring to some documents during your
12 deposition.
13    A.   Yes, sir.
14    Q.   And what is that document?
15    A.   I made notes to myself after I read the
16 brief. Again, I don't know if it was the Canales brief
17 or yours, but I made notes of things that I hoped would
18 be addressed, and one of them was right off the bat
19 about the blanket statement that all gang members are
20 seg. I made a note to myself to make sure you knew
21 that was not true, and I made a note about the hit on
22 Larry Whited, that that's a brand-new case that had
23 nothing to do with the guilt or innocence of Canales.
24 It's things that I want to make sure that if I get the
25 opportunity to people up beyond us know.