A. I recall a visit where we took documents, we took our case file to them, and I think they copied them at their offices. It's just too voluminous for us to do and mail, and I don't remember if it was Speer or Canales. I don't recall, but I don't even remember which lawyer it was, but I remember going to Texarkana with our case file and having copies made. So I don't know. I don't know if there was a mailing of documents or not.

Q. And again, if you don't know, that's fine. I'm just trying to be clear on it.

A. Well, I want to remember.

Q. Regardless of how you handled discovery in Canales' case, I want to focus in on Speer.

A. Yes, sir.

Q. Would there have been an initial discovery response by your office?

A. Well, to the best of my knowledge, but as I recall there's -- I believe we used what's called an omnibus order for discovery, and that's about the open file policy, and Mr. Mullin can address that better than I can. Sometimes I'm there when discovery is made, sometimes I'm not; but I do recall bringing our case law to some lawyers in Texarkana. That's the best I can remember.

Q. Now, Mr. Whited in connection with the Canales/Speer case, who was he and why was he important?

A. Larry Whited was a Texas Mafia member, and I don't recall his rank or his function in the gang, but he had knowledge about the Dickerson killing. I don't remember. I can't remember how important he was, but I do remember he didn't testify for us.

Q. And that was my next question. Do you recall why Mr. Whited didn't testify at trial?

A. No, I don't, I sure don't.

Q. I'm going to hand you Deposition Exhibit Number 11 and ask if you can identify that document.

A. Yes, sir.

Q. And what is that?

A. This is a letter from me to Sergeant Burson, who is the gang intelligence officer at the Wynne Unit, dated March 13th of 2000. There is my letter to Sergeant Burson referring to Bruce Innes's letter to me about Canales' threat against Larry Whited, who was called Bam. That's his gang name -- I mean, Iron. I think he was called Bam also.

And I'm telling Sergeant Burson once again if he gets letters back and forth that doesn't mean he's still trying to be in the gang.

Q. I'm going to hand you what I'm going to mark as Deposition Exhibit No. 12, and does that appear to be a letter from Mr. Innes dated March 6th, 2000, which caused you to generate Deposition Exhibit Number 11?

A. This looks like he's wanting me to write Sergeant Burson to talk about why he's getting mail to and from the gang.

Q. And that the mail that he's receiving from the gang is preventing him from going further in his deconfirmation process?

A. On the face of it, it sounds like they're doubting their sincerity because he's getting mail back and forth, so he's asking me to write Sergeant Burson about the situation.

Q. I'm going to hand you what's been marked as Deposition Exhibit No. 13 and ask if you can identify that document.

A. This is another letter from Innes to me, June 4, 2000.

A. Okay.

Q. And that letter refers to an issue involving a person nicknamed Iron?

A. Yeah, which would be Larry Whited, yes, sir.

Q. And he indicates that -- Mr. Innes indicates that he had written you concerning that issue and never

heard back from you?

A. Right. He's insinuating that I ignored his letter, and actually he says, "If you could take the time to come across the street and come see me, you know, we could talk," which that was his version of the facts. There's reasons I can't go see him all the time, of course, and he didn't understand that; but, yeah, he's talking about some updates on gang business, some of the leadership and he's talking about, he says he wrote Canales about the issue of taking Iron out, which would be Larry Whited, and sent it to you to mail out; and I don't recall ever mailing a letter from Bruce Innes to Canales. I'm emphatic about never doing that. I don't recall that at all.

Q. And he's also expressing concern in Deposition Exhibit No. 15 that perhaps Canales and the others may know that he has a defense -- I'm sorry, a prosecution witness?

A. Who? Bruce Innes?

Q. Yes.

A. That Canales might know he is one?

Q. Yes, because the witness list had been released.

A. I guess you're talking about in the Speer case.

Q. Either, either Canales or I suppose it would have been Canales.
A. We haven't had Canales yet. Can you show me where the witness list part is?
Q. You can read these better than I can.
A. It must have stuck in your brain somewhere. I don't see it in that letter. "I'd like to ask if there is any witness list or evidence been made available," so he's asking if there's a witness list.
Q. And whether that's been disclosed to Mr. Canales?
A. Yeah. He's asking me if it's been done, which I don't know if it has by that time or not; perhaps.
Q. Who was Lonnie Eason, and what was his connection to this prosecution?
A. He, I don't recall if he was a confirmed gang member or not, but he did have -- he was a potential witness for us. He had information about the killing that we thought was important, and I can't recall what it was at this time, but I know he later turned on us and turned against us and he didn't help us. That's why his name sticks out, and I've had a lot of correspondence with him.
Q. I'm going to hand you what's been marked as

Deposition Exhibit 14 and ask if you can identify that.
A. Yes, sir. This looks like it's in response to that one we just talked about, about me coming across the street to see you. The Stiner information, Gaylord Stiner is some official in the Texas Mafia. I can't recall his exact rank, and he's obviously told me something in his letter about Stiner, and I told him I don't think there's a witness list yet, we're waiting as long as we can before we absolutely have to give it up for safety reasons. I don't apologize for that at all.
Q. So for safety reasons and the fact that you didn't want to plug the flow of information from other Texas members.
A. I would not want to stop the flow. I don't know if that's why Mark didn't give up the witness list. I'm not in charge of giving up the witness list. I'll prepare it, but I think it's good business to wait until we absolutely have to, I really do, and I'm already suspecting Lonnie Eason's motives, according to this letter to Innes. I just don't recall --
Q. Do you recall why you were suspecting his motives?
A. No, sir, I don't, and I don't even know what he knew. That's why I don't recall why he was

important to us. Then I'm just telling him where I've been and why I haven't written back to him in a long time.
Q. Now, you indicated that Larry had his own problems?
A. Yes, sir.
Q. Do you recall what that was about?
A. No. I know that he was getting threats. I know he has physical problems, I think his liver or something like that. I don't recall, but I know he has physical problems, and there were some family problems that I don't recall. He was a miserable man. I don't remember everything about it.
Q. I'm going to hand you what I've marked as Deposition Exhibit No. 15 and ask if you can identify that document.
A. It looks like a letter purporting to be from Lonnie Eason to me about Bruce Innes.
Q. And I'll give you a little time to refer to that, but would it be fair to say that the gist of that letter is Mr. Eason telling you that Mr. Innes is not being true to his word in really seeking deconfirmation?
A. Yeah. Now, this is July the 9th, 2000, and Eason is trying to warn or inform us that Innes is

probably not sincere in his help with us or his deconfirmation process.
Q. Why would -- in your opinion, why would Mr. Eason be telling you that information?
A. In my opinion it's because he wanted to remain with the TM if he was one of them, and he's trying to, it sounds like he's trying to make, make that known verbally where people can hear him say things that would make other inmates think that he was not a part of us; and by exposing Bruce Innes as a part of us, for lack of a better word, he's gaining the trust of other inmates is what I glean from this.
Q. Or that Mr. Eason is trying to up his status with your office and become, I guess, for lack of a better word the Number 1 informer.
A. Yeah. He wanted to, I think he wanted to manipulate us to better his situation, and I think, I think there was something about he lost his glasses, or he lost some property, and I helped him get it back, as a matter of fact. Even after he turned his back on us and we found out that he was not square with us, I continued to do what I told him I would do. I believe I wrote a parole letter for him, and I did help him get his property back because that's what I promised him, and that's what I did.

Q. And when you're receiving information with regards to inmates that are working for your office, for lack of a better term, is there sometime some competition among those inmates?

A. It's happened, yes, sir.

Q. And why is that?

A. If they don't -- well, I can only assume, but if they don't think they're getting help fast enough or as much help as somebody else might get, they would perhaps feel like they needed to compete to get more help or help faster.

Q. And that's why these inmates give the information in some form is to receive some benefit?

A. No, sir, I totally disagree with that, I do.

Q. What's your opinion on that subject?

A. It's a heart issue to me. I've worked all or part of 156 prison murders since I've been here, and that's including the Randy Payne case where 20 inmates stomped another inmate to death. We indicted 20 prison inmates for one murder case in Polk County. The only witnesses to that case were prison inmates, no guards, no anybody, just prison inmates.

Using that as an example, there's no way in the world our office could have successfully prosecuted over 150 prison murders if we were known to make up

stories, to manipulate inmates, to make promises we couldn't keep or to offer things that there was no way in the world that could be given to them. And me personally I can't get promoted. I can't get more money. I can't do anything by winning cases. Winning cases, it's not me; it's the prosecutors, of course, so there's no motivation for me to try to goad an inmate into helping us. If we lose a case, if a case doesn't get indicted or if we dismiss a case out-and-out, it doesn't affect my job. And for 20 years I've been here, there's no punishment to me for losing a case. We've lost cases, we really have.

So when I go into preparing a case for trial and I'm talking to go an inmate, potential witness, say Bruce Innes or anybody else in any number of murder cases, I'm always up front about who I am, who I work for. And one of the first words out of my mouth is I can do nothing for you, I cannot do anything for you. If I did anything else, we would never have won a case. We would never have had a witness because that word would get out very quickly.

So when I talk to inmates and I want you to know that if I talk to 20 inmates there might be 18 of them who will not help, absolutely refuse, and so if I was to promise, make all of these promises that I was

accused of in these briefs that I read -- really, really touched me deeply. If I made the promises that I've been accused of, the two inmates who testified for us would supposedly have gotten all of these benefits and the 18 would have got nothing. Well, that's totally not true because there are inmates who don't testify for us and they're fine. And there's inmates -- and I'm glad we have them on the Eason issue -- because there's inmates who turned their backs on us and totally went against our office, but I promised him a parole letter, I wrote it and I helped him get his property back, and I've had communications with him for years since then, and I've always been up and up with him.

So the fact that we write parole letters does not, does not make inmates testify for us. I'll write parole letters on an inmate I meet that has nothing to do with the prison crime but I think he's in dire circumstances and deserves a fair shot, I'll write that saying here's a guy and here's his situation, here's why I think you should be aware of what I'm telling you about him. And contrary to what you guys accuse me of, there's no link in the knot, and the parole board doesn't even know me. I can't even tell you who the members are. There's no link in the knot when I write

a parole letter. I write a letter saying this inmate gave us important information, we think you need to know about it, if you have any questions call me. And I don't apologize for doing that. If I'm ordered by my boss to stop, I will, but I've never been. She's written parole letters also.

Q. The letters that you write you write on SPU stationery?

A. Oh, yes, sir, I sure do. I do it as a representative of our office because I'm nobody even with our office and without our office, I'm really nobody, so why would they listen to me? But I think it's important that if I tell an inmate, not if you help us I'll write a letter, but because you've helped us and cooperated I'm going to write a letter.

So there's no prefacing an inmate coming to testify with, hey, if you helped us I'll write you a letter. No, sir, that does not happen. It's I would rather know the guy is telling me the truth. I don't want people getting up there and lying. I could probably make them lie by making these promises. I don't do that.

I'm probably being disjointed. I apologize for that, but this is a passionate issue for me. I would point out to you and the others who have accused

me of terrible things, nobody in 20 years has ever been paroled because I wrote a letter for them, and if somebody has I don't know that. Nobody has come up and said hey, A.P, guess what, I got paroled because you wrote, I don't know of that ever happening.

So, no, sir, inmates don't help us because they've been promised something. Inmates help us because I think something clicks within them, you know, it's time to do the right thing; and thank the Lord they do that, some of them. Some of them don't. Some of them tell me to get screwed and take a walk.

Q. Now, you testified at Mr. Speer's trial, correct?

A. I don't recall. I probably did, I probably did his fingerprints. I'm not sure.

Q. Do you understand that regardless of what your thoughts are concerning these parole letters that a jury or a fact-finder might imply different thoughts upon reading those parole letters?

A. No, sir. I believe that the letters are so basic they speak for themselves: Here's the information, here's the truth. I mean, it could be disproven if I've written a lie in the letters. Here's the truth, you folks on the parole board use this if you can, if you want to. If you don't want to, fine.

I'm not telling them one way or the other, and if you have any questions call me, which they never do. So, yes, a defense lawyer can take that and could skew it; and a prosecutor could take that and skew it as well. So a juror sitting there figuring out which skew to listen to, and I can't speak to what jurors believe because I don't know. I know they're all different. But if I testified about parole letters in the Speer trial, I don't recall that. I'm not saying I didn't. I just don't recall that.

Q. But there would have been parole letters in Mr. Speer's case because you had already had Mr. Canales case?

A. I believe that to be correct.

Q. And assuming that those parole letters were not turned over to the defense, do you see that that could have been important? The jury would have been deprived the information that you had sent those parole letters on those inmates' behalf?

A. No, sir, I don't believe that and here's why, because if I testified that I wrote parole letters the jury now knows. I believe if it's that important the defense should have said, well, where are they, let me see your copies. Which they could have had because; like we've talked about earlier, they're available. I

don't know which box they were in or something, but they were available.

Q. If they asked -- well, I want to clarify that point. If the parole letters were in your maroon folder, you've already testified that you considered that work product and would not have been delivered to the defense?

A. I'm sorry that I clouded that up. I don't think a parole letter is work product. I think like these notes here are that we've talked about where I'm talking about witnesses in a new case on Larry Whited, I think that's work product. I don't think a parole letter is. So barring knowing where to keep parole letters when I write them, I put them either in my binder, in a folder, in a case box, in a drawer. I don't have a particular policy where I keep them, but if I'm testifying about, yes, I wrote parole letters on these inmates and the defense said give them to me, I'll give it. If they'd have said at pretrial, I would give it to them. I have no reason -- if I'm going to testify to it, why would I hide it? I mean, I'm telling the folks it's there.

So, no, sir, that's not work product, and maybe I'm wrong, but I don't think it is work product.

Q. Doesn't that presuppose that someone has made

the decision for you to testify during the Speer trial?

A. Somebody has what now, presuppose?

Q. What I understood your testimony to be is that if you testified I wrote parole letters then what's the big deal because I testified there were parole letters.

A. No, not what's the big deal. What's the big deal that you're making of it that, well, if you are testifying to it why didn't you hand it to the defense lawyer to testify to it. That's the lawyer's call. That's not my call. If I'm testifying to it and the defense attorney says show it to me, I will. I won't try to hide it or say, well, it doesn't exist. Well, here it is because I believe that bolsters what I'm saying because the letter is so generic, I think -- well, I don't know why defense lawyers do what they do, but I think a jury reading a letter I had written and I just testified about bolsters what I say.

Q. And what I'm asking you is that if a determination is made that you not testify in that case do you not tell the defense we have these parole letters?

A. That's incorrect in the substance of it. If I don't testify -- and I still don't recall testifying in the Speer's case about it, but if you tell me I did

I'm going to believe you.

Q. Well, again it gets foggy to me too because I've looked at them both.

A. **I don't know.**

Q. So I'm not for sure, but what I'm trying to get at is --

A. **I hope I did.**

Q. -- if you didn't testify, would you have necessarily have delivered the parole letters to Mr. Speer's trial counsel?

A. **With those parameters, if I did not testify the defense knew I wrote parole letters because somebody asked our witnesses, be it Mr. Mullin or the other guys. Our witnesses, I remember Bruce Innes getting on the stand in "What has the State done for you?" And I remember in their close that they hammered the fact that they were accusing us of paying for their testimony, not just in parole letters, but they made us sound like we were actually paying and they were getting good things. Bruce Innes hadn't gotten a good thing yet that I recall, that I know of. I hadn't seen him in a pretty good while.**

**So if I did not testify, the defense regardless of that fact knew that there were parole letters written, and they also knew that after Speer's**

**trial there would be parole letters written, so I don't want it thought that that was hidden from anybody. It's not hidden.**

Q. But it may not have necessarily been turned over to them.

A. **I don't know. I don't know if it was a part -- well, it couldn't have been discovery prior to it because they weren't written yet.**

Q. Now let's back up though because I want to make sure, and again I may just be misunderstanding this.

A. **And I'm simple.**

Q. But you have Canales' trial.

A. **Yes, sir.**

Q. And from what I understood your testimony to be is that after that trial was complete you wrote parole letters on the witness's behalf during the Canales trial?

A. **Well, you know what, when you put it like that I need to see the dates on my parole letters, I guess. Maybe I waited until after Speer's.**

**This says November the 6th, 2000. I wrote letters to the parole board for each witness and also Sammy Buentello, so November of 2000 I would have written them.**

Q. So that would have been after Canales' trial but before Speer's trial.

A. **There you go, that's right.**

Q. And the question is, did you provide those letters of November 6th, 2000, to Mr. Speer's trial counsel?

A. **Well, I didn't personally give them to the lawyers, but they went into our active case file, the parole letters.**

Q. Maybe, maybe not.

A. **No, sir, I wouldn't have said it if I didn't do it, especially in that note that I wrote so many years ago never knowing this was going to happen.**

Q. Okay, I see what you're saying, and we'll get to it, and I don't want to rehash it, but we'll get to it in a minute. It says, "copies made of above, one for each inmate, one for SPU file."

A. **Yes, sir. So, in other words, not only do I write it to parole, they have copies, the inmates get a copy, and then our file gets a copy.**

Q. And when you reference the SPU file --

A. **I'm talking about the case file, no longer my file.**

Q. Okay, no longer your maroon folder or Manila folder that you keep for yourself?

A. **Absolutely, or the maroon folder after that second trial would have gone in these boxes; but according to this they went into the boxes. I'm so glad you showed me. Thank you.**

Q. Now, once the parole letters make it into what we're going to call the SPU file, which would be the file that Mr. Mullin kept in his office or near his office, whether that file was made available to the defense team by actually taking the file to New Boston, can you answer that question?

A. **No, I can't, I can't.**

Q. And so it's your position that and correct me if I'm wrong is that with the exception of your maroon folder and this Manila folder that you kept with you because of things you considered work product, if the defense had traveled to Huntsville they could have looked at any of the other documents?

A. **Yes, sir, because I called one of the lawyers I can't remember which one, I made a note of it too that I called them, said I'll be in Huntsville all day because they were coming here for something; if you need to see anything, I'm here, all the stuff is here.**

Q. And I guess what I'm real unclear about and maybe this is better for Mr. Mullin is, how did they get the initial information?

A. **Who?**

Q. The defense team, how did they get the witness statements, the interviews?

A. **I don't know, sir.**

Q. But you would agree with me that being released from ad-seg can be a benefit?

A. **Yes, sir, I do.**

Q. And I guess with regards to closed custody there are two ways to look at that: One, a person might want to get out of closed custody so that he can get back and mingle with the general population?

A. **Get out of closed custody?**

Q. Yes, sir.

A. **Yeah, you'd want to be out of close. I'd rather be in ad-seg than in closed custody.**

Q. Why is that?

A. **Because the bad inmates who have not quite been found out to be bad enough to be in ag-seg are all in closed custody, and that's why we have so many problems. A lot of our assault cases and murders, weapons cases come out of closed custody because they're bad, uncooperative, incorrigible inmates. They just haven't gotten bad enough yet to be in ag-seg, so I'd rather be in ag-seg where I'm by myself 23 hours a day than closed custody. I'd rather be in general population or medium custody or minimum.**

Q. Right, and I guess it cuts the other way to some extent is that you may be an inmate, for lack of better words, may be a 98-pound weakling in general population and that individual might prefer to be in closed custody or ad-seg.

A. **Absolutely not, no, sir. I could just quote you many problems where weak inmates have been in close custody and become victims. They would be tossed around like rag dolls, and that just happened. We just come off a trial where that was the situation. A weak inmate does not want to be in close custody because the people who have gotten there have earned their way there through usually violence, and they're tough, bad inmates, bad, bad-acting inmates.**

Q. Would you characterize Mr. Innes as being a weak inmate?

A. **No, sir. He has health problems too. I forget what they are, but I know they're serious, but when I met him he was pretty stout, and he was some kind of, not enforcer, but some kind of -- a guy who used force to keep the gang running smoothly; in other words, he was a tough guy.**

Q. Muscle?

A. **Yes, sir, and able to fight. I think he was a fighter in the free world of some kind. So, no. They called him Kung Fu. That was one of his names, so he was pretty tough.**

Q. Were you aware that Mr. Innes had in his past refused housing so that he could be placed in closed custody?

A. **Well, no, I didn't, but I don't doubt it.**

Q. And why do you don't doubt it?

A. **Because he's a tough inmate and he was a gangster, so that's the kind of inmate that occupies closed custody, bad, bad-acting inmates.**

Q. But what I'm telling you is, did he ever tell you that he actively tried to get put into closed custody?

A. **I'm not saying he didn't tell me, but I don't recall the conversation or the words he used or anything, but I'm not saying he didn't say it.**

Q. And it could be that from his perspective or from any inmate's perspective closed custody might be better than being in the general population because you're not exposed to general population.

A. **I don't know why an inmate would prefer closed custody unless his unconfirmed gang member mates are in closed custody, he might want to be there then because you could get drugs, sex, anything you want in closed custody just like you can in general population or ag-seg. So from my limited perspective as a guy who wouldn't want to be in prison in the first place, I don't know why somebody would want to be in closed custody, but I'm not doubting that there are idiots who want to be in closed custody.**

Q. If Mr. Innes testified that he wanted to be in closed custody because it made it easier on him for whatever reason, you'd have no reason to doubt that?

A. **I don't doubt he would say that. I don't know why, but I don't doubt it.**

Q. I'll show you Deposition Exhibit No. 16 and ask if you can identify that document.

A. **No, sir, I don't know what this is. I really don't understand what they're saying. It's not a document of mine.**

MR. HENRY: Let her take a break.

(Break taken)

Q. (By Mr. Henry) All right. With regards to Deposition Exhibit 16, you understand this was a document that was pulled from the SPU file?

A. **No, I didn't, I didn't know it was, but I believe it was, I believe you.**

Q. And it appears to be some kind of security threat group correspondence?

A. **Yes, sir. It looks like there was a sticky on top of it at one time. I don't know this person.**

Q. But the sticky appears to be someone, perhaps a guard with TDC that is expressing concern as to why Mr. Innes would be in the process of being deconfirmed but yet writing a major in the Texas Mafia?

A. **Let's see, "According to Inmate Innes 07 screen," which is a screen classification he uses on terminal about his situation with the gang, he is supposed to be on the TM hit list. If he was, why would he be writing the district major a letter like this, and this says C03, so that's a guard named Heath. So what's your question?**

**They denied a letter from him to this person.**

Q. So what happened -- just tell me what happened based on your understanding of reading Deposition Exhibit No. 16.

A. **This one is hard to read. "Shockley's cousin, Shockley's cousin was here"?**

Q. Let me try it this way.

A. **You want to recap it for me.**

Q. I'm going to try to because again, I'm not clear what happened either because I don't understand what goes on in the prison, but this is my take on it, and tell me if I'm wrong, that Mr. Innes was writing a

letter to a major, a ranked major in the Texas Mafia, and the security threat group prevented that letter from going out.

A. **Yes, sir. I believe that's what happened, and I can't see the date. It says June 12th something, so I don't know when it was.**

Q. But the point of the guard was we need to be suspect of Mr. Innes because he's telling us he's trying to deconfirm, but yet he's still trying to write letters.

A. **Right. That officer is saying if he's on the hit list of the Texas Mafia why would he be writing this major. Oh, it's from the Wynne Unit.**

Q. I'm going to show us what's been marked as Deposition Exhibit No. 17 and ask if you can identify that document.

A. **It looks like Bruce's handwriting, a letter to me, spelled my name wrong. I don't know what the date, it's a Thursday, still at the Wynne Unit 10/7 of '99.**

Q. I'll let you read over that, but I just want you to summarize for me what you understand the purpose of that letter is for.

What's your understanding of what Mr. Innes is writing you about in Deposition Exhibit No. 17?

A. **He's telling me that he caught or what we call caught a new case, or he's been given a new disciplinary case, possible criminal charges, it looks like for what they're saying is a weapon, and he's telling me that he was trying to help a guy fix his radio or make a tool to fix his radio, a screwdriver, out of this shaft from his fan; and he's saying that when he tried to get rid of that tool that it was found out, which happens a lot. They know that's Bruce Innes's tool and could have been a weapon, probably looked like a weapon, I'm sure.**

**He's saying he has no reason to make a weapon. He's probably asking for me for help with this disciplinary case, but I didn't see it come to that in the letter because he moves over to the fact that he's been -- his lawyer has said that the deal on his weapons cases that are pending in New Boston is for 10 on one case and five on the other, and he's telling me that wasn't the deal; the deal was for three years and the weapons charge dropped. So all of that stuff is out of my purview. I don't have anything to do with that. I don't know what his plea offers were. As a matter of fact, I didn't know Bruce existed until later on in this case. So he's complaining to me that he thinks they're going back on what was promised to him**

**on the plea deal, plea agreement.**

Q. Let's focus on the first issue, the issue about this part from the fan. It's my understanding -- correct me if I'm wrong -- is that that would have been a new potential weapons charge that he picked up at the Wynne Unit.

A. **Could have been, yes, sir, could have been.**

Q. Sometime prior to October of '99?

A. **Well, yes, sir, I believe so, yes, sir.**

Q. And let's talk about weapons cases in TDC. Number 1, it's a big problem?

A. **Could be. Well, it could be a second-degree felony probably for Bruce or first degree. I can't remember how many enhancements he has; it could be. It could go all the way up to life stacked. So, yeah, it could be a terrible problem.**

Q. And from what I understand your testimony, it can be a problem twofold: One, it could be a criminal case, or it might be a disciplinary.

A. **Or both.**

Q. Or both.

A. **Yes, sir.**

Q. With regards to the disciplinary aspect, catching a weapons charge, what does that do to an inmate as far as the discipline?

A. The first thing that happens is they would put him in a special cell prehearing detention. He would lose immediately the housing that he's in, and he would stay in that transit status until he has a hearing, a disciplinary hearing, which could be soon, or it could be days.

And if an inmate is convicted, especially of a weapons case -- and the disciplinary process is long before indictment -- he could be put in ad-seg, he could be put in closed custody, lose whatever privileges he has as far as visitation and commissary, recreation. So a lot of bad things could happen to him just from the disciplinary.

Q. What about lose good time credits?

A. Yes, yes, sir.

Q. When we talk about good time credits, what are we talking about?

A. The accumulation of credit to your sentence, which is called good time, which can be added together to take down the number of years you serve in prison.

Q. Make you parole earlier?

A. Sure, could.

Q. And with regards to you mentioned commissary, are there different amounts that an inmate can spend on commissary depending on where he's classified?

A. Yes, sir.

Q. And how does that work?

A. I don't know the numbers anymore, but I used to. You get more spend per two-week period according to your classification. I don't remember how much it is.

Q. Fair to say that the higher your classification, the lesser amount you're able to spend in commissary?

A. The more strict your classification the more you can spend at the commissary, yes, sir, in a given time.

Q. So the weapons charge potentially could have caused Mr. Innes great problems both in how he was housed and classified; is that correct?

A. Yes, sir.

Q. And other things, such as denying him recreation and commissiary and those sorts of things?

A. Yes, sir.

Q. It also could have resulted in additional criminal charges, which in his case he would have gotten potentially the big bitch.

A. Could have if he had enough enhancements. I don't recall.

Q. Which could have left him anywhere between 25

to life.

A. Yes, sir.

Q. And with regards to your experience in the Special Prosecution Unit, are those the type of cases that your office handles, weapons in TDC?

A. Yes, sir.

Q. And your experience with those types of cases, what do generally inmates make weapons out of?

A. Well, like this, pieces of a fan like he's talking about, pencils, bones, metal from inside the cell, Plexiglas from inside the cell or outside, pieces of fence, just about anything that's stiff enough to put inside a human being, you know, a stabbing device could be made to it.

Q. Fair to say they can be ingenious in creating weapons?

A. Uh-huh.

Q. Can make a weapon out of anything?

A. Uh.

Q. Is that a "yes"?

A. Yes, sir, it is. I'm sorry, I apologize.

Q. Including fingernail clippers?

A. Yes, sir.

Q. In fact, your office has prosecuted cases where an inmate has made weapons out of fingernail

clippers?

A. Yes, sir. I've testified in those very cases, yes, sir.

Q. I'm going to hand you what's been marked as Deposition Exhibit No. 18 and ask if you can identify that document.

A. That's a letter from me to Bruce Innes at the Wynne Unit.

Q. Does that letter appear to be in response to Deposition Exhibit No. 17?

A. I would imagine because of the dates, yes, sir.

Q. Generally can you tell us what's contained in Deposition Exhibit 18?

A. Yes, sir. Well, I'm telling him I have nothing to do with the plea bargain agreement, first of all, which is the last subject in this letter. And then where he's talking about the disciplinary case for the fan part being found and called a weapon, I'm telling him, I'm informing him that -- and I'm informing you as I did earlier, just because somebody brings a weapon case to us doesn't mean we're going to accept it for prosecution for a variety of reasons. And back in 1999 that was the case as well. We don't prosecute everything brought to us. Now it's a

prosecutor's call.
Q. And a prosecutor makes that call perhaps sometimes with your input?
A. I do input, yes, sir, I sure do; and sometimes it doesn't make any difference.
Q. I understand.
A. But anyway, he was, by the tone in his letter he's like being -- I don't know the proper word -- like aggressive, like you guys promised something and you didn't do it. His tone is -- I can't think of the word I'm trying to say -- it's not gentle as I read it, but at the same time when I decided to write him back -- I could have decided not write him back, but I did; so when I decided to write him back, first of all, to tell him I have nothing to do with the plea process, don't bring that to me, I have nothing to do with it, the weapons thing, if our prosecutors decide to file on him, he's going to get filed, and I've told him that since all of these cases, as a matter of fact: If you do something we're going to come after you and never made any bones about that, but I'm also reminding him we don't have to pursue everything that comes to us, and that's the case in the free world and all of my police career, and I don't see anything wrong with it.
Q. Do you recall whether or not your office ever

prosecuted criminally Mr. Innes for possession of the fan part that is described in Deposition Exhibit No. 18?
A. I don't think we did.
Q. Do you know the reasons why you did not seek prosecution in that case?
A. In my opinion, it's probably because he was helping us with these cases, and I think that would be legitimate.
Q. Can you tell us as you sit here today whether Deposition Exhibits No. 17 and 18 were ever disclosed to Mr. Speer's trial counsel, Mr. Carter or Mr. Dodson?
A. I don't know.
Q. Can you tell us sitting today whether Deposition Exhibits 17 or 18 ever made it from your Manila file or your maroon file into what we've been calling the SPU prosecution file prior to completion of Mr. Speer's trial?
A. Yes, sir.
Q. How do you make that determination?
A. This file is called "miscellaneous Innes letters," and this is how I recall it looking when Mark Mullin made up the prosecution boxes, so because of the fact it's in this file, it's in the miscellaneous Innes letters file, which happens to be

in our case file, I'm telling you that it was in our file.
Q. And again, I'm just not following you how you're so sure of that. Take me step by step through the process.
A. We have a case file. We have an active file -- we have a file in the active case file.
Q. It's confusing because you've got two cases in one file, and just as aside, I'd hope you not do that in the future, but I can understand why y'all did it because it was met with the same facts; but nevertheless, that's just my two cents' worth.
A. And this is probably not the most confusing case we've ever worked, like the 20-defendant case I was telling you about. Because we have a file in the hand of Mark Mullin called "miscellaneous letters."
Q. And when you say that, the file that you're referring to is a Manila file that has a handwritten notation, "miscellaneous Innes letters."
A. Yes, sir; and it's a legal-size file. Sir?
Q. Go ahead.
A. That's Mark Mullin's writing.
Q. That's what I was going to ask. And you said it's a legal-size file, so I guess you'd find some significance in that.

A. No. I'm just being more descriptive for the record.
Q. I only use letter-size files.
A. Well, that's what I use.
Q. And that's why you I asked you if it made any difference.
A. And I don't carry around a legal-size file. When I told you I keep a Manila file sometimes in conjunction with that, I don't keep a legal-size file.
Q. You keep a letter-size file.
A. I keep letter size. It's just easier to handle for me, and they fit in there much better. I don't like legal-size files, but that's an aside.
Q. But apparently Mr. Mullin likes legal-size files.
A. Yes, sir.
Q. And he uses that.
A. Yes, sir. Now, I'm not saying exclusively, but he does use a lot of them, and he's very organized when he does file things. He has his own system, but he knows what his system is, and because of the fact that this letter is in a file not my own I am testifying to you this morning that this letter was inside this file, and the defense had full access to this file.

Q. And how do you know at what time that letter made it into the legal-size file marked "miscellaneous Innes letters"?

A. **I can't tell you a time frame. I don't know when.**

Q. It could have been before Mr. Canales' file?

A. **Well, I believe it was. I believe it was in 1999.**

Q. It could have been after Mr. Canales's file.

A. **It could have been before, but it could have been after.**

Q. That's what I'm asking.

A. **If it was before, it was not after. I believe it was before the Canales trial.**

Q. But you don't know that for a fact?

A. **I don't know. I don't know the date that the letter was put in there. That's my answer.**

Q. So my question is since you don't know when it was put in there you don't know whether it was put in there before Mr. Canales's trial?

A. **I believe, I sincerely believe that it was out in there before Canales' trial. One thing, it's in chronological order, as I just glanced. Another thing, I see the note that I wrote to Mark Mullin on the previous letter, put there before this letter, so that**

**tells me things were going chronologically. The things that I put in the file were chronological, not like I told you before. There were things that I didn't put in here, say, parole letters because I didn't think they were exculpatory, but if I'd been asked about them I would have given them up.**

**So my best knowledge is, my best testimony is that these were in the file prior to the Canales trial, certainly before the Speer's trial.**

Q. Now, in connection with the file that you're referring to that is contained in the SPU prosecution file with the title "miscellaneous Innes letters," do you know whether or not that file would have ever been taken to a pretrial in the Speer's case?

A. **I don't know. Maybe Mr. Mullin will remember. I don't know.**

Q. And if it wasn't taken on one of your trips to New Boston for pretrial, the only way the defense would have been able to employ the contents of that file would have been to come to the office here in Huntsville?

A. **If it was not taken to them and if I or Mark hadn't mailed them information, yes, they would have had to come and look at it.**

Q. And do you understand and agree with me, sir,

that taking light the fact that you have testified that probably the reason that that case was not prosecuted as a weapons case was because of Mr. Innes's cooperation, do you understand that to be potentially impeachment evidence that could be used against Mr. Innes?

A. **No, sir, I don't understand that to be the case, but I'm understanding what you're saying to me, but I believe that's a prosecutor call. I'm talking about whether or not we prosecute that weapons case. That's not my call. If I had input, my input would have been: Would you please take this into consideration because he's helping us in a much more important case, perhaps maybe even to bring down the Texas Mafia. So that would have been my input. I'm saying I didn't input that. I would have been glad to input that.**

**So as far as the impeachment, I don't know. I don't understand all about that.**

Q. Well, you understand that inmates will do any number of things to benefit themselves, and you've encountered that in your career.

A. **I just had an ephiphany. When Innes testified, I know that he testified that he was given a deal for the older weapons cases. I don't know if he**

**said the years or not. I don't recall that, but I do know that that was known to the defense lawyers. So, yes, I understand that he could have been asked if he was given a deal on this brand-new weapons case from the Wynne Unit, and the jury had a right to know about that; but I don't know if he knew that that case was not pursued because of this.**

**Now, he might have had it in his heart and in his mind, well, they didn't go after me because I'm helping them. But if we told him that, yeah, the jury could have known that.**

Q. And your letter marked Deposition Exhibit No. 18 tends to indicate that you're probably not going to prosecute him for that case.

A. **That's from me to Bruce, and I left it open like that because he could have, he could have been prosecuted. Had the Dickerson case gone away somehow, we could have still gone after Bruce Innes. So I'm not telling him we're not going. I want to make that clear. I'm leaving it open.**

Q. You're leaving it open, but you're giving him an indication that it probably won't be pursued if he continues to cooperate.

A. **Well, no, sir. I mean, he could have read that into it, and you are certainly reading that into**

it, but I consider it leaving it open because in the back of my mind I'm always knowing an inmate can manipulate me, and I'm going to leave it open. Even on death row cases that we don't normally go after, I leave those open, like, hey guess what, we are going to go after you, I never said we're not.

So I understand what you're telling me that I did, but I left it open; we could have still gone after him.

Q. And Deposition Exhibit 18 could have been important for the jury in Mr. Speer's case as to Mr. Innes's cooperation?

A. Sir, that would be a defense call. I don't know. That's their call.

Q. But from your perspective at the time that you wrote the letter marked Deposition Exhibit 18, you didn't think it could be used for anything?

A. I didn't think that what, the weapon?

Q. No, the letter, you didn't think there was anything useful?

A. Oh, when I wrote the letter I wasn't anticipating future trials or defense strategies. I wasn't anticipating anything. I was responding to him being so aggressive in his letters.

Q. And you didn't see that it would be anything

impeachment value in Deposition No. 18?

A. Well, sitting here today as you describe it, I say, well, he could have been impeached with that, but at the time I'd never considered that, no, sir, and it was in the file, so the defense could have used it all they wanted.

Q. Clearly, if he wasn't prosecuted for the weapon case at the Wynne Unit, which is separate and apart from the weapons cases he obtained in Telford Unit, to which he did receive sentences --

A. Something.

Q. -- that would be a benefit conferred on the inmate?

A. What would?

Q. If he didn't get prosecuted for a weapons charge because of his cooperation in the Dickerson murder.

A. It is a benefit per se because he didn't get time for that; however, he could have gotten the same benefit by us prosecuting him and running the sentence cc with the other two, so there's many things we could have done that would have benefited him and still indict him for that weapons case, so that's not the only benefit he got out of the deal.

Q. But the fact is he was never indicted for the

weapons case out of the Wynne Unit?

A. To my knowledge, no, sir. My input would have been not to indict him.

Q. And because your input would have been not to indict him because he provided you valuable information in the Dickerson case as well as understanding the structure of the Texas Mafia?

A. And at the time continuing to help us. I would do anything I can to break down that gang, yes, sir, I would within the law.

Q. I'm going to show you Exhibt Deposition Exhibit No. 19 and ask if you can identify that document.

A. It's a letter from Bruce to me, Bruce Innes to me in 1999.

Q. And Deposition Exhibit No. 17 is a letter from Mr. Innes to you?

A. 19?

Q. I'm sorry, 19.

A. Yes, sir.

Q. And can you tell what date that letter is?

A. He wrote July 7th, it looks like '99.

Q. What is the substance of that letter?

A. Let's see, he said that he got my July the 1st, '99 letter delivered properly and not opened.

See, the prison won't open mail that comes from any legal source, you or anybody else. That's called legal mail.

My grievance was answered, which I don't know what grievance he's talking about, where he says in this paragraph "but I'm not going to do anything detrimental to my sentence." In a letter prior to this, I told him what I said a few minutes ago: If you do something bad we're going to come after you, you know, telling you to behave.

So he's saying like what makes you say that or why would you think I would be bad or do something wrong, what is that about. So he said that he hasn't been contacted by classification about a request for a transfer. He's asking me to make a call to facilitate the transfer.

Q. We talked about that, that may have been helpful; it might not have been helpful.

A. Sure, yeah, sure. Because if I told him, I did it.

Q. But just an inmate requesting transfer --

A. Sometimes that works out sometimes, but back in this time frame I can't say. Sometimes an inmate with a legitimate request does get transferred. It would have looked nicer or better, more professional

for us to request with a reason, yes, sir.

Q. So he was seeking a transfer to another unit?

A. Yes, sir.

Q. And can you tell what unit he was on at the time?

A. According to the envelope, it was written from the Ferguson Unit.

Q. He also expressed concern that the deal that he received on the weapons charges or that they were talking about giving him was not what he understood it to be.

A. Is that this letter? I think that was a previous letter.

Q. And your testimony is you would have had no input as to what would happen in those cases, the Telford weapons cases?

A. Yes, sir, but I want to clear something up, that one you just referred to about not getting the deal he thought he was going to get was written after he was transferred to the Wynne Unit, and it looks like several months after the letter we're talking about right now, Exhibit No. 19.

Q. Did he ever express to you that he wanted to go to the Wynne Unit?

A. I don't recall.

Q. If he had done that, you would have sought that recommendation?

A. If there was a unit that he preferred, I would have put that in my letter, he preferred this unit.

Q. Again, back to the letter where he's referring or expressing some concern that the deal on his Telford cases was not what he understood it to be, as I understand your testimony, you had no input into that?

A. You mean the deal he got in New Boston?

Q. Yes.

A. Right. I believe all of that was done before I came into this case. If it was not, then my input would have been to do something, you know, agreeable to him or for him in this situation, but I don't know if I had any input into that.

Q. I'm going to hand you Deposition Exhibit No. 20 and ask if you can identify that document.

A. Okay.

Q. And what is Deposition Exhibit No. 20?

A. 20, it's a letter from me to Bruce Innes, July 12th, 2000. He's at the Wynne Unit, and I'm telling him I have made effort toward getting him moved, and I'm telling him they're supportive of my

asking for particular units, but I do ask. If he has one that he wants to go to, I will ask. I heard about problems between he and Eason, and I assume it's from that other letter that you showed me a while ago, and actually I'm telling him that no matter what Eason is bragging about to other convicts, for lack of a better term, the nut cutting is when you get on that witness stand and you face the Texas Mafia and you start testifying. Now your heart is really showing. So that's what I'm explaining to Bruce. I'm telling him that if you're trying to manipulate us once you get on that witness stand it'll become evident.

And I tell him what I tell all inmates. I'm going to try to do what is right. I don't care the race, I don't care the person's station in life, if he's killed we'll try to prosecute the killers if it's right.

Q. Deposition Exhibit No. 18 indicates that Mr. Innes had told you that he preferred housing at the Wynne Unit; is that correct?

A. Yes, sir.

Q. And he was ultimately moved, in fact, to the Wynne Unit?

A. Yes, sir.

Q. I want to show you Deposition Exhibit No. 21

and ask if you can identify that document.

A. I know it's a letter from Roy Smithey to Sammy Buentello.

Q. Why would you have a copy of that in your file?

A. We sometime in the last several years, obviously before November 6th, 2000, our office policy, unwritten policy became that any requests for inmate transfers especially for safety purposes or to get inmates -- see, sometimes we move inmates closer to us as we get ready for trial to go to talk to them. I can't go to Amarillo all the time or Fort Stockton. So any request, Royce Smithey -- with an E-Y -- he's our chief investigator, we're supposed to go through Royce. Royce will call the classification people, and it's just to give it where there's one person doing all of it. In other words, I make my request through Royce to them. The people in Amarillo make a request through Royce. It was to streamline it, so he sent me a copy showing that, yeah, I did the letter.

Q. So classification does honor SPU's request regarding transfers to different locations on a routine basis?

A. Well, no, it's not routine. It's better now that Buentello is gone, but it's not routine. It never

has been routine, but it was our policy to go through Royce to make the request, and sometimes they have been granted.

Q. And in the Deposition Exhibit 21, you're enclosing or Mr. Smithey is enclosing at your request a list of inmates that testified in either Canales or Speer's trial or I guess actually Canales' trial.

A. Yes; and Sammy told Royce that he would review each inmate individually to see if it could be done.

Q. But Mr. --

A. That doesn't say it's my request or his request. It says here's the list of inmates.

Q. Well, he carbon copied you.

A. Sure. I would have asked Royce to write the letter, but the letter doesn't say A.P. asked me to write the letter.

Q. But you know for a fact that you would have asked him to write the letter?

A. Oh, yes, yes, sir.

Q. So it would have been Mr. Smithey working on your request?

A. I had to go through Mr. Royce to make the request, or I would have done it myself.

Q. For someone in classification to house the

inmate witnesses according to what their desires were.

A. Yeah. Royce actually wrote down the request that the inmate made for Buentello to look at to see if it could be done.

Q. And Mr. Innes requested that he be placed in P.C. segregation or protective custody segregation if he could not be placed in general population?

A. Yes.

Q. An Inmate Driver requested to be transferred with Inmate Canida and stay at the same unit as Mr. Canida?

A. That's what his request was.

Q. And the last sentence of Deposition Exhibit 21, does that indicate that all the requests were approved by Mr. Buentello with classification?

A. Yes, sir, it does.

Q. And with regards to these particular inmates' requests as to which units they want to go to, do you know whether that was for safety or for personal reasons or a combination of both?

A. I think it says on there, like one person said for safety, and I think they've said what their reason was.

Q. Okay. Well, show me that.

A. Right here, protection, protection,

safekeeping, to be protected.

Q. So if they didn't indicate either protection or safekeeping, perhaps the inmate had some other reason they wanted to be at that particular unit?

A. I believe Doyle Hill was from the Houston area, and he was going to parole in 57 days, so his request was to be housed near the Houston area. Of course, he would have paroled out of Huntsville, but for some reason he wanted to go to Houston.

Q. Now, there was a time where -- again I don't know anything about prison stuff, but do they always parole out of Huntsville?

A. They could here lately be paroling out of different places. I don't know that to be a fact. I think the females might be. I'm not sure. But generally speaking, they all leave out of the Walls Unit downtown.

Q. And there was at some point in time parole absentia where they parole out of county jails, that sort of thing?

A. Yes.

Q. Now, with regards to Mr. Innes, he didn't ask for protective custody, he asked to either be in general population somewhere close to Austin. I guess that's where he's from.

A. Well, he asked for protective custody if he could not be in general population. I think he's from Austin.

Q. In fact, have you visited with Mr. Innes after Mr. Speer's trial?

A. I believe Mr. Mullin and I both saw him. We were working a murder case at the Hughes Unit several years ago, and I believe we both -- I know I have seen him, and I think Mr. Mullin and I both saw him.

Q. How many times would you say you've seen him after Mr. Speer's trial?

A. All I recall is that one time. If there's more, I'm not denying it, but all I recall is that one particular time.

Q. Is that an occasion where you visited with himself, or was Mr. Mullin there?

A. Like I said, I think Mr. Mullin was with me, I'm pretty sure.

Q. Did you ever receive any gifts from Mr. Innes?

A. I believe he made me a wallet or something. I didn't use it. I gave it to some person. I didn't take possession of it.

Q. Perhaps a wallet and a belt?

A. No, I never got a belt.

Q. Do you know if that was after Mr. Speer's trial?

A. **I'm sure it was, yes, sir.**

Q. Now, with regards to SPU's policy when they have inmate witnesses or a number of inmate witnesses that are going to testify in a particular trial, do y'all try to keep them separated? In other words, you don't want to pile all of your prosecution witnesses in one room, do you?

A. **No, sir. I mean, sometimes in the courthouse they put them in the same room. That's not policy per se. We don't have a written policy about how to handle inmate witnesses that I know of. When we have several inmate witnesses, like I said, we'll try to get them where it's easier for us to get to them day by day or as we need to talk to them, but we don't ask for them to be housed in the same cell or even to be able to communicate with each other. Sometimes a prison in their own wisdom will transport them all on the same van or bus, and that is not according to our request. Our request is to keep them separate from defense witnesses for obvious safety reasons. So if I answered your question, I don't know, but we don't ask for them to be put together.**

Q. Well, I guess my question is, in a perfect

world you would prefer that even the State witnesses not be together --

A. **Sure.**

Q. -- and communicate?

A. **Sure. Mr. Mullin, I've seen him hundreds of times, many times tell them: Don't talk about this case, you know, amongst yourselves and especially when they end up at the courthouse together, don't talk about this case. So like I said before, we don't gain anything by them cheating or by us cheating. So I know it's his course of business to instruct the witnesses not to talk.**

Q. And the reason you don't want the witnesses to talk to each other is you don't want them comparing notes and fabricating.

A. **It's not fair, it's not fair.**

Q. I'm going to show you what's been marked as Deposition Exhibit Number 22 and ask if you can identify that document.

A. **I believe I recall this is so long, unusually long. It's from Larry Whited to me. And, yeah, when I saw one of y'all's briefs it talked about me -- about Larry Whited telling me that he rode a van to the hospital with Bruce Innes, and he's saying, don't worry, we didn't talk to each other on the van about**

**the case, and he writes "smile" after that. And y'all's accusation was that they did talk about the case and it was all at my behest. That's how I took it.**

Q. Well, no, I don't think anybody was indicating it was at your behest.

A. **It sounded really bad the way it was written down.**

Q. But you can understand that if he says, "we didn't talk about the case on the way down there, smile," that --

A. **Yeah. It's like to me it says, don't worry, A.P, we didn't talk about the case like you're always telling me to do, see. So the reason he wrote smile, I had no control over that. It would have sounded much better without the word, but he's a convict. But anyway, be that as it may, when I read y'all's charge against me in that brief, I immediately thought, hey, here's proof that I tell these guys let's do it the right way or why would he have said that to me, see, if he had never heard that from me.**

**So I would point to you, point out to you that I have no control over who goes to the hospital. I had no idea they were going to the hospital, and I certainly can't tell them: Put these guys on a van and**

**take them to the hospital. I found out when I got the letter from Larry, and I would point out once again he did not testify. If Bruce Innes has told him anything about the trials, it didn't flavor the trial at all because the jury never heard from Larry Whited. And I can't explain to you why he wrote that to me with a smile in there, but I like the fact that he knew not to talk about the case, and he knew that from me or from Mark or both of us.**

Q. Now, with regards to Deposition Exhibit No. 22, can you tell us whether it made it into the SPU prosecution file prior to the time of Mr. Speer's trial?

A. **I'll try to tell you in just a second.**

Q. And while you look for that, you understand from a defense perspective any opportunity that an inmate has had to get together and compare notes would be something important for cross-examination?

A. **Yes, sir. Yes, sir. Now, this is in the SPU case file, and I cannot tell you when this file got into the box. That's my handwriting, and I'll point out it's a letter-size Manila folder. I just happened to notice that this is a letter-size folder.**

Q. It is a letter-size folder, which to you indicates it's probably not Mr. Mullin's because he

typically as a general rule uses legal-size folders.

A. Legal size; and I do acknowledge that. I'm not trying to hide that from you at all, and that is my writing on the tab.

Q. And the tab says?

A. "Letters from inmate witnesses to SPU, Telford murder case."

Now, to the best of my knowledge or my recollection, the way I labeled this file indicates to me personally that it would have been in our case file because if this would have been my personal file I wouldn't have had to write a label, certainly not something that clear because I would know what it is. I could look through there and say, Oh, these are the letters about the case. So I can't tell you that. I can't tell you one way or another, but I believe they were in the case file just by virtue of the way the label is written.

Q. Now, with regards to whether that file ever went to New Boston during any of the pretrial proceedings, can you tell us whether it would have or not?

A. I can't tell you if it ever went to pretrials. I can tell you that it probably did make its way to New Boston because when I had to go to the



Telford Unit up there to talk to witnesses I would have wanted my notes and my letters to say, hey, I'm A.P. Merillat, you wrote me a letter. So they wouldn't just say, no, I'm not talking to you. I would say, you wrote me a letter, let's talk about that letter. So I don't know if it made it to pretrial, but I'm sure it made it up to New Boston.

Q. Just so I'm clear that I understand your testimony, anytime that you would have gone into the prison to visit with the inmates, you probably would have taken the file with you to compare in contrast?

A. I would have taken certainly parts of it. If there was an inmate in the Ferguson and I'm going to the Telford, I wouldn't believed I had to take it but --

Q. But when you went to pretrial, which would have been at the courthouse in New Boston, you don't know whether you took that file with you during any pretrial proceedings?

A. I don't recall independently, no, sir.

Q. We've talked about Deposition Exhibit 23 before, but I just want to go through it again just to make sure the record is clear. That is, I guess, what? What is Deposition Exhibit 23?

A. It's typewritten and I don't know if I typed



or Royce or somebody else. I don't recall who typed this, but it's inmates that testified for us in the Canales case, and then also there's, I made or whoever made this made a note that he didn't testify but he cooperated, and that being Larry Whited. Then it talks about a November 6th of 2000 letters to the parole board were written for each of them and then letters to Sammy Buentello for Innes's gang renunciation. I think I typed that. I'm just not sure.

Q. What was the reason for typing Deposition Exhibit 23? Was it an attachment to a letter, or what do you think?

A. I don't know. I see that it was attached to something else because of the dog-ear right here. I don't know why it was typed and not handwritten. I have no idea.

Q. It also indicates that you wrote a letter to Sammy Buentello on November 6th, 2000 for Innes regarding his gang renunciation?

A. Yes, sir.

Q. And then the last sentence says that copies made of the above, one for each inmate, one for the SPU file.

A. Yes.

Q. And your understanding is that you would have



made a copy of all of the letters, parole letters and put them in the SPU file?

A. Yes, sir.

Q. With regards to the letter from Sammy Buentello, would you have also made a copy and put it in the file?

A. Yes, according to this note, I would have, yes, sir.

Q. I'm going to hand you what's been marked as Deposition Exhibit No. 24. Before I do that, I notice that you're referring to some documents during your deposition.

A. Yes, sir.

Q. And what is that document?

A. I made notes to myself after I read the brief. Again, I don't know if it was the Canales brief or yours, but I made notes of things that I hoped would be addressed, and one of them was right off the bat about the blanket statement that all gang members are seg. I made a note to myself to make sure you knew that was not true, and I made a note about the hit on Larry Whited, that that's a brand-new case that had nothing to do with the guilt or innocence of Canales. It's things that I want to make sure that if I get the opportunity to people up beyond us know.