IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ANIBAL CANALES, JR., | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 2:03CV69 |
| | § | (Death penalty case) |
| RICK THALER, Director, Texas | § | (Judge David Folsom) |
| Department of Criminal Justice, | § | **Filed under seal** |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S RESPONSE TO PETITIONER'S SUPPLEMENT TO PETITION FOR WRIT OF HABEAS CORPUS WITH BRIEF IN SUPPORT

Canales, a Texas death-row inmate, seeks habeas corpus relief. *See* 28 U.S.C. § 2254 (West 2011). The facts of the offense are set out in the original answer of the Respondent, here called "the Director." (ECF[1] No. 12 at 4–5.)

## PROCEDURAL BACKGROUND

Canales was convicted of capital murder and sentenced to death for the prison strangulation of fellow inmate Gary Dickerson at the Telford Unit in Bowie County. (CR[2] 108–11). The conviction and sentence were affirmed on appeal, *Canales v. State*, 98 S.W.3d 690 (Tex. Crim. App. 2003), and his petition for certiorari review was denied, *Canales v. Texas*, 540 U.S. 1051 (2003). His

---

[1] "ECF" refers to the documents filed in the district court's electronic case filing system, followed by the document number and, where appropriate, the page number.

[2] "CR" refers to the clerk's record of papers filed in the trial court followed by the page number.

initial application for state writ relief was denied. *Ex parte Canales*, No. 54,789-01 (Tex. Crim. App. Mar. 12, 2003) (unpublished).

Canales then filed his original federal habeas petition (ECF No. 7 & 7-1), which the Director answered. (ECF No. 12.) Among the claims raised were that (1) Canales was deprived of his right to counsel when the prosecutor used an inmate as an agent to gather evidence against Canales after his right to counsel had attached (ECF No. 7-1 at 1–9); (2) the prosecutor failed to disclose to the defense evidence that would have been favorable to the defense (*id.* at 9–30); (3) the prosecution knowingly allowed false testimony to be presented (*id.* at 22–26); (4) Canales's rights under the Sixth, Eighth, and Fourteenth Amendments were violated by the jurors' ex parte communication with the bailiff (*id.* at 42–47); and (5) Canales's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when some jurors lied about their criminal pasts (*id.* at 36–42).

Canales moved for discovery, seeking to depose witnesses, court personnel, prosecutors and staff, and jurors. (ECF No. 15). The Director opposed the motion. (ECF No. 17). Canales then moved to stay proceedings and hold them in abeyance to allow him to return to state court to present previously unpresented claims. (ECF No. 22). The Director opposed the motion. (ECF No. 24). The Court stayed proceedings to allow Canales to return to state court. (ECF No. 31.) His application for a subsequent state writ was dismissed as abusive. *Ex parte*

*Canales*, No. WR-54,789-02, 2008 Tex. Crim. App. Unpub. LEXIS 132 (Feb. 13, 2008). The Court lifted the stay (ECF No. 33) and allowed Canales to depose certain inmate witnesses and the jurors. (ECF No. 42.) After the inmate-witnesses and jurors were deposed, Canales moved for additional discovery. (ECF No. 73). The Court then allowed Canales to depose the trial bailiff and personnel from the prosecutor's office and allowed document discovery of state agencies. (ECF No. 86.) As that second round of discovery progressed, in response to newly announced court decisions—*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) and *Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010)—the Director moved for summary judgment. (ECF No. 111.) The Court has yet to act on that motion. Nonetheless, the second round of discovery completed, Canales has filed his Supplement to Petition (Supp. Pet.), which this pleading answers (Supp. Answer).

So far, the parties have deposed trial witnesses Steven Canida, Richard Driver, and Bruce Innes; inmate Larry Whited, who did not testify; jurors Zephyr Bagby, James Butler, John W. Dozier, Carl Evans, Rena Fetters, Harriet McGary, Steve Matlock, Jon Miller, Marty Rawson, William Saling, Brian Steed, and Barbara Sue Totty; the trial court bailiff, William Feazell, Jr.; the trial prosecutor, Mark Mullin; and the prosecution's investigator, A.P. Merillat. The parties also have conducted document discovery of the Texas Department of

Criminal Justice, including the Security Threat Group; the Special Prosecution Unit; and the state Board of Pardons and Paroles. (ECF No. 86.)

Every factual allegation and every legal argument, assertion, and defense the Director presented in previous pleadings, he reasserts in and incorporates into this pleading. Those factual allegations and legal arguments, assertions, and defenses are set out in the Director's original answer (ECF No. 12), his response in opposition to discovery (ECF No. 17), his response in opposition to the stay (ECF No. 24), his poststay briefing (ECF No. 40), his response in opposition to additional discovery (ECF No. 79), his summary-judgment motion (ECF No. 111), and his reply to Canales's response to the Director's summary-judgment motion (ECF No. 115).

## ANSWER AND RESPONSE

### I.    Save One, All Claims Are Procedurally Defaulted.

Because Canales has no state remedies remaining, the Director does not move to dismiss his petition for failure to exhaust. *See Teague v. Lane*, 489 U.S. 288, 297–98 (1989). But the Director reasserts that all of Canales's original claims, save one, and all the claims discussed in Canales's Supplement to Petition are defaulted either because Canales never presented them to state courts and cannot do so now, *see Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), or because the state courts rejected the claims by relying upon an

adequate and independent state law ground, *see id.* at 729. (ECF No. 12 at 6–9.) Nor was any default cured by Canales's second state writ application. As the Director noted in his summary judgment motion (ECF No. 111 at 10–18), the state court's dismissal of Canales's second writ application constitutes a procedural bar not an adjudication on the merits. *See Rocha*, 626 F.3d at 833–34.

## II. In the Alternative, Were this Court to Review the Claims on the Merits, it Would Find Canales Entitled to No Relief.

### A. Federal discovery should be disregarded.

If this Court views the state court's resolution of Canales's applications as adjudications on the merits, the Director is entitled to the deferential review set out in the federal habeas corpus statute. Under that statute federal habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless" the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (West 2011). The petitioner carries the burden of proof. *Pinholster*, 131 S. Ct. at 1398; *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) ("The burden of demonstrating that a constitutional violation occurred is, of course, on a habeas petitioner.").

To the extent that the first and second state habeas applications are considered to be adjudications on the merits, the reasonableness of that merits decision must be evaluated in light of the evidence before the state court when it made its decision. *Pinholster*, 131 S. Ct. at 1398. This Court may not consider the evidence that the parties have developed in these federal proceedings. This limit applies whether this Court reviews the state court's decision to determine whether it was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court precedent, § 2254(d)(1); *Pinholster*, 131 S. Ct. at 1398, or whether the decision was based on an unreasonable determination of facts "in light of the evidence presented in State court proceedings," § 2254(d)(2). Hence, if the Court construes the state court's resolution of Canales's applications as adjudications on the merits, the Court must evaluate the reasonable of those adjudications without considering the evidence developed in federal court.

**B.    Canales's individual claims have no merit.**

    **1.    The use of Innes as an informer did not violate the Sixth Amendment because the right to counsel had not attached.**

Canales claims that he was deprived of this Sixth Amendment right to counsel when the Special Prosecution Unit used inmate Bruce Innes as an agent to gather incriminating evidence. (Supp. Pet. at 8–14.)

-6-

The right to counsel attaches only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing. *See Michigan v. Jackson*, 475 U.S. 625, 629 (1986) (stating that right attached at arraignment); *United States v. Laury*, 49 F.3d 145, 150 (5th Cir. 1995) (stating that right had attached at indictment); *see also United States v. Gouveia*, 467 U.S. 180, 192 (1984) (stating that inmates in administrative segregation not constitutionally entitled to counsel before adversarial judicial proceedings had been initiated). The  Sixth Amendment right to counsel is offense-specific. *Texas v. Cobb*, 532 U.S. 162, 166–68 (2001) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). It cannot be invoked once for all future prosecutions. *Id.* (citing *McNeil*, 501 U.S. at 175).

Innes's contribution to the prosecution consisted of two letters he received from Canales. One letter, or kite,[3] in which Canales described the murder of Dickerson (SX[4] 27), was solicited by Innes after the July 1997 murder but before January 1998 (PX[5] 34). Canales was indicted on November 11, 1999. (CR 2–9.)

---

[3]    A "kite" is folded paper used by inmates to exchange information or contraband surreptitiously between cells. Kites may be drawn by a line from one inmate to another. *Mascorro v. State*, No. 13-11-00112-CR, 2011 Tex. App. LEXIS 7014, at *1 (Tex. App.—Corpus Christi, Aug. 29, 2011).

[4]  "SX" refers to the numbered exhibits offered and admitted into evidence by the State at trial.

[5]  "PX" refers to the numbered exhibits attached to Canales's original habeas petition (ECF No. 7 and 7-1.) Because exhibit numbers 33–58, 62–63, and 76 were filed

In the second letter, sent through the formal prison mail system but in code, dated February 16, 2000 (SX 25), Canales told Innes that a "hit" had been ordered on Larry Whited, that is, that the Texas Mafia was planning to kill Whited (12 RR[6] 220–28). After Innes passed on the second letter to Merillat, Merillat asked Innes to gather more information if possible. (SPX 11.) Merillat said after he learned of the threat to Whited, for prison security reasons and for the safety of inmates, he asked Innes to gather whatever information he could about the ordered hit. (Merillat Dep. at 44.)

The first kite (SX 27) was gathered by Innes sometime before January 1998 (PX 34), before Canales was indicted in November 1999. Because when Innes solicited the kite before Canales's right to counsel had attached with respect to the Dickerson murder, questions about Canales's right to counsel do not figure. *See Laury*, 49 F.3d at 150.

As for the second letter, the incriminating aspect of the February 2000 letter involved not the murder of Dickerson but the planned murder of Whited, a crime for which Canales was not yet indicted. Indeed, nothing shows that Canales ever was indicted for the planned murder. Hence, because in connection

---

under seal, they are not available through the Court's electronic case filing system.

[6] "RR" refers to the reporter's record of the trial testimony, preceded with the volume number and followed by the page number.

with the planned hit, criminal proceedings had not yet begun, Canales's right to counsel had not attached.

Further, to show that Innes was a state agent, Canales would have to show that Innes (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control. *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998); *see, e.g., Maine v. Moulton*, 474 U.S. 159, 163 (1985) (noting informer and officers agreed to deal: no further charges would be brought against him if he would testify against codefendant and otherwise cooperate in prosecution of codefendant); *United States v. Henry*, 447 U.S. 264, 271 n.7 (1980) (showing that informer "had been paid by the FBI for expenses and services in connection with information he had provided"; reasonable inference that informer paid when he produced information); *Creel*, 162 F.3d at 393 (informer not state agent because no evidence that anyone promised informer not to pursue charges in exchange for her assistance or testimony). When an individual acts at his own discretion and in the absence of a quid pro quo agreement, between the informer and the State no agency relationship exists. *See id.* at 394.

Nothing in connection with either letter shows that Innes was a state agent. *See id.* Innes denied he ever was asked to gather information against his

gang. (Innes Dep.[7] at 127–28.) The evidence shows that Innes solicited the kite for his own benefit and without the direction or control of the State and without a deal for quid pro quo benefits in place. As for the February 2000 letter, no evidence shows that Innes solicited the letter from Canales either for his own benefit or at the behest of the state. *See id.* 393. Further, even if Innes had been a state agent and even if the right to counsel had attached regarding the February 2000 letter, the Sixth Amendment is not violated where the agent obtains the incriminating statements from the accused "by luck or happenstance." *Moulton*, 474 U.S. at 176.

And as for the letter written by Merillat to Innes asking Innes to gather more information from Canales (SPX[8] 11), the letter was dated March 1, 2000, after the February 12, 2000 letter from Canales. (SX 25.) Merillat testified that he sought additional information in connection with the planned hit on Whited, a crime for which Canales was not charged. Hence, Canales's right to counsel had not yet attached. *See Cobb*, 532 U.S. at 166–68.

---

[7] "Innes Dep." refers to the February 11, 2009 deposition of Bruce Innes followed by the page number.

[8] "SPX" refers to the numbered exhibits attached to Canales's Supplement to Petition. (Supp. Pet.)

## 2.   Canales shows no *Brady* violation.

Canales alleges that he was deprived of due process when the prosecutors failed to disclose evidence that would have been favorable to the defense. (Supp. Pet. at 14–53.) Many of the witnesses in this prison murder were themselves inmates. Canales alleges that in exchange for their testimony, the prosecutors delivered to the witnesses favors that were not disclosed to the defense. Had the favors been disclosed, Canales argues, the defense could have used them to attack the credibility of the inmate witnesses. Canales alleges that the prosecutors used their influence to get for the witnesses better housing and favorable parole consideration and performed for the inmates certain other favors in exchange for their testimony. (*Id.* at 27–41.)

Irrespective of the good faith or bad faith of the prosecution, where evidence is material either to guilt or punishment, the suppression by the prosecution of evidence favorable to an accused after a request violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish such a violation, the petitioner must prove (1) the prosecutor suppressed or withheld evidence (2) that was favorable and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684

(1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 678, 684. Where the evidence at issue is impeaching, the petitioner can prove materiality by showing that the evidence alleged to have been withheld seriously undermines the testimony of a key witness on an essential issue or that there is no strong corroboration. *See United States v. Winetraub*, 871 F.2d 1257, 1262 (5th Cir. 1989). The defendant must bear the responsibility of failing to conduct a diligent investigation when evidence is equally available to both the defense and the prosecution. *Herrera v. Collins*, 954 F.2d 1029, 1032 (5th Cir.1992), *aff'd*, 506 U.S. 390 (1993); *see also Pondexter v. Quarterman*, 537 F.3d 511, 526 (5th Cir. 2008) ("As our court has made clear, '[e]vidence is not "suppressed" if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it'".).

### a. Canales's trial counsel gained access to the prison gang records of the Security Threat Group.

Canales's allegations about what evidence was and was not disclosed to the defense are not pristine. Due process does not require the prosecution to deliver documents. It requires only that the prosecutors disclose evidence. *See, e.g., Giglio v. United State*, 405 U.S. 150, 152 (1972) (describing relevant *Brady* evidence as prosecutor's promise). Canales offers affidavits from trial counsel that they had not before trial seen certain documents. (ECF Nos. 19-1 and 19-2.)

Canales does not allege with specificity what evidence was withheld. *See Pinholster*, 131 S. Ct. at 1398; *Lockett*, 230 F.3d at 707.

For example, the trial record suggests that trial counsel had access to the records of the prison system's Security Threat Group, which deals with prison gangs. The trial record suggests that the Security Threat Group records were not part of the prosecutor's files, that the prosecutor did not have the authority to deliver the records, and that although defense counsel reviewed the records, counsel could not copy the records.

The Security Threat Group records were the subject of a pretrial hearing. (7 RR 86–108.) At the hearing, the Security Threat Group was represented not by Mark Mullin, with Special Prosecution Unit, which is not part of the TDCJ, but by Leonard Peck, with the TDCJ general counsel's office. (7 RR 86.) It appears from the trial record that in the end defense counsel gained access to the records. (7 RR 90 l. 24 to 91 l. 3, 95 ll. 17–19, 103 ll. 23–25, 107 l. 22 to 108 l. 1.) Because Canales offers no evidence that relevant Security Threat Group evidence was withheld from defense counsel, Canales fails to carry his burden of proving a *Brady* violation. *See Pinholster*, 131 S. Ct. at 1398; *Lockett*, 230 F.3d at 707.

### b.   Canales does not show that the prosecutors had access to the evidence.

And before a *Brady* claim can arise, the petitioner must show that the prosecution team had access to the evidence. *See Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005). Although for *Brady* purposes, the prosecution encompasses more than the individual prosecutor trying the case, and the prosecution may be deemed, in limited circumstances, to be in "constructive possession" of *Brady* material, there are limits on the imputation of knowledge from one arm of the government to prosecutors. *United States v. Webster*, 392 F.3d 787, 798 (5th Cir. 2004). The prosecution is deemed to have knowledge of information readily available to it. *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) The Supreme Court has placed on the prosecutor the burden of discovering information held by the State because the prosecutor may establish procedures and regulations to carry that burden. *See Giglio*, 405 U.S. at 154.

As for evidence from the Security Threat Group, as mentioned above, Mark Mullin, counsel for the Special Prosecution Unit, did not have the authority to disclose to the defense counsel the Security Threat Group records. In the pretrial hearing concerning the records, Mullin did oppose the defense counsel's request to gain access to the gang-threat records. (7 RR 88.) But the Security Threat Group was represented by its own counsel. (7 RR 86.) The group had interests in conflict with those of the prosecutors.

-14-

Indeed, record shows that the Special Prosecution Unit did not have automatic access to all prison records. In the pretrial records hearing, Leonard Peck, with the TDCJ general counsel's office, described the Security Threat Group's file structure. (7 RR 91.) He said that the group had two systems of files. (7 RR 91.) The Security Threat Group maintains a central set of files in Huntsville for confirmed gang members. (7 RR 92.) A gang intelligence officer at a unit will maintain separate files on individuals he thinks may be in a gang. (7 RR 92.) The local officer may then "nominate" an individual for confirmation. (7 RR 92.) The central office in Huntsville reviews the file, reviews the source of the information, and reviews its own independent sources before determining whether a nominee is confirmed. (7 RR 92.) Thus, Canales's trial counsel knew or should have known that they could not look solely to Mullin and the Special Prosecution Unit for all prison and gang-related evidence. *See Pondexter*, 537 F.3d at 526; *Herrera*, 954 F.2d at 1032.

As for prison records generally, postconviction proceedings show that the prosecutors did not have automatic access to such prison records. Mullin said that his investigators did not have full access to computer files for the Office of Inspector General, which investigates crimes in prison. (Mullin Dep. at 8.) He said that if he asked for a file from the office he would expect to get it eventually.

-15-

(*Id.*) As for files from the Security Threat Group, "We have to go hat in hand and ask them and hope that they'll cooperate." (*Id.*)

In connection with the Canales-Speer investigation, he said,

> I do think that the access was pretty forthcoming, but I think, if I recall, I had to go over to BOT[9] where they keep all that and look at things there. . . . I don't think they let me copy stuff and take it. And I remember there being a lot of hoopla about who was going to be able to view those . . . records in open court and that kind of thing.

(Mullin Dep. at 9.)

As for his office's access to prison records, Merillat said

> Depends on the office. Some offices, such as the gang office, the STG[10] office, are a little more careful with how they release information. If it's a simple question about do you having anything on inmate so-and-so? Is he a gang member? I can pick up the phone and ask them.

> If I'm wanting . . . his whole gang file, . . . they'll ask that we either *subpoena it* or put a request on our letterhead or do something official.

(Merillat Dep.[11] at 32; italics added.)

Mullin and Merillat did not have automatic access to all prison records. And Mullin agreed he did not have the authority to set *Brady*-related policies

---

[9]  The office where the Bureau of Classification kept its records.

[10]  "STG" refers to the Security Threat Group.

[11]  "Merillat Dep." refers to the June 22, 2011 deposition of A.P. Merillat, an investigator with the Special Prosecution Unit, followed by the page numbers.

and procedures for prison system. (Mullin Dep. at 80.) He acknowledged that the interests of the Special Prosecution Unit and of TDCJ are not identical. (*Id.* at 76) Canales does not show that the prosecutors failed to turn over to the defense readily helpful, material evidence that was readily available to the prosecutors. *See Brady*, 373 U.S. at 87.

### c. Because Innes delivered incriminating letters written by Canales, his credibility was not material.

Canales challenges primarily the testimony of inmate Bruce Innes, a former member of the Texas Mafia prison gang. (Supp. Pet. at 17–27.) Canales alleges that Innes had been promised certain undisclosed favors by the Special Prosecution Unit. Those favors included favorable housing and parole consideration. (*Id.* at 27–34.) As evidence of such promises and consideration Canales offers certain documents that he alleges were not disclosed to the defense counsel. (PX 33–58, 62–63.) Had the document and favors been disclosed, he argues, he could have challenged Innes's credibility. (Supp Pet. at 20, 23–24.)

Innes testified that he received from Canales two letters in which Canales described the murder of Dickerson by Canales and William Speer and in which Canales said that a "hit" had been ordered upon inmate Larry Whited. (SXs 25 & 27.)

He testified that before Dickerson was murdered, Innes was facing two additional Bowie County charges he had collected in prison, assault on a guard and possession of a weapon. (10 RR 52–54.) On cross-examination, he acknowledged that on the two recent charges he faced the possibility of life in prison. (10 RR 48–49.) After the murder, Innes solicited a kite from Canales in which Canales described Dickerson's murder. (10 RR 52–54.) Innes testified that he solicited the letter, in part, so he could exchange his cooperation on the murder case for favorable consideration on his two charges. (10 RR 52–54.) In fact, he said, in exchange for his cooperation and testimony he would plead guilty to the two charges and receive two concurrent three-years sentences. (10 RR 49.) He also testified that he had not yet been sentenced on the two recent charges and would not be sentenced until after his testimony. (10 RR 49–50.) "I assume if I testify like I'm supposed to," Innes said, "that the deal goes through." (10 RR 50 ll. 3–4.)

At trial, Innes testified that he received the kite from Canales directly. (10 RR 32–33.) He said he recognized Canales's handwriting and that the letter was written in Canales's hand. (10 RR 38.) A fingerprint expert found Canales's fingerprints on the letter (9 RR 195–96), and a handwriting expert verified that the letter was written in Canales's hand (10 RR 61–62). Because Innes's contribution arose from the delivery of the letters and not from the truthfulness

of his testimony, Innes's credibility was not material. *See Bagley*, 473 U.S. at 683.

Also at trial Innes testified that he was in prison on a forty-year sentence for aggravated robbery and cocaine possession and that he had been to prison three different times. (10 RR 3, 47.) He said that since 1996, he had been a member of the Texas Mafia, a prison gang. (10 RR 6.) He said the gang was involved in protection, extortion, and the illicit trade in drugs and cigarettes, and that he had as part of his gang duties beaten up other prisoners. (10 RR 4–5, 54, 56.) When Dickerson was murdered, Innes said, he was in administrative segregation in connection with a gang fight. (10 RR 15.) Hence, any impeaching evidence regarding housing and parole letters would not be material. *See Bagley*, 473 U.S. at 683.

### d.   Canales does not show that Innes told two versions of how he received the kite.

Canales alleges undisclosed documents show that Innes gave two differing accounts of how he acquired the Canales kite. (*Id.* at 17–21.) At trial, Innes said he "shot a line" from his cell to the dayroom and saw Canales attach the letter to the line, which Innes then reeled in. (10 RR 29–30.) But, Canales argues, a handwritten note (PX 60) indicates that another inmate, not Innes, received the letter from Canales and that Innes received the letter from that third unnamed inmate. (Supp. Pet. at 20.)

First, although Canales in his pleading describes the handwritten, undated, unsigned note as notes from an interview between the Special Prosecution Unit and Innes's attorney David O'Neil, the record does not support such a description. (Mullin Dep. at 85–86.) The note's scribe was never identified. Nor does the record show that the note memorializes a meeting between O'Neil and anyone with the unit. Nor does the record show that the scribe's recitation is accurate or reflects reality.

In his deposition, Innes said he knew nothing about the note and did not recognize the handwriting. (Innes Dep. at 133.) He denied the inference that Canales drew from the note, that Innes received the kite from someone other than Canales. (*Id.* at 133–34.)

At trial, Innes could not have been impeached with the note. The record does not show that he wrote the note or that the note reflects any assertion he made. Had Innes at trial been asked whether he ever gave a different account of his receipt of the letter and had Innes denied ever relating a different account, the note (PX 60) could not be used to show otherwise.

Also the inculpatory nature of Innes's evidentiary contribution arose not from the manner of receipt but from the kite's existence and its contents. Had Innes lied about the manner of receipt, had the kite been slipped over the transom in the dead of night, his inculpatory testimony was corroborated.

-20-

Although Innes pointed the figure of guilt at Canales when Innes said he recognized Canales's handwriting, Innes's inculpatory testimony was corroborated by a handwriting and fingerprint experts. (9 RR 195–96, 10 RR 61–62.) *See Winetraub*, 871 F.2d at 1262.

Innes did not testify that he saw the crime, saw Canales and Speer enter Dickerson's cell, or saw any activity in connection with the murder. His sole contribution to the guilt-innocence portion of trial was the delivery of the letter to the Special Prosecution Unit and his identifying Canales's handwriting. The manner by which he received the kite is not, for *Brady* purposes, material. *See Winetraub*, 871 F.2d at 1262. Further, considering the impeachment-related evidence given at trial, any lie Innes is presumed to have told about his receipt of the kite is immaterial. *See Bagley*, 473 U.S. at 684.

### e. Canales does not show that the prosecutors ever considered Innes a suspect.

Canales alleges that the Special Prosecution Unit withheld from the defense evidence that Innes had been considered a suspect in the Dickerson murder. (Supp. Pet. at 21–23.)

First, the record does not support an allegation that Innes was, in fact, in any serious way, considered a suspect. Mullin, the prosecutor, said he never considered Innes a suspect. (Mullin Dep. at 34, 36.) Mullin said the prison authorities suspected all of the Texas Mafia involved in the murder. (*Id.* at 36.)

He said that the prison authorities were concerned with "security issues and how they house people." (*Id.*) Innes said that after Dickerson's murder, prison authorities considered every member of the Texas Mafia a suspect. (Innes Dep. at 125–26.).

Also nothing in the record suggests the reliability of the records from the Security Threat Group Management Office or the Office of the Inspector General. (SPX 18 at 21, 22, 28, 30.) Nothing in the record shows the individual who generated the records or shows the accuracy of the records. Innes himself could not be impeached with the records because nothing shows that he generated the records.

But again, even were it assumed that at some point in the investigation Innes was considered a suspect, perhaps by the Office of the Inspector General or the office's predecessor, the Internal Affairs Division, Innes's contribution to the case arose not from his credibility but from the letter, which inculpates Canales regardless of Innes's veracity. *See Winetraub*, 871 F.2d at 1262. And Innes's credibility was attacked sufficiently. *See Bagley*, 473 U.S. at 684.

-22-

### f.   Canales does not show that witnesses collaborated on their stories.

Canales alleges that the prosecutors failed to disclose that investigator A.P. Merillat eased the way for Innes to correspond with Larry Whited, a former Texas Mafia member who also supplied information to the State during the murder investigation. (Supp. Pet. at 21–23.)

First, Whited did not testify at trial. His credibility is not an issue. Any impeaching evidence the prosecutors withheld regarding Whited, and the Director does not acknowledge the prosecutors withheld any, is not relevant for *Brady* purposes.

As for any collaboration between Whited and Innes, again, Innes's contribution arose not from his credibility but from his delivery of the kite. His credibility is of no moment.

Also the letters that Canales cites are not, for *Brady* purposes, favorable to the defense or material. (PXs 45, 55.) Whited in his letter to Merillat, says that he and Innes rode together to Galveston for medical treatment. Whited tells Merillat expressly that Whited and Innes did not discuss or corroborate their stories. (PX 55 at 1.) In his letter, Innes mentions that he and Whited had met face to face but does not give the details of the meeting. (PX 45 at 2.) The record does not show that the meeting to which Innes referred was that same meeting to which Whited referred. (*Id.*) When asked about witnesses corroborating their

stories, Innes said that he was never "one on one" with other witnesses "even in passing, whether it was a transit status or whatever." (Innes Dep. at 153.) He said he would have been reluctant to discuss his cooperation with the prosecution with other inmates. (*Id.*) He said, "You know, I'm not hollering down the run about any kites, you know." (*Id.*)

Innes said that while he and Whited were in administrative segregation, they did talk but did not talk about their roles in the case. "You know," he said, "we all know that that's not permitted." (Innes Dep. at 98.) He said he talked to Whited "a bunch" before it became known that Innes would be a prosecution witness. (*Id.*) Innes suggested that he did not reveal to Whited his intention to testify "because I didn't know where he stood anyway." (*Id.*)

As for Canales's general complaint that the Whited and Innes spoke with each other, Canales does not describe how such evidence would have aided the defense and does not show that the evidence was material. *See Bagley*, 473 U.S. at 684; *Moore*, 408 U.S. at 794–95. The credibility of Whited, who did not testify, is not at issue. The credibility of Innes is not relevant to his contribution, which was not his testimony but his delivery of the incriminating letters. *See Winetraub*, 871 F.2d at 1262.

### g.   Canales does not show that Innes's gang renunciation was illusory.

Canales alleges that the prosecutors withheld evidence that Innes's gang renunciation was illusory. (Supp. Pet. at 23–24.) Canales cites a letter from Lonnie Eason, an inmate, to Merillat dated July 9, 2000. (PX 49.) In that letter, Eason, who claimed to be a former gang member, told Merillat that Innes still was communicating and associating with gang members.

To the extent that Canales wished to raise the issue of the possibility that Innes's conversion was faked, Canales had Eason's letter in advance of Innes's deposition and could have questioned Innes about the sincerity of his renunciation. Canales did not. And Canales could not have challenged the credibility of Innes with a letter that Innes did not write.

In his deposition, Innes did acknowledge that in the runup to trial he continued to correspond with gang members after he decided to turn State's witness "because I did not want to send off alarms to these people." He said, "Sooner or later, they're going to find out; but it's not going to be because I told them. . . . I'm not going to put my life on the line any sooner than I have to. I'm not going to tell them that I turned State's evidence." (Innes Dep. at 148.)

Had Canales raised the issue of Innes's gang renunciation at trial, one might presume that Canales would have gotten that answer Innes gave in his

deposition; that is, his continued conversation with gang members was a matter of survival. He did not wish to tip his hand too soon.

As for the Security Threat Group notes, written by an unidentified hand (PX 50), Canales could have questioned Innes about the document during Innes's deposition but did not. Further, Innes's credibility could not be challenged with a document that he did not write. And nothing suggests that the unidentified scribe's recitation is accurate.

Canales does not show that evidence suggesting that Innes's gang renunciation was illusory would have been favorable to the defense or would have been material. *See Bagley*, 473 U.S. at 684; *Moore*, 408 U.S. at 794–95.

> **h.    Canales does not show that the Walker County case was dismissed as part of a deal.**

Canales alleges that the prosecutors failed to disclose to the defense that before Canales's trial they dismissed a Walker County weapons case against Innes. (Supp. Pet. at 24–27.)

> **i.    The testimony in the codefendant's state proceedings is irrelevant to Canales's case.**

First, to the extent that Canales in this case refers to the depositions of Mark Mullin and A.P. Merillat taken in state habeas proceedings in connection with Canales's co-defendant, William Speer, the Director objects.

The federal rules of evidence apply generally to federal habeas corpus proceedings. *See* Fed. R. Evid. 1101(c); *Smith v. Brewer*, 444 F. Supp. 482, 489 (D.C. Iowa 1978); *see also Townsend v. Sain*, 372 U.S. 293, 311 (1963) (stating that state prisoners in federal habeas entitled to "trial-type proceedings" involving the taking of evidence); *Walker v. Johnston*, 312 U.S. 275, 285–86 (1941) (stating that where court makes inquiry into the truth and substance of the causes of detention, such an "inquiry involves the reception of testimony.").

The Speer deposition testimony is not relevant to Canales's case and is not admissible. *See* Fed. R. Evid. 402. Different parties are involved. Speer and Canales do not have identical interests. The Special Prosecution Unit, which represents the State in Speer's state habeas proceedings, and the Director of the state prison system, the respondent in Canales's federal habeas proceedings, do not have identical interests. None of the attorneys representing Canales or the Director participated in the Speer deposition. The Director's attorneys had no opportunity to cross-examine Mullin and Merillat in the Speer state habeas proceedings. The Director's counsel were not given the opportunity to ask Mullin and Merillat to explain or expand upon their answers in the Speer state habeas depositions. The testimony that witnesses gave in Speer's trial is not before this Court. Thus any statement made by Mullin and Merillat in connection with the prosecution of Speer is not relevant to these proceedings.

-27-

Further, to the extent that the Speer habeas testimony is offered to impeach a witness with prior inconsistent statements, the proper foundation was not laid. *See* Fed. R. Evid. 613(b). Canales cannot use an apparently inconsistent prior statements from a witness unless that witness first is given the opportunity to explain or deny the prior statement. Indeed, when Mullin in his Canales deposition was asked, in accord with Rule 613(b), about a prior statement that was apparently inconsistent, Mullin explained the misstatement. (Mullin Dep. at 56–57.) To the extent that Canales wishes to challenge the credibility of Mullin or Merillat with apparent inconsistencies between the answers given in the Speer depositions and the Canales depositions, such a challenge could have been raised in each witness's Canales deposition but was not. To raise such a challenge in these pleadings where the witness does not have the opportunity to respond is improper.

### ii.    Innes had struck his plea agreement before the Walker County case arose.

As for the dismissed-charge allegation, the record shows that Innes, while housed at the Wynn Unit in Huntsville, disassembled a fan and removed the metal armature shaft from the electric motor. (PX 51.) He said he was trying to fashion a screwdriver to help a fellow inmate repair a radio. (*Id.*) Innes said he discarded the shaft in a pipe chase vent where it was discovered by a guard. (*Id.*; SPX 28; Merillat Dep. Ex. 27.)

Innes received a disciplinary case for the armature. (Merillat Dep. Ex. 26.) Innes wrote Merillat about the incident, and Merillat responded that not every item that could be construed as a weapon is ultimately prosecuted as a weapon. (PX 52.) In deciding whether to prosecute, the prosecutors look at the possessor's intent. (*Id.*) In that letter, Merillat told Innes, "We have no control over the disciplinary process with TDCJ." (*Id.*) Ultimately, the weapons charge was dismissed. (SPX 29.)

Even if the Court assumes that defense counsel were ignorant about the fan-related matter, Canales does not show that the matter is favorable to the defense or material. *See Bagley*, 473 U.S. at 684; *Moore*, 408 U.S. at 794–95. Innes had likely turned over to prosecutors Canales's incriminating kite by February 4, 1998. (Mullin Dep. Ex. 1.) Innes subsequently landed on the Wynn Unit in Huntsville, where the fan armature was discovered on October 3, 1999. (Merillat Dep. Ex. 27.) The case was written up as a minor disciplinary case. (Innes Dep. at 108–09.) And although the case on November 5, 1999, was submitted to Kelly Weeks with the Special Prosecution Unit for prosecution (Merillat Dep. Ex. 26), about three and a half months later, on February 16, 2000, the case was dismissed by the Walker County District Court. (SPX 29.) Canales's trial did not begin until about eight months later in October 2000. (9 RR cover.) When Innes testified at trial, he was no longer facing Walking County

charges. The prosecutors had no Walker County charge with which to influence his testimony. And as discussed above, the prosecutors did have two Bowie County charges on which Innes had not yet been sentenced. The previously dismissed Walker County charge was of no moment.

And, as discussed above, Innes's contribution to Canales's case arose not from Innes's credibility but from the letters he turned over to the prosecutors. Innes's truthfulness had no bearing on the letters' inculpatory nature.

Further through the depositions of Innes, Merillat, and Mullin, Canales has not linked the resolution of the armature case to Innes's testimony. Canales has not shown that the prosecutors' dismissal of the armature case was a benefit given Innes as consideration for his testimony or from his cooperation with the State. *See Brady*, 373 U.S. at 87.

### i.   Canales does not show that Innes received housing and parole benefits as apart of a deal.

Canales alleges also that the prosecutors gave to Innes unspecified assistance of housing and in obtaining parole, assistance that was not disclosed to Canales's trial counsel. (Supp. Pet. at 27–34.)

In his deposition, Innes testified that his pretrial arrangement with the prosecutors did not involve his housing assignment, his classification, any disciplinaries or grievances then pending. (Innes Dep. at 136–37.) He did say,

> I think that . . . any reasonable person would think that once you give over critical evidence in any kind of serious crime dealing with, you know, murders and people that are willing to kill you, that there is some form of . . . protection going to be lined up for your safety. *But just open deals about housing and stuff like that? No.*

(Innes Dep. at 137; italics added.)

A.P. Merillat testified that he could not order a prisoner reclassified or transferred and could not stipulate how a prisoner was to be transported. (Merillat Dep. at 136–137.) In fact, Merillat said, Innes sought but was refused an out-of-state transfer. (*Id.* at 132.)

As for what he could offer an inmate witness, Merillat said:

> I'm always very clear at the outset with an inmate that . . . I can offer them absolutely nothing. Whether or not they help or, or if they have the most crucial information to break the biggest case we've ever had, I still can't promise them anything.
>
> I will promise to do what I can to keep them safe, which means calling or writing letters or whatever I can to advise somebody in authority that this guy is cooperating.

(*Id.* at 35.)

As for whether Merillat could get prisoners transferred in exchange for their help, Merillat said,

> No, I cannot. I can ask for transfers. . . . I can ask for transfers based upon their safety needs or if there are some extenuating circumstances. They have a crippled family member who cannot travel, but they would like to move closer to their home and there's a proper unit near their home. That's [the inmate's] request, not mine. I will pass it along.

-31-

(*Id.* at 35–36.)

Merillat did agree that he would tell inmates that he would do anything reasonable for them. (*Id.* at 36.) In fact, he said,

> [W]e say we'll do whatever is reasonable for an inmate[;] it's not only a witness. I could be any inmate. . . . I get communications from inmates who have nothing to do with our office but they hear about me from other inmates and they'll write me letters and ask for things. And I will do whatever I can to pass along a request to the right people. So when I say we will do whatever is reasonable, I'm not talking simply about criminal witnesses in a case.

(*Id.* at 70–71.)

Indeed, Merillat assisted inmates even when they did not testify. For example, even though inmate Lonnie Eason did not testify against Canales, Merillat passed on to prison authorities Eason's letter renouncing his membership in the Texas Mafia. (PX 57.) Merillat helped retrieve some of Eason's property that had been misplaced by prison authorities. (Merillat Dep. at 40, 132.)

In his letters to prison officials, Merillat did not issue orders or recommendations but relayed information only. For example, in a letter dated June 24, 1998, to Bill Cheatham, in prisoner classification, regarding Bruce Innes's desire to start the deconfirmation process, Merillat said, "I'm providing this information for your consideration and any action you feel is appropriate." (PX 38.) In a letter dated March 13, 2000, to Sgt. Burson with gang intelligence,

also in connection with Innes's desire to deconfirm, Merillat struck the same tone. He said, "Please give this information any consideration you deem appropriate." (PX 44.)

In writing to Innes in a letter dated July 12, 2000, Merillat emphasized the limits of his institutional reach. Merillat said: "I have made moves toward getting you somewhere else. *They aren't real supportive of my asking for particular units*, but I'll give it a go. Of course, all the housing depends on your classification, etc., so I know the options are limited." (PX 54; italics added.) He continued, "I must reiterate though, *I'm not promising, ok?* I have made requests, and now we have to see what those in power will do." (PX 54; italics added.)

In his deposition, prosecutor Mullin echoed the remarks of Merillat and Innes. Mullin said that he and Merillat tell inmates that they, Mullin and Merillat, do not work for the prison system, that they do not run anything, that they cannot force prison authorities to do anything. They can ask prison authorities to move an inmate for the inmate's protection, but they cannot promise an inmate anything. (Mullin Dep. at 21–22.)

As for whether the Special Prosecution Unit had anything to do with Innes's removal from administrative segregation, Mullin said:

> I can't get him out of ad. seg. We don't have the authority. . . . [S]o I don't know if we . . .asked or made suggestions as to where he should go. . . . I

don't think we specifically asked for a specific place. But we made sure [prison authorities] understood this guy will die if you don't keep him safe.

(*Id.* at 37.)

In connection with Innes's deconfirmation, Mullin said he did not think that the SPU would "recommend" deconfirmation. (*Id.*) "I think we tell TDCJ what has happened so that they can take that into account," he said. "Because when you testify against the Texas Mafia in open court, they don't want you in their club any more." (*Id.*)

The evidence developed in depositions shows that the parties involved, Innes, Merillat, and Mullin, agree that the Special Prosecution Unit could do nothing for Innes with respect to housing, deconfirmation, or classification. For *Brady* purposes, the records does not show that the prosecutors granted undisclosed benefits to Innes. 373 U.S. at 87. Indeed, the record shows that the benefits alleged by Canales—housing, classification, and deconfirmation—were not within the power of the prosecutors to deliver.

As for the provision of reasonable safety, the State has a duty under the Eighth Amendment to provide its prisoners with food, clothing, shelter, medical, and reasonable safety. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). The provision of reasonable safety to a prisoner cannot be said to be a benefit for *Brady* purposes. Indeed, were the State to deprive an

inmate of reasonable safety, the State could be open to an accusation of a constitutional violation.

As for the statements made by Innes in his letters to Merillat in which Innes praises the aid and comfort he has received from Merillat, such statements may reasonably be read as less a reflection of reality and more as a bit of apple polishing. As Merillat noted in his deposition, he gets supplications from inmates he does not know. (Merillat Dep. at 70–71.)

For *Brady* purposes, Canales does not show the prosecution offered or delivered to Innes benefits in the form of housing, classification, or gang deconfirmation in exchange for his cooperation. *See Brady*, 373 U.S. at 87.

> **j.     Canales does not show that other inmates received benefits as parts of deals.**

Canales alleges also that the Special Prosecution Unit provided undisclosed benefits to other inmate witnesses in exchange for their testimony. (Supp. Pet. at 39–41.)

> **i.     The parole letters arose after trial; Canales shows no deal.**

Canales notes that the Special Prosecution Unit sent letters to the state Board of Pardons and Paroles in connection with inmate witnesses James Baker (SPX 56), Steven Canida (Merillat Dep. Ex. 41), Innes (SPX 66), Doyle Wayne

Hill (SPX 56), Edwin Henson (SPX 56), Richard Driver (Merillat Dep. Ex. 40), and Tim Rice (SPX 56).

The letters themselves were sent after trial. (SPX 56.) Hence, the letters themselves could not have been delivered to the defendant before trial. *See Brogdon v. Blackburn*, 790 F.2d 1164, 1168 (5th Cir. 1986) ("The prosecution has no duty to turn over to the defense evidence that does not exist."). Canales does not show that the letters were sent to the parole board as part of a pretestimony deal. And the letters were not material. Merillat in the letters said that the inmate witnesses "at great personal risk, testified in open court against Canales and exposed much information about the Texas Mafia."

He continued:

> In keeping with the policy of this unit, we are advising the Board of the cooperation of these inmates who provided assistance in this case. *No promises or offers of any benefit were made to the inmate witnesses, other than to ask prison officials for protection of the witnesses.* . . .
>
> . . . Please give the cooperation and assistance provided by these individuals any consideration you deem appropriate.

(SPX 56; italics added.)

Merillat in his letters noted that the inmate witnesses had been promised nothing but safety and that the letters were being offered only for "any consideration you deem appropriate." (*Id.*)

Mullin said it was "very common," for the prosecutors "to inform [the] parole [board] about an inmate's cooperation." (Mullin Dep. at 52.) He said, "[W]e think it's the right thing to do. We think these guys have made bad decisions all their lives and when they finally do something right, that people ought to know about it." (*Id.* at 52–53.) Mullin noted, also, that so far at Innes was concerned, the letter had not been effective. Innes still was in prison. (*Id.* at 33.)

Canales does not show that a promise to write the parole board was part of a pretrial deal and does not show the information would have helped the defense or that the information was material. *See Brady*, 373 U.S. at 87.

Further, the credibility of the inmates was impeached sufficiently with their criminal records, which were discussed at trial. Rice was in prison for murder. (9 RR 40.) Baker was in prison for burglary of a habitation and had a federal conviction for taking cars across the state line for sale.  9 RR 139.) Driver was in prison for burglary of a habitation and had a "bus load" of prior convictions for burglary. (9 RR 283.) Henson was in prison for burglary and had prior convictions for burglary, forgery, and possession of stolen postal money orders. (10 RR 69.) Canida was in prison for delivery of marijuana and had prior convictions for burglary and delivery of drugs. (10 RR 79.) Hill had been in prison for eighteen years and had been twice before, all for burglary. (10 RR 153.) He also was a captain in the Texas Mafia and had picked up three

additional convictions since he was imprisoned, two for murder and one for weapon possession. (10 RR 155, 159.) Any additional impeachment would not have been material. *See Bagley*, 473 U.S. at 684.

### ii.   Unit transfers were for inmate safety.

Canales alleges also that unit transfers constituted an undisclosed benefit. (Supp. Pet. at 38.)

After trial, Royce W. Smithey, then the chief investigator with the Special Prosecution Unit, sent a letter dated November 6, 2000, to Sammy Buentello with the prison Bureau of Classification. (PX 76.) In the letter, Smithey listed the inmates who had testified at the Canales trial or who had cooperated with the investigation. (*Id.*) The letter also listed each inmate's unit preference. (Id.) In the letter, Smithey said, "Per our meeting of November 1, 2000, it is my understanding that you will review each inmate's card to see if there is a problem with their requests. Per our phone conversation of November 2, 2000, each request will be honored." (*Id.*)

As mentioned above, State has an obligation under the Eighth Amendment to provide each inmate with reasonable safety. *See DeShaney*, 489 U.S. at 200. It was reasonable for the authorities to move the inmate witnesses to safer units away from retribution from current gang members. As for recognizing each inmate's choice of unit, Mullin said that inmates usually have a "pretty good

handle on where they can make it, where they have enemies, where they have trouble."

He said, "And so if they think they can make it somewhere, it would be a bad idea not to tell TDCJ. That doesn't mean TDCJ is going to put them there, but it's something that they can take into account." (Mullin Dep. at 55.)

Canales does not show that the unit transfers were an undisclosed benefit or were consideration for the witnesses' trial testimony. *See Brady*, 373 U.S. at 87.

### iii.   Canida's drug arrest occurred in 2002, after Canales's 2000 trial.

As for Steven Canida's drug arrest in Lamar County, Mullin and Merillat signed a letter dated August 5, 2002, addressed to Mark Burtner, the Lamar County District Attorney, telling him of Canida's assistance in the Canales case. (SPX 62.) The letter said,

> Each time Canida testified, *he did so with no promise of any benefit, nor did we or could we offer him anything in exchange for his testimony*. The only "promise" made him was that we would work to have the prison protect him from possible retaliation by gang members or other inmates.  Still, Canida cooperated and provided assistance to the State. . . . We have become aware that since his parole, Steve Canida has found himself in trouble with the law again. It is certainly your responsibility to the citizens of Lamar County to see that justice is done, and we would not interfere with

that duty. By way of this letter, we wanted to let you know what we believe is important information about Steven Canida, and provide it for any consideration you deem appropriate.

(SPX 62.)

Again Canida's Lamar County difficulties arose after Canales's trial. The prosecutors could have not told defense counsel of the letter. *See Brogdon*, 790 F.2d at 1168. And Canales offers no evidence that the Special Prosecution Unit as part of a pretrial deal offered Canida any assistance in connection with any yet-to-be-committed crime. Indeed, Canales acknowledges that no promises were made expressly. "Mr. Canales is not alleging that SPU explicitly promised to help the inmate witnesses if they got in trouble in the future." (Supp. Pet. at 39.) Canales alleges that the promise was tacit. Even a tacit promise must be proved with some evidence. Canales offers none. He has deposed everyone—Canida, Merillat, and Mullin—who would have been a party to such a promise no one testified or suggested that such a promise was made. *See Brady*, 373 U.S. at 87.

### 3.   Canales does not show any testimony was false.

#### a.   Canales does not show that Innes told inconsistent tales about his receipt of the incriminating kite.

Canales alleges that he was deprived of due process when the State allowed witnesses to testify falsely. (Supp. Pet. at 53–58.) In connection with the incriminating kite he received from Canales, Innes testified at trial that he received the kite from Canales directly. (10 RR 29–31.) Canales now argues that

the record shows that Innes, rather than receiving the kite from Canales directly, received the kite from a third unidentified inmate. (Supp. Pet. at 57.)

The record does not support Canales's argument. Although Canales in his supplemental petition says, "The notes from Royce Smithey, another SPU agent, were in the SPU file," (Supp. Pet. at 57), Canales does not cite to the record showing Smithey's notes. One might assume that Canales refers to an unsigned, undated handwritten note that says, in part, "Letter./Written by Canales/Another inmate has the letter—is not involved @ [sic] all—will have to get the letter from him./Another inmate rec [?] the letter from Canales/This inmate sent me the letter to see it." (ECF No. 7-7 at 46; PX 69.) But nothing in the record shows that the note was written by Smithey, that the note is accurate, or that the notes reflects any statement made by Innes or on Innes's behalf. In his deposition, Innes was asked about the unsigned, undated note. Innes said he did not recognize the handwriting and that the note "was not true." (Innes Dep. at 133.) Hence, not only does Canales not show that Innes lied, he does not show that Innes has told stories that were inconsistent.

### b.   Inmates did not lie about benefits received.

Canales alleges also that the prosecutors allowed the inmate-witnesses to lie about the benefits they received in exchange for their testimony. (Supp. Pet. at 57–58.) This claim is a restatement of the above discussed *Brady* claim and

presupposes that the witnesses lied on the stand. If the witnesses did not receive undisclosed benefits, the witnesses did not lie. And Canales does not show that the witnesses received undisclosed benefits or that they lied about receiving undisclosed benefits.

### 4. No evidence shows the jurors and the court or the bailiff engaged in ex parte communications.

Canales alleges that he was deprived of his rights under the Sixth, Eighth, and Fourteenth Amendments when the jurors communicated in writing with the bailiff and that the communications were never disclosed to counsel or the trial court. (Supp. Pet. at 58–66.)

As for his constitutional allegation, he alleges that the communications between the bailiff and the jurors deprived Canales's of his right of confrontation, his right to counsel, his due process rights to a fair trial, and his due process rights to an appeal. (Supp. Pet. at 64–66.) Questions of ex parte communications with the jurors seem to implicate questions of external influences inducing juror bias, *see Smith v. Phillips*, 455 U.S. 209, 212 (1982) (noting that during trial juror applied for job with prosecutor's office), and deprivations of confrontation and counsel, *see Rushen v. Spain*, 464 U.S. 114 (1983) (noting that ex parte communication between jurors and judge implicates defendant's right to personal presence at all critical stages of trial and defendant's right to counsel). Canales seems to raise the latter primarily. That

is, he seems to complain mostly that the bailiff and the jurors had written communications that were not revealed to the judge and to the defense counsel. (Supp. Pet. at 58–59.) But Canales also seems to allege that (1) the jurors received extraneous information or material, that is, information or material that was not part of the trial record, or (2) that the jurors received only a portion of the trial exhibits. (*Id.* at 65.)

And when an ex parte communication between a juror and the judge relates to some aspect of the trial, the judge generally should disclose the communication to counsel for all parties. *See Rushen*, 464 U.S. at 119. The prejudicial effect of a failure to do so, however, can normally be determined by a posttrial hearing. *See id.* "The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, *if any*, that has occurred." *Id.* at 119–20 (italics added).

Canales fails to prove his case. He fails to show that the jurors passed written notes to the bailiff that the bailiff withheld from the court. And, assuming that the jurors did, in fact, submit written notes to the bailiff that the bailiff passed on to the judge, Canales fails to show that the judge withheld the notes from counsel. Canales fails to show also that the bailiff and the jurors, bypassing counsel and the judge, exchanged substantive oral communications

about the trial or that the judge and the jurors, by passing the bailiff and counsel, had substantive oral communications about the trial.

As for the bailiff's bypassing the judge and counsel, in his deposition bailiff William Feazell, Jr., now retired, said the court used a form for jurors' questions and that he would not allow them to submit oral questions or submit written questions unless the written question was on the court's form. (Feazell Dep.[12] at 13–14, 18.) He then would hand-carry the written question to the judge. (*Id.* at 16.) The usual procedure was later to place the written questions in the district clerk's file. (Id. at 16.) Feazell said that to the best of his knowledge in Canales's case when the jurors began deliberating, they had all the trial evidence. (*Id.* at 23.)

Asked about a juror's recollection that the jurors had asked for and received an additional piece of evidence, Feazell said, "I don't recall that at all. I'm not saying it didn't happened." (Feazell Dep. at 26.) As for specific notes, Feazell said such notes could have been written and given to him, but that he could not recall. (*Id.* at 28.) Asked about a juror's recollection that they had written out a "question or two" for the judge, Feazell said, "I'm sure that happened. I don't remember specifically, but it always happens in every trial."

---

[12] "Feazell Dep." refers to the December 8, 2009 deposition of retired bailiff, William Feazell, Jr., followed by the page number.

(*Id.* at 31.) Feazell said he was sure that the jury foreman had given him notes for the judge but that he did not recall how many. (*Id.* at 37.) He did not know the contents of the notes. (*Id.*) Feazell said that after he delivered the notes to the judge, the judge would contact the attorneys. (*Id.* at 38.) "The would discuss the question, let both attorneys have their say," Feazell said. "[T]hen, the Judge would tell both attorneys what he was going to write in the note. He would hand me back the note. I would take it back to the jury room." (*Id.* at 38.) Feazell said there were no unsolicited notes from the judge to the jurors. (*Id.*) He said also that the foreman did not pass any note to someone other than him, the bailiff. (*Id.*) He said the foreman did not communicate orally with the judge. (*Id.* at 38–39.)

As for the jurors' recollections, every juror has been deposed, and no juror recalls personally writing a note for the judge and handing it to the bailiff. At most some jurors recall some other juror writing a note. (Steed Dep.[13] at 19–20; McGary Dep.[14] at 21–23; Miller Dep.[15] at 9–10.) One juror remembered some questions relayed to the bailiff but did not recall if the questions were written.

---

[13]   "Steed Dep." refers to the January 14, 2009 deposition of juror Brian Steed, followed by the page numbers.

[14]   "McGary Dep." refers to the January 14, 2009 deposition of juror Harriet McGary, followed by the page numbers.

[15]   "Miller Dep." refers to the January 15, 2009 deposition of juror Jon Miller, followed by the page numbers.

(Totty Dep.[16] at 10–11.) But again, no juror recalled personally writing a note and handing it to the bailiff, and no juror recalled personally asking a substantive question of the bailiff.

Canales has deposed those individuals who would be in a position to know about ex parte communications between the bailiff and the jurors. No one recalls a specific oral or written communication. And those who recall messages do not recall and do not allege to having ever known the substance of the communications, either oral or written. Canales has the burden of showing that ex parte communications occurred and that he was harmed by such communications. *See Rushen*, 464 U.S. at 119–20. He has done neither.

Nor has Canales shown that the jurors received material that was not part of the trial record or that any trial evidence was withheld from jurors. *See id.*

To the extent that Canales complains that the communications between the bailiff and the jurors did not follow the procedure set out in Article 36.27 of the Texas Code of Criminal Procedure, Canales complains of a state-law issue not cognizable in federal habeas proceedings. *See Manning v. Blackburn*, 786 F.2d 710, 711 (5th Cir. 1986) (stating that habeas corpus relief not available for

---

[16] "Totty Dep." refers to the January 16, 2009 deposition of juror Barbara Sue Totty, followed by the page numbers.

rights existing solely under rules of state procedure but only for vindication of rights existing under federal law).

To the extent that Canales relies upon *Remmer v. United States*, 347 U.S. 227, 229 (1954), to place the burden of disproving harm upon the State, he errs. First, *Remmer* is a federal appeal. Nothing in the case suggest that the decision has a constitutional basis. *See Smith*, 455 U.S. at 218 (suggesting procedural differences between cases tried in state court and federal cases, such as *Remmer*). Second, the Supreme Court has in later cases placed the burden of showing harm upon the petitioner. *See United States v. Sylvester*, 143 F.3d 923, 933–34 (5th Cir. 1998), *citing Smith*, 455 U.S. at 215 (noting that in posttrial hearing opportunity for showing prejudice available to the defendant), *and United States v. Olano*, 507 U.S. 725, 739 (1993) (noting that the question for reviewing court is "Did the intrusion affect the jury's deliberations and thereby its verdict?").

Canales fails to carry his burden of showing that he was harmed by ex parte communications, if any, between the judge and the jurors or the bailiff and the jurors or that trial evidence was withheld from jurors or that jurors received non-trial material. *See Rushen*, 464 U.S. at 119–20.

### 5.   The evidence shows no juror dishonesty or bias.

Canales alleges that he was deprived of an unbiased jury because at least one, perhaps three, jurors lied about their "criminal pasts." (Supp. Pet. at 66–71.)

Canales alleges that on the prosecutor's list of prospective jurors, next to Marty Rawson's name are handwritten notes, in two different hands, neither of which has been identified, stating "Inv. Pending" (block printing) and "been arrested for hot checks" (cursive). (PX 70.) In his deposition, Rawson denied having even been arrested for hot checks. (Rawson Dep.[17] at 17, 24.) He did recall an overdraft that occurred—he could not remember when—because of a bank error. (*Id.* at 25–26.)

Canales acknowledges that law enforcement records do not show that Rawson had been arrested or investigated for hot checks. (Supp. Pet. at 66–67.) Canales suggests that he may need to subpoena bank records. (*Id.* at 67.)

Juror Steven Matlock on his juror questionnaire when asked, "Have you or any member of your family even been arrested or charged with any crime other than a traffic offense?" Matlock checked the blank, "No." (ECF No. 73-3 at 19 (Question No. 31).) On his questionnaire he also was asked, "Have you, a

---

[17]   "Rawson Dep." refers to the January 15, 2009 deposition of juror Marty Rawson, followed by the page number.

family member, or someone close to you, even spent time in jail or a penitentiary?" He checked "Yes," and wrote, "Nephew in prison for drugs, cousin in prison for drugs, nephew in prison for murder." (ECF No. 73-3 at 19 (Question No. 32).)

In his deposition, Matlock testified that once, he could not remember when, he spent the night in jail in connection with a hot check. He said:

> I got arrested for theft over fifty dollars, under five hundred, because my bank didn't take my savings and apply it to my check. They arrested me for a twenty-seven dollar and twenty-one cent check. And, I had eight hundred dollars in my pocket, and I paid the fine, paid off the check. It just missed me. That is all removed twice.

(Matlock Dep.[18] at 20–21.) Asked to clarify, he said:

> Yeah, because it happened at 5:00 o'clock in the afternoon, and the only reason it was so late is because I was going to pick up a cake for my child's birthday, and I had just gotten paid, and my daughter, who was three, stood up in the back window and waved at the policeman. And, you know, that is when the new seat belt laws came out in Texas. And, he pulled me over to tell me that she had fallen out of her child seat. He said, you know, we have a warrant for your arrest for theft of over fifty, under five hundred. I said, what? And, at 5:00 o'clock in the afternoon, in Texarkana, there is no judges. [sic] So, I spent the night in jail and got out the next morning, paid my fine, and went on my way. It was just that my wife and I had moved twice and we missed the check. And, all they had to do was take fifty cents out of my savings and fix it, but they didn't.

(*Id.* at 21–22.)

---

[18] "Matlock Dep." refers to the January 15, 2009 deposition of juror Steve Matlock, followed by the page numbers.

Asked whether he would now answer the questionnaire the same, that is, that he had never been arrested or charged, he said: "I would have said, no, because I didn't think I was arrested." (*Id.* at 23.) Asked again, "But, were you arrested?" he said, "I was arrested." (*Id.* at 24.)

Although in his caption to his complaint in the Supplement to Petition Canales references three jurors who "lied," in the text he discusses two only, Rawson and Matlock. (Supp. Pet. at 66–71.) In his original petition, Canales complained also about jurors John Dozier and Jon Miller. (ECF No. 7-1 at 36–38.) He alleged that Miller had arrested or investigated for hot checks. (ECF No. 7-1 at 36–38.) In his deposition, Miller denied any hot check charges or investigations. (Miller Dep. at 27–28.) Canales alleged that Dozier had been charged with battery in Miller County, Arkansas. (ECF No. 7-1 at 36–37.) In his deposition, Dozier said the Miller County incident had happened twenty-eight years before and had involved a fist fight. Although posted a property bond, he said he was never arrested or handcuffed and was ultimately found not guilty. (Dozier Dep.[19] at 27–29.) It is not clear that Canales has dropped his claims in connection with Dozier and Miller.

---

[19]   "Dozier Dep." refers to the February 25, 2009 deposition of juror John W. Dozier, followed by the page numbers.

First, by alleging juror dishonesty, Canales does not raise a constitutional claim. Even where a juror lies, unless the lie is rooted in bias or prejudice, the lie is not a basis for reversal. *See United States v. Bishop*, 264 F.3d 535, 555 (5th Cir. 2001) (citing *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1061 (9th Cir. 1997)). The Constitution guarantees juror impartiality only. *Parker v. Gladden*, 385 U.S. 363, 364 (1966). To show a constitutional infirmity, the petitioner must show not that the juror lied but that the juror was biased. *See Drew v. Collins*, 964 F.2d 411, 415–16 (5th Cir. 1992) (stating that absent allegation that jury tainted by outside influences, petitioner must show jury misconduct prejudiced his constitutional right to fair trial); *see also United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir. 1995) (stating that federal court must initially presume that jury was impartial). A lie, standing alone, does not implicate a constitutional value. *See Bishop*, 264 F.3d at 555. Constitutional values are implicated only when the dishonesty is somehow related to the juror's bias, for example, when the juror lies to hide his bias. *See id.*; *also see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) ("[E]ven an intentionally dishonest answer [by a juror] is not fatal, so long as the falsehood does not bespeak a lack of impartiality."); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) (noting that in federal habeas review of state court judgment, juror dishonesty raises constitutional issue where dishonesty evidence of bias); *Rogers v. McMullen*, 673 F.2d 1185, 1191

(11th Cir. 1982) (noting that in federal habeas review of state conviction, juror dishonesty, without proof of bias, insufficient grounds for new trial).

Any attempt by this Court to use this postconviction review to establish a new constitutional guarantee of an honest jury panel would be barred. *See Teague*, 489 U.S. at 310.

Even if it is presumed that the jurors lied, unless the lie is proof of bias, no constitutional infirmity arises. *See Bishop*, 264 F.3d at 555. Canales had the opportunity to depose all of the jurors, including Rawson and Matlock. Even after the depositions, Canales alleges dishonesty only and offers no proof of bias. Although he seems to argue that dishonesty, without more, is proof of bias, he cites no relevant authority to support his argument.

The cases upon which Canales relies do not support his argument that juror dishonesty standing alone is constitutional grounds for a new trial. The case upon which he relies primarily, *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984), is a federal civil lawsuit. Nothing in the case suggests that its juror-honesty language rests upon a constitutional foundation that would apply to a state criminal trial. But even in *McDonough*, the Supreme Court said, "The motives for concealing information may vary, but only those reasons that affect a juror's *impartiality* can truly be said to affect the fairness of a trial." *Id.* (italics added).

But Canales does not prove juror dishonesty. He shows at most that the jurors had a relatively high standard for what constitutes an arrest or had imperfect legal knowledge of what constitutes an arrest. The most that could be said of the jurors is that they had an imperfect understanding of the law. Because the jurors viewed their situations as minor, they did not view their situations as arrests or charges. *See, e.g., Bishop*, 264 F.3d at 555 (stating that failure of juror to disclose conviction due to mistaken, but honest belief record was expunged, or due to embarrassment, does not suggest bias); *Dyer*, 151 F.3d at 973 ("The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation.").

Indeed, even if one were to presume a juror lied about a criminal past, one might presume that the juror was biased not against Canales but against the prosecution. (Mullin Dep. at 65.) Nonetheless, Canales does not show that a biased juror sat on his case and shows no constitutional violation. *See Parker*, 385 U.S. at 364.

## CONCLUSION

The Director again asks this Court to deny Canales's federal petition for writ of habeas corpus with prejudice, and to deny a certificate of appealability with regard to all issues here raised.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


 /s/ Thomas M. Jones
THOMAS M. JONES*

*Attorney-In-Charge    Assistant Attorney General
Postconviction Litigation Division

State Bar No. 00784357

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
Fax No. (512) 936-1280
E-mail: Thomas.Jones@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF AUTHORIZATION

The parties have the authorization from the Court (Docket Entry No. 108)

to file under seal Respondent Thaler's Response to Petitioner's Supplement to

Petition for Writ of Habeas Corpus with Brief in Support.

 /s/ Thomas M. Jones
THOMAS M. JONES
Assistant Attorney General

## CERTIFICATE OF SERVICE

I do hereby certify that on October 17, 2011, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case-filing system of the Court. Because the document was filed under seal, the electronic case-filing system did not send a "Notice of Electronic Filing" to the attorneys of record. Instead, I certify that I served copies of the preceding document upon the following attorneys of record by email:

Counsel for Canales

Teresa L. Norris
Blume Weyble & Norris, LLC
P.O. Box 11744
Columbia SC 29211
email: teresa@blumelaw.com

David Paul Voisin
David P. Voisin PLLC
P.O. Box 13984
Jackson MS 39236
email: davidvoisin@comcast.net


/s/ Thomas M. Jones
THOMAS M. JONES
Assistant Attorney General