IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ANIBAL CANALES, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:03CV69 |
| | ) | |
| RICK THALER, Director, | ) | **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | ) | |
| Correctional Institutions Division, | ) | **FILED UNDER SEAL** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**REPLY TO RESPONDENT THALER'S RESPONSE TO PETITIONER'S
SUPPLEMENT TO PETITION FOR WRIT OF HABEAS CORPUS**

ANIBAL CANALES, JR., through the undersigned court-appointed counsel, herein sets

forth his reply to Respondent's Response to the Supplement to Petition for Writ of Habeas

Corpus (hereinafter "Response").  Dkt. No. 132 (Filed Under Seal).

**I.      Petitioner's Claims Are Not Procedurally Defaulted.**

Respondent asserts that all of the claims asserted in the Petition for Writ of Habeas

Corpus (Dkt. No. 7), save one, and all of the claims addressed in the Supplement to Petition

(Dkt. No. 121) are defaulted.  Respondent is incorrect.  Notably, Respondent asserts both in the

"Procedural Background" and in argument that the state court dismissed Petitioner's second writ

application as "abusive," Response at 2, and that this "dismissal . . . constitutes a procedural bar

not an adjudication on the merits," Response at 5.  Respondent fails, however, to point out that

The Honorable T. John Ward already determined in these proceedings that the state court's

dismissal of Petitioner's second application for habeas corpus relief does not create a procedural

default barring review of his claims in this proceeding.  Order Granting in Part Petitioner

1

Canales' Motion for Discovery (Dkt. No. 42) at 2.  Equally notable is the state court's clarity in

its orders when it is, in fact, dismissing a writ as abusive.  For example, in *Ex Parte Cleve*

*Foster*, No. WR-65,799-03 (Tex. Crim. App. Sep. 12, 2011), the court stated:

> We have reviewed the application and find the applicant's allegations fail to satisy
> the requirements of Article 11.017 § 5.  Accordingly, we dismiss the application
> as an abuse of the writ *without considering the merits of the claim*.

Slip Op. at 2 (emphasis added) (Attached).  The state court can clearly distinguish those

instances in which it relies solely on procedural grounds to dismiss a petition.  In Petitioner's

case, the state court did not make a plain statement as to the basis for its ruling; thus, there

remains a presumption that its decision is at least interwoven with federal law.  In any event,

Petitioner has fully addressed Respondent's assertions of procedural default in prior pleadings

and will not repeat those arguments here.  *See* Petitioner Canales' Response to Respondent

Thaler's Motion for Summary Judgment and to Vacate Discovery Order (Dkt. No. 113).

## II.     The Discovery Obtained in These Proceedings Is Properly Before This Court and Should Be Considered In Adjudicating the Merits of the Claims.

Relying on *Cullen v. Pinholster*, 131 S. Ct. 1388 (2010), Respondent contends that this

Court is not permitted to consider evidence that was not first presented to the state court and

asserts that the reasonableness of the state court adjudications must be evaluated solely "in light

of the evidence before the state court when it made the decision."  Response at 6.  *See also* Dkt.

111 at 8 ("the Court may not consider the evidence that the parties have developed or may

develop in these habeas proceedings").  However, if a petitioner makes a prima facie showing of

the violation of a constitutional right, "a state court's failure to provide him with an opportunity

to develop his claim deprives the state court decision of the deference ordinarily due under the

AEDPA."  *Blue v. Thaler,* ___ F.3d ___, 2011 WL 6413668 at *3 (5th Cir. Dec. 22, 2011)

(quoting *Wiley v. Epps,* 625 F.3d 199, 207 (5th Cir. 2010)).  Furthermore, if a petitioner was also

diligent in pursuing fact development in state court, a federal habeas court may consider new evidence.  Similarly, if a state court has summarily denied relief, the federal court must determine whether, assuming the alleged facts to be true, the state court unreasonably determined that a petitioner failed to state a ground for relief.  If the state court acted unreasonably in denying relief, then the petitioner overcomes the limitation on the grant of relief in § 2254(d)(1) or (2), and this Court is free to determine the need for additional fact development.  Finally, if Petitioner could not uncover facts suppressed by the State until federal proceedings, then any claims based on those facts would not have been adjudicated in state court, and thus § 2254(d) – and *Pinholster* – would be inapplicable.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* [*v. Washington,* 466 U.S. 668 (1984)] analysis").

Again, Petitioner previously responded to these arguments and will not repeat the remainder of those arguments here.  *See* Petitioner Canales' Response to Respondent Thaler's Motion for Summary Judgment and to Vacate Discovery Order (Dkt. No. 113).

**III.     The State's Use of Bruce Innes as an Agent to Obtain Two Incriminating Letters from Petitioner Violated Petitioner's Rights Under the Sixth and Fourteenth Amendments.**

Respondent asserts the following:  (1) Canales' right to counsel was not at issue at the time Innes received the first letter from Petitioner that included a detailed account of the murder, Response at 8; (2) Canales' right to counsel had attached with respect to the murder charge when the second incriminating letter was received, but there was no violation of Canales' right to counsel on the murder charge because the second letter "involved not the murder of Dickerson but the planned murder of Whited [another inmate cooperating with the State], a crime for which

Canales was not yet indicted,"[1] Response at 8; (3) there has been no showing that Innes was a state agent at the time either letter was received, Response at 9; (4) even if Innes was an agent, the February 2000 letter from Petitioner was unsolicited, Response at 10; and (5) Respondent's subsequent communications with Innes related only to "the planned hit on Whited" and are not relevant to the claim of violation of right to counsel on the murder charge, Response at 10.  Each of these arguments will be addressed below.

**A.**     **Bruce Innes clearly acted as an agent for the State in all of his dealings with Petitioner after January 1998.**

As set forth in the Supplement to the Petition for Writ of Habeas Corpus (hereinafter Supplement) at 9-14 (Dkt. No. 121), there can be no serious doubt that Innes was acting as an agent for the State at all times after his lawyer first approached the Special Prosecution Unit (hereinafter "SPU") offering his cooperation.  He was telling Texas Department of Criminal Justice (hereinafter "TDCJ") personnel just that and they were documenting it.  *See, e.g.*, Supplement Exh. 10 ("Offender Innes has requested to be reclassified as an ex member, but claims that special prosecutor's office has instructed him to keep in contact with TM members **(for purposes concerning the homicide**)")) (emphasis added).  Likewise, A.P. Merillat, the SPU investigator assigned to Petitioner's case pretrial, testified that he wanted Innes to continue writing to Canales and gathering information.  Supplement Exh. 1 at 71-72.  In this context, to assert as Respondent does, that Petitioner's letter of February 12, 2000 was unsolicited and purely "by luck or happenstance," Response at 10, is ridiculous.

**B.**     **The communications soliciting the letter of February 2000 were not related solely to other planned offenses.**

Respondent's assertion that Innes was soliciting information solely about a planned hit on another inmate after indictment on the murder charge has no basis in fact, logic, or the law.  He

---

[1] Indeed, Petitioner has never been charged with any crime related to Whited.

was soliciting information to support the State's homicide prosecution AND the State's arguments in support of the death penalty.  In other words, the State was not investigating other crimes or possible crimes – and the State had no knowledge of any alleged planning of a hit on a witness until Innes' receipt of the February 2000 letter.  Moreover, even assuming that the State and its agent Innes were only inquiring about a planned hit on witnesses in the homicide case, that DOES relate directly to the charges in the homicide case for which Petitioner's right to counsel had attached.  Respondent simply draws too narrow a view of the law and facts on this point.

This case is analogous to *Maine v. Moulton*, 474 U.S. 159 (1985), in which Moulton had been indicted on burglary and theft charges, but he was suspected also of threatening and plotting to kill potential witnesses against him.  His co-defendant, acting as a State agent, recorded telephone conversations with Moulton and wore a wire, allowing discussions in an in-person meeting to be recorded.  The State argued that it was investigating only with respect to threats against witnesses and acting to ensure their safety at that point and, therefore, Moulton's right to counsel on the burglary charges was not violated.  *Id.* at 178.  The Court noted that a similar argument had been rejected in *Massiah v. United States*, 377 U.S. 201, 206 (1964).  Likewise, the Court rejected the argument in *Moulton*.  Even assuming that the State intended only to investigate with respect to the witnesses, "the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel" in taking the actions it did, which "suffice[d] to establish a Sixth Amendment violation."  *Moulton*, 474 U.S. at 176 n.12 (quoting *United States v. Henry*, 447 U.S. 264, 271 (1980)).  Therefore, the information obtained was inadmissible with respect to the pending charges, although "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right

has not yet attached, are, of course, admissible at a trial of those offenses." *Moulton*, 474 U.S. at

180 n.16.  As the Court explained:

> The police have an interest in the thorough investigation of crimes for which
> formal charges have already been filed. They also have an interest in investigating
> new or additional crimes. Investigations of either type of crime may require
> surveillance of individuals already under indictment. Moreover, law enforcement
> officials investigating an individual suspected of committing one crime and
> formally charged with having committed another crime obviously seek to
> discover evidence useful at a trial of either crime.  In seeking evidence pertaining
> to pending charges, however, the Government's investigative powers are limited
> by the Sixth Amendment rights of the accused. To allow the admission of
> evidence obtained from the accused in violation of his Sixth Amendment rights
> whenever the police assert an alternative, legitimate reason for their surveillance
> invites abuse by law enforcement personnel in the form of fabricated
> investigations and risks the evisceration of the Sixth Amendment right recognized
> in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to
> which the Sixth Amendment right to counsel had not attached at the time the
> evidence was obtained, simply because other charges were pending at that time,
> would unnecessarily frustrate the public's interest in the investigation of criminal
> activities. Consequently, incriminating statements pertaining to pending charges
> are inadmissible at the trial of those charges, notwithstanding the fact that the
> police were also investigating other crimes, if, in obtaining this evidence, the
> State violated the Sixth Amendment by knowingly circumventing the accused's
> right to the assistance of counsel.

*Moulton*, 474 U.S. at 179-80 (footnotes omitted)

The Court's subsequent holding--that the Sixth Amendment right to counsel is "offense

specific"--does not change the analysis of this type of factual situation.  *See Texas v. Cobb*, 532

U.S. 162, 166-68 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).[2]  For example, in

*United States v. Anderson*, 523 F.2d 1192 (5th Cir. 1975), the defendant, a doctor, was charged

with drug offenses involving improperly prescribed controlled medications.  Shortly before trial,

an undercover agent was sent to the defendant's clinic and obtained an improper prescription for

---

[2] In *McNeil*, the criminal defendant was questioned post-indictment on armed robbery charges about completely separate murder and corollary charges.  *Id.* at 173.  In *Cobb*, where there had been a burglary of a house, which resulted in two murders, the defendant was indicted initially only on the burglary charge.  Subsequent, post-indictment questioning about the murders was not improper as the right to counsel had not attached on those offenses.  532 U.S. at 173.

controlled medications from him showing, according to the government at trial, a "pattern and scheme on the part of this defendant to relate to his intent to violate the law." *Id.* at 1194.   Thus, where the government argued on appeal that the information obtained pertained not to the charged offenses but to an unrelated new offense, the court found this to be unavailing where the government had used the information during trial to obtain a conviction.

> Conviction required proof of both actus rea and mens rea elements of the indicted offenses. Evidence resulting from the government's surreptitious confrontation with defendant is no less incriminating because it tends to prove criminal intent rather than criminal act.

*Id.* at 1196.  This same result would be required post-*McNeil*, as evidenced by *United States v. Bender*, 221 F.3d 265 (1st Cir. 2000).   In *Bender*, the defendant had been charged with possession of a weapon by a felon and was questioned by a government agent concerning his plans to falsify an alibi defense and potentially to kidnap and murder witnesses against him. "There was no discussion of, and Bender made no admissions pertaining to, the pending felon-in-possession charges as such." *Id.* at 267.  The government argued that there was no violation with respect to the pending charge because the statements pertained only to future charges or actions.   The court rejected this because, while not a direct statement of guilt, the statements about falsifying a defense and plotting against witnesses were incriminating with respect to the pending charge.

> All that matters is that the statements were incriminating as to the pending charges; it does not matter how. . . .   It was obvious that questioning Bender about a false alibi for the underlying charges would result in his making incriminating statements as to those charges. The same was true of a plot to do away with government witnesses. Bender's statements, therefore, were likely to be incriminating as to the pending charges, were deliberately elicited post-indictment, and were obtained in the absence of counsel. Thus, they were obtained in violation of the Sixth Amendment and were rightly suppressed by the district court.

*Id.* at 269.

7

The same result must be achieved here.  Innes, acting as the State's agent, was not seeking information about unrelated crimes; he was seeking anything that could be useful to the State in its capital murder prosecution of Petitioner, where the jury must consider future dangerousness in deciding whether to impose a death sentence in Texas.[3]  For Respondent now to argue that these statements were not elicited in relation to the capital murder charges is disingenuous given that the State not only sought, but obtained, admission of the February 2000 letter in the capital sentencing.  Moreover, without this second letter, the State *could not* have obtained admission of the pre-indictment letter into evidence as the second letter formed the basis for the State expert's handwriting comparison and, thus, the foundation for admission of the pre-indictment letter in the trial of the case.  *See* SR10:62.

The State's misconduct in deliberately violating Petitioner's right to counsel and using the evidence obtained in both the trial and the sentencing is clear.

> This is not a case where, in Justice Cardozo's words, "the constable ... blundered," *People v. DeFore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926); rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.

*Henry*, 447 U.S. at 274-75.  Reversal is required.

## IV. Petitioner's Right to Due Process Under the Sixth and Fourteenth Amendments Was Violated by the State's Suppression of Material Evidence Related to Bruce Innes.

In the face of overwhelming evidence that the State suppressed material evidence related to Bruce Innes,  Supplement at 14-53, Respondent resorts to selective and decontextualized facts and arguments.  In general, Respondent argues: (1) the defense had access to the undisclosed information in the TDCJ Security Threat Group (hereinafter "STG") files; (2) the prosecution did

---

[3] The trial court must submit to the jury for consideration:  "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. Ann. art. 37.071 §2 (b)(1) (2009).

not have "readily available" access to the STG or TDCJ files; (3) Petitioner did not establish that notes in the STG, TDCJ, or SPU files were accurate and reliable or admissible in evidence; (4) Innes was used by the State only to introduce two letters corroborated by fingerprint and handwriting expert evidence and, therefore, how he received the letters, whether he was a suspect in the murder, whether he had collaborated with other inmate witnesses on the "story," whether he had truly renunciated his gang membership, and his credibility were not at issue; (5) Petitioner failed to establish that Innes had made prior inconsistent statements about how he received the confession letter; and (6) even assuming Petitioner could have used the undisclosed material to impeach Innes, it would have been merely cumulative because Innes was impeached with information that he had a deal on pending charge. Each of these arguments will be addressed below, along with Respondent's complete failure to address the cumulative impact of the undisclosed material.

### A. The defense had limited access, at best, to the STG files and no access to the TDCJ, OIG,[4] or SPU files.

Respondent asserts that "the trial record suggests that trial counsel had access to the records of the prison system's Security Threat Group." Response at 13. This broad statement is not an accurate representation of the trial record, which reflects only that STG was willing to disclose, with respect to the state's inmate witnesses, only "whether these individuals have been confirmed as gang members, or have been suspected as gang members, or gosh, we didn't know." SR 7:90. There is no showing that the defense was provided any information beyond that. In fact, trial counsel have provided affidavits asserting that they had not been provided with the relevant documents. As Respondent has not rebutted trial counsel's affidavits, the only credible evidence is that the defense was not provided with these documents. Indeed, the

---

[4] TDCJ's Office of Inspector General (formerly the Internal Affairs Division).

9

information was disclosed in these proceedings only after repeated objections by Respondent and an order of production and *in camera* inspection by The Honorable T. John Ward. *See, e.g.,* Dkt. Nos. 17 (Opposition to First Motion for Discovery), 42 (Order Granting in Part and Denying in Part Motion for Discovery), 44-45 (Motion to Vacate Order on Motion for Discovery and Supporting Brief), 51 (Emergency Motion to Stay Discovery), 55 (Order Denying Motion to Vacate Discovery and Motion to Stay), 79 (Opposition to Second Motion for Discovery), 86 (Order Granting in Part and Denying in Part Second Motion for Discovery), Sealed Memorandum Opinion and Order (March 14, 2011) (releasing documents to the parties after *in camera* inspection).[5]   These repeated objections would clearly not have been made if the information had already been disclosed to defense counsel prior to trial.

Moreover, even assuming trial counsel had access to the complete STG files pretrial, as addressed in the Supplement, virtually all of the relevant undisclosed documents were contained not in the STG files, but in the prosecutor's files within SPU or within the TDCJ/OIG files. Specifically, the notes revealing Innes' prior inconsistent statements about how he received the first letter allegedly written by Canales were contained in the SPU files.  Supplement Exh. 17, Exh. 1 at 51, Exh. 16. at 29, 90.  The information that Innes was a suspect in this murder was contained in the TDCJ files.  Supplement Exhs. 18-19, Exh. 16 at 35.  The information that Innes was communicating with another inmate cooperating with the state to get their "stories" straight came from the SPU files.  Supplement Exh. 12, 20, 21, 23.  The information reflecting that Innes had not truly renunciated his gang affiliation came from the SPU files, which contained Inmate Lonnie Eason's letters, and the TDCJ and OIG files.  Supplement Exhs. 24, 26.  The information that the State dismissed a felony case--incurred while Innes was working as a state agent--was contained in the OIG and SPU files.  Supplement Exh. 19, 29, 30, 31, 32.  The information that

---

[5] Respondent made other objections to discovery that are not listed because they related to depositions.

the State made promises generally to "help" the cooperating inmate witnesses was contained in the SPU files.  Supplement Exh. 23, 35, 36, 38, 39, 40, 42, 45, 46, 47, 48.  The information that Innes repeatedly sought and obtained State intervention on matters relating to gang deconfirmation, to better TDCJ classification, and better housing was contained in the TDCJ/OIG and SPU files.  *See* Supplement Exhs. 2, 18, 35, 45, 49, 50, 51, 52, 53, 54.  Thus, even assuming trial counsel had access to the STG files, the issue remains the same.

> **B.  The prosecutor undeniably and concededly had access to the STG, OIG, and TDCJ files and, therefore, had a duty to disclose the information contained in these files.**

Respondent asserts that the prosecutor, Mark Mullin, "did not have the authority to disclose" STG files, Response at 14, and "did not have automatic access to all prison records," Response at 15.  These arguments do not address Petitioner's claim, nor accurately reflect the law.

First, "authority to disclose" is a different question from whether the prosecutor possessed or had access to the records, which would impose not just authority but a constitutional duty to disclose.  Second, not having "automatic access" to records does not mean the prosecutor did not have "access," "possession," "knowledge," or "imputed knowledge" of the information contained in the files.  Thus, Respondent misunderstands the applicable law.

In essence, Respondent asserts that "[t]he prosecution is deemed to have knowledge of information readily available to it," Response at 14 (citing *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991)), *see also* Response at 17, implying that the prosecution is not responsible for disclosure of any other information.  This is contrary to the law.

> Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the

> prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them.

*United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004) (quoting *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995)).

> [T]he prosecution has a *duty to learn* of any exculpatory evidence known to others acting on the government's behalf. Because the prosecution is in a unique position to obtain information known to other agents of the government, *it may not be excused from disclosing what it does not know but could have learned.*

*Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (holding that, even though the prosecutor may not have possessed the records, he was required to disclose the star, immunized "witness's criminal record, including prison records, and any information therein which bears on credibility").

The primary point, which Respondent seems to have completely missed, is that the prosecutor not only has a duty to disclose material exculpatory or impeachment evidence, but also has a *duty to inquire of all of those involved in the prosecution as to whether such information exists* and to disclose the information. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf" and to disclose the information); *Morrow v. Dretke*, 367 F.3d 309, 316 (5th Cir. 2004) ("In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it.  Rather, the prosecutor 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police'").  Thus, all Canales has to show legally is that the SPU investigators, OIG, and STG constitute "others acting on the government's behalf" in this case.

Leaving aside the STG office, solely for the sake of argument on Respondent's incorrect contention that the defense had these files available pretrial, there can be no straight-faced argument that the SPU investigators or the OIG investigators were not "acting on the government's behalf" in this case. There can be no straight-faced argument that the SPU investigators of the OIG investigators were not "acting on the government's behalf. Mullin worked for SPU and Merillat, who possessed the SPU investigative file, was "his investigator" within the SPU office. Supplement Exhs. No. 1 at 23, 16 at 19. Merillat's knowledge and file is clearly imputed to Mullin as they worked in the same office. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity" and the knowledge of one member is attributed to the entire office). As addressed above, the overwhelming bulk of the undisclosed documents at issue here came from that file.

OIG, as detailed in the Supplement at 44-49, investigates cases for SPU and remains involved in development of the case and preparation for trial even after SPU has agreed to prosecute the case. Supplement Exh. 1 at 38-39. Because of this close relationship, SPU staff have largely unfettered access to TDCJ documents both on computer and hard copy. Specifically, Merillat acknowledged that he or another SPU investigator has computer access to STG files and most TDCJ files. Supplement Exh. 1 at 20. Generally, he receives full access to any OIG, STG, or TDCJ files requested. Supplement Exh. 1 at 21. Likewise, Mullin acknowledged that he also generally receives all STG, OIG, and TDCJ files requested. Supplement Exh. 16 at 8-11.

Thus, even if Mullin was not personally aware of the undisclosed information, he was legally responsible for learning of it and disclosing it. *See, e.g., United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (where there was "extensive cooperation between the investigative

agencies . . . the state investigators functioned as agents" of the federal prosecutor and "were in a real sense members of the prosecutorial team"); *United States v. Deutsch*, 475 U.S. 55, 57 (5th Cir. 1973) (U.S. Attorney's failure to provide a personnel file of a U.S. Post Office employee who was a key prosecution witness in an attempted bribery case was held to be a *Brady* violation because "there is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities").

Ultimately, however, Respondent ignores the "elephant in the room," namely that Mullin himself acknowledged having access to all of these documents, and even reviewed them. Supplement Exh. 16 at 8-10. Therefore, as much as Respondent seeks to make this a legally complicated decision for this Court to make, in fact, it requires only the most straightforward application of *Brady*.

**C.    Petitioner is not required to establish that the undisclosed documents were reliable or accurate or even admissible in evidence.**

Respondent argues that Petitioner has not shown the precise author, the reliability, or the accuracy of information contained in the State's files. For example, with respect to the note that contradicts Innes' version of how he came in possession of the first incriminating letter, Supplement Exh. 17, Respondent argues, "The note's scribe was never identified. . . .  Nor does the record show that the scribe's recitation is accurate or reflects reality." Response at 20.[6] Likewise, with respect to the records referring to Innes as a suspect in this murder, Respondent argues that Petitioner has failed to show "the reliability of the records from the Security Threat Group Management Office or the Office of the Inspector General. Nothing in the record shows

---

[6] Contrary to Respondent's assertion, the parties know the likely identity of the note's author. Merillat and Mullin both suggested in their depositions that the author of the note was Roy Smithey, another SPU investigator. *See, e.g.,* Supplement Exh. 1 at 51. Petitioner has previously moved to depose Smithey (Dkt. No. 73) and continues to believe he has demonstrated good cause for the deposition. That said, Smithey's recollection of this interview and his notes is not essential to the claim. The notes speak for themselves.

the individual who generated the records or shows the accuracy of the record." Response at 22 (record citations omitted). Moreover, in both instances, Respondent argued the notes could not be admitted into evidence. Response at 20, 22.[7] This argument misses the point.

First, the relevant case law--*Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny--does not require Petitioner to establish the identity of the author of notes or the accuracy or reliability of the notes. Indeed, Respondent's bold, blackletter-like assertions followed by absolutely no citation of authority, reflect "a deafening silence" on the controlling legal authority. Petitioner does not have to prove the admissibility of the suppressed document. He must establish only that the information would have led to other discoverable, admissible information. For example, in *Spence v. Johnson*, 80 F.3d 989, 998 (5th Cir. 1996), the court held that the District Court erred in concluding "that the undisclosed evidence was not material because under Texas law it would not have been admissible at trial." The Court noted that it had "expressly found otherwise in *Sellers v. Estelle*:"

> In addressing the issue of materiality, the Magistrate found that [statements in police reports] would have been inadmissible, hence these reports were immaterial. Such a conclusion is unwarranted. First, by enabling the defense to examine these reports, [the petitioner] may have been able to produce witnesses whose testimony or written statements may have been admissible. Second, the evidence here suppressed was material to the preparation of the petitioner's defense, regardless of whether it intended to be admitted into evidence or not.

*Id.* (quoting *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981)). *See also Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001) (notes made by prosecutor regarding opinions of medical examiner who performed autopsy on murder victim could potentially have led defense to discover admissible evidence that could have undermined confidence in outcome, so that notes

---

[7] Respondent makes additional similar arguments that will not be addressed here, *see, e.g.,* Response at 25-26, because the reply would be the same.

were material, and thus subject to disclosure under *Brady*, even though notes were hearsay that were not independently admissible).  Thus, Respondent's red herring arguments must be ignored.

**D.     Regardless of Respondent's repeated protestations otherwise, Innes' credibility was at issue.**

Respondent repeatedly asserts that none of the undisclosed documents concerning Innes are material because his credibility was not an issue.  In doing so, Respondent asserts:

> At trial, Innes testified that he received the kite from Canales directly.  He said he recognized Canales's handwriting and that the letter was written in Canales's hand.  A fingerprint expert found Canales's fingerprints on the letter, and a handwriting expert verified that the letter was written in Canales's hand.  Because Innes's contribution arose from the delivery of the letters and not from the truthfulness of his testimony, Innes's credibility was not material.

Response at 17-18 (record citations omitted).  *See also* Response at 21 ("Innes's inculpatory testimony was corroborated by a handwriting and fingerprint experts"); Response at 22 ("Innes's contribution to the case arose not from his credibility but from the letter, which inculpates Canales regardless of Innes's veracity"); Response at 23; Response at 30.   The problem, however, is that Respondent misstates the evidence.  This is the evidence:

--The "kite" Respondent refers to containing a description of the crime is State Exhibit 27.  SR 10:32.

--State Exhibit 25 is a separate letter through the U.S. mail that Innes received in 2000. This was not admitted until sentencing.  SR 10:37.

--A fingerprint expert testified that he identified Petitioner's fingerprint on the letter (State Exhibit 25), not the kite (State Exhibit 27) as Respondent represents.  SR 10:258.

--A handwriting expert testified only that the same person wrote State Exhibits 25 and 27, not that Petitioner wrote the letters as Respondent represents.  SR 10:62.

--Innes testified that he asked Petitioner to write the kite, watched Petitioner tie the kite to his line, and he recognized Petitioner's handwriting on the kite.

--Without his testimony, the State had only evidence that at some point Petitioner touched State Exhibit 25 (which was not admitted in the trial) and the same person wrote State Exhibits 25 and 27.

Thus, Innes' credibility was crucial to link between the fingerprint and handwriting experts.  He was the State's star witness establishing the identity of Petitioner as the author of the letters.[8] Moreover, the record itself reveals the importance of this aspect of Innes' testimony.  The prosecutor questioned Innes at great length and in great detail about the circumstances surrounding how he received the letter describing the inmate's death, SR 10:28-33 (quoted in Supplement at 17-19) clearly reveal that the state believed this was an important issue in the trial. The materiality of Innes' credibility is clear.

> **E.   The evidence establishes that Innes made prior inconsistent statements about how he received the confession letter.[9]**

Respondent asserts that Petitioner has made no showing that Innes made a prior inconsistent statement about how he received the confession letter from Petitioner.  Response at 19.  Respondent's arguments about authorship, accuracy, reality, and admissibility are addressed above and will not be repeated here.

Respondent also relies on Innes' deposition testimony denying knowledge about the note or its contents.  Response at 20.  *See also* Response at 25.  Respondent does not address, however, the fact that Innes repeatedly lied in his deposition.  For example, he testified that he only wrote to Merillat about three times, Supplement Exh. 43 at 85, when SPU's files contained

---

[8] While two gang officers also testified that they recognized the handwriting on the letters as Petitioner's, SR 10:125, 10:139, their credibility was also in issue.

[9] This section also addresses Respondent's similar arguments in response to the false testimony claim.  *See* Supplement at 53-58.

over 25 letters from Innes to Merillat, including a letter written after he was notified that he would be deposed in this case.   Supplement Exh. 3.   Likewise, he denied knowing Inmate Whited, Supplement Exh. 43 at 95-98, despite referencing him in his pretrial letters to Merillat. *See, e.g.*, Supplement Exh. 12 at 2, Exh. 22.   Merillat's and Whited's letters also make clear that Innes knew Whited.   *See, e.g.,* Supplement Exh. 21, Exh. 23 at 21.   Thus, Innes' testimony is clearly unreliable and should be given no weight by this Court.

Even assuming, however, that Innes would have testified similarly in the trial if the note of the prior inconsistent statement had been disclosed, Supplement Exh. 17, and that the note itself is inadmissible, Petitioner still could have obtained admissible evidence to impeach Innes. Specifically, Petitioner could have called the note's author, likely Smithey, as addressed above, to elicit the prior inconsistent statement.

**F.      The undisclosed impeachment information was not merely cumulative of the impeachment examination conducted at trial.**

In essence, Respondent argues with respect to each individual undisclosed document or category that it is not material because Innes was impeached at trial.   *See, e.g.* Response at 21 ("considering the impeachment-related evidence given at trial, any lies Innes is presumed to have told about his receipt of the kite is immaterial"); Response at 22 ("Innes's credibility was attacked sufficiently").   Likewise, Respondent argues that the undisclosed impeachment evidence related to other inmate witnesses for the State is immaterial because "the credibility of the inmates was impeached sufficiently with their criminal records, which were discussed at trial."   Response at 37.   In other words, Respondent implies that because these witnesses were impeached "with something," any additional impeachment evidence is simply immaterial.   This is just not the law. *See Banks v. Dretke*, 540 U.S. 668, 702 (2004) (rejecting argument that since witness was otherwise impeached withheld impeachment evidence was immaterial).   "[C]ourts

have repeatedly held that withheld impeachment evidence does not become immaterial merely because there is some other impeachment of the witness at trial. Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material." *Gonzales v. Wong*, ___ F.3d ___, 2011 WL 6061514, *12 (9th Cir. Dec. 7, 2011). This is precisely what the previously undisclosed evidence demonstrates here: there were qualitatively different avenues of impeachment that would have been available to trial counsel if the state had fulfilled its constitutional obligation. While criminal history may be a generalized reason to discount the testimony of an inmate, the evidence suppressed by the State in this case went directly to the specifics of its case against Petitioner.

Likewise, Respondent completely ignores the Supreme Court's command that materiality turns on the cumulative effect of all suppressed evidence favorable to the defense. In short, materiality is "considered collectively, not item by item," *Kyles v. Whitley*, 514 U.S. 419, 436 (1995), as Respondent has done.[10]

### Conclusion[11]

WHEREFORE, for the reasons set forth in the Petition, Dkt. No. 7, and the Supplement to the Petition, as well as the arguments herein, Petitioner ANIBAL CANALES, JR. prays that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

---

[10] The collective impact of the withheld evidence was addressed in full in the Supplement at 49-53, and will not be repeated here.

[11] With respect to the remainder of Respondent's arguments, Petitioner relies only on the arguments previously made, but does not abandon those claims otherwise included in the Petition, Dkt. No. 7, and the Supplement to the Petition.

2.      Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct in which to brief the issues of law and of fact raised by this petition or such hearing;

3.      Defer ruling on the above-developed claims until he has had the opportunity to develop and present his remaining claims for relief as set forth in his original Petition for Habeas Corpus; and

4.      Grant such other relief as the ends of justice may require.

Respectfully submitted this 19th day of January, 2012.

<div style="margin-left:40%">

Teresa L. Norris
S.C. Bar # 15081
Blume Weyble & Norris, LLC
900 Elmwood Ave., Ste. 101
Columbia, S.C. 29201
(803) 765-1044
(803) 765-1143 (Fax)

David Voisin
Miss. Bar # 100210
P. O. Box 13984
Jackson MS 39236
(601) 949-9486
(601) 354-7854 (Fax)

By:      S/ Teresa L. Norris
         Counsel for Petitioner

</div>

## CERTIFICATE OF SERVICE

This is to certify that I, Teresa L. Norris, have electronically filed the foregoing Reply to Respondent Thaler's Response to Petitioner's Supplement to Petition for Writ of Habeas Corpus under seal as authorized by previous court order (Dkt. No. 133).  I further certify that I have served a copy of this document upon Respondent's counsel, Thomas M. Jones, by email.

This the 19th day of January 2012.

S/ Teresa L. Norris
Counsel for Petitioner