## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## MARSHALL DIVISION

| | | |
|---|---|---|
| **ANIBAL CANALES, JR.** | § | |
| Petitioner, | § | |
| vs. | § | No. 2:03cv069 |
| **NATHANIEL QUARTERMAN, Director**, Texas Department of Criminal Justice, Correctional Institutions Division, | § § | |
| Respondent. | § | |

## SEALED REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Anibal Canales Jr. ("Canales"), an inmate in the custody of the Texas Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. §2254. Canales challenges his conviction of capital murder and death sentence imposed in the Fifth Judicial District Court of Bowie County, Texas in trial cause number 99F0506-005, styled *The State of Texas v. Anibal Canales*. On January 24, 2012, this case was referred to the undersigned United States Magistrate Judge for a recommendation for disposition of the application.

**Facts**

The victim, Gary Dickerson, was an inmate at the Telford Unit of the Texas Department of Criminal Justice. Canales, who was serving a fifteen year sentence for aggravated sexual assault, was also an inmate at the Unit, and was a member of a prison gang known as the Texas Mafia. On

1

July 10, 1997, Dickerson was found dead in his cell.  Authorities originally believed he died of natural causes, but later determined he had been strangled.

On July 1, 1997, Dickerson had been seized by prison officials with contraband currency, which belonged to an African American prison gang.  Dickerson had told another inmate, Baker, that if Baker did not help him avoid retaliation from the African American gang, he (Dickerson) would tip off prison officials about a large quantity of tobacco which was scheduled to be smuggled into the prison.

On July 2, 1997, the tobacco was intercepted by prison officials.  The Texas Mafia  had an interest in the illicit tobacco, and its members assumed that Dickerson had tipped of prison officials.  In retaliation four gang members - William Speer, Jessie Barnes, Michael Constadine, and Canales - agreed to kill Dickerson.  Dickerson was placed in administrative segregation for six days, but on his own request he was returned to the general population.  The next evening, July 9, 1997, Canales and Speer went to Dickerson's cell and, while Canales held Dickerson down, Speer strangled him.  Dickerson's cellmate found his body on the top bunk.  Authorities originally thought that he had died of natural causes, but an autopsy confirmed that he had died of strangulation.

Bruce Innes, another Texas Mafia gang member, asked Canales and Speer what had happened, and they each sent him a letter describing the killing.  Canales's letter, written in 1998, read in part:

> Dirty [Dickerson] lit the smoke and we smoked.  When the last hit was took he was down by the vent on his knee and Puff [Speer] behind and me at the door.  Puff put the hold on him and I grabbed his arms.  It went smooth!  He lost consciousness right away and strugled (sic) for a little bit.  I took the time to inform Him who we were and why he's going to die.  Puff told him . .  "Don't even fuck with the Texas-MAFIA in hell!!"  Ha! Ha! Ha! Anyway. . . we made sure the dick sucker was dead and I declared the hit complete.  We put his shit smelling ass in the top bunk and went quietly out the door.  I went to the yard with minutes to spare!!

2

Reporter's Record ("RR")Vol. 13, State's Ex. 27.   Several months later, Innes, by then facing two serious unrelated charges - assault of a prison guard and possession of a deadly weapon - contacted his attorney and asked if he could get a plea bargain agreement on his charges if he turned over the letters.   Prosecutors agreed to allow him to receive only 3 years on charges that each carried a potential sentence of 99 years.   Innes also agreed to continue to provide them information about the Texas Mafia, as several members wrote him periodically to keep him appraised of gang concerns.

Canales was indicted for Capital Murder in November of 1999.   In February of 2000 he sent another letter to Innes which, although written in code, appeared to ask the gang to retaliate against Larry ("Iron-head") Whited because he believed Whited had informed prison authorities about his role in the killing.   The letter read:

> Greetings, Sir . . As always, I come to you and all worthy with my utmost respects (sic)!  I realize that I just recently sent you a letter but it has become imperative that I write you again, as you'll see . .   First, I arrived at bowie county court on 2-7-00 and was arraigned for several charges.  Mr.s Speers barnes and Constinetine were also there. .  I must tell you that the worst has been done and its (sic) one of the charges (Main one actually) Glarinly  (sic) absent was that iron headed fella . . He was not charged, which is good .. Eh?  Seems that iron obes (sic) bend to the will of the state or not.  I personally think so.
>
> Perhaps some effort can be used to throw that useless material to the scrap yard. . I can't stress how important this is.  As you know Iron can be shaped into what you want it to look like and not in a good way sir!!  If this can't be done then I'll need to ask for legal-assiatance from other arenas .. And that's not to(sic) cool!  Maximum effort Ace, Maximum!!  Now, I will also get with Mr. JR on the others who are involved and can help get it all in order.
>
> Also, it's possible that a legal defense fund will be placed to help with council, (sic) legal material, clothes (for court) I'll have our attorney (who's a freeworld) get it together and put out flyers to all the best ..
>
> We'll need ya'lls (sic) help fellas and I can't stress how important it is to file that writ of dismissal in this area on that pile of scrap!  This in itself would be tremendous in assisting this legal case!  That's how important it is . . .
>
> You take care fellas and put out the word that help is needed on this from all areas. . . .  We continue the struggle,
> In solidarity
> Bigfoot..

RR Vol. 13, State's Ex. 25 B.  Some two months later, in April, 2000 Canales wrote to Hannah,

another inmate, and this letter read in part:

> Yeah bubba, I've been bummed a bit, just a small funk, no sweat .. A lot has to do
> with my case and its outcome or the way I see it.  It's not good , and I've got a few
> making matters worse with their mouths!  I was here with Tony Rice, I know him and
> his case and I know how it came about, I was in super seg with him there in 85 and
> then we were all on the same wing (L -Wing) in 86-87 and we got tight.  I saw the
> downfall and how it came about and who was responsible!
> I've got snakes in the yard and it's getting worse from the crap coming outta the
> mouths of so-called homies.  One dayroom call homeboy, and I'll get it all straight!
> Bet that!  But what can I do?  Nothink! Nada! Zero! Zip! 0!  But, I'm a firm believer
> that what goes around, comes around! And that what you sow, you reap!  So, I'll be
> content with justice in the end.  TDC is not big, at all!  So ......

RR Vol. 13, State's Ex. 29.  These letters were the main evidence in Canales's trial.

 **Procedural history**

On November 4, 1999, Canales was indicted for Capital Murder by the 5th Judicial District

Court of Bowie County, Texas, for intentionally killing another inmate with the intent to establish,

maintain, participate in or share in the profits of a combination of three or more persons.  *See* TEXAS

PENAL CODE §19.03 (a)(5)(B).  His case was tried to a jury and on October 27, 2000, he was

convicted.  A separate trial was held to determine the appropriate punishment for the offense, and

on November 1, 2000, the jury found that there was a probability that Canales would commit acts

of criminal violence that would constitute a continuing threat to society; that Canales either  actually

caused the death of the victim or intended to kill the victim or anticipated that the victim's life would

be taken; and that there were not sufficient mitigating circumstances to warrant imposing a sentence

of life imprisonment, rather than death.  *See* TEXAS CODE CRIM. PROC. Art. 37.071.  Based upon

these findings, the trial court sentenced Canales to death.  His conviction and sentence were affirmed

on direct appeal, *see Canales v. State*, 98 S.W.3d 690 (Tex.Crim.App. 2003) and his application for

a writ of *certiorari* was denied, *see Canales v. Texas,* 540 U.S.1051 (2003).  Canales also filed a

petition for post - conviction relief, which was denied.  *See Ex Parte Anibal Canales*, No. 54,789-01

(Tex.Crim.App. Mar.12, 2003) (unpublished).

On November 29, 2004, Canales filed an application for a writ of *habeas corpus* in the

United States District Court for the Eastern District of Texas, raising thirteen separate claims for

relief.  On March 23, 2007, the Court stayed these proceedings so that Canales could return to state

court and present his claims.  On May 22, 2007, Canales filed a Subsequent Application for a Writ

of Habeas Corpus ("subsequent state petition").  The Texas Court of Criminal Appeals dismissed

Canales's subsequent state petition as an abuse of the writ.  *See Ex Parte Anibal Canales*, No.

54,789-02,  2008 WL 383804 (Tex.Crim.App. Feb. 13, 2008) (unpublished).

**Claims**

Canales raised thirteen claims for relief in his application:

1. His trial counsel's performance, because of an unreasonable trial schedule and inexperience in the defense of death penalty cases, fell below the standard of practice in capital cases.

2. The trial court's rulings violated his right to present a defense.

3. The state's use of another inmate, Innes, as its agent to solicit incriminating evidence from Canales for  its use at both the guilt-determination and punishment-determination phases of his trial violated his rights to due process of law and to the assistance of counsel.

4. The state violated his right to the due process of law when it withheld material exculpatory evidence and when it knowingly allowed false testimony to be presented to the jury.

5. The cumulative effect of the ineffective assistance of counsel and the withholding of material evidence violated his right to a fair trial.

5

6. Prosecutorial misconduct so pervaded his trial that he was denied due process of law.

7. His rights to due process of law, to a fair trial, and to be free from cruel and unusual punishment were violated because several of the jurors in his petit jury lied about their criminal backgrounds.

8. Canales's rights to due process of law, to the assistance of counsel, and to be free from cruel and unusual punishment were violated when the jury, during its deliberations, communicated with the court and with the bailiff outside his and his counsel's presence.

9. His rights to due process of law, to remain silent, and to a fair trial were violated by being forced to wear leg shackles in front of the jury during the punishment determination phase of his trial.

10. His rights to the due process of law and to a fair trial were violated by the process by which Bowie County selects its grand juries resulting in an under representation of women.

11. Allowing the foreperson of the grand jury that indicted Canales to testify as a witness in his trial violated his rights to the due process of law, to a fair trial, and to be free from cruel and unusual punishment.

12. By permitting the jury to find the absence of mitigating factors by a standard of less than beyond a reasonable doubt, the Texas capital sentencing statute deprived him of his right to the due process of law, to a fair trial, and to be free from cruel and unusual punishment.

13. Lethal injection as currently administered in Texas violates his right not to have to endure cruel and unusual punishment.

**Standard of review**

Because Canales's application for *habeas corpus* was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act  "AEDPA" applies to his claims.  Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must fairly present those claims to the state court and thereby exhaust his state remedies.  *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002).  If an

applicant raises a claim in his federal *habeas corpus* application that was not fairly presented to the state courts, the federal court has three options.  First, it can direct the applicant to return to state court and present the claim to the state court in a successive petition, either by dismissing the entire petition without prejudice, *see Rose v. Lundy*, 455 U.S. 509, 522 (1982), or by staying the federal proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 277-78 (2005).  Second, if it is entirely clear that the state court would refuse to consider the merits of the claim if the applicant were to return to state court and present it in a successive petition, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them.  *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001). Finally, the federal court can deny the claim on its merits.  *See* 28 U.S.C. § 2254 (b)(2).

Federal courts do not review claims that the state courts have refused to review based on adequate and independent state grounds unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, because the petitioner is actually innocent of the offense.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of

the United States, *see* 28 U.S.C. § 2254 (d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2).  In reviewing a state court decision, this Court reviews questions of law and mixed questions of law and fact under section 2254(d)(1), and reviews questions of fact under section 2254(d)(2).  The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence.  *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5th Cir.  2008), *cert. denied*, 555 U.S. 1173 (2009).  If a claim was presented to the state court but not adjudicated, this Court will determine it *de novo.  See Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000).

If the state court based its decision on the alternative grounds of both procedural default and rejecting the claim on its merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004).

If it is unclear whether the state court decided the case on procedural grounds or on the merits, the federal court must determine whether the state court's decision fairly appears to rest primarily on federal law, or appears to be interwoven with the federal law, and the adequacy and independence of any possible state law ground is not clear from the face of the opinion.  *See Coleman v. Thompson*, 501 U.S. 722, 733 (1991).  If it does, it is reviewed on the merits.

**Analysis**

Canales presented all thirteen of his claims to the state court in his subsequent state petition. The Texas Court of Criminal Appeals dismissed the petition as an abuse of the writ because Canales's allegations failed to satisfy the requirements of Tᴇx.Cʀɪᴍ.Pʀᴏᴄ. Art. 11.071 §5 (a), which has three parts.  Subsection (a)(1) provides that the merits of claims presented in a subsequent state petition may not be considered and relief on the claim may not be granted unless the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.  Subsection (a)(2) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.  Subsection (a)(3) provides that the merits of the claim may not be considered and relief may not be granted unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's jury trial under Article 37.071 or 37.0711.

When the Texas Court of Criminal Appeals dismisses a subsequent petition for post-conviction relief and gives no reason beyond citing to Art.11.071 §5 (a), it is unclear whether the state court decided the claims on procedural grounds or on the merits. *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007).  As explained above, in this circumstance the federal court must determine, as to each claim, whether the state court's decision fairly appears to rest primarily on federal law,

or appears to be interwoven with the federal law, and the adequacy and independence of any possible state law ground is not clear from the face of the opinion.  If these elements are met, it will treat the state's decision as being on the merits.  Otherwise, it will treat the claim as having been procedurally defaulted.  *See Balentine v. Thaler*, 626 F.3d 842, 851 (5th Cir. 2010), *cert. den*. ___ U.S. ___, 131 S.Ct. 2992 (2011).

The Texas Court of Criminal Appeals dismissed all thirteen of Canales's claims and gave no reason beyond citing to Art. 11.071 §5 (a), so as to each claim the Court must determine whether the basis of the state court's dismissal was based upon state procedural law or based upon the merits. This analysis begins with reviewing the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits. *See Balentine,* 626 F.3d at 854.

Claims 1 and 2:

Canales's first two claims were that his trial counsel's performance, because of an unreasonable trial schedule and inexperience in the defense of death penalty cases, fell below the acceptable standard of practice in capital cases. On pp. 79-83 of his subsequent state petition he contended that these two claims met all three of the exceptions set forth in Art. 11.071 §5 (a). Regarding subsection (a)(1), Canales argued that the legal basis of his ineffective assistance of counsel claim was unavailable on May 16, 2002, the date he filed his initial application, because the legal basis for that claim did not become available until thirteen months later.  *See Wiggins v. Smith*, 539 U.S. 510 (2003).

In rejecting this argument, the Texas Court of Criminal Appeals necessarily determined that *Wiggins* did not establish new standards for ineffective assistance of counsel in capital cases, but

instead reaffirmed the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), a precedent available before Canales filed his state petition.  This reasoning may seem to rest primarily upon or be interwoven with federal law, but in *Rocha v. Thaler*, 626 F.3d 815, 835 (5th Cir. 2010), *cert. denied*, ___ U.S. ___, 132 S.Ct.397 (2011), the United States Court of Appeals for the Fifth Circuit stated flatly that "[i]f the CCA's decision rests on availability, the procedural bar is intact." Therefore, the Court finds that the state court's dismissal of these two claims based upon their failure to meet the elements of subsection (a)(1) rested on adequate and independent state law grounds.

Canales also contended in his subsequent state petition that he met the elements of subsections (a)(2) and (a)(3).  He argued that but for ineffective assistance of counsel, no rational juror would have either found him guilty of capital murder, because one of the elements of capital murder under Texas law is that the murder had to have been committed with the intent to establish, maintain, or participate in a combination of three or more individuals, and had his counsel not conceded this element, the jury could have convicted Canales only of murder, not capital murder. He also argued that but for the unreasonable failure of his trial counsel to obtain and present mitigating evidence, any rational juror would have voted to spare his life.  While one could argue that the state court's implicit rejection of these two arguments seemed to involve state criminal law interwoven with federal standards for effective counsel, the United States Court of Appeals for the Fifth Circuit considers the rejection of such claims as having been based primarily upon state law, not federal law.  *See e.g. Rocha,* 626 F.3d at 840-41.  Accordingly, the Court finds that the state court's dismissal of these two claims based upon their failure to meet the elements of subsections (a)(2) and (a)(3)  rested on adequate and independent state law grounds.

Because Canales's first two claims were procedurally defaulted, the Court cannot review the merits of those claims unless Canales establishes either that he had cause for the default and would be prejudiced if the court failed to address the merits of the claims, or that a fundamental miscarriage of justice would occur because he was actually innocent, either of the crime itself or of the death penalty. To establish actual innocence in this context, an inmate must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995). Canales contended on pp.7-10 of his Reply in Support of Petition for Writ of Habeas Corpus (document 21) that he was actually innocent, citing a non-notarized affidavit by inmate Homer Hughes stating that he was informed by inmate Baker that "Bam" and Driver were actually responsible for the murder, and that inmate Driver had stated that it was ironic that no one had seen "Bam" and him come or go from Dickerson's cell, but everyone and their brother was willing to strike a deal with the state to say that they had seen Canales and Speer come out of that cell. Canales also cited an affidavit from inmate Jason Earwood in which Earwood stated that inmate Driver told him that Canales was "taking the fall" and that as long as it was a Jew who would be blamed, he (Driver) would have no problem lying. Earwood also stated that he observed inmate Canida say to another inmate that he got a transfer to another unit and all he had to do was to "lie on that Jew." Canales also pointed out that in the Internal Affairs records there is a notation that two witnesses, inmates Walker and Earwood, testified that they were talking with Canales in or near his cell at about the time Dickerson was supposed to have been murdered, as well as a notation that no officers witnessed the incident or saw Canales on or leaving the pod where Dickerson was kept.

Considering this evidence along with the other evidence in the record, it is not more likely than not that no reasonable juror would have found Canales guilty beyond a reasonable doubt of killing Dickerson.  Canales provides no objective evidence that could provide a basis for crediting the testimony of Hughes, Earwood or Walker over the witnesses who testified at trial, and Walker's and Earwood's testimony was not believed by the fact finder at the internal affairs hearing.  Because Canales has not established that he is actually innocent of killing Dickerson, no fundamental miscarriage of justice will occur by the Court's failing to review the merits of Canales's first two claims.  Accordingly, the Court should dismiss Canales's first two claims with prejudice.

Claim 3:

Canales's third claim is that the state's use of another inmate, Innes, as its agent to solicit incriminating evidence from Canales for its use at both the guilt-determination and punishment-determination phases of his trial violated his rights to due process of law and to the assistance of counsel.  This claim was raised for the first time in Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of Tex.Crim.Proc. Art. 11.071 §5 (a).  Because the state court's order is unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits. Canales contended that he met the subsection 5 (a)(1) exception because the factual basis of his claim was unavailable at the time he filed his state petition for post-conviction relief, contending that the facts were "never disclosed to the defense and was discovered only upon review of documents from the state's file disclosed to

13

undersigned counsel in the course of federal habeas proceedings." Subsequent state petition at 85-86. In his Post-Stay Briefing Regarding Procedural Status of Mr. Canales' Claims in this Court (document 36), Canales contended that subsection 5(a)(1) is not an "adequate and independent" state ground for dismissal because the state court does not apply it consistently to claims of state misconduct, and in the alternative, even if the Court found that this claim had been procedurally defaulted, he could establish both cause for failing to raise this claim in his initial petition for post-conviction relief and actual prejudice if the court did not address the merits of his claim.

Canales claims that information establishing that Innes was asked by the state to solicit inculpatory information from him after he was indicted for murdering Dickerson was contained in a file kept by an investigator for the prosecution, which was not produced to the defense at trial, on direct appeal, or during state post-conviction proceedings. The Director does not dispute this allegation, so Canales has established cause for failing to timely present this claim to the state courts. Because the standard for establishing actual prejudice in the procedural default context - whether the evidence at issue was material to the jury's verdict - is also the standard for obtaining relief on the substantive claim itself, *compare Rocha v. Thaler,* 619 F.3d 387, 394 (5th Cir. 2010), *cert. denied*, ___ U.S. ___, 132 S.Ct. 397 (2011), the Court must analyze this claim on its merits.

In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court held that the state's employing inmates to elicit information from an inmate who was in custody and under indictment violated that inmate's right to the assistance of counsel. Canales contends that Innes was acting as a government agent when he obtained self-incriminating letters from Canales in January of 1998 and February of 2000. Assuming *arguendo* that Innes acted as a government agent, because Canales was not indicted until November of 1999, Innes's soliciting and obtaining a letter from Canales in

14

January of 1998 did not violate Canales's right to the assistance of counsel.

In Canales's February 2000 letter, he appeared to ask Innes to help arrange a hit on inmate Whited, because he believed that Whited had informed the authorities about his participation in the Dickerson killing.  Canales contends that Innes was acting as an agent for the state at the time he obtained this letter.  The Director admits that an investigator asked Innes to solicit letters from Canales containing inculpatory statements, but contends that the first time he did so was on March 1, 2000, after Innes had obtained the second letter.  *See* Respondent Thaler's Response to Petitioner's Supplement to Petition for Writ of Habeas Corpus with Brief in Support (document 132) p.10.  Canales, however, produced a memo dated September 3, 1999, from a member of the Security Threat Group of the Telford prison unit to a member of the Security Threat Group of the Wynne prison unit with the statement which stated:

> Offender Innes supplied information through Telford IAD, concerning a homicide on 07-11-97, on Telford unit.  Offender Innes has requested to be classified as an ex-member, but claims that Special prosecutor's office has instructed him to keep in contact with TM (Texas Mafia) members (for purposes concerning the homicide.)  You may want to contact Mr. C. Dodson, Telford IAD, regarding any questions you have concerning this situation.

Supplemental Sealed Application for Writ of Habeas Corpus ("supplemental sealed application")(document 121) Ex. 11.  For purposes of this review, the Court will find that Innes was acting as an agent of the state at the time he obtained the second (Feb. 2000) letter, and that because by that time Canales had been indicted for the Dickerson homicide, the admission of the February 2000 letter, which Innes obtained while keeping in contact with Canales for purposes concerning the homicide, constituted a violation of  *Massiah.*  To obtain relief in *habeas corpus* for a *Massiah* violation, however, Canales must establish that the second letter had a substantial and injurious

15

effect or influence in determining the jury's verdict.  *See Wesbrook v. Thaler,* 585 F.3d 245, 255-56 (5 th Cir. 2009), *cert. denied,* ___U.S. ___, 130 S.Ct. 1889 (2010).

*Wesbrook* provides a useful model for comparison in analyzing this issue.  Wesbrook was suffering from depression and believed that his nine-year old daughter from his first ex-wife was being abused by her new husband.  He went to the apartment of his second ex-wife with the idea of discussing a reconciliation, but when he arrived, she had four guests visiting.  He said that his ex-wife eventually slipped away and had sex with one of the male guests, and then told him that she intended to have sex with another.  Wesbrook left, retrieved his gun from his car and shot all five people.  He was convicted of capital murder for killing two persons (his ex-wife and one male guest) in a single criminal episode.  The jury was informed that the other three individuals also died.

While Wesbrook was awaiting trial he told Jones, a fellow inmate, that he was going to have his cousins kill his first ex-wife and her husband, and that he was going to pay the killers by giving them his truck.  After Wesbrook was moved to the county jail's medical facility, Jones contacted the police and offered to serve as an informant.  The police and the District Attorney's Office agreed to put Jones back in contact with Wesbrook.  Jones offered to set up a meeting between Wesbrook and Johnson, a supposed  hit man who was actually an undercover law enforcement officer.  Wesbrook told Jones that he wanted three more people added to the list of persons he wanted to have killed.  Wesbrook gave Jones a list of the five persons he wanted killed and the type of car each person drove.  Jones arranged for Wesbrook to speak with Johnson, and Wesbrook told him what he wanted.  The next day, Wesbrook told Johnson he wanted to call off the plan because he was afraid the telephone call had been recorded by jailers.

At the punishment-determination phase of the trial the State presented  Jones's testimony as

16

to all of these events, as well as recordings of the conversations between Wesbrook and Johnson. It also presented evidence that Wesbrook had cut his second ex-wife's phone line, threatened to burn down the house of his first ex-wife, attempted to burn the home of his ex-landlords after they evicted him, and threatened his second ex-wife and some of her friends with a gun.

The Texas Court of Criminal Appeals found that because Wesbrook was under indictment at the time he began speaking with Jones, any evidence Jones obtained after he began working as an agent for the state was inadmissible in the punishment-determination phase of Wesbrook's capital murder trial. It found that the evidence that Wesbrook was going to have his cousins kill two people was properly admitted, but the fact that he wanted to have three more people killed was not. The court found the error in admitting evidence of the second murder-for-hire scheme harmless:

> To support a finding of future dangerousness in the case at bar, prosecutors relied on the facts of the crime itself, the unadjudicated extraneous solicitation offense, and several bad acts committed by appellant. Aside from evidence of a horrific killing spree that left five people dead, jurors heard from Phillip Jones, who, before he became an agent for law enforcement, independently discovered appellant's efforts to solicit the murders of two individuals. Jones' testimony about these particular facts was free from any Sixth Amendment concerns. The jury, at that point, validly possessed a critical indicator of future dangerousness: that appellant, despite his incarceration for a brutal multiple homicide, was willing to arrange and condone further murders, this time by proxy. Any additional, inadmissible testimony of appellant's hopes to expand his list of desired targets was of minimal consequence. In other words, because the jury possessed details of both the crime itself and the solicitation to murder, there is no reasonable likelihood that the inadmissible portion of Jones' testimony, considered either alone or in context, moved the jury from a state of nonpersuasion to persuasion regarding the issue of future dangerousness.

*Wesbrook v. Texas*, 29 S.W.3d 103, 119-20 (Tex.Crim.App.2000), *cert. denied*, 532 U.S. 944 (2001).

Four judges dissented. Wesbrook then applied for a writ of *habeas corpus*. The federal district court held that in light of the horrific nature of Wesbrook's crime, the evidence of his longstanding habit of threatening others with violence, and the untainted evidence of his plot to solicit two other

murders, Wesbrook had failed to demonstrate that the tainted evidence had a substantial and injurious effect or influence on the jury's verdict.  The United States Court of Appeals for the Fifth Circuit affirmed the district court's denial of *habeas corpus* relief, finding:

> The evidence of Wesbrook's attempts to solicit the murders of his ex-wife and her husband was uncovered prior to Jones becoming an agent for the State. In the light of the evidence that Wesbrook murdered five people, and the untainted evidence that he attempted to solicit the murders of his ex-wife and her husband, the erroneous admission of evidence that Wesbrook attempted to solicit the murders of three more individuals did not have a substantial or injurious influence on the jury's determination of the future dangerousness issue. Accordingly, the district court did not err by denying federal habeas relief for this claim.

*Wesbrook v. Thaler*, 585 F.3d at 256.  Because soliciting the murder of a witness is a critical indicator of future dangerousness, a presumption arises that it would have a substantial and injurious effect or influence on the jury's determination of the future dangerousness issue.  This presumption was rebutted in *Wesbrook* by the fact that the murder of five people was particularly horrific and the tainted evidence of solicitation of murder of three additional individuals was cumulative of properly admitted evidence of solicitation of murder of two individuals.

Comparing that case with the present case, while Canales's killing of Dickerson was not as horrific as Wesbrook's killing five people, Canales's motivation for the killing - gaining admission into a prison gang - is perhaps stronger evidence of future dangerousness than Wesbrook's "losing it" while suffering acute emotional distress.  In addition, at the time of the killing Canales was in prison serving a fifteen year sentence for aggravated sexual assault, after serving a five year sentence on an earlier sexual assault, while Wesbrook did not have a criminal record.  One distinction between the cases is that unlike Wesbrook, Canales did not solicit murder on more than one occasion.  Two months after Canales solicited the murder of informant Whited, however, he did

threaten to kill the informants himself if he ever had the opportunity.  The prosecution stressed this point in final argument:

> This was written barely six months ago.  A little over six months ago.  And this is Anibal Canales (sic) mind game - - mind set.  This is how he is.  This is the man we're talking about.  'So I cut the bitch loose from foot mobile and put her back on the cuff where she belongs.  I've got snakes in the yard, and it's getting worse from the crap coming out of the mouths of so-called homey's.  One day room call home boy, and I'll get it all straight. That debt.'  Now that's hard to understand, okay?  But he's talking about the snitches, and if he has the opportunity to get in the day room with them - - if he ever gets with them, he'll take care of it.  That is a threat.  He is a future danger.

R.R Vol. 12, pp. 120-121.  Canales's April 2000 letter expressing his intention to kill informants if provided the opportunity is strong evidence if future dangerousness, though perhaps not as powerful as his February 2000 solicitation of the murder of informant Whited.  In light of the general similarity between Canales's  February 2000 and his April 2000 letters, in combination  with the other evidence of Canales's future dangerousness, the erroneous admission of the February 2000 letter did not have a substantial and injurious influence or effect on the jury's determination of their verdict on the future dangerousness special issue in the punishment determination phase of Canales's capital murder trial.  Accordingly, Canales's third claim should be denied.

Claim 4:

Canales's fourth claim is that the State violated his right to Due Process when it withheld material exculpatory evidence and when it knowingly allowed false testimony to be presented to the jury. This claim was raised for the first time in Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a).  Because the state court's order is  unclear in regards to whether the state court's

dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits.

Canales contended that the factual basis of this claim was not available to him at the time he filed his application for state post conviction relief, because the state did not disclose it until his federal *habeas corpus* proceedings had been initiated. This suggests that the basis of the state court's dismissal was subsection 5 (a)(1). Canales contends that he can establish cause for failing to present his claims to the state court in either his direct appeal or in his state post-conviction proceedings. He correctly points out that his claim is based upon *Brady v. Maryland*, 373 U.S. 83 (1963), and the Supreme Court of the United States has held that the elements of a *Brady* claim are indistinguishable from the elements of the "cause and prejudice" exception to the procedural default bar:

> We set out in *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct.1936, 144 L.Ed.2d 286 (1999), the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281-82, 119 S.Ct. 1936. "[C]ause and prejudice" in this case "parallel two of the three components of the alleged *Brady* violation itself." *Id.*, at 282, 119 S.Ct. 1936. Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes. 527 U.S., at 282, 119 S.Ct. 1936.

*Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The Court allowed Canales to conduct discovery on this claim, and deposition testimony by the investigator and prosecuting attorney of the Special Prosecutions Unit established that the Unit

attempts to be helpful in several ways to inmates who cooperate with their investigations and prosecutions.  The testimony also shoes that the investigator and lead attorney in the Unit attempt to parse their dealings with inmates so that the inmates can testify credibly that they have received no benefits in exchange for their testimony, and that records of these dealings, which were kept in the investigator's file, were not provided to the defense.  *See* supplemental sealed application at 16 and 27-34.  The Court finds that this evidence is helpful to Canales because (1) it is impeaching and (2) that it has been suppressed.  The remaining issue is whether it is material.

Canales contends that the jury did not learn of the following impeachment evidence:

1) Innes's testimony about how he received Mr. Canales' incriminating letter was false;

2) Innes was himself a suspect in the Dickerson homicide;

3) SPU in fact made promises to help the inmate witnesses and to provide information to the parole board;

4) SPU encouraged Innes to speak to at least one other State witness prior to trial;

5) Innes' renunciation of his gang affiliation was suspect;

6) After accepting it for prosecution, SPU dismissed a felony case of Possession of a Deadly Weapon in a Penal Institution against Mr. Innes prior to Mr. Canales' trial;

7) Innes repeatedly – and successfully – sought SPU's intervention on prison matters regarding gang deconfirmation, better TDCJ classification, better housing, and property in exchange for his cooperation, including soliciting incriminating evidence;

8) SPU assisted inmate witnesses in obtaining favorable housing, with parole, in subsequent criminal matters, and in post-release planning.

Whether considered singly or in combination, these facts are not material as that term is defined in *Brady*. Regarding the first contention, Innes obtained and provided to the prosecution two letters that were essentially written confessions by Canales, one stating that he and Speer killed Dickerson and the other stating that he was planning on killing Whited because he believed Whited informed on him about the Dickerson murder. Because there was no physical evidence linking Canales to the murder of Dickerson, and because Canales did not admit writing the letters, Innes's credibility was an important issue for the jury. Innes testified that he watched Canales tie the letter onto a string connecting their cells, and kept possession of it from the time he received it from Canales until he turned it over to his attorney. See R.R. Vol. 10 pp. 29-30. Canales cites to a hand-written note, not produced to the defense, which stated:

> Letter
> written by Canales
> Another inmate has the letter - he's not involved @
> all - will have to get the letter from him
> Another inmate rec the letter from Canales
> This inmate sent me the letter to see it
> The letter is step for step how the letter(sic)
> Went down.
> The letter is in Canales's handwriting

Supplemental sealed application Ex. 21. Canales contends that these notes are taken from an interview with Innes and, because his testimony at trial was that he kept the letter in his possession until turning it over to his attorney, the note contradicted his trial testimony. It seems at least equally likely, however, that the note is of an interview with someone other than Innes, and that the other inmate referred to in the note is in fact Innes himself. Under those circumstances, the substance of

22

the note is quite consistent with Innes's testimony - its impeachment value would have been slight.

Regarding the second contention, while the authorities may well have initially considered Innes a suspect by virtue of his membership in the Texas Mafia, such suspicion is immaterial unless the reasons for it undermine the case against Canales and Speer in Dickerson's murder. If Canales's contention is simply that being under suspicion of murder gave Innes a reason to obtain and turn over letters implicating Canales, the fact that Innes was at one point under suspicion for the murder would have been merely cumulative to his testimony fact that he had already been indicted on two other major felony charges.

Regarding the third and eighth contentions, the testimony of the investigator and prosecuting attorney was that they tried to help inmates with their general requests by passing them along to the officials who could grant them, while mentioning that those inmates had cooperated with them. They did not consider this a benefit in exchange for testimony, but rather simply being fair and decent. As a result, they believed that inmates could testify truthfully that they had not received benefits as a result of agreeing to testify, and that any records of the inmate requests and their own vouching for the inmate's cooperation need not be disclosed to the defense under *Brady*. *See* supplemental sealed application Ex. 1 at 35-40, 70-71; Ex. 29, at 21-22.

While the investigator and prosecuting attorney are incorrect, in this case their general approach did not constitute a temptation sufficiently strong to objectively undermine the credibility of the inmate testimony. Canales was allowed to depose the inmate witnesses, and none appear to have been subjectively motivated to lie by the prospect of favorable treatment.

Regarding the fourth contention, inmate Whited wrote in a letter to the SPU investigator that while he and Innes were riding in a bus to a hospital "we got to talk the whole way down there (and

no, we didn't coach one another on our stories. Smile)" *See* supplemental sealed application Ex. 27.  While the word "smile" in this context could well have suggested to the jury that the statement was a joke and therefore untrue, Whited did not testify at Canales's trial and the impeachment value of this note in regards to Innes's credibility would have been slight.

Regarding the fifth contention, the fact that Innes continued corresponding with gang members after he told authorities he was renouncing his membership was consistent with his testimony that until the gang became aware of his decision to sell them out, he intended to continue gathering information about them for the authorities.  *See* supplemental sealed application Ex. 49 at 148, and Ex. 1 at 125-126.  The impeachment value of this evidence appears quite slight.

Regarding the sixth contention, after being caught with a metal shaft, Innes told the Special Prosecutions Unit investigator that he was only trying to make a screwdriver to fix his radio.  While the decision by the SPU not to prosecute this offense as possession of a weapon could fairly be considered special treatment, the jury would likely have considered it cumulative, since Innes admitted in his testimony that he turned over the letters in order to avoid being prosecuted for two other serious offenses.  *See* R.R.Vol.10 at 52-54.

Regarding the seventh contention, after Innes turned over the letters, he continued to obtain information about gang activities and the SPU continued to attempt to help him with requests regarding his prison classification and being transferred to other facilities.  The impeachment value of this point is cumulative to Innes's testimony that he sought and received a favorable plea agreement as a result of obtaining and turning over the letters.

In summary, the impeachment value of the suppressed evidence was slight, either because it was subject to differing interpretations, or cumulative to Innes's admission that he turned over the

24

letters in order to receive a lighter sentence on serious pending charges.  The Court finds that there is not a reasonable probability that, had this evidence been produced to the defense, the result in Canales's trial would have been different.  Because Canales cannot establish the materiality prong of his *Brady* claim, his fourth claim should be denied.

Claim 5:

Canales's fifth claim is that the cumulative effect of the ineffective assistance of counsel and the withholding of material evidence violated his right to a fair trial, even if neither claim by itself was sufficiently prejudicial to entitle him to relief.  This claim was raised for the first time in Canales's subsequent application for a writ of *habeas corpus*, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a).  Because the state court's order is  unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits.

Although Canales did not discuss his cumulative error claim specifically in his subsequent state petition, he did contend on p.48 of his Post-Stay Briefing Regarding the Procedural Status of Mr. Canales' Claims in this Court (document 36) that this claim warranted review on the merits because both of the underlying claims (ineffective assistance of counsel and *Brady*) were entitled to be reviewed on the merits.  Canales argued that the legal basis of his ineffective assistance of counsel claim and the factual basis of his *Brady* claim were not available at the time he filed his initial application for post-conviction relief.  However, the Court has already found  Canales's ineffective assistance of counsel claim barred from consideration under the doctrine of procedural default.  *See*

25

*supra* pp. 11-13.  In *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), the United States Court of Appeals for the Fifth Circuit held that a claim of cumulative error which is based in part on a procedurally defaulted claim is itself barred from federal review. Accordingly, Canales's fifth claim should be dismissed with prejudice.

Claim 6:

Canales's sixth claim is that prosecutorial misconduct so pervaded his trial that he was denied due process of law.  This claim was raised for the first time in Canales's subsequent state application, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX. CRIM. PROC. Art. 11.071 §5 (a).  Because the state court's order is unclear in regards to whether its dismissal of this claim was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits. Canales contended that none of his prosecutorial misconduct claims were available at the time he filed his original state petition because the information forming its basis was not disclosed to his counsel until 2004.  *See* subsequent state petition at 120.  This contention is not credible, because Canales cites to the trial transcript numerous times to establish the factual basis of this claim, *see* Petition for Writ of Habeas Corpus by a Prisoner in State Custody (document 7) at 111-112, yet never contends that his state post-conviction counsel was denied access to the transcript.  The Court of Criminal Appeals's dismissal appears to have been based upon a finding that the factual basis of this claim was available at the time Canales filed his state petition for post-conviction relief, which is an adequate and independent state law ground.  Accordingly, Canales's sixth claim should be dismissed with prejudice.

26

Claim 7:

Canales's seventh claim is that his rights to due process, a fair trial, and freedom from cruel and unusual punishment were violated because several of the jurors on his *petit* jury lied about their criminal backgrounds.  This claim was raised for the first time in the subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of Tex.Crim.Proc. Art. 11.071 §5 (a).  Because the state court's order is unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) the petitioner relied in arguing that his claims should be considered on the merits.

Canales contended that his claim was not available at the time he filed his original state petition for post-conviction relief because the information forming its basis consisted of handwritten notes in the prosecution's file, which was not disclosed to his counsel until 2004.  *See* subsequent state petition at 133.  The problem with Canales's argument is that he neither contends nor establishes that his state post-conviction counsel asked to view the prosecution file.  Had they done so and been refused, the Court would have no trouble finding that this claim was unavailable at the time Canales filed his petition for state post-conviction relief.  Absent evidence of an unsuccessful request, however, the Court presumes that the factual basis of this claim would have been discovered in the exercise of due diligence by Canales's state post-conviction counsel.[1]  Because the Texas Court of Criminal Appeals's dismissal of this claim was based upon

___

[1] Although not dispositive of this issue, the Guidelines and Standards for Texas Capital Counsel, which were adopted by the State Bar Board of Directors on April 21, 2006, provide that state post-conviction counsel has both the duty to obtain and review the prosecution's entire file and the duty to conduct a searching inquiry into whether any constitutional violations have taken place, including juror misconduct

27

adequate and independent state grounds, it is barred from federal review.  Accordingly, Canales's seventh claim should be dismissed with prejudice.

Claim 8:

Canales's eighth claim is that his rights to due process of law, to the assistance of counsel, and to be free from cruel and unusual punishment were violated when the jury, during its deliberations, communicated with the court and with the bailiff outside his and his counsel's presence.  This claim was raised for the first time in Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a).  Because the state court's order is  unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) Canales relied in arguing that this claim should be considered on the merits. Canales contended on page 131 of his subsequent state petition that "[b]ecause all the communication occurred outside the presence of a court reporter, Mr. Canales' counsel did not know the communication had occurred and has been denied the best mechanism to appeal that this *ex parte* communication occurred."   While this statement may be true, the appropriate inquiry in these proceedings is: Considering that Canales's federal habeas counsel were able to discover the factual basis for this claim, why was his state post-conviction counsel was not able to do so before filing his initial petition for post-conviction relief? Because Canales provides no answer to this question, the Court must find that the Texas Court of Criminal Appeals's dismissal of this claim was based upon an adequate and independent state ground and barred from federal review, and dismiss Canales's eighth claim with prejudice.

Claim 9:

Canales's ninth claim is that his rights to due process of law, to remain silent, and to a fair trial were violated by being forced to wear leg shackles in front of the jury during the punishment determination phase of his trial. Canales raised this claim both on direct appeal and in his initial state post-conviction proceedings. On direct appeal, the state court found that any error by the trial judge was harmless, since "nothing in the record indicates that the jury either saw or heard or was otherwise aware that appellant was wearing shackles." *See Canales v. State*, 98 S.W.3d at 697-98. In Canales' state post-conviction proceedings, the state court adopted the findings made by the trial judge, who found:

> The defendant only had leg shackles that were not seen by the jury. The court stated that the defendant was behind the desk and could not be seen by the jury. This was after the defendant had been found guilty and during the punishment hearing. Such action was proper.

State Habeas Record p.329, Findings and Conclusions No. 14. Canales then presented the claim to the state court a third time in his subsequent application for state post-conviction relief, but it was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a). Because the state court adjudicated this claim on its merits in Canales's direct appeal and in his state petition for post-conviction relief, the inquiry for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2).

In *Deck v. Missouri*, 544 U.S. 622, 633 (2005), the Supreme Court of the United States pointed out that the law has long forbidden routine use of visible shackles during the guilt-determination phase of the trial. Finding that concerns of unfair prejudice from that procedure were equally strong during the punishment determination phase of a capital trial, when the issue before the jury is the likelihood that a defendant will continue to be a danger to society, the Supreme Court held that routine shackling of a capital defendant at the punishment determination phase of his trial denies him due process of law. Canales is correct that, to the extent the state court's opinion in his case can be construed as being based on the proposition that routine shackling of a capital defendant is allowable once he has been convicted, it is contrary to *Deck*.

The problem with Canales's argument is that *Deck* was decided more than a year after his conviction became final, and "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989). Canales argues that *Deck* is not a new rule for non-retroactivity purposes, but cites no authority in support of this position. The courts that have considered the question have all reached the opposite conclusion. *See e.g. Marquard v. Secretary for the Dept. of Corrections*, 429 F.3d 1278, 1311-12 (11th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006); *Stephenson v. Indiana*, 864 N.E.2d 1022, 1030 n.1 (Ind. 2007) *cert. denied*, 552 U.S. 1314 (2008).

Because the rule in *Deck* was not clearly established at the time Canales's conviction became final, the Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by

30

the Supreme Court of the United States.  Thus, Canales's ninth claim should be denied.

Claim 10:

Canales's tenth claim is that his rights to the due process of law, to a fair trial, and to be free from cruel and unusual punishment were violated by the process by which Bowie County selects its grand juries resulting in an under representation of women.  This claim was raised for the first time in Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of  Tex.Crim.Proc. Art. 11.071 §5 (a) Canales relied. Because the state court's order is  unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) Canalas relied.  Canales, however, made no argument in any of his pleadings that this claim was improperly dismissed.

In the absence of information to the contrary, the Court must presume that the data upon which Canales relied was available at the time Canales filed his initial state petition. Accordingly, the claim would have been dismissed pursuant to subsection 5(a)(1).  In order to avoid the procedural default bar, Canales must establish legal cause for failing to raise this claim in his initial state post-conviction petition.  Because Canales does not offer any explanation, Canales's tenth claim has been procedurally defaulted and should be dismissed with prejudice.

Claim 11:

Canales's eleventh claim is that allowing the foreperson of the grand jury that indicted him to testify as a witness in his trial violated his rights to the due process of law, a fair trial, and to be free from cruel and unusual punishment.  This claim was raised for the first time in

31

Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a). Because the state court's order is unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review Canales's subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) he relied in arguing that this claim should be considered on the merits.

In his subsequent state petition Canales made no argument that this claim met any of the exceptions set forth in Art. 11.071 §5 (a). Because Canales cited to the trial court record to support his factual allegations, see subsequent state petition at 149-150, the state court's basis for dismissing this claim appears to be that it was factually and legally available at the time Canales filed his initial petition for state post-conviction relief. The Court thus finds that this claim has been procedurally defaulted. Canales does not allege that he had cause for failing to timely raise this claim, and he does not argue that no reasonable juror would have found him guilty of capital murder and/or sentenced him to death if the grand jury foreperson's testimony had been excluded. Accordingly, Canales's eleventh claim should be dismissed with prejudice.

Claim 12:

Canales's twelfth claim is that by permitting the jury to find the absence of mitigating factors by a standard of less than beyond a reasonable doubt, the Texas capital sentencing statute deprived him of his right to the due process of law, to a fair trial, and to be free from cruel and unusual punishment. This claim was raised for the first time in Canales's subsequent state petition, which was dismissed as an abuse of the writ for failing to satisfy the requirements of

TEX.CRIM.PROC. Art. 11.071 §5 (a).  Because the state court's order is unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent state petition to determine upon what subsection of Art. 11.071 §5 (a) Canales relied in arguing that this claim should be considered on the merits.

In his subsequent state petition Canales made no argument whatsoever that this claim met any of the exceptions set forth in Art. 11.071 §5 (a).  Because the facts necessary to support this claim can be found in the trial court record, see R.R. Vol. 104-105, the claim was factually and legally available at the time Canales filed his initial petition for state post-conviction relief. Further, Canales did not even allege, much less establish by clear and convincing evidence, that no reasonable juror would have found beyond a reasonable doubt that the mitigating evidence he presented was insufficient to warrant a life sentence.  Accordingly, the state court's dismissal of this claim was based upon adequate and independent state grounds. Therefore, the Court finds that Canales's twelfth claim has been procedurally defaulted, and it should be dismissed with prejudice.

Claim 13:

Canales's thirteenth and final claim is that lethal injection as currently administered in Texas constitutes cruel and unusual punishment.  This claim was raised for the first time in Canales's subsequent application for state post-conviction relief, which was dismissed as an abuse of the writ for failing to satisfy the requirements of TEX.CRIM.PROC. Art. 11.071 §5 (a).  Because the state court's order is unclear in regards to whether the state court's dismissal was based upon adequate and independent state grounds, the Court must initially review the subsequent petition to

33

determine upon what subsection of Art. 11.071 §5 (a) Canales relied in arguing that this claim should be considered on the merits.

Canales contended on pages 178-179 of his subsequent state petition that this claim was unavailable at the time he filed his initial petition for state post conviction relief for two reasons. First, expert testimony as to the needless pain and suffering caused by the three chemicals used by the State of Texas in its execution protocol was not available until 2005.  Second, since the filing of his initial petition for state post-conviction relief, nine states have imposed a moratorium on executions precisely because of the fear that the current lethal injection procedure may violate the prohibition against cruel and unusual punishment.  Canales contends that this illustrates that new evidence has become available establishing that the standards of decency which underlie the Eighth Amendment have evolved.

Because Canales's claim is based upon data that was unavailable until after the time for filing his initial petition for state post conviction relief, his claim should have been considered on the merits by the state court, and it will be reviewed on its merits.  In *Baze v. Rees*, 553 U.S,. 35, (2008), the Supreme Court of the United States held that the State of Kentucky's three drug lethal injection protocol did not constitute cruel and unusual punishment.  In *Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir. 2010) the United States Court of Appeals for the Fifth Circuit held that the Texas execution protocol was substantially similar to the Kentucky execution protocol. Therefore, the Court should deny Canales's thirteenth and final claim.

**Recommendation**

For the above reasons, the undersigned recommends the Court deny Canales's third,

34

fourth, ninth and thirteenth claims, and dismiss his remaining claims with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's Report and Recommendation, any party may serve and file written objections to the findings and recommendations within.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report and Recommendation within fourteen days after being served with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 15th day of June, 2012.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE