IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ANIBAL CANALES, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:03CV69 |
| | ) | |
| RICK THALER, Director, | ) | **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | ) | |
| Correctional Institutions Division, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Petitioner, Anibal Canales, Jr., pursuant to Fed. R. Civ. Proc. 72, hereby files the following objections to the Magistrate Judge's Report and Recommendation.  Dkt. No. 139 (hereinafter "Report").  In the report filed June 15, 2012, the Magistrate Judge recommended denial of Canales' third, fourth, ninth, and thirteenth claims and dismissal of the remaining claims with prejudice.  Report at 34-35.

Pursuant to 28 U.S.C. § 636(b)(1), this Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Such a review will establish that this Court should reject the Report and Recommendation of the Magistrate Judge in most respects.

### Request for Oral Argument

Due to the complexity of the arguments and evidence surrounding the questions involved, Canales respectfully submits that oral argument is appropriate and will serve the interests of justice and fairness.

**The Claims that the Magistrate Judge Recommended Denial of Relief On.**

**Claim 3: (The State's Use of Bruce Innes as an Agent to Obtain Two Incriminating Letters from Petitioner Violated Petitioner's Rights under the Sixth and Fourteenth Amendments).**

In resolving Canales' claim of constitutional violation under the clearly established federal law addressed in *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264, 271 (1980), the Magistrate Judge made the following essential findings and conclusions, which Canales objects to as addressed below: (1) the state court dismissed the subsequent state petition, in which this issue was asserted, on procedural grounds "as an abuse of the writ," Report at 13; and (2) while Canales established cause for failing to present this claim in the initial state habeas proceedings, he failed to establish prejudice despite the Magistrate Judge's finding of "a violation of *Massiah*" with respect to admission in evidence of the February 2000 letter solicited by Innes while acting as an agent of the state because Canales did not establish that the letter had "a substantial and injurious effect or influence in determining the jury's verdict," Report at 15-16 (citing *Wesbrook v. Thaler*, 585 F.3d 245, 255-56 (5th Cir. 2009)).

With respect to the finding that the state court dismissed the subsequent state petition as an abuse of the writ, the objections are the same as those addressed *infra* at pages 24-27, 39-40 and those objections will not be repeated here but are incorporated in full.  With respect to the finding that Canales did not establish prejudice, Canales objects as follows:

A.    The Magistrate Judge Erred in Conducting the Prejudice Analysis Because the State Waived the Issue.

In the initial petition for writ of habeas corpus, Canales not only asserted error but specifically asserted prejudice and argued that the applicable standard is that set forth in *Chapman v. California*, 386 U.S. 18, 24, 26 (1967) (reversal is required when "a federal

constitutional error" is found unless the State can prove that the error "was harmless beyond a reasonable doubt"). Dkt. No. 7 at 89. In responding to this argument, the State simply argued that there was no Sixth Amendment violation, Dkt. No. 12 at 26-28, and did not address the question of prejudice. After obtaining discovery as permitted by the District Court, Canales reasserted this issue in the Supplement to the Petition for Writ of Habeas Corpus again arguing that the violation was harmful and that the *Chapman* standard is applicable. Dkt. No. 121 at 14. Again, in response, the State made no argument whatsoever concerning prejudice. Dkt. No. 132 at 6-10.

The State's failure to assert at any point that any error was harmless was a waiver of the issue. *Amadeo v. Zant*, 486 U.S. 214, 228 n.6 (1988) (finding state waived issue of prejudice by failing to timely argue the issue); *Jones v. Cain*, 600 F.3d 527, 540 (5th Cir. 2010) (state's failure to argue harmlessness of violation of Confrontation Clause waived the issue); *Tenny v. Dretke*, 416 F.3d 404, 407-08 (5th Cir. 2005) (By focusing only on the prejudice prong of the *Strickland v. Washington*[1] analysis, the state waived argument on whether counsel's conduct was deficient). *See also Lam v. Kelchner*, 304 F.3d 256, 269–70 (3rd Cir. 2002); *Ayers v. Hudson*, 623 F.3d 301, 317 n.12 (6th Cir. 2010); *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005); 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 31.2, at 1512 & n. 1 (5th ed. 2005). Thus, the Magistrate Judge upon finding error should have automatically found the violation to be prejudicial.

B.    Even assuming that a Prejudice Analysis Is To Be Conducted Despite the State's Waiver, the Analysis Must Be Conducted under *Chapman*.

1.    *De Novo* Review is Applicable.

Canales objects to the Magistrate Judge's application of the "substantial and injurious"

---

[1] 466 U.S. 668 (1984).

standard.  While the Magistrate Judge cited only to *Wesbrook v. Thaler*, 585 F.3d 245, 255-56 (5th Cir. 2009), this is the standard that the Supreme Court prescribed for use in habeas corpus proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting the standard announced in *Kotteakos v. United States*[2] for assessing the harmlessness of nonconstitutional errors).  The underlying rationale of *Brecht* was that the threshold should be higher than the *Chapman* standard because, in theory, the state court would have already conducted the *Chapman* analysis, or at least addressed the merits of the claim.  Thus, whenever the State court has adjudicated the claim on its merits, regardless of whether the state court actually addressed the question of harm or prejudice, the applicable standard in habeas is *Brecht*.  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, *supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*").

Here, however, the Magistrate Judge found that the state court dismissed this claim on a state procedural ground as an abuse of the writ.  Report at 13.  The Magistrate Judge did not clearly state whether the state court order regarding this claim was independent of federal law; instead, he jumped to the question of whether Canales could show cause for a default.  While Canales disagrees and objects to this implicit finding regarding the independence of the state court order, assuming the Magistrate Judge is correct, dismissal on a procedural ground unquestionably would mean that the state court did not address the merits of this claim.  Under these circumstances, the standard of *Chapman* applies.  The Supreme Court indicated in *Fry* that

---

[2] 328 U.S. 750 (1946).

4

the standard for assessing harmlessness would depend on whether appellate review was available. *Fry,* 551 U.S. at 118 ("The federal habeas review rule applied to the class of case in which state appellate review is available does not have to be the same rule applied to the class of case where it is not"). *Fry* did not expressly resolve the issue because the petitioner received merits review of his claim in state court. Nevertheless, *Fry* recognized that the factors favoring a more state-friendly standard for determining harmlessness would not be applicable if the state court avoided a merits review of a claim altogether. Moreover, such a result would be consistent with the Supreme Court's determination as to when AEDPA applies to a state court decision. *See Garcia v. Quarterman,* 454 F.3d 441, 447 n.11 (5th Cir. 2006) (*Brecht's* less-stringent standard of review is predicated on the same concerns for comity, finality, and federalism that Congress addressed in AEDPA). If the state court did not "adjudicate" the claim and the AEDPA limitations on the grant of relief are inapplicable, this Court must address the issue *de novo. Cone v. Bell*, 556 U.S. 449, 472 (2009). In short, this case is controlled by *Cone v. Bell* in which the Supreme Court addressed a situation in which the state court rejected a claim on procedural grounds but the federal court was not prohibited from reaching the merits of the claim. In these circumstances, the Court held:

> [F]ederal habeas review is not subject to the deferential standard that applies under AEDPA to "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*.

*Id.* at 472. The Fifth Circuit reached this same conclusion long ago. *See, e.g., Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (dismissal of a subsequent state habeas petition by the Texas courts as an abuse of the writ, "i.e. on procedural grounds," means "these claims were not adjudicated on the merits in State court" and *de novo* review is required); *Mercadel v. Cain*, 179 F.3d 271, 274-75 (5th Cir. 1999) ("the AEDPA deference scheme outlined in 28 U.S.C. §

2254(d) does not apply" when the state court dismissed a claim on procedural grounds and did not address the merits); *Fisher v. Texas*, 169 F.3d 295, 299-300 (5th Cir. 1999) (same).  *De novo* review in the context of a constitutional violation means application of the *Chapman* standard rather than the *Brecht* standard.

      2.    <u>The State's Pattern of Prosecutorial Misconduct So Infected the Integrity of the Proceedings as to Warrant Application of the *Chapman* Standard.</u>

Even in *Brecht*, in establishing the general standard to be applied in habeas proceedings, the Supreme Court recognized an exception to application of the "substantial and injurious" standard in habeas corpus proceedings.

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceedings as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.

507 U.S. at 638 n.9.  This case is that unusual case.

Specifically, the Magistrate Judge found--and the state "does not dispute"--that Canales established "cause" for not asserting the *Massiah* issue, as well as claims of state misconduct  for suppressing material impeachment evidence and presenting false testimony,[3] in the initial state habeas proceedings BECAUSE the evidence establishing these claims was withheld by the State during the trial, direct appeal, and state post-conviction proceedings.   Report at 14, 20.  Likewise, in addition to finding that the State had violated Canales' rights under *Massiah*, the Magistrate Judge also found that the State suppressed impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).  Report at 21.  Thus, the Magistrate Judge has already found a pattern of prosecutorial misconduct," *Brecht*, 509 U.S. at 638 n.9, such that reversal should be mandated without regard to whether actual prejudice is established.

---

[3] These issues are addressed *infra* at pages 11-20 and in the Report at 19-25 (Claim 4).

Likewise, aside from whether there was a deliberate and egregious pattern of state misconduct, the *Chapman* rather than the *Brecht* standard should be applied because the state's action in withholding the evidence during initial state post-conviction proceedings denied Canales application of the *Chapman* standard.  In other words, if the state had disclosed the evidence during the state post-conviction proceedings and allowed Canales to raise this claim, the state court would have been required to analyze whether the error was harmless beyond a reasonable doubt under *Chapman* rather than whether there was a substantial and injurious effect on the verdict under *Brecht*.  Put simply, Canales should not be denied a more lenient harm standard BECAUSE of the state's misconduct in withholding this information until federal habeas proceedings had commenced.

C.      <u>Even assuming that *Brecht* is the Appropriate Standard, the Burden of Showing that There Was No Prejudice is On the State Rather Than Canales.</u>

The Magistrate Judge reported:  "To obtain relief in *habeas corpus* for a *Massiah* violation, . . . , Canales must establish . . . a substantial and injurious effect or influence in determining the jury's verdict."  Report at 15-16.  Canales objects because the burden of proof and "the risk of doubt" under the *Brecht* standard are on the State to prove that there was not a substantial and injurious effect.  *O'Neal v. McAnich*, 513 U.S. 432, 439 (1995).  *See also United States v. Dominguez Benitez*, 542 U.S. 74, 82 n.7 (2004) ("the Government has the burden of showing that constitutional trial error is harmless" in collateral review under the *Brecht* standard).

D.      <u>Even assuming that *Brecht* is the Appropriate Standard, the State Has Not and Cannot Establish the *Massiah* Violation is Harmless.</u>

As addressed above, the State has never even argued a lack of harm.  Thus, the issue has been forfeited by the State.  Regardless, however, the Magistrate misconstrues the facts in

finding no prejudice.  In essence, the Magistrate Judge held only that the February 2000 letter ("solicit[ing] the murder of informant Whited," Report at 18)[4] should not have been admitted into evidence, but that there was no prejudice during trial because the jury still would have had before it the confessional letter to inmate Innes "describing the killing."  Report at 2.  Likewise, the Magistrate Judge found no prejudice in sentencing because the jury still would have had before it the confessional letter AND the April 2000 letter to inmate Hannah "threaten[ing] to kill the informants himself if he ever had the opportunity."  Report at 19.[5]  The Magistrate Judge misconstrued the facts, however, because without the February 2000 letter, the State would not have been able to establish except by lay witness opinion of inmate Innes (a state agent), State Record "SR" 10 at 62, and two prison employees, SR 10 at 125 & 139, that the letters were written by Canales.  Thus, the State likely would have been unable to admit these letters into evidence.

Specifically, the February 2000 letter, State's Exhibit 25, was matched to Canales because, according to expert testimony, his fingerprint was on the letter.  SR 9 at 258.  The State then used this letter with Canales' fingerprint to argue that he had written the confessional letter to Inmate Innes, State's Exhibit 27, and the letter to Inmate Hannah threatening to kill informants, State's Exhibit 29, by expert testimony that all three letters were written by the same person.  SR 10 at 62.  The State even conceded at trial that the admission of all three of the letters was tied together.  SR 9 at 260-61; SR 10 at 35; SR 11 at 138.  Indeed, the State offered evidence of the existence of State's Exhibits 25 and 29 during the trial solely because of the need

---

[4] The letter is quoted at length in the Report at page 3.

[5] The letter is quoted at length in the Report at page 4.

to lay a foundation for admission of the confessional letter.[6]  Thus, without admission of the February 25 letter solicited in violation of Canales' Sixth Amendment rights under *Massiah*, the State would not have been able to admit the confessional letter.  The remainder of the State's case against Canales was built entirely on the testimony of inmate witnesses, whose credibility was in doubt from the word go, even according to the prosecutor in closing argument.  SR 11 at 135 ("Inmates lie").  Under these circumstances, it is impossible to say that the *Massiah* violation did not have substantial and injurious effect on the trial verdict.

> A confession is like no other evidence.  Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .  Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.  While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quotations and citations omitted).  This is such a case.  The confessional letter described the motive and the means of the crime.  Report at 2.

It is likewise impossible to say that admission of the February 2000 letter, which again was the foundation for admission of the confessional letter and the subsequent letter to inmate Hannah, did not have substantial and injurious effect on the sentencing verdict.  The admission of the confessional letter "also influenced the sentencing phase of the trial" just as the confession in *Fulminante* impacted the capital sentencing proceedings.  *Id.* at 301.  Likewise, without the evidence that Canales solicited the murder of an informant in the February 2000 letter and threatened harm to informants himself in the April 2000 letter, the State's evidence of future dangerousness would have been greatly reduced.  In other words, there was a substantial and injurious effect on the verdict.

---

[6] The contents of State's Exhibits 25 and 29 were not revealed to the jury until sentencing.

Finally, Canales objects to the Magistrate Judge's reliance on *Wesbrook* to say that the evidence of future dangerousness was stronger in this case.  Report at 18.  At bottom, as the Magistrate Judge mentioned in the lengthy discussion of *Wesbrook*, the evidence that Wesbrook killed five people and solicited the murder of two witnesses was uncontroverted.  585 F.3d at 256.  The evidence tainted by the state's *Massiah* violation was simply that Wesbrook subsequently solicited the murder of three additional witnesses.  *Id.*  Here, absent the State's *Massiah* violation, which also permitted admission of Canales' solicitation of one murder and threat to harm other unidentified informants, the picture of future dangerousness before the jury would have been far different.[7]  In other words, the *Massiah* violation, which allowed admission of all three of the letters, did have a substantial and injurious effect on the verdict in capital sentencing which requires "a reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).  Any error which precludes the jury from making a reliable determination or "reasoned moral response" is far more likely to be prejudicial in sentencing than is an error during trial where the question is only whether the government has met its burden of proving guilt.  *See generally Nelson v. Quarterman*, 472 F.3d 287, 314 (5th Cir. 2006) (*Penry* error, in which special instructions given to jury at capital sentencing failed to provide a vehicle for jury to consider capital murder defendant's mitigating evidence of mental illness, was not subject to harmless error analysis on habeas review).  Indeed, a substantial and injurious effect on the verdict of just one juror requires reversal.  *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (prejudice in capital sentencing is established by focusing on whether "at least one

---

[7] Regardless, the evidence concerning the underlying crime and future dangerousness cannot be viewed alone in determining whether there is prejudice from a constitutional error in capital sentencing.  *See, e.g., Walbey v. Quarterman*, 309 Fed. Appx. 795, 801 (5th Cir. 2009); *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001).

juror would have struck a different balance").

**Claim 4: (The State Violated Canales' Right to the Due Process of Law When It Withheld Material Impeachment Evidence and When It Knowingly Allowed False Testimony to be Presented to the Jury).**

In resolving Canales' claims of constitutional violation under the clearly established federal law addressed in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959), the Magistrate Judge made the following essential findings and conclusions, which Canales objects to as addressed below: (1) the state court dismissed the subsequent state petition, in which this issue was asserted, on procedural grounds "as an abuse of the writ," Report at 19; (2) Canales did not establish that the State presented false testimony, Report at 22-23; and (3) while Canales established cause for failing to present this claim in the initial state habeas proceedings, he failed to establish prejudice or that the suppressed evidence was material as defined in *Brady*, Report at 25.

With respect to the finding that the state court dismissed the subsequent state petition as an abuse of the writ, the objections are the same as those addressed *infra* at pages 24-27, 39-40 and those objections will not be repeated here but are incorporated in full. With respect to the findings that Canales did not establish that the state presented false testimony or that the suppressed evidence was material, Canales objects as follows:

A.     The Magistrate Judge Erred in Finding that There Was No Showing of False Testimony.

The Magistrate Judge concluded that Canales is incorrect that the handwritten notes of an interview concerning the confessional letter were notes of an interview with Inmate Innes. Instead, the Magistrate Judge concluded:

> It seems at least equally likely, however, that the note is of an interview with
> someone other than Innes, and that the other inmate referred to in the note is in
> fact Innes himself.  Under these circumstances, the substance of the note is quite
> consistent with Innes's testimony – its impeachment value would have been

slight.

Report at 22-23.

Canales' objection to this finding is that rather than speculating about what the notes reflect, Canales should be allowed to establish those facts.[8]  Specifically, Mark Mullin, the Special Prosecution Unit "SPU" trial prosecutor, and A.P. Merillat, the lead SPU investigator, both suggested in their depositions that the author of the note was Roy Smithey, another SPU investigator.  *See, e.g.,* Dkt. No. 121 Exh. 1 at 51-54; Exh. 16 at 85-86.  Canales has previously moved to depose Smithey, Dkt. No. 73, and continued that request both in his Supplement to the Petition, Dkt No. 121 at 20 n.7, and his Reply to the State's Response, Dkt. No. 136 at 14 n.6.  Canales continues to believe he has demonstrated good cause for the deposition, particularly given the dispute about whether the notes reflect an interview of Innes or another inmate because clearly if of Innes Canales has established that the State knowingly presented false testimony.  Canales should thus be permitted to conduct the deposition of Smithey.

B.      The Magistrate Judge Erred in Finding that the Suppressed Evidence Was Not Material.

Innes was the most critical witness for the State.  As the Magistrate Judge reported:

Because there was no physical evidence linking Canales to the murder of Dickerson, and because Canales did not admit writing the letters, Innes's credibility was an important issue for the jury.

Report at 22.  Canales agrees with this finding, but is compelled to point out that the State's initial response to this claim was simply that the undisclosed impeachment evidence was immaterial and cumulative of the impeachment evidence that was disclosed.  Dkt. No. 12 at 29-32.  Nonetheless, following discovery permitted by the Court in these proceedings, the State shifted to making the earlier waived arguments that defense counsel had access to the materials

_____

[8] Indeed, at this stage of the proceedings, the Magistrate Judge was obliged to assume that all facts alleged by Canales were true.  *See Wolfe v. Johnson,* 565 F.3d 140, 169 (4th Cir. 2009).

while the prosecution did not, Dkt. No. 131 at 12-17, AND, in any event, that Innes' credibility was immaterial "[b]ecause Innes's contribution arose from the delivery of the letters and not from the truthfulness of his testimony," *Id.* at 19.  By shifting the argument in this fashion from reliance on Innes during the trial, state appeal, state collateral proceedings, and even earlier in these proceedings[9] to the recent assertion that Innes' credibility was not at issue, the State "virtually concedes" that the undisclosed impeachment evidence "would have rendered [Innes's] testimony far less credible." *Monroe v. Angelone*, 323 F.3d 286, 315 (4th Cir. 2003).[10]  In other words, the suppressed evidence was material for purposes of *Brady v. Maryland*, 373 U.S. 83 (1963).

Nonetheless, in general, the Magistrate Judge concluded that none of the undisclosed impeachment evidence was material because the impeachment value was merely cumulative to the disclosure that Innes had a favorable plea agreement in exchange for his testimony.  Report at 23-24.  Canales objects because "[w]hether or not the jury has had the opportunity to consider other impeachment evidence is not the correct standard for determining materiality of

---

[9] For example, in responding to Canales' claim of ineffective assistance of counsel, the State asserted in the initial response to the petition for writ of habeas corpus:

> Canales argues that he received ineffective assistance when defense counsel failed to challenge the scientific validity of handwriting analysis. Pet. at 27-34. Canales's argument has little force. The primary evidence tying the kite to Canales was not the expert but Innes.

Dkt. No. 12 at 18.

[10] In *Monroe*, the Commonwealth of Virginia argued before the United States Court of Appeals for the Fourth Circuit that no reversal was required due to the suppression of impeachment materials related to a Commonwealth's witness because it was "extremely doubtful whether the jurors believed her" testimony to start with, which was a complete contradiction of the prosecution's reliance on the witness during the trial's closing arguments.  323 F.3d at 314 & n.56.  The Court held, however, that the suppressed impeachment information was material because the witness' testimony would have been far less credible and "the Commonwealth virtually concede[d] as much on appeal, asserting that [the witness'] testimony was unnecessary to [the] conviction.  *Id.* at 315.

undisclosed information." *United States v. Perdomo*, 929 F.2d 967, 972 (3rd Cir. 1991).

Suppressed evidence is material if it is evidence such "that, if disclosed and used effectively, it

may make the difference" in the verdict. *United States .v Bagley*, 473 U.S. 667, 676 (1985). The

fact that some impeachment was disclosed simply does not address the question. *See, e.g., Banks*

*v. Dretke*, 540 U.S. 668, 675, 688, 702-03 (2004 (finding that suppression of evidence that a

witness was a "paid police informant" during the time he obtained statements and testified

against the capital defendant was material even though the witness had been impeached at trial

with evidence that he had previously served as an unreliable, state informant in a different state).

    1.    <u>Evidence that Innes was a Suspect in the Dickerson Homicide.</u>

The Magistrate Judge found that evidence that Innes was suspected of committing the

murder for which Canales was convicted was merely cumulative of evidence that Innes "had

already been indicted on two other major felony charges." Report at 23. Canales objects

because facing other felony charges is clearly not of the same caliber as facing a capital murder

charge.

> [T]he penalty of death is qualitatively different from a sentence of imprisonment,
> however long. Death, in its finality, differs more from life imprisonment than a
> 100-year prison term differs from one of only a year or two.

*Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). *See also Phillips v. Ornoski*, 673 F.3d

1168, 1182 (9th Cir. 2012) (prosecution's agreement not to press capital murder charge against

witness in exchange for her testimony was characterized as providing "substantial, possibly life-

saving benefits" to the witness), While Innes did have other felony charges, his motive to cast

suspicion away from himself in order to avoid a capital murder charge opens up a different

avenue of impeachment. *See Banks v. Dretke*, 540 U.S. 668, 702 (2004) (rejecting argument that

since witness was otherwise impeached withheld impeachment evidence was immaterial);

*Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (finding materiality even though the jury was aware that the state's witness was a "career burglar and six-time felon, with a criminal record going back to adolescence" but where the witness' prison records, which revealed a long history of violence, were not disclosed to the defense, which was asserting that the witness was actually the murderer). "[C]ourts have repeatedly held that withheld impeachment evidence does not become immaterial merely because there is some other impeachment of the witness at trial. Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material." *Gonzales v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011). The analysis of materiality is not "against a backdrop of how the defense presented its case at trial without the suppressed [evidence]." *Graves v. Dretke*, 442 F.3d 334, 344 (5th Cir. 2006). Rather, the focus must be this: "If the [evidence] had been revealed, the defense's approach could have been much different. . . ." *Id.* Here, the potential new avenue was impeachment with the information that Innes, who was suspected of committing the crime, became an agent for the State in order to develop evidence against Canales and to take the focus away from himself. This was powerful impeachment evidence. *See, e.g., McMillian v. State*, 616 So.2d 933, 946 (Ala. Crim. App. 1993).

> 2.  Evidence that SPU Assisted Inmate Witnesses In Other Ways, Including Obtaining Favorable Housing and Prison Conditions and Obtaining Parole.

The Magistrate Judge found that evidence that SPU provided undisclosed assistance to inmate witnesses was not material because these undisclosed benefits to virtually all of the state's inmate witnesses "did not constitute a temptation sufficiently strong to objectively undermine the credibility of the inmate testimony. Canales was allowed to depose the inmate witnesses, and none appear to have been subjectively motivated to lie by the prospect of favorable treatment." Report at 23.

First, Canales objects to this finding because the determination of whether the undisclosed benefits created motive to lie is for the jury to make rather than for the Magistrate Judge or this Court. This Court's role is to determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). A reasonable probability is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Application of this standard requires this Court to focus on what the jury might have concluded. In other words, as the Court stated in *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 560 (4th Cir. 1999):

> It is not our role to function as a jury. But to assess . . . material[ity], we must examine [the undisclosed evidence] in light of the other evidence presented to the jury.

In other words, the court must focus on what the jury might have concluded had the suppressed evidence been disclosed and used effectively by the defense. *Id.* at 560-61. *See also Gonzales*, 667 F.3d at 982 ("Our inquiry into how the jurors viewed [a witness] is primarily focused on how the withheld evidence could have provided additional or alternative means of impeachment").

Second, Canales objects to this finding because it is virtually incontrovertible that offering an incarcerated inmate benefits with prison housing and conditions and assistance in obtaining parole DOES CREATE a powerful motive to lie in order to obtain these benefits.

> [R]ather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promise as contingent upon the quality of evidence produced [--] the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor.

16

*Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976).  Even without the promise of benefits, the motive to lie for inmates is powerful.

> [I]nmate testimony is inherently unreliable.  Defendants or suspects with nothing to sell sometimes embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives, and cellmates alike.

*Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011).

Third, Canales objects to this finding because the inmate witnesses essentially confirmed that they were motivated to lie in order to obtain benefits for themselves.  Inmate Whited, who cooperated with the State but did not ultimately testify, recollected that inmates saw Mr. Canales' case as offering rich opportunities to improve their situations.  He observed that prisoners would lie to get a case dismissed or to get transferred to another facility.  Dkt. No. 121 Exh. 33 at 135; see also 66 ("And there was a lot of people that weren't involved in it that… were saying that they were because they wanted to get write-ups off of them …").  Likewise, State witness Doyle Wayne Hill testified:  "You knew that in this situation, a lot of people are going to say whatever, whether they've seen something or not.  There are just that many prisoners looking to make a deal[.]"  Dkt. No. 121 Exh. 34 at para. 8.

Fourth, Canales objects to this finding because, even assuming the Magistrate Judge is correct that the inmate witnesses were not motivated to lie by the undisclosed benefits provided by the State, the inmate witnesses DID LIE in their testimony by denying the existence of any benefits to them, *see, e.g.,* SR 9 at 111-12 (Inmate Tim Rice), SR 9 at 320, 322 (Inmate Richard Driver), when all were told, at minimum, that information favorable to them would be provided

to the parole board,[11] which did, in fact, happen after the trial, Dkt. No. 121 Exh. 56.  Thus, the suppressed impeachment evidence was material.  *Sivak*, 658 F.3d  at 916 ("There is a substantial difference between general evidence of untrustiworthiness and specific evidence that a witness has lied").

>    3.    Evidence that SPU Encouraged Inmate Witnesses to Communicate With Each Other Prior to Trial.

The Magistrate Judge found that the impeachment value of evidence that SPU encouraged inmate witnesses to communicate with each other prior to trial and that Innes did communicate with Inmate Whited was "slight" with respect to Innes's credibility because Innes was impeached by disclosure of a plea agreement.  Report at 24-25.  Canales objects to this finding because it is virtually incontrovertible that knowledge that a witness has communicated with other witnesses prior to trial in order to "get their story straight" casts grave doubt on the witness' credibility before the jury.  *Compare Banks*, 540 U.S. at 675 (information that a "witness' trial testimony had been intensively coached" was material information suppressed by the State).

>    4.    Evidence that Innes Continued Involvement in Prison Gang Activities, Incurred an Additional Possession of Weapon Charge During the Time He Was Working as a State Agent, and Obtained Numerous Other Benefits with Prison Classification and Housing.

The Magistrate Judge found that evidence that Innes continued in gang activities after allegedly "renouncing his membership" was of "quite slight" value as impeachment evidence. Report at 24.  Likewise, while the Magistrate Judge found that dismissal of a possession of weapon charge, incurred by Innes while acting as a State agent in this case, "could fairly be considered special treatment, the jury would likely have considered it cumulative, since Innes

---

[11] Specifically, Mullin testified that Merillat informed witnesses: "[W]hat I typically do – A.P. speaking – what I typically do is when an inmate testifies for us, I'll – I'll inform the parole board so that they know." SP Exh. 16 at 54:16-19.

admitted in his testimony that he turned over the letters in order to avoid being prosecuted for two other serious offenses." Report at 24. Finally, the Magistrate Judge found that evidence that Innes continually received assistance with prison classification and housing issues was merely cumulative. Report at 24.

Canales objects on each of these individual findings. Continued prison gang activity and ongoing criminal activity and charges WHILE acting as a State agent are material "tangible benefits," *Phillips v. Ornoski*, 673 F.3d 1168, 1186 (9th Cir. 2012), and any "expectation of leniency in and of itself would have provided valuable impeachment" evidence, *id.* at 1188. The evidence of ongoing criminal activity with immunity from prosecution was especially important impeachment evidence. *Bean v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002) (Evidence of an informant's continued criminal activity coupled with the fact "that the police knew about this but chose not to prosecute him would also be relevant to show his bias" and "a motive to provide the prosecution with inculpatory information, even if he had to fabricate it"). *See also United States v. Steinberg*, 99 F.3d 1486, 1491 (9th Cir. 1996). In short:

> Where, as here, the witness's credibility "was . . . an important issue in the case . . . evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it."

*Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (quoting *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (emphasis in original).

5.     Cumulative Impact.

The Magistrate Judge essentially found that because Innes was impeached with information about a favorable plea agreement, nothing else mattered, "[w]hether considered singly or in combination," Report at 22. Canales objects because the fact that Innes was impeached with some information only shows "the inadequacy of the impeachment material *actually presented*, not that of the suppressed impeachment material; in light of the failure of the

impeachment attempt at trial, the suppressed impeachment material may take on an even greater importance." *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005) (internal quotes omitted). Likewise, Canales objects because when viewed cumulatively as the suppressed evidence must be under *Kyles*, 514 U.S. at 436-37 (materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item"), the undisclosed impeachment evidence was plainly material.[12]

**Claim 9: (Canales' Fifth, Sixth, Eighth, and Fourteenth Amendment Rights Were Violated by Forcing Him to Wear Leg Shackles In Front of the Jury During the Capital Sentencing Phase of His Trial).**

In resolving Canales' claim that he was entitled to relief pursuant to *Deck v. Missouri,* 544 U.S. 622 (2005), the Magistrate Judge found that Canales exhausted the claim in state court. Moreover, he found that "to the extent the state court's opinion in this case can be construed as being based on the proposition that routine shackling of a capital defendant is allowable once he has been convicted, it is contrary to *Deck.*" Report at 30. Nevertheless, the Magistrate Judge recommended the denial of relief on this claim because *Deck*, decided more than a year after Canales' conviction became final, is a new rule and thus not retroactively applicable. *See Teague v. Lane,* 489 U.S. 288 (1989). Generally speaking, a rule is "new" and thus not applicable retroactively, if it was not dictated by precedent.

Respondent conceded in these proceedings that *Deck* is not a new rule. In Respondent Thaler's Motion for Summary Judgment and to Vacate Discovery Order with Brief in Support, he could not have been clearer: *"**Deck does not constitute new law.** Due process had long forbad shackling a defendant before the jurors during the guilt-innocence phase of trial. . . . Deck* extended the prohibition to sentencing." Dkt. No. 111 at 17 (emphasis added).

---

[12] The collective impact of the withheld evidence was addressed in full in the Supplement to the Petition, Dkt. No. 121, at 49-53. Petitioner will not repeat that argument here but incorporates it in full in objecting to these findings.

This concession is hardly surprising.  The factors leading the Supreme Court to prohibit shackling except in extraordinary circumstances at the culpability phase of a trial apply with equal force to the penalty phase.   In *Illinois v. Allen,* the Supreme Court recognized that physical restraints tend to prejudice the jury against the defendant and convey that the trial judge believes that the defendant is not to be trusted and is dangerous.  397 U.S. 337.  Restraints may interfere with a defendant's thought processes and ability to communicate with counsel and are an affront to the dignity of judicial proceedings.  *Id.* at 344.  For these reasons, it is "inherently prejudicial . . . for a defendant on trial to be shackled in the courtroom."  *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986).  In *Deck*, the Supreme Court found that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases."  *Deck,* 544 U.S. at 632.  Furthermore, the Supreme Court observed that shackling could interfere with the reliability of the jury's sentencing determination: "The appearance of the offender during the penalty phase in shackles, however, almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community--often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point."  *Id.* at 632-33.  The Fifth Circuit has long-recognized that the principles of *Allen* apply with equal, if not greater, force at the penalty phase.  *Marquez v. Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994)[13] ("Simply put, a defendant must not be shackled before his jury unless it is necessary to protect the safety of the trial participants or the sanctity of the trial itself").[14]

---

[13] Respondent cited to *Marquez* in conceding that *Deck* does not constitute new law.  Dkt. No. 111 at 17.

[14] Even before *Deck,* the Fifth Circuit was not the only appellate court to grasp that *Allen* necessarily applied to the penalty phase.  *See Duckett v. Godinez*, 67 F.3d 734, 747 (9th Cir. 1995) ("shackling a defendant during a sentencing hearing before a jury is an inherently

The fact that *Deck* applies the holding of *Allen* to a different phase of the trial is not enough to make it "new," i.e., not dictated by precedent. For instance, *Strickland v. Washington,* 466 U.S. 668 (1984) established a test for counsel's performance during trial, in particular the penalty phase. The Supreme Court, however, applied this holding not just to other stages of formal criminal proceedings, but also to consultations regarding plea offers. *See Lafler v. Cooper,* 132 S. Ct. 1376 (2012). Similarly, after *Estelle v. Smith,* 451 U.S. 454 (1981), held that *Miranda* warnings must be given prior to a court-appointed mental evaluation, the Fifth Circuit found that *Estelle* "merely applied already fixed principles to a new factual situation." *Battie v. Estelle,* 655 F.2d 692, 699 (5th Cir. 1981). *Deck* merely did the same for *Illinois v. Allen*.

For these reasons, this Court should reject the recommendation of the Magistrate Judge finding this ground for relief *Teague*-barred.[15]

### Objections to the Recommended Dismissal of Claims Because of Procedural Default

As noted previously, the Magistrate Judge recommended dismissal of Claims 1, 2, 5, 6, 7, 8, 10, 11, and 12 of the habeas petition, Dkt. No. 7, which were supplemented following discovery, Dkt. No. 121, because of procedural default. Canales objects as follows:[16]

---

prejudicial practice which comports with due process only when used as a last resort"); *Elledge v. Dugger,* 823 F.2d 1439, 1450 (11th Cir. 1987) ("a [capital sentencing] jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom, may also be unmanageable in prison, leaving death as a proper decision").

[15] Petitioner also objects to the Magistrate Judge's Recommendation of denial of relief of Claim 13 (Lethal Injection As It Is Currently Carried Out in Texas Will Produce Unneccessary Pain, Torture, and Lingering Death), but will rely on the arguments set forth in the Habeas Petition, Dkt. No. 7 at 151-63, and not repeat those arguments here.

[16] The Magistrate Judge recommended that the Court "deny" relief on claims 3 and 4. Report at 34-35. This recommendation suggests that the Magistrate Judge denied relief on the merits. Other portions of the recommendation raise the possibility that the Magistrate Judge found claims 3 and 4 defaulted but found that Petitioner established "cause" for the default due to the

A.     Overview of Canales' Objections to the Finding of Default.

Canales timely filed his Petition for Writ of Habeas Corpus, Dkt. No. 7, in this Court, but subsequently asked the Court to stay and hold the case in abeyance while he exhausted certain claims in state court.  Dkt. No. 22.  The Court granted the Motion.  Dkt. No. 31.  Canales returned to this Court after the state court dismissed his successive application for writ of habeas corpus, and successfully sought leave to conduct discovery on a number of issues involving state misconduct and irregularities regarding the jury.   The Director opposed discovery primarily on the basis of argument that the state court found the grounds for relief barred as an abuse of the writ.  *See, e.g.,* Dkt. No. 45.  The Honorable T. John Ward rejected the Director's position, finding that "the Texas Court of Criminal Appeals' dismissal of Canales' second petition as an abuse of the writ does not meet the elements of a procedural default."  Dkt. No. 42 at 1-2.  After the Director moved to vacate the discovery order, Dkt. No. 44, 45, Judge Ward reaffirmed his position that the CCA's order was not sufficient to act as a bar to federal merits review.  Dkt. No. 55.

After these discovery matters were resolved and Canales' case was reassigned to this Court, the case was referred to the United States Magistrate Judge.  Contrary to the prior findings of Judge Ward, the Magistrate Judge found that the CCA order dismissing the second state habeas petition rested on an independent state law ground.   Canales objects to the Magistrate Judge's recommended procedural ruling on two principal grounds.

First, the Magistrate Judge erred in finding that the CCA's order was independent of federal law and misconstrued Fifth Circuit opinions addressing the adequacy and independence of Texas's abuse of the writ rule.  Second, even if CCA's order is an adequate and independent

State's suppression of key evidence.  To the extent that the Magistrate Judge may have found claims 3 and 4 barred, Petition objects, as discussed at the conclusion of this section.

state law ground sufficient to bar merits review, Canales can show cause for any default. He received the ineffective assistance of post-conviction counsel in his first round of state habeas proceedings, which was his first opportunity to challenge the effectiveness of trial counsel. *See Martinez v. Ryan,* 132 S. Ct. 1309 (2012).

B.     The CCA's Order of Dismissal was not Independent of Federal Law.

    1.     A bar must be independent of federal law to be honored in habeas proceedings.

A federal habeas court may respect a state court judgment resting on a state procedural rule only if such a rule is adequate and independent of federal law. *Coleman v. Thompson,* 501 U.S. 722 (1991). A rule is adequate if it is firmly established and consistently applied. *Ford v. Georgia,* 498 U.S. 411, 424 (1991). A rule is independent if it is not interwoven with federal law. *Ake v. Oklahoma,* 470 U.S. 68, 75 (1985). When a state procedural law question depends, in part, on a resolution of a federal constitutional question, a presumption exists that a state court decision is not based upon an independent and adequate state ground if the state court does not clearly and expressly state that its decision is "based on bona fide separate, adequate, and independent grounds." *Michigan v. Long,* 463 U.S. 1032, 1041 (1983); *see also Coleman,* 501 U.S. at 733; *Harris v. Reed,* 489 U.S. 255, 266 (1989). As the Supreme Court explained in *Coleman*:

> [F]ederal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state court judgments, will presume that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman*, 501 U.S. at 734-35 (citations omitted). Federal law thus places the burden on the state

court to clearly and expressly show the state-law ground of decision if federal review is to be precluded. "To avoid procedural bar, 'in some form, the state court has to make a fair indication that the merits of the claim were reached.'" *Puckett v. Epps,* 641 F.3d 657, 665 (5th Cir. 2011) (quoting *Balentine v. Thaler,* 626 F.3d 842, 854 (Tex. 2010)).

 2. <u>The CCA's Ambiguous Dismissal Order.</u>

 The CCA disposed of Canales' second state habeas petition in an unsigned *per curiam* order: "We have reviewed the application and the briefs of both parties and find that all of the allegations fail to satisfy the requirements of Article 11.071, Section 5(a). Accordingly, this application is dismissed as an abuse of the writ." *Ex parte Canales,* slip op., No. WR-54,789-02 (Tex. Crim. App. 2008). In *Ex parte Campbell,* 226 S.W.3d 418 (Tex. Crim. App. 2007), the CCA explicated how it conducts a Section 5(a) assessment of a subsequent application in which it was alleged that the facts or law were not available at the time the prior application was filed:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1)the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.

*Id.* at 421.

 Canales argued to the CCA that he should be allowed to proceed in state court on his various claims because they were either previously factually or legally unavailable to him, and he alleged facts which, if proven, would establish violations of the United States Constitution. Canales' application was dismissed pursuant to Section 5. This order, however, does not settle the matter because Section 5 includes a federal component and because characterizing the

dismissal as an abuse of the writ does not of its own force constitute an independent and adequate state law ground.   As discussed previously, federal law places the burden on the state court to show the state law ground of decision if federal review of a claim is to be precluded.  By issuing the brief order that simply declared that Canales did not satisfy Section 5, the CCA failed to "clearly and expressly" demonstrate that the basis of the decision was a state procedural rule rather than the federal component of Section 5.

Reviewing a similar order in *Ruiz v. Quarterman,* 504 F.3d 523 (5th Cir. 2007), the Fifth Circuit concluded that the ambiguous, unexplained order denying a subsequent state habeas petition was not independent of federal law.  As the Fifth Circuit explained:

This settled principle [of adequate and independent state procedural bars] gives to state courts control over the federal review of their opinions.  It has become a rote rule at the fingertips of every writing member of state courts of last resort where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvertent.  Calibrated uncertainty can play a mediating role in garnering support for an outcome.  To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's *Wiggins* claim to federal review.  At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application.  As the CCA is keenly aware, its choice of language was made against a background legal standard -- which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ – that is interwoven with federal law.

The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) whether the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence.  The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.

*Id.* at 527 (internal citations omitted).

As in *Ruiz,* the CCA, in resolving Canales' subsequent habeas application, could have clearly stated that it was rejecting Canales' claims on an independent state law basis.  It did not,

however, and instead, issued a boilerplate order that did not explain the basis for the denial. Because a Section 5 dismissal is, by the CCA's own explanation in *Ex parte Campbell,* necessarily interwoven with federal law, this Court must presume the dismissal is not independent of federal law and must therefore address the merits of the claims dismissed by the Magistrate Judge.

3.   The Magistrate Judge's Flawed Finding of Default Regarding the Ineffective Assistance of Counsel Claims (1, 2, and 5).

Unlike Judge Ward, the Magistrate Judge construed the CCA dismissal order as resting on a procedural basis. In the section of the recommendation focusing on Grounds 1, 2, and 5 (ineffective assistance of trial counsel at the culpability and penalty phases of the trial (Grounds 1 and 2) and the cumulative effect of state misconduct and ineffectiveness claims (Ground 5)), the Magistrate Judge noted that Canales argued that the legal basis of this claim was not available in 2002 when his first application was filed, and did not become available until the Supreme Court decided *Wiggins v. Smith*, 539 U.S. 510 (2003). The Magistrate Judge concluded that the CCA "necessarily determined that *Wiggins* did not establish new standards for ineffective assistance of counsel in capital cases but instead reaffirmed the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Report at 10-11. Though acknowledging that "[t]his reasoning may seem to rest primarily upon or be interwoven with federal law," the Magistrate Judge turned to *Rocha v. Thaler*, 626 F.3d 815, 835 (5th Cir. 2010), in which the Fifth Circuit held that "[i]f the CCA's decision rests on availability, the procedural bar is intact." Dkt. No. 139 at 11. The Magistrate Judge also rejected Canales' contention that he satisfied subsections (a)(2) and (a)(3) of Section 5, again relying on *Rocha's* conclusion that a rejection on those grounds was based on state law. *Id.* at 11 (citing *Rocha*, 626 F.3d at 840-41).

The Magistrate Judge's analysis is flawed for a number of reasons. First, as explained in

*Ruiz*, the CCA understands how to state clearly the basis for its decision if it actually determines that dismissal is in fact based on unavailability.  Second, the Magistrate Judge misconstrued the significance of the CCA's request for additional briefing to address the effect of *Wiggins v. Smith*.  Third, the Magistrate Judge failed to recognize that Canales also argued that the facts in support of his ineffective assistance and other claims were unavailable, unlike the petitioners in *Rocha, supra,* and *Balentine v. Thaler,* 626 F.3d 842 (5th Cir. 2010).  In fact, Canales attached a declaration from his initial state habeas attorney, Troy Hornsby.  The fact that Canales squarely raised the question as to the legal and factual availability of his claims makes it impossible to determine the basis of the state court's order of dismissal, as the Fifth Circuit recognized in *Balentine, supra.*

      a.    <u>The CCA understands how to express clear reliance on a state procedural rule.</u>

In *Ruiz,* the Fifth Circuit recognized that ambiguity in an order from the CCA might be necessary to garner support for an outcome.  When the CCA is firm about the basis for a decision regarding a subsequent application, however, it makes a clear statement as to whether its dismissal is based on the state procedural prong (the prior availability of facts or law) or the substantive prong of the Section (a)(1) test.  For instance, as Canales pointed out in his Reply to the Response to the Supplement to the Petition, Dkt. No. 136 at 2, in *Ex parte Cleve Foster,* No. WR-65,799-03 (Tex. Crim. App. Sep. 12, 2011), the court stated: "We have reviewed the application and find the applicant's allegations fail to satisfy the requirements of Article 11.017 § 5.  Accordingly, we dismiss the application as an abuse of the writ *without considering the merits of the claim*."  Slip Op. at 2 (emphasis added) (Attached as Exhibit 1).  The state court can clearly distinguish those instances in which it relies solely on procedural grounds to dismiss a petition.  Moreover, *Foster* was not an aberration.  In multiple cases, the CCA has been clear

about when it dismisses a successive application based on availability without addressing the merits. *See Ex parte Mark Anthony Stroman,* No. WR-62,298-02 (Tex. Crim. App. July 14, 2011); *Ex parte Ruben Gutierrez,* No. WR-59,552-02 (Tex. Crim. App. Aug. 24, 2011); *Ex parte Steven Michael Woods,* No. WR-62,627-02 (Tex. Crim. App. Sept. 2, 2011); *Ex parte Manuel Garza,* No. WR-70,797-02 (Tex. Crim. App. Oct. 12, 2011); *Ex parte Guadalupe Esparza,* No. WR-66,111-03 (Tex. Crim. App. Oct. 19, 2011); *Ex parte Frank Martinez Garcia,* No. WR-66,977-02 (Tex. Crim. App. Oct. 27, 2011); *Ex parte Taichin Preyor,* No. WR-72,660-03 (Tex. Crim. App. Nov. 9, 2011); *Ex parte Jeffrey Demond Williams,* No. WR-50,662-03 (Tex. Crim. App. Nov. 23, 2011); *Ex parte Beunka Adams,* No. WR-68,066-03 (Tex. Crim. App. Feb. 15, 2012); *Ex parte Jedidiah Isaac Murphy,* No WR-70,832-02 (Tex. Crim. App. Mar. 21, 2012). These orders are attached as Exhibit 2.

In Canales' case, the state court did not make a plain statement as to the basis for its ruling. Because the CCA clearly indicates when it wishes to base its order of dismissal on procedural grounds, its failure to do so in Canales' case indicates that its dismissal was at least interwoven with federal law. This is particularly true in this case, in which Canales argued the prior availability of the legal basis of the ineffectiveness claims and the availability of the facts supporting the claim.

       b.    The CCA's request for briefing indicates that its decision was at least interwoven with federal law.

Canales contended that there was a presumption that the CCA's dismissal order was interwoven with federal law in light of the CCA's request for additional briefing on two topics:

Question 1: Is *Wiggins v. Smith*, 539 U.S.510, 527 (2003), new law or such an extension of old law that this Court should hold that it meets the dictates of Article 11.071 § 5?

Question 2: If *Wiggins* is new law or such an extension of old law that it should

meet the dictates of Article 11.071 § 5, under what standard should a court judge the effectiveness of counsel's actions undertaken before the decision in *Wiggins* was announced?

After receiving briefs from each party, the CCA entered its order of dismissal.

The Magistrate Judge concluded that the CCA "necessarily" found the legal basis of the claim previously available because *Wiggins v. Smith*, on which Canales relied for his assertion of trial counsel's penalty phase ineffectiveness, was not new as a matter of federal law.  As the Magistrate Judge pointed out, *Wiggins* involved an application of *Strickland v. Washington,* 466 U.S. 668 (1984).  Report at 10-11.  The Magistrate Judge, however, failed to appreciate that when the CCA considered whether *Wiggins* was newly available, it was not necessarily limiting itself to the narrow question as to whether *Wiggins* involved a substantively new rule as a matter of federal law.  Rather, the CCA also considers whether a new decision alters the manner in which it reviews even established principles of law.  *See, e.g., Black v. State,* 816 S.W.2d 350, 371 (Tex. Crim. App. 1991).

Certainly, applicants have long raised claims of ineffective assistance of counsel, citing the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), which set forth the dual requirements of deficient performance and prejudice before an applicant could be granted relief.  While this two-pronged standard has remained the same, the CCA could have seen *Wiggins* as a significant change in the way the CCA approached these types of claims. Moreover, the second question asked by the CCA pertained to the standard by which it should assess counsel's performance, which is clearly a question focusing on the merits of the claim. Given these circumstances, it is impossible to "necessarily" conclude that the CCA's unexplained order reflected only a finding on a state law ground wholly independent of the merits of the federal claim.

30

i.   A new decision may alter the state court analysis for purposes of Section (a)(1) without creating new substantive federal law.

The CCA has recognized several instances where a change in the application of federal constitutional principles, although not "new" for federal purposes, nonetheless was considered sufficient to exclude it from being treated as an abuse of the writ.   In the context of *Penry*[17] claims, for example, the CCA noted that:

> The Supreme Court's finding that *Penry* does not impose a new obligation on the State of Texas, however, does not directly control whether *Penry* claims are novel in light of the right not recognized doctrine approved in *Ex parte Chambers*.

*Black v. State,* 816 S.W.2d 350, 371 (Tex. Crim. App. 1991). Therefore, even though the *Penry* jurisprudential underpinnings flowed from well-established cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982), and *Jurek v. Texas,* 428 U.S. 262 (1976), the CCA could, and did, refuse to apply state procedural bars to such claims.

In *Black,* the CCA also highlighted its treatment of claims involving the necessity of warnings to capital defendants during psychiatric evaluations:

> [T]he United States Court of Appeals for the Fifth Circuit held that the decision in *Estelle v. Smith* "did not establish a new principle of federal constitutional law because that decision merely applied already fixed principles to a new factual situation." The circuit court viewed *Smith* as a logical extension of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and its related line of cases. *Battie v. Estelle*, 655 F.2d 692, 699 (5th Cir.1981). In contrast, in his concurrence in *Fields v. State*, 627 S.W.2d 714 (Tex.Cr.App.1982), Presiding Judge McCormick recognized the significant impact of the decision in Smith on Texas law:
>
> > Both holdings in *Estelle v. Smith* changed the law in Texas. This Court had for years rejected claims on these bases. Never before had it been held a court-appointed mental health expert must warn a defendant of his right to remain silent and that the evidence adduced in the psychiatric interview could be used against him. Never before had it been held that the defendant's attorney could receive notice before a psychiatric interview on the dangerousness issue could be held. In fact, in numerous cases this Court rejected

---

[17] *Penry v. Lynaugh*, 492 U.S. 302 (1989).

> the contentions that the proceedings used in *Estelle [v. Smith]* violated a defendant's rights. 627 S.W.2d at 723 (McCormick, J., concurring).

*Id.* at 371 (Campbell, J. concurring). Despite the clear acknowledgment by the federal courts that *Estelle v. Smith* did not establish a "new principle of federal constitutional law" the CCA did not apply a state procedural bar to those claims.

The CCA has also expressly recognized that *Tennard v. Dretke,* 542 U.S. 274 (2004), *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), *Brewer v. Quarterman*, 550 U.S. 286 (2007), *Smith v. Texas*, 543 U.S. 37 (2004) (*Smith I*), and *Smith v. Texas,* 550 U.S. 297 (2007) (*Smith II*) are "newly available legal bases" for Section 5 purposes even though these were not new rules for purposes of federal law. Indeed, all but *Smith* were decided in federal habeas proceedings and would have been barred as nonretroactive if they were new law. *See Ex parte Moreno*, 245 S.W.3d 419, 429-31 (Tex. Crim. App. 2008) (reconsidering and granting relief on applicant's previously dismissed *Penry* claim, concluding that *Abdul-Kabir*, *Brewer, Smith II*, and *Tennard* constituted a new legal basis under 11.071, § 5, and holding that those cases held that a defendant's mitigating evidence of "a troubled childhood" required special instructions so that the jury could fully consider its mitigating value outside the statutory special issues); *Ex parte Martinez*, 233 S.W.3d 319, 323 (Tex. Crim. App. 2007) (relief granted on subsequent habeas corpus application on Penry claims based on *Smith I, Tennard, Abdul-Kabir, Brewer*, and *Smith II*; "We further believe that the recent United States Supreme Court precedent . . . compels a decision that applicant presented 'constitutionally relevant mitigating evidence' at his 1989 trial and that the jury did not have a vehicle to give this evidence 'meaningful consideration'") (quoting *Abdul-Kabir*); *Ex parte Kim Ly Lim*, No. WR-56,297-01, 2008 WL 2391119 (Tex. Crim. App. June 4, 2008) (per curiam) (not designated for publication) (remanding subsequent

writ  containing *Penry* claim to habeas court; "Upon reviewing the subsequent application, and in light of intervening United States Supreme Court decisions, this Court has determined that Applicant's third claim concerning the nullification instruction given at the punishment stage of his trial should not have been dismissed as an abuse of the writ but remanded to the trial court for its consideration"); *Ex parte Hathorn*, No. AP-75,917, 2008 WL 2058677 (Tex. Crim. App. May 14, 2008) (per curiam) (not designated for publication) (reconsidering applicant's previously dismissed *Penry* claim).  Hathorn received relief and was granted a new trial on punishment in *Ex parte Hathorn*, 296 S.W.3d 570 (Tex. Crim. App. 2009) (relying on *Brewer* and *Abdul-Kabir* and holding that applicant was not required to object at trial or raise *Penry* issue on appeal to obtain relief under most recent Supreme Court cases; "Because the mitigating evidence presented at Applicant's trial is the type of evidence for which he was entitled to a separate vehicle for consideration, we remand the case to the trial court for [a] new punishment hearing").

The CCA has also found that *Miller-El v. Dretke,* 545 U.S. 231 (2005) was "new law" for Section 5 purposes, even though *Miller-El* involved a straightforward application of *Batson v. Kentucky,* 476 U.S. 79 (1986).  *See Ex parte Arthur Williams*, No. WR-71,404-02 (Tex. Crim. App. Apr. 29, 2009).[18]

These cases conclusively show that the CCA applies its own standard to determine whether any given federal law is newly available for state procedural purposes.  The magistrate's decision undermines, and effectively rejects, the state court's prerogative to interpret state law.

---

[18] Similarly, in *Ex parte Chavez,* ___ S.W.3d ___, 2012 WL 1858948 (Tex. Crim. App. June 20, 2012), the CCA determined that due process claims resting on the unknowing use of false evidence were newly available for purposes of an analysis of Art. 11.07, 4(a)(1), the provision for non-capital cases similar to Art. 11.071, 5(a)(1), even though comparable due process claims were well-established under federal law.

ii.   The CCA's second question directly implicated federal law, thereby raising a presumption that the order of dismissal was not independent of federal law.

The CCA requested additional briefing to consider what standard should be applied for judging "the effectiveness of counsel's actions undertaken before the decision in *Wiggins.*" Thus, the CCA's request expressly called for briefing on a question of federal substantive law regarding the assessment of trial counsel's performance.   The briefing order indicates that the CCA took seriously the likelihood that *Wiggins* provided a newly available legal basis for a claim; otherwise, requesting briefing on the merits of the claim would have been a futile exercise.  This provides further support for the possibility that the CCA either found *Wiggins* to be a newly available legal ground or skipped over the question to resolve the merits of the ineffectiveness claims.   Thus, the request for additional briefing indicates that the CCA's order was intertwined with federal law, creating a presumption that its decision was not based on an independent state law ground.   Because the Magistrate Judge erred in concluding otherwise, this Court should reject the recommendation that these grounds for relief be considered procedurally barred as an abuse of the writ.

The Magistrate Judge realized that the CCA's concern about the effect of *Wiggins* suggested the possibility that the dismissal order rested on federal law.   Relying on *Rocha v. Thaler,* 626 F.3d 815, 835 (5th Cir. 2010), however, the Magistrate Judge discounted that possibility. In *Rocha,* the Fifth Circuit "stated flatly that '[i]f the CCA's decision rests on availability, the procedural bar is intact.'"  Report at 11 (quoting *Rocha, supra*).  The Magistrate Judge's conclusion begs the question, namely whether the CCA's order was in fact based on availability.   As the Magistrate Judge himself acknowledged, the call for additional briefing places federal law squarely at issue, which raises the presumption that the state order was

independent of state procedural law.  Nothing in the ambiguous state court order overcomes this presumption.

Furthermore, there is nothing in *Rocha* that suggests that this presumption can be overcome based on the circumstances present in this case.  Although *Rocha* indicates that not every ambiguous boilerplate order should be interpreted as being denied on the merits, it recognized that a federal court should review the circumstances of the particular case.  In *Rocha*, for instance, there was nothing, such as a briefing order, to trigger the presumption that the CCA may have relied on federal law.  Furthermore, as the Fifth Circuit pointed out, a federal court could conclude that the CCA based a decision on the state law availability question if the petitioner did not argue that the facts or law were unavailable.  *See also Balentine v. Thaler,* 626 F.3d 842, 855 (5th Cir. 2010) (finding dismissal based on state law ground because "Balentine's subsequent application made no effort to show that the facts or law underlying his *Wiggins* claim were unavailable to him at the time of his first state application").[19]   However, the request for briefing on specific questions of federal law indicates that the CCA's decision-making was at least interwoven with federal law in Canales' case, and Canales, unlike Balentine*,* argued both the legal and factual unavailability of his claim.

As *Rocha* made clear, "[w]hether a dismissal is independent of federal law turns on case-specific factors."  626 F.3d at 835.  Under Canales' circumstances, a federal court cannot discern from the face of the state court order whether the CCA (1) determined that *Wiggins* is not a new legal basis within the meaning of state law; (2) determined whether the facts were unavailable;[20]

---

[19]   Unlike Canales (or Ruiz), Balentine did not identify Section 5(a)(1) as the provision he satisfied, and in *Balentine,* the CCA did not indicate that it was considering the merits.

[20]   In *Rocha,* the Fifth Circuit asserted that the CCA applies the factors of Section 5(a)(1) sequentially.  That is, the CCA will entertain the merits only if it finds the claim to have been factually or legally unavailable in a prior application.  However, it is questionable whether the

(3) determined that *Wiggins* is a new legal basis within the meaning of state law but dismissed based on its view that Canales had not made a prima facie showing of a constitutional violation "sufficiently serious as to likely require relief from his conviction or sentence," *Ex parte Campbell,* 226 S.W.3d 418, 422 (Tex. Crim. App. 2007); or 4) skipped over the issue of availability and determined that the claims lacked merit.[21]

As in *Ruiz,* the Fifth Circuit case that Canales' resembles more closely than *Balentine* or *Rocha,* the CCA's dismissal "leaves the decisional path far short of the clarity insisted upon by *Michigan v. Long* . . . of which the CCA is acutely aware." *Ruiz,* 504 F.3d at 528. Under these circumstances, and unlike in *Balentine* or *Rocha*, there is "good reason to question whether there is an independent and adequate state ground for the decision." *Coleman*, 501 U.S. at 739. For these reasons, this Court should reject the Magistrate Judge's recommendation of dismissal based on the ambiguous CCA order, at least concerning grounds 1, 2 and 5.

    4.    <u>The Facts Supporting the Juror Misconduct Claims (7 and 8) were Not Available, and Nothing Suggests that the CCA's order was not independent of federal law.</u>

Canales raised two claims of juror misconduct (Grounds 7 and 8). For Ground 7, his federal habeas counsel discovered handwritten notations in files disclosed by the State suggesting that two and perhaps three jurors made false statements under oath regarding their prior criminal history. Canales alleged that two jurors, Rawson and Miller, answered in the negative on a questionnaire regarding whether they had been arrested for a crime other than a

---

CCA only proceeds in this fashion in all cases. As Justice Price recently noted, "we should dismiss a subsequent writ as abusive if it fails to satisfy *either* the new-law *or* the prima facie statement of facts aspect of the pleading requirement; we should not necessarily have to conduct *both* analyses." *Ex parte Chavez,* ___ S.W.3d ___, 2012 WL 1858948 at *17 n.9 (Tex. Crim. App. June 20, 2012) (noting by analogy that a court need not decide both parts of a *Strickland* claim if it found either wanting).

[21] Or "[c]alibrated uncertainty" may have played "a mediating role in garnering support for an outcome." *Ruiz,* 504 F.3d at 527.

traffic offense. On notes found in the prosecutor's files, however, there was a notation next to Rawson's name: "been arrested for hot checks" and "inv. Pending." Next to Miller's name was written "hot checks" and "inv. pnd."[22] Thus, despite each of these men's disavowals, at least one, and perhaps both, had been arrested for something other than a traffic offense. Moreover, each of these men was currently under investigation. At no point did the State, despite its actual knowledge of these arrests and pending investigations on the jury, bring this information to the attention of the trial court or defense counsel.

Canales also asserted that juror Dozier inaccurately asserted that a prior conviction had been expunged from his record. It appears that juror Dozier's Arkansas conviction for battery has not been expunged from his record. Like other information regarding jurors, this information was not readily available. In Ground 8, Canales alleged inappropriate communications between the jury and court personnel.

Because of the apparently early stages of the investigation of the jurors, Canales' trial counsel would not have been able to find information on their own about criminal charges against these jurors. Moreover, Troy Hornsby, prior state habeas counsel, would not have been on notice of these notes. Hornsby assumed that he had all relevant materials from the prosecution because of an "open file" policy. Hornsby 2012 declaration (attached as Exhibit 3). He had no reason to suspect the existence of such notes about the jurors and instead focused on gathering evidence relevant to more typical materials from the State, such as witness statements, and, in this case, materials about gang activity. *Id.* As Hornsby explains in his declaration, he had no indication that this information existed, and in any event, he would not have had the

---

[22] Juror Matlock also had a notation that states: "he's been arrested several times – reckless driving, etc." and "no conv." To the extent that any of the other of the "several times" he was arrested was for something other than a traffic offense, Canales incorporates Matlock into this claim.

funds to pursue an appropriate investigation. *Id.*

The Magistrate Judge concluded that the CCA barred these claims as an abuse of the writ because the facts should have been available to prior state habeas counsel because they were discovered by federal habeas counsel. Report at 27 (regarding Ground 7: "The problem with Canales' argument is that he neither contends nor establishes that his state post-conviction counsel asked to view the prosecution file"); Report at 28 (similar explanation for recommendation to find Ground 8 barred). However, as the Supreme Court has found in a slightly different context, discovery of evidence in federal proceedings does not automatically imply that the materials would have been available to reasonably diligent state post-conviction counsel. In *Williams v. Taylor,* 529 U.S. 420 (2000), the Court found that a habeas petitioner could not be faulted for not uncovering during state post-conviction proceedings evidence that a juror failed to disclose that she had been married to the lead detective and witness in the case. The Court of Appeals for the Fourth Circuit found that the claim could have been discovered if the state post-conviction attorneys had searched county marriage records. The Supreme Court rejected this argument: "Because of [the juror's and knowledgeable prosecutor's] silence, there was no basis for an investigation into [the juror's] marriage history." *Id.* at 443.

Similarly, the Supreme Court has found that trial and state habeas counsel are entitled to rely on the prosecutor's representation that there is an "open file" policy. *Strickler v. Greene,* 527 U.S. 263, 284 (1999); *Banks v. Dretke,* 540 U.S. 668, 693 (2004). Thus, if there were no "red flags" indicating a need for additional investigation, prior counsel were under no duty to investigate. Thus, the facts underlying the claim were not available.

For Canales, information about the jurors was in the prosecutor's files. Prior state habeas counsel had no reason to believe that there would have been any information that had not been

produced as part of the prosecutor's open-file policy, and thus acted reasonably under the circumstances.[23]  Moreover, there was no basis for the CCA to conclude that these facts would have been available.  Thus, it is likely that the CCA's dismissal was based on an assessment of the merits of the claim. Under these circumstances, the Magistrate Judge erred in finding that these claims were reasonably available in Canales' first attempt to obtain state habeas relief.

5.  There is a Presumption that the State Court Resolution of Grounds 3 and 4 Was At Least Interwoven with Federal Law.

At the conclusion of his recommendation, the Magistrate Judge found that Claims 3 and 4 should be denied and most of the other claims dismissed.  This recommendation suggests that the Magistrate Judge found no bar with respect to Claims 3 and 4.   Elsewhere, however, the Magistrate Judge indicated that he found that there was a procedural bar but that Canales demonstrated "cause" for the default.  In those portions of the recommendation, after noting the ambiguity of the state court order, the Magistrate Judge found that the facts supporting those claims had not been available previously, which would support a showing of cause for a default. Report at 14 (noting that the Director did not dispute the unavailability of the facts supporting Claim 3) and at 20-21 (finding that the State suppressed the facts supporting the *Brady* claim). Canales does not dispute the finding that the facts underlying these claims was unavailable. However, to the extent that the Magistrate Judge's recommendation could be construed to find that the CCA's dismissal of these claims was not independent of federal law, Canales objects. Because Canales argued in his subsequent state court application that the facts underlying these claims were unavailable at the time of his first application, it is unlikely that the state court denied relief on state law grounds; rather, its decision had to have rested, at least in part, on a

---

[23] In the alternative, and as discussed in greater detail below, state habeas counsel performed ineffectively, and this ineffectiveness provides cause for any default.  *See Martinez v. Ryan,* 132 S. Ct. 1309 (2012).

consideration of federal law.

This position is reinforced by the order remanding the successive application of William Speer, Canales' co-indictee.  Speer relied on the same evidence that Canales relied on in state court to support similar claims of misconduct.  *See* Respondent Quarterman's Response in Opposition to Petitioner's Motion for Stay and Abeyance (Dkt. No. 24), *Speer v. Quarterman*, No. 2:04-cv-269 at 3-5, 10 (E.D. Tex, filed April 16, 2008) (noting reliance on materials obtained by Canales' federal habeas counsel) (attached as Exhibit 4).  The CCA remanded for a determination as to whether the materials supporting the misconduct claims were available when Speer's previous application had been filed.  *Ex parte Speer,* No. WR-59,101-02 (Tex. Crim. App. Nov. 5, 2008) (attached as Exhibit 5).  If the CCA could not determine the availability of materials filed by Speer, then it could not have found the same materials available when Canales submitted them to the CCA at least one year prior to the time that Speers submitted them.  Under these circumstances, it is impossible to determine whether the CCA dismissed these claims because it found them unavailable.  Thus, its order involved federal law and cannot serve as a bar to this Court's review.[24]

C.    Canales Can Establish Cause for any Defaults as a Result of Receiving the Ineffective Assistance of Post-Conviction Counsel.

As noted, the Magistrate Judge found the majority of the claims (Grounds 1, 2, 5-8, and 10-12) barred as an abuse of the writ.  In addition, the Magistrate Judge found that Canales could not show cause to excuse the default.  Since Canales completed briefing, however, the United States Supreme Court held in *Martinez v. Ryan¸* 132 S. Ct. 1309 (2012), that a federal habeas petitioner may establish cause if he received the ineffective assistance of state habeas counsel in circumstances where state habeas proceedings were the first opportunity to raise claims such as

---

[24] Of course, even if this Court finds that there is a valid procedural bar, the Magistrate Judge was correct to find that Canales showed cause for the default.

ineffective assistance of counsel.  If this Court finds that the CCA dismissal order was sufficient to bar merits consideration of the claims found barred by the Magistrate Judge, then the Court should determine whether Canales can show cause pursuant to *Martinez* or remand the case to the Magistrate Judge in light of *Martinez*.

Canales first reviews the holding of *Martinez,* discusses the performance of his first state habeas attorney, examines why *Martinez* applies to capital cases in Texas, and establishes that in his own particular case, he could not have raised claims based on facts outside of the trial record except in state habeas proceedings.   Based on the following, this Court should excuse any alleged default and grant relief based on the facts and argument in the federal petition, Dkt. No. 7, and the Supplement to the Petition, Dkt. No. 121.  In the alternative, this Court should remand this issue to the United States Magistrate Judge for additional proceedings in light of *Martinez*.

1.    *Martinez* as a vehicle to establish cause to overcome a default.

Arizona, where *Martinez* arose, does not permit prisoners to raise ineffective assistance of counsel claims on direct appeal, requiring them instead to file such claims in state collateral proceedings.  Martinez sought federal habeas corpus relief claiming ineffective assistance of trial counsel.  The claim was procedurally defaulted because it had not been properly raised in state court.  Martinez argued that he was entitled to the effective assistance of counsel in that state collateral proceeding because it constituted his first opportunity to raise his claim of ineffective assistance of trial counsel.  Because he had been denied such assistance, Martinez contended, he had established "cause" for any default.   The district court found his claim of ineffective assistance of trial counsel procedurally defaulted, citing *Coleman v. Thompson*, 501 U.S. 722, 755 (1991) (holding that "post-conviction counsel's ignorance or inadvertence does not qualify as cause to excuse a procedural default"). The Ninth Circuit affirmed, and Martinez presented to

41

the Supreme Court the question *Coleman* left open*:* "whether a prisoner has a [constitutional] right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez v. Ryan*, 131 S. Ct. 2960 (2011).

Although the Supreme Court granted *certiorari* to address Martinez's constitutional question, it deferred that issue and instead addressed "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." *Martinez*, 132 S. Ct. at 1315. The Court concluded that "a narrow exception" to the unqualified holding in *Coleman* was necessary "[t]o protect prisoners with a potentially legitimate claim of ineffective-assistance of trial counsel." *Id.* at 1315. Thus, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.*

The Court explained that an exception to *Coleman* was appropriate because when "an initial review-collateral proceeding" provides the first opportunity for raising a claim of ineffective assistance of trial counsel, it is the equivalent of a prisoner's direct appeal, in that "the state habeas court looks to the merits of the claim of ineffective assistance, no other court has addressed the claim, and defendants pursuing first-tier review are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Id.* at 1317 (citations and internal quotation marks omitted). *Martinez* pointed out that if direct appeal counsel is ineffective, "the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain adjudication on the merits of his [other] claims." *Id.* Without the effective assistance of counsel in initial-review collateral proceedings, there is a similar risk that prisoners will forfeit claims of ineffective

assistance of trial counsel. *Id.* Such claims often cannot be presented adequately without factual investigation and an "understanding of trial strategy." *Id.* When a claim of ineffective assistance of trial counsel cannot be raised on direct appeal, a prisoner in initial-review collateral proceedings

> cannot rely on a court opinion or the prior work of an attorney addressing that claim . . . . The prisoner, unlearned in the law, may not comply with the State's procedural rules or may misapprehend the substantive details of federal constitutional law. . . . [C]onfined to prison, ***the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record***.

*Id.* (citation omitted) (emphasis added).

The *Martinez* Court recognized that while there are sound practical reasons for adjudicating ineffective assistance of counsel claims in collateral proceedings, doing so deprives the prisoner of constitutionally-guaranteed counsel to help safeguard perhaps the most important trial right:

> Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim. *Ibid.* Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim. *See* Primus, *Structural Reform in Criminal Defense*, 92 Cornell L. Rev. 679, 689, and n. 57 (2004) (most rules give between 5 and 30 days from the time of conviction to file a request to expand the record on appeal). Thus, there are sound reasons for deferring consideration of ineffective-assistance-of-trial-counsel claims until the collateral-review stage, but this decision is not without consequences for the State's ability to assert a procedural default in later proceedings. By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims. It is within the context of this state procedural framework that counsel's ineffectiveness in an initial-review collateral proceeding qualifies as cause for a procedural default.

*Id.* at 1318. The core concern of *Martinez* is for a prisoner to have an adequate opportunity to vindicate his Sixth Amendment right to the guiding hand of counsel: "A prisoner's inability to

present a claim of trial error is of particular concern when the claim is one of ineffective assistance of counsel.  The right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Id*. at 1317.

To guarantee that a habeas petitioner had an opportunity to vindicate the right to the effective assistance of counsel, *Martinez* held that petitioners can show cause for a procedurally defaulted ineffective assistance of counsel claim by demonstrating:

> (1)     that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S .Ct. 2052, 80 L.Ed.2d 674 (1984)"; and,

> (2)     "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that ... [it] has some merit."

*Martinez*, 132 S. Ct. at 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standard for certificate of appealability).  Canales will address each part of the *Martinez* test in turn.

> 2.    <u>Appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).</u>

Canales was sentenced to death on November 1, 2000.  No one filed a motion for a new trial on his behalf.  On January 11, 2001, Paul Hoover was appointed to represent Canales on direct appeal, and six days later, the trial judge appointed Troy Hornsby to represent him in connection with state habeas proceedings.  Trial court docket sheets (attached as Exhibit 6). Hornsby filed a state habeas petition consisting almost entirely of claims apparent from the trial record.  Hornsby conducted limited investigation into the circumstances of the offense, primarily to establish a claim of actual innocence based on "new evidence."  He also sought discovery of gang related files.  Hornsby did not investigate, much less raise, any claim regarding trial

44

counsel's failure to develop and present mitigating evidence, and he did not pursue claims of juror misconduct or develop any of the other claims that the Magistrate Judge found were available to him.

Hornsby's failure to develop any mitigating evidence was not the product of a strategic decision based on a reasonable investigation. *See Strickland v. Washington*, 466 U.S. 668 (1984). Instead, as he explained in a declaration previously submitted to this Court, he believed that state law allowed only $25,000 per capital habeas case, and that limit included attorneys fees, litigation expenses, and funds for experts and investigators. Dkt. No. 21 Exh. A (Hornsby declaration, dated Oct. 17, 2005). In light of this perceived limitation, Hornsby allotted only $2,500 for investigation, and dedicated that small sum to investigate issues pertaining to innocence. Hornsby retained Richard Ramsey, a retired law enforcement officer, to interview individuals who may have had knowledge of the offense. Exhibit 3 (Hornsby declaration, dated July 19, 2012) (attached). Hornsby always believed that a mitigation investigation was important, however. In fact, if he "had additional financial resources, [he] would have certainly directed investigation into developing mitigating information trial counsel had not been able to develop at trial." Dkt. No. 21 Exh. 1. He explained that in his experience, "mitigation investigation is time-intensive and therefore expensive" and that he "knew the court would not make sufficient funds available to undertake this investigation." *Id*. Similarly, he did not undertake an inquiry into juror misconduct, even though those facts would have been available to him. Exhibit 3 (July 19, 2012 declaration) (attached).

Hornsby's failure to undertake the necessary investigation fell below the standard of care for attorneys representing death-sentenced prisoners in Texas. Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus proceedings. Tex. Code Crim. Proc.

art. 11.071 § 1.  The appointment of counsel is mandatory unless waived by the prisoner.  *Id*. at §

2.  The habeas statute *requires* that counsel conduct an extra-record investigation:

> Investigation of Grounds for Application
>
> Sec. 3. (a) On appointment, counsel **shall** investigate expeditiously, ***before and after*** the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

*Id*. at § 3 (emphasis added).  Counsel must be thorough and exercise reasonable diligence to

uncover the factual basis for every available claim.  *Id*. at § 5(e) (claims are not cognizable in

subsequent habeas applications, and thus waived, unless "the factual basis was not ascertainable

through the exercise of reasonable diligence" when the prior application was filed).

Investigation is so fundamentally important that Texas courts are obligated to grant all

reasonable investigative funding requests.  *Id*. at § 3(c); § 3(d).

> a. <u>The contemporaneous standard of care in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation.</u>

One year after the 1995 passage of article 11.071 overhauled capital habeas corpus

proceedings and established a right to counsel, the State Bar of Texas published the third edition

of the Texas Criminal Appellate Manual.  Excerpt, Texas Criminal Appellate Manual 1996, 3d

ed.) (attached as Exhibit 7).  One of the chapters in the State Bar Manual was a primer for

defense counsel litigating capital habeas corpus cases.  *Id*.  The State Bar Manual confirms that,

by 1996, the prevailing standard of care in capital habeas corpus representation compelled

counsel to conduct extensive investigation.

The manual begins with "essential ideas to bear in mind" when considering the habeas

corpus litigation, the first two of which stress the need to investigate the case:

> 1. ***State habeas litigation is not the same as a direct appeal.  Habeas litigation concentrates on developing and presenting facts outside the appellate record***

which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

2. ***Writ practice requires investigation***. You can't learn about, develop, and present facts outside the record if you don't investigate the case. ***Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel***. It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.

*Id*. at 4 (emphasis added).

The State Bar Manual repeatedly emphasizes the paramount importance of extra-record

fact development:

Facts outside the record are critical to a successful writ application. Those facts must be sought out through investigation . . . . Because of the nature of habeas claims, habeas counsel must investigate not only the client's background and the facts that gave rise to the offense, but also the investigation by police and defense counsel and the actions of the jury. There is no quick and easy way to do this and counsel will almost certainly need the help of a trained investigator to do an efficient and complete job . . . .

*Id*. at 31.

Ten pages -- almost 25% of the State Bar Manual -- are dedicated to describing the scope

and depth of the requisite investigation. *Id*. at 31-40. Of course, any investigation begins with

the client, and the State Bar Manual describes the "[t]opics to cover" during client interviews:

(1) Your client[']s version of the facts of the offense; (2) his or her relationship with the trial and direct appeal lawyers; (3) anything the client found strange, unusual or objectionable about the trial or direct appeal; (4) ***your client's social history, including his or her background, education, family history, medical history, drug abuse history, etc***. You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge.

*Id.* at 32-33 (emphasis added).[25]   Given this broad range of topics, the State Bar Manual advises habeas counsel that "the information you need from your client cannot be obtained in just one interview," thus "the more conversations you have, the more likely it is that you will win the inmate's trust and uncover additional helpful and highly relevant information." *Id.* at 33.

Client interviews, though critical, "must serve as the beginning, not the end, of [counsel's] investigation":

> [The client's family] may shed light on mitigating evidence that was not presented at trial, or guilt/innocence phase evidence that was suggested to trial counsel, but not presented. ***They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims*** concerning mental disorders, mental limitations, or drug abuse.   You will also want to ask them about their contacts with trial counsel, as part of your investigation into trial counsel's investigation.

*Id.* at 33–34 (emphasis added).

Habeas counsel must also meet with trial counsel or, at a minimum, obtain trial counsel's files:

> [Y]ou should always, at the first meeting with [trial counsel], request their files. The files and all the notes in them belong to the client, not the lawyer, and you should insist on them being turned over to you . . . .   [H]aving access to the file is vital, for it will tell you a lot about what information the lawyers had and what they were doing before, during and after the trial.   Be sure that the file you receive includes all notes of the lawyers as well, for those notes are also the property of the client.

*Id.* at 34.

The above steps are merely preliminary measures: "Your record review, and interviews of your client, his or her family, and trial counsel will give you a pretty good idea of what some of the important issues may be in the case.   That will allow you to focus your energy on

---

[25] This standard essentially mirrors the CCA's determination that, in a 1997 trial, capital defense counsel had a duty to interview the client about specific aspects of his social history.   *Ex parte Gonzales*, 204 S.W.3d 391, 400–01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

developing information relevant to those issues." *Id.* at 34–35.   The State Bar Manual subsequently describes three basic methods for investigating the case. *Id.* at 35-37.   In addition to these fundamental documents, the State Bar Manual includes a five-page "Investigative Source List," *id*. at Appendix I, that itemizes numerous other sources of relevant documents.

The State Bar Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." *Id*. at 38.   "Other experts will likely be needed, too," including mental health and medical experts. *Id*.

In sum, both the statute that governed habeas counsel's appointment and the contemporaneous standard of care in capital habeas corpus proceedings mandated that counsel conduct substantial extra-record investigation.   As he noted in his declarations, Hornsby neglected to pursue any penalty phase investigation.

> b.   <u>State habeas counsel's failure to conduct a full investigation, including an investigation of mitigating circumstances, was based on a misunderstanding of the law.</u>

Initial state habeas counsel labored under the misimpression that the habeas corpus statute limited him to a total of $25,000, including his attorney fees and all costs of investigation. As a result of this misunderstanding, he budgeted $2,500 for a limited investigation of Canales' innocence, and did not devote investigative resources to mitigating evidence.   Article 11.071 provides for a cap on state expenditures of $25,000, but nothing in the state habeas statute precludes habeas counsel from seeking reasonably necessary investigative and expert expenses in excess of that amount from the trial court, and there is no valid reason for not at least seeking authorization to expend funds from the trial judge.   In fact, as the Director pointed out, "[a]s for the alleged financial constraints, nothing shows that the state court would have rejected a request

for additional funding had Canales' initial investigation and discovery uncovered evidence and claims worth pursuing." Dkt. No. 111 at 15.

State habeas proceedings afford an inmate such as Canales his first opportunity to develop federal claims based on facts outside of the trial record. Due to a misperception about the funding available, Hornsby failed to address perhaps the most significant issues in a capital trial. Reviewing courts generally defer to counsel's reasoned strategic decisions, *see, e.g., Wiggins v. Smith*, 539 U.S. 510 (2003), but decisions based on a misunderstanding of the law are not reasonable and fall below norms of professional conduct. *See Kimmelman v. Morrison,* 477 U.S. 365, 385 (1986) (counsel's performance deficient because he operated on a mistaken understanding of the applicable discovery provisions); *Smith v. Dretke*, 417 F.3d 438, 442 (5th Cir. 2005) (counsel's conduct was deficient because he "failed to achieve a rudimentary understanding of the well-settled law" and "misapprehension of the law is a classic example of deficiency of counsel"). *See also Everett v. Beard*, 290 F.3d 500, 509 (3rd Cir. 2002) ("[a] reasonably competent attorney patently is required to know the state of the applicable law"); *Luchenburg v. Smith*, 79 F.3d 388, 392-93 (4th Cir. 1996) (when counsels' conduct is based on an erroneous understanding of law "counsel made no tactical 'choice,' unless a failure to become informed of the law affecting his client can be so considered"). Likewise, an attorney may be ineffective for failing to seek funding or pursue motions only because of a subjective sense that the trial court would deny such requests. *See Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) (Trial counsel ineffective in capital sentencing phase for failing to obtain independent mental health evaluation when funds were available and sanity was a critical issue, but counsel assumed funds were not available and did not pursue the issue). Hornsby made no reasonable decision about whether to pursue an investigation. As a result, Hornsby did not even plead, much less try

to prove, that trial counsel's penalty phase performance was deficient and prejudicial.

3.     In Texas, *relief* on most extra-record ineffective assistance of counsel claims requiring extensive investigation before they can be pled is only available in post-conviction proceedings.

Under Texas law, an applicant's first meaningful opportunity to raise an ineffective assistance of counsel claim, or any claim relying on extra-record evidence, is in state habeas proceedings.   For instance, Texas courts have consistently found that where an applicant is claiming their counsel performed below the standard as required by *Strickland v. Washington*, 466 U.S. 668 (1984), going beyond the trial record to evaluate such claims is necessary.

> Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel.   Indeed, in a case such as this, where the alleged derelictions primarily are errors of omission de hors the record rather than commission revealed in the trial record, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record.

*Ex parte Duffy*, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980), *overruled on other grounds by Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999).   In fact, as demonstrated below, state law **affirmatively precludes relief** on a claim of ineffective assistance of trial counsel raised on direct appeal if all the facts necessary to adjudicate the claim are not contained within the four corners of the appellate record.   *See, e.g., Freeman v. State,* 125 S.W.3d 505, 506 (Tex. Crim. App. 2003) (failure to develop a record sufficient to resolve an ineffective assistance of counsel claim precluded the defendant from establishing on direct appeal the counsel's deficient performance).

An allegation that trial counsel was ineffective is a quintessential example of an extra-record claim that must be pressed in habeas corpus proceedings.   When raising a claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the applicant must "show that the counsel's

representation fell below an objective standard of reasonableness" and that there was a "reasonable probability, that but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In almost all cases, satisfying either prong of the *Strickland* test requires the prisoner to submit evidence from outside the trial record. For example, trial counsel must "make reasonable investigations [or] make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. When assessing trial counsel's performance, courts look not only to the record of the trial but to trial counsel's reasons for their actions: "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (footnote omitted). Resolving the question of whether the challenged failure to investigate was a "strategic judgment call" or a "plain omission" requires counsel to explain the rationale for their actions or omissions, which in turn requires the submission of evidence from outside the trial record. *See also Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (discussing the inadequacy of the record on appeal for resolving claim under *Strickland*).

On direct review, Texas courts impose a mandatory presumption, drawn from *Strickland*, that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Ex parte Varelas*, 45 S.W.3d 637, 629 (Tex. Crim. App. 2001). Thus, except in the unusual situation where the trial record itself contains counsel's explanation for a challenged decision, a convicted defendant who challenges on direct review the

effectiveness of his legal representation at trial cannot prevail under *Strickland*.  The Court of Criminal Appeals consistently enforces this presumption; it recently reversed a lower court of appeals for failing to recognize that "direct review is usually an inadequate vehicle for raising such a claim":

> For a claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant.  An ineffective-assistance claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim.  "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped."  This statement is true with regard to the "deficient performance" prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record.  Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."  If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it."

*Menefield v. State*, 363 F.3d 591, 592–93 (Tex. Crim. App. 2012) (footnotes omitted).  *See also Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003) (reversing lower court's decision on ineffective assistance claim, but emphasizing that the court was not "deciding on this direct appeal whether appellant did or did not receive effective assistance of counsel," and that he was free to submit his ineffective assistance claim "for review on the merits" in a habeas corpus application); *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003) (reversing lower court's grant of relief on direct review and noting "[we] have held several times that in cases like this the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel") (citations omitted); *Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (same); *Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994) (same).

Ineffectiveness claims based on trial counsel's alleged failure to investigate and present

evidence require a reviewing court both to assess counsel's pretrial preparation and consider any assertions of strategy by trial counsel. *See Strickland*, 466 U.S. at 691. In Texas, this evidence will not be in the direct appeal record because of a variety of circumstances identified by the Texas courts, any one of which would render the record inadequate to evaluate trial counsel's performance:

> [T]he trial record ordinarily does not reflect counsel's reasons for doing or failing to do actions of which the defendant complains. ***While expansion of the record may be accomplished in a motion for new trial, that vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point*** . . . . Further, ***mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion***. Hence, in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims.

*Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (emphasis supplied); *see also Thompson v. State*, 9 S.W.3d 813–14 ("[i]n the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel"); *Ex parte Varelas*, 45 S.W.3d at 629 ("[i]n most cases, the record on direct appeal is 'inadequate to develop an ineffective assistance claim' because 'the very ineffectiveness claimed may prevent the record from containing the information necessary to substantiate such a claim'") (quoting *Torres*, 943 S.W.2d at 475); *Ex parte White*, 160 S.W.3d 46, 49 (Tex. Crim. App. 2004) (same).[26]

Likewise, it is rarely possible for a prisoner to show that he was "prejudiced" by any error of omission by trial counsel, as required by *Strickland*'s second prong, without presenting

---

[26] In Texas, it is only in habeas corpus proceedings that counsel are provided funding for investigators and experts -- funding that is critical to the investigation and presentation of claims of ineffective assistance of counsel. *See* Tex. Code Crim. Proc. Art. 11.071, § 3. No comparable funding is provided for counsel on direct appeal. The statutory scheme thus recognizes the essential extra record nature of habeas corpus proceedings.

evidence from outside the trial record.  The claim at issue in this case and in *Martinez* -- a claim that trial counsel failed to investigate and present certain evidence -- requires the investigation, presentation and consideration of substantial evidence from outside the trial record.  In order to show that a different outcome was reasonably probable if trial counsel had performed properly, the prisoner or his post-conviction counsel must submit the evidence that trial counsel should have discovered.  In a capital case, that evidence often includes extensive social history documents as well as affidavits from witnesses who could have testified at trial.  "Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Martinez*, 132 S. Ct. at 1317.  *See Wiggins v. Smith*, 539 U.S.510, 535 (2003) (habeas counsel introduced extensive evidence of the defendant's "troubled history"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (assessing the impact of "the material post-conviction counsel found").

Accordingly, as in *Martinez*, the first and only opportunity for a prisoner to secure relief on the vast majority of ineffective assistance of trial counsel claims in Texas is in state habeas corpus proceedings:

> While defendants in criminal cases in Texas are not legally prohibited from challenging the effectiveness of their trial counsel on direct appeal, such claims typically call for extensive factual development beyond what is disclosed in the appellate record, and thus, ***as a practical matter, post-conviction habeas corpus is the first opportunity to raise them***. *Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999).

*Ex parte Balentine*, No. WR-54,071-03, at Dissenting Statement, 2 n.5 (Tex. Crim. App. June 14, 2011) (Price, J., dissenting, joined by Johnson and Alcala. JJ.) (dissenting from majority's refusal to grant stay of execution pending *Martinez*) (emphasis added).[27]  *See also Ex parte Hernandez*, 2012 WL 1060079, at *1 (Tex. Crim. App. Mar. 26, 2012) at *1 (same) (citation omitted).  This

---

[27] The Court of Criminal Appeals' majority did not dispute this conclusion, nor would there have been any basis in Texas law to do so.

fact -- that relief is unavailable on direct review if the claim requires consideration of evidence from outside the record -- has been repeatedly and consistently reiterated by the Court of Criminal Appeals.

In *Thompson v. State*, the defendant challenged on direct appeal his trial counsel's failure to object to the State's manifest and persistent attempts to elicit inadmissible hearsay.   After discussing *Strickland* and the prisoner's heavy burden of overcoming the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance," the CCA held that the record was inadequate to resolve the claim because it was "silent as to **why** . . . trial counsel failed to object."   *Thompson*, 9 S.W.3d at 814 (emphasis added).   The opinion contains a strong warning to courts of appeals and litigants regarding the difficulties inherent in adjudicating ineffective assistance claims on direct appeal:

> A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation.  ***In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel***.  *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998) . . . .  "Indeed in a case such as this, where the alleged derelictions primarily are errors of omission de hors the record rather than commission revealed in the trial record, collateral attack may be *the* vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record."  *Jackson v. State*, 973 S.W.2d at 957. [Footnotes omitted].

*Id.* at 814–815 (emphasis added).  *See also Bone v. State*, 77 S.W. 3d 828, 835 (Tex. Crim. App 2002) (citing *Jackson* language); *Ex parte Varelas*, 45 S.W.3d at 629–30 ("[i]n most cases, the record on direct appeal is 'inadequate to develop an ineffective assistance claim' because 'the very ineffectiveness claimed may prevent the record from containing the information necessary to substantiate such a claim'") (citations omitted); *Rylander v. State,* 101 S.W.3d 107 (Tex. Crim. App. 2003) (rejecting claim of ineffective assistance of trial counsel requiring non-record

evidence; appellant encouraged to raise the claim in habeas corpus); *Mitchell v. State,* 68 S.W.3d 640, 643 (Tex. Crim. App. 2002) ("[g]enerally the record on direct appeal will not be sufficient to show the counsel's representation was so deficient as to meet the first part of the *Strickland* standard" . . . [habeas corpus] "usually is the appropriate vehicle to investigate ineffective-assistance claims") (citations omitted); *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App 2011) ("ineffective assistance claims are generally not successful on direct appeal" because the record "is usually inadequately developed and cannot adequately reflect the failings of trial counsel," such claims "are more appropriately urged in a hearing on an application for writ of habeas corpus").

Since *Martinez*, the Texas courts have continued to preclude relief on direct review of claims of ineffective assistance of trial counsel that rest on evidence outside the record. *See e.g. Velez v. State*, ___ S.W.3d ___, 2012 WL 2130890, at *35 (Tex. Crim. App. June 13, 2012) (denying relief on direct appeal because the record is insufficient to show "that counsel's representation was lacking in tactical and strategic decision making").

The fact that post-conviction review is the exclusive avenue to obtain relief on many ineffective assistance claims was one of the considerations that drove some members of the Texas court to dissent from a holding that Texas law does not require court-appointed capital habeas corpus counsel to perform competently:

> If the defendant's habeas counsel performs deficiently, a meritorious claim [of ineffective assistance of trial counsel] may not be adequately raised or investigated. Applicants only get one shot at habeas corpus relief. If the attorney appointed on his first writ is incompetent, then a defendant, who was deprived of effective assistance of counsel at trial, has *no means* to enforce his constitutional right to affective assistance of counsel at trial.

*Ex parte Graves*, 70 S.W.3d 103, 124–25 (Tex. Crim. App. 2002) (Price, J., dissenting) (emphasis added). *See also Ex parte Rojas*, 2003 WL 1825617, at *1 (Tex. Crim. App. Feb. 12,

2003) (unpublished) (Price, J., dissenting) (Article 11.071 habeas corpus proceeding is the "one opportunity to raise claims not based solely on the record").

The absence of the availability of relief has prompted the Texas court to admonish direct appeal counsel to refrain from raising ineffective assistance of counsel claims on direct review:

> This case stands for a very simple proposition: As a general rule, one should **not** raise an issue of ineffective assistance of counsel on direct appeal. This is so because a trial record is generally insufficient to address claims of ineffective assistance of counsel in light of the "strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). [Footnote omitted].
>
> \* \* \* \*
>
> A trial record is directed to the issues of guilt/innocence and punishment. And we review that record with an eye toward the errors allegedly committed in relation to those issues. However, in order to effectively argue an issue of ineffective assistance of counsel, a record focused on the conduct of trial or appellate counsel should be developed. Such a record is generally best developed in the context of a hearing held in relation to an application for writ of habeas corpus.

*Jackson v. State*, 877 S.W.2d 768, 772–773 (Tex. Crim. App. 1994) (Baird, J., concurring).

Finally, other Texas entities with expertise in the Texas post-conviction process have determined that post-conviction is the exclusive route for vindicating most claims of ineffective assistance of trial counsel. The State Bar of Texas Task Force on Habeas Counsel Training and Qualification, comprised of Court of Criminal Appeals judges, and trial judges, amongst others, has recognized that state post-conviction is the lone avenue for securing relief on the type of claim at issue here:

> Habeas proceedings are the only opportunity available to those sentenced to death to raise post conviction claims of prosecutorial misconduct or ineffective assistance of trial counsel and to present evidence not developed or discovered during trial -- including evidence as to the actual innocence of the applicant.

Task Force Report, Apr. 27, 2007 (available on the internet).[28]

This is not to say, nor does *Martinez* require, that Texas law **mandates** that ineffectiveness claims be raised in state habeas proceedings. In Texas, a claim that trial counsel was ineffective can be **raised** on direct appeal. But there is no **remedy** on direct review unless the claim rests solely upon the paper record, or all necessary evidence is submitted in a motion for new trial, which must be filed within 30 days of judgment, T.R.A.P. 21.4., and almost invariably by **trial counsel**. *Martinez* recognized the substantial inadequacies in this approach. *Id.* at 1318 ("Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim").

The statutory limitations on motions for new trial in Texas criminal cases render litigating most ineffective assistance of counsel claims, particularly claims that require an extensive social history investigation, inherently impossible. As noted, the defendant must sufficiently investigate every allegation he wishes to raise within 30 days of judgment. T.R.A.P. 21.4. Thereafter, he has just 10 days in which to present any relevant evidence. T.R.A.P. 21.6. While a trial court may extend the 10-day deadline somewhat, *id.*, it must reach a final decision on any issue raised by the defendant no later than 45 days after the motion is filed because Texas law mandates that trial courts rule on a motion for new trial within 75 days of the judgment. T.R.A.P. 21.8(a) ("Time to Rule. The court **must** rule on a motion for new trial within 75 days after imposing or suspending sentence in open court") (emphasis added).

Based on these limitations on motions for new trials in Texas, the Texas Court of Criminal Appeals itself recognizes the inadequacy of the motion for new trial as a vehicle for adjudicating ineffective assistance of counsel claims. *Ex parte Torres*, 943 S.W.2d 4 at 475 ("While expansion of the record may be accomplished in a motion for new trial, that vehicle is

---

[28] http://www.aclutx.org/files/SBOT%20Task%20Force%20Final%20Report%20Signed.pdf

often inadequate because of time constraints and because the trial record has generally not been transcribed at this point."); *Jackson v. State*, 877 S.W.2d at 773, n. 3 (addressing difficulties of developing a sufficient record on a motion for new trial). In this case, as in the great majority of capital cases, the trial transcript was so voluminous that its preparation was not complete until well after the 30-day deadline for filing a motion for new trial had passed.

The absence of a trial transcript forecloses even identifying those omissions of counsel discernible *from the trial record* that might support an ineffective assistance claim.[29]

The ineffectiveness claim at issue in *Martinez*, and the ones at issue herein, rest on evidence outside the trial record, though having the trial record is a prerequisite to adequately pleading the claim. Thus, for *Martinez* purposes, post-conviction review was the "initial review proceeding" in which those claims could meaningfully be asserted. Any gloss that disregards this reality repudiates the text, spirit, and intent of *Martinez*.

4.      Panels of the Fifth Circuit have adopted divergent approaches to *Martinez*.

Canales anticipates that the Respondent will assert, based on conflicted and incomplete Fifth Circuit precedent, that *Martinez* is inapplicable to this case. In fact, the published orders of Fifth Circuit panels[30] have taken divergent approaches. Further, because the issue was not raised by the parties in these cases, the court of appeals has yet to address Canales' position that regardless of whether *Martinez* is inapplicable to the general run of cases, it must apply to cases

---

[29] To be entitled to a hearing on a motion for new trial alleging ineffective assistance of counsel, a movant must "allege sufficient facts from which a trial court could reasonably conclude **both** that counsel failed to act as a reasonably competent attorney **and** that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex. Crim. App. 2009) (emphasis in original). Accordingly, those facts must be developed prior to the 30-day deadline for filing. When direct appeal counsel is appointed who did not participate in the trial proceedings, and no transcript is available for review within the 30-day deadline for filing a motion for new trial, presenting and adjudicating such claims in a motion for new trial is a practical impossibility.

[30] The unpublished opinions are not precedent. Fifth Circuit Rule 47.5.4.

in which conflicts of interest and other case-specific circumstances render it impossible for a defendant to raise an extra-record ineffective assistance of counsel claim on direct appeal. Thus, this Court must address the issue in the first instance.

Panels of the Fifth Circuit have adopted two divergent approaches to *Martinez*. The first looks at how the state in question routes litigation of ineffective assistance of trial counsel claims and whether post-conviction proceedings will be the first ***practical*** occasion to raise such challenges. The second asks whether it is technically possible to raise some claims of ineffective assistance on direct review. If the answer to that question is "yes," the analysis ends without considering whether state post-conviction proceedings are nonetheless the first and only available proceeding in which the vast majority of such claimants may obtain relief, or even whether it was possible to raise on direct appeal the specific ineffectiveness claim at issue. Adopting the second, hyper-technical approach would mean that many Texas litigants -- for whom it is impossible to raise an extra-record ineffective assistance of counsel claim on direct review -- will be unfairly denied the equitable safety valve established in *Martinez*. Only the former approach is faithful to *Martinez*, and this Court should embrace it. The second approach is a plausible reading of *Martinez* only if the courts allow individual litigants, for whom it actually was impossible to raise an ineffective assistance of counsel claim on direct appeal, to show cause for a default under *Martinez*.

In *Lindsey v. Cain*, 2012 WL 1366040, at *1 (5th Cir. Apr. 19, 2012) (unpublished), the first Fifth Circuit decision to address *Martinez*, the panel concluded that "[w]hen a state, like Louisiana, requires that a petitioner raise an ineffective assistance of counsel claim on collateral review," he may invoke *Martinez* to establish cause for a procedural default. *Id*. As another member of the court subsequently noted, Louisiana's handling of ineffective assistance of

counsel claims is materially indistinguishable from Texas's:

> Louisiana, like Texas, allows a prisoner to raise ineffective assistance of counsel on direct appeal "when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal." *State v. Brashears*, 811 So.2d 985 (La. App. 5 Cir. 2002). *See also State v. Williams*, 738 So.2d 640,651-652 (La. App. 5 Cir. 1999) ("Ineffective assistance of counsel claims are most appropriately addressed on application for post conviction relief, rather than on direct appeal, so as to afford the parties adequate opportunity to make a record for review.   However, when an ineffective assistance claim is properly raised by assignment of error on direct appeal and the appellate record contains sufficient evidence to evaluate the claim, the reviewing court may address the ineffective assistance claim in the interest of judicial economy").

Order, *Ibarra v. Thaler*, ___ F.3d ___, 2012 WL 2620520, at *8 (5th Cir. June 28, 2012) (Graves, J., dissenting) (order denying Mr. Ibarra's motion for a remand to the district court). The fact that Louisiana courts may sometimes hear claims of ineffective assistance of trial counsel on direct appeal -- when deciding such claims does not require resort to evidence outside the appellate record -- was not enough to deny the benefit of *Martinez* to Louisiana prisoners.[31]

The first published post-*Martinez* opinion by the Fifth Circuit was *Cantu v. Thaler*, 682 F.3d 1053, 2012 WL 1970364 (5th Cir. June 1, 2012).  Ivan Cantu argued that his state habeas counsel's ineffectiveness established cause for the procedural default of his ineffective assistance of trial counsel claim.  *Cantu v. Thaler*, 632 F.3d 157, 166 (5th Cir. 2011), *judgment vacated by*, *Cantu v. Thaler*, 132 S. Ct. 1791 (2012).  Cantu conceded, and the Fifth Circuit held, that the argument was foreclosed at the time by *Coleman*.  *Id.*

Cantu raised his cause argument in a petition for *certiorari*.   Petition for Writ of

---

[31]   A federal district court has also applied *Martinez* to Louisiana, noting Louisiana's "jurisprudential rule . . . that ineffective assistance claims are generally best suited for post-conviction proceedings," and observing that the state court had applied that rule in the petitioner's own case.  *Wessinger v. Cain*, 2012 WL 1752683, at *2 (M.D. La. May 16, 2012) (citing *State v. Hamilton*, 699 So.2d 29, 31 (La. 1997), and *State v. Wessinger*, 736 So.2d 162, 195 (La. 1999)).

Certiorari, *Cantu v. Thaler*, 132 S. Ct. 1791 (2012) (Mem.), at 21-26.  Noting the pendency of *Martinez*, Cantu argued that "state habeas corpus application was, in fact, '*the one and only appeal*' available to challenge his trial attorneys' performance." *Id.* at 24 (quoting *Thompson v. State*, 9 S.W.3d 808, 813 n.5 (Tex. Crim. App. 1999)) (emphasis in the original); *see also id.* at 25 ("When a Texas defendant is deprived of his federal right to effective assistance of trial counsel, his first and only recourse is to file a state habeas corpus application"); *id.* at 26 ("Cantu was, in fact, deprived of the effective assistance of counsel in his 'one and only appeal' available to challenge trial counsel's performance").  Cantu urged that post-conviction counsel's ineffectiveness "should constitute cause sufficient to excuse the procedural default of the underlying claim." *Id.* at 26–27.

In response, the Respondent argued that "nothing [the Supreme] Court does in [*Martinez*] will lead to a different result in" Cantu's case.  Respondent's Brief in Opposition, *Cantu v. Thaler*, 132 S. Ct. 1791 (2012) (Mem.), at 36.  Respondent alleged that,

> under Texas law, an individual may raise an ineffective-assistance claim on appeal and need not rely on collateral proceedings.  *See Thompson v. State*, 9 S.W.3d 808, 814 n.6 (Tex. Crim. App. 1999).  And while he was entitled to constitutionally effective counsel on appeal, *see Evitts v. Lucey*, 469 U.S. 387, 393-94 (1985), Cantu has not complained of appellate counsel's performance.

*Id.* at 37.

The Supreme Court first considered Cantu's petition -- and the Respondent's Opposition -- on September 26, 2011, and decided to hold the case for *Martinez*.[32]  The Court revisited

---

[32]   *Cantu    v.    Thaler*,    No.    10-11031    (U.S.    2012)    (available    at http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-11031.htm)    (the    Court considered Cantu's petition its September 26, 2011, conference but took no action until after *Martinez*).

Cantu's petition after *Martinez*[33] and -- after considering pleadings raising the issue of whether post-conviction proceedings were the first opportunity for Texas litigants to obtain relief on an ineffective assistance of counsel claim -- granted *certiorari*, vacated the Fifth Circuit's prior decision, and remanded the case for further consideration in light of *Martinez*. *Cantu v. Thaler*, 132 S. Ct. 1791 (2012) (Mem.).

On June 1, 2012, the Fifth Circuit, in a published opinion, remanded the case for further consideration of Cantu's contention that his state habeas counsel was ineffective and thus he had cause for the default. *Cantu v. Thaler*, 682 F.3d 1053 (5th Cir. June 1, 2012). While the panel did not expressly hold that state post-conviction was Cantu's first opportunity to raise his ineffective assistance of trial counsel claim, there would have been no reason to remand the case back to the district court for consideration of Cantu's argument for cause if *Martinez* had no application in Texas. The panel held the case for over a month after the Supreme Court's decision was final, and then, like the *Lindsey* panel, remanded the case to the district court. In this factual context in which the arguments regarding the applicability had been fully briefed in, and implicitly rejected by, the Supreme Court, the most sensible reading of *Cantu* is that the panel deemed *Martinez* applicable and the remand was to consider whether Cantu's state habeas counsel was in fact ineffective.

Four weeks later, in response to another petitioner's request for a remand to the district court, a divided panel of the Fifth Circuit adopted the opposite position. Relying on the fact that "Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, ***when practicable***," the panel stated that *Martinez* did not apply to Texas. *Ibarra*, 2012 WL 2620520, at *4 (emphasis added). Of course, the operative

---

[33] The Supreme Court considered Mr. Cantu's petition in its March 23, 2012, conference, three days after it issued *Martinez*. *Cantu v. Thaler*, No. 10-11031 (U.S. 2012) (available at http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/10-11031.htm).

language here is "when practicable."  As described, *supra*, the Texas Court of Criminal Appeals has stated that it most often will not be "practicable" for a convicted defendant to raise on direct appeal a claim of ineffective assistance of trial counsel:  "While expansion of the record may be accomplished in a motion for new trial, ***that vehicle is often inadequate*** because of time constraints and because the trial record has generally not been transcribed."  *Ex parte Torres*, 943 S.W.2d at 475 (emphasis added); *see also id*. ("mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion").  Carried to the extreme, the rationale endorsed by the *Ibarra* majority would deny the benefit of *Martinez* to ***all*** Texas prisoners simply because ***some*** litigants ***might*** be able to raise their ineffective assistance of counsel claims on direct appeal.[34]  *Ibarra*,

---

[34] Another Fifth Circuit panel, without the benefit of any post-*Martinez* briefing from the parties, concluded in an unpublished opinion that *Martinez* has no application to Texas.  In *Gates v. Thaler*, 2012 WL 2305855 (5th Cir. June 19, 2012) (unpublished), the briefing was complete long before *Martinez* was decided.  *See Gates v. Thaler*, No. 11-70023 (June 19, 2012) (the last filing prior to the opinion was dated October 26, 2011, five months before the *Martinez* decision).  Thus, neither party had briefed *Martinez* or how it might apply in Texas.  Nonetheless, the panel anticipated that Mr. Gates "m[ight] contend" that *Martinez* applied to his case, and then proceeded to reject the argument that Gates might have raised.  *Id*. at *6.  The panel noted that a capital defendant can raise, and the Court of Criminal Appeals will consider, a claim of ineffective assistance of counsel on direct review, citing *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992).

The *Gates* panel was correct, insofar as its analysis went, but that analysis was fundamentally incomplete.  It is true that a capital defendant can raise on direct appeal a claim of ineffective assistance of trial counsel, and that the Court of Criminal Appeals may consider it.  However, what the Court of Criminal Appeals will not do on direct appeal is ***grant relief*** on any ineffective assistance claim that rests on facts outside the appellate record.  This is true of even the most ostensibly record-bound claims, such as complaints about trial counsel's failure to lodge a meritorious objection.  As described, *supra*, even these claims require factual development to establish whether counsel had any strategic reason for not objecting.  Absent such factual development, on direct review the Court of Criminal Appeals will "presume [that trial counsel] . . . rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Varelas*, 45 S.W.3d at 629.

Thus, the observation that ineffective assistance of counsel claims can be raised on direct appeal in Texas is true to the same extent that it is true that litigants may deliberately by-pass state court remedies and raise claims for relief for the first time in federal habeas corpus proceedings.  Petitioners can indeed raise such claims, and federal courts can consider and deny

however, did not reach the question of whether *Martinez* applies to those Texas prisoners who -- because of the circumstances of their case -- cannot raise an ineffective assistance of trial counsel claim on direct appeal.  Thus, it does not control the outcome of this case.[35]

Moreover, the alternative procedures identified in *Ibarra,* motions for a new trial, are inadequate for raising extra-record claims.  Any mechanism for raising claims such as ineffective assistance of counsel must comport with due process and equal protection principles. *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (state court must provide procedural mechanism for adequate factual development of claims of counsel's ineffectiveness).  A defendant is not entitled to a new attorney in connection with a motion for a new trial, and defense counsel cannot raise his or her own incompetence.  *Massaro v. United States*, 538 U.S. 500, 502-03 (2003) ("an attorney who handles both trial and appeal is unlikely to raise an ineffective-assistance claim against himself")  Thus, besides the practical limitations discussed earlier, this avenue for challenging trial counsel's performance is foreclosed to indigent defendants.  *See Smith v. Bennett*, 365 U.S. 708 (1961) (denial of equal protection for indigents in state collateral remedies

such claims on the merits.  28 U.S.C. § 2254(b)(2).  However, relief is not available to such litigants, and neither is it available to Texas defendants who seek to raise extra-record ineffective assistance of counsel claims on direct review.

Like *Ibarra*, the *Gates* panel did not address whether *Martinez* applied to litigants who could not raise their claims on direct appeal.

[35] Additionally, *Ibarra* was not a dispositive opinion but a non-dispositive order denying a remand to the district court.  The case is still pending before the court of appeals on Ibarra's request for a certificate of appealability (COA).  The panel has yet to decide whether to grant COA, whether Ibarra's claim is in fact procedurally defaulted and, if so, whether his other arguments for cause excuse the default.  If there is no default, or if the default is excused on a different basis, then the panel purported to settle a question of law "that cannot affect the rights of the litigants in the case before it."  *C&H Nationwide, Inc. v. Norwest Bank Texas NA*, 208 F.3d 490, 493 (5th Cir. 2000) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).  That Ibarra himself prematurely requested the remand is of no moment because the court of appeals was obligated to decline the invitation to issue an advisory opinion.  *See, e.g., In re Coho Resources, Inc.*, 345 F.3d 338, 345 (5th Cir. 2003) ("we decline [the litigant's] invitation to issue an advisory opinion on the question").

violates the equal protection clause).[36]

Direct appeal does not afford an adequate remedy for claims involving new evidence. Texas law precludes the inclusion of extra-record facts on direct appeal. *See Amador v. State,* 221 S.W.3d 666, 677 (Tex. Crim. App. 2007) (the record may be supplemented under the appellate rules if something has been omitted, but the supplementation rules cannot be used to create new evidence) (cite omitted); Rule 34.6(c). Under these circumstances, direct appeal is not an available remedy for indigent death-sentenced inmates who must supplement the record to establish extra-record claims, such as ineffective assistance of counsel. In fact, a regime requiring that a death-sentenced prisoner seek relief via direct appeal but without the ability to expand the record (and without any provision for funding for investigative and expert assistance) would violate due process. *See Brecheen v. Reynolds,* 41 F.3d 1343, 1363-64 (10th Cir. 1994); *cf. Panetti v. Quarterman,* 551 U.S. 930 (2007) (state court procedures for resolving claims of incompetence to be executed violated guarantee of due process of law).

There is at least some ambiguity about the current law of the Fifth Circuit, and *Ibarra* is strikingly at odds with established Texas capital habeas procedure. On the one hand, *Cantu* was the first panel to publish an opinion disposing of a post-*Martinez* Texas case, and the "court [of appeals] adheres strictly to the maxim that one panel of the court cannot overturn another, even if it disagrees with the prior panel's holding." *In re Caddo Parrish-Villas South, Ltd.*, 174 F.3d 624, 629 (5th Cir. 1999). On the other hand, the *Cantu* opinion was opaque and the panel may not have in fact concluded that *Martinez* applies to all Texas prisoners.[37] For the reasons

---

[36] *Ibarra* relied on *Holden v. State,* 201 S.W.3d 761 (Tex. Crim. App. 2006), to establish the alleged availability of a remedy via a motion for a new trial. However, *Holden* involved a non-capital defendant who was able to retain a new lawyer for a motion for a new trial.

[37] Another circuit has already construed *Martinez* to apply to states like Texas. In Oregon, as in Texas, there is no absolute bar to raising ineffective assistance of counsel claims on direct

67

described below, however, the Fifth Circuit has yet to authoritatively address all of the *Martinez*-related questions necessary to resolve Canales' case.

>    5.    <u>Regardless of whether *Martinez* applies to all Texas cases, it binds every federal court adjudicating a case in which post-conviction was "the first occasion to raise a claim of ineffective assistance at trial."[38]   *Martinez* thus applies to Canales' case because several circumstances precluded him from raising his claim on direct appeal.</u>

*Martinez*'s holding stems from the concern that prisoners have one opportunity to litigate an ineffective assistance of counsel claim.   *Martinez* was thus focused on "initial-review collateral proceedings," which the Court defined as "the ***first occasion*** to raise a claim of ineffective assistance at trial."   *Martinez*, 132 S. Ct. at 1315 (emphasis added).   The court was concerned that,

> [w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim.   This Court on direct review of the state proceeding could not consider or adjudicate the claim . . . .   And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

*Id*. at 1316.   "Without the help of an adequate attorney, a prisoner will have . . . difficulties

---

appeal, but claims that rely on facts outside of the record cannot reasonably be asserted on direct appeal.   *Compare State v. Robinson*, 550 P.2d 758 (Or. App. 1976) ("Appellant contends on appeal that his trial counsel was incompetent.   This issue, except in rare instances, is one which can be properly resolved only in a postconviction proceeding in which evidence can be taken.   *See, Turner v. Cupp*, 1 Or.App. 596, 465 P.2d 249 (1970)"), *with Ex parte Torres*, 943 S.W.2d at 475 ("in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims").   Knowing that it was technically possible to raise at least some ineffective assistance of counsel claims on direct review in Oregon, the Ninth Circuit nonetheless held that *Martinez* applied to Oregon petitioners in § 2254 proceedings: "For the purposes of our review in this case, therefore, *Martinez* instructs that Sexton may establish cause for his procedural default of his new ineffective assistance of trial counsel claims, because the State of Oregon required Sexton to raise them in a collateral proceeding, *State v. Robinson*, 550 P.2d 758 (Or. App. 1976)."   *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012).   The panel nonetheless denied Mr. Sexton's request for a remand to the district in light of *Martinez* based on its determination that trial counsel was not ineffective.   *Id*.

[38] *Martinez*, 132 S. Ct. at 1315.

vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Id*. at 1317. Thus the *Martinez* Court sought to ensure that litigants would not be barred from federal court if they had been denied access to adequate counsel for their first opportunity to raise an ineffective assistance of trial counsel claim in state court:

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim.

*Id*. at 1318.

The Court ultimately held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. The principle that animates *Martinez* is that petitioners should have adequate counsel for "the first occasion" to raise their ineffective assistance of counsel claims. *Martinez* must apply to all prisoners who, due to the circumstances of their individual case, cannot raise their ineffective assistance of counsel claim on direct review. Canales did not have the opportunity to raise extra-record claims until his state habeas proceedings.[39]

Canales was sentenced to death on November 1, 2000, thus his motion for new trial was due on December 1, 2000, thirty days after he was sentenced. Tex. R. App. Proc. 21.4. However, trial counsel did not file a motion for a new trial. Moreover, even if trial counsel been inclined to file such a motion, they could not have raised their own ineffectiveness as a ground

---

[39] *Ibarra* does not control here because Ibarra argued only that, based on the Texas direct review and post-conviction schemes, *Martinez* applied to **every** Texas prisoner. The Fifth Circuit rejected that argument: "Ibarra is not entitled to the benefit of *Martinez* for his ineffectiveness claims, as Texas procedures entitled him to review through counseled motions for new trial and direct appeal." *Ibarra*, 2012 WL 2620520, at *4. Ibarra did not argue, and the court did not address, whether the particular circumstances of an individual case would render post-conviction the first occasion for raising an ineffective assistance of counsel claim.

for relief.  Counsel for direct appeal was appointed on January 11, 2001, and Troy Hornsby was appointed to handle the habeas proceedings on January 17, 2011.  Exhibit 6 (attached).  Under Texas habeas procedure, Hornsby had the duty to investigate all meritorious claims, and funding was available for this purpose.  Direct appeal, which progressed at the same time as the state habeas, is confined to the record before the trial court, and there are no provisions for appellate counsel to obtain investigative assistance or supplement the record.  Moreover, with both avenues to challenge the conviction and sentence being prepared simultaneously, it would make little sense to have appellate counsel duplicate the efforts of habeas counsel.

In *Martinez*, the Arizona's Supreme Court's directive that prisoners not raise their Sixth Amendment claims on direct appeal meant that post-conviction proceedings were "the first occasion to raise a claim of ineffective assistance at trial."  Here, the circumstances of the case also meant that post-conviction proceedings were "the first occasion to raise a claim of ineffective assistance at trial."  The result is the same: *Martinez* applies to the case at bar.  *See e.g. Arthur v. Thomas*, 2012 WL 2357919, slip. at *9 (N.D. Ala. June 20, 2012) (distinguishing, for *Martinez* purposes, between cases in which petitioners receive new counsel for direct appeal); *Collazo v. Curley*, 2012 WL 2026830 (W.D. Pa. June 5, 2012) (remanding to Magistrate Judge for hearing pursuant to *Martinez*).

> 6.   Canales' underlying ineffective assistance of trial counsel claim and other extra-record claims are substantial and have sufficient merit to satisfy the predicate showing described in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

As set out more fully in the petition for a writ of habeas corpus, Canales received ineffective assistance of counsel at both phases of his capital trial.   Dkt. No. 7 at 5-78, 110-11. He also suffered a deprivation of his federal constitutional rights for the reasons set out in Grounds 6-8 and 10-12. Dkt. No. 7, Dkt. No. 121.  There, he established that his federal claims

were "substantial."  As a result, this Court should find that Canales has overcome the procedural bar.  Because the Magistrate Judge did not address the underlying merits of these claims, even to the limited extent of addressing whether Canales could show prejudice stemming from the ineffectiveness of state habeas counsel, this Court should either find that Canales is entitled to habeas corpus relief based on these additional grounds or remand these matters to the Magistrate Judge for additional proceedings.

### Conclusion

WHEREFORE, for the reasons set forth in the Petition, Dkt. No. 7, the Supplement to the Petition, Dkt. No. 121, and the Reply to the State's Response to the Supplement to the Petition, Dkt. No. 136, as well as the arguments herein, Canales prays that this Court:

1.      Reject the Magistrate Judge's objected-to recommendations;

2.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

3.      Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct in which to brief the issues of law and of fact raised by this petition or such hearing;

4.      Grant him additional discovery to include a deposition of Roy Smithey; and

5.      Grant such other relief as the ends of justice may require.

Respectfully submitted this 6th day of August, 2012.

> Teresa L. Norris
> S.C. Bar # 15081
> Blume Norris & Franklin-Best, LLC
> 900 Elmwood Ave., Ste. 101
> Columbia, S.C. 29201
> (803) 765-1044
> (803) 765-1143 (Fax)
>
> David Voisin
> Miss. Bar # 100210
> P. O. Box 13984
> Jackson MS 39236
> (601) 949-9486
> (601) 354-7854 (Fax)

By:     S/ Teresa L. Norris
        Counsel for Petitioner


## CERTIFICATE OF SERVICE

This is to certify that I, Teresa L. Norris, have electronically served a copy of this document upon Respondent's counsel by filing same with the United States District Court Electronic Case Filing system.

> S/ Teresa L. Norris
> Counsel for Petitioner