IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ANIBAL CANALES, JR., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:03CV69 |
| | ) |
| RICK THALER, Director, | ) **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | ) |
| Correctional Institutions Division, | ) |
| | ) |
| Respondent. | ) |
| | ) |

**PETITIONER'S RESPONSE TO RESPONDENT THALER'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Petitioner, Anibal Canales, Jr., pursuant to Fed. R. Civ. Proc. 72, previously filed Objections to the Magistrate Judge's Report and Recommendation. Dkt. No. 154. Pursuant to Local Rule 72C, Canales herein responds to the Objections by Respondent (hereinafter "the State").

**I.       The Evidence that Inmate Bruce Innes was a State Agent Was Suppressed.**

The State objects as follows: "The Director Does Not Admit that the Relationship Between Innes and Prison-Security Personnel Was Withheld from the Defense." Dkt. No. 148 at 1-2.

The evidence that Innes was an agent of the State and the impeachment evidence was contained in the files of the Special Prosecution Unit (SPU) Investigators, the Texas Department of Criminal Justice's (TDCJ) Office of the Inspector General (OIG) (formerly the Internal Affairs Division), Dkt. No. 121 Exh. 1 at 84, and TDCJ's Security Threat Group Management Office (STGMO). These files were suppressed until these federal habeas corpus proceedings.

1

Prosecutor Mark Mullin did not dispute in his deposition in these proceedings that the SPU investigator's file maintained by Investigator A.P. Merillat was maintained separate and apart from his file and that he disclosed to the defense only what he had in his own file.

> Q   And does the investigator maintain separate files from you?
>
> A   The investigator usually has their own investigative notes and things because they have to, you know, prepare to contact witnesses and make whatever notes they have.
>
> Q   And is that -- is a copy of that placed in your file or is that maintained separately?
>
> A   Historically what I'm used to seeing is when the case is over, an investigator…typically will take his file, and it's usually in a manila folder or whatever, and put it in my box or my file once the case is over. But I don't recall seeing [A.P.] copy me on stuff during the pending of the case.

Dkt. No. 121 Exh. 16 at 6-7.  Likewise, Mullin conceded that he never obtains and discloses the investigator's file to the defense.

> Q   And typically when you make disclosures, is that just the file that you maintain in your cabinets, your boxes, or would you also go get the investigator's file?
>
> **A   I have never -- since I've started prosecuting, I can't remember ever thinking to go get an investigator's file and hand it over to the defense.**

Dkt. No. 121 Exh. 16 at 15-16. This is not to say that Mullin did not have access to the SPU Investigator file. He did as he worked for SPU and Merillat, who possessed the SPU investigative file, was "his investigator" within the SPU office. Dkt. No. 121 Exhs. No. 1 at 23, 16 at 19.

Mullin also conceded that he had access to the STG, OIG, and TDCJ files but that he did not disclose this information to the defense. OIG, as detailed in the Supplement to the Petition, Dkt. No. 121 at 44-49, investigates cases for SPU and remains involved in development of the case and preparation for trial even after SPU has agreed to prosecute the case. Dkt. No. 121 Exh. 1 at 38-39. Because of this close relationship, SPU staff have largely unfettered access to TDCJ

documents both on computer and hard copy. Specifically, Merillat acknowledged that he or another SPU investigator has computer access to STG files and most TDCJ files. Dkt. No. 121 Exh. 1 at 20. Generally, he receives full access to any OIG, STG, or TDCJ files requested. Dkt. No. 121 Exh. 1 at 21. Likewise, Mullin acknowledged that he also generally receives all STG, OIG, and TDCJ files requested. Dkt. No. 121 Exh. 16 at 8-11.

Despite the prosecution's possession of this information, it was not disclosed to the defense. Both of Canales' trial counsel provided affidavits in these proceedings asserting that the relevant information was withheld. Dkt. No. 19 Exhs. 1-2. As Respondent has not rebutted trial counsel's affidavits, the only credible evidence is that the defense was not provided with these documents. Indeed, the information was disclosed in these proceedings only after repeated objections by Respondent and an order of production and *in camera* inspection by The Honorable T. John Ward. *See, e.g.,* Dkt. Nos. 17 (Opposition to First Motion for Discovery), 42 (Order Granting in Part and Denying in Part Motion for Discovery), 44-45 (Motion to Vacate Order on Motion for Discovery and Supporting Brief), 51 (Emergency Motion to Stay Discovery), 55 (Order Denying Motion to Vacate Discovery and Motion to Stay), 79 (Opposition to Second Motion for Discovery), 86 (Order Granting in Part and Denying in Part Second Motion for Discovery), Sealed Memorandum Opinion and Order (March 14, 2011) (releasing documents to the parties after *in camera* inspection). These repeated objections would clearly not have been made if the information had already been disclosed to the defense prior to trial.

Finally, as the Magistrate Judge correctly found, the State did not dispute in its response to the habeas petition that evidence related to Innes serving as an agent for the State and evidence that could have been used to impeach Innes was withheld from the defense. Dkt. No.

139 at 14. The State's initial response to the *Brady*[1] claim was simply that the undisclosed impeachment evidence was immaterial and cumulative of the impeachment evidence that was disclosed. Dkt. No. 12 at 29-32.

This is simply not plausible. Innes was the star of the State's case. Presenting two powerfully inculpatory notes allegedly written by Canales, he provided the only testimony alleging any statement or admission from Canales regarding the Dickerson murder. Unbeknownst to defense counsel, and in violation of *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980), Innes was acting as an undercover agent of the State (Claim 3). In addition, in violation of *Brady* and its progeny, the State withheld substantial impeachment evidence related to Innes including, but not limited to, the following:

- Innes was himself a suspect in the Dickerson homicide;

- Innes and the other inmate witnesses for the State were promised that favorable information would be provided to the parole board following the trial;

- SPU encouraged Innes to speak to at least one other State witness prior to trial;

- Innes' renunciation of his gang affiliation was suspect;

- After accepting it for prosecution, SPU dismissed a felony case of Possession of a Deadly Weapon in a Penal Institution against Innes prior to trial; and

- Innes repeatedly – and successfully – sought SPU's intervention on prison matters regarding gang deconfirmation, better TDCJ classification, better housing, and property in exchange for his cooperation, including soliciting incriminating evidence.

Aside from being factually inaccurate, the State's present argument that the evidence was not suppressed was waived by the failure to assert this argument in the response to the habeas petition. *Amadeo v. Zant*, 486 U.S. 214, 228 n.6 (1988) (finding state waived issue of prejudice by failing to timely argue the issue); *Jones v. Cain*, 600 F.3d 527, 540 (5th Cir. 2010) (state's

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

failure to argue harmlessness of violation of Confrontation Clause waived the issue); *Tenny v. Dretke*, 416 F.3d 404, 407-08 (5th Cir. 2005) (By focusing only on the prejudice prong of the *Strickland v. Washington*[2] analysis, the state waived argument on whether counsel's conduct was deficient). *See also Lam v. Kelchner*, 304 F.3d 256, 269–70 (3rd Cir. 2002); *Ayers v. Hudson*, 623 F.3d 301, 317 n.12 (6th Cir. 2010); *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005); 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 31.2, at 1512 & n. 1 (5th ed. 2005).

## II. The Record Clearly Establishes That Innes Was a State Agent Even Prior to Canales' Indictment.

The State asserts that there was no reliable evidence that Innes was a State Agent until Merillat's letter to Innes on March 1, 2000, which was after Innes received the inculpatory documents he solicited from Canales. Dkt. No. 148 at 2-3. The State is incorrect.

As set forth in more detail in the Supplement to the Petition for Writ of Habeas Corpus, Dkt. No. 121 at 9-14, there can be no serious doubt that Innes was acting as an agent for the State at all times after his lawyer first approached the prosecution offering his cooperation. He was telling TDCJ personnel just that and they were documenting it. *See, e.g.*, Dkt. No. 121 Exh. 10 ("Offender Innes has requested to be reclassified as an ex member, but claims that special prosecutor's office has instructed him to keep in contact with TM members **(for purposes concerning the homicide)**") (emphasis added). Likewise, A.P. Merillat, the SPU investigator assigned to Canales' case pretrial, testified that he wanted Innes to continue writing to Canales and gathering information. Dkt. No. 121 Exh. 1 at 71-72 ("Q: In general, would you want him to continue gathering information? A: I would hope he could"); *see also* at 44:11-19 ("was that the general discussion between you and Mr. Innes about how to approach things in terms of keep

---

[2] 466 U.S. 668 (1984).

trying to get all the information you can? A: Sure As far as Whited, and also any information he could get on the Canales case I would take as well"). In this context, Innes clearly was a State agent well before he solicited the February 2000 letter.

### III. The CCA's Denial of Relief on the *Brady* Claim was NOT Independent of Federal Law.

Respondent maintains that the Magistrate Judge should have clearly found the *Brady* claim defaulted. Dkt. No. 148 at 3-5. However, an examination of how this matter indicates that the CCA had to have relied on federal law in denying relief on this claim, and because the state court ruling was not independent of federal law, any alleged procedural rule is not sufficient to bar this Court from reaching the merits of the claim.

The Magistrate Judge noted that the state court relied on the abuse of the writ doctrine to deny relief on the successive habeas application. Dkt. No. 139 at 19. However, the abuse of the writ bar is sufficient to bar federal habeas review of the merits only if the ruling was not interwoven with federal law. For the Magistrate Judge to have concluded that the CCA's order was independent of federal law, he had to have believed that the state court would have found that the facts supporting the *Brady* claim were previously available, which is a matter of state law. If the CCA could not have determined the availability of the facts, however, then the only plausible conclusion is that the CCA denied relief only because it determined that Canales could not obtain relief on the merits of the claim.

As pointed out in Canales' objections to the Magistrate Judge's Report, Dkt. No. 154, the CCA obviously could not have denied relief based on the availability of the facts supporting the *Brady* claim because it asked for supplemental briefing on precisely this point in the habeas application of William Speer, Canales' co-indictee. *See* Pet. Obj. at 34-35. Speer relied on the same evidence that Canales relied upon. If the CCA could not resolve the issue of availability on

6

the face of what was presented, then it could only have barred the successive application because it did not believe Canales made a showing that would entitle him to relief.

Moreover, in determining whether Canales could show "cause" for any possible default, the Magistrate Judge found that the facts supporting the *Brady* claim were unavailable. Respondent does not contest this point; thus, there is a consensus that the underlying facts were not previously available. Under these circumstances, there is no question that the CCA's decision was not independent of federal law, and therefore its abuse of the writ finding does not preclude merits review of the *Brady* claim.

### IV. For *Brady* Purposes, Benefits-Received Analysis Regarding Prisoners Differs from Similar Analysis Regarding Free-World Witnesses.

The State makes the puzzling argument that the State should be allowed to provide undisclosed benefits to inmate witnesses because "the state is responsible not only for the roof over his head, but for every bite of food, every stitch of clothing, and every drop of medicine," as well as the inmate's "physical safety." Dkt. No. 148 at 5-6. In short, the State must provide "every necessary." Dkt. No. 148 at 6.

While Canales certainly opposes the notion that the State can provide undisclosed benefits to inmate witnesses, Canales also must point out that the intent of the State in providing benefits to witnesses is not the relevant focus. The relevant point is whether the witness has motive to lie, which is valuable impeachment evidence that must be disclosed, because he expects or hopes for a benefit in exchange for his cooperation. *See, e.g. United States v. Bagley*, 473 U.S. 667, 683 (1985) (the fact that the witnesses had not been guaranteed a benefit and there was only "the possibility of a reward" if they testified "to the satisfaction" of the prosecutor "served only to strengthen any incentive to testify falsely in order to secure a conviction"). Inmate witnesses are even more vulnerable than free-world witnesses in many ways, which

7

makes it more likely than an inmate witness will be motivated to lie in order to improve his own situation. In short, in prison the incentives to cooperate with the State are more varied and subtle precisely because the prison exerts total control over the inmate's environment, from whether he is permitted to hang pictures of his family on his cell wall to whether he is locked in his cell 23 hours a day. The atmosphere in prison is so controlled that prisoners can be punished for possession of lip balm or other small items. *See, e.g.*, Dkt. No. 7 Exh. 31. If an inmate has a long sentence, benefits that seem trivial to a free person represent to a prisoner a way to make prison survivable.

When an inmate is classified as a confirmed gang member, his already contracted freedoms can be even further reduced. Confirmed Texas Mafia gang members, such as Innes and other state witnesses were, are automatically placed in administrative segregation ("Ad Seg"). Dkt. No. 121 Exh. 1 at 46; *see also* Dkt. No. 7 Exh. 32 at Para. I.F.1. ("Offenders assigned Level 1 [of Ad Seg] are generally maintaining good behavior but have a requirement for segregation or separation from general population offenders. Additionally, the offender is considered a security risk due to being: … (c) a physical threat to the physical safety of offenders or staff for reasons other than behavior, such as membership in a Security Threat Group (STG)"). According to TDCJ policies, an inmate is on "Administrative Segregation anytime he is separated from the general population by confinement in a cell for twenty (20) hours or more a day without a disciplinary hearing." Dkt. No. 7 Exh. 32 at Para. I.A.

In reality, the best behaved prisoner in Ad Seg will be allowed out of his cell for either one hour a day, seven days a week; two hours, five days a week; or three hours, four days a week. Dkt. No. 7 Exh. 32 at Para. III.C.l.A. Ad Seg inmates are housed in single man cells and allowed only one non-contact visit each week and no contact visits. They are not allowed work

assignments, their movement is severely restricted, and they are subject to frequent strip searches. Faced with the hard time that gang classification entails and the powerful influence SPU had on TDCJ, it is little wonder that inmates would readily concoct stories, exaggerate their knowledge and act as illicit agents for the State. Further, given how SPU continued to assist its witnesses for years after they testified at trial, the true scope of the suppressed evidence remains difficult to assess.[3]

Moreover, the State's argument is essentially that the only "benefit" provided to the inmate witnesses was to "ensure the prisoner's safety," Dkt. No. 148 at 6, and that the prosecution was only "passing along . . . prisoner requests," which should not be viewed as a disclosable "benefit" under *Brady*. First, it is absolutely not true that the only benefits provided to the inmate witnesses were related to "safety" or "security." Every single inmate witness for the State was promised and received a favorable letter to the Parole Board on their behalf. Specifically, Mullin testified that Merillat informed witnesses: "[W]hat I typically do – A.P. speaking – what I typically do is when an inmate testifies for us, I'll – I'll inform the parole board so that they know." Dkt. No. 121 Exh. 16 at 54. *See also* Dkt. No. 121 Exh. 56.

---

[3] Tellingly, Innes sent Mullin and Merillat an agitated letter before he was deposed in these proceedings, asking for their assistance and whether they could obtain the questions in advance. Dkt. No. 121 Exh. 3.

> I'm disturbed by it & I need your counsel on this, could you please get back to me on this or at least try to put this off until we are prepared to answer their questions, do they not have to let you know what they will ask or something like that?

Merillat testified in his deposition that he did not believe they responded to Innes' letter. Dkt. No. 121, Exh. 1 at 114. This may account for why Innes repeatedly lied in his deposition about critical issues regarding the extent of his contact with the prosecution. *See, e.g.*, Dkt. No. 121 Exh. 43 at 85 (wrote Merillat only about three times; disclosed documents included over 25 letters from Innes to Merillat); at 88 (Merillat could do little for Innes and Innes could do little for Merillat); at 95-98 (denied knowing Whited and saw him only on the chain bus to Bowie County). He clearly understood the impeachment value of the information he sought to conceal.

9

Moreover, every single cooperating inmate witness for the State was allowed to request their own housing placement transfer following their testimony and these requests were honored. Dkt. No. 121 Exh. 57. Even Merillat conceded in his deposition in these proceedings that these requests were not motivated solely by safety concerns, but also inmates' desires to be closer to family or prison educational or vocational opportunities. Dkt. No. 121 Exh. 1 at 35-36. *See also* Dkt. No. 121 Exh. 14 at 47.

With respect to Innes alone, he obtained "special treatment" (as the Magistrate Judge put it) by the dismissal of a possession of weapon charge, incurred by Innes while acting as a State agent in this case. Dkt. No. 139 at 24. He also received special treatment with respect to gang renunciation and housing, including being moved off Ad Seg to "safekeeping," which is a far less restrictive environment. Dkt. No. 121 Exh. 54. Thus, any argument by the State that the "benefits" provided by the State related only to safety and security are specious, at best.

**V.    The Federal Basis of the Shackling Claim Was Fairly Presented to the State Court.**

Respondent contends that Canales did not fairly present his shackling claim as a matter of federal law. This is incorrect. In his initial state habeas application, Canales raised the shackling and cited *Illinois v. Allen,* 397 U.S. 337 (1970). *See* First Application for Writ of Habeas Corpus, *Ex parte Anibal Canales,* No. 99F506-5-A at 94-95 (5th Dist. Ct. of Bowie County, filed May 16, 2002).[4] Because Canales presented authority clearly setting forth the federal basis of his challenge, this ground for relief was fully exhausted in state court.

A petitioner must give "the State the 'opportunity to pass upon and correct' the alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state

---

[4] For the convenience of the Court, the relevant pages are attached.

10

court . . . thereby alerting that court to the federal nature of the claim." *Id.* "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at 32; *see also Soffar v. Dretke,* 368 F.3d 441, 465 (5th Cir. 2004) (reliance on pertinent federal authority is sufficient to fairly present federal basis of claim to state court). Because Canales plainly relied on the controlling United States Supreme Court case on this matter when he submitted this ground for relief to the state court, he fully satisfied the federal exhaustion requirement. Thus, Respondent's objection to the Magistrate Judge's finding on this point is baseless.

### VI. Any Wrongfully Obtained Evidence Must Be Excluded in Capital Sentencing.

The State argues that evidence obtained in violation of Canales' Sixth Amendment right to counsel by Innes acting as a state agent in soliciting incriminating information "need not be excluded at punishment." Dkt. No. 148 at 7-8. This argument is misplaced for two reasons. First, it fails to acknowledge that Texas law prohibits the introduction of precisely the evidence at issue here. Second, it relies on irrelevant cases, while ignoring those on point.

The evidence at issue here is evidence obtained in violation of Canales' constitutional right to counsel. Texas law precludes admission of such evidence. Specifically Tex. Code Crim. Proc. Ann., Art. 38.23(a) provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

*See also Wilson v. State*, 311 S.W.3d 452 (Tex. Crim. App. 2010) ("the use of any evidence that would be barred by federal constitutional principles--as interpreted by the United States Supreme

11

Court--is barred under article 38.23, our state exclusionary rule"). Texas courts apply this provision in capital sentencing just as they do to the trial. See, e.g., *Wesbrook v. State*, 29 S.W.3d 103, 121 (Tex. Crim. App. 2000).

Further, the State relies on *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1181 (5th Cir. 1993), which is simply inapplicable to this case. First, *Montoya-Ortiz* was not a capital case and, thus, did not involve the same heightened "need for reliability in the determination that death is the appropriate punishment" by a capital jury, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), which requires a finding of enumerated aggravating circumstances or special issues to be made by a jury and beyond a reasonable doubt, *Ring v. Arizona*, 536 U.S. 584, 609 (2002).[5] Instead, *Montoya-Ortiz* involved judge only sentencing by a federal judge under the United States Sentencing Guidelines, which specifically allowed the court to "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probably accuracy." *Montoya-Ortiz*, 7 F.3d at 1181-82 (quoting U.S.S.G. § 6A1.3(a)).[6]

Second, the evidence at issue in *Montoya-Ortiz* was evidence that the defendant possessed a dangerous weapon, which the court had excluded from trial evidence under the Fourth Amendment. The Fifth Circuit noted that it had previously held that "[t]he exclusionary rule applicable to Fourth Amendment violations is generally inapplicable to the district court's consideration of evidence for purposes of sentencing." *Montoya-Ortiz*, 7 F.3d at 1181 (quoting *United States v. Robins*, 978 F.2d 881, 891 (5th Cir. 1992)). The court also noted that the

---

[5] Continuing danger or future dangerousness, which is the relevant issue here, is a special issue required to be found before a Texas jury can impose a death sentence. Tex. Code Crim. Proc. Ann., Art. 37.071(b); *Penry v. Johnson*, 532 U.S. 782, 786 (2001).

[6] The constitutionality of this provision of the Sentencing Guidelines was called into question by *United States v. Booker,* 543 U.S. 220 (2005).

defendant had "not contend[ed] that the weapon was unconstitutionally seized for the sole purpose of enhancing his sentence." *Id.* at 1181 n.10. The court then cited a number of cases directly addressing the exclusionary rule under the Fourth Amendment that bear absolutely no relationship to the issue involved in this case, which is the violation of Canales' Sixth Amendment right to counsel. *Id.*[7]

The distinction between a Fourth Amendment versus a Sixth Amendment violation is significant. The Fourth Amendment is not a trial right, but is instead a protection against governmental intrusion into one's home. *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). The exclusionary rule was created by the Court not as "a personal constitutional right," but as a deterrence to the State committing future Fourth Amendment violations. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011). The Sixth Amendment right to counsel, on the other hand, "is a fundamental right of criminal defendants; it assures the fairness, and, thus, the legitimacy of our adversary process." *Kimmelman v. Morrison*, 477 U.S. at 374. Thus, protections under the Sixth Amendment are far more stringent than those applied in the Fourth Amendment context.

The relevant cases are those directly from the United States Supreme Court that exclude evidence obtained in violation of the Sixth Amendment right to counsel from consideration in capital sentencing. *Estelle v. Smith*, 451 U.S. 454 (1981). Admission of evidence obtained in violation of the Sixth Amendment right to counsel in capital sentencing requires reversal, unless the State can prove beyond a reasonable doubt that the constitutional error did not contribute to

---

[7] The State also cites *United States v. Bender*, 221 F.3d 265, 271 (1st Cir. 2000) for the proposition that "evidence obtained in violation of Sixth Amendment may be used nonetheless for impeachment if the defendant testifies and may be used at sentencing." Dkt. No. 148 at 8. *Bender* is another non-capital case under the federal sentencing guidelines. And, while Canales cannot quarrel with the proposition that evidence obtained in violation of the Sixth Amendment under *Messiah* may in some circumstances be used as impeachment evidence if the defendant testifies, *Kansas v. Ventris*, 556 U.S. 586, 594 (2009), Canales did not testify in the trial or sentencing. Thus, this case is likewise irrelevant.

the death verdict, *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988), or the defendant waived his right to object in some fashion, *Powell v. Texas*, 492 U.S. 680, 686 (1989).[8]

Finally, by objecting to the Magistrate Judge's report and recommendation on this point and making this argument that the evidence is admissible, even if obtained in violation of the Sixth Amendment, the State essentially concedes that the error was not harmless. Indeed, as addressed in full in Canales' objections, the State has never argued harm and has waived any argument on that issue. Dkt. No. 154 at 2-3.

## Conclusion

Wherefore, the State's objections should be rejected.

                                      Teresa L. Norris
                                      S.C. Bar # 15081
                                      Blume Norris & Franklin-Best, LLC
                                      900 Elmwood Ave., Ste. 101
                                      Columbia, S.C. 29201
                                      (803) 765-1044
                                      (803) 765-1143 (Fax)

                                      David Voisin
                                      Miss. Bar # 100210
                                      P. O. Box 13984
                                      Jackson MS 39236
                                      (601) 949-9486
                                      (601) 354-7854 (Fax)

                          By:    S/ Teresa L. Norris
                                Counsel for Petitioner

---

[8] The Court applies the same harmless error analysis to Fifth Amendment violations, *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), which also involve a "fundamental trial rights," *Withrow v. Williams*, 507 U.S. 680, 691 (1993).

## CERTIFICATE OF SERVICE

This is to certify that I, Teresa L. Norris, have electronically served a copy of this document upon Respondent's counsel by filing same with the United States District Court Electronic Case Filing system on August 13, 2012.

S/ Teresa L. Norris
Counsel for Petitioner
