# ATTACHMENT

NO. _____

---

## IN THE SUPREME COURT OF THE UNITED STATES
## OCTOBER 2011 TERM

---

**CLEVE FOSTER,**
Petitioner
**vs.**
**RICK THALER, Director, T.D.C.J., C.I.D.,**
Respondent

---

### On Petition for a Writ of Certiorari to the
### United States Court of Appeals for the Fifth Circuit

---

### THIS IS A CAPITAL CASE

### MR. FOSTER IS SCHEDULED TO BE EXECUTED
### TUESDAY, SEPTEMBER 25, 2012

---

Maurie Levin*
Capital Punishment Clinic
U.T. School of Law
727 East Dean Keeton
Austin, TX  78705
512-232-7795

F. Clinton Broden
Broden & Mickelsen
2600 State Street
Dallas, TX  75204
214-720-9552

Counsel for Cleve Foster

*Counsel of Record

CAPITAL CASE

QUESTIONS PRESENTED

Last Term, in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), this Court fashioned a narrow equitable exception to the procedural default regime that governs federal habeas corpus actions brought by prisoners in state custody, with the goal of ensuring that substantial claims of ineffective assistance of trial counsel receive meaningful consideration. Under *Martinez*, such claims, if procedurally defaulted during state post-conviction proceedings, may nevertheless be heard on the merits in federal habeas if the default was traceable to ineffective representation by state post-conviction counsel.

The United States Court of Appeals for the Fifth Circuit has concluded that *Martinez* does not apply to a federal habeas case brought by a person in custody pursuant to the judgment of a Texas court, because it remains theoretically possible for Texas prisoners to challenge the effectiveness of trial counsel on direct appeal – despite the fact that Texas maintains a procedural framework intentionally designed to channel the adjudication of such *Strickland* claims into state collateral proceedings. *Ibarra v. Thaler*, ___ F.3d ___, 2012 WL 3537826 (5th Cir 2012).

It has also held that the change of law represented by *Martinez* is not an "extraordinary circumstance," and, on that basis alone, petitioners are not entitled to reconsideration of an earlier adverse judgment under Fed. R. Civ. P. 60(b)(6). *Adams v. Thaler*, 679 F.3d 312, 320 (5th Cir. 2012). *Adams* conflicts with the decision of the Ninth Circuit Court of Appeals in *Lopez v. Ryan*, 678 F.3d 1131 (9th Cir. 2012) holding that *Martinez* constitutes a "remarkable-if-limited-development in the Court's equitable jurisprudence" and, along with other factors, weighed in favor of reopening Mr. Lopez's case.

In Petitioner's case, the Fifth Circuit applied both these holdings to bar him from obtaining review under Fed. R. Civ. P. 60(b), despite the fact that Petitioner acted with due diligence at every turn and advances a powerful claim of ineffective assistance of trial counsel that was forfeited due to the errors of his state habeas counsel.

The questions presented by the Fifth Circuit's decision are:

1.    Does *Martinez* require a federal habeas court to consider the ineffective assistance of state habeas counsel as "cause" to excuse default of an ineffective assistance of trial counsel claim raised by a state prisoner in a state that maintains a procedural regime intentionally designed to channel the adjudication of *Strickland* claims into state collateral proceedings?

2.    Can the decision of the Fifth Circuit Court of Appeals in *Adams v. Thaler*, holding that *Martinez* does not qualify as the "extraordinary circumstances" required for relief from judgment pursuant to Fed. R. Civ. P. 60(b)(6) and thus, on that basis alone, a petitioner is not entitled to relief from judgment, be squared with this Court's precedents and the ruling of the Ninth Circuit Court of Appeals in *Lopez v. Ryan*?

## TABLE OF CONTENTS

                                                                                    Page

QUESTIONS PRESENTED ........................................................................................ i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ v

OPINIONS BELOW ................................................................................................... 1

JURISDICTION ......................................................................................................... 1

CONSTITUTIONAL PROVISIONS INVOLVED ......................................................... 1

INTRODUCTION ....................................................................................................... 1

STATEMENT OF THE CASE .................................................................................... 3

I.      PRIOR PROCEEDINGS ............................................................................. 3

II.     FACTS MATERIAL TO THE QUESTIONS PRESENTED ........................... 5

        A.  The Trial: The Law of Parties and Circumstantial Evidence ............ 5

        B.  Co-defendant Ward's Four Statements Exonerating Mr. Foster. ...... 8

        C.  The Motion for an Instructed Verdict. ............................................... 10

        D.  The Motion for New Trial and Direct Appeal .................................... 12

        E.  Mr. Foster Repeatedly and Diligently Expressed his Concerns about the Quality of his Appointed Attorney, and the Claims that were not being Raised ......... 12

        F.  The Federal Habeas Proceedings ..................................................... 13

                1.  Newly appointed federal counsel's efforts to investigate and raise Mr. Foster's substantial claim of ineffective trial counsel and related claim of innocence ................................................................................. 13

                2.  Federal habeas counsel asserted the ineffectiveness of state habeas counsel as cause for the default of the unexhausted claims .............. 15

REASONS FOR GRANTING THE WRIT.................................................................................. 16

I.  *MARTINEZ* APPLIES TO TEXAS ..................................................................................... 16

    A.  *Martinez* is an Equitable Decision Intended to Ensure Federal Review of *Strickland* Claims Defaulted by Inadequate Representation in State Court ... 16

    B.  Texas Designates the Article 11.071 Proceeding as that in which *Strickland* Claims that are not Firmly Founded in the Appellate Record are to be First Adjudicated ........................................................................................................ 16

    C.  *Ibarra v. Thaler* Contravenes *Martinez.* ............................................................. 19

II.  MR. FOSTER CAN SATISFY THE TWO-PART TEST SET FORTH IN *MARTINEZ* FOR ESTABLISHING CAUSE FOR THE PROCEDURAL DEFAULT OF HIS INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIM.. ............................................................. 22

    A.  Mr. Foster's Appointed State Habeas Counsel was Ineffective ....................... 22

    B.  Mr. Foster's Underlying Ineffective Assistance of Trial Counsel Claim is Substantial ......................................................................................................... 25

        1.  The Evidence Used to Convict Mr. Foster under the "Law of Parties" was Inferential and Circumstantial.......................................................... 26

        2.  Trial Counsel Failed to Introduce Key Pieces of Exculpatory Evidence. ..................................................................................................... 27

        3.  Mr. Foster was Prejudiced by Counsel's Deficient Performance. ............. 30

III.  THE RULING BELOW, DEPENDENT ON THE DECISION IN *ADAMS V. THALER*, FLIES IN THE FACE OF THIS COURT'S JURISPRUDENCE REQUIRING CONSIDERATION OF A CONSTELLATION OF FACTORS WHEN CONSIDERING A MOTION FOR RELIEF FROM JUDGMENT, AND CONFLICTS WITH THE DECISION OF THE NINTH CIRCUIT COURT OF APPEALS IN *LOPEZ V. RYAN*..................................................................................... 31

    A.  This Court's Rulings Require Consideration of a Variety of Factors in Determining Whether Relief from Judgment is Warranted. ....................................................... 31

    B.  While not Every Change in Decisional Law *Alone* is an Extraordinary Circumstance, *Martinez* Reversed Two Decades of Supreme Court and Homogeneous Circuit Precedent................................................................................................................ 32

    C.  Mr. Foster's Diligence Weighs in Favor of Relief from Judgment......................... 33

D.  The Fact that Mr. Foster's Meritorious Claims of Ineffective Assistance of Trial and Habeas Counsel have never been Fully or Properly Considered on the Merits Weighs in Favor of Relief from Judgment .................................................................. 34

E.  *Adams v. Thaler* and *Lopez v. Ryan* Reflect a Split among the Circuit Courts of Appeals on a Question Vital to the Meaningful Interpretation of Martinez .......... 38

CONCLUSION ........................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page**

### Federal Cases

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) ................................................................ *passim*

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) .................................................... 33

*Arthur v. Thomas*, 2012 U.S. LEXIS 85563 (N.D. Ala.) .................................................. 41

*Artuz v. Bennett*, 531 U.S. 4 (2000) ................................................................................ *passim*

*Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000) ................................................................. 33

*Coleman v. Thompson*, 501 U.S. 722 (1991) .................................................................. *passim*

*Conklin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004) .................................................... 8

*Cook v. Ryan*, 2012 WL 2798789 (D. Ariz.) .................................................................... 41

*Foster v. Quarterman*, 2008 WL 5083078 (N.D. Tex.) ................................................... *passim*

*Foster v. Texas*, 131 S.Ct 991 (2011) ............................................................................ 4

*Foster v. Texas*, 131 S.Ct 1034 (2011) .......................................................................... 4

*Foster v. Texas*, 131 S.Ct 1848 (2011) .......................................................................... 4

*Foster v. Texas*, 131 S.Ct 2951 (2011) .......................................................................... 4

*Foster v. Texas*, 132 S.Ct 69 (2011) .............................................................................. 5

*Foster v. Texas*, 132 S.Ct. 1821 (2012) ......................................................................... 5

*Foster v. Texas*, 549 U.S. 1118 (2007) .......................................................................... 3

*Foster v. Texas*, 2010 WL 3698830 (N.D. Tex.) ............................................................ 3

*Foster v. Thaler*, 607 F.3d 391 (5th Cir. 2010) .............................................................. 15, 29

*Foster v. Thaler*, 369 Fed. Appx. 598 (5th Cir. 2010) .................................................... 15

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir 2005) ...................................................... 8

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ...................................................................... *passim*

*House v. Bell*, 547 U.S. 518, 538 (2006ir. 1993) ............................................................... 33

*Hull v. Freeman*, 991 F.2d 86 (3d Cir. 1993) ..................................................................... 33

*Ibarra v. Thaler*, _ F.3d._, 2012 WL 3537826 (C.A.5 (Tex.)) ............................................ *passim*

*In re Goff*, 250 F.3d 273 (5th Cir. 2001) ........................................................................... 33

*Jones v. Johnson*, 171 F.3d 270 (5th Cir. 1999) ............................................................... 33

*Landrum v. Anderson*, 2012 WL 3637365 (S.D. Ohio) ...................................................... 41

*Lopez v. Ryan*, 678 F.3d 1131 (9th Cir. 2012) ................................................................... *passim*

*Maples v. Maples*, 2011 WL 940889 (U.S.) ......................................................................... 4

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012) ........................................................................... *passim*

*Mize v. Hall*, 532 F.3d 1184 (11th Cir. 2008) .................................................................... 33

*Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) ........................................................... 33

*Murray v. Carrier*, 477 US at 488-89 ................................................................................ 20

*Schlup v. Delo*, 512 U.S. 298 (1995) ................................................................................. *passim*

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981) .............................................. 32

*Sims v. Houston*, 2012 U.S. Dist. LEXIS 80945 (D.Neb.) .................................................. 41

*Smith v. Angelone*, 111 F.3d 1126 (4th Cir. 1997) ............................................................. 33

*Smith v. Baldwin*, 510 F.3d 1127 (9th Cir. 2007) ............................................................... 33

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................................. *passim*

*Szabo v. Walls*, 313 F.3d 392 (7th Cir. 2002) .................................................................... 33

*United States. v. Barnette*, 211 F.3d 803 (4th Cir. 2004) .................................................... 8

*Vicknair v. Formosa Plastics Corp*, 98 F.3d 837 (5th Cir, 1996) ...................................... 33

*Vogt v. Coleman*, 2012 WL 2930871 (4th Cir. 2004) .......................................................... 41

*Wainwright v. Sykes*, 433 US 72 (1977) ............................................................................. 20

*Wooten v. Norris*, 578 F.3d 767 (8th Cir. 2009) ................................................................. 33

*Yeboah-Sefah v. Ficco,* 556 F.3d 53 (1st Cir. 2009) ........................................................................... 33

## Federal Constitution, Statutes and Court Rules

28 U.S.C. § 2244 ................................................................................................................. 37

28 U.S.C. § 2254 ................................................................................................................... 3

Fed. R.Civ. P. 60(b) ...................................................................................................... *passim*

## State Cases

*Dewberry v. State,* 4 S.W.3d 735 (Tex. Crim. App. 1999) .................................................. 28

*Ex parte Duffy,* 607 S.W.2d 507 (Tex. Crim. App. 1980) ............................................ 17, 18

*Ex parte Elizondo,* 947 S.W.2d 202 (Tex. Crim. App. 1996) ............................................. 24

*Ex parte Foster,* No. WR-65,799-01 (Tex. Crim. App. Mar. 21, 2007) ................................. 3

*Ex parte Foster,* No. WR-65,799-02 (Tex. Crim. App. Dec. 30, 2010) ........................... 4, 25

*Ex parte Foster,* No. WR-65,799-03 (Tex. Crim. App. Sept. 12, 2011) ............................. 4, 8

*Ex parte Gardner,* 959 S.W.2d 189 (Tex. Crim. App. 1998) ............................................. 23

*Ex parte Holmes,* 885 S.W.2d 389 (Tex. Crim. App. 1994) .............................................. 24

*Ex parte Reynoso,* 257 S.W.3d 715 (Tex. Crim. App. 2008) ............................................. 22

*Foster v. State,* 2006 WL 947681 (Tex. Crim. App. April 12, 2006) ............................... 3, 29

*Jackson v. State,* 877 S.W.2d 769 (Tex. Crim. App. 1994) ............................................... 21

*Mallett v. State,* 65 S.W.3d 59 (Tex. Crim. App. 2001) .................................................... 17

*Mata v. State,* 226 S.W.3d 425 (Tex. Crim. App. 2007) ................................................... 17

*Mitchell v. State,* 68 S.W.3d 640 (Tex. Crim. App. 2002) ................................................ 17

*Robinson v. State,* 16 S.W.3d 808 (Tex. Crim. App. 2000) .......................................... *passim*

*Rylander v. State,* 101 S.W.3d 107 (Tex. Crim. App. 2003) ........................................ 18, 19

*Salinas v. State,* 163 S.W.3d 734 (Tex. Crim. App. 2005) ............................................. 17

*Sprouse v. State*, 2007 Tex. Crim. App. LEXIS 1862 ........................................ 17, 20

*State v. Sheldon Ward,* No. 0835934A .................................................. 7, 10

*Ex parte Cleve Foster*, No. 0839040 ................................................ *passim*

*State v. Cleve Foster*, No. 0839040 ................................................ 12

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) .................................. *passim*

*Ward v. State,* 2007 WL 1492080 (Tex. Crim. App. May 23, 2007) ......................... 17, 18

## State Statutes and Rules

Guidelines and Standards for Texas Capital Counsel, 69 Tex. Bar J. 966 (2006) ............................ 18,21

Tex. Code Crim. Proc. art. 11.071 .................................................... *passim*

Tex. Code Crim. Proc. art. 26.04 .................................................... 17

Tex. Code Crim. Proc. art. 26.05 .................................................... 17

Tex. R. App. Proc. 21.4 ............................................................ 17

Texas R. Evid. 803(24) ............................................................. 28

## PETITION FOR WRIT OF CERTIORARI

Petitioner Cleve Foster petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in *Foster v Thaler*, No. 12-70026 (5th Cir. 2012) (slip op.).

## OPINIONS BELOW

The Fifth Circuit decision sought to be reviewed, *Foster v. Thaler*, No. 12-70026 (5th Cir. Sept. 21, 2012) (unpub. slip op.), is attached as Appendix 1. The district court order denying Mr. Foster's request for relief from judgment and a certificate of appealability, *Foster v. Thaler*, No. 4:07-cv-000210 (N.D. Tex. Aug. 13, 2012), is attached as Appendix 2.

## JURISDICTION

The court of appeals order sought to be reviewed was entered on September 21, 2012. This Court has jurisdiction pursuant to 28 U.S.C. § 1254(1).

## CONSTITUTIONAL PROVISIONS INVOLVED

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI.

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . . ." U.S. CONST. amend. XIV.

## INTRODUCTION

Mr. Foster has consistently asserted his innocence. The state's case against him – based on the law of parties, and *never* on an argument that Mr. Foster was the person who pulled the trigger of the gun that killed Nyaneur "Mary" Pal – was circumstantial and threadbare. His co-defendant, Sheldon Ward, who the State prosecuted as the actual shooter, confessed four times to Ms. Pal's murder: twice before his arrest, once in a written statement he gave upon arrest, and once from prison after he was sentenced to death. There are inconsistencies between Ward's statements, but they are unremittingly consistent in

making clear that he alone murdered Ms. Pal – and murdered her alone.  Indeed, in Ward's capital trial, the

state argued: *"There's no evidence that Cleve Foster had anything to do with [Mary Pal's murder] other

than he was in the truck when they left."*

It was only because of trial counsel's ineffectiveness that Mr. Foster was convicted and sentenced

to death on such sparse evidence.  Counsel appointed to represent Mr. Foster in state habeas was likewise

ineffective, failing to perform the investigation necessary to adequately assert his powerful claim of

innocence, or raise the trial ineffectiveness claims pivotal to same – despite Mr. Foster's repeated

entreaties to counsel and the courts.  As state habeas counsel performed inadequately, newly appointed

federal habeas counsel were hamstrung in their efforts to investigate or fully present claims that had not

been fully exhausted in the state courts.

At the conclusion of those federal proceedings, facing an execution date, Mr. Foster returned to the

state courts in an attempt to gain a forum to litigate his claim of innocence and related claims of ineffective

counsel that had been forfeited by ineffective state habeas counsel.  Unsuccessful in clearing the

heightened hurdles facing any successive litigant in the state courts, Mr. Foster petitioned this Court for a

writ of certiorari. The Court stayed that first scheduled execution – and two more - in conjunction with

appeals revolving around Mr. Foster's assertion that he had a right to the effective assistance of state

habeas counsel, and, barring that, that such ineffectiveness should serve as cause to excuse procedural

default in the federal courts. [1]

This, of course, was the issue addressed in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012).  After

*Martinez* was decided, Mr. Foster returned to the district court, seeking relief from the previous judgment

rejecting his unexhausted (as a result of ineffective state habeas counsel) claims on the basis of the

*Martinez* decision.  The district court denied Mr. Foster's Motion and a Certificate of Appealability, finding

---

[1] This is Mr. Foster's fourth scheduled execution in the span of a year.  He was previously scheduled for execution on January 11, 2011, April 5, 2011, and September 20, 2011.  Each was stayed by this Court.

both that *Martinez* does not apply in Texas, citing *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. 2012), and that

*Martinez* does not constitute the "extraordinary circumstances" necessary to warrant relief from judgment,

citing *Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012).  In so doing, the district court made pivotal factual and

legal errors regarding the presentation and resolution of the underlying claims.  On appeal, the Fifth Circuit

affirmed the judgment of the district court and denied Mr. Foster's request for a stay of execution, relying on

*Ibarra* and *Adams*.  *Foster v. Thaler*, No. 12-70026 (5th Cir. Sept. 21, 2012).  Mr. Foster is thus before this

Court again, still seeking merits review of his claims of ineffective assistance of trial counsel and innocence.

### STATEMENT OF THE CASE

### I.   PRIOR PROCEEDINGS

Cleve Foster was convicted and sentenced to death for the murder of Nyanuer "Mary" Pal in

February 2004.  The conviction and sentence were affirmed on direct appeal.  *Foster v. State*, 2006 WL

947681 (Tex. Crim. App.).  This Court denied *certiorari*.  *Foster v. Texas*, 549 U.S. 1118 (2007).

An attorney was appointed to represent Mr. Foster in his state habeas proceedings.  After the filing

of the petition and state's response, the trial court adopted verbatim the State's proposed findings of fact

and conclusions of law, and the Texas Court of Criminal Appeals (CCA) adopted the trial court's

recommendation in a boilerplate order.  *Ex parte Foster*, No. 65,799-01 (Tex. Crim. App. Mar. 21, 2007).

Mr. Foster, represented by new counsel, challenged his conviction in federal court pursuant to 28

U.S.C. § 2254.  The district court denied the petition.  *Foster v. Quarterman*, 2008 WL 5083078 (N.D. Tex.).

The Fifth Circuit denied his Application for a Certificate of Appealability, *Foster v. Thaler*, 2010 WL 924885

(C.A.5 Tex.), and his Petition for Writ of Certiorari was denied.  *Foster v. Texas*, 2010 WL 3698830 (Dec.

13, 2010).

In December, 2010, under shadow of a January 11, 2011 execution date, Mr. Foster was able to

obtain the *pro bono* services of a blood spatter expert who provided an affidavit supporting his claim of

innocence. Mr. Foster thus filed a subsequent state habeas application, asserting claims of ineffective

assistance of trial counsel (for failing to retain the services of a blood spatter expert), and innocence (as integral to the ineffectiveness claim, and to support Foster's argument that consideration of his successive petition was warranted pursuant to Tex. Code Crim. Pro. Art. 11.071 §5). Mr. Foster also outlined the deficiencies of appointed state habeas counsel that prevented these claims from being presented earlier.

The CCA dismissed his Application, with two judges dissenting. *Ex parte Foster*, No. WR 65,799-02 (Tex. Crim. App. Dec. 30, 2010). Mr. Foster filed a petition for a writ of certiorari off that denial, raising the question of whether there is a limited right to constitutionally effective state habeas counsel with respect to claims, such as ineffective assistance of trial counsel, that can only be raised for the first time in state habeas proceedings. This Court stayed Mr. Foster's scheduled execution pending disposition of his petition. *Foster v. Texas*, 131 S.Ct 991 (2011). On January 18, 2011 this Court denied *certiorari* and lifted the stay. *Foster v. Texas*, 131 S.Ct. 1034 (2011). On January 28, 2011, the trial court scheduled Mr. Foster for execution on April 5, 2011.

On March 21, 2011, this Court granted *certiorari* in *Maples v. Maples,* 2011 WL 940889 (U.S.). In light of that grant, on April 1, 2011, Mr. Foster filed with this Court an out of time Petition for Rehearing of Order of Denial of Certiorari, a Motion for Leave to File Out of Time, and a Motion for Stay of Execution. On April 5, 2011, the Court granted the Motion for Leave to File, and again stayed Mr. Foster's scheduled execution. *Foster v. Texas*, 131 S.Ct. 1848 (2011). On May 31, 2011, the Court denied Mr. Foster's Petition for Out of Time Rehearing, and lifted the stay of execution. *Foster v. Texas*, 131 S.Ct. 2951 (2011). The trial court set Mr. Foster for execution on September 20, 2011.

On June 6, 2011, this Court granted *certiorari* in *Martinez v. Ryan*. On September 2, 2011, Mr. Foster filed a subsequent application in the CCA, again raising claims of ineffective assistance of trial counsel for failure to present evidence of innocence (relying on an affidavit from a second blood spatter expert, an affidavit from trial counsel stating that this failure was not the result of strategy, and affidavits from three inmates to whom Sheldon Ward had made statements exonerating Mr. Foster), and ineffective

4

assistance of state habeas counsel for failing to raise the trial ineffectiveness claim. The CCA dismissed that application on September 12, 2011, again with two judges dissenting. Mr. Foster filed a petition for a writ of certiorari off that denial, and on September 20, 2011, this Court again stayed Mr. Foster's scheduled execution. *Foster v. Texas*, 132 S.Ct. 69 (2011).

On March 20 2012, *Martinez v. Ryan* issued. On March 26, 2012, this Court denied certiorari in Mr. Foster's case and lifted the stay of execution. *Foster v. Texas*, 132 S.Ct. 1821 (2012).

On June 1, 2012, Mr. Foster filed a Motion for Relief from Judgment in the district court, asking that the court reopen its prior judgment in light of *Martinez*. *Foster*, No. 4:07-cv-000210, Docket No. 71. On June 14, 2012, the state trial court set Mr. Foster's scheduled execution for September 25, 2012. On June 28, 2012, the Fifth Circuit issued *Ibarra*, *supra*, holding that *Martinez* does not apply to Texas. In the wake of that decision, on July 9, 2012, Mr. Foster filed a "Notice of Recent Relevant Authority and Request for Certificate of Appealability," conceding that *Ibarra* was controlling on the district court. *Foster*, No. 4:07-cv-000210, Docket No. 80. On August 13, 2012, the district court entered an order denying Mr. Foster's Motion for Relief from Judgment and denying a Certificate of Appealability. *Id.*, Docket No. 83. On September 17, 2012, Mr. Foster filed with the Fifth Circuit an Application for a Certificate of Appealability, and a Motion for Stay of Execution. The Fifth Circuit denied both requests on September 21, 2012. *Foster v. Thaler*, No. 12-70026 (5th Cir. Sept. 21, 2012).

## II.  FACTS MATERIAL TO THE QUESTIONS PRESENTED

### A.  The Trial:  The Law of Parties and Circumstantial Evidence.

Cleve Foster and his friend / roommate Sheldon Ward, were regulars at the Fat Albert's bar and pool hall in Fort Worth, Texas. RR 17:22.[2] On February 13, 2002, they arrived at Fat Albert's around seven in the evening. RR 17:23. A few hours later, another semi-regular customer, Mary Pal, arrived. RR

---

[2] "RR" represents the Reporter's Record from the trial followed by the volume and page number. "CR" represents the Clerk's Record, followed by a page number.

17:24.  Ms. Pal did not know Mr. Foster and Ward, but that night all three shared a pool table.  RR 17:24.

As the night wore on, Ward became friendlier with Ms. Pal: the two danced and the bartender remembers

that Ward touched Ms. Pal's buttocks with his hand.  RR 17:27, 42  Mr. Foster and Ms. Pal never danced

and most of the interaction was between Ward and Ms. Pal.  RR 17:27;38.  At closing time, Ms. Pal, Mr.

Foster and Ward all left at the same time.  RR 17:27.  Ms. Pal stood outside her car talking for a few

moments to Mr. Foster and Ward as they sat inside Mr. Foster's truck, and after a few moments, Ms. Pal

got in her car and drove west with Mr. Foster and Ward following.  RR 17:30.

Early the next morning, construction workers discovered Ms. Pal's naked body in a secluded area.

(RR 17:103)  She had died of a gunshot wound to the head, made at close range.  RR 17:133; 18:13.

DNA testing revealed Ward's semen in Ms. Pal's anus and on her thigh.  Mr. Foster's semen was

found in Ms. Pal's vagina.  RR 17:187-88.  There was no evidence of force or bruising, sexual or otherwise.

RR 18: 25-28.  There was a stain on the passenger seat of Mr. Foster's truck that could not be excluded as

belonging to Ward or Ms. Pal, but was excluded as belonging to Mr. Foster.  RR 17:196.  Police found a

gun registered to Ward in a drawer in the motel room shared by Ward and Mr. Foster.  RR 17:56; RR

DX#2)  Ms. Pal's blood was discovered on the muzzle of that gun.  RR 17:182.

After Ward submitted to the DNA testing that revealed his semen in and on Ms. Pal, he attempted

to flee, with the help of his friend Duane Thomas, to whom he confessed.  RR 17:187-88.  When Thomas

turned Ward in, the police discovered Ward's bloody clothes in his car. RR 17:152.  No bloody clothes

belonging to Mr. Foster were ever found.

In April, 2003, Sheldon Ward was tried, convicted, and sentenced to death as the person who

assaulted and shot Ms. Pal.  In closing arguments at Mr. Ward's trial, the state asserted that "*There's no

evidence that Cleve Foster had anything to do with [Mary Pal's murder] other than he was in the truck when*

6

*they left.".  State v. Sheldon Ward*, No. 0835934A (CDC #1 of Tarrant County, Texas).  RR 22:45.[3]

At Mr. Foster's 2004 trial, the state relied heavily on the argument that Ms. Pal had not been shot where she was found, that Sheldon Ward could not have carried her there alone, and, thus, *a fortiori*, Mr. Foster helped him – thus implicating him as a party.  In support of this theory, the state relied on the testimony of two witnesses, neither of whom was qualified to offer expert opinions on the matter.  First, the state elicited testimony from Tarrant County Chief Medical Examiner Nizam Peerwani who was not an expert in either blood spatter or crime scene analysis.  RR 18:6.   Nevertheless, he was asked to opine, based on the blood spatter at the scene, whether Ms. Pal was shot where she was found.

Q:  If Ms. Pal had been found in the place she was shot, in other words lying on – if she had been lying on some dry leaves, dead leaves, and had also been shot there, what kind of matter or blood would you expect to find around these wounds?
A:  This was, in fact, a rather devastating gunshot wound, and the bullet had passed through the brain stem and blood vessels, so there would be a profuse amount of blood there, *I would suspect*.
Q:  And would the path of the bullet have also expelled brain matter in the area or do you have an opinion about that?
A:  Yes.  Certainly there's a possibility but one can't say with certainty . . .

RR18:14.  The second witness the state relied upon was the lead detective on the case was John McCaskill (also not a blood spatter expert):

Q:  And being at the crime scene and examining the crime scene photographs, do you have an opinion as to whether or not Nyaneur Pal was shot as she lay in that location?
A:  No sir, I don't believe that she was.
Q:  Can you tell the jury why.
A:  Well, we typically would have seen a lot of blood splatter [sic.] around the area. [4]  Because it was what appeared to be a close contact wound, there's what's referred to as blow back.[5]  A shot that's fired from a centerfire handgun, a large caliber handgun, has quite a bit of actual muzzle blast, and it creates – the blast itself causes quite a bit of damage which will cause flesh and bodily fluids to come back out.  And we would normally see that on the area, possibly the ground around there or on her body itself.  And we did not see that in this case.

.   .   .

Q:  Is there anything of significance to you about how her body was lying?

---

[3] Not surprisingly, Mr. Foster was not mentioned in the appellate opinion affirming Ward's conviction.  *Ward v. State*, 2007 WL 1492080 (Tex. Crim. App. May 23, 2007).

[4] McCaskill's reference to it as "blood splatter" rather than "blood spatter" evinces his lack of expertise.  RR 17:137.

[5] Of course, the "blowback" scenario is the opposite of the "oozing" scenario about which Dr. Peerwani speculated.

A:  Yes, sir.
Q:  Tell us what that is.
A:  In particular, I considered her right arm right here, and the way she was lying with that arm up, I considered the possibility that two people might have carried her out there.  One person carrying the feet, the other person carrying the arms, and they might have just dropped her in that position.

RR 17:137; 140. [6]

### B.  Co-defendant Ward's Four Statements Exonerating Mr. Foster. [7]

Sheldon Ward has confessed to the murder of Ms. Pal four times.  Not one of those statements implicates Mr. Foster; one explicitly exonerates him.  There are inconsistencies in Ward's statements - as to whether Mr. Foster was with him when he originally picked Ms. Pal up from her apartment complex, or whether he remembered actually shooting Ms. Pal but only standing over her dead body – but *all* the statements make clear that Ward alone murdered Ms. Pal and that Mr. Foster neither assisted him nor anticipated the murder would take place.

### 1.  Statement One (*not* introduced at trial).

Ward's first confession came in the form of a handwritten note to Mr. Foster.  The note read:

Duke,
Hey man.  I'm sorry you had to be involved in this.  I fucked up & I can't let you take the fall for this.  I drugged you the other night with your own sleeping pills & took your truck.  Just to prove you were out cold I had Mary ride you while you slept.  I hope nothing bad happens to you.  My hope is that the law will see this too.  I can't take this any longer.  I hope you don't lose your truck but if you do take my car.  I won't be needing it where I'm going.  So long friend you've done so much for me that I can't begin to thank you, but, well:

---

[6] This is hardly "expert" testimony.  Ms. Pal's body could have ended up in the position in which she was found for numerous reasons.  Det. McCaskill merely fashioned one scenario that appeared to implicate Mr. Foster.  However, without the assistance of an expert, trial counsel were unprepared to cross-examine Dr. Peerwani or Detective McCaskill about the spatter patterns.  A weak cross-examination without even the benefit of consulting with an expert to prepare the cross-examination is hardly a substitute for expert testimony.  *See, e.g., Gersten v. Senkowski*, 426 F.3d 588 (2d Cir 2005); *Conklin v. Schofield*, 366 F.3d 1191, 1212-13 (11th Cir. 2004) ("A concession in cross-examination . . . cannot substitute for the presence of another, equally qualified expert who would have directly testified to the plausibility of Conklin's version of events."); *United States. v. Barnette*, 211 F.3d 803, 825 (4th Cir. 2004) ("[C]ross examination is poor substitution for a live expert witness.").

[7] Fifth, sixth, and seventh statements were recently provided in a letter and two declarations from inmates to whom Sheldon Ward repeated his statements that Mr. Foster was not responsible for Ms. Pal's death.  *See Ex parte Foster*, Tex. Crim. App., No. WR-65,799-03, Second Subsequent Application (Sept, 2, 2011), Appendix 2.

THANK YOU!
        P.S. Take my check for all the trouble I've caused!
                Your Bro
                /s/ Sheldon

To whom it may concern,        2:30AM 2/22/02

I, Sheldon Ward, confess to the murder of Mary. I acted alone without any outside help or motivation. I am truly sorry for what I've done. I never meant for anyone to get hurt.
                /s/ Sheldon Aaron Ward

RR DX-PT #1 (admitted for record purposes only). Significantly, although this note explained why Mr. Foster's semen was found in the victim's vagina, Mr. Foster's trial attorneys never presented it to the jury.

### 2.   Statement Two (introduced through Thomas' testimony)

After Ward left the handwritten note, his friend Duane Thomas picked him up at the motel where he and Mr. Foster shared a room. Thomas drove Ward toward Thomas' home, and on the way Ward confessed for a second time. Ward told Thomas that "he had been doing drugs and drinking and that *he* had followed a girl home from a bar…forced her into a truck at gunpoint and made her get into the floorboard…taken her out someplace and raped her and then drove down some old country road and stripped her down naked and blew her brains out." There was not a single mention of Mr. Foster. After hearing Ward's confession Thomas stopped at a gas station and called the police. *See* RR 18:53-58.

### 3.   Statement Three (introduced at trial).

Ward gave his third confession to Detective Johnson shortly after his arrest. RR DX #3. According to that statement, while he and Mr. Foster were at Fat Albert's bar, Ward and Ms. Pal made arrangements to meet up after the bar closed. Ward rode from the bar to the motel room with Mr. Foster, left Mr. Foster there, and drove Mr. Foster's truck alone to Ms. Pal's apartment. Ward and Ms. Pal had sex in the truck then went to the motel room and had sex again. Ward then explained that the next thing he remembered, he was standing over Ms. Pal's dead body, looked down, and saw the gun in his hands. He panicked, took Ms. Pal's clothes off, left her body, and later dumped her clothes in an unknown dumpster. Ward told

9

Detective Johnson that the clothes he was wearing were spotted with blood and he had placed them in his car. Ward's confession to Detective Johnson only used the singular "I" and never "we."[8]   Indeed, when Detective Johnson asked about Mr. Foster, Ward, not appearing to understand the question, simply stated that he left a note for Mr. Foster apologizing for the trouble. *Id.*

### 4.   Statement Four (made after trial).

From death row, Ward confessed again. In this fourth and final confession, dated May 22, 2005, Ward explicitly exonerated Mr. Foster:

> I, Sheldon A. Ward, #999454, do here state that on the night of Feb 13 / morning of Feb 14, 2002 [sic] left Fat Albert's with Cleve Foster in his truck and picked up Mary at her apartment. We then went to my and Foster's hotel room where we (Mary and I, Mary and Foster) had consentual [sic] sexual intercourse. There was no kidnapping, no rape. Foster did go to sleep sometime later, and if I used his truck later that morning he was not aware of it. Aside from his medications we were all very drunk and he was clearly passed out.
> /s/ Sheldon A. Ward

*See Foster*, No. 4:07-cv-000210, Docket No. 30, Appendix F.

### C.  The Motion for an Instructed Verdict.

At the close of the evidence defense counsel moved for an instructed verdict, pointing to the statements Ward made exonerating Mr. Foster, and the dearth of actual evidence implicating Mr. Foster. RR 18:61-62. The trial judge was openly skeptical of the worth of the state's evidence. For instance, when the state argued that the "only" thing Ward left out of his statement to Duane Thomas was "that Cleve was with him" the Court asked: "Well, I mean, that's pretty much a big thing, don't you think, counsel? He [Sheldon Ward] never says – there's not a single statement where he ever says that somebody else did this with him." RR 18:63. The state argued that the stories were inconsistent, and that "at no point did he

---

[8] During summations at Ward's trial, the state focused on this aspect of his confession: "*There's no evidence that Cleve Foster had anything to do with this other than he was in the truck when they left.* I suspect he did. But when Sheldon was talking to Duane, he didn't say anything about Cleve, did he? It was I. I. My gun and what I did." *State v. Sheldon Ward*, No. 0835934A (CDC #1 of Tarrant County, Texas), RR 22:45.

[Ward] say Cleve wasn't with me. . . ." *Id.* The following colloquy then occurred between the court and the state:

> Court: How do you get him a party to a murder?
>
> Mr. Leonard: Because the inference is that he was there. All the evidence points to the fact that he had to be there if –
>
> Court: No it doesn't. It points to the fact that he had sex. There is not any evidence that points to the fact that he was there. . . . Talk to me about the killing. What is there that puts this defendant at the killing or makes him a party to the murder.
>
> Mr. Leonard: What makes him a party to murder is that the gun was found right there equally in his possession, the weapon that was used to kill.
>
> Court: That doesn't make him a party to the murder.
>
> Mr. Leonard: And he was with Sheldon Ward on the night that the murder occurred and there is no evidence –
>
> Court: Mere presence is not sufficient to make one a party.
>
> Mr. Leonard: I understand that, Judge.
>
> Court: I mean, I'm not there. You know. I need to understand this because I don't see it
> . . . .
> Court: I want to understand from you why you believe this defendant is connected to the murder.
>
> Mr. Leonard: Because there's no – because the evidence is just as – the evidence shows just as much that he was with Sheldon Ward from the time they left the bar to the time that Mary Pal was killed.
>
> Court: No, it doesn't. Because he says a million times he did it by himself.

RR 18:66-68. The discussion continued in this vein, with the state arguing that there was evidence that Mr. Foster raped Ms. Pal, and the court conveying continued skepticism. RR 18:67-74. When the court asked "what else" there was, the prosecutor honed in on the state's theory that it was impossible for Ward to have acted alone because Ms. Pal was not killed where her body was found:

> Detective McCaskill gave an opinion. That it looks like two people carried her body and threw her down. That's the evidence in front of the jury. And if Sheldon Ward weighs approximately 155 pounds, Mary Pal weights 147 pounds, this defendant is much larger and much bigger than both of them.

11

(RR 18:75).  The court continued to express skepticism, but denied the motion for an instructed verdict.

### D.  The Motion for New Trial and Direct Appeal

Appellate counsel was appointed to represent Mr. Foster on the day of the punishment phase

verdict.  *State v. Cleve Foster*, No. 0839040 (CDC #1 of Tarrant County, Texas), CR at 356.  Two weeks

later that (direct appeal) counsel filed a motion for new trial. [9]  *Id.*, CR at 385-6.  The Motion was two pages

long, and asserted only that the "verdict was contrary to the law and the evidence because the evidence

presented at trial was factually insufficient to sustain a verdict of guilty. . . ."  It also noted that the defendant

did not request a hearing, that the motion could be ruled on without any "additional testimony" and asked

that it be ruled on as a matter of law.  *Id*.  The motion did *not* assert that a new trial was required due to

ineffective assistance of counsel at trial.

### E.  Mr. Foster Repeatedly and Diligently Expressed his Concerns about the Quality of his Appointed Attorney, and the Claims that were not being Raised.

Mr. Foster repeatedly tried to reach out to state habeas counsel and the courts to express his

concerns about the quality of the representation being provided.  Those letters reveal that counsel failed

altogether to communicate with Mr. Foster, or incorporate the concerns Mr. Foster expressed about his

case.  Thus, in a letter to the trial judge Mr. Foster wrote:

> Judge Wilson, please allow me to add the following.
>      I have been housed here at TCCC for 248 days today and I come to you for help.  My
> attorney that has been apointed [sic] to me has yet to come and acquaint himself with my case.
>      I have sent him letters to his office asking him to come see me, my family has written him,
> emailed him, called him, and as of yet, nothing!

*See Foster*, No. 4:07-cv-000210, Docket No. 71, Appendix 1.A.  When there was no response, Mr. Foster

wrote to the CCA:

> I am writing to notify you that I have instructed both of my court appointed attorneys, David L.
> Richards and Robert Ford not to file any documents with the court without my prior approval and

---

[9] Thirteen days after the trial concluded was of course long before a record was available for review.

> signature to ensure that my attorneys are representing my best interests and lawful objectives
> since they both refuse or neflect to answer any of the numerous letters I have sent, asking them for
> information regarding the issue I wish to be raised and preserved in the filing of my appeals.

*Id.,* Appendix 1.B (letter of August 13, 2006).  When that letter produced no results, Mr. Foster wrote again

to the trial judge:

> I come to you again and ask that the following evidence be reviewed and considered
> before you make any ruling, I would appreciate these facts be added to the facts of my case prior
> to your ruling.
> Your Honor I'm no attorney and I've no idea how to get my court appointed to address
> these issue witch [sic] I feel are facts and to have them put in my WRIT so, I'm asking for your
> wisdom and guidance on how to get the following issues raised.

*Id.,* Appendix 1.C (letter of November 16, 2006).

None of these pleas had any effect.  It was thus no surprise that Foster was adamant that he did

not want state habeas counsel to represent him in federal court.  He expressed these sentiments in a letter

to the clerk of the federal district court:

> I do not yet know which Federal Judge has been assigned to my federal appeal "capital case" so I
> pray that addressing this accordingly will be allowed.  I would ask that State Habeas Attorney
> Robert Ford in no way be connected to my federal appeals.  He neglected to keep properly keep
> me informed, I asked him repeatedly to investigate issues and he did not, he refused to answer my
> questions and after having asked him numerous times to allow me the chance to view my WRIT
> before submitting it, it was filed without my knowledge.  At this time I pray that my request be
> granted.  Thank you.

*Id.,* Appendix 1.D (Letter of March 26, 2007).  To his appointed state habeas attorney Mr. Foster wrote

> Due to your lack of attention to detail and poor communication with me and your willingness or the
> lack there of to properly investigate my alications [sic], I'm letting you know as of this date
> mentioned above I do not want you to have anything to do with my federal appeals. . . . This is my
> life Mr. Ford and I feel you treated me like a dog.  So please, I ask that you not try and be assigned
> to my appeals at a federal level.

*Id.,* Appendix 1.E. (letter of Mar. 26, 2007).  Mr. Foster did everything within his power to request, convince

and compel his appointed state counsel to perform diligently and competently.  These efforts – not for lack

of trying – were unavailing.

F.  **The Federal Habeas Proceedings**

1.  **Federal counsels' efforts to investigate and raise Mr. Foster's substantial claim of ineffective trial counsel and related claim of innocence.**

In federal district court Mr. Foster finally received new counsel – including the undersigned (F. Clinton Broden) – who identified and attempted to investigate and raise the claims that trial counsel were ineffective in failing to fully present to the jury evidence of Mr. Foster's innocence.  Unfortunately, these efforts were thwarted by the state's opposition and the legacy of ineffective state collateral counsel.

On September 14, 2007, counsel asked for funds for investigative assistance, noting the consistent assertions of innocence and Ward's multiple exonerating statements.  *See Foster*, No. 4:07-cv-000210 Docket No. 15.  That motion was granted, "for an amount not to exceed $1000.00.  *Id.*, No. 16.

On December 4, 2007, defense counsel sought limited discovery, asking to depose a witness who might have been able to establish that Mr. Foster was not at the scene of Ms. Pal's murder.  *Id.*, Docket No. 17.  The state opposed the request, asserting: "claims of actual innocence are not cognizeable on federal habeas review" and that although "Foster raised claims of actual innocence and ineffective assistance of counsel in his state habeas application, [he] did not premise them on the facts alleged in his request. Therefore, his claims are unexhausted and procedurally barred from federal habeas review."  *Id.*, Docket No. 18 at 7, 9.  The motion for limited discovery was denied.  *Id.,* Docket No. 21.

Defense counsel subsequently sought leave to file an application for additional investigative funds *ex parte*.  The state opposed the request, again asserting that the claims Foster sought to investigate - 'issues relating to claims of innocence and ineffective assistance of counsel for failure to properly investigate,' would not be cognizable, and would be procedurally barred.  *Id.*, Docket No. 22 at 3.

Counsel were granted leave to proceed *ex parte*, and filed a request for an additional $2000.00 in funds for additional investigative assistance, and a request for blood spatter expert assistance.  *Id.*, Docket Nos. 25, 27.  In the latter request, counsel cited to the continued assertions of innocence, that Ward

committed the murder alone, and outlined the state's argument at trial that Mr. Foster participated in the murder by helping Ward carry Ms. Pal's body to the field where she was found.  The request noted that the state had argued that the lack of blood spatter at the scene supported their argument, and noted that the crime scene pictures reflected otherwise.  *Id.*, Docket No. 25.

The district court denied both requests.  In denying the request for a blood spatter expert, the court stated: "this Court canot determine whether, if this funding were granted, it would support the presentation of a claim that is either cognizeable on federal habeas and/or potentially meritorious."  *Id.*, Docket No. 28.

### 2.  Federal habeas counsel asserted the ineffectiveness of state habeas counsel as cause for the default of the unexhausted claims.

Thus handicapped by the inadequacies of state habeas counsel and the consequences for assistance in federal court, federal counsel filed a federal petition that nonetheless raised, among others, two unexhausted claims:  a claim of innocence, and a claim of ineffective assistance of trial counsel for failing to fully litigate (through introduction of Ward's pivotal motel room) the question of his innocence.  *See Foster*, No. 4:07-cv-000210, Docket No. 30 at 16-33.  Respondent contended that these claims were unexhausted – either for failure to present to the state courts, or for the failure to present all the facts upon which the federal claims relied – and thus defaulted.  *Id.*, Docket No. 35 at 17-19; 20-21.  In Reply, Mr. Foster argued that state habeas counsel's ineffectiveness should constitute cause for the default.  *Id.*, Docket No. 40 at 3-6. The district court denied the petition.  *Foster*, 2008 WL 5083078.

Mr. Foster sought a Certificate of Appealability, including on the claims of innocence and ineffective assistance of trial counsel.  *Foster v. Thaler*, No. 09-70001 (5th Cir.), Motion for Certificate of Appealability (filed Mar. 24, 2009).  In response the State again argued that these claims, among others, were unexhausted.  *Id.*, Response in Opposition (filed May 22, 2009).  Mr. Foster's Reply asserted that "ineffective assistance of state habeas counsel" established cause for any default.  *Id.*, Reply (filed June 22, 2009).  The Fifth Circuit declined to consider this argument. *Foster v. Thaler*, 369 Fed. Appx. 598 (5th Cir.

2010).  It first mistakenly asserted that Mr. Foster had not "present[ed] the argument in the district court,"[10]

and then found that the argument was waived because it was raised "for the first time in a reply brief." *Id* at

*603, *5.  However, the court also noted that the argument presented a question that at least one Justice

considered to have been "left open" by *Coleman v. Thompson*, 501 U.S. 722 (1991).

## REASONS FOR GRANTING THE WRIT

### I.   *MARTINEZ* APPLIES TO TEXAS.

#### A.   *Martinez* **is an Equitable Decision Intended to Ensure Federal Review of** *Strickland* **Claims Defaulted by Inadequate Representation in State Court**

*Martinez v. Ryan* is an equitable decision intended to "ensure that proper consideration [i]s given to

[] substantial claim[s]" of ineffective assistance of trial counsel by federal courts. 132 S.Ct. at 1318.

Recognizing that some states defer consideration of ineffective assistance of counsel or "*Strickland*" claims

until collateral proceedings, and in recognition of the "bedrock principle in our justice system" that is the

right to counsel during criminal trials, the *Martinez* Court sought to create an exception to the general rule

of *Coleman v. Thompson* that ineffective assistance of counsel during a stage of the proceedings at which

a prisoner does not have a Sixth and/or Fourteenth Amendment right to counsel cannot serve as cause for

default. *Martinez*, 132 S.Ct. at 1315. The decision accordingly sought to empower federal courts to reach

the merits of defaulted *Strickland* claims where the default was a consequence of no or inadequate

assistance of counsel during the stage of state court proceedings designated as the first appropriate forum

to adjudicate the claim.  *Martinez* thus held that when a state court initial-review collateral proceeding is the

first proceeding designated by a state to adjudicate a *Strickland* claim, a prisoner may establish cause for

default of such claim where counsel in the initial-review collateral proceeding was ineffective under the

standards of *Strickland v. Washington*, 466 U.S. 668 (1984). 132 S.Ct. at 1318. Collateral proceedings

---

[10] The court recognized its error in its Order denying Mr. Foster's Motion for Rehearing.  *See Foster v. Thaler*, 607 F.3d 391, 392 (5th Cir. 2010).

which provide the first occasion to adjudicate a *Strickland* claim are "initial-review collateral proceedings." *Id.* at 1315.

**B. Texts Designates the Article 11.071 Proceeding as that in which *Strickland* Claims that are not Firmly Founded in the Appellate Record are to be First Adjudicated**

Pursuant to Texas' dual-track review procedure, after a judgment imposing death is entered, the trial court must appoint two lawyers to represent an indigent defendant: appellate counsel and Article 11.071 counsel. TEX. CODE CRIM. PROC. art. 26.05(j), art. 11.071 § 2(b). The trial court is prohibited from appointing an attorney as appellate counsel if the attorney represented the defendant at trial, except in limited circumstances. TEX. CODE CRIM. PROC. art. 26.052(k). Only indigent persons sentenced to death are afforded the statutory right to collateral counsel for habeas corpus proceedings.

Texas law also requires that a motion for a new trial, if any, be filed within 30 days of the date that judgment is entered. TEX. R. APP. PROC. 21.4. Post-trial appointments of appellate and Article 11.071 counsel do not always occur immediately. If after trial a convicted defendant is not yet represented by appellate counsel, it is trial counsel's duty to advise the defendant of his or her right to file a motion for new trial and a notice of appeal and, if replacement counsel is not appointed promptly and the defendant wishes to pursue an appeal, file a timely notice of appeal. TEX. CODE CRIM. PROC. art. 26.04(j)(3).

In view of the separate and concurrent roles that state law assigns to appellate and Article 11.071 counsel, the CCA has designated Article 11.071 proceedings as the first proceeding for a death-sentenced prisoner to adjudicate extra-record *Strickland* claims. *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007); *Mitchell v. State*, 68 S.W.3d 640, 643 (Tex. Crim. App. 2002); *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000); *Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1980); *Sprouse v. State*, 2007 WL 1839481 (Tex.Crim.App.); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999). *See also Ibarra*, 687 F.3d at 229 (Graves, J., concurring in part and dissenting in part);

*Balentine v. Thaler*, No. 12-70023, Order on Rehearing *en banc*, slip op. at 5 (Dennis, J., dissenting) (5th Cir. Aug. 21, 2012) ("capitally sentenced prisoners are virtually required to first raise a claim of ineffective assistance of trial counsel during collateral proceedings")

There is a narrow exception to the CCA's rule for *Strickland* claims alleging deficiencies that are "firmly founded in the [appellate] record" which may be adjudicated on direct appeal. *Thompson*, 9 SW 3d at 814. For the "vast majority" of cases, the Article 11.071 proceeding is the designated proceeding for a capital prisoner to adjudicate *Strickland* claims. *Id.* at 814; *Robinson*, 16 S.W.3d at 813 n.7; *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. BAR J. 966, 977 (2006) ("SBOT Guidelines"); State Bar of Texas Task Force on Habeas Counsel Training and Qualification, *Task Force Report* at 3 (Apr. 27, 2007).

*Martinez's* rationale for permitting cause for default of *Strickland* claims to be established by inadequate representation in the initial-review collateral proceeding applies to Texas prisoners whose *Strickland* claims are based on extra-record evidence. The *Martinez* Court recognized that where the collateral proceeding is the first designated proceeding for a prisoner to raise a *Strickland* claim, the proceeding is similar to a prisoner's direct appeal with respect to that claim because (1) the state habeas court looks to the merits of the claim, (2) no other court has addressed the claim, and (3) defendants pursuing first-tier review are generally ill equipped to represent themselves because they do not have a brief from counsel or an opinion of the court addressing their claim. *Martinez*, 132 S.Ct. at 1317.

First, Texas courts address the merits of all extra-record *Strickland* claims raised in Article 11.071 proceedings. No extra-record *Strickland* claim raised in an Article 11.071 proceeding is considered defaulted for not having been raised on direct appeal nor barred by *res judicata* if it was raised on direct appeal. *See Duffy*, 607 S.W.2d at 512; *Torres*, 943 S.W.2d at 475.

Second, Texas courts will not have addressed the merits of the claim prior to the Article 11.071 proceeding. While Texas's rule against raising *Strickland* claims on direct appeal admits of an exception, when such claims are nevertheless raised there, the CCA will not adjudicate them except in the "rare case"

18

where the allegations of deficient performance are "firmly founded in the [appellate] record" and the deficiency is "so outrageous that no competent attorney would have engaged in it." *Robinson*, 16 S.W.3d at 813 n.7; *Thompson*, 9 S.W.3d at 814. Otherwise, Texas courts do "not decid[e] on [] direct appeal [whether] appellant did or did not receive the effective assistance of counsel during trial." *Thompson*, 9 S.W.3d at 813, 814; *Rylander v. State*, 101 S.W.3d 107, 111 n.1 (Tex. Crim. App. 2003).  Instead, "the proper procedure will be for the appellate court to overrule an appellant's Sixth Amendment claim without prejudice to appellant's ability to dispute counsel's effectiveness collaterally." *Robinson*, 16 S.W.3d at 813 n.7.

Third, Texas prisoners pursuing first-tier collateral review are ill-equipped to represent themselves with respect to *Strickland* claims, and lack a brief from prior counsel or a court opinion addressing the claim. The rare brief raising a *Strickland* claim on direct appeal will necessarily be limited to alleged deficiencies appearing in the record and will not – cannot - contemplate extra-record evidence of deficient performance nor of prejudice. *See Torres*, 943 S.W.2d at 475; *Thompson*, 9 S.W.3d at 813. Thus, CCA opinions disposing of such claims on direct appeal simply note the inadequacy of the record. *See, e.g., Thompson*, 9 S.W.3d at 814; *Rylander*, 101 S.W.3d at 111 n.1 (Tex. Crim. App. 2003).

Accordingly, for *Strickland* claims raised in Texas capital cases that assert errors outside the record, the Article 11.071 proceeding is the initial review proceeding within the meaning of *Martinez*.

### C. *Ibarra v. Thaler* Contravenes *Martinez*

In *Ibarra*, *supra*, the Fifth Circuit held that *Martinez* has no applicability to federal habeas corpus cases arising from Texas.  The *Ibarra* panel, over the dissent of one Judge, reasoned that "Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings, and they do not by law deprive Texas defendants of counsel-and-court-driven guidance in pursuing ineffectiveness claims." *Id.*, 687 F.3d at 227.  *Ibarra* relied on the CCA's *Thompson* decision for the proposition that "the TCCA sometimes reach[es] the merits of ineffectiveness claims on direct appeal," even though in *Thompson* the CCA explicitly held that it was **not** deciding the merits of the *Strickland* claim

19

in the appeal. *Thompson*, 9 S.W.3d at 814. *Ibarra* further observed that "[w]here [the Texas courts] do not

[adjudicate the *Strickland* claim on direct appeal], Texas habeas procedures remain open..." *Ibarra*, 687

F.3d at 287.  Accordingly, *Ibarra* itself recognized the existence of a class of *Strickland* claims that the CCA

does not adjudicate on appeal and for which the Article 11.071 proceeding must be the initial review

proceeding.

   *Ibarra* eviscerates *Martinez*' attempt to ensure federal review of *Strickland* claims that are defaulted

in state court due to inadequate assistance of counsel.  During the time at which a capitally sentenced

Texas prisoner has a constitutional right to effective assistance of counsel–trial and direct appeal–such

counsel have no state law duty to raise *Strickland* claims. In fact, appellate counsel is affirmatively

dissuaded by Texas law from doing so. Like a state that strictly prohibits *Strickland* claims from being

raised on appeal, a failure to raise a *Strickland* claim on appeal in Texas does not create a procedural

default in federal court because Texas courts permit *all* extra-record *Strickland* claims to be adjudicated on

the merits in an Article 11.071 proceeding. Because Texas courts dissuade appellate counsel from raising

*Strickland* claims on direct appeal and because Texas law clearly places the duty to investigate and raise

*Strickland* claims on Article 11.071 counsel, appellate counsel in Texas capital cases can never be

ineffective for deferring *Strickland* claims to collateral review. *Sprouse v. State*, 2007 WL 1839481

(Tex.Crim.App).  Because no procedural default is created when appellate counsel defers *Strickland* claims

to Article 11.071 counsel, *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986), can afford no relief to a capitally

sentenced Texas prisoner whose appellate counsel **properly** forgoes raising a *Strickland* claim on appeal.

   Such prisoners are therefore equitably situated identically to prisoners with defaulted *Strickland*

claims whose cases arise in states that have absolute bars against raising *Strickland* claims on appeal. In

both instances, it is the state *habeas* court that looks to the merits of the claim; no other court will have

examined it; and prisoners pursuing first-tier review lack briefs or opinions addressing it. For both prisoners,

the procedural default applied in federal court occurs in the state collateral proceeding–the proceeding

designated by both as the first-tier review proceeding for *Strickland* claims. Both therefore equally require the equitable benefit of *Martinez* to "ensure that proper consideration [i]s given to [] substantial claim[s]" of ineffective assistance of trial counsel by federal reviewing courts.

*Ibarra* also thwarts Texas's legitimate interests in channeling the resolution of claims to the most appropriate forum and in the integrity of its judicial procedural regime, *Coleman*, 501 U.S. at 750; *Wainwright v. Sykes*, 433 US 72, 99 (1977) (Brennan, J., dissenting), undermining Texas's procedural rules that designate the Article 11.071 proceeding as the appropriate forum in which to adjudicate extra-record *Strickland* claims. By relying on the motion for new trial as an available means by which to expand the record and adjudicate *Strickland* claims on direct appeal in state court, *Ibarra* undermines Texas's dual track review system by incentivizing appellate counsel in capital cases to try to use the motion for new trial proceeding to do just that–despite the CCA's admonitions and recognition that the motion for new trial is wholly inadequate for this task. *See Robinson*, 16 S.W.3d at 810; *Torres*, 943 S.W.2d at 475; *Jackson v. State*, 877 S.W.2d 769, 773 n.3 (Tex. Crim. App. 1994) (Baird, J., concurring). *Accord Martinez*, 132 S.Ct. at 1318. Appellate counsel's attempts to perform investigative and other duties that Texas statutorily imposes on Article 11.071 counsel would wreak havoc with and impose unnecessary costs on the state court system, which would in capital cases now be faced with competing claims of duties by different lawyers appointed at the same time.

The differences between the post-trial review mechanisms in capital and non-capital cases explains why Texas courts are more likely to see *Strickland* claims raised on direct appeal in the non-capital context, notwithstanding its admonitions against raising such claims in that posture. Unlike indigent defendants sentenced to death, indigent Texas defendants sentenced to less than death are not subject to a dual-track review mechanism and are not entitled to the appointment of counsel to represent them in collateral proceedings. Consequently, only one lawyer is appointed after conviction–appellate counsel–and appellate counsel understands that he or she is likely all that stands between the defendant obtaining relief

and the defendant serving the sentence as imposed. Appellate counsel in those circumstances may well undertake to raise a *Strickland* claim in a motion for new trial and pursue the claim on direct appeal. Doing so—while still subject to all the obstacles that the CCA has observed make it a disfavored process—would not also give rise to competing duties and duplicative undertaking with collateral counsel as it would in the capital dual-track review procedure.  In contrast, in capital cases, given the dual-track framework, it is simply not expected and indeed unworkable that appellate counsel—or anyone other than 11.071 counsel—will undertake to investigate and litigate an extra record *Strickland* claim.

Absent application of *Martinez* to capital federal habeas corpus cases arising from Texas, *Strickland* claims will continue to be defaulted notwithstanding ineffective representation in the forum designated by Texas as the proper place for their adjudication.

II.    **MR. FOSTER CAN SATISFY THE TWO-PART TEST SET FORTH IN *MARTINEZ V. RYAN* FOR ESTABLISHING CAUSE FOR THE PROCEDURAL DEFAULT OF HIS INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIM.**

A.    **Mr. Foster's Appointed State Habeas Counsel was Ineffective**

Texas imposes separate duties on appellate and Article 11.071 counsel in capital cases. While appellate counsel's role is limited to litigation of claims that can be raised and resolved on the basis of the paper record, *see Guidelines and Standards,* 69 TEX. BAR J. at 967, the Guidelines and Article 11.071 impose a statutory duty on state habeas counsel to "expeditiously" investigate upon appointment "*before and after* the appellate record is filed." Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis supplied). *See also Ex parte Reynoso,* 257 S.W.3d 715, 720 n.4 (Tex. Crim. App. 2008); SBOT Guidelines, 69 TEX. BAR J. at 977.  Thus, article 11.071 specifically provides for the possibility of  reasonable investigative and expert expenses. Tex. Code Crim. Proc. art. 11.071 § 3(d).

State habeas counsel Robert Ford was appointed to represent Mr. Foster in his state habeas proceedings on March 2, 2004.  On March 1, 2005, counsel filed a motion for appointment of an investigator, stating only that the investigator's services were needed "to assist in preparation of the

22

Applicants capital murder writ of habeas corpus. *Ex parte Foster*, No. 0839040 (CDC #1 of Tarrant County, Texas), CR at 375-376.  That motion was granted, noting that any expenses over $500 must be approved by the court. *Id*., CR at 377.  On March 25, 2005, defense counsel filed a motion for appointment of an expert witness, stating only that "the present case will involves [sic] mental health issues that are a critical element in the applicant's case." Id., CR at 378-9.  On May 24, 2005, the trial court granted the motion, appointing psychiatrist Troy Martinez, limiting the funds to $3000.

On June 24, 2005, defense counsel filed a second Motion for the Appointment of an Investigator, stating that services were needed "(1) to contact those witnesses necessary to establish the alibi of the defendant if any; (2) to establish the identity of the individual who was in fact responsible for the commission of the offense charged; and (3) to establish the evidence that in fact there was no offense at all."[11]  The Court granted the motion. *Id*. at 388-390.

On August 18, 2005, defense counsel filed a Motion for Extension of Time to file Writ, stating that "[t]he undersigned attorney has continued an aggressive record search involving mitigating evidence." *Id*. at 391-2.  On August 19, 2005, counsel filed a Supplemental Motion for Additional Payment for Investigator, which was identical to the motion filed in June, as was the order granting same (including the limitation of expenses to $500.00). *Id*., CR at 394-6.

These motions, their timing, and the lack of care taken in preparing same, evince the dearth of attention counsel was paying to Mr. Foster's habeas appeal.  From all appearances, counsel received a total of $1500 for investigative assistance.  Although the boilerplate, generic (or worse) requests on their face might make it appear that counsel was looking into questions of innocence, the bases for the request,

---

[11] Of course, these reasons cited are worse than generic, as they don't apply to the facts of Mr. Foster's case.

and the fact that the motion for extension of time pointed to the search for mitigation evidence, makes clear that was not the case[12] – despite the threadbare nature of the state's case against Mr. Foster.

On November 18, 2005, counsel filed an Application for Writ of Habeas Corpus on Mr. Foster's behalf. Two of the claims raised (claims 5 and 6) had already been raised on direct appeal – and were thus not cognizable in habeas. *See Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1998). Two others (claims 2 and 4) are boilerplate challenges to the Texas death penalty statute. The one extra-record claim filed, ineffective assistance of counsel at the punishment phase of the trial, consists primarily of lengthy quotes from outdated case law, and includes only a perfunctory summary of the evidence gathered in post-conviction. *See Ex parte Foster*, No. 083940-A, Application at pp. 14-15.

The innocence "claim" (claim 3) is five pages long. It starts with a two page discussion of the legal standard, focusing on the CCA's 1994 decision in *Ex parte Holmes*, 885 S.W.2d 389 (Tex. Cr. App. 1994). The decision in *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Cr. App. 1996), decided two years after *Holmes* (and nine years before Mr. Foster's habeas was filed), is never mentioned, despite the fact that it significantly revised *Holmes*. This section was furthermore apparently cut and pasted – without appropriate adaptation - from a pleading in another case, as it only refers to *Holmes'* applicability to Article 11.07 (vs. 11.071) applications, which govern non-capital habeas petitions. *See Ex parte Foster*, No. 083940-A, Application at pp. 22-23. The remaining three pages of the "claim" are captioned "direct appeal argument," and merely restate the sufficiency of the evidence arguments raised (and rejected) on direct appeal.[13] *Id.*, pp. 24-26. Such a claim – already raised on direct appeal - is not cognizable in habeas proceedings. *See Gardner, supra*. No extra-record evidence is attached or mentioned. Thus, the state habeas petition filed on Mr. Foster's behalf raises a hollow claim of innocence citing outdated law, a handful of boilerplate

---

[12] Indeed, the Application identifies the investigation that was performed – all focused on mitigation. *See Ex parte Foster*, No. 083940-A, (CDC #1 of Tarrant County, Texas), Application for Writ of Habeas Corpus, pp. 14-15.

[13] Indeed, the footnote to the heading (Direct Appeal Argument) states "Used with permission of [appellate counsel] David Richards."

claims, a number of claims that were raised on direct appeal and are thus not cognizeable in habeas, and one paper thin extra record claim. The petition evinces the deficient performance of habeas counsel.

Counsel appointed to represent Mr. Foster in his state habeas proceedings failed to investigate, uncover, or present any of the readily available exculpatory evidence, or raise the failure to present it as ineffective assistance of trial counsel. Given the transparently feeble nature of the state's trial case against Mr. Foster, Ward's confessions exculpating Mr. Foster, and Mr. Foster's consistent assertions of innocence, habeas counsel's failure to investigate his innocence – and how trial counsel's ineffectiveness contributed to the guilty conviction – was patently ineffective. The resulting prejudice is detailed *infra*.

### B. Mr. Foster's Underlying Ineffective Assistance of Trial Counsel Claim is Substantial[14]

To prove a constitutional violation arising from ineffective assistance of counsel, a habeas petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "any deficiencies in counsel's performance must be prejudicial" to the defendant. *Strickland*, 466 U.S. at 688. In the context of a *Martinez* showing, Mr. Foster must only show that the claim had "some merit." He does so easily.

As outlined in detail above, Mr. Foster was prosecuted under the law of parties, and has never been accused of pulling the trigger of the gun that killed Ms. Pal. The "evidence" of Mr. Foster's purported involvement in Ms. Pal's murder is entirely circumstantial, and depends on the state's argument about the inferences that should be drawn from the presence of Mr. Foster's semen inside the victim, the inconsistencies in and between his and Ward's statements, the reluctant and unqualified testimony of the state's medical examiner who was asked to speculate about the import of the blood spatter at the scene, and the testimony of a police investigator, who strays far outside his area of expertise to surmise and

---

[14] *Martinez* equates the substantiality of an underlying *Strickland* claim with the showing required for Certificate of Appealability. *Id.*, 132 S. Ct. at 1318-19 *(citing Miller-El v. Cockrell*, 537 U.S. 322 (2003))*.

speculate about the circumstances of Ms. Pal's death.  RR 18:82-86; 104-114.  Indeed, the judge presiding over Mr. Foster's trial gave serious consideration to giving an instructed verdict against the state.  *See supra*; RR 18:61-78.

The state's arguments were not tested at trial because Mr. Foster's defense lawyers failed to employ even the most minimal evidentiary arguments to get into evidence a particularly pivotal confession by Ward, and because they blindly accepted the state's argument that Ms. Pal was not killed where her body was found.  The failure to challenge these pillars of the state's thin case through the means available constituted ineffective assistance.[15]

> 1. **The Evidence Used to Convict Mr. Foster under the "Law of Parties" was Inferential and Circumstantial.**

In arguing Mr. Foster's guilt by inference, there were three arguments central to the state's case. First, the state pointed to the allegedly inconsistent statements made by Mr. Foster when he was interviewed the day the police executed the search warrants for DNA samples.  According to Detective McCaskill, during that interview Mr. Foster first told the police that Ms. Pal had not been in his truck.  RR 17:131.  However, Detective McCaskill claimed that Mr. Foster then changed his story and said Ms. Pal left Fat Albert's in his truck and all three went cruising, and they later dropped Ms. Pal off at Fat Albert's.  *Id.* Curiously, only a small portion of the interview was recorded.  During the recorded portion, Mr. Foster stated that he did not remember if Ms. Pal was in his truck nor did he remember if Ward drove his truck anytime during the preceding few weeks.  RR SX #28.  Moreover, on tape, Mr. Foster is heard adamantly explaining that, prior to the tape being turned on when he mentioned "going cruising," it was McCaskill, not him, that suggested it was with Ms. Pal and, in fact, he could not remember who he went "cruising" with. RR SX #28.  Thus, the *actual* recorded statement presented to the jury was hardly inconsistent.

---

[15] The dissenting opinion to the CCA's denial of Mr. Foster's first subsequent application notes: "I am inclined to agree with Applicant, at least on the basis of his pleading, that his trial counsel provided ineffective assistance of counsel in this regard.  *Ex parte Foster*, No. WR 65,799-02, slip op. at 1, fn. 1 (Price, J., dissenting).

Second, the state pointed to the evidence of Mr. Foster's semen in Ms. Pal's vagina and McCaskill's testimony that Mr. Foster denied having sex with Ms. Pal. However, in Ward's motel room statement (that trial counsel failed to get into evidence before the jury) Ward explained that he drugged Mr. Foster and persuaded Ms. Pal to have sex with Mr. Foster while he was unconscious. *See* RR DX-PT #1 (admitted for record purposes only). The medical examiner could not determine if the vaginal sex with Ms. Pal was non-consensual. RR 18:28. Lastly, as the trial judge pointed out, the fact that Mr. Foster and Ms. Pal may have had sex does little to establish that Mr. Foster was a party to Ms. Pal's murder.[16]

Third, the state relied heavily on the argument that Mr. Foster helped Ward move Ms. Pal's body. As this was the only argument that made Mr. Foster an actual participant in the murder, the state overreached in their attempt to find evidence that would allow them to make the argument, relying on the reluctant testimony of the medical examiner, and the unqualified speculations of a police detective. RR 18:14; 17:137. Each of these three arguments could have been effectively undermined or rebutted by competent counsel and the available evidence.

### 2.  Trial Counsel Failed to Introduce Key Pieces of Exculpatory Evidence. [17]

#### a.  Ward's Exculpatory Statement

After Ward submitted to the DNA testing and provided a written statement to the police, but before he fled with Duane Thomas, he left a handwritten note for Mr. Foster in their motel room. The note explicitly

---

[16] The state also points to the fact that the murder weapon was found in the hotel room that Mr. Foster and Ward shared. This is hardly surprising given that Ward admits to murdering Ms. Pal, he lived in the motel room and owned the gun that was registered to him. RR 17:56; RR DX#2.

In order to explain why there was no physical evidence tying Mr. Foster to Ms. Pal's murder, the state pointed to the fact that the police found various items in fluid in a cooler in the back of Mr. Foster's truck, and claim that he was trying to destroy forensic evidence with bleach. RR 17:85. Yet, the items were never seized and the liquid was never tested. Nevertheless, it had its expert testify that bleach can destroy forensic evidence and then argued in closing that the liquid "in the cooler smelled like cleaning solution *and* bleach." RR 18:84. However, the state's own witness described the liquid as a "bluish-green fluid" with a "detergent or soap-type smell. RR 17:85. There was absolutely no testimony or evidence that the untested liquid was or smelled anything like bleach.

[17] These are two items of evidence that federal habeas counsel has been able to identify without ever receiving funding for expert assistance, discovery, or adequate funds for investigation.

exonerated Mr. Foster, and provided an explanation for the fact that Mr. Foster's DNA was found inside Ms. Pal. RR DX-PT #1. During the trial, defense counsel approached the bench and requested permission to discuss the contents of Ward's note with the police officer who discovered it. RR 17:63. The court ruled that the defense could not introduce the content of the note without first laying the proper predicate, and the issue of the note was never brought up again and the jury never learned of its contents. RR 17:63.

Ward's motel room note central to Foster's claim of innocence, particularly in light of the state's arguments. It was also admissible. According to TEXAS R. EVID. 803(24) a statement against the penal interest of the declarant can be admissible. First, the statement must be against the declarant's penal interest when it was made. Second, the statement must be corroborated such that the trustworthiness is established. There is no requirement that the declarant of the statement also be the defendant. *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).

Here, the statement was unarguably against Ward's penal interest at the time it was written. Indeed, when Ward addressed the second part of the letter as "to whom it may concern," he intended the letter to serve not just as a confession to Foster but presumably to the police as well. Ward had already provided a sample of his DNA (and fled shortly thereafter), and likely knew the police would be looking for him in conjunction with the murder of Ms. Pal.

The letter was also corroborated. The confession that Ward acted alone is further corroborated by Ward's confessions to Duane Thomas and Detective Johnson. RR 18:58; DX #3. The DNA testing on the stain on the front passenger seat of the truck could not be excluded as belonging to Pal or Ward, but could be excluded as Foster's. RR 17:196. Finally, in the note Ward told Foster to take his car for the trouble he caused, which is corroborated by the fact that Ward left his car in the parking lot of the motel.

Ward's confession letter was admissible. The trial court clearly would have acted in accord because it admitted Ward's confession to Duane Thomas as well as his confession to Detective Johnson. Trial counsel were deficient in failing to introduce Ward's motel room note.

### b.  Blood Spatter Evidence

Lacking any direct evidence of Mr. Foster's involvement, the state repeatedly returned to its theory that Ward had to have help – Mr. Foster's help – moving the body.  The theory is based on the premise that the alleged lack of blood spatter at the scene where the body was found meant that Ms. Pal had been killed elsewhere, and carried – with Mr. Foster's help – to the spot where she was found.  It is pure speculation. Lacking any expert evidence to support their theory, the state asked Medical Examiner Peerwani and Detective McCaskill, neither qualified as an expert, to speculate whether Ms. Pal was shot where her body was found. RR18:13; RR 17:136-37.

At every juncture, the state pointed to the importance of this "evidence" as proof of Mr. Foster's involvement.  They did so during the colloquy about the directed verdict, RR 18:75, during closing arguments, RR 18:85-86, in responding to Mr. Foster's legal and factual insufficiency arguments on direct appeal, *Foster v. State*, 2006 WL 947681, *3-4 (Tex. Crim. App. April 12, 2006), in their Proposed Findings of Fact and Conclusions of Law filed with and adopted by the habeas court and then the CCA, *Ex parte Foster*, No. 0839040-A, *State's Proposed Memorandum, Findings of Fact and Conclusions of Law*, and *Order* adopting same (Aug. 31, 2006), in recounting the evidence in the case to the federal court *Foster*, 2008 WL 5083078, at *3, in responding to Mr. Foster's Motion for a Certificate of Appealability, *Foster v. Thaler*, 369 Fed. Appx. 598, 600 (5th Cir. 2010), and in responding to Mr. Foster's first Petition for Writ of Certiorari, *Foster v. Thaler*, No. 10-6595, Br. Opp. at 4-5.  It is, without a doubt, evidence the state felt was central to their case.

Shortly before Mr. Foster's first scheduled execution, federal habeas counsel were able to obtain the pro bono services of Gary Rini, a well-credentialed blood spatter expert.  Rini prepared an affidavit concluding that, contrary to the state's theory, Ms. Pal was, in fact, killed where her body was found.  *See Foster*, No. 4:07-cv-000210, Docket No. 71, Appendix 2. Rini noted bloodstain patterns from the scene where Ms. Pal's body was found that "could have only been generated at the time the decedent sustained

her fatal wound at the location and the position she was discovered." *Id.* He further noted a "'passive bloodstain pattern" on the victim's right cheek, which, based upon its downward "drip," allowed him to conclude, "the decedent was shot at the location, and in the position, at which she was discovered." *Id.* Rini observed "no evidence that [Ms. Pal] was shot elsewhere and transported to the location at which she was discovered." *Id.*

A second highly qualified expert, Anita Zannin, agreed to review Mr. Foster's case in conjunction with his third scheduled execution date, also on a *pro bono* basis. Her conclusions corroborate those of Mr. Rini, reflected in her final opinion that "the evidence is most consistent with the shooting having occurred at the location where the body was found. There is no bloodstain evidence to indicate that the victim was moved after the gunshot wound was inflicted." *Id.,* Appendix 3.

Rini and Zannin – the first *experts* to look at the relevant evidence – both concluded that the state's arguments had no basis in the evidence, and that Ms. Pal was, in fact, killed where her body was found. Nevertheless, just as his trial attorneys failed to move for introduction of Ward's first and most comprehensive confession (Appendix 1) as a statement against interest, they made no efforts to test the state's theory with a qualified blood spatter expert.[18]

### 3. Mr. Foster was Prejudiced by Counsel's Deficient Performance.

The motel room note and affidavits of blood spatter experts Rini and Zannin undermine and rebut central tenets of the state's theory at trial. Ward's letter provided an explanation for the presence of Mr. Foster's DNA in Ms. Pal, particularly when combined with the undisputed evidence that there was no evidence of force. The affidavits of blood spatter experts would have entirely undermined the weak and speculative testimony about the lack of blood spatter at the scene – an argument essential to the state's assertion that Mr. Foster helped Ward carry Ms. Pal's body.

---

[18] Counsel has averred that this was *not* the result of trial strategy. *See Foster*, No. 4:07-cv-000210, Docket No. 71, Appendix 4.

30

In short, the state's arguments about Foster's involvement, from trial through all the appeals, have always depended, in part, on arguments about the presence of Mr. Foster's DNA, speculation about where Ms. Pal was killed, and how she was transported to the scene where she was found.  If trial counsel had introduced Ward's statement, or the testimony from the likes of blood spatter experts Rini and Zannin – testimony that would have entirely undermined the thin and unqualified testimony of the witnesses the state relied upon to assert their theory – there is far more than a reasonable probability that the outcome of the trial would have been different.  *Strickland*, 466 U.S. at 687.  Indeed, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by [trial counsel] errors than one with overwhelming record support."  *Id.* at 6.

III.   **THE RULING BELOW, DEPENDENT ON THE DECISION IN *IBARRA V. THALER*, FLIES IN THE FACE OF THIS COURT'S JURISPRUDENCE REQUIRING CONSIDERATION OF A CONSTELLATION OF FACTORS WHEN CONSIDERING A MOTION FOR RELIEF FROM JUDGMENT, AND CONFLICTS WITH THE DECISION OF THE NINTH CIRCUIT COURT OF APPEALS IN *LOPEZ V. RYAN*.**

A.   **This Court's Rulings Require Consideration of a Variety of Factors in Determining Whether Relief from Judgment is Warranted.**

Federal Rule of Civil Procedure Rule 60(b) "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity."  *Plaut v. Spendthrift Farm*, 514 U.S. 211, 233-234 (1995).  "In simple English," Rule 60(b) vests power in courts "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."  *Klaprott v. United States*, 335 U.S. 601, 615 (1949).  To obtain relief from a judgment under Rule 60(b)(6), a movant must show the existence of "extraordinary circumstances."  *Gonzalez v. Crosby*, 545 U.S.534, 536 (2005).

In *Gonzalez*, this Court upheld a district court's denial of Rule 60(b)(6) relief premised on the post-judgment decision in *Artuz v. Bennett*, 531 U.S. 4 (2000) that contradicted the district court's application of the statute of limitations to deny Gonzalez's habeas corpus petition.  This Court upheld the district court's

denial on the ground that extraordinary circumstances were not present.  Observing that "not *every* interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final," 545 U.S. at 536 (emphasis added), this Court held that *Artuz* did not amount to extraordinary circumstances because (1) in *Artuz*, this Court had merely addressed an unsettled legal question of statutory interpretation that differed from the lower court's then-prevailing interpretation; and (2) Gonzalez's own conduct was proof that the announcement of *Artuz* was not extraordinary, as he failed to pursue review of the limitations issue on appeal, despite the Eleventh Circuit's precedent on the issue having been "at odds with the rule in several other Circuits."  *Gonzalez*, 545 U.S. at 536-537.

However, this Court also made clear that an assessment of the viability of a Rule 60(b) motion requires consideration of a constellation of factors, some of which bear on the determination of whether an intervening decision constitutes an "extraordinary circumstance."  Thus, the *Gonzales* Court also focused on the petitioner's conduct in the litigation when assessing whether the equities warranted relief from the judgment, in particular on the petitioner's lack of diligence in pursuing review of the issue on which the law changed. *Gonzalez*, 545 U.S. at 537–538.  Likewise, the dissenting Justices identified a petitioner's diligence in seeking relief based on a change in the law, along with the probable merit of the underlying claim, as factors militating in favor of Rule 60(b)(6) relief.  *Gonzalez*, 545 U.S. at 541–42 (Stevens, J., dissenting).  *See also Ackermann v. U.S.*, 340 U.S. 193 (1950) (Appellant's choice to not appeal one factor weighed in assessing Rule 60(b) merits).  This multi-faceted approach was in fact taken by the Fifth Circuit – until the decision in *Adams* – in *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396, 402 (5th Cir. 1981) (articulating eight factors that should inform any court's assessment of the merits of a Rule 60(b) motion, citing Moore's Federal Practice).

### B.  While not Every Change in Decisional Law *Alone* is an Extraordinary Circumstance, *Martinez* Reversed Two Decades of Supreme Court and Homogeneous Circuit Precedent.

*Gonzalez* is instructive here because of the notable *differences* between the relevant factors and

32

the character of the intervening change in law.  Unlike *Artuz*, the change in law wrought by *Martinez* represents a reversal of what was understood by all parties to be settled law—both in all circuits **and** this Court—regarding the unavailability of the ineffectiveness of state post-conviction counsel to serve as cause for procedurally defaulted habeas corpus claims.  This Court expressly understood *Martinez* to have carved out an exception to a rule that the Court *itself* had created over twenty years earlier in *Coleman, supra*. *Martinez*, 132 S.Ct. at 1319.  Indeed, this Court's dramatic departure from settled precedent sparked a particularly heated dissent decrying the Court's disregard for the principle of *stare decisis*.  *See id.* at 1324 (Scalia, J., dissenting).

Moreover, precisely because this Court had created the controlling law twenty-one years ago, no circuit split was ever possible: Since *Coleman*, *every* court of appeals in the nation had concluded that the legal principle that the ineffective assistance of state habeas counsel cannot constitute cause for procedural default is well-established.  *See, e.g., Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999); *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 75 (1st Cir. 2009); *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007); *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993); *Smith v. Angelone*, 111 F.3d 1126, 1133 (4th Cir. 1997); *In re Goff,* 250 F.3d 273, 276 (5th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 516 (6th Cir. 2000); *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002); *Wooten v. Norris*, 578 F.3d 767, 778 (8th Cir. 2009); *Smith v. Baldwin*, 510 F.3d 1127, 1146-47 (9th Cir. 2007); *Anderson v. Sirmons*, 476 F.3d 1131, 1141 n.9 (10th Cir. 2007); *Mize v. Hall*, 532 F.3d 1184, 1191 (11th Cir. 2008).

Accordingly, *Martinez*, unlike *Artuz*, represents not merely the settling of an open circuit split but a jurisprudential sea change in federal habeas corpus.  *Vicknair v. Formosa Plastics Corp., Louisiana*, 98 F.3d 837, 839 (5th Cir. 1995).  As a result of this "radical alteration of [this Court's] habeas jurisprudence," *Martinez*, 132 S.Ct. at 1327 (Scalia, J., dissenting), constitutional claims which previously could not be reviewed on the merits because of deficient representation by state post-conviction counsel may now receive merits review if state habeas counsel's representation can be shown to have been ineffective.

While not every change in decisional law alone is an extraordinary circumstance, *Martinez*'s "repudiation of the longstanding principle[s] governing procedural default" is undoubtedly a remarkable development.

### C.  Mr. Foster's Diligence Weighs in Favor of Relief from Judgment.

There can be no question about Mr. Foster's diligence.  He has pursued this issue throughout the course of his state and federal habeas proceedings.  He consistently complained to the Courts about the abysmal quality of his appointed counsel, and simultaneously attempted to communicate his concerns to counsel.  In the federal courts he attempted to obtain funds for the investigation and expert assistance that would have permitted him to adequately litigate his claims of innocence and ineffective assistance of counsel, but was hamstrung from the outset by state habeas counsel's deficient performance. Despite precedent squarely foreclosing the issue, he raised that same deficient performance as cause for default – in the district court, the Fifth Circuit, and this Court.  He filed two subsequent habeas corpus applications in the Texas courts, and received three stays of execution from this Court as a result of raising the very issue addressed in *Martinez*.  Within two months of the *Martinez* decision he filed his Motion for Relief from Judgment. Mr. Foster has been more than diligent in pursuing this issue.  His diligence is an extraordinary circumstance that weighs in favor of Rule 60(b)(6) relief.

### D.  The Fact that Mr. Foster's Meritorious Claims of Ineffective Assistance of Trial and Habeas Counsel have never been Fully or Properly Considered on the Merits Weighs in Favor of Relief from Judgment.

This Court should also weigh the fact that no court has ever considered – or had the opportunity to consider – the *full* merits of the claims at issue:  a claim of innocence, and of trial counsel's ineffectiveness for failing to investigate and present evidence of same.  While the Respondent asserts that the district court conducted such an analysis, the court employed an incorrect legal standard, undermining its conclusions, and did not have before it – through no fault of Mr. Foster - a properly developed or fully briefed record.  In fact, the state proceedings – the inadequacies of trial and state habeas counsel that are at the center of this litigation - infected all subsequent events in the federal courts.

First, as detailed *supra*, federal habeas counsel was hamstrung by the inadequacies of appointed state habeas counsel, and the dismal quality of the state habeas petition. Efforts to get funding to explore Mr. Foster's claim of innocence (including a request for a blood spatter expert) and related claims of trial ineffectiveness were of no avail, because the claims they sought to investigate and document had not been presented by state habeas counsel. Thus, while the claims were raised in the federal petition, the lack of funding provided dictated that the claims would be inadequately presented and briefed.

Second, as counsel had not been provided the requested expert funds, they could not bring a claim of trial ineffectiveness for failing to identify or present the testimony of a blood spatter expert. Had the funds been provided, trial counsel's failure to obtain a blood spatter expert would have been part of the claim that trial counsel were ineffective in failing to introduce Ward's note, and the prejudice analysis, necessarily looking at the combined effect of these two pieces of evidence, would have looked far different. Had funding been provided, we cannot know what other evidence might have come to light. [19]

When the district court found that neither the claim of trial ineffectiveness for failing to introduce Ward's note, nor the claim of innocence, were exhausted, the court nonetheless proceeded to address the merits. In addition to the incompleteness of the record,[20] the court's findings cannot be given credence because they applied, at numerous points, an incorrect legal standard for assessing the claim at issue.

Thus, with respect to Mr. Foster's claim of trial ineffectiveness for failing to introduce Ward's note, the court found that "Foster has failed to establish prejudice because he has not shown a reasonable probability that, had this note been in evidence at trial, *either his motion for directed verdict would have*

---

[19] To this day, there has not been an opportunity to obtain the funding that would permit further investigation into Mr. Foster's innocence and trial counsel's conduct (notwithstanding the pro bono services of blood spatter experts Rini and Zannin, obtained well after the federal petition was filed.).

[20] The district court specifically notes that "because this [ineffectiveness] ground was not raised at the state level, defense counsel's affidavits do not address this issue. Accordingly, this Court does not have before it the reason why counsel did not make any further attempt to place the note into evidence." Slip op. at *11. The court instead found that Foster's claim failed because he could not meet the prejudice prong of *Strickland*.

*been granted by the trial court or he would have been found not guilty* by the jury." *Foster*, 2008 WL 5083078 at *11 (emphasis added). Of course, the appropriate standard is not whether he would have been found "not guilty" or "acquitted" but whether there is a reasonable probability – a "probability *sufficient* to undermine confidence in the outcome" - the result would have been different but for counsel's ineffectiveness. *See Strickland*, 466 U.S. at 688.   Making a showing that Ward's note might have made a difference to one juror is a far cry from a showing that it "would have" resulted in an acquittal.

Moreover, in assessing possible prejudice, the court only looked at Ward's other confessions, finding that the note Foster contends should have been admitted would have only exacerbated existing inconsistencies, and on that basis holding that prejudice could not be shown.  Of course, the appropriate analysis looks at the "totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . ." *Strickland*, 466 U.S. at 695-6.

This is not the analysis the district court conducted.  It looked, instead, at only the statements given by Ward, and failed to evaluate the potential affect of the statement at issue within the constellation of all the evidence presented. *See* slip op. at *11-12. As outlined above, and as expressed in the trial court's skepticism in the hearing on the instructed verdict, the state's evidence was extremely weak.[21] As *Strickland* states: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  The guilty verdict against Mr. Foster was only "weakly supported by the record."  Mr. Foster has shown prejudice, even on the thin record before the federal court, and the court's findings to the contrary rely upon an erroneous legal standard.

---

[21] The district court itself notes that "[i]ndeed, Ward has never implicated Foster in any statements he made to anyone about the crime, including the police." Slip op. at *11, fn. 1.

The court made similar errors in assessing whether Mr. Foster met the requirements for the miscarriage of justice showing necessary to get his defaulted claims heard on the merits. Thus, the district court stated that "none of the three confessions Ward made at and around the time of his arrest are new evidence, and therefore they do not meet the requirements of *Schlup v. Delo*. His confessions to his friend Duane Thomas and the police detective were admitted into evidence at trial, and the note he left for Foster was referred to at trial, but not admitted into evidence." Slip op. at *8. First, the note Ward left for Foster at the motel was new evidence, because it was never in front of the jury. The *Schlup* standard requires looking at the affect of all the evidence:

> *Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House v. Bell*, 547 U.S. 518, 538 (2006) (citations omitted). The district court failed to consider all the evidence – it only looked at the statements made by Foster and Ward to conclude that Ward's motel room note "is not a credible admission of guilt on his part," slip op. at *8, and prejudice cannot be shown. This "analysis" does not consider *all* the evidence, as *Schlup* and *House* require. A holistic analysis of the possible impact of Ward's note in the context of the state's circumstantial case compels a finding of prejudice.[22]

The district court's opinion denying Mr. Foster's Motion for Relief from Judgment makes similar, and additional, factual and legal errors. First, the inadequacy of the record on which the court bases its assessments suffers from the inadequacies outlined above. Second, with respect to Mr. Foster's claim of innocence, the court erroneously found that it had been considered exhausted (and thus addressed on the

---

[22] The district court's opinion is internally inconsistent as well. Thus, the court states both that "in only one of these confessions, the note left for Foster, did Ward imply that Foster was not involved in the murder," slip op. at *8, and that "[i]ndeed, Ward has never implicated Foster in any statements he made to anyone about the crime. . . ." Id. at *11, fn.1.

merits in Mr. Foster's original habeas proceedings), and thus dismissed as a same claim successor (*see* 2244(b)(1)). *Id.*, slip op. at p.19. In fact, as outlined above, the district court's 2008 opinion found that the innocence claim was **not** exhausted. *See supra; Foster*, 2008 WL 5083078, slip op. at *6, *9. Third, as the district court dismissed as successive Mr. Foster's claim of ineffective counsel for failure to identify and introduce the affidavits of blood spatter experts, trial counsel, and the three inmates to whom Ward had confessed, it did not consider that new evidence in its assessment of Mr. Foster's innocence claim. Fourth, the district court concluded that "[t]his Court's [sic] remains confident in the trial outcome despite the fact that the jury did not also consider Ward's motel letter. The Court concludes, as it did in 2008, that Foster has not shown "*Strickland* prejudice." *Id.* at 25-26. The district court's order thus incorporates and repeats application of the erroneous legal standard from its 2008 opinion, and assesses not whether Mr. Foster's claim has "some merit" but whether it would prevail under *Strickland*.

Moreover, in making this assessment, the district court faults Mr. Foster because he "fails to address the inherent problems with Ward's credibility given the unusual relationship between the two men and Ward's brain tumor." *Id.* at 25. The "evidence" the court relies upon in order to characterize the relationship between Ward and Foster includes a statement Mr. Foster gave which was introduced at the *punishment* phase of Mr. Foster's trial, and evidence from the state *habeas* record that Ward had a brain tumor, and that it "undermined Ward's credibility in the eyes of the *state habeas* court." *Id.* Of course, none of this evidence was before or relevant to the jury's assessment of guilt, and is thus not relevant to the Strickland assessment of the prejudice resulting from a claim of ineffective assistance at the *guilt* phase of trial. *See Strickland,* 466 U.S. at 688.

Mr. Foster thus submits that while the district court ostensibly considered the merits of the claims at issue, the very errors Petitioner complains of rendered the record – and thus the district court's review – incomplete, and the court's opinions were rife with legal errors. Mr. Foster's claims have never been fully considered, and Rule 60(b) relief is warranted.

**E.** *Adams v. Thaler* and *Lopez v. Ryan* Reflect a Split among the Circuit Courts of Appeals on a Question Vital to the Meaningful Interpretation of *Martinez*.

In *Adams v. Thaler*, the court begins its analysis with the observation that "[o]ur precedents hold that '[a] change in decisional law after entry of judgment does not constitute exceptional circumstances and *is not alone* grounds for relief from a final judgment' under Rule 60(b)(6)." *Id.* (citations omitted). After addressing *Gonzalez,* the court held that Adams was not entitled to relief because *Martinez* "does not constitute an 'extraordinary circumstance' under Supreme Court and our precedent to warrant Rule 60(b)(6) relief. The *Martinez* Court's crafting of a narrow, equitable exception to *Coleman*'s holding is 'hardly extraordinary.'" *Adams*, 679 F.3d at 320. The court concluded, without explicitly addressing the other circumstances proffered by Adams, that "[b]ecause Adams has not made a showing of a likelihood of success on the merits of his Rule 60(b)(6) motion, the district court abused its discretion in granting a stay of his execution pending the resolution of this motion." *Id.* In basing its decision and denial of relief solely on an assessment that Martinez did not qualify as an "extraordinary circumstance," *Adams* fails to honor this Court's decisions.

In contrast to the approach of the Fifth Circuit, the Ninth Circuit has concluded that *Martinez* is a "remarkable" development that weighs in favor of relieving Mr. Lopez from judgment:

> The nature of the intervening change of law at issue here differs from the situations at issue in *Gonzalez* and *Phelps*. Here, *it was settled law* that post-conviction counsel's effectiveness was irrelevant to establishing cause for procedural default. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In *Martinez*, 132 S.Ct. at 1315, however, the Supreme Court "qualifie[d] *Coleman* by recognizing a narrow exception." In our view, these circumstances weigh slightly in favor of reopening Lopez's habeas case. Unlike the "hardly extraordinary" development of the Supreme Court resolving an existing circuit split, *Gonzalez*, 545 U.S. at 536, 125 S.Ct. 2641, the Supreme Court's development in *Martinez* constitutes a *remarkable*—if "limited," *Martinez*, 132 S.Ct. at 1319—development in the Court's equitable jurisprudence.

*Lopez v. Ryan*, 678 F.3d 1131, 1136 (9th Cir. 2012) (emphasis added).[23]

---

[23] The Ninth Circuit held that Lopez was not entitled to 60(b) relief based on several critical circumstances that are not present here. First, Lopez was not diligent in pursuing his claim that state habeas counsel was ineffective. In

Lower federal courts have recognized that a circuit split has already developed over whether *Martinez* may, in a given case, present extraordinary circumstances justifying relief under Rule 60(b)(6). See *Vogt v. Coleman*, 2012 WL 2930871 (W.D. Pa.), slip op. at *4 (citing *Arthur v. Thomas*, 2012 U.S. Dist. LEXIS 85563 (N.D. Ala.); *Sims v. Houston*, 2012 U.S. Dist. LEXIS 80945 (D. Neb.), and *Lopez v. Ryan*, 678 F.3d 1131, 1135–36 (9th Cir. 2012)); *Cook v. Ryan*, 2012 WL 2798789 (D. Ariz.), slip op. at *6 (citing *Lopez v. Ryan* and *Adams v. Thaler*). *See also Landrum v. Anderson*, 2012 WL 3637365 (S.D.Ohio), slip op. at *10 (applying the case law of the Sixth Circuit Court of Appeals in weighing numerous factors to determine whether Rule 60(b) relief warranted in the wake of *Martinez:* "the decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.'") (citations omitted).

This Court's intervention is needed to resolve the split among the circuit courts on the vital question of Martinez' application in the Rule 60(b) context.

## CONCLUSION

For the forgoing reasons, the Court should grant the petition for writ of certiorari to consider the questions presented by this petition. Alternatively, the Court should grant the petition for writ of certiorari, vacate the judgment below, and remand for reconsideration in light of *Martinez*.

Respectfully submitted,

   /s/ Maurie Levin
Maurie Levin*
Texas Bar No. 00789452
Capital Punishment Clinic

---

fact he had never raised habeas counsel's deficiencies until after *Martinez* was decided, and had previously argued that state habeas counsel **was diligent**. 678 F.3d at 1136. Second, the federal court's prior rejection of his claim did not rest on a procedural default, so there was little connection between *Martinez* and his case. *Id.* at 1137. Even despite these seemingly fatal equities against reopening the judgment, the court stated that "in some ways, the equitable considerations in this case are close." *Id.*

U.T. School of Law
727 East Dean Keeton
Austin, TX  78705
512-232-7795
512-232-9171 (facsimile)

  /s/ F. Clinton Broden
F. Clinton Broden
Texas Bar No. 24001495
Broden & Mickelsen
2600 State Street
Dallas, TX  75204
214-720-9552
214-720-9594 (facsimile)

**_Counsel for Cleve Foster_**

*Counsel of Record
Member, Bar of this Court

41

NO. _____

---

## IN THE SUPREME COURT OF THE UNITED STATES
## OCTOBER 2011 TERM

---

**CLEVE FOSTER,**
**Petitioner**
**vs.**
**RICK THALER, Director, T.D.C.J., C.I.D.,**
**Respondent**

---

**On Petition for a Writ of Certiorari to the**
**United States Court of Appeals for the Fifth Circuit**

---

### CERTIFICATE OF SERVICE

I certify that on September 23, 2012, I have served Petitioner's PETITION FOR WRIT OF CERTIORARI on Mr. Stephen Hoffman (stephen.hoffman@oag.state.tx.us), Assistant Attorney General Office of the Attorney General, 300 West 15th Street, Suite 800, Austin, Texas, 78701, (512) 936-1400 by electronic mail. All parties required to be served have been served. I am a member of the Bar of this Court.

Respectfully submitted,


   /s/ Maurie Levin
Maurie Levin
Texas Bar No. 00789452
Capital Punishment Clinic
U.T. School of Law
727 East Dean Keeton
Austin, TX  78705
512-232-7795
512-232-9171 (facsimile)

Counsel for Petitioner

42