# UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

**ANIBAL CANALES, JR,**                                                                **PETITIONER**

     **v.**                                                                 **Case No. 2:03-CV-69-JRG-RSP**

**DIRECTOR, Texas Department of Corrections,**
**Correctional Institutions Division,**                                        **RESPONDENT**

### PETITIONER'S BRIEF REGARDING PREJUDICE

Pursuant to this Court's orders, Petitioner, Anibal ("Andy") Canales, Jr., files this brief to address whether he was prejudiced by trial counsel's failure to develop and present mitigating evidence at the penalty phase of his capital trial.  Dkt 188, 214.  There is no serious dispute that trial counsel performed deficiently.  Moreover, the Fifth Circuit found that Petitioner's showing of prejudice due to trial counsel's limited penalty phase presentation was at least substantial. *Canales v. Stephens,* 765 F.3d 551, 570 (5th Cir. 2014).  Since the Fifth Circuit remanded his case, Petitioner has greatly expanded his showing of prejudice with expert reports addressing severe mental illness and documenting a history of physical and sexual abuse, neglect, poverty, and abandonment.

Petitioner first summarizes the relevant procedural history, explains the applicable standard for addressing the issue, reviews the facts presented at trial and facts developed in the course of these proceedings, and discusses the applicable substantive law.

### RELEVANT PROCEDURAL HISTORY

Petitioner challenged the failure of trial counsel to develop and present mitigating evidence at the penalty phase of his trial in his federal habeas corpus petition.  Dkt 7.  *See generally Wiggins v. Smith,* 539 U.S. 510 (2003). Because this claim had not been presented to

1

the state court in his initial state habeas corpus petition, Petitioner filed a successive writ with the Texas Court of Criminal Appeals ("CCA"), and this Court stayed proceedings to allow the state court an opportunity to consider unexhausted claims. Although asking for supplemental briefing on the *Wiggins* issue, the CCA dismissed the successive petition as an abuse of the writ. *Ex parte Canales,* No. WR-54,789-02 (Tex. Crim. App. 2008).  Relying on the abuse of the writ finding, this Court dismissed the claim regarding trial counsel's penalty phase performance.  It also rejected Petitioner's argument that the ineffective performance of initial state habeas counsel permitted him to overcome the state court's default finding.

When the case was on appeal to the Fifth Circuit, the United States Supreme Court held that Texas habeas petitioners could overcome defaults committed by initial state habeas attorneys.  *Trevino v. Thaler*, 133 S. Ct. 1911 (2012).  Applying the principles of those decisions, the Fifth Circuit determined that Petitioner's prior state habeas counsel performed deficiently. *Canales v. Stephens,* 765 F.3d 551, 569 (5th Cir. 2014).  The Fifth Circuit noted that prior state habeas counsel failed to develop mitigating evidence because of a misunderstanding about the resources available for investigative and expert services.  *Id.*

The panel also found that Petitioner showed that the underlying *Wiggins* claim was "substantial."  The Fifth Circuit noted that trial counsel did virtually no investigation into mitigating circumstances. "Considering all of the circumstances here, Canales's trial attorneys' performance was not reasonable. His trial counsel did not make a reasoned decision not to conduct a mitigation investigation."  *Id.* at 570.  The panel also found "some merit" to the allegation that Petitioner was prejudiced by trial counsel's failure to prepare for the penalty phase.  *Id.*

2

The panel remanded the case to this Court "to consider whether Canales can prove prejudice as a result of his trial counsel's deficient performance, and if so, to address the merits of his habeas petition on this claim." *Id.* at 571.  This Court asked the parties to file briefs on the question as to whether Petitioner can establish prejudice due to trial counsel's failure to develop and present mitigating evidence.  Dkt 188. Following litigation pertaining to funding for expert and investigative assistance, the Court ultimately determined that Petitioner's brief is due no later than February 1, 2017.  Dkt 214.

## STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §§ 2241-55, do not apply if the court is reviewing a claim dismissed by the state court on procedural grounds, *Hughes v. Quarterman,* 530 F.3d 336, 340-41 (5th Cir. 2008), or if the court is reviewing a claim for which cause has been established for the failure to submit the claim to the state court in the first instance, *Jones v. Bagley*, 696 F.3d 475, 484 (6th Cir. 2012). Because the CCA dismissed the case on procedural grounds, the limitations on the grant of relief found in 28 U.S.C. § 2254(d) are not applicable and thus Petitioner is entitled to de novo review of this ground for relief.

Furthermore, because there are no state court findings to which deference is owed, this Court must accept as true the allegations raised in Petitioner's pleadings.  *Walton v. Johnson*, 407 F.3d 285, 295 (4th Cir. 2005).

## PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE OF HIS TRIAL

The Court asked Petitioner to address whether trial counsel's deficient performance at the penalty phase of his trial had a prejudicial effect on the jury's sentencing decision.  Petitioner first discusses the facts that trial counsel should have presented, and then applies those facts to

3

the legal test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner demonstrates that there is a reasonable probability that at least one jury would have voted for a life sentence if trial counsel had presented compelling facts about his background, psychological and medical issues, and circumstances surrounding the offense.

I.     **Trial Counsel (And State Habeas Counsel) Could Have Presented Compelling Facts And Expert Testimony In Mitigation And To Rebut The State's Showing Of Future Dangerousness**

   A.     Introduction

   As the Fifth Circuit noted, the only mitigating evidence presented by trial counsel was that Andy Canales was a peacemaker in prison and a gifted artist.  *Canales v. Stephens,* 765 F.3d 551, 570 (5th Cir. 2014).  Trial counsel's minimal case resulted from a failure to conduct an investigation into Andy Canales' background or confer with appropriate experts to assess the affect of severe trauma and deprivation.  All of his primary caretakers were alcoholics and/or drug addicts.  He and his siblings suffered persistent violence at the hands of their fathers and stepfathers, and their mother failed to intervene to protect them.  Sexual abuse was rampant especially when Andy's mother was involved with Carlos Espinoza.  Their daily life was marked by instability, poverty and neglect.  Andy's father abandoned him when Andy was very young and later, when Andy stayed with him in Houston, his father left 13-year-old Andy to fend for himself.  Neglected by his parents, 9-year-old Andy was forced to become involved with the Latin Kings, a notorious criminal gang controlling his Chicago neighborhood.  The gang involvement heightened his exposure to violence, alcohol, and drugs.  His abusive, chaotic, and dysfunctional life had pronounced effects on Andy's judgment, academic performance, and mental health.  These mental impairments, in conjunction with chronic physical health problems, made Andy especially vulnerable to prison gangs and contributed to his involvement in the

4

capital offense.

In the following sections, Petitioner draws from the expert reports of Susan Herrero (Dkt 220-1), Tora Brawley, Ph.D. (Dkt 220-2), and Donna Maddox, M.D. (Dkt 220-3), as well as the declarations attached to Ms. Herrero's report (Dkt 220-1 at 53-88) and declarations attached to his initial federal habeas petition (Dkt 7).  He first provides an overview of his family and some of the significant events in his life.  Next, he discusses the factors contributing to his emotional, social, cognitive, and psychological development.  He also examines the adverse consequences he suffered, including poor academic performance, drug and alcohol abuse, gang involvement, impaired decision-making, and mental illness.

     B.    <u>Family Background and History</u>

        1.    <u>Extended family history of alcoholism, mental illness, and violence</u>

Abandonment, violence, mental illness, and poverty are enduring features of the Canales family.  Andy's paternal grandfather, Jose Canales, who was from Mexico, and his wife, Elisia had five children.  Anibal, Sr., Andy's father, was the youngest.  When Anibal was only 2 ½ years old, Jose left his family for another woman and never returned.  Dkt 220-1 at 7.  Anibal was sent to live with his grandparents.  After her husband left, Elisia, who was sickly, lived in abject poverty.  *Id.* at 8.  In part, because of the strain of raising children under such difficult conditions, she beat her children with a belt to discipline them.  *Id.* at 8.  After Anibal returned to live with his mother, he began working at a young age as a dishwasher and, when he was fifteen, picking cherries.  Elisia turned Anibal against his father.

When the family moved to Laredo, Texas, they moved into government housing.  During a lengthy hospitalization during which Elisia had a lump removed from her lung, Anibal and his brother Jose, Jr., were on their own.  They eventually moved to Waukegan, Illinois.  Later in life,

Anibal did nothing to help his mother, but he stayed with her and left his children for her to care for. *Id.* at 8.

Andy's maternal family history also includes neglect, violence, and alcoholism. Andy's maternal grandparents were Jose (Joe) Garcia and Petra Maldonado. Petra, who was sickly and who did go far in school, did not work outside of the home. Joe worked as a temporary construction worker. *Id.* at 9. They had seven children. Andy's mother, Janie, was their third child. Joe and Petra lived in poverty and were alcoholics who were verbally and physically abusive to their children. Dkt 220-1 at 9.

Joe forced all of the children, except Ruby, who had Down's Syndrome, to wake up at four or five in the morning to scrub the house, including cabinets, bathrooms, and dishes. If not satisfied with their work, he beat the children with his fists, belts, straps, or buckles. The youngest child, Dorothy, recalls rushing home from work when she was 18 because her father called to complain about the job she did cleaning a bathroom. After arriving at home, her father beat her with an object on the back of her head while shoving her face into the toilet. *Id.* Irene, the eldest recalls her father returning from World War II very angry and described him as physically and verbally abusive, and "always very controlling, overbearing, dictatorial." *Id.* at 10; Dkt 7, Exhibit 18. Petra never intervened to protect her children. Dkt 220-1 at 10; Dkt 7, Exhibit 18.

2.    Andy's Parents and their Marriage.

Anibal and Janie married in 1963 or 1964. Andy, their first child was born in December 1964, and his sister Elizabeth was born in February 1966. The marriage of Anibal and Janie faced insurmountable obstacles from the outset. Janie's parents, who were financially dependent on Janie, opposed the union, and Petra sought to sabotage it. Dkt 220-1 at 10 (also Jose, Jr.)

The animosity even extended to Andy and Elizabeth, his sister, *id*, such that Andy was aware then and recalls now that his grandparents hated him and his sister.  Janie's sister, Irene Garcia, also believes that Joe and Petra's animosity stemmed from their racist attitudes, especially toward Mexicans from Mexico.  Dkt 220-1 at 11; Dkt 7, Exhibit 18.  Elizabeth recalled that her maternal grandparents would not buy Christmas presents for her or Andy but would buy presents for her cousins.  Dkt 7, Exhibit 17 at 4.

Both Anibal and Janie were alcoholics.  Dkt 220-1 at 24.  Also, Anibal hit Janie and was a womanizer.  Dkt 220-1 at 24.  He was also a terrible father who hit his children.  *Id.*  Anibal and Janie were unfaithful to each other, and eventually, Janie became involved with Carlos Espinoza.  Dkt 220-1 at 11.  Janie and Carlos married in 1971.

After his marriage to Janie broke up, Anibal lived in Chicago for a brief period and dated a Puerto Rican woman with two small children.  He moved back to Texas, married Marlene, and had two children, Ulyses and Yolanda.  Marlene and her children left Anibal, who never saw those children.  Anibal then had a six year relationship with Elizabeth Velasco.  Anibal never paid child support for Andy and Elizabeth.  Dkt 220-1 at 12.  He had limited involvement in their lives.  Janie sent the children to stay with Anibal, who simply left them with his mother.

3.     Janie's catastrophic relationship with Carlos Espinoza

After Janie became involved with Carlos Espinoza, Andy's life became more difficult.  Both Janie and Carlos drank heavily.  Janie went out to bars frequently, leaving her children without adequate supervision.  Dkt 220-1 at 15.  Moreover, Carlos was physically abusive to Janie, Andy and Elizabeth, and molested his stepchildren.  Dkt 220-1 at 46.  Janie and Carlos had a daughter, Gabriela, who was born in December 1972.  Carlos was a sexual predator who molested Elizabeth and Andy.  He stripped Andy before beating him with a belt.  For the most

7

part, Janie failed to protect her children.  Eventually, she stabbed Carlos.

### 4.   Andy was treated like he was not wanted

Anibal left when Andy was young and had little involvement in his son's life.  When Andy was 13 years old, he moved to Houston and stayed with his father.  Anibal moved away from Houston and left Andy behind.  Anibal did not even notify Janie that he left Andy alone in Houston.

The consequences of neglect and abandonment were evident even earlier.  Andy was forced to begin working when he was still in elementary school.  On the streets in a gang-infested neighborhood, he was threatened unless he worked for the gang.  The leaders of the gang provided young Andy with alcohol in the mornings before school.  Andy was an alcoholic by age 14.

### 5.   Involvement with the criminal justice system

Andy's first brush with the criminal justice system was tied up with his traumatic family history.  His mother moved in with John Ramirez, another violent, alcoholic sexual predator.  It was obvious that Ramirez targeted Elizabeth and Andy's younger sister Gabriela.  By this time, Andy was grown and capable of protecting his sisters. When Andy stole his check, Ramirez pushed Andy's prosecution to remove his obstacle.  After serving time for the check theft, Andy was charged with raping a young woman and then pled guilty to a sexual assault, his second.  Exposed to gang violence in prison, Andy joined the Texas Syndicate, a Latino prison gang.  Dkt 220-1 at 46.  He was eventually paroled.

### 6.   Andy's adjustment to a normal life collapsed when he could not cope with his mother's illness and death

Around 1992, Andy began dating Liz Hewitt, who lived at home and came from a close, normal Catholic family.  Liz's parents welcomed Andy into the family and invited him to family

cookouts, barbecues, and other family gatherings.  Liz's mother cooked for Andy and treated

him like a son.  Andy helped around the house.  Liz found Andy to be caring, affectionate, and

never abusive.  Dkt 220-1 at 46; Dkt 220-1 at 87.

Andy's happiness was shattered when his mother had an aneurysm, which caused her to

lose speech and motor functions.  Dkt 220-1 at 46.  Andy deteriorated, started working for a

traveling band, and began using drugs.  He was never the same after he realized his mother was

not going to recover.  Dkt 220-1 at 47; Dkt 220-1 at 57.  Andy lost his parole and returned to

prison.

### 7.    Andy's severe heart disease and its effect

Back in prison in 1995, Andy suffered the first of three or four myocardial infarctions and

was placed on blood thinners and other essential medication.  Medical records indicate that he

has had treatment for a myocardial infarct, atrial fibrillation, and unstable angina.  Dkt 220-3 at

6.[1]  When Andy's gang, the Texas Syndicate learned that Andy had a prior sex conviction and

that he had been a member of the Latin Kings, it placed a hit on him.  Unable to defend himself

because of his heart condition, Andy turned to another prison gang, the Texas Mafia.  His

cellmate, Bruce Richards, was in the Texas Mafia and arranged for Andy to transfer to that gang.

The intercession by the Texas Mafia meant that Andy owed his life to it, and thus was in the

vulnerable position of being under their control.  This was Andy's predicament at the time of the

Dickerson murder in 1997.

### C.    Risk Factors for Impaired Emotional and Cognitive Development

Susan Herrero identified a number of significant factors impeding Andy's intellectual,

cognitive, social, emotional, and psychological development, and which left him susceptible to

---

[1] Dr. Maddox reviewed Andy's continuing medical problems, including exposure to tuberculosis in 1994, a mouth tumor, lower extremity edema, deep venous thrombosis, hyperlipidemia, and hypothyroidism.  Dkt 220-3 at 6-7.

major mental illness and substance abuse.  These factors include prenatal exposure to alcohol and parental alcoholism, poverty and homelessness, neglect, parental rejection, and abandonment, and physical and sexual abuse.  Petitioner reviews the factors and adds additional details from the expert reports and witness declarations.

      1.   <u>Parental Alcoholism</u>

Alcoholism had a devastating effect on Andy's upbringing and development.  His exposure to his parents' alcoholism began prenatal.  When Janie was pregnant, she and Anibal went to bars.  Dkt 220-1 at 12.[2]

After her marriage to Anibal ended, Janie continued to drink heavily.  Often she went out, leaving the children without supervision.  Dkt. 220-1 at 17; Dkt 7, Exhibit 18.  Janie's cousin, Dorothy Schiefelbein remembers having to pick Janie off the floor after Janie had fallen off the toilet.  Dkt 220-1 at 18; Dkt 7, Exhibit 23.

Janie's cousin Michele recalled that Janie drank heavily to forget her problems, including her poverty, and it was likely that Janie drank because she was depressed.  *See also* Dkt 7, Exhibits 18 and 23 (expressing belief that depression was a part of the cause for Janie's alcoholism).[3]  Of course, the heaving drinking contributed to Janie's lack of determination to succeed and explained her inability to provide adequate guidance to her children.  Dkt 220-1 at 18; Dkt 220-1 at 81; Dkt 220-1 at 84 (noting that drinking undermined Janie's).

Janie drove drunk even with the children in the car.  Gabriela recalls an occasion when Andy was a young teenager and Janie was driving while grossly intoxicated.  Andy asked to drive.  Janie stopped the car.  When Andy left the vehicle, Janie drove off.  Gabriela "cried and cried."  Dkt 220-1 at 17; Dkt 220-1 at 61.  Gabriela adds that her mother drank every night and

---

[2] Ms. Herrero explains that Andy was at risk for Fetal Alcohol Syndrome, but there were no photos or other evidence that could provide support for such a finding.  Dkt 220-1 at 12.
[3] Irene Garcia, a maternal aunt, reported having depression.  Dkt 220-3 at 6.

became "trashed" on the weekend.  *Id.* When Gabriela was a bit older, about 13 years old, she

had to drive her mother to and from bars.  *Id.* at 18; Dkt 220-1 at 62.

Just as Janie's mother allowed her to drink with her, Janie permitted her children to drink.

Her sister Linda recalls that "Janie allowed her children to drink as teenagers, just like our

mom."  Dkt 220-1 at 17; Dkt 220-1 at 84; Dkt 220-1 at 80.

Anibal was an alcoholic and drug addict.  When Andy and Elizabeth went to Laredo to

stay with their paternal grandmother, they saw their father, who never seemed to have money for

food but who always drank and smoked marijuana.  Dkt 220-1 at 19; Dkt 220-1 at 55.  Like

Janie, he drove while drunk with the children in the car.  Driving from Laredo to visit relatives in

Mexico, Anibal ran red lights and stop signs.  When he was too drunk, he allowed Andy to drive.

Dkt 220-1 at 19; Dkt 220-1 at 55.  Elizabeth and Anibal's common law wife, Elizabeth Velasco,

point out that in addition to marijuana and alcohol, Anibal used cocaine.  Dkt 220-1 at 19; Dkt 7,

Exhibit 20.  Andy's half-brother, Aquiles confirmed their father's substance abuse problems:

"My dad is an alcoholic and drug addict.  He smoked pot and was addicted to coke and crack my

entire life."  Dkt 220-1 at 20; Dkt 220-1 at 66.  Aquiles added that his father introduced him to

alcohol at an early age.  *Id.*[4]

Anibal's brother, Jose, Jr., believes that Anibal also suffers from mental illness in

addition to addiction:

> My brother has deteriorated over the years…He has not had a real job in more
> than 20 years…at one point he was homeless. I was sending him boxes of
> clothes…He barhops, he drinks way too much, he is not stable, he is always
> womanizing…I would not be surprised if there are drugs involved.  It has become
> difficult to communicate with my brother because he is so irrational…my brother
> has real psychological problems. His irrationality started when he started having
> problems with Juanita.

Dkt 220-1 at 21; Dkt 7, Exhibit 19.  To this day, Anibal refuses to get help for his addiction, and

---

[4] Anibal later did drugs in front of his young granddaughter.  Dkt 220-1 at 20; Dkt 220-1 at 67.

his son Aquiles aptly sums up Anibal's character: "My father is not a good person.  He is not sorry.  He doesn't care."  Dkt 220-1 at 68.

> 2. Poverty and Homelessness

Andy's parents did not have much money to begin with, and their alcohol and drug use virtually guaranteed that there would be tough times. In addition, Anibal never paid child support.  As a result, Andy experienced poverty and homelessness.  Dkt 220-1 at 12. Later, Carlos Espinoza, Janie's second husband, failed to pay child support for their daughter Gabriela.

Andy's sister Elizabeth recalls that although their mother worked, they sometimes had to stay with family or friends and "many times we didn't have enough food to eat." Dkt 220-1 at 13; Dkt 220-1 at 53.  Elizabeth remembers being hungry often.  In Junior High School, Andy gave Elizabeth his food, and she passed it on to Gabriela.  Dkt 220-1 at 13.  Gabriela confirms that the family often did not have enough to eat and that she now realizes that they moved frequently because her mother could not afford the rent.  Dkt 220-1 at 13; Dkt 220-1 at 60. Elizabeth also remembers that there were times they ate nothing but rice and beans for all meals for two weeks at a time, or until their mother was paid.  Dkt 220-1 at 14; Dkt 7, Exhibit 17 at 6. Due to the lack of funds, the family was sometimes homeless and had to move in with relatives. Dkt 220-1 at 13-14; Dkt 220-1 at 54, 56; Dkt 220-1 at 84.

To help with family finances, the children went to work.  When he was 8 or 9 years old, Andy shined shoes and sold newspapers in Chicago.  When she was only 13 or 14, Elizabeth found a job making tortillas.  She had to drive herself even though she was too young to have a license.  Dkt 220-1 at 13; Dkt 220-1 at 56.

> 3. Neglect and Abandonment

With the poverty and parental alcoholism and the resulting instability, it is no surprise

that Andy suffered from neglect and abandonment.  Multiple relatives remarked about Anibal abandoning the children and Janie frequently leaving them or dropping them off to go barhopping.  Dkt 220-1 at 15-16.  Andy's paternal uncle, Jose, Jr., tried his best to fill the gap in the lives of Andy and Elizabeth and did things with them on weekends.  Dkt 7, Exhibit 19.   As he described, "Juanita [Janie] . . . was always interested in going out and going to bars and she didn't provide the kind of support or structure that they needed.  When I was spending time with them on the weekends, Juanita was glad to get rid of the kids so she could go out."  Dkt 7, Exhibit 19.

When Andy and Elizabeth went to visit their father in Texas, Anibal also spent no time with them, choosing instead to dump his children with his mother.  As Jose, Jr. points out, Anibal "wanted to go out and didn't think about the kids much at all."  Dkt 220-1 at 16, 21; Dkt 7, Exhibit 19.  On those rare occasions when Anibal saw his children, he was drunk or high.  Dkt 220-1 at 22.  Jose was deeply moved when Andy said that he wished Jose was his father.  Jose wished he had been in a position to adopt Andy and Elizabeth.  Dkt 220-1 at 16; Dkt 7, Exhibit 19.

When Andy was a teenager, he went to stay with Anibal in Houston.  Anibal, however, left Andy to live by himself in Houston.  Dkt 220-1 at 22; Dkt 7, Exhibit 19.  Jose explained that Janie sent Elizabeth and Andy to stay with their paternal grandmother in Laredo, but she could not afford to keep the children.  Elizabeth returned to San Antonio to be with her mother, but Andy went to Houston to stay with Anibal, who was living with Eliza (Elizabeth Velasco).  Andy was only about 13 years old at the time.  Dkt 220-1 at 22; Dkt 7, Exhibit 19.

Jose related the circumstances of Andy's stay in Houston:

Anibal was working as a trucker in Houston at the time…with Eliza (Elizabeth Velasco)…They were living in a small apartment with only one room. Andy went

13

> to work as a busboy in a cafeteria…There was tremendous hostility and anger in the house. No one was paying attention to Andy. I remember that Andy was complaining of headaches around that time, he was having trouble sleeping, and said that he was bothered at night by vision and voices… I became aware during that time that Andy was smoking marijuana with his friends. My brother wasn't helping the situation.  He was having bad problems with Eliza and I know that he was violent with her…My brother got laid off …and Eliza was pregnant with Aquiles so he decided to move back to Laredo. Andy wanted to stay…in Houston. I was very much opposed to the idea of leaving Andy by himself in Houston. He was too young, and I knew it was a very bad idea. I argued with my brother about leaving Andy in Houston, with friends who were bad company. But there was nothing I could do to get my brother to listen, and they left Andy there, and I never heard from Andy again.

Dkt 220-1 at 22; Dkt 7, Exhibit 19.

Anibal's friends Estorgio Perez and Cesar Guitierez tried unsuccessfully to persuade him not to leave Andy behind in Houston.  Andy, for his part, realized that his father did not want him to move to Laredo with him, and he understandably feared his father's temper and violence. He witnessed his father throw a pot of hot beans on Elizabeth Velasco.  Dkt 220-1 at 23.

Anibal failed to let Janie know that he left Andy alone in Houston.  Only after Elizabeth realized that she and her mother had not heard about Andy in a while did Janie attempt to contact Anibal.  According to Elizabeth, Janie was unsure about what to do but decided to leave Andy in Houston.  Dkt 220-1 at 23; Dkt 220-1 at 55.  Completely abandoned by both parents at age 13, Andy turned to drugs and alcohol.  The combination of youth, abandonment, and substance abuse made Andy vulnerable to making poor decisions.  When he was 13, he was arrested in Houston in an incident involving a stolen car.   Dkt 220-1 at 23; Dkt 7, Exhibit 19.

Elizabeth sadly recalls visiting Andy in a juvenile detention center.  Andy acted upbeat, but she could tell that he was masking his feelings.  Dkt 220-1 at 24; Dkt 7, Exhibit 17 at 6.

        4.    <u>Verbal and Physical Abuse</u>

As Susan Herrero observes in her report, "[p]arenting is modeled."  Dkt 220-1 at 24.

14

Anibal grew up with a mother who beat him.  Janie grew up in male-dominated family with a violent father and alcoholic mother who failed to intervene to protect her children. Unsurprisingly, she did nothing when Anibal beat Andy and Elizabeth and later failed to block Carlos Espinoza from abusing her children.

Jose frequently visited Janie and Anibal when they lived in Chicago.  He saw Janie when her face was black and blue, and she told him that Anibal hit her.  Dkt 220-1 at 24-25; Dkt 7, Exhibit 19.  Andy and Elizabeth both recall Anibal beating them at a young age and throughout their childhoods.  Dkt 220-1 at 25.  The couple briefly moved to Roma, Texas, to attempt a fresh start.  The effort failed, and Janie returned to Chicago.  She took up with the alcoholic Carlos Espinoza and married him in November 1971.  Their daughter Gabriela was born December 11, 1972.

Carlos's abuse was worse than what the family endured from Anibal.  Elizabeth described a harrowing episode when Carlos attached Janie, and she and Andy tried to intervene:

> I remember one time my mom stayed out late after work. When she got home, I was already asleep and so was Andy.  I woke up because I heard some rustling, and I woke Andy up. We went out to see what was going on, and Carlos was sitting on my mom, who was on her back, and he was hitting her as hard as he could around her face and head. He was really beating her bad. Andy ran to the back to get something, and I ran over and started pulling on his hair, and trying to get him off my mom. He backhanded me, and I fell down. The next thing I remember, I woke up and my mom was lying next to me in bed, along with Andy. We were all three in one single bed, and she had an ice pack over her head.

Dkt 220-1 at 25; Dkt 7, Exhibit 17.

Carlos was physically abusive to Andy and Elizabeth.  Andy was only six years old when Carlos beat him with belts and his fist.  More ominously, Carlos often stripped Andy before beating him.  Dkt 220-1 at 26; Dkt 220-1 at 54.  Elizabeth graphically describes Carlos' violence toward Andy:

> Andy didn't stand a chance with Carlos. Beatings were a regular thing at our
> house. He would drag Andy around by his ears. Carlos would beat Andy with a
> belt. He would beat Andy until he had welts all over his back, and butt, and arms
> and legs. We were always having to kneel in a corner for punishment. Andy had
> to strip sometimes to be beaten. Andy and I were always afraid we would do
> something wrong around him. I remember seeing Andy lying naked, curled up in
> a ball, and Carlos hitting him as hard as he could with the buckle end of the belt.
> Carlos would beat Andy until he had welts and bruises all over his body.

Dkt 220-1 at 26; Dkt 7, Exhibit 17.  Andy received the worst of the beatings because he did his

best to protect Elizabeth.  *Id.*

> Jose also remarked about Carlos' violence towards Andy:
>
> I remember when Espinoza was living with the kids... they complained bitterly
> about him all the time. I remember them telling me over and over that they hated
> him, that they didn't want him living in the house, that they didn't want him
> putting his hands on them or spanking them. They would say "we hate that man,
> we hate that man, we cannot stand him."  I suspect that they were being abused.
> One time Andy came to my house and he had black and blue welts on his arm
> from having been beaten with a belt. Now that I look back on it, I realize that I
> should have lifted his little shirt to see if he had marks on the rest of his body, but
> I was so young, I didn't know what to do. Andy did say that Espinoza hit him in
> the head with his fists…

Dkt 220-1 at 26; Dkt 7, Exhibit 19.  Jose pleaded the children's case with Janie, but she defended

Carlos' actions.  *Id.*   Jose did not pursue the matter because he wanted to continue to see the

children.  *Id.*

Around 1980, Andy returned to live with his father.  Elizabeth Velasco recalled that when

Andy returned, his father did not give him a hug or any support.  Instead, Andy was treated to

violence.  Like Carlos, Anibal used a belt and left bruises all over Andy's body.  Elizabeth

mentioned one particularly violent incident in which Anibal kept hitting Andy for about an hour.

Dkt 220-1 at 27; Dkt 7, Exhibit 20.  Dkt 220-3 at 3.  Anibal was also violent toward Elizabeth

Velasco even in front of his son.  Dkt 220-3 at 3.

On earlier occasions, when Andy and Elizabeth went to Laredo to stay with their paternal

grandmother, they experienced Anibal's violent temper.  Elizabeth is haunted by a particular episode in which she suggested that she and Andy sneak into the pool of a nearby motel.  As Elizabeth recounts, Anibal caught them.  When he took them back to their grandmother's house, "Anibal almost beat Andy to death. . . . It was one of the worst beatings ever."  Dkt 220-1 at 55.

When Andy ultimately caught up with his mother in San Antonio after being abandoned in Houston, he found his mother homeless, living with Hope Chacon and her sister Linda.  Janie then met John Ramirez, another alcoholic, and moved in with him.  Dkt 220-1 at 27; Dkt 220-1 at 85.  Ramirez was also abusive; however, because Andy had grown, Ramirez could not beat him and also did not hit Janie or Elizabeth when Andy was around.  Dkt 220-1 at 27-28; Dkt 220-1 at 56.  Ramirez, though, was menacing.  Once, after catching Elizabeth take his pocket change, Ramirez threatened to kill Janie and Gabriela.  Gabriela recalled Ramirez's violence toward her mother.  Ramirez also insisted on leaving the door open when he had sex with Janie. For her part, Janie was often drunk and incoherent.  Dkt 220-1 at 28; Dkt 220-1 at 61.

5.    Sexual Abuse

All of the primary men in Janie's life engaged in sexual abuse and assault.  Anibal targeted Janie's sisters.  Dorothy Garcia Schiefelbein reports that when she was 8, 9, and 10 years old, Anibal placed his hand inside her underwear.  She felt that her parents and sister were too unreliable to protect her.  Dkt 220-1 at 28; Dkt 7, Exhibit 23.  Anibal also aggressively and forcefully tried to kiss Janie's sister Linda when he was married to Janie.  Dkt 220-1 at 28; Dkt 220-1 at 83.

Andy and Elizabeth became victims of horrific physical and sexual abuse when Carlos Espinoza entered the picture.  Besides dragging her around by the hair and beating her in the head, Carlos began molesting Elizabeth when she around five years old.  Dkt 220-1.  Andy

17

witnessed Carlos rape his sister twice.  Dkt 220-3 at 2.  The first time, Andy disclosed what he saw to his mother; on the second occasion, Carlos beat him after Andy revealed what happened. Dkt 220-3 at 2.

Elizabeth courageously related the graphic details of one of the horrible rapes she endured, which occurred when she was physically ill:

> My most vivid memory I have of being molested was a time I was sick, I was having fevers. I went in to sleep with my Mom, and Carlos put me in between them, which I didn't want. My mom got up in the morning and left, and I woke up and Carlos was all over me. I was in my underwear, and Carlos started rubbing me and putting his hands all over me and having me rub him and all that, it was horrible. I was crying and crying, and he kept slapping me in the head to get me to stop. I finally did because I just kept getting slapped. And he had me sit on him, and then he flipped me over and he had my hands pinned above my head and he took my leg and was getting my underwear off.

Dkt 220-1 at 29; Dkt 7, Exhibit 17, at 2.  On that occasion, Andy tried to rescue her:

> Andy was home-it must have been a Saturday morning- and he came in and started yelling, "I'm gonna tell, I'm gonna tell!" Carlos got off me and ran after Andy, and Andy dodged him, and came in and got me and we ran downstairs to the neighbors. I was naked, and I was bleeding from a busted lip and we were just trying to get them to call my mom. The neighbors knew what was going on, but they were the type, they just didn't want to know, didn't want to be involved. They finally got a hold of my Mom, and she came down and got me. She took me to my uncle Joe and aunt Bonnie's and we were there for a while. They didn't know what happened.

*Id.*  Janie's response was to cut Elizabeth's hair short to make her look like a boy.  Dkt 220-1 at 29; Dkt 220-1 at 60.  For his part, Espinoza threatened to kill Anibal and her uncle Jose if Elizabeth ever told them about being molested.  He also threatened to kill Janie, Gabriela, and Elizabeth if Elizabeth ever told anyone about the sexual abuse.  Dkt 220-1; Dkt 220-1 at 54.

Eventually, Janie stood up to Carlos when he tried to get to Elizabeth after a night of drinking.  Janie stabbed him.  Elizabeth remembers that he wore a "gauzy shirt," and she could see the blood seeping through the fabric.  The next morning she saw blood in the kitchen, and on

the porch, and the stairs.  Dkt 220-1 at 30; Dkt 220-1 at 54; Dkt 7, Exhibit 17 at 3.  Andy saw the stabbing as well.  Dkt 220-3 at 3.

Carlos did not spare Andy.  He tried to rape Andy when he stripped and beat his stepson when he was 6 years old.  Dkt 220-1 at 30; Dkt 220-3 (report of Dr. Maddox).

After Janie moved in with John Ramirez, he also targeted her children.  Elizabeth notes that Ramirez, like her mother, was a heavy drinker.  He walked around the house naked and insisted on leaving the bedroom door open when he had sex with Janie.  He started pursuing Elizabeth, but she kept her bedroom door locked and used a pole to prevent him from being able to open her bedroom window.  Dkt 220-1 at 31; Dkt 220-1 at 56.

Gabriela recalled Ramirez getting an erection when she sat on his lap when she was only about 7 or 8 years old.  Dkt 220-1 at 31; Dkt 220-1 at 61.  Elizabeth and Andy understood that Ramirez would also seek to prey on their younger sister.  As long as Andy lived with them, there was some protection from Ramirez's predations.

When Andy stole John Ramirez's check, Ramirez saw an opportunity to get him out of his way, freeing him to go after Elizabeth or Gabriela.  Elizabeth saw Andy being arrested on television, and Ramirez declared that he wanted Andy "prosecuted to the full extent of the law."  Dkt 220-1 at 31; Dkt 220-1 at 56.  At that point, Ramirez hugged Elizabeth.  *Id.*  Gabriela agrees that Ramirez hoped to get Andy out of the way.  At the time, Andy was about 19, Elizabeth was 17, and Gabriela about 11 years old.  Dkt 220-1 at 31-32; Dkt 220-1 at 61.  Elizabeth warned Janie that Ramirez was after Gabriela and urged Janie to protect her youngest daughter.  Dkt 220-1 at 31; Dkt 220-1 at 56.

Following his arrest but before sentencing, Andy stayed with his cousin Michele.  Both Michele and her mother Linda recall that Andy got along well with Michele and her husband.

19

Michele describes Andy as a "good-hearted person," and Linda found that Andy responded to

the guidance and advice Michele and her husband gave him.  To Linda, Andy "was a lost boy

who just needed some guidance."  Dkt 220-1; Dkt 220-1 at 85; Dkt 220-1 at 80.  Both Linda and

Michele agree that Ramirez pushed for Andy's prosecution to get him away from his family.

After Andy was gone, Ramirez came after Elizabeth.  Janie passed out from drinking.  To

protect herself, Elizabeth broke a beer bottle and threatened to cut him.  Ramirez was undeterred.

Elizabeth ran to her bedroom and locked the door.  Ramirez came around to a sliding glass door,

but Elizabeth used a stick to prevent it from being slid open.  A next-door neighbor heard the

commotion and yelled that she planned to call the police.  Ramirez fled, and Elizabeth went to

stay with her.  Dkt 220-1 at 34; Dkt 7, Exhibit 17 at 7.

Elizabeth pointed out that she was molested and beaten by a number of her mother's

other boyfriends.  Dkt 7, Exhibit 17 at 3.  She notes that Andy stayed around whenever possible

to deter attacks.  When Andy was out, Elizabeth often waited on the porch for him.  *Id.*

D.    Consequences of Andy's Traumatic Life History

1.    Educational Setbacks

Andy's early school records show that he made progress and managed to remain in an

appropriate grade level.   However, having to cope with trauma in his home and the incredible

instability of incessantly having to move and change schools took a toll.[5]  Susan Herrero captures

a flavor of Andy's deteriorating academic performance as his life spiraled out of control:

> [L]ater records from the Wilson school show him in the 6th grade during the 1976-
> 77 school year when, factoring for his age, he should have been in 7th grade.
> Other records document his attendance in 5th grade at Park Ave School in Los
> Angeles on 10/28/78 when Andy should have been in 9th grade.  Additional
> records show Andy attended 8th grade at Scarborough school in Houston that

---

[5] Due to his family instability, Andy attended 16 schools in Texas,, including special education in Southwest ISD
and Northeast ISD in San Antonio.  He also attended two schools in Chicago, three schools in Wisconsin, and five
schools in California.  Dkt 220-3 at 4.

same school year (1978-79).  The records show that during that same school year (1978-79), he was transferred to Gifford school on 01/30/78 and placed into a 7th grade special education class for "B.D." (Behavior Disordered).  Later records show him failing out of the Sam Houston High School on 03/12/80 during the 1979-80 school year even though he was placed in resource classrooms for English, Math, Science and Social Studies.

Dkt 220-1 at 35.

Standardized test scores also show that Andy struggled academically:

Records indicate the ITBS (Iowa Test of Basic Skills) was administered on 04/75. Andy would have been 10 years old and was in the end of 5th grade.  He was reading at the beginning of a 3rd grade level (3.0) and his Arithmetic was at a 2nd grade level (2.7).  His 10/13/76 WISC scores show a Verbal Score of 85, a Performance Score of 101 and a Full Scale Score of 91, with a reading level at 5.1 grade, arithmetic level at 3.9 grade, and level and spelling level at 3.5 grade.  In 10/76, he should have been functioning at a 7th grade level, as that was age appropriate.  Records also indicate that on 04/06/79, he withdrew from 8th grade at Scarborough with "Fs" in all classes when he should have been in 9th grade. On 10/79, Mac Arthur High School administered a Primary Mental Abilities test. Andy scored extremely low.  His Raw Scores converted to IQ were all well below average. His Reasoning and Composite scores fall within the Intellectual Disability (bottom 2%) range:

Verbal Resolution  IQ  92  = 31%
Reasoning          IQ  64  =  1%;
Composite          IQ  66  =  2 %
Numerical facility IQ  90  = 27%
Spatial relations  IQ  75  =  6 %

According to records, Sam Houston High School administered the San Antonio CRT Level IV Form B test scores on 02/80.  Andy's results (Raw Scores = Language 30; math 17; Total 47) indicate extremely low scores.  Percentile score for language was 11% and percentile score for math was 1%, giving him a total percentile score of 3%.

Later, at almost 18 years of age, on 10/28/82, he completed his GED at the Brownwood State School, Brownwood, Texas.  His scores were low in writing (16th %) and math (31st %).  Andy reports he had several placements in Behavior Disorder classrooms and one is documented in the few school records that we have.

Dkt 220-1 at 35-36.

Elizabeth Velasco recalls Andy struggling when he came to stay with Anibal and her

when Andy was about 13 years old.  "Andy did not know how to write, nor did he know how to read well."  Dkt 220-1 at 35; Dkt 7, Exhibit 20 at 2.  Elizabeth Velasco tried to help with homework, but Andy did not improve.  Andy's sister Elizabeth found that her brother had a short attention span and had problems focusing.  Dkt 220-1 at 36; Dkt 220-1 at 56.  Andy did have a talent for art.  *Id.*

2.  Andy's Drug and Alcohol Use

Andy was introduced to alcohol use at a young age.  His maternal cousin, Michele Vallin, babysat for Andy and Elizabeth.  When she was 11 years old, and Andy only 8 years old, Janie paid Michele with beer and cigarettes for babysitting.   When she was 13 and Andy about 10, Michele and Andy drank beer and smoked cigarettes while Janie was out.  Dkt 220-1 at 39; Dkt 220-1 at 80.

As discussed in the next subsection, Andy was forced to join a street gang when he was about 9 years old.  The gang leaders provided Andy with alcohol in the morning before school.  Dkt 220-1 at 39.  When he lived in Houston, Andy smoked pot.  When Andy was held in juvenile institutions, drugs were readily available.  As Ms. Herrero points out, Andy was an alcoholic by age 14.  Dkt. 220-1 at 39.  Andy had a job working for a record company as a driver.  He was fired after he drove a van containing band members into a palm tree.  Andy reported being intoxicated and driving at 70 mph at the time of the accident.  Dkt 220-3 at 5.

Andy also reported using LSD when he was 15 years old and using cocaine beginning when he was 16 years old.  He also developed an addiction to heroin.  Dkt 220-3 at 8

3.  Andy was forcibly recruited into gang involvement.

When he was young, Andy lived in a neighborhood controlled by the Latin Kings.  In the 1970s, the Latin Kings took over vacant apartments, seized control over local drug sales, and ran

22

dogfights.  The gang had a well-defined hierarchy with strict rules and guidelines.  Its method of operation included the forcible recruitment of young children to serve as runners, lookouts, or dupes who held drugs if the police came.  Dkt 220-1 at 40.  The Latin Kings were associated with violence.  In fact, when he was 6 years old, Andy witnessed a shooting that left one man dead.  *Id.; see also* Dkt 220-3 at 2.

Andy was forced into the gang when he was 9 years old and working shining shoes and selling newspapers.  He was threatened with death if he refused to run errands.  Dkt 220-1 at 40. In 1974, when he was either in fourth or fifth grade, Andy was shot at during a drive-by shooting.  Dkt 220-3 at 3.  Elizabeth also recalls that Andy had to be taken by ambulance to a hospital.  He may have been shot or stabbed by someone in the gang.  *Id.*; 220-1 at 55.  Shortly after this incident, Janie moved the family to California.

Andy thrived in those few times when he was in a stable and loving environment.  He was embraced by Liz Hewitt and her family.  Tragically, he had too much to overcome.  As his sister Elizabeth observed, "Andy was a throwaway child.  He was inconvenient to my parents. . . . He never had a chance.  We were both hated children by my father.  If only my parents would have given Andy a little more attention, he could have grown up to have a family and a good life. He was always brave when I needed him to be.  I will forever be grateful for that."  Dkt 220-1 at 58.

4. <u>Mental illness and cognitive difficulties.</u>

In her evaluation of Andy, Dr. Donna Maddox found some problems with concentration and language as well as deficits in short term memory.  Dkt 220-3 at 11.  In neuropsychological testing, Dr. Tora Brawley found mild deficits in frontal lobe functioning in particular matrix reasoning and verbal fluency.  Dkt 220-2 at 3.  Dr. Brawley also concluded that a structured

environment has benefited Andy's overall cognitive functioning.  He would have been more significantly impaired prior to incarceration.  *Id.*

More significantly, Andy suffers from severe mental illness, primarily Posttraumatic Stress Disorder (PTSD) and Persistent Depressive Disorder.  Andy reports having a depressed mood for years and increased irritability, being short-tempered, and having low energy and poor concentration.  Dkt 220-3 at 15.

Consistent with PTSD, Dr. Maddox carefully tracked factors in Andy's life and experiences that align with the criteria for that Trauma and Stressor Related Disorder.  Dkt 220-3 at 14.  The essential feature of the disorder is development of specific symptoms after exposure to a traumatic event.  *Id.*  Highest rates of PTSD are found among survivors of rape, military combat, and captivity.  *Id.* at 15.  Pre-traumatic risk factors include prior traumatic experience, lower socioeconomic status, lower education, and family dysfunction.  *Id.*  As described previously, Andy experienced many of the factors placing him at risk, including witnessing a shooting, being sexually assaulted, witnessing his sister being assaulted, and severe physical beatings.

Peritraumatic risk factors include the severity of the trauma, perceived life threat and interpersonal violence by a caregiver.  *Id.*  Again, Andy personally experienced extreme violence at the hands of his father and other men with whom his mother became involved.  Additionally, when he was very young, he witnessed a shooting, and his early gang experience exposed him to additional violence and trauma.[6]  As Dr. Maddox points out, Andy's experience is consistent with that of other prisoners involved with street gangs in that all had more exposure to violence, symptoms of PTSD, paranoia, anxiety, and forced behavioral control.  *Id.* at 16.

---

[6] After consulting with Dr. Fred Sautter, Ms. Herrero believes it is possible that Andy suffers from even more severe "Complex PTSD," because of his "extensive exposure to trauma beginning early in life and continuing into adolescence.  Dkt 220-1 at 34.

24

Dr. Maddox concluded as follows in her evaluation:

1. Mr. Canales has a history of exposure to trauma beginning by latency age.
2. He has had multiple exposures to traumatic events during his life.
3. He meets the criteria for PTSD and developed a comorbid substance abuse and mood disorder.
4. Mr. Canales was incarcerated during his most recent offense.
5. At the time his health was poor.
6. Various documents note that his life had been threatened due to the nature of his prior charges and involvement in a gang.
7. He was suffering from mental illness at the time of his offense.
8. A recent study comparing prisoners who were involved in street gangs compared to prisoners who were not involved in street gangs reveal that prisoner who were involved in street gangs had more exposure to violence, symptoms of PTSD, paranoia, anxiety and forced behavioral control. Wood, Jane L. and Dennard, Sophie (2016) *Gang membership: links to violence exposure, paranoia, PTSD, anxiety and forced control of behavior in prison.* Psychiatry: Interpersonal and Biological Processes. . ISSN 0033-2747. (In press)
9. Mr. Canales has never had treatment for his PTSD nor mood symptoms.
10. Mr. Canales has a medical condition and prescribed medication (Metoprolol) which are associated with depression.

Dkt 220-3 at 15-16.

E.     Rebutting the State's Case for Future Dangerousness

At the penalty phase, the State focused on Andy's violent actions and threats while incarcerated and as a member of the Texas Mafia to establish future dangerousness. The mitigating evidence of Andy's mental illness, his life-threatening heart condition, and factors about gang life in the Texas prisons would have provided necessary context to understand the offense and also to diminish the strength of the State's case.

When in prison in the mid-1980s, Andy was a member of the Texas Syndicate gang, which included Mexicans, Whites, and Chicanos.  Dkt 220-1 at 41.  The Texas Mafia was formed as a "cousin" to the Texas Syndicate.  The Texas Mafia had mostly white inmates and included many former Aryan Brotherhood gang members and other white supremacists.  The Texas Mafia engaged in criminal money-making ventures such as selling tobacco and other

contraband.  *Id.*  The two gangs were close.  *See also* Dkt 220-1 at 70.

Although Andy was paroled in 1990, he returned to prison after spiraling out of control shortly after his mother's aneurysm.  He became cellmates with Bruce Richards, a leader of the Texas Mafia, at the Telford Unit.  Bruce had been convicted for forgeries, burglaries, and possession of heroin and cocaine.  *Id.*  After his heart attack in 1995, Andy was especially vulnerable.  He used nitroglycerine under his tongue.  He bruised easily, and if he even pricked himself, he would bleed for hours.  As a result, he avoided fights.  *Id.*  at 41-42; Dkt 220-1 at 71.

Around this time, prison gang leaders began to acquire court files on their members.  As a result, the Texas Syndicate leaders learned that Andy had been a member of the Latin Kings and had two prior sex convictions.  The Texas Syndicate ordered a hit on Andy.  Andy confided in Bruce Richards about his problems with the Syndicate.  *Id.* at 42.

Because Bruce had become friends with Andy, he decided to intervene.  He approached the leader of the Texas Syndicate and offered to take Andy into the Texas Mafia.  In return, Bruce owed the Syndicate a favor.  *Id.*

Gary Dickerson, another prisoner, learned about the tobacco-smuggling operation run by the Texas Mafia.  He threatened to expose it if he did not receive payment.  According to Bruce Richards, Dickerson was seen as a danger and thus had to be punished.  Dkt 220-1 at 71.  After the Dickerson murder, Bruce ordered Andy and Speers to write to Bruce Innes and exaggerate their role in the murder.  Richards hoped to impress Innes to recruit him.  Innes had money, and if he could recruit Innes, Richards could get his money. Richards also points out that Andy and Speer were new recruits and had to follow his orders.  "If Andy refused to do what I told him I would have sent him back to the Texas Syndicate, and he would be killed.  I saved his life and he

owed me." Dkt 220-1 at 72 (emphasis added); Dkt 220-1 at 44.[7]  Andy also understood that

Doyle Hill, another leader of the largely white supremacist Texas Mafia, was after him.  Dkt.

220-1 at 76.  Facing danger from the Texas Syndicate and from a leader of the Texas Mafia and

being "unable to fight a lick after his heart attack," "Andy was willing to do whatever it took to

get these hits off of him to save his life."  Dkt 220-1 at 76.

      Bruce Richards ultimately renounced the gang, went through the Gang Renouncement

and Disassociation Process and was released in 2012.  As far as Andy is concerned:

> [He] regrets ever being involved in prison gangs, but it was impossible to be a
> loner and survive back then.  Prison was very dangerous and violent when he was
> a young man.  At that time, gangs had a lot of control within the prison.  The
> prominent gangs were the Texas Syndicate and the Texas Mafia.  After suffering
> a debilitating heart attack in 1995, Andy was no longer able to defend himself.
> He was a Mexican Jew (Andy converted to Judaism while in prison) who was
> living with many white supremacists.

Dkt 220-1 at 45.  Andy's PTSD and life-long history of trauma made him feel especially

vulnerable to the threats he faced.

      Besides providing needed context about the circumstances surrounding offense, trial

counsel could have also presented expert evidence that the Texas Department of Corrections had

well-established security measures for those sentenced to life imprisonment.  According to Steve

Martin, a former consultant with the Texas Attorney General's Office and a former Legal

Counsel, General Counsel, and Executive Assistant with the Texas Department of Corrections,

inmates receiving a life sentence are placed in the most secure housing, under security conditions

"essentially identical to those on Texas' death row."  Dkt 7, Exhibit 30.  Strict security measures

allow for limited time out of cells, prohibit participation in many programs, involve tighter

---

[7] Andy was also vulnerable because he crossed Doyle Hill, another leader in the Texas Mafia.  Hill and Richards clashed.  Andy helped foil an attempt to kill Richards and thus Hill hated Andy. Dkt 220-1 at 42, 71, 75, 77-78.  Andy had also refused to follow some of Hill's orders to act as his enforcer.  Dkt 220-1 at 42.  According to Richards, Hill led Innes to believe there was a hit on him to get Innes to agree to testify against Andy.  Dkt 220-1 at 44, 72.

controls if the prisoner is moved in the prison, and ban contact visits.  *Id.* These well-established

policies would have reduced the likelihood that Andy would be a future danger in the prison

system.

The State sought to prove Andy's future dangerousness by highlighting his gang

membership, involvement in a gang homicide, and threats made in a kite following the homicide.

A thorough investigation of his medical and psychological condition as well as an investigation

of the context of the murders would have diminished the strength of the State's case and placed

Andy's involvement in a very different context.


## II.    Had Trial Counsel Presented The Available And Substantial Mitigating Evidence, There Is A Reasonable Probability That The Result Of His Penalty Phase Would Have Been Different.

Petitioner establishes prejudice due to trial counsel's deficient performance if there is a

reasonable probability that the result of the penalty phase would have been different.  *Strickland*

*v. Washington,* 466 U.S. 668, 694 (1984).  A reasonable probability is a probability that is

sufficient to undermine confidence in the outcome.  *Id.* at  694. This Court must determine

whether the undiscovered "mitigating evidence, taken as a whole, might well have influenced the

jury's appraisal" of the defendant's culpability.  *Rompilla*, 545 U.S. 374, 376 (2005); *see also*

*Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (a "proper analysis of prejudice under *Strickland*"

takes "into account the newly uncovered evidence of [Petitioner's] significant mental and

psychological impairments, along with the mitigation evidence introduced during [his] penalty

phase trial.").

"Mitigating evidence unrelated to dangerousness may alter the jury's selection of

penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."  *Williams*

28

*v. Taylor*, 529 U.S. 362, 398 (2000).  Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors.  *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (emphasis added); *Lewis v. Dretke,* 355 F.3d 364, 369 (5th Cir. 2003) (had adequate mitigation been presented, "it is quite likely that it would have affected the sentencing decision of at least one juror").

The gap between what was actually presented at trial and what was available through investigation and expert evaluations is immense.  Trial counsel presented nothing of Andy's background, family history, trauma, abuse, mental illness, medical condition, or circumstances leading to gang involvement.  As a result, when the jury was considering whether to find future dangerous and whether to sentence Andy to death, it only had before it tepid and unconvincing evidence that he was generally a "good guy," peaceable, and a good artist.  SR 12:41-42; SR 12:55-56. This testimony "left the jury knowing hardly anything about him other than the facts of his crimes." *Porter v. McCollum,* 130 S. Ct. 447, 449 (2009).  No wonder the prosecutor was able to argue in response:  "Mitigating evidence folks – it is unbelievably sad – it's an incredibly sad tribute that when a man's life is on the line about the only good thing we can say about him is he's a good artist."  SR 12:118-19.

Reviewing courts have often recognized that the type of evidence presented here and in connection with the habeas corpus petition (Dkt 7) is sufficient to satisfy *Strickland*'s prejudice test.  For instance, in *Williams v. Taylor,* 529 U.S. 362 (2000), the Commonwealth of Virginia presented two experts regarding Williams' likelihood of being a future danger and evidence of several other violent felonies he committed before and after the capital murder.  *Id.* at 368.  Similar to this case, the defense only presented very brief testimony that the defendant was a "nice boy" and not a violent person.  *Id.* at 369.  In collateral proceedings, however, counsel

provided evidence of abuse, mistreatment, and neglect during early childhood as well as evidence of cognitive limitations.  *Id.* at 370-71.

In finding prejudice, the Supreme Court stressed that while the evidence adduced at trial "may not have overcome" the prosecution's evidence of aggravating factors, "the graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."  *Id.* at 398.

Similarly, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the defendant was convicted of a heinous offense, and two of the aggravating circumstances included that the murder was committed by torture and that the defendant had a significant history of prior violent convictions. *Id.* at 378.  The defense presented brief testimony from five witnesses, primarily that they still believed the defendant to be innocent and that they believed him to be a good man.  *Id.*  Had Rompilla's attorneys performed an adequate investigation, they would have found evidence of his childhood and mental health very different from what they had seen.  *Id.* at 390-91. Available records showed that Rompilla grew up with violently alcoholic parents and later became an alcoholic, which was a factor in his prior offenses.  *Id.* at 391-93.[8]  Based on the newly developed mitigating evidence, the Supreme Court reversed Rompilla's death sentence. *See also Sears v. Upton*, 130 S. Ct. 3259, 3261-62 (2010) (prejudice found in light of evidence of abusive parents, behavior problems, sexual assault, deficits in mentality and impulse control, head injuries and substance abuse).

Evidence of a traumatic childhood has long been recognized as mitigating, and reviewing courts have found prejudice even in light of graphic crimes or crimes involving multiple victims.

---

[8] Not surprisingly, the Fifth Circuit favorably compared Canales's case to the circumstances in *Rompilla v. Beard,* 545 U.S. 374 (2005), and *Williams v. Taylor,* 529 U.S. 362 (2000).  765 F.3d  at 570 (noting the similarity in evidence of privation and abuse).

*See, e.g., Lewis v. Dretke,* 355 F.3d 364 (5th Cir. 2003) (counsel ineffective for not presenting evidence of abusive background); *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) (prejudice found despite fact that the petitioner was involved in the stabbing death of two people); *Mason v. Mitchell,* 543 F.3d 766, 769 (6th Cir. 2008) (prejudice found even though the petitioner raped a woman and beat her to death using "a blood-stained board with protruding nails").

Similarly, evidence of physical and psychological abuse, neglect, poor academic performance due, in part, to abusive parents, parental alcoholism, and Posttraumatic Stress Disorder has been found sufficient to establish prejudice. *See Bond v. Beard*, 539 F.3d 256, 283 (3rd Cir. 2008); *see also Outen v. Keary*, 464 F.3d 401 (3rd Cir. 2006) (counsel presented a "good guy" penalty phase case and failed to uncover evidence of family issues, cognitive and psychological problems, or substance abuse and failed to call a witness to provide a comprehensive social history).

In *Anderson v. Sirmons*, 476 F.3d 1131, 1146 (10th Cir. 2007), the Tenth Circuit found prejudice despite convictions on three counts of "callous and brutal" first degree murder and despite fact that prosecution introduced evidence that while awaiting trial, the petitioner obtained illegal drugs and a knife.   The court recognized that the prosecutor had been able to capitalize on the overall weakness in the mitigation case at trial:  "relying on the exceedingly limited nature of trial counsel's case in mitigation, the prosecution was able to argue convincingly to the jury that there was nothing in the case to diminish [the petitioner's] moral culpability for the murders." *Id*. at 1147.  The mitigation evidence that was not presented at trial, however, could have helped explain the petitioner's predispositions.  *Id*. The Tenth Circuit's conclusions apply equally well to this case:

> [T]he absence of this readily available mitigation evidence left the jury
> with no explanation for the murders other than the prosecution's assertion

> Anderson was 'evil.'  Although the case against Anderson was strong and the murders in this case were horrific, court have not hesitated to grant relief in similar circumstances where the absence of available mitigation evidence left the jury with a 'pitifully incomplete' picture of the defendant.  Had the jury been presented a complete picture of Anderson's background and history, there is a reasonable probability at least one juror would have struck a different balance between the mitigating and aggravating factors.

*Id.* at 1148 (cites omitted).[9]

Two other glaring omissions of counsel were prejudicial.  Besides failing to present mitigating evidence about Petitioner's social history and psychological condition, trial counsel failed to account for his debilitating heart condition and how his medical problems made him vulnerable to the control of gang leaders in prison, who coerced him into involvement in this capital crime.  Additionally, the abandonment and neglect he suffered while living in a gang-infested neighborhood made him vulnerable to exploitative street gangs.  This explanation would have provided the jurors with a much different context in which to view his involvement in the murders.

Finally, although trial counsel ostensibly wanted to show that Andy was a good person, they failed to present anyone who knew him well and could have provided specific instances of his good qualities, such as Liz Hewitt.  And counsel did not contact Andy's sisters, who could have told the jury how Andy did his best to protect them and even stood up to adults, placing himself at risk. As Elizabeth stated in her recent declaration, "If only my parents would have given Andy a little more attention, he could have grown up to have a family and a good life.  He was always brave when I needed him to be.  I will forever be grateful for that."  Dkt 220-1 at 58.

---

[9] Other courts have found prejudice for the omission of evidence similar to that in this case.  *See Johnson v. Mitchell*, 585 F.3d 923, 943-45 (6th Cir. 2009) (petitioner was beaten and threatened by father as a child, petitioner used drugs extensively, developed paranoia, was intellectually competent but was impulsive and antisocial); *Williams v. Anderson*, 460 F.3d 789, 804-05 (6th Cir. 2006) (petitioner's father left family when petitioner was young; petitioner had alcoholic mother, became addicted to cocaine and suffered from personality disorders).

Had jurors learned of these qualities, there is a reasonable probability that at least one of them would have voted for a life sentence.

<u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Petitioner asks the Court to grant the writ of habeas corpus setting aside Petitioner's death sentence and ordering a new sentencing trial.  In the alternative, Petitioner asks the Court to have an evidentiary hearing on this issue.

Respectfully submitted on February 1, 2017.

/s  TERESA L. NORRIS                         /s  DAVID P. VOISIN

Teresa L. Norris                              David P. Voisin
101 Meeting Street, 5th Floor                 P.O. Box 13984
Charleston, SC 29401                          Jackson, MS 39236
(843) 958-1858                                (601) 949-9486
tlnorris@charlestoncounty.org                 david@dvoisinlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I have served the foregoing Motion via the Court's ECF system on Counsel  for Respondent:

This the 1st day of February 2017.

/s  DAVID P. VOISIN

33