IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ANIBAL CANALES, JR., #999366, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:03cv69 |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| Respondent. | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Anibal Canales, Jr., a death row inmate confined in the Texas prison system, brings this petition for a writ of habeas corpus challenging his capital murder conviction pursuant to 28 U.S.C. § 2254. The petition was referred for findings of fact, conclusions of law and recommendations for the disposition of the case.

Procedural History

Canales was sentenced to death in Bowie County, Texas, for the capital murder of Gary Dickerson, a fellow inmate. The conviction was affirmed on direct appeal. *Canales v. State*, 98 S.W.3d 690 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1051 (2003). His initial application for a writ of habeas corpus filed in state court was denied on the merits. *Ex parte Canales*, No. WR-54,789-01 (Tex. Crim. App. March 12, 2003) (unpublished).

On November 29, 2004, Canales filed the present petition, raising thirteen separate grounds for relief. On March 23, 2007, the Court stayed the proceedings in order to give Canales the opportunity to present his unexhausted claims to the state court system. The Texas Court of Criminal Appeals ("TCCA") dismissed his subsequent state application as an abuse of the writ. *Ex parte Canales*, No. WR-54,789-02, 2008 WL 383804 (Tex. Crim. App. Feb. 13, 2008).

1

Canales returned to this Court.  On August 24, 2012, the Court dismissed Canales's first, second, fifth, sixth, seventh, eighth, tenth, eleventh and twelfth claims with prejudice as procedurally defaulted and denied his third, fourth, ninth and thirteenth claims on the merits.

The United States Court of Appeals for the Fifth Circuit affirmed, in part, and reversed, in part, the decision of this Court.  *Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014).  The Fifth Circuit reversed this Court's decision regarding Canales's claim that he received ineffective assistance of counsel during sentencing.  *Id.* at 559.  This Court's decision regarding his remaining claims was affirmed.  *Id.*  The ineffective assistance of counsel during sentencing claim was remanded for further consideration in light of the Supreme Court's recent decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

Canales filed a brief regarding prejudice (Dkt. #222) on February 3, 2017.  The Director filed a brief in response (Dkt. #228) on May 16, 2017.  Canales filed a reply (Dkt. #229) on May 30, 2017.

<u>Factual Background</u>

The Fifth Circuit discussed the factual background of the offense as follows:

On July 1, 1997, prison officials caught Larry "Dirty" Dickerson ("Dickerson"), an inmate at the Telford Unit of the Texas Department of Criminal Justice ("the Unit"), with contraband that belonged to another prison gang.  Dickerson told another inmate, James Baker ("Baker"), that if Baker did not help him avoid retaliation from the gang whose contraband was stolen, Dickerson would tell prison officials about a large quantity of tobacco that was to be smuggled into the prison the next day.

The next day, prison officials intercepted a shipment of contraband tobacco intended for Baker and the Texas Mafia, a prison gang.  When the tobacco was intercepted, Dickerson was placed in administrative segregation.  At his own request, he returned to the general population about a week later.  Dickerson was found dead in his cell on July 11, 1997.  Prison authorities initially concluded that Dickerson had died of natural causes.  Only after conducting an autopsy did the State conclude that Dickerson had actually been strangled.

The Texas Mafia had a financial stake in the intercepted contraband tobacco and arranged for Dickerson's murder.  *See Canales,* 98 S.W.3d at 693.  Canales, who was also an inmate in the Unit, was a member of the Texas Mafia.  According to the magistrate judge's summary of the facts Canales and three other Texas Mafia members—William Speer ("Speer"), Jessie Barnes, and Michael Constantine—agreed to murder Dickerson. Canales and Speer went to Dickerson's cell, and while Canales held him down, Speer strangled him.

2

In 1998, Canales sent a letter to Bruce Innes ("Innes") in which he described Dickerson's murder and the Texas Mafia's interest in it. The letter was admitted into evidence at trial.

> Dirty [Dickerson] lit the smoke and we smoked.  When the last hit was took he was down by the vent on his knee and Puff [Speer] behind and me at the door.  Puff put the hold on him and I grabbed his arms.  It went smooth!  He lost consciousness right away and strugled (sic) for a little bit.  I took the time to inform Him who we were and why he's going to die.  Puff told him. . "Don't even fuck with the Texas–MAFIA in hell!!"  Ha!  Ha!  Ha!  Anyway . . . we made sure the dick sucker was dead and I declared the hit complete.  We put his shit smelling ass in the top bunk and went quietly out the door.  I went to the yard with minutes to spare!!

R. at 2355 (magistrate judge's summary of the facts) (alterations in original) (emphasis omitted).

Canales was indicted for capital murder in November 1999.  In February 2000, he sent another letter to Innes.  As the district court described the letter, "although written in code, [it] appeared to ask the gang to retaliate against Larry ("Iron-head") Whited because he believed Whited had informed prison authorities about his role in the killing."  The district court also included the letter:

> Greetings, Sir . .  As always, I come to you and all worthy with my utmost respects (sic)!  I realize that I just recently sent you a letter but it has become imperative that I write you again, as you'll see . .  First, I arrived at bowie county court on 2–7–00 and was arraigned for several charges.  Mrs. Speers barnes and Constinetine were also there . . I must tell you that the worst has been done and its (sic) one of the charges (Main one actually) Glarinly (sic) absent was that iron headed fella.. He was not charged, which is good . . Eh? Seems that iron obes (sic) bend to the will of the state or not.  I personally think so.
>
> Perhaps some effort can be used to throw that useless material to the scrap yard. . I can't stress how important this is.  As you know Iron can be shaped into what you want it to look like and not in a good way sir!!  If this can't be done then I'll need to ask for legal-assistance from other arenas . .  And that's not to(sic) cool!  Maximum effort Ace, Maximum!!  Now, I will also get with Mr. JR on the others who are involved and can help get it all in order.  Also, it's possible that a legal defense fund will be placed to help with council, (sic) legal material, clothes (for court) I'll have our attorney (who's a freeworld) get it together and put out flyers to all the best.
>
> We'll need ya'lls (sic) help fellas and I can't stress how important it is to file that writ of dismissal in this area on that pile of scrap!  This in itself would be tremendous in assisting this legal case!  That's how important it is . . .  You take care fellas and put out the word that help is needed on this from all areas. . . .  We continue the struggle,
>
> In solidarity
> Bigfoot..

3

R. at 2356–57 (emphasis omitted).  This letter was also admitted into evidence at trial.

In April 2000, Canales wrote a third letter to another inmate, which read in part:

> Yeah bubba, I've been bummed a bit, just a small funk, no sweat . .  A lot has to do with my case and its outcome or the way I see it.  It's not good, and I've got a few making matters worse with their mouths!  I was here with Tony Rice, I know him and his case and I know how it came about, I was in super seg with him there in 85 and then we were all on the same wing (L—Wing) in 86–87 and we got tight.  I saw the downfall and how it came about and who was responsible!  I've got snakes in the yard and it's getting worse from the crap coming outta the mouths of so-called homies.  One dayroom call homeboy, and I'll get it all straight!  Bet that!  But what can I do?  Nothink!  Nada!  Zero!  Zip!  0!  But, I'm a firm believer that what goes around, comes around!  And that what you sow, you reap!  So, I'll be content with justice in the end. TDC is not big, at all!  So. . . . . .

R. at 2357.  The State also introduced this letter into evidence at trial.

The 1998 letter was particularly important in the guilt phase, and the other two letters were used at punishment phase to help establish "future dangerousness," the special issue that led to his capital sentence.  *Canales,* 98 S.W.3d at 699.  The State also used several inmates as witnesses, including Innes (who allegedly started working as a State agent in 1999 or 2000), Richard Driver, Jr., and Doyle Hill.

*Canales*, 765 F.3rd at 559-61.

<u>Punishment Evidence</u>

1.   <u>State's Evidence</u>

The State's evidence during the punishment phase of the trial consisted of documentary evidence, along with the testimony of Suzanne Hartbarger and Bruce Innis.  The documentary evidence included the pen packets showing Canales's prior convictions.  His prior convictions included a five year sentence for theft, *State v. Canales*, No. 84CR-0012 (290th Dist. Ct., Bexar County, Tex. April 23, 1984); a fifteen year sentence for sexual assault, *State v. Canales*, No. 83CR-3030 (290th Dist. Ct., Bexar County, Tex. March 12, 1984); and a fifteen year sentence for aggravated sexual assault, *State v. Canales*, No. 93-CR-2039-G (319th Dist. Ct., Nueces County, Tex. Jan. 6, 1995).  The documentary evidence was admitted without objection.  12 RR 11.[1]

---

[1]"RR" refers to the reporter's record of the transcribed testimony during the trial, preceded by the volume number and followed by the page number.  "CR" refers to the clerk's record on direct appeal, followed by the page number.

The victim of the Bexar County sexual assault testified that she was a student at San Antonio College at the time of the assault.  Canales approached her in a parking lot near the college, showed her a badge, told her that he was a police officer, and said he was investigating a drug-sale in which she had been named.  12 RR 12-13.  He told her that she was going to jail.  She got out of her car, he got in the driver's side, and he said he would drive her to the jail.  Rather than driving to the jail, Canales drove around.  At some point in time, she realized that he was not a police officer.  12 RR 13.  She told him that she was going to jump out of the car.  12 RR 14.  He responded by telling her that he would "blow [her] away" if she jumped out of the car.  *Id.*  She believed that he might have a gun.  After stopping the car, he walked her into the woods and raped her.  12 RR 16.  She discussed the rape as follows:

> He raped me.  He had intercourse with me, and at the time -- and at the time it was happening -- I had a cross in my hand and I was praying, 'To our Father' out loud so -- it happened to me, but I felt I was shielded by God, because when I looked at him as I was praying, I just saw like the devil in him.

12 RR 16.  When he finished, he told her "you'd better not tell, or I'll kill you." 12 RR 17.  He drove off in her car with her "car keys, address book, house keys, everything." *Id.*  As for the effect of the rape, the victim made the following statement to the jury:

> It has made me bitter, and has weakened me, because I didn't think I would ever have to open up this door again, and I had to, and it has weakened me to somebody I don't want to be - didn't want to because, you know.  It just made me a weaker person.  I just feel weak, like I don't have any - I don't know how to explain it.

12 RR 17-18.  On cross-examination, she testified that he called her house threatening to kill her if she testified against him.  12 RR 20.

Inmate Bruce Innis testified that Canales wrote to him shortly before the trial.  Canales believed that Innis was still a member of the Texas Mafia prison gang, and he did not know that Innis was planning to testify against him.  12 RR 22.  Innis testified that Canales had sent him a coded letter in which he asked Innis to arrange for the murder of inmate Larry Whited, whom Canales suspected of cooperating with investigators.  12 RR 23-25.

The record also shows that the victim of the aggravated sexual assault in the early 1990s did not testify.  Among other reasons, it was explained that she did not communicate well in English. 12 RR 8.

2.     Defense Evidence

The defense called seven witnesses on behalf of Canales, including inmates and officers, testifying that Canales was not troublesome and had an aptitude for art.  The defense also elicited testimony that Canales's mother was dead and that he received few visits from family.   It is noted that one inmate testified that he had seen Canales trying to stop inmates from fighting.  12 RR 56.

The docket sheet reveals that the jury started deliberating at 10:00 a.m. on November 1, 2000. CR at 12.  A verdict was returned on that same day at 11:45.  *Id.*

Discussion and Analysis

1.     Procedural Requirements

The claim remanded for the Court's consideration concerns whether Canales received ineffective assistance of counsel at sentencing.  In his federal habeas petition, Canales alleged that he received ineffective assistance of counsel because his attorneys failed to discharge their duty to conduct an investigation into his life, and thus failed to uncover powerful mitigating evidence.  He argued that an effective investigation would have explained his desire to be part of a gang and uncovered evidence of his traumatic and neglectful childhood, his love and efforts to protect his sister, the love his family has for him, and the likelihood of mental disorders.  The claim was based on *Wiggins v. Smith*, 539 U.S. 510 (2003).  The Director argued that the claim was procedurally defaulted because Canales failed to raise the claim in his initial state habeas corpus proceedings.  This Court stayed the present proceedings to give Canales the opportunity to present this and other unexhausted claims to the state court system for review.  The TCCA dismissed Canales's subsequent application as an abuse of the writ pursuant to Tex. Code Crim. Proc. Art. 11.071 §5 (c).  *Ex parte Canales*, 2008 WL 383804, at *1.  Canales returned to this Court, which found that the *Wiggins* claim was procedurally barred and that Canales could not show actual innocence to avoid the default.

6

The resolution of this claim concerns complex procedural issues involving exhaustion of state remedies, procedural defaults and whether Canales can overcome the procedural default via *Martinez* and *Trevino*. The analysis of Canales's claims should begin with a discussion of the exhaustion requirement. State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In Texas, all claims must be presented to and ruled upon the merits by the TCCA. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g., Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The exhaustion requirement, however, was profoundly affected by the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims are procedurally barred because if a petitioner attempted to exhaust them in state court, they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* (citing *Coleman*, 501 U.S. at 750-51). Dismissals pursuant to abuse of writ principles have regularly been upheld as a valid state

7

procedural bar foreclosing federal habeas review.  *See Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

In the case at bar, the TCCA dismissed Canales's claim as an abuse of the writ without consideration of the merits of the claim pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c).  Until just recently, the claim would have undoubtedly been dismissed as procedurally barred in light of the decision by the TCCA dismissing it as an abuse of the writ.  However, the Supreme Court opened the door slightly for a showing of cause and prejudice to excuse the default in *Martinez* and *Trevino*.  In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial."  566 U.S. at 8 (citing *Coleman*, 501 U.S. at 755).  The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17.

The Supreme Court extended *Martinez* to Texas in *Trevino*.  Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."  *Trevino*, 133 S. Ct. at 1921.  The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective.  *Id.*

The Fifth Circuit subsequently summarized the rule announced in *Martinez* and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must

8

demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014). The Fifth Circuit has also reiterated that a federal court is barred from reviewing a procedurally defaulted claim unless a petitioner shows both cause and actual prejudice. *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1760 (2014). To show actual prejudice, a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (citations omitted) (emphasis in original).

2.  Cause

The Fifth Circuit discussed the issue of cause in the present case as follows:

We turn next to Canales's claim that he received ineffective assistance of trial counsel during the sentencing phase of his trial. Canales argues his trial counsel was ineffective because he failed to thoroughly investigate and present mitigation evidence. He also argues that the performance of his state habeas counsel fell below an objective standard of reasonableness. Canales's state habeas counsel did not conduct a mitigation investigation due to a misunderstanding of funding for habeas investigations: his state habeas counsel thought his funding was capped at $25,000, and so he only dedicated $2,500 to investigation—and most of that went to issues related to innocence. Both parties agree, however, that funding was not capped at $25,000.

First, we agree with Canales that the performance of his state habeas counsel fell below an objective standard of reasonableness. The Supreme Court recently considered a similar situation in which trial attorney failed to request additional funding to replace an inadequate expert because of a mistaken belief about the amount of funding available. *Hinton v. Alabama,* —— U.S. ——, 134 S.Ct. 1081, 1088, 188 L.Ed.2d 1 (2014) (per curiam). The Court held that the trial lawyer's decisions "based not on any strategic choice but on a mistaken belief that available funding was capped [at a certain amount]" constituted deficient performance. *Hinton,* 134 S.Ct. at 1088–89. Similarly, Canales's state habeas counsel did not make a strategic choice to forego a mitigation investigation. Instead, he chose not to pursue that claim in any depth because he thought he could not receive any additional funding to pursue those claims. Accordingly, his performance fell below an objective standard of reasonableness.

9

*Canales*, 765 F.3d at 569.   The Fifth Circuit went on to observe that the "question then becomes whether Canales can actually prove *prejudice* due to the deficient performance of his habeas counsel." *Id.* at 571 (emphasis in original).   Thus, the case was remanded to this Court "to consider whether Canales can prove prejudice as a result of his trial counsel's deficient performance, and if so, to address the merits of his habeas petition on this claim."  *Id.*

3.  <u>Canales's New Mitigating Evidence</u>

In order to give Canales the opportunity to prove prejudice, the Court approved his motions to retain Susan Herrero, Dr. Tora L. Brawley and Dr. Donna Maddox as experts.  In his brief, Canales initially provided an overview of their findings.  Their reports (Dkt. #220) reveal a family history of alcoholism, mental illness, and violence.  Canales was born in Waukegan, Illinois on December 1, 1964.  Canales's father suffered from alcoholism and drug abuse.  He  abandoned the family when Canales was 2 1/2 years old.  His mother was left to live in poverty.  She was an alcoholic and would beat her children.  She often neglected them.  There were times when the family was homeless.  For a while, Canales lived with his maternal grandparents.  His grandparents lived in poverty and were alcoholics.  His mother married Carlos Espinoza in 1971.  They lived in Chicago.  His mother and Espinoza drank heavily.  Espinoza physically and sexually abused Canales and his sister.  Canales turned to the streets in order to make money to assist his family by shining shoes and selling newspapers at the young age of 8 or 9 years old.  He subsequently joined the Latin Kings street gang.  Gang leaders gave him alcohol before school.  By 1974, Canales had been shot during a drive- by shooting.  His sister, Elizabeth, recalled another incident where he was left all bloody in a ditch.  His mother sent him to live with his father in Houston.  His father subsequently moved to Laredo, but he did not take his son with him.  Canales was abandoned in Houston.  He was arrested at age 13 and spent time in juvenile detention.  In 1978, his mother left Espinoza and moved the family, including Canales, to California.  By age 18, Canales was living again in Houston with his mother, sisters, and John Ramirez, his mother's live-in boyfriend, another sexual predator.  Canales was sent to prison for stealing a check from Ramirez.  After being paroled, he was sent back to prison for two sexual assault offenses.  While in prison, he joined the Texas Syndicate, a Latino prison gang.

10

Around 1992, after being paroled, Canales began dating Liz Hewitt, who lived at home and came from a close, normal Catholic family. Her parents welcomed him into the family and treated him as a son. His happiness came to an end, however, when his mother had an aneurysm, which caused her to lose speech and motor functions. Canales's life deteriorated, and he began using drugs. He was never the same, and his parole was revoked.

In 1995, Canales suffered the first of three or four myocardial infarctions and was placed on blood thinners and other medication. When the Texas Syndicate learned that he had a prior sexual assault conviction and had been a member of the Latin Kings, the gang placed a hit on him. Unable to defend himself because of his heart condition, Canales turned to another gang, the Texas Mafia. His cellmate, Bruce Richards, was in the Texas Mafia, and he arranged for Canales to transfer to that gang. The intercession by the Texas Mafia meant that Canales owed his life to the gang, and he was thus in a vulnerable position of being under their control. That was Canales's predicament at the time he murdered Gary Dickerson in 1997.

In addition to presenting an overview of the mitigating evidence that could have been offered during the punishment phase of the trial, Susan Herrero, a mitigation expert, provided a more in-depth analysis of Canales's life. She identified a number of significant factors impeding Canales's intellectual, cognitive, social, emotional and psychological development. These factors included prenatal exposure to alcohol and parental alcoholism, poverty and homelessness, neglect, parental rejection, abandonment, and physical and sexual abuse. Ms. Herrero observed that "parenting is modeled," and Canales grew up in an environment of alcoholics, who abused him. His step-father, Carlos Espinoza, beat him and tried to sexually assault him when he was just six years old.

Following his arrest but before sentencing, Canales lived with his cousin, Michele. Michele and her mother recalled Canales getting along well with Michele and her husband. Michele described Canales as a "good hearted person," and that he responded to the guidance and advice that she and her husband gave to him. Her mother described him as "a lost boy who just needed some guidance." Both Michele and her mother agreed that Ramirez pushed for Canales's prosecution to get him away from his family.

11

Ms. Herrero obtained evidence that Canales began drinking alcohol and smoking cigarettes when he was about nine or ten years old.  Gang leaders gave him alcohol before school.  He smoked marijuana while going to school in Houston.  Drugs were readily available while he was confined in juvenile institutions.  Ms. Herrero stated that he was an alcoholic by age fourteen.  He was fired from a job working for a record company after he had an accident while driving the band members.  He was reported being intoxicated and driving at 70 mph at the time of the accident.

Ms. Herrero observed that Canales's early school records reveal that he made progress and managed to remain in an appropriate grade level.  Later records show that he was in sixth grade during the 1976-77 school year, when he should have been in the seventh grade.  On October 28, 1978, he was in fifth grade in another school in Los Angeles, when he should have been in ninth grade.  Other records show that he attended eighth grade in Houston in 1978-79.  During that year, he was transferred to a seventh grade special education class for behavior disorder.  He flunked out of Sam Houston High School on March 12, 1980.  His Iowa Test of Basic Skills, administered in April 1975, while he was in fifth grade, revealed that he was reading on a third grade (3.0) level and his arithmetic was at a second grade (2.7) level.  On October 13, 1976, his Wechsler Intelligence Scale for Children ("WISC") scores showed a Verbal Score of 85, a Performance Score of 101 and a Full Scale Score of 91.  Later, at almost eighteen years of age at the Brownwood State School, he completed his GED.  His scores were low in writing (16th percentile) and math (31st percentile).

Dr. Tora L. Brawley, a clinical psychologist, conducted an extended clinical interview and neuropsychological test battery, which uncovered mild deficits in frontal lobe functioning, in particular matrix reasoning and verbal fluency.  The Court notes that she also found that his Full Scale IQ was 92 on the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV") (Dkt. #220-2 at 2).  She concluded that "Canales has had an improvement in overall cognitive functioning.  He has been undergoing a good deal of 'self-teaching' during the 23 years of his incarceration.  He appears to have benefitted significantly from the structured environment and the cessation of drug and alcohol use." *Id.* at 3.

12

Dr. Donna Maddox, a General and Forensic Psychiatrist, found that Canales has some problems with concentration and language as well as deficits in short term memory.  She found that Canales suffered from Trauma and Stressor Related Disorder, consistent with PTSD.  She came to the following conclusions from her evaluation:

1. Canales has a history of exposure to trauma beginning by latency age.
2. He has had multiple exposure to traumatic events during his life.
3. He meets the criteria for PTSD and developed a comorbid substance abuse and mood disorder.
4. Canales was incarcerated during his most recent offense.
5. At the time his health was poor.
6. Various documents note that his life had been threatened due to the nature of his prior charges and involvement in a gang.
7. He was suffering from mental illness at the time of his offense.
8. A recent study comparing prisoners who were involved in street gangs compared to prisoners who were not involved in street gangs reveal that prisoners who were involved in street gangs had more exposure to violence, symptoms of PTSD, paranoia, anxiety and forced behavioral control.  Wood, Jane L. and Dennard, Sophie (2016) *Gang membership: links to violence exposure, paranoia, PTSD, anxiety and forced control of behavior in prison*.  Psychiatry: Interpersonal and Biological Processes. ISSN 0033-2747.  (In press)
9. Canales has never had treatment for his PTSD nor his mood symptoms.
10. Canales has a medical condition and prescribed medication (Metroprolol) which are associated with depression.

Dkt. #220-3 at 15-16.

In light of the reports provided by Susan Herrero, Dr. Tora L. Brawley, and Dr. Donna Maddox, Canales discusses how this new mitigation evidence could have been used to rebut the State's case for future dangerousness.  He observes that the State's case during the penalty phase focused on his violent actions and threats while incarcerated and as a member of the Texas Mafia to establish future dangerousness.  The case is made that the mitigating evidence of his mental illness, his life-threatening heart conditions and factors about gang life in the Texas prisons would have provided necessary context to understand the offense and to simultaneously diminish the strength of the State's case.

Canales places special emphasis on circumstances surrounding the murder of Gary Dickerson, particularly with respect to gang activities in the Texas prison system.  He notes that he was a member of the Texas Syndicate gang while in prison in the mid-1980s.  The Texas Syndicate gang included Mexicans, Whites and Chicanos.  The Texas Mafia formed as a "cousin" to the Texas Syndicate.  The

13

Texas Mafia had mostly white inmates and included many former Aryan Brotherhood gang members and other white supremacists. The Texas Mafia engaged in criminal money-making ventures such as selling tobacco and other contraband. The two gangs were close.

Canales returned to prison and became cellmates with Bruce Richards, a leader of the Texas Mafia. Canales was especially vulnerable after suffering a heart attack in 1995. He used nitroglycerine under his tongue. He bruised easily, and if he even pricked himself, he would bleed for hours. As a result, he avoided fights.

Around this time, Texas Syndicate leaders learned that Canales had been a member of the Latin Kings and had two prior sexual assault convictions. The Texas Syndicate ordered a hit on Canales. Canales confided in Bruce Richards about his problems with the Texas Syndicate. Because Richards had become friends with Canales, he decided to intervene. Richards approached the leader of the Texas Syndicate and offered to take Canales into the Texas Mafia. In turn, Richards owed the Syndicate a favor. This favor resulted in the murder of Gary Dickerson.

Gary Dickerson, another prisoner, learned about the tobacco-smuggling operation run by the Texas Mafia. He threatened to expose it if he did not receive payment. According to Richards, Dickerson was seen as a danger and had to be punished. After the Dickerson murder, Richards ordered Canales and Speers to write to Bruce Innes to exaggerate their role in the murder. Richards hoped to impress Innes to recruit him. Innes had money, and if he could recruit Innes, Richards could get his money. Richards also pointed out that Canales and Speers were new recruits and had to follow his orders. Richards explained: "If [Canales] refused to do what I told him I would have sent him back to the Texas Syndicate, and he would be killed. I saved his life and he owed me." Dkt. #220-1 at 72. Canales also understood that Doyle Hill, another leader of the largely white supremacist Texas Mafia, was after him. Facing danger from the Texas Syndicate and from a leader of the Texas Mafia and being "unable to fight a lick after his heart attack," "[Canales] was willing to do whatever it took to get these hits off of him to save his life." *Id.* at 76.

Canales argues that, in addition to providing context about the circumstances surrounding the offense, trial counsel could have presented expert evidence about the well-established security

measures for those sentenced to life imprisonment.  According to Steve Martin, a former consultant with the Texas Attorney General's Office and a former Legal Counsel, General Counsel, and Executive Assistant with the Texas Department of Corrections, inmates receiving a life sentence are placed in the most secure housing, under security conditions "essentially identical to those on Texas' death row."  Dkt. #7, Exhibit 30.  Canales argues that a thorough investigation of his medical and psychological condition as well as an investigation of the context of the murders would have diminished the strength of the State's case and placed his involvement in the murder in a very different context.

4.    Ineffective Assistance of Counsel

The standard for evaluating ineffective assistance of counsel claims was established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1994).  *Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs.  466 U.S. at 687.  Under the first prong, he must show that counsel's performance was deficient.  *Id.*   To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance.  *Id.* at 688.  Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice.  *Id.* at 687.  To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either.  *Id.* at 697.  The *Strickland* standard applies to ineffective assistance of counsel claims in the context of *Martinez* and *Trevino*.  *See Martinez*, 566 U.S. at 14.

Canales specifically argues that his attorneys were ineffective in failing to discharge their duty of conducting an investigation into his life; thus, they failed to uncover powerful mitigating evidence.  The case law is abundantly clear that "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into

15

potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), *cert. denied*, 537 U.S. 1104 (2003). *See also Woods v. Thaler*, 399 F. App'x 884, 891 (5th Cir. 2010), *cert. denied*, 563 U.S. 991 (2011). "Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir.2003) (citation omitted), *cert. denied*, 543 U.S. 1056 (2005). In assessing whether counsel's performance was deficient, courts look to such factors as what counsel did to prepare for sentencing, what mitigation evidence he had accumulated, what additional "leads" he had, and what results he might reasonably have expected from those leads. *Neal*, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, at 133 (1989)). The Supreme Court stressed in *Wiggins* that the "investigation into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* (emphasis in original). As was previously noted, the Fifth Circuit has already found that counsel's representation fell below an objective standard of reasonableness. *Canales*, 765 F.3d at 569.

The issue before the Court is prejudice. The Fifth Circuit remanded the case in order to determine "whether Canales can actually prove prejudice." *Canales*, 765 F.3d at 571. In reviewing the issue of prejudice at capital sentencing, courts must reweigh the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, against the aggravating evidence. *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000); *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009). "In evaluating that question, it is necessary to consider *all* the relevant evidence that the jury would have had before it if [the petitioner]

16

had pursued the different path - not just the mitigation evidence [the petitioner] could have presented, but also the . . . evidence that almost certainly would have come with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (emphasis in original).  After reweighing all the mitigating evidence against the aggravating, a court must determine whether the petitioner "has shown that, had counsel presented all the available mitigating evidence, there is a reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence." *Gray v. Epps*, 616 F.3d 436, 442 (5th Cir. 2010) (quoting *Wiggins*, 539 U.S. at 534), *cert. denied*, 563 U.S. 905 (2011). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693). "[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker." *Sears v. Upton*, 561 U.S. 945, 954 (2010) (citing *Strickland*, 466 U.S. at 700).  The inquiry requires a court to engage in a "probing and fact-specific analysis." *Id.* at 955.  The *Strickland* standard in analyzing the prejudice prong "necessarily requires a court to 'speculate' as to the effect of the new evidence - regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Id.* at 956.

In the present case, having reweighed all of the mitigating evidence against the aggravating evidence, the Court finds that the aggravating evidence far outweighs the mitigating evidence.  The murder itself was cold and calculated.  It was a heinous gang related murder of a prisoner by other prisoners.  Gang leaders ordered Canales and others to kill the victim because the gang had a financial stake in contraband.  Under Texas substantive law, the circumstances of the charged offense were sufficient to support an affirmative finding of future dangerousness. *White v. Dretke*, 126 F. App'x 173, 177 (5th Cir.), *cert. denied*, 546 U.S. 940 (2005).  The aggravating evidence also revealed a habitual criminal, who had a conviction for theft and two convictions for sexual assault.  The facts surrounding his Bexar County sexual assault conviction reveal that he threatened to kill the victim--at both the time of the rape and later while confined in jail awaiting trial.  Furthermore, while waiting to go to trial in the present case, he asked inmate Bruce Innis to

arrange for the murder of inmate Larry Whited, whom Canales suspected of cooperating with investigators. The three letters written by Canales reveal a cold and callous murderer.

The mitigating evidence presented at trial showed that Canales was not troublesome and that he had an aptitude for art. There was testimony that his mother was dead and that he had few visits from family. One inmate testified that he had seen Canales try to stop inmates from fighting. The additional mitigating evidence presented during these proceedings show that Canales had prenatal exposure to alcohol and parental alcoholism, poverty and homelessness, neglect, parental rejection, abandonment, and physical and sexual abuse. His Full Scale IQ score on one test was 91 and 92 on another. He did not complete school, but completed his GED at Brownwood State School. The additional evidence delved further into his gang activities. At one time, he was a member of the Texas Syndicate, who placed a hit on him. He then joined the Texas Mafia and participated in the murder of Gary Dickerson. Prior to the murder, he had a heart attack and was dependent on the gang.

Canales argues that this additional evidence provides proper context to the circumstances surrounding the offense. The Director argues, in response, that the new mitigating evidence was "double-edged" and "[m]itigation, after all, may be in the eye of the beholder." *Martinez v. Cockrell*, 481 F.2d 249, 258 (5th Cir. 2007) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)), *cert. denied*, 552 U.S. 1146 (2008). He further argues that even though the post-conviction evidence of poverty, abuse, and neglect is compelling, it does not outweigh the aggravating evidence in this case. In reply, Canales observes that the Fifth Circuit has rejected the notion that a case with substantial evidence in aggravation can never be mitigated. *Walbey v. Quarterman*, 309 F. App'x 795, 804 (5th Cir. 2009).

Viewed collectively, the reports presented by Ms. Herrero, Dr. Brawley and Dr. Maddox present a wealth of double-edged evidence, including evidence of gang violence, alcohol, drugs, and physical and sexual abuse. The Fifth Circuit has observed that evidence of "brain injury, abusive childhood, and drug and alcohol problems is all 'double-edged.' In other words, even if his recent claims about this evidence is true, it could all be read by the jury to support, rather than detract, from his future dangerousness claim." *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002), *cert. denied*,

18

538 U.S. 926 (2003).  Canales's history of heart disease, while compelling, is also doubled-edged in that it contributed to his act of murdering the victim in order to be protected by the Texas Mafia.

Having reweighed all of the mitigating evidence, both old and new, against the aggravating evidence, the Court is of the opinion, and so finds, that there is *no* reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence.  The following conclusion by the Fifth Circuit is equally applicable to the present case: "the additional mitigating evidence was not so compelling, especially in light of the horrific facts of the crime, that the sentencer would have found a death sentence unwarranted."  *Martinez*, 481 F.2d at 259.  Canales has not proven prejudice.  He has not shown that he is entitled to federal habeas corpus relief.

As a final matter, the Director appropriately argues that Canales's ineffective assistance of trial counsel claim remains procedurally barred in light of his inability to prove prejudice under *Coleman*.  The Fifth Circuit held that "[t]o excuse the procedural default fully, Canales would then be required to prove that he suffered prejudice from the ineffective assistance of his trial counsel."  *Canales*, 765 F.3d at 568 (citing *Martinez*, 566 U.S. at 18).  Canales has not shown prejudice in order to excuse the procedural default.  Overall, Canales has not shown prejudice under *Strickland* on the merits of his ineffective assistance of trial counsel claim and, concomitantly, has not shown prejudice in order to excuse the procedural default.  Canales is not entitled to federal habeas corpus relief.

Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order issued in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Canales has not yet filed a notice of appeal, it is respectfully recommended that this Court, nonetheless, address whether he would be entitled to a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*;  *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003).  "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, it is respectfully recommended that reasonable jurists could not debate the denial of Canales's § 2254 petition on procedural or substantive grounds, nor find that the issues presented are adequate to deserve encouragement to proceed.  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Accordingly, it is respectfully recommended that the Court find that Canales is not entitled to a certificate of appealability as to his claims.

## Recommendation

It is accordingly recommended that the petition for a writ of habeas corpus be denied and the case be dismissed with prejudice.  A certificate of appealability should be denied.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n.*, 79 F.3d

1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 9th day of August, 2017.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE